## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

**VISHVA DESAI and PHILIP J. CHARVAT,**
**on behalf of themselves and others similarly**
**situated,**

     **Plaintiffs,**

**v.**                                                   **Case No. 1:11-cv-1925**

**ADT SECURITY SERVICES, INC.,**

     **Defendant.**

### Plaintiffs' Memorandum in Support of Unopposed
### <u>Motion for Preliminary Approval of Class Action Settlement</u>

<h1 align="center">Table of Contents</h1>

Page

**Table of Authorities** ...................................................................................................... iii

**Introduction and Summary of Argument** ......................................................................... 1

**Background** ...................................................................................................................... 2

   A.   Telemarketing calls to Plaintiffs and commencement of action ...................... 2

   B.   Plaintiffs' discovery efforts ............................................................................ 3

   C.   ADT's third-party complaint .......................................................................... 4

   D.   Plaintiffs identify class members through the Dynamic call records. .............. 5

   E.   Legal uncertainty regarding "on behalf of" liability. ..................................... 6

   F.   The settlement negotiations .............................................................................. 8

**The Proposed Settlement** ................................................................................................ 8

   A.   The settlement class ........................................................................................ 8

   B.   The settlement fund ......................................................................................... 9

   C.   Other relief .................................................................................................... 10

   D.   Notice and settlement administration ............................................................ 11

   E.   Opt-out and objection procedures ................................................................. 13

   F.   Release ........................................................................................................... 13

**Argument** ..................................................................................................................... 14

   A.   The settlement is well within the range of possible approval, and therefore warrants preliminarily approval. ............................................................................................... 14

      1.   All factors favor preliminary approval. ................................................. 16

         a.   The settlement provides significant benefits to the settlement class, particularly in light of the uncertainty of prevailing in the litigation. .................................................... 16

         b.   This multi-year litigation has already involved complex and expensive discovery and the briefing of numerous critical legal issues. ............................................................ 17

         c.   The settlement resulted from extensive arms-length negotiations and is not the product of collusion. ....................................................................................................... 17

         d.   The proposed class notice is adequate. .................................................. 18

   B.   The Court should grant class certification for settlement purposes. ............................. 21

      1.   The Rule 23(a) factors are met. ............................................................... 22

         a.   The class is sufficiently numerous and joinder is impracticable. ........................... 22

         b.   The class shares many common issues of law and fact. ........................................ 23

         c.   The Plaintiffs' claims are typical of the settlement class. .................................... 24

         d.   The Plaintiffs and their counsel are adequate representatives. .............................. 24

2.      The Rule 23(b)(3) factors are met. ............................................................. 25

**Conclusion** ............................................................................................................... 27

**Table of Authorities**

Page

## Cases

*Am. Int'l Grp., Inc. et al., v. ACE INA Holdings, et al.,*
  Nos. 07-cv-2898, 09 C 2026, 2012 WL 651727 (N.D. Ill. Feb. 28, 2012) .................... 1, 14, 26

*Amchem Prods. v. Windsor*,
  521 U.S. 591 (1997) ............................................................................................... 25, 26

*Armstrong v. Bd. of Sch. Dirs. of the City of Milwaukee*,
  616 F.2d 305 (7th Cir.1980) .................................................................................. 14, 16

*Bridgeview Heath Care Ctr. Ltd. v. Clark*,
  No. 09 C 5601, 2011 WL 4628744 (N.D. Ill. Sept. 30, 2011) ................................. 23

*Burns v. First Am. Bank*,
  No. 04 C. 7682, 2006 U.S. Dist. LEXIS 92159 (N.D. Ill. Dec. 19, 2006) .............. 19

*Charvat v. ADT Sec. Servs., Inc.,*
  No. 2:11cv0093 (S.D. Ohio) ..................................................................................... 2

*Charvat v. Echostar Satellite, LLC,*
  676 F. Supp. 2d 668 (S.D. Ohio 2009) .................................................................... 7

*City of Greenville, et al. v. Syngenta Crop Prot., Inc., et al.*,
  No. 3:10-cv-188-JPG-PMF, 2012 WL 1948153 (S.D. Ill. May 30, 2012) .............. 15

*Desai v. ADT Sec. Servs., Inc.,*
  2012 WL 4482012 (N.D. Ill. 2012) .......................................................................... 4

*Desai v. ADT Sec. Servs., Inc.*,
  Civil Action No. 11-04026 (N.D. Cal.) ..................................................................... 3

*Desai v. ADT Sec. Servs., Inc.,*
  No. 11-C-1925, 2011 WL 2837435 (N.D. Ill. July 18, 2011) ............................. 2, 6, 7

*Desai v. EMI, Inc.,*
  No. 2:11-cv-04026-GAF-AJW (C.D. Cal.) ................................................................ 5

*F.C.V., Inc. v. Sterling Nat'l. Bank,*
  652 F. Supp. 2d 928 (N.D. Ill. 2009) ....................................................................... 19

*Gammon v. GC Servs. Ltd. P'ship.,*
  162 F.R.D. 313 (N.D. Ill. 1995) ............................................................................... 25

*Goldsmith v. Tech Solutions Co.,*
  No. 92 C 4374, 1995 WL 17009594 (N.D. Ill. Oct. 10, 1995) ............................... 14

*Golon v. Ohio Savs. Bank,*
  98 C 7430, 1999 WL 965593 (N.D. Ill. Oct. 15, 1999) ........................................... 26

*Haynes v. Logan Furniture,*
  503 F.2d 1161 (7th Cir. 1974) ................................................................................. 26

*Henry v. Cash Today, Inc.,*
  199 F.R.D. 566 (S.D. Tex. 2000) ............................................................................. 26

*In re Ky. Grilled Chicken Coupon Mktg. & Sales Practices Lit.,*
  280 F.R.D. 364 (N.D. Ill. 2011) ............................................................................... 15

*In re Northfield Labs., Inc. Sec. Litig.,*
  No. 06 C 1493, 2012 WL 366852 (N.D. Ill. Jan. 31, 2012) .................................... 15

*In Re the Joint Petition Filed by Dish Network, LLC, the United States of America, et al.*,
    FCC, CG Docket #11-50 ................................................................................................ 7

*In re Vivendi Universal, S.A.*,
    242 F.R.D. 76 (S.D.N.Y. 2007) ................................................................................... 20

*Isby v. Bayh*,
    75 F.3d 1191 (7th Cir. 1996) ...................................................................................... 16

*Kinder v. Nw. Bank*,
    No. 1:10-cv-405, 2012 U.S. Dist. LEXIS 97496 (W.D. Mich. June 5, 2012) .......... 19

*Mangone v. First USA Bank*,
    206 F.R.D. 222 (S.D. Ill. 2001) ................................................................................. 20

*Mars Steel Corp. v. Cont'l Ill. Nat'l. Bank & Trust Co. of Chicago*,
    834 F. 2d 677 (7th Cir. 1987) ..................................................................................... 17

*McCabe v. Crawford & Co.*,
    210 F.R.D. 631 (N.D. Ill. 2002) ................................................................................. 22

*Medina v. Mfrs. & Traders Trust Co.*,
    No. 04 C 2175, 2004 WL 3119019 (N.D. Ill. Dec. 14, 2004) ................................... 18

*Mey v. Pinnacle Sec., LLC*,
    No. 5:11-cv-00047, 2012 WL 4009718 (N.D. W. Va., Sept. 12, 2012) ...................... 7

