## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

### EASTERN DIVISION

**VISHVA DESAI and PHILIP J. CHARVAT,**
**on behalf of themselves and others similarly**
**situated,**

      **Plaintiffs,**

**v.**                                              **Case No. 1:11-cv-1925**

**ADT SECURITY SERVICES, INC.,**

      **Defendant.**

### PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION
### FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

Dated: June 7, 2013

# TABLE OF CONTENTS

I.     Introduction ........................................................................................................... 1

II.    Background ........................................................................................................... 2

   A.   Telemarketing calls to Plaintiffs and commencement of action. ......................................... 2

   B.   Plaintiffs' discovery efforts ............................................................................................... 2

   C.   ADT's third-party complaint. ............................................................................................. 4

   D.   Plaintiffs identify class members through the Dynamic call records. ................................. 5

   E.   Legal uncertainty regarding "on behalf of" liability. ......................................................... 6

   F.   The settlement negotiations. ............................................................................................... 8

III.   The Proposed And Preliminarily-Approved Settlement. ..................................................... 8

   A.   The settlement class. ......................................................................................................... 8

   B.   The settlement fund ............................................................................................................ 9

   C.   Additional class member relief. ....................................................................................... 10

   D.   Notice and settlement administration ............................................................................... 11

   E.   Opt-out and objection procedures. ................................................................................... 14

   F.   Release. ............................................................................................................................ 14

IV.   The Settlement Warrants Final Approval. ........................................................................ 15

   A.   All factors favor final approval. ...................................................................................... 16

      1.   The settlement provides significant benefits to the settlement class, particularly in light of the uncertainty of prevailing in the litigation. ................................................ 16

      2.   This multi-year litigation has already involved complex and expensive discovery and the briefing of numerous critical legal issues. ..................................................... 18

      3.   The lack of opposition to the settlement supports final approval. ............................. 19

      4.   Class counsel believes the settlement is fair, reasonable, and adequate. ................... 20

      5.   The extensive discovery and advanced stage of the proceedings weigh in favor of settlement approval. ................................................................................................ 20

   B.   The notice scheme is consistent with due process and Rule 23........................................ 21

V.      The Requested Attorney Fees Are Reasonable.................................................................. 22

VI.     The Incentive Awards To The Class Representatives Are Reasonable. ........................... 24

VII.    The Five *Pro Se* Objections Should Be Overruled. .......................................................... 26

VIII.   Conclusion ........................................................................................................................ 27

# TABLE OF AUTHORITIES

## Cases

*Am. Int'l Grp., Inc. et al., v. ACE INA Holdings, et al.,* Nos. 07-cv-2898, 09 C 2026, 2012 WL 651727 (N.D. Ill. Feb. 28, 2012) ............................................................................ 15

*Armstrong v. Bd. of Sch. Dirs. of the City of Milwaukee*, 616 F.2d 305 (7th Cir.1980)......... 15, 16

*Bryan v. Pittsburgh Plate Glass Co.,* 494 F.2d 799 (3d Cir. 1974)............................................. 19

*Bussie v. Allmerica Fin. Corp.*, 50 F. Supp. 2d 59 (D. Mass. 1999) ........................................... 19

*Charvat v. Echostar Satellite, LLC*, 676 F. Supp. 2d 668 (S.D. Ohio 2009).................................. 7

*Charvat v. Echostar Satellite, LLC*, 630 F.3d 459 (6th Cir. 2010)................................................. 7

*City of Greenville v. Syngenta Crop Prot., Inc.*, --- F. Supp.2d ---, No. 3:10-cv-00188, 2012 WL 5252304 (S.D. Ill Oct. 23, 2012) ........................................................................... 22

*Cook v. Niedert,* 142 F.3d 1004 (7th Cir. 1998) .................................................................. 24, 25

*Desai v. ADT Sec. Servs., Inc.,* No. 11-C-1925, 2012 WL 4482012 (N.D. Ill. 2012) .................... 4

*Desai v. ADT Sec. Servs., Inc.,* No. 11-C-1925, 2011 WL 2837435 (N.D. Ill. July 18, 2011) ... 2, 6

*Dish Network, LLC v. Fed. Comm. Comm'n*, No 13-1182 (D.C. Cir.) ........................................... 7

*Erie Forge and Steel, Inc. v. Cyprus Minerals Co.,* No. 94–404 (W.D. Pa. Dec. 23, 1996)........ 17

*Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998)........................................................................ 15

*Florin v. Nationsbank of Ga., N.A.,* 34 F.3d 560 (7th Cir. 1994) ................................................. 22

*Gaskill v. Gordon*, 942 F. Supp. 382 (N.D. Ill. 1996) ................................................................ 22

*Hammon v. Barry*, 752 F. Supp. 1087 (D.D.C. 1990) ................................................................ 19

*Heekin v. Anthem, Inc.*, No. 1:05-01908, 2012 WL 5878032 (S.D. Ind. Nov. 20, 2012)............. 25

*Hinman v. M&M Rentals, Inc.*, No. 06-1156 (N.D. Ill. Oct. 6, 2009) .......................................... 23

*In re Domestic Air Tranp. Antitrust Litig.,* 148 F.R.D. 297 (N.D. Ga. 1993) ............................. 17

*In re Ky. Grilled Chicken Coupon Mktg. & Sales Practices Litig.*, 280 F.R.D. 364 (N.D. Ill. 2011)...................................................................................................... 1, 16, 20, 21

*In re Newbridge Networks Sec. Litig.*, No. 94-1678, 998 WL 765724 (D.D.C. Oct. 23, 1998)... 17

*In re Ravisent Techs., Inc. Sec. Litig.*, No. 00-1014, 2005 WL 906361
(E.D. Pa. Apr. 18, 2005) ................................................................. 17

*In re Synthroid Mktg. Litig.*, 264 F.3d 712 (7th Cir. 2001) ........................ 24

*In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.,* 724 F. Supp. 160
(S.D.N.Y. 1989) ............................................................................ 22

*In re Vivendi Universal, S.A.,* 242 F.R.D. 76, 107 S.D.N.Y. 2007) ............. 21

*Isby v. Bayh,* 75 F.3d 1191 (7th Cir. 1996) ........................................... 16

*Laskey v. International Union (UAW),* 638 F.2d 954 (6th Cir.1981) ............ 19

*Lazy Oil Co. v.* Witco, 95 F.Supp.2d 290 (W.D. Pa. 1997) ........................ 17

*Lively v. Dynegy, In*c., No. 05-0063, 2008 WL 4657792 (S.D. Ill. Sept. 30, 2008) ............ 25

*Matter of Cont'l Ill. Sec. Litig.*, 962 F.2d 566 (7th Cir. 1992) ..................... 22

*Mirfasihi v. Fleet Mortg. Corp.,* 356 F.3d 781(7th Cir. 2004 ..................... 21

*Morlan v. Universal Guar. Life Ins*., No. 99-274, 2003 WL 22764868 (S.D. Ill. Nov. 20, 2003)25

*Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) ............ 21

*Saf-T-Gard Int'l, Inc. v. Seiko Corp. of Am.*, No. 09 C 0776 (N.D. Ill. Jan. 14, 2011) ............... 23

*Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560 (N.D. Ill. 2011) ................ 17, 18

