# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| VISHVA DESAI and PHILIP J. CHARVAT, )<br>on behalf of themselves and others similarly situated, )<br>)<br>    Plaintiffs, )<br>)<br>    v. )<br>)<br>ADT SECURITY SYSTEMS, INC., )<br>)<br>    Defendant. )<br>------------------------------------------------------------------)<br>ADT SECURITY SYSTEMS, INC., )<br>)<br>    Third-Party Plaintiff, )<br>)<br>    v. )<br>)<br>MR. PETE TOLMAN; LEADS DIRECT )<br>MARKETING; VOICE TEL CORP.; MR. )<br>CHRISTOPHER LONG; EMI, INC.; CITY VIP, LLC; )<br>JMB ENTERPRISES; DIRECT SAVINGS USA, INC.; )<br>MR. OSCAR MONTENEGRO; EVERSAFE )<br>SECURITY SYSTEMS, INC.; SAFE STREETS USA, )<br>LLC; PARAMOUNT MEDIA GROUP; THE )<br>ELEPHANT GROUP, INC.; and UNKNOWN JOHN )<br>DOE DEFENDANTS I THROUGH XX, )<br>)<br>    Third-Party Defendants. )<br>------------------------------------------------------------------)<br>SAFE STREETS USA, LLC, as successor to )<br>EVERSAFE SECURITY SYSTEMS, INC., )<br>)<br>    Cross-Claimant and    Third-Party Plaintiff )<br>)<br>    v. )<br>)<br>DIRECT SAVINGS USA, INC.; MR. OSCAR )<br>MONTENEGRO; DIRECT SAVINGS USA, )<br>)<br>    Cross-Defendants and )<br>    Third-Party Defendants. )<br>_____ ) | Case No. 11 C 1925<br><br>Judge Bucklo |

### MEMORANDUM OF LAW IN SUPPORT OF ELEPHANT GROUP, INC.'S MOTION FOR SUMMARY JUDGMENT

NOW COMES defendant Elephant Group, Inc. (EG), and pursuant to Fed.R.Civ.P. 56, hereby submits this memorandum of law in support of its motion for summary judgment.

### I.    INTRODUCTION

Plaintiffs Desai and Charvat brought this putative class action lawsuit against ADT pursuant to the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq*. ("TCPA"). Plaintiffs alleged they received unsolicited automated telemarketing calls ("robocalls") from a telemarketer promoting the sale and installation of ADT's home security systems. In addition to their individual claims, plaintiffs sought to represent a class of similarly situated individuals who received calls promoting ADT's products and services.

On January 30, 2013, ADT entered into a settlement agreement with plaintiffs that not only resolved the individual claims of Desai and Charvat, but settled claims of millions of other consumers who received robocalls. *Doc. 226-1, p. 3*. As acknowledged by ADT, "the [settlement] class includes not only Robocalls that were made by ADT or that mention ADT in the call, but any Robocall where the lead sought to be generated from the call ultimately could have been sold to ADT." *Doc. 229, p. 3*. ADT's willingness to settle was premised on its desire to have "total peace with respect to any claims relating to Robocalls, that relate in any way to ADT prior to the effective date." *Doc. 229, p. 3*. Most certainly, ADT did not settle the case because of the likelihood of class certification or an adverse liability finding. As ADT admits, "without a settlement, the class would likely recover nothing." *Doc. 229, p. 2*.

Having bought its own peace, ADT now wants to have that purchase price reimbursed by EG under a theory of contractual indemnity. That claim must fail for 4 reasons. **First**, there is no evidence that EG made any telemarketing calls advertising ADT's products or services.

**Second**, there is no evidence that any affiliate of EG made any outbound telemarketing calls. **Third**, even assuming that EG did breach the Agreement with ADT, pursuant to that same Agreement, ADT's own negligence erases any indemnity obligations owed by EG. **Fourth,** ADT and by extension, EG, could not be held vicariously liable under the TCPA for the calls that precipitated this case and were made by unrelated third parties.

## II. STATEMENT OF MATERIAL FACTS

EG has also filed a statement of uncontested material facts pursuant to Local Rule 56.1. Citations to facts in this brief will refer to the Statement of Material Facts (*SMF*).

