# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| VISHVA DESAI and PHILIP J. CHARVAT, ) <br> on behalf of themselves and others similarly situated, ) <br>  ) <br> Plaintiffs, ) <br>  ) <br> v. ) <br>  ) <br> ADT SECURITY SYSTEMS, INC., ) <br>  ) <br> Defendant. ) <br> ------------------------------------------------------------------ ) <br> ADT SECURITY SYSTEMS, INC., ) <br>  ) <br> Third-Party Plaintiff, ) <br>  ) <br> v. ) <br>  ) <br> MR. PETE TOLMAN; LEADS DIRECT ) <br> MARKETING; VOICE TEL CORP.; MR. ) <br> CHRISTOPHER LONG; EMI, INC.; CITY VIP, LLC; ) <br> JMB ENTERPRISES; DIRECT SAVINGS USA, INC.; ) <br> MR. OSCAR MONTENEGRO; EVERSAFE ) <br> SECURITY SYSTEMS, INC.; SAFE STREETS USA, ) <br> LLC; PARAMOUNT MEDIA GROUP; THE ) <br> ELEPHANT GROUP, INC.; and UNKNOWN JOHN ) <br> DOE DEFENDANTS I THROUGH XX, ) <br>  ) <br> Third-Party Defendants. ) <br> ------------------------------------------------------------------ ) <br> SAFE STREETS USA, LLC, as successor to ) <br> EVERSAFE SECURITY SYSTEMS, INC., ) <br>  ) <br> Cross-Claimant and Third-Party Plaintiff ) <br>  ) <br> v. ) <br>  ) <br> DIRECT SAVINGS USA, INC.; MR. OSCAR ) <br> MONTENEGRO; DIRECT SAVINGS USA, ) <br>  ) <br> Cross-Defendants and ) <br> Third-Party Defendants. ) <br> _____ ) | Case No. 11 C 1925 <br><br> Judge Bucklo |

## LOCAL RULE 56.1 STATEMENT OF UNCONTESTED MATERIAL FACTS

NOW COMES defendant Elephant Group, Inc., by and through undersigned counsel, and pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, submits this Statement of Uncontested Material Facts in support of Elephant Group's motion for summary judgment. Elephant Group respectfully requests the Court to consider the following:

A.   **Description of the Parties**

1.   ADT is a Delaware corporation. *See May 28, 2008 Agreement (Agreement) attached as Exhibit 1*.

2.   ADT is in the business of providing electronic security services to residences in the U.S. directly or through its Authorized Dealer Program of independent contractor ADT Authorized Dealers. *Exhibit 1*.

3.   Elephant Group, Inc. is a Delaware Corporation with its corporate headquarters located at 3303 West Commercial Boulevard in Fort Lauderdale, Florida. *Exhibit 1*.

4.   Elephant Group was an authorized marketer of ADT's services engaged in promoting sales "leads" for ADT's authorized dealers. *Exhibit 1*.

B.   **All Facts Supporting Venue and Jurisdiction**

5.   This Court has supplemental jurisdiction to hear the Third Party Complaint pursuant to 28 U.S.C. § 1367(a) because those claims arise out of the same case and controversy as the claims raised in plaintiffs' First Amended Complaint, which asserted claims pursuant to the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 *et seq.*. *Doc. 121, ¶ 19*. This Court had federal question jurisdiction over plaintiffs' TCPA claims pursuant to *Mims v. Arrow Financial Services, LLC*, 132 S.Ct. 740 (2012).

6. Venue is proper in this Court because the calls that were made to plaintiff Desai were received in this District. *Doc. 15, ¶ 2.*

C. **Uncontested Material Facts**

<u>The ADT and Elephant Group relationship</u>

7. ADT and Elephant Group entered into a service agreement (Agreement) on May 28, 2008, under which Elephant Group was to generate sales leads for ADT's authorized dealers to sell ADT's security services. *Exhibit 1.*

8. The Agreement contained two different indemnity provisions in the event that Elephant Group breached the agreement. *Exhibit 1, ¶ 6(b) and ¶ 23.F.*