*Mirfasihi v. Fleet Mortg. Corp.*,
    356 F.3d 781 (7th Cir. 2004) ...................................................................................... 20

*Mullane v. Cent. Hanover Bank & Trust Co.*,
    339 U.S. 306, 70 S.Ct. 652 (1950) ............................................................................. 19

*Parker v. Risk Mgmt. Alts., Inc.*,
    206 F.R.D. 211 (N.D. Ill. 2002) ................................................................................. 24

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985) .................................................................................................... 26

*Rahim v. Sheahan*,
    No. 99 C 0395, 2001 WL 1263493 (N.D. Ill. Oct. 19, 2001) .................................... 25

*Randolph v. Crown Asset Mgmt., LLC*,
    254 F.R.D. 513 (N.D. Ill. 2008) ................................................................................. 22

*Reliable Money Order, Inc., v McKnight Sales Co., Inc.*,
    218 F.R.D. 327 (E.D. Wis. 2012) ............................................................................... 23

*Shurland v. Bacci Cafe & Pizzeria on Ogden, Inc.*,
    271 F.R.D. 139 (N.D. Ill. 2010) ........................................................................... 18, 20

*Simer v. Rios*,
    661 F.2d 655 (7th Cir. 1981) ...................................................................................... 20

*Sledge v. Sands*,
    182 F.R.D. 255 (N.D. Ill. 1998) ................................................................................. 25

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*,
    463 F.3d 646 (7th Cir. 2006) ...................................................................................... 16

*Thomas v. Taco Bell Corp.*,
    879 F. Supp. 2d 1079 (C.D. Cal. 2012) ....................................................................... 7

**Statutes**

47 U.S.C. § 227(b) ............................................................................................................. 2

**Other Authorities**

H. Newberg & A. Conte, Newberg on Class Actions (4th ed. 2002)............................ passim

*Manual for Complex Litigation* (4th ed. 2004) ................................................................ 15, 18, 22

**Rules**

Fed. R. Civ. P. 23 ..................................................................................................... passim

**Introduction and Summary of Argument**

After nearly two years of hard-fought litigation, followed by four days of mediation and additional informal negotiations over a span of several months, the parties in this putative Telephone Consumer Protection Act class action have reached a proposed settlement. (*See* Settlement Agreement, Ex. A, Pls.' Mot. Prelim. App.) The settlement establishes a $15 million fund that Plaintiffs expect will pay class members an estimated $50-100 per claim. If approved, the settlement would bring a sure end to what otherwise has been, and likely would continue to be, contentious and costly litigation centered on the unsettled legal question of ADT's liability for the allegedly unlawful telemarketing practices of its dealers and others who market or sell ADT products and services.

By their motion, Plaintiffs seek, *inter alia*, preliminary certification of a settlement class, approval of claims procedures, and approval of the proposed form and method of class notice. This memorandum describes in detail the reasons why preliminary approval is in the best interests of the class, and is consistent with Rule 23.

In evaluating the fairness of a proposed class action settlement, the most important consideration is the strength of the plaintiff's case on the merits balanced against the amount offered in the settlement. *Am. Int'l Grp., Inc. et al., v. ACE INA Holdings, et al.,* Nos. 07-cv-2898, 09 C 2026, 2012 WL 651727, at *2 (N.D. Ill. Feb. 28, 2012). While the Plaintiffs believe they would secure class certification and prevail on the merits at trial, success is not assured. At every turn, ADT has vigorously defended this case. The relief provided here—payments from the settlement fund, coupled with ADT's agreement to take measures to assure future TCPA compliance—meets and exceeds the applicable standards of fairness. Accordingly, the Court

should preliminarily approve the settlement so that class members can receive notice of their rights.

**Background**

**A.    Telemarketing calls to Plaintiffs and commencement of action**

In February 2011, Plaintiff Vishva Desai received an unsolicited automated telemarketing call—or "robocall"—from a telemarketer promoting the sale and installation of ADT home-security systems.  On March 21, 2011, Ms. Desai, who resides in the Northern District, commenced this action.  She alleges the call she received was placed on behalf of ADT and for its benefit, and that ADT was liable for violating the TCPA's provisions banning robocall telemarketing unless the caller has received the recipient's prior express consent.  *See* 47 U.S.C. § 227(b).

Mr. Charvat, an Ohio resident, also received ADT-related robocalls, and on January 28, 2011 commenced a similar action against ADT in Columbus, Ohio.  *See Charvat v. ADT Sec. Servs., Inc.,* No. 2:11cv0093 (S.D. Ohio).  After learning of Ms. Desai's lawsuit, Mr. Charvat voluntarily dismissed his case and, together with his counsel, joined forces with Ms. Desai and her attorney.  Mr. Charvat and Ms. Desai consolidated their claims in this Court by filing a First Amended Complaint (ECF No. 18) on April 18, 2011.

ADT responded to this filing with a motion to dismiss, and asserted its chief legal defense:  that because ADT did not make or otherwise initiate the telemarketing calls at issue, it could not be liable for the calls under the TCPA.  The parties submitted extensive briefing on this and other matters raised in the motion, which the Court denied on July 18, 2011.  *See Desai v. ADT Sec. Servs., Inc.,* No. 11-C-1925, 2011 WL 2837435 (N.D. Ill. July 18, 2011) ("*Desai I*").

2

**B.      Plaintiffs' discovery efforts**

During the pendency of the motion to dismiss, Plaintiffs commenced what ultimately proved to be a massive and far-reaching discovery effort, including subpoenas directed to some 92 separate persons and entities.  Plaintiffs' discovery plan was threefold:  first, to identify the entities behind the telemarketing calls to the Plaintiffs; second, to identify other companies that also telemarketed ADT products and services; and third, to identify class members—those persons who received allegedly unlawful calls from ADT-related telemarketers.

These efforts required diligence, persistence and no small degree of knowledge of the telemarketing industry.  Determining who was behind the Plaintiffs' telemarketing calls was complicated by the fact that the calls were "spoofed," meaning the telemarketers manipulated their telephone systems in order to cause false information to display on the recipient's caller ID device.  Finding these callers required Plaintiffs to issue dozens of subpoenas up the telemarketing chain to targets across the nation.  The subpoena trail began with Ms. Desai's and Mr. Charvat's own telephone companies, then led to telephone management companies that leased phone lines to telemarketers, and then on to the telemarketers, who in turn relied on separate telemarketing outfits using automated dialing systems.

Plaintiffs' subpoena efforts often were met with resistance and noncompliance by the recipients, which led to discovery battles waged in other federal district courts.  *See, e.g., Desai v. ADT Sec. Servs., Inc.*, *Order Regarding EMI, Inc.'s Motion to Quash Subpoena*, Civil Action No. 11-04026 (N.D. Cal.) (ECF No. 5).  Plaintiffs hired counsel in these remote jurisdictions to protect their interests, and eventually obtained the subpoenaed information after prevailing on discovery motions.

While tracing the trail of the Charvat and Desai calls, Plaintiffs' counsel simultaneously served written discovery on ADT, which led to more discovery-motion practice after ADT

objected to certain aspects of Plaintiffs' requests. Ultimately, the ADT-directed discovery led to a rolling production of more than 175,000 pages of documents over the course of six months.