*Shurland v. Bacci Café & Pizzeria on Ogden, Inc.,* 271 F.R.D. at 146) ........ 21

*Spicer v. Chicago Bd. Options Ex., Inc*., 844 F. Supp. 1226 (N.D. Ill. 1993) ........... 25

*Sutton v. Bernard*, 504 F.3d 688 (7th Cir. 2007) ..................................... 21

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.,* 463 F.3d 646 (7th Cir. 2006) ........ 16

*Thomas v. Taco Bell Corp.*, 879 F. Supp. 2d 1079 (C.D. Cal. 2012) ............ 6

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.* 396 F.3 96 (2d Cir. 2005) ........... 15

## Statutes

47 U.S.C. § 227.......................................................................... *passim*

## Other Authority

*In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, --- FCC Rcd. ---
(F.C.C. May 9, 2013) ...................................................................... 7

## I.    INTRODUCTION

After nearly two years of hard-fought litigation, followed by four days of mediation and additional informal negotiations over a span of several months, the parties in this putative Telephone Consumer Protection Act class action reached a proposed settlement.  (*See* Ex. A, Settlement Agreement.)  The settlement establishes a $15 million fund that Plaintiffs expect will pay class members an estimated $47.27 per claim.  If approved, the settlement will bring to conclusion what has been, and likely would continue to be, contentious and costly litigation centered on the unsettled legal question of ADT's liability for the allegedly unlawful telemarketing practices of its dealers and others who market or sell ADT products and services.

By their motion, Plaintiffs seek final approval of this class action settlement.  This memorandum describes in detail the reasons why final approval is in the best interest of the class and is consistent with Rule 23. Class members appear to agree; over 132,000 have submitted claims for payment.

In evaluating the fairness of a class action settlement, the most important consideration is the strength of the plaintiff's case on the merits balanced against the amount offered in the settlement.  *In re Ky. Grilled Chicken Coupon Mktg. & Sales Practices Litig.*, 280 F.R.D. 364, 375 (N.D. Ill. 2011).  While the Plaintiffs believe they would secure class certification and prevail on the merits at trial, success is not assured.  At every turn, ADT has vigorously defended this case.  The relief provided here—payments from the settlement fund, coupled with ADT's agreement to take measures to assure future TCPA compliance—meets and exceeds the applicable standards of fairness.  Accordingly, the Court should approve the settlement so that class members may receive their settlement benefits.

## II.    BACKGROUND

**A.    Telemarketing calls to Plaintiffs and commencement of action.**

In February 2011, Plaintiff Vishva Desai received an unsolicited automated telemarketing call—or "robocall"—from a telemarketer promoting the sale and installation of ADT home-security systems.  On March 21, 2011, Ms. Desai, who resides in the Northern District, commenced this action.  She alleges the call she received was placed on behalf of ADT and for its benefit, and that ADT is liable for violating the TCPA's provisions banning robocall telemarketing unless the caller has received the recipient's prior express consent.  *See* 47 U.S.C. § 227(b).

Mr. Charvat, an Ohio resident, also received ADT-related robocalls and on January 28, 2011 commenced a similar action against ADT in Columbus, Ohio.  *See Charvat v. ADT Sec. Servs., Inc.,* No. 2:11cv0093 (S.D. Ohio).  After learning of Ms. Desai's lawsuit, Mr. Charvat voluntarily dismissed his case and, together with his counsel, joined forces with Ms. Desai and her attorney.  Mr. Charvat and Ms. Desai consolidated their claims in this Court by filing a First Amended Complaint (ECF No. 18) on April 18, 2011.

ADT responded to this filing with a motion to dismiss, and asserted its chief legal defense:  that because ADT did not make or otherwise initiate the telemarketing calls at issue, it could not be liable for the calls under the TCPA.  The parties submitted extensive briefing on this and other matters raised in ADT's motion, which the Court denied on July 18, 2011.  *See Desai v. ADT Sec. Servs., Inc.,* No. 11-C-1925, 2011 WL 2837435 (N.D. Ill. July 18, 2011) ("*Desai I*").

**B.    Plaintiffs' discovery efforts.**

During the pendency of the motion to dismiss, Plaintiffs commenced what ultimately

2

proved to be a massive and far-reaching discovery effort, including subpoenas directed to some 92 separate persons and entities. Plaintiffs' discovery plan was threefold: first, to identify the entities behind the telemarketing calls to the Plaintiffs; second, to identify other companies that also telemarketed ADT products and services; and third, to identify class members—those persons who received allegedly unlawful calls from ADT-related telemarketers.

These expensive and time-consuming discovery efforts required diligence, persistence and no small degree of knowledge of the telemarketing industry. Determining who was behind the Plaintiffs' telemarketing calls was complicated by the fact that the calls were "spoofed," meaning the telemarketers manipulated their telephone systems in order to cause false information to display on the recipient's caller ID device. Finding these callers required Plaintiffs to issue dozens of subpoenas up the telemarketing chain to targets across the nation. The subpoena trail began with Ms. Desai's and Mr. Charvat's own telephone companies, then led to telephone management companies that leased phone lines to telemarketers, and then on to the telemarketers, who in turn relied on separate telemarketing outfits using automated dialing systems.

Plaintiffs' subpoena efforts often were met with resistance and noncompliance by the recipients, which led to discovery battles waged in other federal district courts. Plaintiffs hired counsel in these remote jurisdictions to protect their interests, and eventually obtained the subpoenaed information after prevailing on discovery motions.

While tracking the trail of the Charvat and Desai calls, Plaintiffs' counsel served written discovery on ADT, which led to more discovery-motion practice after ADT objected to certain aspects of Plaintiffs' requests. Ultimately, the discovery directed at ADT led to a rolling production of more than 175,000 pages of documents over the course of six months.

When combined with the 35,000 pages of documents and hundreds of thousands of pages of call records obtained through Plaintiffs' third-party efforts, a complete picture of the case began to emerge. Plaintiffs determined that one of the Charvat calls was placed by EMI, a California telemarketing and lead generation firm hired by an outfit called DirectSavings USA, which in turn was providing telemarketing leads to Eversafe Corporation, one of ADT's largest authorized dealers. EMI also placed the Desai call after it was hired by a marketing company called Paramount Media Group, which in turn was hired by an ADT-authorized marketer called Saveology—an independent company that sells leads to ADT's authorized dealers.

## C.     ADT's third-party complaint.

The complex discovery in the case began to shift from subpoenas to written discovery when, on August 25, 2011, ADT filed a third-party complaint (ECF No. 75) for indemnification and contribution against entities that Plaintiffs identified were potentially responsible for the Charvat and Desai calls, including Saveology, Eversafe, and EMI. This pleading spawned a thick stack of third-party filings, including answers, cross-claims, default motions, and motions to dismiss. *See, e.g.*, *Desai v. ADT Sec. Servs., Inc.,* No. 11-C-1925, 2012 WL 4482012 (N.D. Ill. 2012) ("*Desai II*").

The upshot of ADT's third-party complaint for Plaintiffs was the opportunity, utilized in November of 2011, to issue interrogatories and requests for production of documents to third-party defendants Eversafe, Saveology, Chris Long, EMI, Peter Tolman, Leads Direct Marketing, Voice Tel Corporation, Direct Savings, USA, Oscar Montenegro, City VIP, LLC and Paramount Media Group. The parties also took the Rule 30(b)(6) deposition of Paramount Media Group. As with the subpoenas, some of the written discovery was contested, which necessitated more

4

motions to compel discovery, most of which were granted. (ECF Nos. 184, 206.) In response to this discovery, these third-party defendants produced another 10,000 pages of documents.