## III. EG DOES NOT OWE CONTRACTUAL INDEMNITY TO ADT

ADT settled a putative class action lawsuit that involved potentially millions of calls made by unauthorized telemarketers because ADT feared the potential ruinous damages. ADT's decision to settle the case, from a business standpoint, may have been reasonable as a $15 million settlement in a case with potential exposure in the billions appears at first blush as a pretty good deal. ADT is now seeking to be reimbursed for the costs of that settlement by the only third party defendant that potentially has funds to contribute. ADT's legal decisions are not as reasonable as their business judgment might be though, as ADT agreed to pay $15 million to settle a case when plaintiffs' theory would fail as a matter of law. Moreover, ADT is attempting to shirk any responsibility it had in creating the environment that lead to the robocalls, and wants to hold EG solely responsible for calls that were made by other authorized participants in ADT's marketing program, contrary to EG's operational policies, and without EG's involvement.

ADT failed to control a marketing network that resulted in authorized dealers hiring unauthorized lead generators that made unauthorized outbound telemarketing calls. Despite that failure, ADT could not be held vicariously liable for the calls that were made by the

2

unauthorized vendors, and EG cannot now be held to indemnify ADT for calls that EG was similarly not liable for under the TCPA. EG is entitled to summary judgment on ADT's contractual indemnity claim.

### A. NEITHER EG NOR ANY AFFILIATE OF EG TOOK ANY ACT THAT WOULD TRIGGER A DUTY TO INDEMNIFY ADT

The issues presently before this Court are not complicated and have already been largely decided in this Court's Order of September 26, 2012. *See Doc. 217*. In that Order, the Court denied in part and granted in part EG's motion to dismiss ADT's three count indemnity claim. Specifically, ADT's common law indemnity and contribution claims were dismissed, but the contractual indemnity claim survived. *See Doc. 217, pp. 6-7*. This Court concluded that the contractual indemnity claim should proceed because ADT had plausibly alleged that Paramount Media Group (Paramount) was an affiliate of EG that had committed negligent acts.[1] *Doc. 217, p. 7*. As there is no evidence that EG actually made any robocalls that marketed ADT's services, the gravamen of ADT's indemnity claim can only be that Paramount was an affiliate of EG and committed an act that gives rise to EG's contractual duty to indemnify. However, in the time since this Order was issued, the parties have completed discovery, and there can be no dispute that Paramount was *not* EG's affiliate. As Paramount was not an affiliate of EG, any wrongful act or tort committed by Paramount is insufficient to trigger an indemnity obligation from EG.

As this Court recognized in the Order on EG's motion to dismiss, the term "affiliate" is defined in the Agreement between ADT and EG ("Agreement"): "[t]he term 'Affiliate' shall

---

[1] The Court stated: "the third party complaint can reasonably be read to allege that EMI has committed negligence or an intentional tort by placing phone calls in violation of the TCPA and that Paramount was negligent in its use of EMI's services" and "that the complaint alleges facts to support a claim that Paramount itself was negligent." *Doc. 217, p. 7*. In sum, the Court concluded that ADT's contractual indemnity claim would survive because ADT had plausibly alleged that Paramount, as an affiliate of EG, had committed some wrongful act potentially triggering EG's duty to indemnify. The lynchpin of this conclusion was that Paramount was alleged to be an affiliate of EG.

3

mean any corporation or other person or entity that directly or indirectly controls, is controlled by, a successor-in-interest to, or alter ego of, or is under the common control with, ADT or Elephant Group, respectively." Here, the undisputed facts show that Paramount was an independent vendor of EG (and other authorized dealers of ADT). *SMF ¶¶ 20, 22 and 23*. EG did not control, nor was it controlled by Paramount. *SMF ¶¶ 22, 26*. EG was not a successor-in-interest to, an alter ego of or under common control with Paramount. *SMF ¶¶ 22, 23 and 26.*

In fact, Paramount was a separate LLC formed in October, 2010 by Ryan Neill. *SMF ¶ 20.* EG entered into a contractual relationship with Paramount at the end of 2010 to have Paramount work as a lead generator for EG. *SMF ¶¶ 21, 22.* Paramount was an independent company that had simply agreed to provide sales leads to EG. *SMF ¶ 22.* There is no evidence that EG exercised any corporate control over Paramount, or was under common control with EG. Because ADT is unable to demonstrate that Paramount was an affiliate of EG, under the express terms of the contract between ADT and EG, the acts or omissions of Paramount cannot trigger any indemnity obligation from EG to ADT, and ADT's contractual indemnity claim fails as a matter of law.