9. The indemnification provision of paragraph 6(b) reads in relevant part:

> Elephant Group shall indemnify, defend and hold ADT, its Affiliates, officers, directors, employees and agents (collectively the 'ADT Group') harmless from and against any and all damages, costs (including court costs and attorneys' fees), losses, fees and expenses suffered by the ADT Group resulting from or relating to, any negligence or intentional torts by Elephant Group, its Affiliates, officers, directors, employees and agents in connection with or related to this Agreement, except to the extent that any such claim or action is due to any negligent acts, omissions, wrongful acts, fault or willful misconduct of ADT, its employees, agents or invitees**.** If any act or proceeding in connection with any such matter is brought against ADT, ADT shall furnish Elephant Group with a copy of any papers served.

*Exhibit 1, ¶ 6(b); see also Doc. 170-1, p. 6.*

10. The second indemnification provision in the Agreement is found in § 23.F, and provides:

> In addition to any other indemnification provisions in the Agreement or this Amendment, Elephant Group agrees to indemnify, defend and hold ADT harmless from and against any claims, actions, proceedings and damages, including reasonable attorney's fees and costs, and all monetary penalties or costs imposed upon ADT arising out of Elephant Group's breach of the provisions set forth in Sections A and B hereinabove.

*Exhibit 1, ¶ 23.F; see also Doc. 170-1, p. 27.*

11. After signing the Agreement, ADT's supervision to ensure compliance with the telemarketing rules by Elephant Group consisted of simply relying on the contractual terms. As described by ADT's corporate representative:

> Q. And at those meetings, one of the agenda items would be to ensure that Elephant Group was not hiring third-party lead generators?
>
> A. No, I think it was just a quarterly meeting on how things were going with the relationship. We relied on them [Elephant Group] to not breach the contract and hire affiliates without our express written consent. We, you know, didn't ask them specifically whether they were following each term of the contract on a quarterly basis.
>
> Q. Got it.
>
> A. We assumed that they followed the contract, because they signed it.

*See deposition of ADT's corporate representative Hannah Lim attached as Exhibit 2, pp. 133-34.*

12. Elephant Group made no unsolicited outbound telemarketing calls advertising ADT's services. *See Exhibit 2, p. 54; see also deposition of Reid Shapiro attached as Exhibit 3, pp. 21, 22, 29; and deposition of Joseph Bamira attached as Exhibit 4, pp. 11, 12, 38.*

13. Though the Agreement required Elephant Group to obtain written approval to hire any lead generator vendors, ADT had approved a more informal process of review and vendor approval, which involved telephone conversations or e-mail exchanges between ADT and Elephant Group. *Exhibit 3, pp. 31-32; Exhibit 4, pp. 13-14. See also deposition of Daphne Fernandez attached Exhibit 7, p. 121; pp. 123-124.*

14. ADT's indemnity claim against Elephant Group arises out of Elephant Group's hiring of Paramount without first obtaining written approval from ADT. *Exhibit 2, pp. 9-10; p. 50; p. 52; p. 102.*

15. Every time that ADT received a complaint from a consumer about a telemarketing call from Elephant Group, Elephant Group was able to provide ADT with substantiation that the consumer had consented to receiving the return telephone call from EG. *See deposition of Renata Bergman attached as Exhibit 5, p. 41*.

16. Since 2008, ADT received 19 complaints from consumers regarding a call involving Elephant Group. In all 19 instances, Elephant Group was able to substantiate that all of the activity was done consistent with the ADT's compliance policies to satisfy the complaint. *Exhibit 5, pp. 41-42*.

17. Elephant Group never used prerecorded messages in telemarketing in connection with ADT's products and services. *Exhibit 3, p. 41*

18. Elephant Group never made unsolicited outbound telemarketing calls. *Exhibit 3, p. 21, p. 22, p. 29; Exhibit 4, p. 11, p. 12, p. 38*.

<u>Elephant Group's relationship with Paramount</u>

19. Paramount Media Group (Paramount) operated an inbound call center and its business was alarm sales. *See deposition of Ryan Neill attached as Exhibit 6, p. 12*.