When combined with the 35,000 pages of documents and hundreds of thousands of pages of call records obtained through Plaintiffs' third-party efforts—including subpoenas directed to 92 different persons and entities—a complete picture of the case began to emerge. Plaintiffs determined that one of the Charvat calls was placed by EMI, a California telemarketing and lead generation firm hired by an outfit called DirectSavings USA, which in turn was providing telemarketing leads to Eversafe Corporation, one of ADT's largest authorized dealers. EMI also placed the Desai call after it was hired by a marketing company called Paramount Media Group, which in turn was hired by an ADT-authorized marketer called Saveology—an independent company that sells leads to ADT's authorized dealers.

## C.    ADT's third-party complaint

The complex discovery in the case began to shift from subpoenas to written discovery when, on August 25, 2011, ADT filed a third-party complaint (ECF No. 75) for indemnification and contribution against entities that Plaintiffs identified were potentially responsible for the Charvat and Desai calls, including Saveology, Eversafe, and EMI. This pleading spawned a thick stack of third-party filings, including answers, cross-claims, default motions, and motions to dismiss. *See, e.g.*, *Desai v. ADT Sec. Servs., Inc.,* 2012 WL 4482012 (N.D. Ill. 2012) ("*Desai II*").

The upshot for Plaintiffs was the opportunity, utilized in November of 2011, to issue interrogatories and requests for production of documents to third-party defendants Eversafe, Saveology, Chris Long, EMI, Peter Tolman, Leads Direct Marketing, Voice Tel Corporation, Direct Savings, USA, Oscar Montenegro, City VIP, LLC and Paramount Media Group. The

parties also took the Rule 30(b)(6) deposition of Paramount Media Group. As with the subpoenas, some of the written discovery was contested, which necessitated more motions to compel discovery, most of which were granted. (ECF Nos. 184, 206.) In response to this discovery, these third-party defendants produced another 10,000 pages of documents.

**D.     Plaintiffs identify class members through the Dynamic call records.**

Plaintiffs' efforts to obtain discovery from third-party defendants Christopher Long and EMI proved especially challenging—and fruitful. Long and EMI initially refused to respond to Plaintiffs' discovery, and then unsuccessfully moved to quash Plaintiffs' subpoena in federal district court in California. *Desai v. EMI, Inc.,* No. 2:11-cv-04026-GAF-AJW (C.D. Cal.). Then, after Plaintiffs moved to compel production before this Court (ECF No. 143), Long and EMI commenced bankruptcy proceedings in California, in which Plaintiffs' counsel appeared and examined Long under oath. Still, Long and EMI failed to respond to discovery, even after this Court granted the Plaintiffs' motion to compel. Left with no alternative, Plaintiffs moved for contempt sanctions against Long and EMI, which finally drew their attention as they filed an opposition. The Court resolved the matter by ordering Long and EMI to produce the requested information. (ECF No. 196.)

This production, combined with the bankruptcy-proceeding testimony from Long, proved critical to this litigation, as it identified a California company called Dynamic Interactive as the telecommunications provider for Long's and EMI's massive telemarketing campaign. Dynamic provides voice broadcasting services that enable companies like EMI to transmit thousands of prerecorded phone messages simultaneously to thousands of consumers. Plaintiffs' follow-up subpoena to Dynamic yielded documents that revealed EMI as the dialer of the telemarketing call to Ms. Desai, and included recordings of the robocall messages placed by EMI. The

Dynamic production also included call logs showing approximately 50 million attempted telemarketing calls placed by EMI using Dynamic's voice broadcasting technology. EMI placed robocalls for clients in many industries, not only home security. Most critically, the Dynamic subpoena resulted in the production of a list of more than 1.4 million unique telephone numbers to which EMI transmitted telemarketing robocalls that mentioned ADT and which were completed (*i.e.*, answered by a person or an answering machine).[1] The consumers associated with these 1.4 million numbers are thus within the proposed class. Through a "reverse-lookup" process of the 1.4 million phone numbers, Plaintiffs have obtained information that will allow for the mailing of class notice to between 50-70% of these consumers, or 700,000 to 900,000 class members nationwide. As for the other approximately 50 million attempted telemarketing calls attributed to EMI, Plaintiffs lack sufficient information to determine the nature of these calls. These calls may mention security services, but Plaintiffs have not received evidence showing that the calls were made in efforts to sell ADT products or security services.

**E.    Legal uncertainty regarding "on behalf of" liability.**

From the inception of the action, and throughout the period Plaintiffs and their counsel invested their time and money prosecuting these claims, the parties have litigated in the shadow of uncertainty regarding the central legal question presented by this case: whether and under what circumstances ADT, who did not place telemarketing calls to Plaintiffs or class members, could be liable for TCPA violations committed by its authorized dealers and their agents. Courts have been sharply divided on this issue. *Compare Desai I,* 2011 WL 287435, *3 (denying

---

[1]    After receiving the Dynamic call logs, Plaintiffs' counsel were able to identify the calls that played a pre-recorded message mentioning ADT by having Dynamic investigate those logs that Plaintiffs' counsel believed were associated with such pre-recorded messages. Dynamic's system allowed Dynamic to identify the prerecorded message that was played to the numbers called in a particular log, and those files, produced in ".wav" format, did indeed mention ADT.

ADT's motion to dismiss, and finding that TCPA liability does not require a party to make a call) *with Thomas v. Taco Bell Corp.*, 879 F. Supp. 2d 1079 (C.D. Cal. 2012) (absence of "on behalf of" language in 47 U.S.C. 227(b)—unlike 227(c)(5)— means the entity whose goods are advertised in a precorded message is not liable under the TCPA unless traditional vicarious liability principles are satisfied); *Charvat v. Echostar Satellite, LLC*, 676 F. Supp. 2d 668, 674-677 (S.D. Ohio 2009) (even under § 227(c)(5) an entity cannot be held liable for calls made on its behalf unless it had the right to control of the manner and means of the telemarketing), *remanded by Charvat v. Echostar Satellite, LLC*, 630 F.3d 459, 465 (6th Cir. 2010 (district court should have invoked the doctrine of primary jurisdiction and referred issue to the Federal Communications Commission).  And while it is true that **this** Court in *Desai I* rejected ADT's narrow view of "on behalf of" liability, the issue has not been addressed by the Seventh Circuit or any other court of appeal.  In fact, since December 2010, courts and litigants alike have awaited the resolution of proceedings referred by the Sixth Circuit to the Federal Communications Commission to address the scope of "on behalf of" liability under the TCPA. *See Charvat v. Echostar Satellite, LLC*, 630 F.3d 459 (6th Cir. 2010);  *In Re the Joint Petition Filed by Dish Network, LLC, the United States of America, et al*., FCC, CG Docket #11-50.

While Plaintiffs expect (and most certainly hope) the FCC will resolve the issue favorably to the Plaintiffs, that outcome is by no means assured.  In fact, Plaintiffs' counsel were impressed with the shifting state of the law regarding "on behalf of" liability when, during the course of the settlement negotiations, they received an adverse ruling in an "on behalf of" case several of Plaintiffs' counsel were prosecuting in a separate action against another security company.  *See Mey v. Pinnacle Sec., LLC,* No. 5:11-cv-00047, 2012 WL 4009718, *4 (N.D. W. Va., Sept. 12, 2012) (granting summary judgment to defendant on ground that the security

company on whose behalf telemarketing calls allegedly were placed played only "a passive role" in its interaction with lead generators, and rejecting FCC's previously-stated views regarding "on behalf of" TCPA liability).