**D.     Plaintiffs identify class members through the Dynamic call records.**

Plaintiffs' efforts to obtain discovery from third-party defendants Christopher Long and EMI proved especially challenging—and fruitful. Long and EMI initially refused to respond to Plaintiffs' discovery, and then unsuccessfully moved to quash Plaintiffs' subpoena in federal district court in California. *Desai v. EMI, Inc.,* No. 2:11-cv-04026-GAF-AJW (C.D. Cal.). Then, after Plaintiffs moved to compel production before this Court (ECF No. 143), Long and EMI commenced bankruptcy proceedings in California, in which Plaintiffs' counsel appeared and examined Long under oath. Still, Long and EMI failed to respond to discovery, even after this Court granted the Plaintiffs' motion to compel. Left with no alternative, Plaintiffs moved for contempt sanctions against Long and EMI, which finally drew their attention and they opposed the motion for sanctions. The Court resolved the matter by ordering Long and EMI to produce the requested information. (ECF No. 196.)

This production, combined with the bankruptcy-proceeding testimony from Long, proved critical to this litigation, as it identified a California company called Dynamic Interactive as the telecommunications provider for Long's and EMI's massive telemarketing campaign. Dynamic provides voice broadcasting services that enable companies like EMI to transmit thousands of prerecorded phone messages simultaneously to consumers nation-wide. Plaintiffs' follow-up subpoena to Dynamic yielded documents that revealed EMI as the dialer of the telemarketing call to Ms. Desai, and included recordings of the robocall messages placed by EMI. The Dynamic production also included call logs showing approximately 50 million attempted

5

telemarketing calls placed by EMI using Dynamic's voice broadcasting technology. EMI placed robocalls for clients in many industries, not only home security. Most critically, the Dynamic subpoena resulted in the production of a list of more than 1.4 million unique telephone numbers to which EMI transmitted telemarketing robocalls that mentioned ADT and were completed (*i.e.*, answered by a person or an answering machine).[1] The consumers associated with these 1.4 million numbers are thus within the proposed class. Through a "reverse-lookup" process of the 1.4 million phone numbers, Plaintiffs obtained information that allowed for the mailing of class notice to more than 1.2 million households. As for the other telemarketing calls attributed to EMI, Plaintiffs lack sufficient information to determine whether the calls were made in efforts to sell ADT products or security services.

**E.    Legal uncertainty regarding "on behalf of" liability.**

From the inception of the action, and throughout the period Plaintiffs and their counsel invested their time and money prosecuting these claims, the parties have litigated in the shadow of uncertainty regarding the central legal question presented by this case: whether and under what circumstances ADT, who did not place telemarketing calls to Plaintiffs or class members, could be liable for TCPA violations committed by its authorized dealers and their agents. Courts have been sharply divided on this issue. *Compare Desai I,* 2011 WL 287435, *3 (denying ADT's motion to dismiss, and finding that TCPA liability does not require a party to make a call)

---

[1] After receiving the Dynamic call logs, Plaintiffs' counsel were able to identify the calls that played a pre-recorded message mentioning ADT by having Dynamic investigate those logs that Plaintiffs' counsel believed were associated with such pre-recorded messages. Dynamic's system allowed Dynamic to identify the prerecorded message that was played to the numbers called in a particular log, and those files, produced in ".wav" format, did indeed mention ADT.

with *Thomas v. Taco Bell Corp.*, 879 F. Supp. 2d 1079 (C.D. Cal. 2012) (absence of "on behalf of" language in 47 U.S.C. § 227(b)—unlike § 227(c)(5)— means the entity whose goods are advertised in a precorded message is not liable under the TCPA unless traditional vicarious liability principles are satisfied); *Charvat v. Echostar Satellite, LLC*, 676 F. Supp. 2d 668, 674-677 (S.D. Ohio 2009) (even under § 227(c)(5) an entity cannot be held liable for calls made on its behalf unless it had the right to control of the manner and means of the telemarketing), *remanded by Charvat v. Echostar Satellite, LLC*, 630 F.3d 459, 465 (6th Cir. 2010) (district court should have invoked the doctrine of primary jurisdiction and referred issue to the Federal Communications Commission).

Neither the Seventh Circuit nor any other Federal Court of Appeals has addressed this issue. Recently, the FCC issued its decision in *In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, --- FCC Rcd. --- (F.C.C. May 9, 2013) (hereinafter "FCC Ruling 13-54") (clarifying that "a seller … may be vicariously liable under federal common law agency-related principles for violations of either section 227(b) or 227(c) committed by telemarketers that initiate calls to market its products or services."), *pet. for app. filed, Dish Network, LLC v. Fed. Comm. Comm'n*, No 13-1182 (D.C. Cir.).[2]  Although the FCC Ruling confirms the Plaintiff's view of the applicable law in this case, whether ADT is actually liable for the conduct of third party marketers remains a hotly contested issue.

---

[2] Mr. Charvat, one of the two class representatives in this case, also was the consumer who initiated suit against Dish Network that brought to the Sixth Circuit Court of Appeals the issue as to whether Dish was liable for the illegal telemarketing practices of its authorized dealers. The Sixth Circuit in turn referred this question to the FCC under the doctrine of general jurisdiction, which ultimately resulted in the issuance of FCC Ruling 13-54. *See Charvat, supra.*

**F.    The settlement negotiations.**

Against this unsettled background, the parties began to explore settlement.  Plaintiffs'

counsel first met with ADT's counsel in New York City on April 11, 2012.  Following this initial

meeting, the parties completed three daylong mediation sessions with mediator Professor Eric

Green, a co-founder of JAMS/Endispute who now mediates complex cases through his Boston

firm, Resolutions LLC.  These sessions took place in May and September 2012, with intermittent

settlement talks in between, some led by Prof. Green, and some directly between counsel.

Eventually, these discussions culminated in the settlement agreement which this Court approved

preliminarily on February 19, 2013.

### III.    THE PROPOSED AND PRELIMINARILY-APPROVED SETTLEMENT

This Court preliminarily approved the settlement in an order dated February 19, 2013.

(ECF No. 233.)

**A.    The settlement class.**

The final settlement would establish a settlement class defined as follows:

All persons or entities who, at any time from January 1, 2007 through the date of
the Settlement Agreement, received one or more Covered Calls.