    **B.    ADT'S INDEMNIFICATION CLAIM UNDER § 6(b) FAILS BECAUSE THE UNDERLYING ACTION WAS DUE TO ADT'S OWN NEGLIGENCE**

The only surviving claim against Elephant Group is for contractual indemnity. *Doc. 217*. The applicable contract between Elephant Group and ADT has two indemnity provisions, paragraphs 6(b) and 23.F. *SMF ¶¶ 9, 10.* Paragraph 6(b) reads in relevant part:

> Elephant Group shall indemnify, defend and hold ADT, its Affiliates, officers, directors, employees and agents (collectively the 'ADT Group') harmless from and against any and all damages, costs (including court costs and attorneys' fees), losses, fees and expenses suffered by the ADT Group resulting from or relating to, any negligence or intentional torts by Elephant Group, its Affiliates, officers, directors, employees and agents in connection with or related to this Agreement,

4

<u>except to the extent that any such claim or action is due to any negligent acts, omissions, wrongful acts, fault or willful misconduct of ADT, its employees, agents or invitees</u>.

The above provision is clear: EG must indemnify ADT for its negligence or intentional torts <u>only to the extent that ADT was not also negligent</u>. In other words, ADT has indemnity rights under § 6(b) only if the underlying lawsuit was not "<u>due to any</u> negligent acts, omissions, wrongful acts, fault or willful misconduct of ADT." *SMF ¶ 9*.

Fatal to ADT's claim, there is abundant evidence that this case was "due" to ADT's historic and current lack of adequate control over the marketing program. For example:

- ADT entered into a Consent Decree and Order for Civil Penalties with the FTC in 2007. In that Consent Decree, ADT was alleged to have engaged in illegal telemarketing and agreed to undertake a more robust monitoring program of its dealers. *SMF ¶ 52. See Doc. 15, ¶ ¶ 28-35; Doc. 15, Ex. A and SMF 67* (class period began January 1, 2007).

- In this case, calls were being made by entities that had no contractual relationship with EG. ADT admits that the telemarketing calls were being made by numerous companies on behalf of authorized ADT dealers like Eversafe and other than EG – including Leads Direct Marketing, Direct Savings USA, City VIP and JMB Enterprises. *SMF ¶¶ 53, 54, 55, 58-60. See also ADT's Corrected Third Party Complaint*, [doc. 121], ¶ 67, ¶ 88 (in tracing the First Charvat call, identifying the caller as Leads Direct Marketing, which then routed the call to Direct Savings USA, a company that had a contractual relationship to sell leads with Eversafe, an authorized ADT dealer) and ¶ 119 and ¶ 127 (in tracing the Second Charvat Call, identifying the caller as City VIP and/or JMB Enterprises on behalf of ADT's authorized dealer, Eversafe.)

- EMI, a vendor that made millions of ADT robocalls, engaged in telemarketing campaigns for ADT dealers unrelated to EG, including Alarms Pro and Home Alert. *SMF ¶ 54*.

- ADT engages in its own telemarketing by making outbound telephone calls, employing 75 people to place outbound calls to leads. *SMF ¶ 56*.

- Authorized dealers unrelated to EG, including Absolute Security of America, Eversafe and Defender also hired lead generators to create sales leads. *SMF ¶ 55*.

- ADT admits that most of the covered calls included in the class action settlement were not called by EMI, the only company that is even tangentially related (through Paramount) to EG in this case. *See doc. 229, p. 3.*

- Finally, earlier this year, the same plaintiffs lawyers that filed the underlying *Desai*

5

litigation filed a new class action lawsuit against ADT and one of its authorized dealers, Security Solutions, Inc., for continuing to engage in allegedly illegal telemarketing. *SMF ¶ 57. See also Doc. 259.*

In this case, the lynchpin of ADT's claim against EG was the allegedly negligent hiring and supervision of Paramount. According to ADT, EG breached the Agreement and became obligated to indemnify ADT because it hired and failed to supervise Paramount.[2] ADT's argument recalls the expression that "people who live in glass houses should not throw stones."