20. Paramount was an LLC formed in October, 2010 by Ryan Neill. *See Exhibit 6, p. 11*.

21. Paramount bought leads, took inbound calls and tried to convert them into sales. *Exhibit 6, p. 12*.

22. On November 12, 2010, Paramount entered into a written agreement with Elephant Group. *Exhibit 6, p. 19; see also Doc. 179-1*. Paramount was a lead provider vendor for Elephant Group. *Exhibit 7, p. 28*.

5

23. Paramount's relationship with Elephant Group was not exclusive. Paramount could and did sell security leads to other companies. *Exhibit 6, p. 34.*

24. Pursuant to the terms of the agreement, Paramount was specifically prohibited from making any unsolicited outbound telemarketing calls. *Exhibit 6, p. 37; Doc. 179-1, p. 3.* And neither ADT nor Elephant Group gave Paramount the authority to make unsolicited outbound telemarketing calls. *Exhibit 6, p. 37.*

25. Paramount did not make any unsolicited outbound telemarketing calls. *Exhibit 6, pp. 20 - 21.*

26. As part of the agreement with Elephant Group, Paramount agreed to comply with ADT's telemarketing guidelines and received training on the guidelines. *Exhibit 6, p. 42.*

27. Elephant Group's Director of Operation for the home security division also provided in person training to Paramount at Paramount's offices. *See Exhibit 7, pp. 46-47.* This training and supervision process included things such as periodically listening to calls, ensuring the correct scripts were being used and correcting errors committed by Paramount. *Exhibit 7, p. 51; p. 95.*

28. Paramount was prohibited from purchasing leads that involved prerecorded messages. *Exhibit 6, p. 39.*

29. If Paramount purchased leads that were generated using prerecorded messages, it would have been acting contrary to Elephant Group's and ADT's interests. *Exhibit 6, p. 39.*

30. Paramount would create its own leads, or purchase leads from EMI and sell those leads to other ADT dealers, and was not exclusively providing leads to Elephant Group. *Exhibit 6, p. 34.* However, Elephant Group did not hire EMI or purchase leads from EMI. *Exhibit 2, p. 45*

6

31. Paramount simply bought leads from EMI through purchases orders; there was no contract between EMI and Paramount. *Exhibit 6, p. 14.*

<u>Paramount's relationship with EMI</u>

32. At all times relevant to this lawsuit, Christopher Long owned and operated EMI, Inc. (EMI), a company engaged in telemarketing. *Stipulated Permanent Injunction as to Third Party Defendant, Christopher Long, Doc. 255, ¶ 2.*

33. Christopher Long was never an employee, agent or independent contractor of ADT and never had authority to engage in telemarketing on ADT's behalf. *Doc. 255, ¶ 3.*

34. Paramount bought leads from EMI and paid EMI for each phone call that EMI transferred to Paramount. *Exhibit 6, p. 16, p. 64.*

35. Paramount did not have a written agreement with EMI. *Exhibit 6, p. 49, p. 64.*

36. Paramount did not authorize EMI to use ADT's name in pre-recorded messages that were sent out to consumers. *Exhibit 6, p. 52.*

37. Paramount did not know that EMI was robocalling or sending prerecorded messages to consumers. *Exhibit 6, p. 17.*

38. In fact, EMI told Paramount that EMI was fully compliant with all federal regulations regarding telemarketing. *Exhibit 6, p.17.*

39. As part of that compliance, Paramount understood that EMI was manually dialing outbound calls through live agents. *Exhibit 6, p.17.*

40. If EMI was using ADT's name, EMI was acting contrary to what they told Paramount. *Exhibit 6, p. 52.*

41. Elephant Group was not aware that Paramount was buying leads from EMI. *Exhibit 6, p. 48.*

42. If EMI were, in fact, robocalling people using prerecorded messages, that would be contrary to what they told Paramount. *Exhibit 6, p. 51*.

43. Elephant Group placed contractual limitations on Paramount's ability to engage in marketing activities and Paramount was specifically prohibited from placing unsolicited outbound telemarketing calls. *Exhibit 6, p. 37. Doc. 179-1, p. 3*.