**F.     The settlement negotiations**

Against this unsettled background, the parties began to explore settlement.  Plaintiffs' counsel first met with ADT's counsel in New York City on April 11, 2012.  Following this initial meeting, the parties completed three daylong mediation sessions with mediator Professor Eric Green, a co-founder of JAMS/Endispute who now mediates complex cases through his Boston firm, Resolutions LLC.  These sessions took place in May and September, with intermittent settlement talks in between, some led by Prof. Green, and some directly between counsel. Eventually, these discussions culminated in the settlement agreement Plaintiffs are now asking the Court to approve preliminarily.

**The Proposed Settlement**

**A.     The settlement class**

The proposed settlement would establish a settlement class defined as follows:

> All persons or entities within the United States of America who, at any time from January 1, 2007 through the date of the settlement agreement, received one or more Covered Calls.

> "Covered Calls" means either (1) a telemarketing call utilizing a pre-recorded message or (2) a telemarketing call to a cell phone that was made through the use of automated dialing equipment, where the call described in (1) and/or (2) relates in any way to ADT Security Services, Inc.  Covered Calls include calls initiated or made by ADT or by someone acting or purporting to act on behalf of ADT, seeking to sell products or services relating in any way to ADT, including calls made by ADT's Authorized Dealers, ADT's Authorized Telemarketers, ADT's Marketing Partners, or by anyone seeking to sell leads relating to ADT, or any calls initiated or made by anyone seeking to sell leads relating to ADT to anyone else, where the lead sought to be generated from the call ultimately could have been sold to ADT, ADT's Authorized Dealers, ADT's Authorized Telemarketers, or ADT's Marketing Partners, including but not limited to any calls made

or caused to be made by Christopher Long, Oscar Montenegro, EMI, Inc. ("EMI") (or anyone acting by, through, or with EMI), Direct Savings USA, LLC (or anyone acting by, through, or with Direct Savings USA, LLC), Direct Savings USA, Inc. (or anyone acting by, through, or with Direct Savings USA, Inc.), Paramount Media Group (or anyone acting by, through or with Paramount Media Group), Dynamic Interactive Corp. (or anyone acting by, through or with Dynamic Interactive Corp.), Pete Tolman, Leads Direct Marketing (or anyone acting by, through, or with Leads Direct Marketing), Voice Tel Corp. (or anyone acting by, through, or with Voice Tel Corp.), TM Caller ID (or anyone acting by, through, or with TM Caller ID), City VIP (or anyone acting by, through, or with City VIP), and JMB Enterprises (or anyone acting by, through, or with JMB Enterprises). Covered Calls included any such calls whether or not authorized by, approved by, or known by ADT.

(*See* Ex. A, ¶¶ 2.13, 2.26.)

## B. The settlement fund

The proposed settlement would establish a $15 million fund that will be used to pay notice and administration costs (estimated at $4 million), Court-approved attorneys' fees (up to 33 1/3 % of the $15 million fund), reimbursement of costs and expenses, Court-approved service payments to both Plaintiffs (up to $30,000 each), and payments to class members. Authorized claimants are entitled to equal shares of the remainder of the settlement fund after payments for notice, administration, attorneys' fees and costs, and Plaintiffs' service payments; however, no settlement class member's payment will exceed the $500.00 statutory damages limit. (*Id.* § 4.2.)

Based on an estimate of the number of claims expected in response to the notice program developed with the assistance of the proposed settlement administrator, AB Data, Plaintiffs anticipate a payout in the range of $50-$100 per class member claim. Any funds that remain after class members are paid will be distributed as *cy pres* to a charitable institution proposed by the parties and approved by the Court. The parties propose the Electronic Privacy Information Center ("EPIC"), in Washington, D.C., as the *cy pres* recipient. (*Id*. § 4.3.) EPIC is a public interest research center established in 1994 to focus public attention on emerging civil liberties

issues and to protect privacy, the First Amendment, and constitutional values.  *See* Electronic Privacy Information Center, www.epic.org (last visited Feb. 10, 2013).

## C.    Other relief

As an additional benefit to all settlement class members, ADT has agreed that for a period of at least two years from the effective date, ADT will continue in place its policy of not making telemarketing calls promoting ADT services using pre-recorded messages.  (Ex. A § 4.6.) Additionally, ADT shall, for a period of at least two years from the effective date, include in all new contracts with ADT's Authorized Marketers a provision, and amend its telemarketing guidelines for all of ADT's Authorized Dealers, to prohibit Authorized Marketers and Authorized Dealers from making telemarketing calls promoting ADT's services using pre-recorded messages or purchasing leads that were generated through telemarketing using pre-recorded messages.  These restrictions on use of pre-recorded messages will include any call using an artificial or prerecorded voice to deliver a message with or without consent, that is made for the purpose of marketing ADT services.  The restrictions do not apply to calls (i) made for non-solicitation purposes, including, but not limited to, calls for appointment scheduling and confirmation, calls regarding service issues or advisories, calls regarding account payment and administration, customer satisfaction survey calls, and calls associated with provision of monitoring services or (ii) made by an Authorized Marketer or Authorized Dealer to market products and services that do not relate to ADT.  The prohibition also does not apply to any pre-recorded messages made to comply with the Telemarketing Sales Rule's and Telephone Consumer Protection Act's call abandonment rules.

**D.     Notice and settlement administration**

As noted above, the settlement class members are consumers who received unsolicited pre-recorded calls to their residential or cellular phone promoting ADT between January 1, 2007 and the date of the settlement agreement.  Because the calls were placed by third parties and, aside from EMI, the identity of those third-party callers is unknown, the Plaintiffs cannot identify all class members.  Therefore, for purposes of notice, the settlement class is comprised of two categories of members: "Direct Notice Consumers" who received ADT-related telemarketing robocalls from EMI/Dynamic and whose names and addresses can be obtained through "reverse-lookup" procedures (*see infra* at 5-6); and "Publication Notice Consumers" who received ADT-related telemarketing calls but for whom Plaintiffs do not have specific identifying information, and have no way of determining their identities in order to send them direct notice.  (*See* Ex. A.2—Notice Plan.)

Direct Notice Consumers will receive first-class mailed notice.  (*See* Ex. A.4, Mailed Notice; Ex. A.6, Mailed Notice Claim Form.)  Class members whose mailed notice is returned as undeliverable will be run once through the U.S. Post Office's National Change of Address system by the Settlement Administrator to identify, if possible, a current address.

Publication Notice Consumers (*see* Ex. A.5) will receive publication notice through the extensive notice plan developed by the proposed settlement administrator, AB Data. Under this plan, notices will run in the following major publications:

| PUBLICATION | CIRCULATION | NOTICE SIZE | INSERTS |
|---|---|---|---|
| *Parade* | 33,000,000 | 2/5 page | 2 |
| *USA Weekend* | 22,250,000 | 2/5 page | 1 |
| *Reader's Digest* | 5,577,717 | Full page | 1 |
| *Good Housekeeping* | 4,346,757 | 1/3 page | 1 |
| *People* | 3,563,035 | 1/3 page | 1 |
| *TV Guide* | 3,276,822 | 1/3 page | 1 |
| *Sports Illustrated* | 3,204,945 | 1/3 page | 1 |
| *Time* | 2,010,879 | 1/3 page | 1 |
| *USA Today (Friday)* | 1,981,016 | 1/6 page | 1 |
| TOTAL | 79,211,171 | | |

(Ex. A.2.)  The publication notice will reach an estimated 79,211,171 households nationwide.  The total number of persons exposed to the notice program, or "gross impressions," would be 158,422,342, or 67% of all adults in the United States.  (*Id.*)

In addition, the proposed notice plan will establish a settlement website with downloadable case documents and claim forms, and will allow persons to input their telephone numbers to determine eligibility for settlement benefits.  (*Id.*)  The website will include a list of anticipated "frequently asked questions" with responses, and other pertinent case information.