"Covered Calls" means either (1) a telemarketing call utilizing a pre-recorded
message or (2) a telemarketing call to a cell phone that was made through the use
of automated dialing equipment, where the call described in (1) and/or (2) relates
in any way to ADT Security Services, Inc. Covered Calls include calls initiated or
made by ADT or by someone acting or purporting to act on behalf of ADT, or calls
initiated or made by someone seeking to sell products or services relating in any
way to ADT, including calls made by ADT's Authorized Dealers, ADT's
Authorized Telemarketers, ADT's Marketing Partners, or calls initiated or
made  by anyone seeking to sell leads relating to ADT,  or any calls initiated or
made by anyone seeking to sell leads relating to ADT to anyone else, where the
lead sought to be generated from the call ultimately could have been sold to ADT,
ADT's Authorized Dealers, ADT's Authorized Telemarketers, or ADT's
Marketing Partners, including but not limited to any calls made or caused to be

made by Christopher Long (or any entity associated with Christopher Long), Oscar Montenegro (or any entity associated with Oscar Montenegro), EMI, Inc. (also known as European Marketing International and European Media International and Nationwide Media, Inc.) (collectively "EMI") (or anyone acting by, through, or with EMI), Direct Savings USA, LLC (or anyone acting by, through, or with Direct Savings USA, LLC), Direct Savings USA, Inc. (or anyone acting by, through, or with Direct Savings USA, Inc.), Paramount Media Group (or anyone acting by, through or with Paramount Media Group), Dynamic Interactive Corp. (or anyone acting by, through or with Dynamic Interactive Corp.), Pete Tolman, Leads Direct Marketing (or anyone acting by, through, or with Leads Direct Marketing), Voice Tel Corp. (or anyone acting by, through, or with Voice Tel Corp.), TM Caller ID (or anyone acting by, through, or with TM Caller ID), City VIP (or anyone acting by, through, or with City VIP), and JMB Enterprises (or anyone acting by, through, or with JMB Enterprises). Covered Calls included any such calls whether or not authorized by, approved by, or known by ADT.

(*See* Ex. A, Settlement Agreement ¶¶ 2.13, 2.26.)

## B.    The settlement fund.

The proposed settlement would establish a $15 million fund that has been used to pay notice and administration costs (currently estimated to be approximately $3.4 million), and will be used to pay Court-approved attorneys' fees (33 1/3 % of the $15 million fund), reimbursement of costs and expenses, Court-approved service payments to both Plaintiffs (up to $30,000 each), and payments to class members. Authorized claimants are entitled to equal shares of the remainder of the settlement fund after these payments.

Based on the **136,440** claims received in response to the notice program developed with the assistance of the proposed settlement administrator, AB Data, Plaintiffs anticipate a payout of $47.33 per class member claim. Any funds that remain after class members are paid will be distributed as *cy pres* to a charitable institution proposed by the parties and approved by the Court. The parties propose the Electronic Privacy Information Center ("EPIC"), in Washington, D.C., as the *cy pres* recipient. (*Id.* § 4.3.) EPIC is a public interest research center established in

1994 to focus public attention on emerging civil liberties issues and to protect privacy, the First

Amendment, and constitutional values. *See* Electronic Privacy Information Center,

www.epic.org, last visited June 4, 2013. However, due to the large number of claimants, there

will not be any *cy pres* distribution unless settlement members who already filed a claim fail to

tender their settlement check.

## C. Additional class member relief.

As an additional benefit to all settlement class members, ADT has agreed that for a

period of at least two years from the effective settlement date, ADT will continue in place its

policy of not making telemarketing calls promoting ADT services using pre-recorded messages.

(Ex. A, Settlement Agreement § 4.6.) Additionally, ADT shall, for a period of at least two years

from the effective date, include in all new contracts with ADT's Authorized Marketers a

provision, and amend its telemarketing guidelines for all of ADT's Authorized Dealers, to

prohibit Authorized Marketers and Authorized Dealers from making telemarketing calls

promoting ADT's services using pre-recorded messages or purchasing leads that were generated

through telemarketing using pre-recorded messages.

These restrictions on use of pre-recorded messages will include any call using an

artificial or prerecorded voice to deliver a message with or without consent, that is made for the

purpose of marketing ADT services. The restrictions do not apply to calls (i) made for non-

solicitation purposes, including, but not limited to, calls for appointment scheduling and

confirmation, calls regarding service issues or advisories, calls regarding account payment and

administration, customer satisfaction survey calls, and calls associated with provision of

monitoring services or (ii) made by an Authorized Marketer or Authorized Dealer to market

10

products and services that do not relate to ADT. The prohibition also does not apply to any pre-recorded messages made to comply with the Telemarketing Sales Rule's and Telephone Consumer Protection Act's call abandonment rules. This benefit is a significant one for class members, as many telemarketing entities will purport to use lawful lead generation activities employing the use of pre-recorded messages, when, in fact, the telemarketing is in violation of state or federal law.

**D.     Notice and settlement administration.**

AB Data, Ltd. was retained to perform the duties of claims administrator, including, *inter alia*, giving notice, maintaining the settlement website, fielding inquiries about the settlement, and processing claims.   An affidavit is attached from an account executive with AB Data, Ltd. setting forth the various publication efforts undertaken, and the responses received. (Ex. B, Peters-Stasiewicz Aff.) A comparison of this affidavit with the Court's preliminary approval order (ECF No. 233) demonstrates that notice and settlement administration was conducted in accordance with that order.

The Plaintiffs could not identify all class members because the calls were placed by third parties and, aside from EMI, the identity of those third-party callers is unknown. Therefore, for purposes of notice, the settlement class is comprised of two categories of members: (1) "Direct Notice Consumers" who received ADT-related telemarketing robocalls from EMI/Dynamic and whose names and addresses can be obtained through "reverse-lookup" procedures; and, (2) "Publication Notice Consumers" who received ADT-related telemarketing calls but for whom Plaintiffs do not have specific identifying information, and have no way of determining their identities in order to send them direct notice. (*See* Ex. C).

11

The **1,280,221** Direct Notice Consumers were mailed the Court approved first-class mailed notice on March 12, 2013. (Ex. B, Peters-Stasiewicz Aff. ¶¶ 7-9.) The **358,972** Class members whose mailed notice was returned as undeliverable were run once through the U.S. Post Office's National Change of Address system by the Settlement Administrator and forwarding addresses were found for **1,180** class members. (*Id.* ¶ 11.) A total of **922,429** Class Members were successfully mailed notice. (*Id.* ¶ 12.)

Publication Notice Consumers received publication notice through the extensive notice plan developed by AB Data. Under this plan, notices ran in the following major publications:

| PUBLICATION | CIRCULATION | NOTICE SIZE | INSERTS | ON SALE DATE |
|---|---|---|---|---|
| Parade | 33,000,000 | 2/5 page | 2 | 04/21/2013; 04/28/2013 |
| USA Weekend | 22,250,000 | 2/5 page | 1 | 04/21/2013 |
| Reader's Digest | 5,577,717 | Full page | 1 | 04/15/2013 |
| Good Housekeeping | 4,346,757 | 1/3 page | 1 | 04/15/2013 |
| People | 3,563,035 | 1/3 page | 1 | 03/29/2013 |
| TV Guide | 3,276,822 | 1/3 page | 1 | 04/18/2013 |
| Sports Illustrated | 3,204,945 | 1/3 page | 1 | 03/27/2013 |
| Time | 2,010,879 | 1/3 page | 1 | 03/22/2013 |
| USA Today | 1,981,016 | 1/6 page | 1 | 03/22/2013 |
| TOTAL | 79,211,171 | | | |

(*Id.,* Ex. B) The publication notice reached an estimated 79,211,171 households nationwide. The total number of persons exposed to the notice program, or "gross impressions," are

estimated to be 158,422,342, or 67% of all adults in the United States. (*See* Ex. B) **2,639** potential Class Members requested and were mailed Publication Claim Forms. (Ex. B, Peters-Stasiewicz Aff. ¶ 15.)