To the extent EG was negligent or committed an intentional tort by failing to supervise Paramount, the underlying claim in its case was "due" equally if not more so from ADT's failure to supervise its other authorized vendors, such as Eversafe, Absolute Security, Defender, Alarms Pro and Home Alert, and unauthorized entities like Leads Direct Marketing, Direct Savings USA, City VIP and JMB Enterprises. *SMF ¶¶ 47, 48, 49, 53, 54, 55, 58, 60, 62.* To be clear: two of the three calls that were made to plaintiffs which initiated this action were caused not by EG or any company alleged to be connected to EG. *SMF ¶¶ 59, 61.* Moreover, the third call placed to plaintiff Desai was placed by EMI on a campaign designed to sell leads to Paramount. *SMF ¶ 62.* But there is no evidence that the Desai call was ever going to be forwarded to EG, that EG was in any way responsible for or involved with the making of the call. *SMF ¶¶ 30, 41.*

Moreover, assuming for purposes of this motion only that it committed a wrongful act in hiring and supervising Paramount, EG's putative negligence is dwarfed by the wrongful acts of ADT. It is undeniable that any argument ADT may raise related to EG's negligence can be made

---

[2] ADT is likely to argue that EG breached the agreement by hiring Paramount as a lead generator without first obtaining written approval from ADT. That argument is of no consequence here though, because the relevant inquiry is whether ADT engaged in some negligent act that also contributed to the underlying "claim or action" under § 6(b) of the Agreement. To the extent ADT will argue in their anticipated summary judgment motion that there was a breach of the contract by EG's hiring of Paramount without written permission, that is a disputed factual issue, as three witnesses from EG testified that ADT was aware that Paramount was hired prior to the filing of this lawsuit. *SMF ¶ 13.* Though this factual dispute will preclude granting of ADT's summary judgment motion, the fact is not material here.

6

with greater force against ADT. For example, when ADT asserts that EG was negligent because it did not adequately supervise Paramount, ADT's own supervision over the marketing program was more deficient as shown by the number of ADT dealers that were using lead generators.

Like the agreement between ADT and EG, EG's agreement with Paramount specifically banned Paramount from making any unsolicited outbound telemarketing calls. *SMF ¶ 24*. In fact, EG incorporated ADT's telemarketing guidelines into the contract with Paramount. *SMF ¶ 26*. Then, unlike ADT, EG worked to ensure that Paramount was living up to the contractual standards by auditing Paramount during the term of the agreement, including performing on-site reviews, correcting any process errors, listening to recordings and approving scripts. *SMF ¶ 27*. Conversely, ADT's supervision of EG consisted of simply relying on the contractual terms of the agreement with EG. As described by ADT at SMF ¶ 11:

> Q. And at those meetings, one of the agenda items would be to ensure that Elephant Group was not hiring third-party lead generators?
>
> A. No, I think it was just a quarterly meeting on how things were going with the relationship. We relied on them to not breach the contract and hire affiliates without our express written consent. We, you know, didn't ask them specifically whether they were following each term of the contract on a quarterly basis.
>
> Q. Got it.
>
> A. <u>We assumed that they followed the contract, because they signed it</u>.

EG put in strict rules and undertook supervision to ensure that Paramount was not making outbound telemarketing calls. *SMF ¶¶ 28, 29, 36-46*. Moreover, every time that ADT received a complaint from a consumer about a telemarketing call from EG, EG was able to provide ADT with substantiation that the consumer had consented to receiving the return telephone call from EG. *SMF ¶ 15*. Since 2008, ADT received only 19 complaints from consumers regarding a call from EG. In all instances, EG showed that all of the activity was done consistent with the ADT's

7

compliance policies to satisfy the complaint. *SMF ¶ 16.*

Any contention that EG was negligent in the manner of hiring and supervising a vendor can be equally applied to ADT. If ADT claims that EG was negligent for failing to discover that an unknown party (EMI) was engaged in unsolicited telemarketing, then ADT was also negligent for failing to discover that it had numerous dealers buying leads from EMI.