44. Paramount was also prohibited from purchasing leads that involved prerecorded messages. *Exhibit 6, p. 39*.

45. If Paramount purchased leads that were generated using prerecorded messages, it would have been acting contrary to Elephant Group's interest and ADT's interest. *Exhibit 6, p. 39*.

46. Paramount was provided with ADT's telemarketing guidelines and received training on the guidelines. *Exhibit 6, p. 42*.

47. After the *Desai* lawsuit was filed, it was learned that EMI had made outbound telemarketing calls for customers other than Paramount. *Exhibit 2 pp. 119-120; see also declaration of Daniel Bernal attached as Exhibit 8, ¶ 5*.

48. EMI had relationships with Paramount, Alarm Pros, Home Alert and Eversafe for the purpose of marketing ADT's products and services, and sold leads to each of these companies. *See ADT's Responses to Elephant Group, Inc.'s First Discovery Requests, No. 19 attached as Exhibit 9*.

49. Moreover, there were vendors other than EMI, including Leads Direct Marketing and City VIP, that were making outbound telemarketing calls for ADT's products. *Exhibit 2, p. 112*.

ADT's Marketing Program

8

50. ADT markets its security services in two general ways, directly and indirectly. *Exhibit 5, p. 13.*

51. Direct marketing involves tactics such as the use of a direct mail program, taking inbound calls and making outbound calls. *Exhibit 5, p. 14*. ADT employees 75 full time employees to make outbound calls from leads ADT obtains from its own lead generator vendors. *Exhibit 5, p. 16.*

52. ADT entered into a Consent Decree and Order for Civil Penalties with the FTC in 2007. In that Consent Decree, ADT was alleged to have engaged in illegal telemarketing and agreed to undertake a more robust monitoring program of its dealers. *See Doc. 15, ¶ ¶ 28-35* and *Doc. 15, Ex. A.*

53. In this case, ADT determined that calls were being made by entities that had no contractual relationship with Elephant Group. The telemarketing calls were being made by companies unrelated to and with no involvement of Elephant Group – including Leads Direct Marketing, Direct Savings USA, Eversafe, City VIP, LLC and JMB Enterprises. *See ADT's Corrected Third Party Complaint*, [doc. 121], ¶ 67, ¶ 88, ¶ 119 and ¶ 127; *see also Exhibit 2, p. 12, p. 14, p. 20, p. 45 and p. 121.*

54. EMI engaged in telemarketing campaigns for ADT dealers unrelated to Elephant Group, including Alarms Pro and Home Alert. *See Exhibit 8. See also Exhibit 2, p. 45, p. 119-120 and Exhibit 9, ADT's answer to Interrogatory Number 19 at page 9.*

55. Moreover, ADT's authorized dealers, including Absolute Security of America, Eversafe and Defender hired their own lead generators to create sales leads independent of EMI. *Exhibit 2, p. 12; p. 14.*

56. ADT engages in its own telemarketing by making outbound telephone calls, employing 75 people to place outbound calls to leads. *Exhibit 5, p. 16.*

57. Earlier this year, the same plaintiffs' lawyers that filed the underlying *Desai* litigation filed a new class action lawsuit against ADT and one of its authorized dealers, Security Solutions, Inc., for continuing to engage in allegedly illegal telemarketing. *See Fitzhenry v. The ADT Corporation referenced in plaintiff's motion to designate as a related case at Doc. 259.*

<u>Facts Related To Plaintiffs Charvat and Desai</u>

58. Plaintiff Charvat received two calls marketing ADT's services. The first Charvat call was made by Leads Direct Marketing, a lead generator used by ADT's authorized dealer, Eversafe. *Exhibit 2, p. 26, p. 30.*

59. Elephant Group, Paramount and EMI had no involvement in the first Charvat call. *Exhibit 2, p. 28.*

60. The second Charvat call was made by JMB Enterprises on behalf of ADT's authorized dealer, Eversafe. *Exhibit 2, p. 32.*