Finally, notice will be disseminated via internet banners on popular websites, a method expected to generate 2.2 million views (or "impressions") of the banners over a 45-day period.  Potential class members can click on the banner, which will link to the settlement website.  The websites that will carry the banners include the following:

| WEBSITE | POSITIONING | IMPRESSIONS |
|---|---|---|
| Yahoo! | Inside Pages on Yahoo!/Run of Network | 900,000 |
| Microsoft/MSN | Inside Pages on MSN/Run of Network | 900,000 |
| NYTimes.com | Inside Pages/Run of Site | 400,000 |
| | TOTAL | 2,200,000 |

(*Id.*)

**E.      Opt-out and objection procedures**

Settlement class members will have an opportunity to exclude themselves from the settlement or object to its approval. (*See* Ex. A § 1.1.) The procedures and deadlines for filing opt-out requests and objections will be conspicuously listed in the notices and on the settlement website.  With regard to objections, the notices inform settlement class members that the Final Approval Hearing will be their opportunity to appear and have their objections heard.  The notices also inform settlement class members that they will be bound by the release unless they timely exercise their opt-out right.

**F.      Release**

The release is appropriately tailored to the claims raised in the case.  In exchange for settlement benefits, Plaintiffs and settlement class members will release ADT Security Services, Inc. and all ADT Authorized Dealers, ADT Authorized Telemarketers, and ADT Authorized Marketing Partners from any and all claims by the settlement class that relate in any way to Covered Calls as defined in the settlement, including any claims that were brought or could have been brought in the litigation, including any federal or state law claims, in addition to any claims under the Telemarketing Sales Rule or the TCPA, as well as any claims related to any other telephone call, facsimile, e-mail, text message, or other communication received at any time prior to the date of the settlement agreement.  (Ex. A ¶ 14.1.)

**Argument**

**A.    The settlement is well within the range of possible approval, and therefore warrants preliminarily approval.**

The settlement represents a fair and reasonable resolution of this dispute and is worthy of notice to, and consideration by, the settlement class members. It will provide financial relief to participating settlement class members and will relieve the parties of the burden, uncertainty and risk of continued litigation.

Under Rule 23(e)(2), a court may approve a class action settlement if it is "fair, reasonable, and adequate." There is usually an initial presumption of fairness when a proposed class settlement "is the product of arm's length negotiations, sufficient discovery has been taken to allow the parties and the court to act intelligently, and counsel involved are competent and experienced." H. NEWBERG & A. CONTE, NEWBERG ON CLASS ACTIONS § 11.41 (4th ed. 2002); *Goldsmith v. Tech Solutions Co*., No. 92 C 4374, 1995 WL 17009594, at *3 (N.D. Ill. Oct. 10, 1995).

As the Seventh Circuit recognizes, courts generally favor settlements of class actions:

> It is axiomatic that the federal courts look with great favor upon the voluntary resolution of litigation through settlement. In the class action context in particular, 'there is an overriding public interest in favor of settlement.' Settlement of the complex disputes often involved in class actions minimizes the litigation expenses of both parties and also reduces the strain such litigation imposes upon already scarce judicial resources.

*Armstrong v. Bd. of Sch. Dirs. of the City of Milwaukee*, 616 F.2d 305, 312-13 (7th Cir.1980) (citations and quotations omitted), *overruled on other grounds by Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998); *Am. Int'l Grp.*, 2012 WL 651727, at *1 ("Federal courts naturally favor the settlement of class action litigation.") (*quoting Isby v. Bayh,* 75 F.3d 1191, 1196 (7th Cir. 1996)).

District court review of a class action settlement is a two-step process. *In re Northfield Labs., Inc. Sec. Litig.*, No. 06 C 1493, 2012 WL 366852, at *5 (N.D. Ill. Jan. 31, 2012) (*citing In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330, 346 (N.D. Ill. 2010)). At the preliminary approval stage, the question for this Court is whether the settlement falls well within the "range of possible approval," and is sufficiently fair, reasonable and adequate to warrant dissemination of notice apprising class members of the proposed settlement and to establish procedures for a final settlement hearing under Rule 23(e). *Id.*; *City of Greenville, et al. v. Syngenta Crop Prot., Inc., et al.*, No. 3:10-cv-188-JPG-PMF, 2012 WL 1948153, at *3 (S.D. Ill. May 30, 2012); NEWBURG, *supra*, § 11.41. If the district court preliminarily approves a class action settlement, it then proceeds to the second step in the review process, the fairness hearing. *In re Northfield Labs*, 2012 WL 366852, at *5; *Manual for Complex Litigation* § 21.633 (4th ed. 2004).

In assessing the fairness, reasonableness and adequacy of a settlement, courts view the facts in the light most favorable to the settlement. *In re Ky. Grilled Chicken Coupon Mktg. & Sales Practices Lit.*, 280 F.R.D. 364, 375 (N.D. Ill. 2011) (*citing Isby*, 75 F.3d at 1199). "[T]he Court must not substitute its own judgment as to the optimal settlement terms for the judgment of the litigants and their counsel." *Id.* (*citing Armstrong*, 616 F.2d at 315). To evaluate fairness at the preliminary approval stage, courts consider the following factors: (1) the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement; (2) the complexity, length and expense of the litigation; (3) the presence of collusion in reaching a settlement; and (4) the stage of the proceedings and the amount of discovery completed. *Id.* (*citing Synfuel Techs., Inc. v. DHL Express (USA), Inc.,* 463 F.3d 646, 653 (7th Cir. 2006)); *see*

*also Armstrong*, 616 F.2d at 314; *Isby*, 75 F.3d at 1199. Of these considerations, the first is most important. *Synfuel Techs., Inc.,* 463 F.3d at 653.

      1.      **All factors favor preliminary approval.**

         a.      **The settlement provides significant benefits to the settlement class, particularly in light of the uncertainty of prevailing in the litigation.**

The strength of the settlement is further emphasized by the fact that it represents, to the best of Plaintiffs' knowledge, the sixth-largest TCPA settlement and the largest telemarketing robocall settlement ever reached.

The amount of the settlement and the payments to class members are particularly significant in light of the risks of ongoing litigation. If ADT were to succeed on its chief defense—that it is not liable for calls that it did not physically dial or direct to be dialed— settlement class members would recover nothing. In addition to ADT's defenses on the merits, Plaintiffs would have been required to prevail on a contested class certification motion, for which success is by no means guaranteed. *See Schulte,* 805 F. Supp.2d at 582. "Settlement allows the class to avoid the inherent risk, complexity, time, and cost associated with continued litigation." *Id*., at 586 (citation omitted). "If the Court approves the [settlement], the present lawsuit will come to an end and [settlement class members] will realize both immediate and future benefits as a result." *Id*. Plaintiffs and settlement class members will receive their payments now, instead of years from now—or perhaps never. *See id.* at 582.