In addition, the notice plan established a settlement website, http://robocallsettlement.com, with downloadable case documents and claim forms, including the publication claim form and option to submit a claim online. (*Id.* ¶ 20.) The website includes a list of anticipated "frequently asked questions" with responses, and other pertinent case information. The Publication Claim Form was downloaded **20,023** times. (*Id.*)

Finally, notice was disseminated via internet banners on popular websites, a method believed to have generated 2.2 million views (or "impressions") of the banners over a 45-day period. Potential class members could click on the banner, which linked to the settlement website. The websites that carried the banners include the following:

| WEBSITE | POSITIONING | IMPRESSIONS |
|---|---|---|
| Yahoo! | Inside Pages on Yahoo!/Run of Network | 3,426,220 |
| Microsoft/MSN | Inside Pages on MSN/Run of Network | 562,960 |
| NYTimes.com | Inside Pages/Run of Site | 1,052,632 |
| | TOTAL | 5,041,812 |

The outcome of this thorough notice procedure was the receipt of **136,440** timely claim forms. (*Id.* ¶ 25.) This response rate—over 14% of direct notice recipients—is relatively high compared to other similar class actions, which yielded claims rates of approximately 5%. (*Id.* ¶ 26.).

13

**E.      Opt-out and objection procedures.**

Settlement class members had the opportunity to exclude themselves from the settlement

or object to its approval. (*See* Ex. A, Settlement Agreement § 1.1.) The procedures and deadlines

for filing opt-out requests and objections were conspicuously listed in the notices and on the

settlement website.  (Peters-Stasiewicz Aff., Exs. B.B, B.C.)  Settlement Class Members were

given 81 calendar days from the date of the Preliminary Approval Order to postmark a request

for exclusion.  A Settlement Class Member seeking an exclusion was required to disclose his or

her name, address, the telephone number(s) asserted to have received covered call(s), the number

of calls received, and whether each telephone number is a cellular phone or a residential landline.

Fifty-seven Class Members have made timely requests for exclusion.  Plaintiffs are filing with

this motion a list of all who have opted out with this Court.  (*Id.,* Ex. B.)

With regard to objections, the notices informed settlement class members that the Final

Approval Hearing would be their opportunity to appear and have their objections heard.  (*Id.)*

The notices also informed settlement class members that they would be bound by the release

unless they timely exercised their opt-out right.  The Parties received five objections, four of

which were also mailed to A.B. Data, all of which were offered *pro se*.  The objections are

included with the affidavit of the class administrator. (Ex. B.)

**F.      Release.**

The release is appropriately tailored to the claims raised in the case.  In exchange for

settlement benefits, Plaintiffs and settlement class members will release ADT Security Services,

Inc. and all ADT Authorized Dealers, ADT Authorized Telemarketers, and ADT Authorized

Marketing Partners from any and all claims by the settlement class that relate in any way to

Covered Calls as defined in the settlement, including any claims that were brought or could have been brought in the litigation, including any federal or state law claims, in addition to any claims under the Telemarketing Sales Rule or the TCPA, as well as any claims related to any other telephone call, facsimile, e-mail, text message, or other communication received at any time up to and including the date of the Final Approval Order.  (Ex. A, Settlement Agreement ¶ 14.1.)

## IV.    THE SETTLEMENT WARRANTS FINAL APPROVAL

The settlement represents a fair and reasonable resolution of this dispute and is worthy of final approval. It will provide financial relief to participating settlement class members, will provide injunctive relief to individuals nationwide and will relieve the parties of the burden, uncertainty and risk of continued litigation.

Under Rule 23(e)(2), a court may approve a class action settlement if it is "fair, reasonable, and adequate."  "A presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery." *Am. Int'l Grp. v. ACE INA Holdings, Inc.*, Nos. 07-CV-2898, 09-C-2026, 2012 WL 651727, at *10 (N.D. Ill. Feb. 28, 2012) (internal quotation marks omitted) (quoting *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.* 396 F.3 96, 116 (2d Cir. 2005).

Courts generally favor settlements of class actions:

It is axiomatic that the federal courts look with great favor upon the voluntary resolution of litigation through settlement.  In the class action context in particular, 'there is an overriding public interest in favor of settlement.' Settlement of the complex disputes often involved in class actions minimizes the litigation expenses of both parties and also reduces the strain such litigation imposes upon already scarce judicial resources.

*Armstrong v. Bd. of Sch. Dirs. of the City of Milwaukee*, 616 F.2d 305, 312-13 (7th Cir.1980) (citations and quotations omitted), *overruled on other grounds, Felzen v. Andreas*, 134 F.3d 873

(7th Cir. 1998); *Am. Int'l Grp.*, 2012 WL 651727, at *1 ("Federal courts naturally favor the

settlement of class action litigation.") (*quoting Isby v. Bayh,* 75 F.3d 1191, 1196 (7th Cir. 1996)).

In assessing the fairness, reasonableness and adequacy of a settlement, courts view the

facts in the light most favorable to the settlement. *In re Ky. Grilled Chicken Coupon Mktg. &*

*Sales Practices Litig.*, 280 F.R.D. at 375 (*citing Isby*, 75 F.3d at 1199). "[T]he Court must not

substitute its own judgment as to the optimal settlement terms for the judgment of the litigants

and their counsel." *Ky. Grilled Chicken*, 280 F.R.D. at 375 (*citing Armstrong*, 616 F.2d at 315).

To evaluate fairness, a court must consider the following factors: (1) the strength of the case for

plaintiffs on the merits, balanced against the amount offered in settlement; (2) the complexity,

length and expense of the litigation; (3) the opposition to settlement among affected parties; (4)

the opinion of competent counsel, and (5) the stage of the proceedings and the amount of

discovery completed. *Ky. Grilled Chicken*, 280 F.R.D. at 375 (*citing Synfuel Techs., Inc. v. DHL*

*Express (USA), Inc.,* 463 F.3d 646, 653 (7th Cir. 2006)); *see also Armstrong*, 616 F.2d at 314. Of

these considerations, the first is most important. *Synfuel Techs., Inc.,* 463 F.3d at 653.

## A.     All factors favor final approval.

### 1.     The settlement provides significant benefits to the settlement class, particularly in light of the uncertainty of prevailing in the litigation.

The historic size and nature of the settlement is eminently fair given the hurdles

remaining for the putative class in this case. The $15 million settlement fund represents, to the

best of Plaintiffs' knowledge, the sixth-largest TCPA settlement and the largest third party

telemarketing robocall settlement ever reached.

The financial compensation to each class member who completed a Claims Form is

significant. Because **136,440** class members submitted valid and complete claims forms, they

will each receive nearly $50. The statutory damages to which each claimant would have been entitled if prevailing at trial would have been $500. 47 U.S.C. § 227. The individual class members will receive close to 10% of that amount, which is a meaningful recovery for claimants who did not expend time or effort to litigate their claims, particularly in light of the risks of ongoing litigation and the modest amount of the individual statutory recovery relative to the costs of individual litigation.