The sum total of the discovery in this case reveals a systemic problem that ADT had, and continues to have with the manner it which its vendors engage in telemarketing. As much as ADT may now argue otherwise, this case was not due to EG's hiring of Paramount. Even if EG never hired Paramount, Paramount was still going to buy leads from EMI and sell those leads to other authorized dealers of ADT. *SMF ¶¶ 23, 30.* And even if Paramount did not buy leads from EMI, EMI was going to make outbound telemarketing calls for other customers. *SMF ¶¶ 47, 48.* As shown by the calls to plaintiff Charvat, even if EMI was not making the outbound telemarketing calls, other vendors were and selling those leads to ADT dealers. *SMF ¶ 49.* This action would have been filed regardless of EG's hiring of Paramount, and was due to ADT's failure to control the dealer network.

ADT should not be heard now to complain about a lawsuit that was due to its own negligence and failures. On balance, it was ADT's own failure to control the marketing program that contributed to a greater degree to the underlying action that any acts or omissions of EG. To abrogate any indemnity obligation, EG must only show that the underlying "claim or action" was "due to any negligent acts, omissions, wrongful acts, fault or willful misconduct of ADT." *SMF ¶ 9.* This bar is easily cleared as the original action was due in large part to ADT's negligence in overseeing the program, and the indemnity claim under § 6(b) of the Agreement necessarily fails.

    **C.    ADT'S INDEMNIFICATION CLAIM UNDER § 23.F FAILS BECAUSE EG DID NOT MAKE ANY OUTBOUND TELEMARKETING CALLS**

The second indemnification provision in the Agreement is found in § 23.F:

> In addition to any other indemnification provisions in the Agreement or this Amendment, Elephant Group agrees to indemnify, defend and hold ADT harmless from and against any claims, actions, proceedings and damages, including reasonable attorney's fees and costs, and all monetary penalties or costs imposed upon ADT arising out of Elephant Group's breach of the provisions set forth in Sections A and B hereinabove.

The indemnity provision in § 23.F is inapplicable to this case because there is no evidence that EG made any unsolicited telemarketing calls in violation of the telemarketing provision of § 23.A. Indemnity under § 23.F is triggered only if Elephant Group breaches "the provisions set forth in Sections A and B." Section A provides for "No Unsolicited Telemarketing Services", while Section B deals exclusively with "E-Mail Marketing Services." As this case does not involve e-mail, only Section A applies. Section 23.A provides that "[u]nder no circumstance will Elephant Group make any unsolicited outbound telephone calls as part of a plan, program or campaign directly or indirectly through telemarketing agents or others on behalf of ADT." The undisputed facts here show that EG made no unsolicited outbound telemarketing calls advertising ADT's services. *SMF ¶ 12*. Moreover, the calls that were made, by companies such as EMI, Leads Direct Marketing and City VIP, were not agents of EG and were not placed with the knowledge, involvement or direction of EG. *SMF ¶¶ 48, 49, 59 and 61*. To the extent that ADT argues that EG is vicariously liable for unsolicited outbound calls made by others without their authority, ADT is wrong. *See infra, § E*. As such, there is no evidence that EG breached § 23.A, and EG has no indemnity obligation under § 23.F.

> D. **ADT IS NOT ENTITLED TO INDEMNIFICATION BECAUSE EG COMMITED NO ACT CREATING LIABILITY UNDER THE TCPA**

Assuming, *arguendo*, that this Court concludes that the underlying case was not due to ADT's own negligent acts, the claim still fails because ADT cannot establish a causal connection

9

between the alleged "negligence or intentional torts" of EG and the losses created by the underlying TCPA case. Reduced to its core, ADT's indemnity claim against EG is premised on the allegedly wrongful decision of EG to hire Paramount to provide sales leads. From there, ADT argues that a chain of events was set in motion that exposed ADT to potentially devastating damages under the TCPA. ADT is wrong – EG's decision to hire Paramount to provide sales leads in no way exposed ADT to any liability under the TCPA.