61. Elephant Group, Paramount and EMI had no involvement in the second Charvat call. *Exhibit 2, p. 32.*

62. The call made to plaintiff Desai was made by EMI on a Paramount campaign. *Exhibit 2, p. 35.*

63. ADT did not know of the existence of EMI prior to the lawsuit, and did not consent to EMI making outbound telemarketing calls or the use of ADT's name, trademark or logo. *Exhibit 2, pp. 101-102.*

64. ADT did not direct any entity, including EMI to make the calls involved in the underlying case. *Exhibit 2, p. 99.*

65. ADT played no part in drafting the message, creating the message script, or dictating the manner in which the telemarketing calls were to be made. *Exhibit 2, p. 35.* ADT did not know these calls were being made. *Exhibit 2, p. 35.*

66. ADT never received the benefit of any of the calls from EMI and ADT did not knowingly accept the benefit of any of the calls. *Exhibit 2, p. 35.*

67. The settlement between plaintiff and ADT included calls wholly unrelated to Elephant Group, and for which Elephant Group played no role in either making the call, or directing the placement of the call. The settlement class consisted of:

> All persons or entities who, at any time from January 1, 2007 through the date of the Settlement Agreement, received one or more Covered Calls. "Covered Calls" means either (1) a telemarketing call utilizing a pre-recorded message or (2) a telemarketing call to a cell phone that was made through the use of automated dialing equipment, where the call described in (1) and/or (2) relates in any way to ADT Security Services, Inc. Covered Calls include calls initiated or made by ADT or by someone acting or purporting to act on behalf of ADT, or calls initiated or made by someone seeking to sell products or services relating in any way to ADT, including calls made by ADT's Authorized Dealers, ADT's Authorized Telemarketers, ADT's Marketing Partners, or calls initiated or made by anyone seeking to sell leads relating to ADT, or any calls initiated or made by anyone seeking to sell leads relating to ADT to anyone else, where the lead sought to be generated from the call ultimately could have been sold to ADT, ADT's Authorized Dealers, ADT's Authorized Telemarketers, or ADT's Marketing Partners, including but not limited to any calls made or caused to be made by Christopher Long (or any entity associated with Christopher Long), Oscar Montenegro (or any entity associated with Oscar Montenegro), EMI, Inc. (also known as European Marketing International and European Media International and Nationwide Media, Inc.) (collectively "EMI") (or anyone acting by, through, or with EMI), Direct Savings USA, LLC (or anyone acting by, through, or with Direct Savings USA, LLC), Direct Savings USA, Inc. (or anyone acting by, through, or with Direct Savings USA, Inc.), Paramount Media Group (or anyone acting by, through or with Paramount Media Group), Dynamic Interactive Corp. (or anyone acting by, through or with Dynamic Interactive Corp.), Pete Tolman, Leads Direct Marketing (or anyone acting by, through, or with Leads Direct Marketing), Voice Tel Corp. (or anyone acting by, through, or with Voice Tel Corp.), TM Caller ID (or anyone acting by, through, or with TM Caller ID), City VIP (or anyone acting by, through, or with City VIP), and JMB Enterprises (or anyone acting by, through, or with JMB Enterprises). Covered

11

>Calls included any such calls whether or not authorized by, approved by, or known by ADT.

*Doc. 243, pp. 2-3 (Final Approval Order)*

                Respectfully submitted,

                /s/ Daniel W. Pisani
                James K. Schultz
                Daniel W. Pisani
                Sessions Fishman Nathan & Israel, LLC
                55 West Monroe Street, Suite 1120
                Chicago, Illinois 60603
                Telephone: (312) 578-0990
                Facsimile: (312) 578-0991
                jschultz@sessions-law.biz
                dpisani@sessions-law.biz

                *Attorneys for Elephant Group, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 14, 2014, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to the parties of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Respectfully submitted,

/s/ Daniel W. Pisani
James K. Schultz
Daniel W. Pisani
Sessions Fishman Nathan & Israel, LLC
55 West Monroe Street, Suite 1120
Chicago, Illinois 60603
Telephone: (312) 578-0990
Facsimile: (312) 578-0991
jschultz@sessions-law.biz
dpisani@sessions-law.biz

*Attorneys for Elephant Group, Inc.*