Finally, ADT has represented that it will implement additional policies and practices designed to ensure compliance with the TCPA. This prospective relief benefits Plaintiffs and settlement class members (and others) by reducing the likelihood of receiving unsolicited telephone calls like the ones at issue. Such relief is considered in evaluating the overall value of the Settlement to Plaintiffs and settlement class members. *See id.* at 568-69.

**b.** **This multi-year litigation has already involved complex and expensive discovery and the briefing of numerous critical legal issues.**

This litigation has already required substantial investment of time and money, particularly in respect to discovery. Plaintiffs issued some 92 subpoenas as they worked through layers of intermediaries in the telemarketing industry in a successful effort to trace the origins of the ADT-related telemarketing calls. Plaintiffs similarly issued discovery requests to ADT and the third-party defendants, ultimately generating hundreds of thousands of pages of documents.

The case has required Plaintiffs to brief numerous legal issues, including in particular, the critical and unsettled issue of ADT's liability for telemarketing calls placed by others. And, at virtually every stage of the discovery process, recipients of subpoenas and discovery requests refused to comply. Plaintiffs' successful briefing in response to those many challenges culminated in the identification of Dynamic Interactive as the telecommunications provider for the Desai call and the production of call records identifying a portion of the settlement class members.

**c.** **The settlement resulted from extensive arms-length negotiations and is not the product of collusion.**

The requirement that a settlement be fair is designed to protect against collusion among the parties. *Mars Steel Corp. v. Cont'l Ill. Nat'l. Bank & Trust Co. of Chicago*, 834 F. 2d 677, 684 (7th Cir. 1987) (approving settlement upon a finding of no "hanky-panky" in negotiations). There is an initial presumption that a proposed settlement is fair and reasonable when it was the result of arms-length negotiations. NEWBERG, *supra*, § 11.42. The lengthy duration of the litigation, followed by six months of highly contested settlement negotiations, the excellent result for the settlement class in spite of the significant procedural and substantive hurdles Plaintiffs

faced, and the participation of an experienced mediator throughout the negotiation process, all are testament to the non-collusive nature of the proposed settlement.

### d. The proposed class notice is adequate.

Under Rule 23(c)(2), class members are entitled to notice of any proposed settlement and an opportunity to object or opt out before it is finally approved by the Court. *Manual for Complex Litig.* § 21.31 (4th ed. 2004). The advisory committee note to Rule 23 states that the "mandatory notice pursuant to subdivision (c)(2) . . . is designed to fulfill requirements of due process to which the class action procedure is of course subject." FED. R. CIV. P. 23(d)(2) advisory committee's note.

The Seventh Circuit has explained, "in recognition of the potential divergence of interests within the class, each class member in actions for money damages is entitled as a matter of due process to personal notice and an opportunity to opt out of the class action . . . . Accordingly, Rule 23(c)(2) guarantees those rights for each member of a class certified under Rule 23(b)(3)." *Shurland v. Bacci Cafe & Pizzeria on Ogden, Inc.*, 271 F.R.D. 139 (N.D. Ill. 2010) (quoting *Lemon v. Int'l Union of Operating Eng'rs, Local No. 139, AFL–CIO*, 216 F.3d 577, 580 (7th Cir. 2000). Rule 23(c)(2)(B) states for class actions such as this one, "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort," and explain the details of the action to those members, including the opportunity to opt out. FED. R. CIV. P. 23(c)(2)(B) (emphasis added).

The requirement of "personal notice" does not mean that each individual who is potentially a member of the class must receive actual notice of the class action. *Medina v. Mfrs. & Traders Trust Co.*, No. 04 C 2175, 2004 WL 3119019, at *3 (N.D. Ill. Dec. 14, 2004) (Rule

23(b)(3) class) ("This [best notice practicable] standard can be satisfied even though a particular class member never receives actual notice."); *Kinder v. Nw. Bank*, No. 1:10-cv-405, 2012 U.S. Dist. LEXIS 97496, at *6 (W.D. Mich. June 5, 2012) ("Neither Rule 23 nor due process, however, requires actual notice to each party intended to be bound by the adjudication of a class action.") (citing *Fidel v. Farley*, 534 F.3d 508, 514 (6th Cir. 2008)).  There is an abundance of case law that supports notice by publication alone in class actions where individual class members cannot be easily identified.  *See, e.g.*, *Burns v. First Am. Bank*, No. 04 C. 7682, 2006 U.S. Dist. LEXIS 92159, at *33-38 (N.D. Ill. Dec. 19, 2006) (rejecting argument that class is unmanageable due to "serious obstacles . . . in the process of trying to identify class members and provide notice to them," because "general public notice" will suffice where individual notice is not reasonable).  The Court must simply make certain that class members receive "the best practicable notice that is: 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'"  *F.C.V., Inc. v. Sterling Nat'l. Bank*, 652 F. Supp. 2d 928, 944 (N.D. Ill. 2009) (Rule 23(b)(3) class) (quoting *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 808 (1985)).

As the Supreme Court explained: "This Court has not hesitated to approve of resort to publication as a customary substitute in [a] class of cases where it is not reasonably possible or practicable to give more adequate warning.  Thus it has been recognized that, in the case of persons missing or unknown, employment of an indirect and even a probably futile means of notification is all that the situation permits and creates no constitutional bar to a final decree foreclosing their rights." *Mullane v. Cent. Hanover Bank & Trust Co*., 339 U.S. 306, 316, 70 S.Ct. 652 (1950) (discussing "best notice practicable" in the context of a common trust fund settlement). Courts have "broad discretion in fashioning the notice program in each particular

case," *Mangone v. First USA Bank*, 206 F.R.D. 222, 232 (S.D. Ill. 2001) (Rule 23(b)(3) class), "subject only to the broad 'reasonableness' standards imposed by due process." *Simer v. Rios*, 661 F.2d 655, 686 (7th Cir. 1981) (Swygert, J., dissenting) (Rule 23(b)(3) class) (quoting *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 121 (8th Cir. 1975)).

In cases where the names and addresses of class members are not readily ascertainable, notice by publication alone is sufficient. "When individual notice is infeasible, notice by publication in a newspaper of national circulation . . . is an acceptable substitute." *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 786 (7th Cir. 2004) (Rule 23(b)(3) class) ("[Individual] notice is preferable to newspaper or other collective notice but it was impossible here because [Defendant] has no record of those customers whose financial information it gave the telemarketers but who did not buy anything from the latter."); *see also Shurland v. Bacci Cafe & Pizzeria on Ogden, Inc*., 271 F.R.D. at 146 ("[T]he court is satisfied that notice by publication may be sufficient when individual class members cannot be identified."); *In re Vivendi Universal, S.A.,* 242 F.R.D. 76, 107 (S.D.N.Y. 2007) (Rule 23(b)(3) class) ("While individual notice, where reasonably possible, is required, when class members' names and addresses may not be ascertained by reasonable effort, publication notice has been deemed adequate to satisfy due process.").

Direct notice presents enormous challenges in this case given the theory of liability plaintiffs have asserted against ADT. Because ADT did not make any of the calls at issue, it has no records relating to the calls. Nonetheless, through extensive third party discovery efforts, (*see infra* at 5-7), Plaintiffs have obtained call records that they expect will permit the identification of 700-900,000 class members who actually received ADT-related telemarketing calls. Each of these class members will receive direct notice. The remaining class members will receive

publication notice, as their identities cannot be determined "through reasonable effort." FED. R. CIV. P. 23(c)(2)(B).