Settlements providing a percentage of total potential trial recovery are routinely deemed reasonable and approved. "Numerous courts have approved settlements with recoveries around (or below)" 10% of the class's maximum potential recovery. *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 583-84 (N.D. Ill. 2011), *citing*, *e.g., Lazy Oil Co. v. Witco*, 95 F.Supp.2d 290, 339 (W.D. Pa. 1997) (approving settlement amounting to 5.35% of damages for the entire class period, and 25.5% of damages within the limitations period)); *Erie Forge and Steel, Inc. v. Cyprus Minerals Co.,* Civil No. 94–404 (W.D. Pa. Dec. 23, 1996) (approving settlement of $3.6 million where plaintiffs' expert estimated damages at $33 million); *In re Domestic Air Tranp. Antitrust Litig.,* 148 F.R.D. 297, 325 (N.D. Ga. 1993) (12.7% to 15.3%); *In re Newbridge Networks Sec. Litig.*, No. 94-1678, 1998 WL 765724, at *2 (D.D.C. Oct. 23, 1998) (approving settlement and concluding that while "[c]ourts have not identified a precise numerical range within which a settlement must fall in order to be deemed reasonable; [ ] an agreement that secures roughly six to twelve percent of a *potential* trial recovery while preventing further expenditures and delays and eliminating the risk that no recovery at all will be won, seems to be within the targeted range of reasonableness"); *In re Ravisent Techs., Inc. Sec. Litig.*, No. 00-1014, 005 WL 906361, at *9 (E.D. Pa. Apr. 18, 2005) (approving settlement which amounted to 12.2% of damages and citing study by Columbia University Law School, which determined that

17

"since 1995, class action settlements have typically recovered between 5.5% and 6.2% of the class members' estimated losses.") (internal citations omitted).

These payments are particularly significant in light of the risks of ongoing litigation.  If ADT were to succeed on its chief defense—that it is not liable for calls that it did not physically dial or direct to be dialed—settlement class members would recover nothing.  In addition to ADT's defenses on the merits, Plaintiffs would have been required to prevail on a contested class certification motion, for which success is by no means guaranteed.  *See Schulte,* 805 F. Supp.2d at 582. "Settlement allows the class to avoid the inherent risk, complexity, time, and cost associated with continued litigation." *Id*. at 586 (citation omitted). "If the Court approves the [settlement], the present lawsuit will come to an end and [settlement class members] will realize both immediate and future benefits as a result." *Id*.  Plaintiffs and settlement class members will receive their payments now, instead of years from now—or perhaps never.  *See id.* at 582.

Finally, ADT has represented that it will implement additional policies and practices designed to ensure compliance with the TCPA.  This prospective relief benefits Plaintiffs and settlement class members (and others) by significantly reducing the likelihood of receiving unsolicited telephone calls like the ones at issue.  Such relief is considered in evaluating the overall value of the Settlement to Plaintiffs and settlement class members. *See id.* at 568-69.

## 2. This multi-year litigation has already involved complex and expensive discovery and the briefing of numerous critical legal issues.

This litigation has already required substantial investment of time and money, particularly in respect to discovery.  Plaintiffs issued some 92 subpoenas as they worked through layers of intermediaries in the telemarketing industry in a successful effort to trace the origins of

18

the ADT-related telemarketing calls. Plaintiffs similarly issued discovery requests to ADT and the third-party defendants, ultimately generating hundreds of thousands of pages of documents.

The case has required Plaintiffs to brief numerous legal issues, including in particular, the critical and unsettled issue of ADT's liability for telemarketing calls placed by others. And, at virtually every stage of the discovery process, recipients of subpoenas and discovery requests refused to comply. Plaintiffs' successful briefing in response to those many challenges culminated in the identification of Dynamic Interactive as the telecommunications provider for the Desai call and the production of call records identifying a substantial portion of the settlement class members.

### 3. The lack of opposition to the settlement supports final approval.

Class members have shown substantial interest in the settlement, with almost no opposition. Over 136,000 Class members filed claim forms. Direct notice was given to **922,429** class members, and publication notice exposed some 158 million persons to the notice program. By contrast, just five class members filed objections. The class members have spoken, and they overwhelmingly support this settlement.

The small percentage of objections and exclusions strongly supports the conclusion that the settlement is fair and reasonable. A. CONTE & H. NEWBERG, NEWBERG ON CLASS ACTIONS (4th ed.) § 11.41. *See also Hammon v. Barry*, 752 F. Supp. 1087, 1092 (D.D.C. 1990) (85 objections to a settlement involving about 2,000 individuals constitutes "low level of dissatisfaction."); *Bryan v. Pittsburgh Plate Glass Co.,* 494 F.2d 799, 803 (3d Cir. 1974) (settlement approved with 20% of class objecting), *cert. denied,* 419 U.S. 900 (1974); *Laskey v. International Union (UAW),* 638 F.2d 954, 956 (6th Cir.1981) (settlement fair and reasonable

19

when only 7 objections were filed out of 109 noticed class members); *Bussie v. Allmerica Fin. Corp.*, 50 F. Supp. 2d 59, 77 (D. Mass. 1999).

### 4.    Class counsel believes the settlement is fair, reasonable, and adequate.

"Courts are entitled to rely on the opinion of competent Class Counsel that the settlement is fair, reasonable and adequate." *In re Ky. Grilled Chicken Coupon Mktg. & Sales Practices Litig.*, 280 F.R.D. at 379. Counsel, all of whom are experienced in litigating class action cases in general, and TCPA cases in particular, have expressed their support for the settlement. (*See* Mot. Prelim. App., ECF No. 226-9 through 13 (counsel declarations)). In sum, the proposed settlement is the product of extensive, adversarial negotiations between counsel experienced in class action, consumer fraud litigation and counsel for defendants. As discussed above, the settlement provides the class with significant equitable and monetary relief, particularly in light of the risk of little or no recovery and certainty of additional costs and expenses if litigation were to continue. Thus, in counsel's view, the proposed settlement is fair, reasonable, and adequate and in the best interests of the class members.

### 5.    The extensive discovery and advanced stage of the proceedings weigh in favor of settlement approval.

"Approval of a settlement is proper where discovery and investigation conducted by class counsel prior to entering into settlement negotiations was extensive and thorough." *In re Ky. Grilled Chicken Coupon Mktg. & Sales Practices Litig.*, 280 F.R.D. at 379. As discussed above, Plaintiffs engaged in extraordinary discovery that allowed counsel to unwind the tangled web of connections between ADT and its third-party telemarketers. The parties also put the strengths of their opposing positions to the test at extensive settlement negotiations and in briefing before this

Court on a motion to dismiss, upon which Plaintiffs prevailed. With this thorough knowledge of the pertinent facts and understanding of the applicable law, class counsel is well equipped to accurately value class members' claims.