To trigger the duty to indemnify, ADT is required to establish that negligence or tortious acts of EG caused the losses of which ADT complains. The contract establishes the causal connection required: first, EG is required to indemnify ADT for any losses "resulting from or relating to, any negligence or intentional torts by" EG. *SMF ¶ 9.* Second, EG agreed to indemnify ADT for damages "imposed upon ADT arising out of Elephant Group's breach of" the telemarketing provisions of the Agreement. *SMF ¶ 10.* The sole factual predicate upon which ADT bases the indemnity claim is the hiring and supervision of Paramount. *SMF ¶ 14.* Paramount then purchased leads from EMI.[3] *SMF ¶¶ 30, 34.* Simply put, ADT cannot show the requisite causal link between any losses "resulting from or relating to" the hiring of Paramount because the acts of EG were not capable of creating potential TCPA liability for ADT.

Reference to the underlying case is required. In that case, plaintiffs alleged that ADT violated the TCPA by making telephone calls using an artificial or prerecorded voice without prior express consent in violation of 47 U.S.C. § 227(b)(1). *Doc. 15, ¶ 10.* Under this section of the TCPA, it is unlawful "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party…" *Id.* "The plain language of the TCPA assigns civil liability to the party who

---

[3] ADT wants to mischaracterize the relationship between Paramount and EMI. Paramount did not contract with or "hire" EMI. Paramount just bought leads from EMI. The relationship was more akin to a retailer, EMI, selling a product (the security lead) to a customer, Paramount. *SMF, ¶¶ 31, 34 and 35.*

10

'makes' a call." *Thomas v. Taco Bell Corp.*, 879 F.Supp.2d 1079, 1084 (C.D. Cal. 2012); *Friedman v. Massage Envy Franchising, LLC*, 2013 WL 3026641, *4 (S.D. Cal. 2013). Therefore, ADT can be held liable under § 227(b)(1) directly if it personally 'initiated' a call in the method proscribed by the statute.[4] Alternatively, ADT can be vicariously liable for violations of the TCPA, "such as, if it was in an agency relationship with the [calling] party." *Thomas*, 879 F.Supp.2d at 1084; *see also In the Matter of the Joint Petition Filed by Dish Network, LLC, et al.*, 28 F.C.C.R. 6574, 6582 (FCC May 9, 2013) (hereinafter, "2013 FCC Ruling") (an entity "is not directly liable for a violation of the TCPA unless it initiates the call.").

At a minimum, to establish a claim for vicarious liability against ADT, plaintiffs were required to satisfy federal common law agency principles. *Golan v. Veritas Entertainment, LLC*, 2014 WL 2095310, *4 (E.D. Mo. 2014). These principles allow vicarious liability to be imposed in three different ways: when the beneficiary of the call has an agency relationship with the wrongdoer, "when the third party has apparent (if not actual) authority" or through ratification. *2013 FCC Ruling*, 28 F.C.C.R. at 6586-87. In other words, to make out a *prima facie* vicarious liability claim sufficient to trigger an indemnity obligation from EG, plaintiffs were required to show (1) that EG was the agent of ADT, that Paramount was the agent of EG, and that EMI was the agent of Paramount; or (2) that EMI was operating, through Paramount, and then through EG, with the apparent authority of ADT; or (3) that ADT ratified the conduct of EMI.[5] As ADT acknowledges, this plaintiff could not do. And if ADT could not suffer any losses "resulting

---

[4] In the underlying case, plaintiffs did not allege that ADT initiated any calls or was directly liable under the TCPA. Plaintiffs' claim was that the calls were made "on behalf of" ADT, such that ADT was vicariously liable under the TCPA. *See* Doc. 15, ¶ ¶ 15-16. Obviously, to the extent ADT made any calls included in the settlement, ADT and not EG would be directly liable for any violations of the TCPA arising out of those calls. SMF, ¶ 51.
[5] For the sake of convenience and clarity, this is a simplistic summary of the exposure that ADT faced in this case. As ADT admits though, most of the calls that were included in the class action settlement had nothing to do with EG. *See* Doc. 229, p. 3. As EG's only involvement here is through EMI, this limited analysis suffices to show that EG and ADT could not be held vicariously liable for EMI's conduct.

from or relating to" EG's hiring of Paramount by operation of vicarious liability, EG has no obligation to indemnity ADT.