The proposed notice scheme is consistent with the due process requirements incorporated in Rule 23(c)(2)(B). The notice itself is clear and straightforward, and provides settlement class members with enough information to evaluate whether to participate in the settlement. The notice contains all of the information required by Rule 23(c)(2)(B)(i)-(vii): the nature of the action; the class definition; the summary of the class claims and defenses; the ability to enter an appearance; the exclusion rights; the objection rights; and the binding effect of a class judgment on members under Rule 23(c)(3).

As outlined *infra* at 11-12, the settlement administrator will mail notice and a claim form to those 700-900,000 class members who can be identified through the Dynamic Interactive call records. The extensive publication notice outlined above will reach an estimated 79.2 million households nationwide. All told, 158.4 million persons nationwide—some 67% of all adults in the United States—will be exposed to the publication notice program, which will be augmented by an internet notice program expected to generate another 2.2 million gross impressions.

This notice plan provides the best notice practicable under the circumstances to all potential class members, and conforms to the guidelines for notice as applied within this Circuit and as mandated by Supreme Court precedent.

**B.      The Court should grant class certification for settlement purposes.**

For settlement purposes only, the parties have agreed that the Court may make preliminary findings and enter an order granting provisional certification of the settlement class and appoint Plaintiffs and their counsel to represent the class. "The validity of use of a

temporary settlement class is not usually questioned." NEWBERG, *supra*, § 11:22. The Manual

for Complex Litigation, § 21.612, explains the benefits of settlement classes:

> Settlement classes—cases certified as class actions solely for settlement— can
> provide significant benefits to class members and enable the defendants to
> achieve final resolution of multiple suits. Settlement classes also permit
> defendants to settle while preserving the right to contest the propriety and scope
> of the class allegations if the settlement is not approved and, in Rule 23(b)(3)
> actions, to withdraw from the settlement if too many class members opt out. An
> early settlement produces certainty for the plaintiffs and defendants and greatly
> reduces litigation expenses.

For settlement purposes only, the settlement class is submitted for certification under

Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure. The class is defined in the

settlement agreement and also appears on pp. 8-9, *infra*. As detailed below, the settlement class

meets all of the applicable certification requirements.

## 1.        The Rule 23(a) factors are met.

### a.        The class is sufficiently numerous and joinder is impracticable.

The Settlement Class as defined meets Rule 23(a)'s numerosity requirement. Based on

the discovery conducted to date, there will be over 700,000 settlement class members who will

be sent direct notice. In addition, Settlement Class Members for whom counsel does not have

contact information will receive notice through nationwide publication notice. This class clearly

is sufficiently numerous. *See, e.g.*, *McCabe v. Crawford & Co*., 210 F.R.D. 631, 643 (N.D. Ill.

2002) (a class of forty or more is generally sufficient to establish numerosity). The number of

individuals in the Settlement Class, coupled with the fact that it is a national class that is

geographically disbursed throughout the country, renders joinder impracticable. *See, e.g.,*

*Randolph v. Crown Asset Mgmt*., *LLC*, 254 F.R.D. 513, 517 (N.D. Ill. 2008) (finding that joinder

of hundreds of lawsuits is impractical).

### b.     The class shares many common issues of law and fact.

The settlement class satisfies Rule 23(a)(2)'s commonality requirement because all members received a pre-recorded telephone call from an automatic telephone dialing system, without prior express consent.  These common issues of fact and identical legal claims under the TCPA are sufficient to show commonality here.  Moreover, Plaintiffs and the settlement class members all suffered the same injury—they received unsolicited telephone calls in violation of the TCPA.  In *Reliable Money Order, Inc., v McKnight Sales Co., Inc.,* 218 F.R.D. 327, 332-33 (E.D. Wis. 2012), the court certified a TCPA class in the litigation context, finding:

> The class in this action asserts the same injury:  faxes sent to the potential class members in violation of the TCPA. The events surrounding the transmission of each of the faxes are identical. Additionally, determining whether the defendant violated the TCPA in relation to one plaintiff will likely answer whether the defendant violated the TCPA with regard to the remaining 3,313 members of the class. There is a possibility of individual defenses, such as a prior existing business relationship or prior express permission. But generally, the answer to the common question will resolve the class claims. Thus, the court finds that the plaintiff has established commonality.

Likewise, in *Bridgeview Heath Care Ctr. Ltd. v. Clark*, No. 09 C 5601, 2011 WL 4628744, at *5 (N.D. Ill. Sept. 30, 2011), a district court in this District certified a contested TCPA class, explaining that the same evidence concerning the defendant's advertising campaign applied to the plaintiff's claim as well as the claims of the class members.

This case involves common issues of fact and law, including:

- Whether pre-recorded messages were transmitted in violation of the TCPA;

- Whether the defendants obtained valid prior express consent from consumers before sending them unsolicited pre-recorded messages;

- Whether ADT's Dealers and Marketers are liable for illegal calls made on their behalf— and on behalf of ADT—where such calls were physically transmitted by a third party;

- Whether ADT is liable for illegal telemarketing conducted by its Dealers and Marketers;

- Whether ADT ratified the illegal conduct of its Dealers or Marketers;

- Whether ADT and its Dealers or Marketers are in partnership or joint venture.

As the settlement class members here as all suffered the same injury and are generally subject to the same defenses, commonality is satisfied.

### c.    The Plaintiffs' claims are typical of the settlement class.

Typicality exists where the claim involves the same "event, practice or course of conduct that gives rise to the claim of the other class members, and if the claims are based on the same legal theory." *Parker v. Risk Mgmt. Alts., Inc.*, 206 F.R.D. 211, 213 (N.D. Ill. 2002); *see also* FED. R. CIV. P. 23(a)(3).  "Typicality is established when there is a 'sufficient relationship . . . between the injury to the named plaintiff and the conduct affecting the class,' and the claims of the named plaintiff and those of the class 'are based on the same legal theory.'" NEWBERG, *supra*, § 3.13 (citation omitted).

For virtually the same reasons discussed in the preceding section, this element also is met.  The Plaintiffs claims are typical of, if not identical to, those of settlement class members. All claims arise out ADT's authorized dealers utilizing prerecorded telephone messages to promote ADT's goods and services, in alleged violation of the TCPA.  The Plaintiffs and settlement class members were all affected in the same way by this conduct.

### d.    The Plaintiffs and their counsel are adequate representatives.

Adequacy requires the representative of a class to provide fair and adequate representation of the class.  FED. R. CIV. P. 23(a)(4).  Courts in this District have broken this requirement down into three elements:  (1) the representative cannot have interests antagonistic to the class; (2) the representative must have a sufficient interest in the outcome of the litigation; and (3) counsel for the representative must have appropriate experience, qualifications, and

competency.  *Sledge v. Sands*, 182 F.R.D. 255, 259 (N.D. Ill. 1998); *Gammon v. GC Servs. Ltd. P'ship*., 162 F.R.D. 313, 317 (N.D. Ill. 1995).