**B.      The notice scheme is consistent with due process and Rule 23.**

Notice has been provided to class members as directed by this Court in the order of preliminary approval. (Ex. B, Peters-Stasiewicz Aff.) That notice provides "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified with reasonable effort." Fed. R. Civ. P. 23(c)(2). *See also Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314-15 (1950). As discussed above, notice was directly mailed to all individuals for whom addresses could be located through a reverse-lookup of phone numbers, notice was published in magazines with circulations of tens of millions, notice was posted on popular websites, and a website was created with information about the action and claim forms. *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 786 (7th Cir. 2004) (Rule 23(b)(3) class) ("When individual notice is infeasible, notice by publication in a newspaper of national circulation … is an acceptable substitute."; *see Shurland v. Bacci Café & Pizzeria on Ogden, Inc.,* 271 F.R.D. at 146 ("[T]he court is satisfied that notice by publication may be sufficient when individual class members cannot be identified."). *See also, In re Vivendi Universal, S.A.,* 242 F.R.D. 76, 107 S.D.N.Y. 2007) (Rule 23(b)(3) class) ("While individual notice, where reasonably possible, is required, when class members' names and addresses may not be ascertained by reasonable effort, publication notice has been deemed adequate to satisfy due process."). The notice scheme included, *inter alia*, a description of the action, the definition of

21

the class, the claims, how to enter an appearance and object, and how to request an exclusion, all as required by Rule 23.

## V. THE REQUESTED ATTORNEY FEES ARE REASONABLE

Plaintiffs seek an award of one-third of the Settlement Fund, plus actual costs and expenses. This litigation was actively contested, involving substantial discovery and dispositive motion practice, and presented real risks of recovery for counsel. The proposed fee and cost award meets the requirements for approval.

Attorneys who recover a common fund for the benefit of a class are entitled to a reasonable attorney fee from the fund as a whole. *See Sutton v. Bernard*, 504 F.3d 688, 691-92 (7th Cir. 2007). "[T]he approach favored in the Seventh Circuit is to compute attorney's fees as a percentage of the benefit conferred upon the class." *In re Ky. Grilled Chicken Coupon Mktg. & Sales Practices Litig.*, 280 F.R.D. at 379. Courts should "do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *Id.* The market price "depends in part on the risk of nonpayment a firm agrees to bear, in part on the quality of its performance, in part on the amount of work necessary to resolve the litigation, and in part on the stakes of the case." *Sutton*, 504 F.3d at 693.

"[T]here are advantages to utilizing the percentage method in common fund cases because of its relative simplicity of administration." *Florin v. Nationsbank of Ga., N.A.,* 34 F.3d 560, 566 (7th Cir. 1994).

> The percentage method is bereft of largely judgmental and time-wasting computations of lodestars and multipliers. These latter computations, no matter how conscientious, often seem to take on the character of so much Mumbo

22

Jumbo. They do not guarantee a more fair result or a more expeditious disposition of litigation.

*In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.,* 724 F. Supp. 160, 170 (S.D.N.Y. 1989); *see also Matter of Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 573 (7th Cir. 1992) (noting that it is easier to establish market based contingency fee percentages than to "hassle over every item or category of hours and expense and what multiple to fix and so forth"); *Gaskill v. Gordon,* 942 F. Supp. 382, 386 (N.D. Ill. 1996) ("'[T]he percentage of the fund method provides a more effective way of determining whether the hours expended were reasonable.'"), *aff'd,* 160 F.3d 361 (7th Cir. 1998).

One-third of the common fund, a percentage of the benefit conferred upon the class, is at the market price and therefore reasonable, as reflected in the fees approved by other courts. *In re Kentucky Grilled Chicken*, 280 F.R.D. at 380-81 (citing cases, and describing a fee of 32.7% of the common fund as "well within the market rate and facially reasonable"); *see also City of Greenville v. Syngenta Crop Prot., Inc.*, --- F. Supp.2d ---, No. 3:10-cv-00188, 2012 WL 5252304 at *5 (S.D. Ill Oct. 23, 2012) (approving a one-third fee because a "contingent fee of one-third of any recovery after the reimbursement of costs and expenses reflects the market price," and citing cases). This Court has also approved similar fee awards previously in TCPA cases. *See Saf-T-Gard Int'l, Inc. v. Seiko Corp. of Am.*, No. 09 C 0776 (N.D. Ill. Jan. 14, 2011) (Bucklo, J.) (ECF No. 100) (fees and expenses equal to thirty-three percent of the settlement fund); *See also Hinman v. M&M Rentals, Inc.*, No. 06-1156 (N.D. Ill. Oct. 6, 2009) (Bucklo, J.) (ECF No. 225) (same).

A review of the market price factors from *Sutton* demonstrates that counsel should receive a market-rate fee award of one-third of the common fund. At the onset of this litigation,

there was a substantial risk of nonpayment due to both high factual hurdles of identifying those making the robocalls, which counsel ultimately overcame with robust discovery, and legal uncertainty, including in particular the then unanswered question of liability under the TCPA for calls made by others for the alleged TCPA violator's benefit.  Indeed, the latter question remains, in part, unresolved.  Nonetheless, through thousands of hours of work, counsel was able to secure both financial compensation and, perhaps more importantly, injunctive relief from harassing phone calls for more than a million class members as well as all other individuals nationwide.  The stakes were high, and this positive outcome speaks to the quality of counsels' representation.

## VI.  THE INCENTIVE AWARDS TO THE CLASS REPRESENTATIVES ARE REASONABLE

Federal courts often exercise their discretion under Rule 23(d) and (e) to approve case contribution awards to plaintiffs who instituted and prosecuted actions on the theory that there would be no class-wide benefit absent their suits.  These awards recognize the burdens assumed by plaintiff litigants in instituting and prosecuting the actions, the time spent by plaintiffs on communicating with counsel and fulfilling class responsibilities of supervision, and the risks that plaintiffs bear in bringing the suit.  In *Cook v. Niedert,* 142 F.3d 1004 (7th Cir. 1998), the Seventh Circuit Court of Appeals recognized that "because a named plaintiff is an essential ingredient of any class action, an incentive award is appropriate if it is necessary to induce an individual to participate in the suit."  *Id.* at 1016.  *See also In re Synthroid Mktg. Litig.*, 264 F.3d 712, 722 (7th Cir. 2001) ("incentive awards are justified when necessary to induce individuals to become named representatives"). Factors relevant to determining whether an incentive award is proper, and the amount of such award, "include the actions the plaintiff has taken to protect the

24

interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." *Cook*, 142 F.3d at 1016.

The settlement provides for each of the named Plaintiffs to receive an incentive payment of $30,000 out of the Settlement Fund. As the class was advised in the Notice, ADT has agreed not to oppose an award of service payments to the Class Representatives of $30,000 each. In this case, the Class Plaintiffs were instrumental to the ultimate recovery obtained for the class. Either Plaintiff could easily have accepted an individual settlement that would have far exceeded the value of their individual claims. Instead, Ms. Desai and Mr. Charvat chose to litigate not for themselves but for the class. Ms. Desai and Mr. Charvat further succeeded not only in obtaining a significant monetary recovery for the class, but also in forcing ADT to change the way it allows its authorized dealers to market on ADT's behalf.