The analysis here is not difficult. To have held ADT liable for the calls made by EMI under § 227(b)(1), plaintiffs needed to prove that an agency relationship existed between ADT, as the principal, and EMI, as the agent. *Thomas,* 879 F.Supp.2d at 1084-85. An agency relationship will be created when there is a "manifestation of consent by one person to another that the other shall act *on his behalf.*" *Meyer*, 537 U.S. at 286 (emphasis in original). Agency "means more than mere passive permission; it involves request, instruction, or command." *Thomas*, 879 F.Supp.2d at 1085. For ADT to be vicariously liable for the acts of EMI, ADT must have had the right to control "the manner and means of the [calling] campaign [EMI] conducted." *Id.*, 879 F.Supp.2d at 1084. Here, ADT admits that EMI was not an agent, manifested no permission for EMI to act on behalf of ADT, and exercised no control over the manner and means that EMI operated. *SMF ¶ 33, 63, 64 and 65*. Neither EMI nor any of the companies that actually placed the calls covered by the settlement were agents of ADT (or EG or Paramount). *SMF ¶ 63, 64 and 65*. ADT was not vicariously liable under an agency theory for those calls placed by EMI. *Thomas*, 879 F.Supp.2d at 1084 (rejecting claim under the TCPA because defendant did not direct or supervise the creation and distribution of the communication needed to support vicarious liability); *Mey*, 2012 WL 4009718 at *5 (no vicarious liability under the TCPA when defendant had "little to no control over the means or manner by which these companies generate sales leads."); *Mais v. Gulf Coast Collection Bureau, Inc*., 944 F.Supp.2d 1226 (S.D. Fla. 2013) (refusing to hold entity vicariously liable because defendant did not exercise, and had no right to exercise, the type of control needed to create vicarious liability); *Friedman*, 2013 WL 3026641 (granting defendant's motion to dismiss claim under § 227(b)

12

because plaintiff failed to establish an agency relationship to support a vicarious liability claim); *Smith v. State Farm*, 2013 WL 5346430, *6 (N.D. Ill. 2013) (granting defendant's motion to dismiss because plaintiff "has failed to sufficiently allege facts to support vicarious liability under Section 227(b) of the TCPA.").

Moreover, ADT has admitted that the calls from EMI and others were not made with any apparent authority from ADT. In the 2013 FCC Ruling, the FCC concluded that vicarious liability under § 227(b)(1) can arise when the caller is acting with the apparent authority of the beneficiary of those calls. *2013 FCC Ruling*, 28 F.C.C.R. at 6592. "Three elements must be proven to establish apparent authority: (1) a reasonable belief in the agent's authority; (2) generated by some holding out or neglect of the principal; and (3) justifiable reliance on the authority." *Utilities Optimization Group, LLC, v. TIN,* Inc., 440 Fed. Appx. 249, 252 (5th Cir. 2011). ADT admits that at no point was EMI held out as an agent with any authority. *SMF ¶ 63, 64 and 65*. ADT has also failed to produce any evidence supporting the conclusion that there was any reasonable belief in EMI's authority by a third party, or a justifiable reliance on that authority. *SMF ¶ 63, 64 and 65*. In fact, none of the elements needed to establish that ADT (or EG) is vicariously liable under an apparent authority theory has been satisfied. *Id.*

The last basis to prove a vicarious liability claim against ADT required plaintiff to prove that the wrongful acts of EMI and the other callers were ratified by ADT. ADT could not ratify this conduct though, because ADT was unaware of it. *SMF ¶ 66*.

The Restatement (Third) of Agency defines ratification as "the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent with actual authority." *Id.,* § 4.01(1). "A person ratifies an act by (a) manifesting assent that the act shall affect the person's legal relations, or (b) conduct that justified a reasonable assumption that the person so

13

consents." *Id.,* § 4.01(2). "Ratification occurs when three elements are present: (1) acceptance by the putative principal [ADT] of the benefits of acts by the putative agent [EMI], (2) full knowledge of the facts by the putative principal, and (3) circumstances or an affirmative election demonstrating the putative principal's intent to accept the unauthorized arrangements." *Nationwide Mutual Insurance Co. v. Powell*, 292 F.3d 201, 205 (4th Cir. 2002). ADT did not ratify the conduct of EMI (or other callers) because ADT was not aware of their actions until this lawsuit was filed, and did not knowingly accept the benefits of the wrongful calls. *SMF ¶ 66*.