Here, the Plaintiffs have no interests that are antagonistic to or in conflict with the settlement class members they seek to represent, and their alleged injuries are identical to those suffered by class members.  *See Amchem Prods. v. Windsor*, 521 U.S. 591, 625–26 (1997) (courts look simply at whether the representatives' interests are in any way antagonistic to or in conflict with those of the class members).  In addition, it is undisputed that Plaintiffs' counsel are active practitioners with substantial experience in consumer law and class action litigation.  (*See* Exs. B–F, Class Counsel Declarations.) The requirements of Rule 23(a) therefore are satisfied.

## 2.      The Rule 23(b)(3) factors are met.

Rule 23(b)(3) requires that common questions predominate over individual questions, and that the class action device must be the superior method for adjudicating the controversy. The Court must consider these requirement in the context of:  (1) the interest of the individual class members in controlling the litigation; (2) the extent and nature of any pending litigation involving the same matters; (3) the desirability of concentrating the litigation of all the members' claims in the forum in which the class action was commenced; and (4) the management difficulties that may be encountered in a class action.  *Rahim v. Sheahan*, No. 99 C 0395, 2001 WL 1263493, at *16 (N.D. Ill. Oct. 19, 2001).

As an initial matter, the difficulties of managing a class action are vitiated by this settlement.  When "confronted with a request for settlement only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial." *Amchem*, 521 U.S. at 620, *quoted in In re Ky. Grilled Chicken Coupon Mktg. & Sales Practices Lit*, 280 F.R.D. at 385; *see also Am. Int'l Grp,*

*Inc*., 2012 WL 651727, at *4, (*quoting Amchem*, 521 U.S. at 622 ("settlement is a factor in the calculus" in determining whether certification is proper)).  A class action is the superior method of resolving large scale claims if it will "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results."  *Amchem,* 521 U.S. at 615.

In this case the aggregate claims of the class are comprised of calculable statutory damages in amounts that make it uneconomic for individuals to pursue these claims on their own.  *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985) (a class action is the superior method of proceeding when it allows the plaintiffs to pool claims that would be uneconomical to litigate individually).  It is thus unlikely that individuals would invest the time and expense necessary to seek relief through litigation.

In determining the best available method for resolving a dispute, the Court may consider the "improbability that large numbers of class members would possess the initiative to litigate individually."  *Haynes v. Logan Furniture,* 503 F.2d 1161, 1164-65 (7th Cir. 1974).  In fact, in this case many class members may be unaware of their claims or may not understand their legal rights.  *See Henry v. Cash Today, Inc*., 199 F.R.D. 566, 574 (S.D. Tex. 2000).  Many others may not have access to competent counsel willing to invest the time and resources necessary to prosecute the claims.

Predominance is satisfied "when there exists generalized evidence that proves or disproves an element on a simultaneous, class-wide basis, . . . [since s]uch proof obviates the need to examine each class member's individual position."  *Golon v. Ohio Savs. Bank*, 98 C 7430, 1999 WL 965593, at *4 (N.D. Ill. Oct. 15, 1999).  The predominance element has clearly

been met here because the claims of the class members, the circumstances under which these claims arise, and the method of proving damages are identical.

## Conclusion

The proposed class action settlement is fair, reasonable, and adequate. For the foregoing reasons, the proposed settlement is well within "the range of possible approval," and should be approved in all respects.

A proposed agreed order is attached to Plaintiffs' Motion for Preliminary Approval as Exhibit A.3.

PLAINTIFFS, VISHVA DESAI
and PHILIP CHARVAT,
By their attorneys,

s/ John W. Barrett
Alexander E. Burke
Burke Law Offices, LLC
155 N. Michigan Ave., Suite 9020
Chicago, IL 60601
(312) 729-5288
(312) 729-5289 facsimile
ABurke@BurkeLawLLC.com

Brian K. Murphy
Joseph F. Murray
Murray Murphy Moul + Basil LLP
1533 Lake Shore Drive
Columbus, OH 43204
(614) 488-0400
(614) 488-0401 facsimile
murphy@mmmb.com

John W. Barrett
Jonathan Marshall
Bailey & Glasser, LLP
209 Capitol Street
Charleston, WV 25301
(304) 345-6555
(304) 342-1110 facsimile
jbarrett@baileyglasser.com

jmarshall@baileyglasser.com

Edward A. Broderick
Anthony Paronich
Broderick Law, P.C.
125 Summer St., Suite 1030
Boston, MA  02110
(617) 738-7080
ted@broderick-law.com
anthony@broderick-law.com
*Admitted Pro Hac Vice*

Matthew P. McCue
The Law Office of Matthew P. McCue
1 South Ave, Third Floor
Natick, MA 01760
(508) 655-1415
mmccue@massattorneys.net
*Admitted Pro Hac Vice*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

**VISHVA DESAI and PHILIP J. CHARVAT,**
**on behalf of themselves and others similarly**
**situated,**

      **Plaintiffs,**

**v.**                                    **Case No. 1:11-cv-1925**

**ADT SECURITY SERVICES, INC.,**

      **Defendant.**

### Certificate of Service

I hereby certify that *Plaintiffs' Memorandum in Support of Unopposed Motion for Preliminary Approval of Class Action Settlement* was served upon the following counsel of record through the ECF system for the Northern District of Illinois on the 11th day of February, 2013:

Eric Jay Goldberg, Esquire
Pepper Hamilton, LLP
301 Carnegie Center, Suite 400
Princeton, NJ 08543
goldberg@pepperlaw.com
*Counsel for ADT Security Services, Inc.*

Michael E. Baughman, Esquire
Robert L. Hickok, Esquire
Pepper Hamilton, LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103
baughmam@pepperlaw.com
hickokr@pepperlaw.com
*Counsel for ADT Security Services, Inc.*

Jason Lawrence Pyrz, Esquire
John A. Leja, Esquire
Polsinelli Shughart, PC
161 N. Clark Street, Suite 4200
Chicago, IL 60601
jpyrz@polsinelli.com
jleja@polsinelli.com
*Counsel for ADT Security Services, Inc.*

595689

Gary S. Betensky, Esquire
Richman Greer, P.A.
250 Australian Avenue South, Suite 1504
West Palm Beach, FL 33401
gbetensky@richmangreer.com
*Counsel for The Elephant Group, Inc.*

Howard L. Teplinsky, Esquire
Beerman Swerdlove, LLP
161 N. Clark Street, #2600
Chicago, IL 60601
hteplinsky@beermannlaw.com
*Counsel for The Elephant Group, Inc.*

Joshua L. Spoont, Esquire
Richman Greer, PA
201 S. Biscayne Blvd.
Miami, FL 33131
jspoont@richmangreer.com
*Counsel for The Elephant Group*

Saman Behnam, Esquire
Law Office of Saman Behnam
400 Oceangate, 8th Floor
Long Beach, CA 90802
behnamlaw@yahoo.com
*Counsel for Christopher Long and EMI, Inc.*

Lorne T. Saeks, Esquire
Much, Shelist, Freed, Denenberg,
 Ament &Rubenstein, P.C.
191 North Wacker Drive, Suite 800
Chicago IL 60605
lsaeks@muchshelist.com
*Counsel for Eversafe Security Systems, Inc. and Safe Streets USA, LLC*

James Preston Shuck, Esquire
Quintin F. Lindsmith, Esquire
Bricker & Eckler, LLP
100 South Third Street
Columbus, OH 43215
jschuck@bricker.com
*Counsel for Eversafe Security Systems, Inc. and Safe Streets USA, LLC*

<u>s/ John W. Barrett</u>