Both Ms. Desai and Mr. Charvat remained involved in this litigation since its onset over two years ago. Both Class Plaintiffs spent significant time working with class counsel on several rounds of discovery, including extensive document productions and interrogatory responses. Both were consulted on major litigation decisions and briefing. Both were kept abreast of the proceedings through litigation and settlement negotiations. Both Class Plaintiffs reviewed and commented on the final Settlement, and were available to answer questions or provide documentation as needed. The award of $30,000 to Ms. Desai and $30,000 to Mr. Charvat is consistent with incentive awards allowed by the courts in this District and in the Seventh Circuit in common fund class actions. *See Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. Ill. 1998) (affirming $ 25,000 incentive award to plaintiff); *Heekin v. Anthem, Inc.*, No. 1:05-01908, 2012 WL 5878032 (S.D. Ind. Nov. 20, 2012) (approving $25,000 incentive award to lead class

25

plaintiff over objection); *Lively v. Dynegy, In*c., No. 05-0063, 2008 WL 4657792 (S.D. Ill. Sept. 30, 2008) (awarding $10,000 to each of three plaintiffs); *Morlan v. Universal Guar. Life Ins*., No. 99-274, 2003 WL 22764868 (S.D. Ill. Nov. 20, 2003) (awarding $25,000, $20,000, $20,000 and $5,000 respectively to class representatives); *Spicer v. Chicago Bd. Options Ex., Inc*., 844 F. Supp. 1226, 1267-1268 (N.D. Ill. 1993) (collecting cases awarding incentive fees ranging from $5,000 to $100,000; awarding $10,000 each to named plaintiffs).

## VII.   THE FIVE *PRO SE* OBJECTIONS SHOULD BE OVERRULED

None of the five objections have merit and thus all should be overruled.

Mr. Dietz objects that the "law says that Company should pay to me $30,000 for calling me as a fine," and he may, though it is unclear, be objecting to the incentive award. The TCPA provides for only a $500 fine, potentially trebled if the violation is willful or knowing, 47 U.S.C. § 227, not $30,000, and as discussed *supra* the settlement value is reasonable under the circumstances. Also as discussed *supra*, the incentive fee is reasonable. Mr. Dietz's objection should be denied.

Luis Navarrette objects that the Settlement Fund should be "divided up equally between myself and my representative." If this is an objection to the incentive payment, as explained *supra* that payment is appropriate, and if it is an objection to the payments among the class, the payments are disbursed equally. Mr. Navarrette's objection should be denied.

Thomas Hamilton objects to the incentive payment to the class representative, and says that "all involved should be treated equal." As explained *supra*, the incentive payment is appropriate. Mr. Hamilton's objection should be denied.

Tyrone Tennyson objects that his individual recovery "isn't enough to compensate for the harassment [from ADT telemarketing] and [his] loss." As explained *supra*, the settlement value is reasonable under the circumstances. Mr. Tennyson's objection should be denied.

Lawrence Bridgett also filed an objection, but the basis for his objection is unclear and it should therefore be denied.

## VIII.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant the motion for final approval. A proposed Final Approval Order is attached to this motion. (Ex. C).


Dated: June 7, 2013

<div style="margin-left:40%;">

PLAINTIFFS, VISHVA DESAI
and PHILIP CHARVAT,
By their attorneys,

/s/ Edward A. Broderick

</div>

| | |
|---|---|
| Alexander E. Burke | John W. Barrett |
| Burke Law Offices, LLC | Jonathan Marshall |
| 155 N. Michigan Ave., Suite 9020 | Bailey & Glasser, LLP |
| Chicago, IL 60601 | 209 Capitol Street |
| (312) 729-5288 | Charleston, WV 25301 |
| (312) 729-5289 facsimile | (304) 345-6555 |
| ABurke@BurkeLawLLC.com | (304) 342-1110 facsimile |
| | jbarrett@baileyglasser.com |
| | jmarshall@baileyglasser.com |
| | |
| Brian K. Murphy | Edward A. Broderick |
| Joseph F. Murray | Anthony Paronich |
| Murray Murphy Moul + Basil LLP | Broderick Law, P.C. |
| 1533 Lake Shore Drive | 125 Summer St., Suite 1030 |
| Columbus, OH  43204 | Boston, MA  02110 |
| (614) 488-0400 | (617) 738-7080 |
| (614) 488-0401  facsimile | ted@broderick-law.com |
| murphy@mmmb.com | anthony@broderick-law.com |

Matthew P. McCue
The Law Office of Matthew P. McCue
1 South Ave, Third Floor
Natick, MA 01760
(508) 655-1415
mmccue@massattorneys.net

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

**VISHVA DESAI and PHILIP J. CHARVAT,**
**on behalf of themselves and others similarly**
**situated,**

        **Plaintiffs,**

v.                                **Case No. 1:11-cv-1925**

**ADT SECURITY SERVICES, INC.,**

        **Defendant.**

<u>**Certificate of Service**</u>

        I hereby certify that ***Plaintiffs' Memorandum in Support of Motion for Final Approval***

***of Class Action Settlement*** was served upon the following counsel of record through the ECF

system for the Northern District of Illinois on the 7th day of June, 2013:

Eric Jay Goldberg, Esquire
Pepper Hamilton, LLP
301 Carnegie Center, Suite 400
Princeton, NJ 08543
goldberg@pepperlaw.com
*Counsel for ADT Security Services, Inc.*

Michael E. Baughman, Esquire
Robert L. Hickok, Esquire
Pepper Hamilton, LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103
baughmam@pepperlaw.com
hickokr@pepperlaw.com
*Counsel for ADT Security Services, Inc.*

Jason Lawrence Pyrz, Esquire
John A. Leja, Esquire
Polsinelli Shughart, PC
161 N. Clark Street, Suite 4200
Chicago, IL 60601
jpyrz@polsinelli.com
jleja@polsinelli.com
*Counsel for ADT Security Services, Inc.*

Gary S. Betensky, Esquire
Richman Greer, P.A.
250 Australian Avenue South, Suite 1504
West Palm Beach, FL 33401
gbetensky@richmangreer.com
*Counsel for The Elephant Group, Inc.*

Howard L. Teplinsky, Esquire
Beerman Swerdlove, LLP
161 N. Clark Street, #2600
Chicago, IL 60601
hteplinsky@beermannlaw.com
*Counsel for The Elephant Group, Inc.*

Joshua L. Spoont, Esquire
Richman Greer, PA
201 S. Biscayne Blvd.
Miami, FL 33131
jspoont@richmangreer.com
*Counsel for The Elephant Group*

Saman Behnam, Esquire
Law Office of Saman Behnam
400 Oceangate, 8th Floor
Long Beach, CA 90802
behnamlaw@yahoo.com
*Counsel for Christopher Long and EMI, Inc.*

Lorne T. Saeks, Esquire
Much, Shelist, Freed, Denenberg,
Ament & Rubenstein, P.C.
191 North Wacker Drive, Suite 800
Chicago IL 60605
lsaeks@muchshelist.com
*Counsel for Eversafe Security Systems, Inc.*
*and Safe Streets USA, LLC*

James Preston Shuck, Esquire
Quintin F. Lindsmith, Esquire
Bricker & Eckler, LLP
100 South Third Street
Columbus, OH 43215
jschuck@bricker.com
*Counsel for Eversafe Security Systems, Inc.*
*and Safe Streets USA, LLC*

Rev. Thomas A. Hamilton
23695 B. Drive North
Albion, MI 49224
*By Mail Only*

Luis Navarrette
5518 S. Robin Avenue
Tucson, AZ 85746
*By Mail Only*

Frederick T. Dietz
60430 N. Tranquility Road
Lacombe, LA 70445
*By Mail Only*

Tyrone Tennysonhall
12921 Saint Marys Street
Detroit, MI 48227
*By Mail Only*

Lawrence T. Bridgett
1335 Wentworth Road
Winston-Salem, NC 27105
*By Mail Only*

/s/ Edward A. Broderick