Before agreeing to settle plaintiffs' claims on a class wide basis, ADT took the position that it was not vicariously liable for the calls made without its authorization. That original position was correct. ADT was not liable for calls made by others without their authorization and neither is EG required to indemnity ADT for those calls. In other words, ADT was not subject to any losses "resulting from or relating to" the alleged wrongful conduct of EG, because EG did not set in motion a chain of events that would have exposed ADT to vicarious liability under the TCPA. *Thomas v. Taco Bell Corp*, --- Fed. Appx.---, 2014 WL 2959160 (9th Cir. July 2, 2014) (in an unpublished order, affirming the dismissal of TCPA complaint because there was no basis to hold defendant vicariously liable under a theory of agency, apparent authority or ratification when there was no evidence that defendant controlled the third parties promotional campaign.)

In shortest form, ADT is unable to establish a causal connection between EG's hiring of Paramount and any losses suffered in this case. And without a causal connection, the contractual indemnity claim fails as a matter of law. *Strock v. USA Cycling, Inc.*, 2006 WL 1223151, *6 (D. Colo. 2006) (causation sufficient to show "such facts and circumstances as would indicate with *reasonable probability* that, but for the defendant's acts, he or she would not have suffered

14

harm" is a required element of a breach of contract action in Colorado (emphasis in original)).[6]

### F. THE SETTLEMENT WAS EXTREMELY BROAD AND MOST OF THE COVERED CALLS ARE NOT ALLEGED TO BE CONNECTED TO EG

As ADT acknowledged in its brief in support of the class action settlement, plaintiffs faced "enormous challenges … in both establishing their novel theory of liability (for calls which ADT did not authorize or even know about) and in establishing that a class could be certified here." *Doc. 229, p. 2.* ADT concisely and directly admitted: "Simply put, without a settlement, the class would likely recover nothing." *Doc. 229, p. 2.*

The claims ADT settled directly with the plaintiffs are extremely broad, and go well beyond any possible involvement of EG. *See SMF, ¶ 67; see also Doc. 243, pp. 2-3.* As acknowledged by ADT, the settlement class includes not only robocalls that mention ADT in the call, "but any Robocall where the lead sought to be generated from the call ultimately could have been sold to ADT." *Doc. 229, p. 3.* As already conceded by ADT, they did not agree to this settlement because of anything EG did or failed to do. "ADT's willingness to settle the case for the stated consideration is premised on a broad settlement class and corresponding release that will give ADT total peace with respect to any claims relating to Robocalls, that relate in any way to ADT, prior to the effective date." *Doc. 229, p. 3.* This Court should reject ADT's efforts to shift the costs of buying "total peace" onto a company that did not create the circumstances that led to the lawsuit, especially when ADT's own involvement created the environment that resulted in the filing of the underlying lawsuit.

### V. CONCLUSION

WHEREFORE, Elephant Group requests that the Court enter an Order granting summary judgment in its favor and against ADT, for the attorney fees and costs incurred in defending this

---

[6] Pursuant to § 19 of the Agreement, this dispute "shall be construed and enforced in accordance with the laws of the state of Colorado."

15

lawsuit and for all other just and equitable relief.

                                                        Respectfully submitted,

                                                        <u>/s/ Daniel W. Pisani</u>
                                                        James K. Schultz
                                                        Daniel W. Pisani
                                                        Sessions Fishman Nathan & Israel, LLC
                                                        55 West Monroe Street, Suite 1120
                                                        Chicago, Illinois 60603
                                                        Telephone:  (312) 578-0990
                                                        Facsimile: (312) 578-0991
                                                        jschultz@sessions-law.biz
                                                        dpisani@sessions-law.biz

                                                        *Attorneys for Elephant Group, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 14, 2014, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to the parties of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Respectfully submitted,

/s/ Daniel W. Pisani
James K. Schultz
Daniel W. Pisani
Sessions Fishman Nathan & Israel, LLC
55 West Monroe Street, Suite 1120
Chicago, Illinois 60603
Telephone: (312) 578-0990
Facsimile: (312) 578-0991
jschultz@sessions-law.biz
dpisani@sessions-law.biz

*Attorneys for Elephant Group, Inc.*