# Exhibit 2

Page 1

1

2          UNITED STATES DISTRICT COURT

      FOR THE NORTHERN DISTRICT OF ILLINOIS

3              EASTERN DIVISION

      -------------------------------x

4     VISHVA DESAI,

5                         Plaintiff,

6

7              -against-          No. 11C1925

      ADT SECURITY SERVICES, INC.,

8     et al.,

9                         Defendants.

      -------------------------------x

10

11                       June 27, 2014

12                       10:15 a.m.

13

14        Deposition of ADT SECURITY

15    SERVICES, INC., by HANNAH LIM, pursuant

16    to notice and subpoena, at the offices

17    of Veritext Legal Solutions, 301

18    Northeast 51st Street, Boca Raton,

19    Florida, before Jack Finz, a Shorthand

20    Reporter and Notary Public within and

21    for the State of Florida.

22

23

24

25

Page 2

```
 1
 2  A P P E A R A N C E S :
 3     SARA GOLDBERG, ESQ.
       McNEW P.A.
 4     Attorneys for Defendant
       ADT SECURITY SERVICES, INC.
 5        2385 New Executive Center Drive
          Suite 100
 6        Boca Raton, FL 33431
 7
 8     JAMES K. SCHULTZ, ESQ.
       SESSIONS FISHMAN NATHAN & ISRAEL LLC
 9     Attorneys for Third-Party Defendant
       the ELEPHANT GROUP
10        55 West Monroe Street
          Suite 1120
11        Chicago, IL 60603-5130
          (Via telephonic conference call)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2        E X H I B I T S
 3
       (ADT Exhibit 3 for        16
 4     identification, document
       entitled "ADT Security Services,
 5     Inc.'s Corrected First Amended
       Third Party Complaint".)
 6
       (ADT Exhibit 4 for        63
 7     identification, document
       entitled "Settlement Agreement
 8     and Release.")
 9     (ADT Exhibit 5 for        74
       identification, document
10     entitled "ADT's Securities
       Services Brief in Support of
11     Unopposed Motion For Preliminary
       Approval.")
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1              HANNAH LIM
 2        H A N N A H   L I M ,
 3     having been first duly sworn by the
 4     Notary Public (Jack Finz), was
 5     examined and testified as follows:
 6  EXAMINATION BY
 7  MR. SCHULTZ:
 8        Q.   Hannah, could you just state
 9  your name for the record, please?
10        A.   Hannah Funhi Lim.  The middle
11  name is spelled F-u-n-h-i.
12           MR. SCHULTZ:  Let the record
13     reflect that this is the deposition
14     of Hannah Lim, being taken in the
15     ADT versus Elephant Group case,
16     taken pursuant to the notice and
17     continued to today's date by
18     agreement of the parties.
19        Q.   Hannah, I know you have been
20  deposed before, even in this case, but
21  you understand that in today's deposition
22  you are being presented as the Rule
23  30(b)(6) witness for ADT?
24        A.   Yes.
25        Q.   And you are an attorney;
```

Page 5

```
 1              HANNAH LIM
 2  correct?
 3        A.   I am.
 4        Q.   Are you familiar with what
 5  Federal Rule of Civil Procedure 30(b)(6)
 6  is?
 7        A.   Yes.
 8        Q.   And you understand that the
 9  testimony you are giving is not
10  necessarily what you personally know, but
11  you are testifying on behalf of the
12  corporations?
13        A.   I do.
14        Q.   And you were just in the room
15  for the deposition of Renata Bergman;
16  correct?
17        A.   I was present, yes.
18        Q.   And when we showed Renata
19  Exhibit No. 1, the deposition notice, she
20  had said that she was going to be
21  testifying on topics 13, 14, 15 and 16;
22  correct?
23        A.   That's correct.
24        Q.   And that Exhibit 1, do you
25  have that in front of you?
```

2 (Pages 2 - 5)

HANNAH LIM

1
2    A.   I do now.  It's in the binder
3  that I have, and I'm looking at it right
4  now.
5    Q.   You see that there's 17
6  topics?
7    A.   Yes.
8    Q.   In total.
9    A.   Yes.
10   Q.   Are you being presented today
11 to testify on the remaining topics in
12 this deposition notice?
13   A.   That is correct.
14   Q.   That would be, just so we are
15 perfectly clear, topics 1 through 12 and
16 number 17?
17   A.   Correct.
18   Q.   Some of this testimony may be
19 duplicative of what you testified to
20 earlier, but again you understand that
21 for today's testimony you are the
22 corporate representative?
23   A.   I do understand that.  And I
24 have done an extensive review of the
25 documents and spoken with individuals.

HANNAH LIM

1
2  But there is still information gaps
3  because we don't have certain
4  information.  So let's take it -- we can
5  take it as we come.
6    Q.   I think you anticipated my
7  next question, but since your last
8  deposition what exactly have you done to
9  prepare to testify on these 13 topics
10 that we have identified in Exhibit 1?
11   A.   I have attended the deposition
12 prep of Renata, although she doesn't
13 recall that, of Dan Geiger, and I have
14 also met with Dan McGrath, who reports to
15 me in the law department.  And I have met
16 with our external counsel as well, Sara
17 and Sanders.
18   Q.   What documents have you
19 reviewed?
20   A.   I have reviewed a compilation
21 of documents from the Desai lawsuit,
22 primarily.
23   Q.   Can you describe those to the
24 best of your ability, please?
25   A.   Sure.  I have reviewed briefly

HANNAH LIM

1
2  the discovery responses submitted by the
3  plaintiff, primarily the interrogatory
4  responses.  I have reviewed several
5  affidavits.  What comes to mind are the
6  Tantalo and the Bernal affidavits.
7        I've reviewed deposition
8  testimony by Ryan Neill and by Chris Long
9  in a bankruptcy proceeding.  And I
10 reviewed certain emails, contracts,
11 relating to our relationship, ADT's
12 relationship, with Saveology.
13        And I've also reviewed certain
14 consent forms that the company had
15 drafted, they drafted up and sent out to
16 lead providers following the Desai
17 lawsuit.
18   Q.   And I think you said earlier,
19 Hannah, that there might be some
20 information gaps in what you were able to
21 prepare for.  Is that true?
22   A.   There could be.  I'm not
23 anticipating that, but let's just go and
24 see how much we can get through and maybe
25 there won't be.

HANNAH LIM

1
2    Q.   Are you prepared to go forward
3  to testify on the 13 topics in the
4  deposition notice now?
5    A.   Yes, I am.
6    Q.   Is there any reason that you
7  anticipate that you can't go forward with
8  the deposition then?
9    A.   No.
10   Q.   I am just going to ask you a
11 general question.  Can you just, Hannah,
12 describe for us what the Desai versus ADT
13 case was about?
14   A.   Sure.  In brief, it was about
15 TCPA violations, and we discovered
16 through the course of that litigation
17 that those unauthorized robocalls were
18 made on behalf of a company that we hired
19 and its affiliates.
20   Q.   And what company is that?
21   A.   We hired a company called
22 Saveology, or Elephant Group, and I'll
23 use those two names synonymously, and
24 Saveology then hired a company called
25 Paramount.

HANNAH LIM

1
2       Paramount then, as I
3   understand it through the documents,
4   hired a company called EMI.  EMI then
5   hired -- well, they hired, I don't know
6   if they hired, I guess they did, but they
7   used a technology platform called Dynamic
8   Interactive, which was a robocalling or a
9   speed-dialing technology platform which
10  EMI used to make large quantities of
11  calls in a short period of time.
12      We also learned through the
13  course of discovery that EMI hired other
14  lead-gen partners or affiliates.  One of
15  them comes to mind, Two Free Nights,
16  Savilo, and there's deposition testimony
17  that there were approximately 30 other
18  affiliates that EMI hired to generate
19  leads and do outbound calls on their
20  behalf.
21      Q.   That was a very thorough and
22  much more detailed answer than I was
23  anticipating.  But the underlying lawsuit
24  for the TCPA violations against ADT was
25  settled; correct?

HANNAH LIM

1
2       A.   I'm sorry, could you repeat
3   that, Jim?
4       Q.   The underlying case, Desai and
5   Charvat versus ADT, was settled?
6       A.   That's correct, yes.
7       Q.   And so the current litigation
8   involves a third-party complaint filed by
9   ADT against a variety of different
10  entities; right?
11      A.   Well, I guess, let me just
12  back up.  You are correct in saying that
13  the primary suit between ADT and the
14  class, that claim was settled.  There
15  were third-party complaints, as you just
16  referenced, that ADT filed against
17  Defender, Eversafe, Saveology, Elephant
18  Group, and a number of other entities.
19  Those in large part are settled.
20      And we are now, as you are
21  aware, continuing to litigate the
22  third-party claim that arose from Desai
23  with Saveology and Elephant Group.
24      Q.   Is ADT prosecuting any other
25  third-party complaints arising out of the

HANNAH LIM

1
2   Desai litigation, other than against
3   Saveology?
4       A.   We did pursue litigation
5   against Chris Long.  Chris Long, as you
6   are aware, filed for bankruptcy.  There
7   was a creditors' hearing during the
8   course of Desai.  We have not pursued
9   that litigation as a result of the
10  bankruptcy claim, and we settled out with
11  three major dealers.
12      And when I say dealers, I mean
13  in the, you know, colloquial sense, ADT
14  has a dealer network, and we partner with
15  those dealers to generate accounts.  And
16  so we settled with three dealers that
17  were peripherally involved in the
18  lawsuit.  Those dealers, as we learned
19  through discovery, hired Saveology and
20  other lead-gen partners to create leads.
21      MR. SCHULTZ:  Jack, there is a
22  collection of documents, starting
23  out with Confidential Settlement
24  Contribution Agreement and Release.
25  It's Bates stamped on the bottom

HANNAH LIM

1
2   ADT 1505 through ADT 1524.
3       Sara, this one I'm assuming we
4   don't want to mark and attach?
5       MS. GOLDBERG:  That is
6   correct.  I believe it was marked
7   in the first deposition of Hannah
8   Lim, but we will have to mark that
9   as confidential.
10      MR. SCHULTZ:  I wasn't
11  planning on marking it.  I was just
12  going to reference it by the Bates
13  number.
14      MS. GOLDBERG:  That's fine
15  with me.  I think that's
16  preferable.
17      Q.   Hannah, I am going to ask Jack
18  to hand you a group of documents that are
19  Bates stamped ADT 1505 through 1524.
20      A.   I have that.
21      Q.   And those, I will represent to
22  you, are documents that were provided by
23  your counsel in the course of this
24  litigation.  That appears to be three
25  different settlement agreements that ADT

HANNAH LIM

1
2  reached in the third-party action. Would
3  that be fair?
4      A.  That's correct.
5      Q.  And so the first one, ADT
6  1505, is an agreement between ADT and
7  Eversafe; correct?
8      A.  That's correct.
9      Q.  And 1511 would be the
10 settlement agreement between ADT and
11 Defender?
12     A.  Yes, that's correct.
13     Q.  And then the third one would
14 be starting at 1517 between ADT and
15 Absolute Security of America, along with
16 a couple of other individuals?
17     A.  Yes, that's correct.
18     Q.  Are those the three
19 settlements that you alluded to before?
20     A.  Yes, these are.
21     Q.  Did I hear you correctly,
22 Hannah, did you say that ADT had reached
23 a conclusion that some of these three
24 entities had hired Saveology?
25     A.  We have information that these

HANNAH LIM

1
2  dealers hired certain lead-gen partners,
3  which also hired affiliates or partners
4  that made unauthorized telemarketing
5  calls.
6      Q.  And who are the lead
7  generation partners that were hired by
8  Eversafe?
9      A.  I don't recall specifically,
10 but I think Direct Savings comes to mind.
11     Q.  And what about Defender, who
12 did they hire?
13     A.  I believe -- I was under the
14 impression that Defender hired Saveology,
15 but I don't recall as I sit here.
16     Q.  Any others that you may
17 recall?
18     A.  Absolute.
19     Q.  As far as Defender, any other
20 lead generation entities or vendors that
21 were hired besides Saveology, that you
22 might recall?
23     A.  No, that's the only one that
24 comes to mind.
25     Q.  What about for Absolute, do

HANNAH LIM

1
2  you have an understanding as to who they
3  hired as lead generators?
4      A.  It's the same as Defender,
5  Saveology.
6      Q.  They were Saveology, and you
7  are not aware of any others?
8      A.  Correct.
9      MR. SCHULTZ:  Jack, can you
10     hand Hannah a copy, and mark it as
11     Exhibit 3, "ADT Security Services,
12     Inc.'s Corrected First Amended
13     Third Party Complaint."
14         (ADT Exhibit 3 for
15     identification, document entitled
16     "ADT Security Services, Inc.'s
17     Corrected First Amended Third Party
18     Complaint".)
19     Q.  Hannah, we are handing you
20 what has been marked as Exhibit 3, the
21 third-party complaint in this case,
22 that's against, among others, Elephant
23 Group.  I am assuming you have seen this
24 before?
25     A.  Yes, I have.

HANNAH LIM

1
2      Q.  I think we talked about this
3  in your last deposition, but in the
4  caption there are a variety of different
5  entities that are named, starting with
6  Pete Tolman; correct?
7      A.  That's correct, yes.
8      Q.  The third-party defendants
9  have, I think we always seem to count
10 wrong, but somewhere between 12 to 14
11 different entities?
12     A.  Correct.
13     Q.  And that includes Elephant
14 Group?
15     A.  Yes.
16     Q.  Defender is not named;
17 correct?
18     A.  I don't see them here,
19 correct.
20     Q.  Why did ADT not sue Defender
21 as a third-party defendant?
22     A.  I believe that we probably
23 found out about Defender later on.  We
24 filed the third-party complaint -- let me
25 check the date.

Page 18

HANNAH LIM

1
2    Q.   10/28/11.
3    A.   Yes, 10/28.  So the suit was
4  filed.  Then we filed a third-party
5  complaint based on the discovery that had
6  already come through the door at that
7  point in time.  And we likely did not
8  have information about Defender.  That's
9  why we did not name them.
10    Q.   And Absolute Security is also
11  not named; correct?
12    A.   That's correct.  And I
13  specifically recall that we discovered
14  that Absolute -- we received certain call
15  campaigns through the course of discovery
16  and learned that the Absolute call
17  campaign -- the Absolute call campaign
18  came to our attention maybe a month
19  before we settled.
20        So, no, we didn't amend the
21  complaint, but we put these folks on
22  notice that we were going to be seeking
23  indemnity from them based on the
24  information received in discovery from
25  plaintiffs.

Page 19

HANNAH LIM

1
2    Q.   Were there any other entities,
3  besides Defender and Absolute, that ADT
4  identified as potentially contributing to
5  this case, but did not sue?
6    A.   Yes.  There is an entity out
7  of Georgia, a dealer, and I don't
8  remember the name right now, but it was a
9  small mom-and-pop shop, and they were
10  essentially bankrupt, so we didn't name
11  them.
12    Q.   Were they a lead generating
13  company or an authorized dealer, or who
14  was this company out of Georgia?
15    A.   It was a dealer.
16    Q.   And so the decision was not to
17  include them because they were
18  essentially defunct or bankrupt?
19    A.   Correct.  Well, it was like a
20  mom-and-pop shop, basically a husband and
21  a wife, and they didn't have any assets
22  for us to go after them for.
23    Q.   Are they still a dealer of
24  ADT?
25    A.   I don't believe they are.  I

Page 20

HANNAH LIM

1
2  don't believe they have any assets or
3  generate any accounts.  So they were
4  defunct, and we had to terminate them as
5  a result of the lawsuit.
6    Q.   Any other entities that you
7  can think of besides this company in
8  Georgia that wasn't named?
9    A.   That's the only thing that
10  comes to mind.
11    Q.   And the settlements that we
12  talked about in the settlement agreement,
13  starting at ADT 1505, those are the only
14  three settlements that ADT has had in
15  relation to any third-party complaints or
16  causes of action; correct?
17        If you don't understand that
18  question, I'll repeat it.  I know it was
19  bad.
20        Did ADT settle claims with any
21  other entities besides Eversafe, Defender
22  and Absolute?
23    A.   No.
24    Q.   So the entire contribution
25  that ADT has received in this case is

Page 21

HANNAH LIM

1
2  reflected in the three settlement
3  agreements we looked at, beginning at ADT
4  1505?
5    A.   Yes.
6    Q.   And as we sit here today, is
7  ADT pursuing third-party claims against
8  anybody other than Elephant Group?
9    A.   No.
10    Q.   The case with Chris Long was
11  settled for basically an injunction, or
12  promise by him to stop; correct?
13    A.   That's correct.  I think it
14  was in the course of his bankruptcy
15  hearing.
16    Q.   And Chris Long was the
17  principal of EMI; right?
18    A.   Yes, he was.
19    Q.   So what I'm kind of going
20  through here is the caption, and so I'm
21  just curious and crossing off names as
22  far as who has either settled or been
23  resolved.  Is there any ongoing
24  litigation against Pete Tolman?
25    A.   No.

6 (Pages 18 - 21)

Page 22

HANNAH LIM

2  Q.  Any --
3  A.  I mean, I can kind of cut it
4 short and say there is no active
5 litigation against any of the entities in
6 the third-party complaint, or first
7 amended third-party complaint, aside from
8 Saveology and -- I'm sorry, Saveology and
9 Elephant Group.  We either resolved the
10 claims or made an assessment that the
11 entity or individuals are bankrupt or
12 have no assets.
13  Q.  So other than Elephant Group,
14 in this caption here, all those other
15 entities, except I guess it would be
16 Eversafe, Safe Streets, which I
17 understand is related to Eversafe, Chris
18 Long and EMI, all the remaining entities,
19 ADT concluded that there was no reason to
20 go after them?  Would that be fair to say
21 then?
22  A.  That they had no assets, and
23 we could not tie them directly through
24 discovery that was produced as a result
25 of the third-party complaint to the Desai

Page 23

HANNAH LIM

2 and Charvat litigation, correct.
3  Q.  So Elephant Group has the good
4 fortune of being the pocket that you can
5 dig into?
6  MS. GOLDBERG:  Objection.
7  A.  Well, Saveology and Elephant
8 Group, we learned through the course of
9 discovery, was involved in many, many
10 campaigns, call campaigns, that generated
11 tens of millions of calls, in violation
12 of the TCPA, and because as the law, as
13 you are aware, is joint and several, we
14 could go after Saveology for all or
15 nothing, and we could also go after these
16 dealers for all or nothing of the
17 liability they created.
18  So there is no, you know, in
19 my view of the law, there's no
20 allocation.  There can be contribution,
21 claims that folks can claim against one
22 another.  But we can make one claim
23 against one individual or entity and go
24 after that entity for the entire amount.
25  Q.  So it is ADT's position in

Page 24

HANNAH LIM

2 this lawsuit that Elephant Group, I think
3 you said, was involved in campaigns to
4 make tens of millions of calls?
5  MS. GOLDBERG:  Objection to
6 form.
7  A.  Elephant Group hired
8 Paramount, which hired EMI, which used
9 many lead generators, and all those
10 affiliates after Elephant Group, or
11 affiliates of Elephant Group, or
12 sub-affiliates, violated the TCPA by
13 making these outbound telemarketing calls
14 without express written consent.
15  Q.  Let's take a look at the
16 individuals that brought the underlying
17 lawsuit, Desai and Charvat.  Okay?  What
18 I want to talk to you about, Hannah, is
19 what ADT's investigations into those
20 calls were.  Okay?
21  A.  Sure.
22  Q.  And is it your understanding
23 that Philip Charvat alleged in his
24 complaint that he had received two
25 different calls that were telemarketing

Page 25

HANNAH LIM

2 ADT products and services?
3  A.  That's my understanding from
4 reading the discovery responses in
5 plaintiff's answers to interrogatories,
6 correct, yes.
7  Q.  Looking at Exhibit 3, the
8 third-party complaint filed by ADT, did
9 you get a chance to review that?
10  A.  I did not review this one
11 recently, but I'm thumbing through it and
12 I'm, you know, generally familiar with
13 the facts in this third-party complaint.
14  Q.  At some point in time you had
15 reviewed it, though?
16  A.  Correct, yes.
17  Q.  And I'm not going to test you
18 on it, but what I want to know, Hannah,
19 is at the time you reviewed it, did it
20 appear to be accurate, to the best of
21 your knowledge at that time?
22  A.  Absolutely.
23  Q.  Beginning on page 11, with
24 paragraph 61, ADT describes what it calls
25 the "First Charvat Call."  Do you see

7 (Pages 22 - 25)

Page 26

HANNAH LIM

1          HANNAH LIM
2 that?
3    A.  I do.
4    Q.  So according to ADT, who made
5 the first Charvat call sometime around
6 September 7, 2010?
7       MS. GOLDBERG:  Objection.  You
8    are asking what the complaint says
9    or you are asking based on other
10   knowledge?
11      MR. SCHULTZ:  I am asking what
12   ADT's current understanding is as
13   far as who made the first Charvat
14   call on or about September 7, 2010.
15   A.  Based on this, it would be
16 Leads Direct Marketing, a company owned
17 by Pete Tolman.
18   Q.  And has ADT learned any
19 information since the filing of this
20 complaint in October 2011 as far as any
21 other entities that may have made that
22 call?
23   A.  I'm sorry, could you repeat
24 that?
25   Q.  You referenced that, according

Page 27

1          HANNAH LIM
2 to this, which I assume you mean Exhibit
3 3, it was Leads Direct Marketing and Pete
4 Tolman that made the first Charvat call;
5 correct?
6   A.  That's correct.  But, I mean,
7 I kind of -- well, let's just see where
8 you take this.  Because my understanding
9 of this third-party complaint is that --
10 well, first of all, the Charvat call
11 seemed to be generated in and through one
12 of the dealers and one of their lead-gen
13 companies.
14     So ADT's dealer basically
15 generated this call.  We were not
16 involved contractually with anything
17 related to the Charvat call.  The Desai
18 call, however, we traced back to --
19   Q.  I appreciate that.  I just
20 want to focus on Charvat for right now.
21   A.  Sure.
22   Q.  So let's talk about the
23 Charvat call.  It was Leads Direct
24 Marketing.  Is that currently ADT's
25 understanding as to who made the first

Page 28

1          HANNAH LIM
2 Charvat call?
3   A.  No, I believe it was Direct
4 Savings, or Engage Tel.
5     Yes, Tolman.  Yes.
6   Q.  I'm sorry, I just want to make
7 sure it was clear.  Is it ADT's current
8 understanding that the first Charvat call
9 was made by Leads Direct Marketing?
10   A.  It looks like it was made by
11 Leads Direct Marketing, who is owned by
12 Pete Tolman, and Engage Tel was also
13 involved as well on that call, the first
14 call.
15   Q.  At any point in time, had ADT
16 discovered that Dynamic Interactive had
17 anything to do with the first Charvat
18 call?
19   A.  I don't have information here
20 connecting Dynamic Interactive to those
21 calls, no.
22   Q.  Do you have any information
23 that EMI had anything to do with the
24 first Charvat call?
25   A.  No.

Page 29

1          HANNAH LIM
2   Q.  Do you have any information
3 that Paramount had anything to do with
4 the first Charvat call?
5   A.  No.
6   Q.  Do you have any information
7 that Elephant Group had anything to do
8 with the first Charvat call?
9   A.  No.
10   Q.  So does ADT have any evidence
11 currently, that you are aware of, that
12 Elephant Group or Saveology played any
13 role in making the first call to Charvat?
14   A.  No.  But, again, we can go
15 after Saveology for the entire amount if
16 Eversafe --
17   Q.  I understand that that's going
18 to be your position, Hannah, but I am
19 just asking a very discrete, factual
20 question.  We don't need to get into a
21 legal dispute.  We will have the motions
22 for that.
23   A.  Okay.  Fair.  Go ahead.
24   Q.  Did you ever find out, did ADT
25 ever find out that Leads Direct Marketing

8 (Pages 26 - 29)

Page 30

HANNAH LIM

1  was a lead generator that was being used
2  by Eversafe?
3      A.  Yes, we did.
4      Q.   Are you aware of whether or
5  not there were any other authorized
6  dealers or sellers of ADT that were using
7  Leads Direct, besides Eversafe?
8      A.  Not to my knowledge.
9      Q.   Are you aware of any other
10  authorized sellers that were using either
11  Voice Tel or Direct Savings or Pete
12  Tolman companies?
13      A.  Not to my knowledge.
14      Q.   So, as far as ADT is aware,
15  the only authorized seller of ADT
16  products that used Leads Direct Marketing
17  was Eversafe?
18      A.  Yes.
19      Q.   Let's move on to the second
20  Charvat call.
21      A.  Okay.
22      Q.   A description of that starts
23  on Exhibit 3, on page 17, starting with
24  paragraph 111.

Page 31

HANNAH LIM

1      A.  Okay.
2      Q.   Do you see that?
3      A.  Yes, I do.
4      Q.   And paragraph 111, ADT states
5  that Charvat alleges that he got a second
6  call on January 18, 2011; correct?
7      A.  Yes, correct.
8      Q.   Did ADT ever investigate as to
9  who made that call?
10      A.  It looks to be an entity
11  called JMB Enterprises.
12      Q.   And JMB Enterprises, again,
13  they were named as a third-party
14  defendant here?
15      A.  They were, yes.
16      Q.   Does ADT ever figure out what
17  happened TO the call after it was made by
18  JMB Enterprises?
19      A.  What do you mean by that
20  question?
21      Q.   Let me try it again.  It's
22  ADT's belief that JMB Enterprises is the
23  one that placed the second Charvat call;
24  correct?

Page 32

HANNAH LIM

1      MS. GOLDBERG:  Objection to
2  form.  To the extent that any of
3  these third-party defendants have
4  defaulted, we were not able to get
5  information from them.
6      Q.   Again, ADT's current
7  information is that the second Charvat
8  call was made by JMB Enterprises;
9  correct?
10      A.  Correct.
11      Q.   Does ADT know on whose behalf
12  or who they were making that call for?
13      A.  It appears to be on behalf of
14  ADT's authorized dealer Eversafe.
15      Q.   Again, was Dynamic involved in
16  making that call at all?
17      A.  Neither Dynamic, Paramount,
18  Elephant Group or Saveology were involved
19  in that call, no.
20      Q.   Was EMI involved at all?
21      A.  No.  EMI, Elephant Group,
22  Saveology, Paramount, no.
23      Q.   So as far as the second
24  Charvat call is concerned, does ADT have

Page 33

HANNAH LIM

1  any evidence that Saveology was in any
2  way related to the making of that call?
3      A.  No, we don't.  And again I am
4  just going to say that we have -- go
5  ahead.
6      Q.   Let's now talk about the Desai
7  calls.
8      A.  Why not?
9      Q.   I think this starts on page 6
10  of Exhibit 3, beginning with paragraph
11  30.
12      A.  I thought you said we are not
13  going to talk about the Desai call.
14      Q.   No, of course we are.
15      A.  Because I'm like why not.  Go
16  ahead.
17      Q.   The Desai call was alleged to
18  have occurred around February 27, 2011;
19  correct?
20      A.  Yes.
21      Q.   Let's trace that call.  Who
22  did ADT identify as having made that
23  call?
24      A.  We traced that call to Dynamic

9 (Pages 30 - 33)

HANNAH LIM

1
2 Interactive was the calling platform that
3 EMI used. EMI was hired by Paramount,
4 and Paramount was hired by Elephant
5 Group/Saveology.
6     Q.   Did ADT ever learn what
7 happened during the Desai call? You
8 know, did it get answered, was it routed
9 in any way?
10     A.   It was answered, and there is
11 discussion for about one minute.
12     Q.   And what was discussed?
13     A.   I don't know. That's just
14 what was produced in discovery. We know
15 that there was a call that was picked up
16 from that number, from the Desai phone
17 number, and we know that the call lasted
18 for approximately one minute.
19     Q.   And it is ADT's position that
20 the call was made by EMI on the Dynamic
21 phone platform?
22     A.   Yes. We have affidavit
23 evidence of that.
24     Q.   Does ADT have any evidence
25 that that call was made by EMI on behalf

HANNAH LIM

1
2 of or at the direction of Paramount?
3     A.   That specific call or that
4 campaign?
5     Q.   That specific call.
6     A.   Well, that specific call was
7 part of a campaign which Paramount
8 authorized, correct, yes.
9     Q.   And what's the basis of that
10 conclusion? What evidence do you have
11 that that was a Paramount campaign?
12     A.   The testimony and the -- if
13 you go to the plaintiff's interrogatory
14 answers, they highlight the different
15 call campaigns that were made. And the
16 Desai call --
17     Q.   Are you looking at a document
18 right now?
19     A.   Yes. But I don't see the call
20 campaigns included here.
21       If you could turn to the
22 Bernal affidavit, there are many call
23 campaigns that are outlined there.
24     Q.   Is that what you are looking
25 at right now, Hannah, the Bernal

HANNAH LIM

1
2 affidavit?
3     A.   Yes, I am.
4     Q.   Doing this by phone, I want to
5 make sure we are all on the same page.
6       And what is it in the Bernal
7 affidavit that leads ADT to the
8 conclusion that this was a Paramount
9 campaign?
10     A.   If you take a look, starting
11 from page 5 to 10, there's cell-type
12 charts included, showing which call
13 campaigns EMI ran on the Dynamic platform
14 on behalf of Paramount, marketing ADT
15 products.
16     Q.   Is there any indication in the
17 Bernal affidavit as far as which campaign
18 included the Desai call?
19       MS. GOLDBERG: Objection. The
20     document speaks for itself.
21       MR. SCHULTZ: I was testing
22     the basis of ADT's conclusion.
23     A.   I have other information. Let
24 me just see if I can find it for you,
25 Jim.

HANNAH LIM

1
2       So on page 2 of the Bernal
3 affidavit, it talks about, in paragraph
4 8, EMI through Chris Long retained
5 Dynamic, and then it goes on to say in
6 that same affidavit, on page 5,
7 Plaintiffs' counsel also asked me to
8 identify which, if any, campaign run by
9 EMI contacted (405) 326-9079, which I was
10 informed was the Desai number. That same
11 number was contacted on March 1, 2011, by
12 EMI, using ANI (574) 970-0866. The call
13 remained connected for approximately one
14 minute.
15     Q.   So this affidavit indicates
16 that the call was made on March 1, 2011,
17 to Desai's number by EMI?
18     A.   Correct, yes.
19     Q.   How did ADT link Paramount to
20 that call?
21     A.   Paramount was hired -- I'm
22 sorry, Paramount hired EMI. So if you
23 take a look at -- let's see here -- that
24 same affidavit, there are a number of
25 campaigns that are listed. As I

Page 38

HANNAH LIM

1 mentioned --
2
3     Q.   If you look on page 6, the
4 Paramount Media Group PMG-6 campaign on
5 March 1, the third from the bottom.
6     A.   Right.  Exactly.  So if you
7 take a look at those call campaigns, it
8 shows that EMI was retained by client
9 Paramount Media Group, PMG-9, et cetera.
10    Q.   And so I understand how ADT
11 gets from the call made by Dynamic to EMI
12 to Paramount.  How does ADT then link
13 that call from Paramount to Saveology?
14    A.   Well, Paramount was hired by
15 Saveology/Elephant Group.
16    Q.   Was Paramount hired by any
17 other authorized dealers, vendors or
18 marketers besides Saveology, that you are
19 aware of?
20    A.   They may or may not have been.
21 But we do know that Paramount was hired
22 directly by Saveology, and --
23    Q.   And what is ADT's
24 understanding of what Saveology hired
25 Paramount group to do?

Page 39

HANNAH LIM

1
2     A.   To generate leads.
3     Q.   Was Paramount hired by
4 Saveology to make any outbound telephone
5 calls?
6         MS. GOLDBERG:  Objection to
7     form.
8     A.   They were not supposed to be
9 making outbound telephone calls, no.
10    Q.   And what was the basis of that
11 prohibition?
12    A.   The TCPA.
13    Q.   Have you --
14    A.   Let me finish.  We had very
15 strict guidelines outlined in our
16 contract.  In order to protect the
17 company against TCPA violations, we did
18 not want as a company to be exposed to
19 violations under that act, and had
20 specific language in that contract to
21 protect us from any of our partners or
22 our partner affiliates from using
23 outbound telemarketing.
24         So, no, we did not authorize
25 Paramount, let alone Paramount's

Page 40

HANNAH LIM

1
2 affiliates or sub-affiliates, from making
3 outbound calls on ADT's behalf.  No, that
4 was never understood or authorized.
5     Q.   Does ADT have any evidence
6 that this call made by EMI during a
7 Paramount campaign was ever routed to or
8 sent to Saveology?
9     A.   Well, we know that Paramount
10 was hired by Saveology.  We have
11 deposition testimony from Saveology
12 employees, as well as Paramount
13 employees, saying that they hired
14 Paramount to create leads.  So --
15    Q.   Isn't it true that there is
16 also evidence that Paramount was hired by
17 other authorized dealers of ADT to
18 generate leads?
19         MS. GOLDBERG:  Objection.
20    Mischaracterizes the testimony.
21    A.   I don't have that information
22 in front of me.  That may or may not be
23 the case.  But we don't have any direct
24 evidence linking any of the dealers to
25 the Desai call.

Page 41

HANNAH LIM

1
2     Q.   Do you have any evidence that
3 specifically links Saveology to the Desai
4 call?
5     A.   We do.  As I mentioned, the
6 Bernal affidavit lists the call campaigns
7 that they engaged in.
8     Q.   But Does ADT have any evidence
9 that that call was ever transferred from
10 Paramount to Saveology in any way?
11    A.   We have evidence that
12 Paramount was hired by Saveology to
13 conduct these call campaigns.  So if they
14 didn't do these, if they didn't have this
15 call campaign, why would they be doing
16 the call campaign unless they were
17 getting paid for it by Saveology?  And we
18 have Ryan Neill's testimony that they
19 were hired by Saveology to mount these
20 call campaigns.
21         So I can't link this specific
22 call, but we do know that they were hired
23 to generate these leads for Saveology.
24         MS. GOLDBERG:  I want to add
25     something here.  Jim, we have asked

11 (Pages 38 - 41)

HANNAH LIM

1
2 multiple times if you could serve
3 Elephant Group with a second
4 document request, and I have spoken
5 with Dan, perhaps you as well,
6 many times asking for documents
7 responsive to that, because it goes
8 to this very issue. And Elephant
9 Group has refused, despite my many
10 requests, to produce those
11 documents.
12       ADT does not have those
13 documents in its possession,
14 custody or control because ADT
15 couldn't have those documents.
16 Only Elephant Group has those in
17 its possession, custody and
18 control. So I'm going to once
19 again demand production, as per our
20 second document request.
21       MR. SCHULTZ: Based on your
22 assumption that such documents
23 exist, that's fine, Sara, you can
24 make whatever that just was, a
25 speaking request.

HANNAH LIM

1
2       MS. GOLDBERG: Well, but the
3 thing is I'm asking for evidence
4 that you have, you've been asked
5 for it, and you haven't produced to
6 us.
7       A.   And so I can only assume that
8 if you don't have those documents, then
9 those relationships don't exist.
10      Q.   If we just look at the Bernal
11 affidavit, on page 5, for example,
12 though, Hannah, we see that there are
13 other clients identified; correct? Alarm
14 Pros, Home Alert, and Paramount.
15      Do you see those?
16      A.   Yes, I do.
17      Q.   Do you know who Alarm Pros is?
18      A.   Likely a dealer.
19      Q.   Do you know who Home Alert is?
20      A.   It's likely a dealer.
21      Q.   When you say likely a dealer,
22 are those authorized dealers?
23      A.   I can't tell because it says,
24 "Pre-Recorded Message File and Name."
25 And it says "adtdebbie" on it. So I'm

HANNAH LIM

1
2 assuming, because it has ADT affixed to
3 those call campaigns, that ADT products
4 were being marketed.
5       I mean, unless it was an
6 entity that's not a dealer that's
7 claiming to be ADT and, you know, hiring
8 Saveology or Paramount to do these call
9 campaigns, which is possible, because we
10 get companies that rip off our name all
11 the time.
12      Q.   Based on the Bernal affidavit,
13 though, it looks like EMI was making ADT
14 telemarketing calls for a client named
15 Alarm Pros; correct?
16      A.   According to the Bernal
17 affidavit, yes, that's what it appears to
18 say.
19      Q.   And also according to the
20 Bernal affidavit, EMI was making calls on
21 behalf of a client called Home Alert?
22      A.   Yes, correct.
23      Q.   There's no evidence in the
24 Bernal affidavit that Saveology ever
25 asked EMI to make any calls on its

HANNAH LIM

1
2 behalf, is there?
3       A.   Could you repeat that?
4       Q.   There are no campaigns in the
5 Bernal affidavit identifying the client
6 as either Saveology or Elephant Group,
7 is there?
8       A.   Well, they wouldn't. It looks
9 like these call campaigns are based on --
10 that Saveology? Well, Saveology never
11 hired EMI. Saveology hired Paramount,
12 and then Paramount hired EMI. So these
13 call campaigns wouldn't be identified by
14 Saveology because Saveology didn't retain
15 EMI. It was Paramount that hired EMI.
16      MR. SCHULTZ: Off the record.
17      (Discussion off the record.)
18      Q.   Hannah, following up on that,
19 does ADT have any evidence that Elephant
20 Group was directly involved in asking EMI
21 to make the Desai call?
22      A.   Yes.
23      MS. GOLDBERG: Objection;
24 mischaracterizes the testimony.
25      A.   Could you repeat that? I'm

12 (Pages 42 - 45)

HANNAH LIM

1
2 sorry.
3    Q.    Does ADT have any evidence
4 that Saveology was directly involved in
5 having EMI make that Desai call?
6    A.    Yes, I do.  I just said that
7 Saveology or Elephant Group hired
8 Paramount, Paramount hired EMI, and EMI
9 made the Desai call.
10    Q.    Have you had a chance to look
11 at the agreement between Paramount and
12 Saveology?
13    A.    Did you produce it?
14    Q.    Have you heard the testimony
15 then from the Saveology people about the
16 nature of the relationship between
17 Paramount and Saveology?
18    A.    I don't know that, no.
19    Q.    Have you read Ryan Neill's
20 deposition?
21    A.    I skimmed through it, but I
22 attended his deposition.
23    Q.    Do you recall Ryan Neill
24 testifying that the agreement between
25 Paramount and Saveology prohibited

HANNAH LIM

1
2 Paramount from making outbound calls?
3         MS. GOLDBERG:  Objection.  The
4    document speaks for itself.
5    A.    I've never reviewed that
6 document, so I can't say one way or
7 another.
8    Q.    You don't recall any testimony
9 on that one way or the other?
10    A.    No.  But if you point me to
11 it, I can get it, I can take a look at
12 it.
13    Q.    I'm trying to recall and
14 figure out the basis of what you're
15 saying.
16         Is the only link that ADT has
17 between Saveology and EMI through
18 Paramount?
19    A.    The only connection that ADT
20 has to EMI and Paramount?
21    Q.    I can ask the question again
22 if it's not clear.
23         What I am trying to figure out
24 is I am looking at sort of this link from
25 the call to Desai up the chain.

HANNAH LIM

1
2    A.    Okay.
3    Q.    And I think we've agreed that
4 the call was made by EMI on a Paramount
5 campaign.
6    A.    Yes.
7    Q.    Correct?
8    A.    Correct.
9    Q.    And I believe you testified
10 that Elephant Group's role in this was
11 hiring Paramount, who then hired EMI.
12    A.    Correct.
13    Q.    What I'm curious is, besides
14 the conduit through Paramount, does ADT
15 have any evidence that Elephant Group or
16 Saveology had any other type of
17 relationship with EMI?
18    A.    I don't have that information.
19 I'm not saying it doesn't exist, but I
20 haven't received any information showing
21 me that they had hired EMI directly.
22    Q.    Does ADT have any evidence
23 that Saveology or --
24    A.    But I do know that they were
25 aware that EMI existed.

HANNAH LIM

1
2    Q.    Not quite my question, though.
3    A.    Okay.
4    Q.    What I just want to make sure
5 I understand is -- well, let me ask you
6 this, Hannah:  What is it that ADT claims
7 that Elephant Group did wrong?  Why do
8 they owe ADT indemnity in this case?
9    A.    Okay.  That's the million
10 dollar question.
11    Q.    I think it's about 11 million,
12 but, yes.
13    A.    Okay, that's true.  Then I'll
14 give you $11 million of response.
15         The reason why we are pursuing
16 Saveology and Elephant Group for the $11
17 million is because ADT hired Saveology to
18 create leads for the company, which would
19 hopefully generate sales.  There was
20 clear language in our contract with
21 Saveology that prohibited them from
22 making outbound telemarketing calls,
23 number one, and, number two, from hiring
24 any affiliates to do any lead-gen
25 activities without their express written

HANNAH LIM

1
2  consent.
3        In violation of that
4  agreement, we learned after the Desai
5  suit was filed, and discovery ensued,
6  that Saveology did hire third-party
7  affiliates, namely, Paramount.
8        We learned through discovery
9  in Desai that Paramount hired EMI off of
10 a Craig's List ad.  There was negligence
11 in hiring an entity off the Craig's List
12 ad, not doing any due diligence of that
13 entity, and having that entity create
14 leads for ADT.
15       So our claim consists of
16 negligent hiring, negligent supervision,
17 either an intentional tort if we can
18 prove knowledge, and breach, primarily
19 also breach of the contract to secure
20 express written consent from the head of
21 our marketing or sales organization to
22 hire an affiliate.
23       So that's the basis of our
24 claim against Saveology/Elephant Group.
25    Q.   Let's try to break that down a

HANNAH LIM

1
2  little bit.
3    A.   Okay.
4    Q.   Correct me if I'm wrong,
5  Hannah, because I was trying to take some
6  notes, but if you think I'm misstating
7  anything, please let me know.  Okay?
8    A.   Okay.
9    Q.   The way I heard it is that
10 there was two general categories of
11 wrongdoing identified by you as far as
12 Saveology that are potentially at issue
13 here.
14       I think the first thing you
15 said was that there was clear language
16 prohibiting Elephant Group or Saveology
17 from making outbound telemarketing calls,
18 and the second thing would be the hiring
19 of affiliates to do third-party lead
20 generation.
21    A.   Then there would be probably
22 four.  So it would be those two, in
23 addition to negligent hiring supervision,
24 put that into one bucket, of any
25 affiliates or sub-affiliates they had

HANNAH LIM

1
2  hired without our knowledge, failure to
3  provide ADT with notice that those
4  affiliates were being used, and outbound
5  calls were being made on behalf of ADT by
6  those affiliates.
7        And then the last category is
8  breach of our contract to --
9    Q.   Again, I'm not trying to be
10 argumentative here, but what I'm just
11 trying to figure out is factually what
12 the two different components were.
13 Factually, I understand that the first
14 potential claim would be for Elephant
15 Group violating what you call the clear
16 language prohibiting outbound
17 telemarketing calls.  And the second
18 factual thing would be the hiring of the
19 affiliates, which then could lead to the
20 negligent hiring, negligent supervision,
21 breach of contract and intentional tort.
22       That's kind of what I was
23 talking about.  But again, I'm just
24 giving that for the context of where my
25 next question is coming from.

HANNAH LIM

1
2       MS. GOLDBERG:  I just want to
3    interject and counsel the witness,
4    you are here to testify as to
5    facts, but not legal theories or
6    legal claims or our theory or
7    strategy in the case.
8        So I would like you to
9    restrict your answer to facts alone
10   and warn you not to disclose
11   anything that is attorney work
12   product privilege or privilege in
13   any other way.
14       So carry on.
15   Q.   The first category, again,
16 what I'm calling it, Hannah, was having
17 to do with the prohibition on making
18 outbound telemarketing calls.
19   A.   Yes.
20   Q.   Does ADT have any evidence
21 that Elephant Group made any outbound
22 telemarketing calls advertising ADT's
23 products or services?
24       MS. GOLDBERG:  Asked and
25   answered.

14 (Pages 50 - 53)

HANNAH LIM

1
2     A.    Yeah, I believe I answered
3  that.  We don't have any direct evidence
4  of that yet.  It doesn't mean it doesn't
5  exist.
6     Q.    You understand the discovery
7  closes here in a couple of weeks?
8     A.    Right, yes.
9     Q.    Is ADT asserting in this case
10 that Elephant Group or Saveology did, in
11 fact, make outbound telephone calls,
12 advertising ADT's products or services?
13       MS. GOLDBERG:  Objection to
14    whether we are making legal claims
15    or what the nature of our legal
16    claims are.
17       MR. SCHULTZ:  I'm asking
18    whether you are factually alleging
19    that, Sara.
20    A.    Well, if we can go through the
21 complaint, then that might be a better
22 way to answer it.  I mean, let's go
23 through the third-party complaint then.
24    Q.    If you want to look at the
25 complaint to answer the question, that's

HANNAH LIM

1
2  fine, Hannah.  But I guess the question I
3  have is what evidence, if any, does ADT
4  have to support a claim that there was
5  outbound telemarketing going on from
6  Saveology, if any.  And if your answer is
7  investigation continues, that's fine, but
8  I just want to complete the circuit.
9     A.    Yes, I would say that our
10 investigation is still continuing on
11 that.
12    Q.    The second thing that we
13 talked about then was having to do with
14 the hiring of the affiliates to perform
15 the lead generation.  What affiliates
16 does ADT contend Saveology or Elephant
17 Group hired in violation or in breach of
18 the contract?
19    A.    Paramount group primarily, and
20 we learned that Paramount group, of
21 course, hired other sub-affiliates.
22    Q.    Had ADT learned of any other
23 affiliates that were hired by Saveology
24 that ADT contends breached the contract?
25    A.    Could you repeat that?

HANNAH LIM

1
2     Q.    Does ADT have evidence of any
3  other third-party entities that were
4  hired to do lead generation, besides
5  Paramount, allegedly in violation or in
6  breach of the contract?
7     A.    You mean that Saveology hired,
8  or --
9     Q.    Yes.  What I'm trying to
10 figure out is we know that ADT takes the
11 position that Saveology should not have
12 hired Paramount.  Are there any other
13 entities like Paramount that ADT believes
14 were wrongfully hired by Saveology?
15    A.    Well, there were 30-plus other
16 affiliates that they used to create
17 invalid opt-ins, and so, yes, there were
18 a number of other affiliates that were
19 involved, like the Two Free Nights,
20 Savilo.  These were all entities that
21 were creating leads.
22    Q.    And what relationship do they
23 have to Saveology?
24    A.    Well, Saveology hired them to
25 create leads that were not compliant, or

HANNAH LIM

1
2  opt-ins that were not compliant.
3     Q.    What opt-ins were obtained
4  that were not compliant?
5     A.    The Two Free Nights, for
6  example.
7     Q.    Why were those not compliant?
8     A.    Because it didn't outline that
9  it was going to be made -- that people
10 who filled out that form to get two free
11 nights of hotel were volunteering to get
12 information about ADT specifically.  It
13 was a generic opt-in, not a clear opt-in.
14       I mean, that's the best
15 opt-in, from defendants' perspective.
16 The worst opt-ins don't have any
17 references to either security or ADT.  So
18 those are just, you know, opt-ins that
19 had no clear language about what folks
20 were opting in to.
21    Q.    I am just trying to reconcile
22 this with what Renata said a little bit
23 ago, Hannah.  And you were in the room
24 for her deposition; right?
25    A.    Well, for most of it.  I had

Page 58

HANNAH LIM

1 to step out to do a few calls.
2    Q.    At one point in time she
3 testified that prior to the Desai lawsuit
4 there were 19 complaints that were
5 forwarded to Saveology for followup to
6 authenticate the opt-in.  Did you hear
7 that testimony?
8    A.    Okay.  I don't recall it, but
9 okay.
10    Q.    What Renata, and I might be
11 wrong, because it just happened a little
12 bit ago, but my understanding of what she
13 testified to is that every time ADT had
14 gotten a complaint regarding an opt-in,
15 and they had gone back to Saveology,
16 Saveology was able to authenticate the
17 opt-in.  And it seems now that you're
18 saying something drastically different
19 from that.
20    A.    No, I'm not.  What testimony
21 are you referring to of mine that's
22 inconsistent?
23    Q.    You said that there were all
24 these opt-ins that were improper, that
25

Page 59

HANNAH LIM

1 were somehow made by Saveology.
2    A.    Absolutely.
3    Q.    Or obtained by Saveology.
4    A.    Absolutely.  So those opt-ins
5 that I'm referring to occurred after the
6 Desai lawsuit was commenced.  We didn't
7 learn about and investigate all the
8 opt-in information at the time, until
9 after the Desai lawsuit.  We weren't
10 aware that these opt-ins were created on
11 ADT's behalf.
12       What Renata was talking about
13 were there were 19 complaints over the
14 course of, I guess, a couple of years,
15 that came through the door, which Renata
16 and her team investigated.  They provided
17 opt-in information with, you know, that
18 satisfied ADT, and those calls were -- we
19 then had a response, and had the opt-in
20 information that Saveology provided.
21       It was after the Desai lawsuit
22 we learned that there were many, many
23 other opt-ins that were created by
24 Saveology that were not appropriate and
25

Page 60

HANNAH LIM

1 not compliant.  They were generic
2 opt-ins, without any indication that it
3 was being made on behalf of security or
4 ADT specifically.
5    Q.    And it's ADT's position that,
6 for example, Two Free Nights, those were
7 exclusively opt-ins of Saveology?
8    A.    Saveology or its affiliates,
9 yes.
10    Q.    So we have got then Paramount,
11 and then these 30 other lead generators
12 then that you believe were wrongfully
13 retained by Saveology?
14    A.    Correct, yes.
15    Q.    And of those 30, they were
16 identified as Savilo and Two Free Nights?
17    A.    Yes, but there were references
18 in affidavit testimony that there were
19 30-plus additional lead-gen partners that
20 were creating opt-ins, and those opt-ins
21 were generic opt-ins, without any
22 specific reference to ADT or security.
23    Q.    Did ADT ever identify the
24 other 30?
25

Page 61

HANNAH LIM

1    A.    We didn't get those names from
2 Saveology.
3    Q.    Did ADT ever attempt to bring
4 claims against any of those lead
5 generating partners?
6    A.    If we knew the names, we
7 would, yes.  Or, better yet, Saveology
8 could file a third-party complaint
9 against those folks, since they are your
10 affiliates.
11    Q.    Let's talk about the
12 settlement of the underlying case.
13    A.    Okay.
14    Q.    Of the case between Desai and
15 Charvat versus ADT.  Are you aware of the
16 general terms of that settlement, Hannah?
17    A.    Yes.
18    Q.    And you understand it was a
19 class-wide settlement?
20    A.    It was, yes.
21    Q.    What calls were included in
22 the settlement?  Who were the class
23 members that ADT obtained a release from?
24       MS. GOLDBERG:  Objection.
25

16 (Pages 58 - 61)

HANNAH LIM
1
2     First, the agreement document
3     speaks for itself.
4         A.   We threw the net wide and made
5  it on behalf of anyone who could have
6  made calls on ADT's behalf.
7         Q.   Did ADT ever make a
8  determination as to how many people were
9  potentially in the class?
10       A.   I don't remember that.
11       Q.   The class, though, would have
12  included people that had received a call
13  that in some way was telemarketing of
14  ADT's goods or services?  Is that fair to
15  say?
16           MS. GOLDBERG:  Objection to
17       form.  The settlement defines the
18       class and the covered calls.
19       A.   If you could pull the
20  settlement document, because I haven't
21  seen it, or the class notice, I could
22  take a look at it.
23       Q.   This is the issue, because we
24  weren't a party to the settlement
25  agreement, so I just want to make sure I

HANNAH LIM
1
2  understand it.
3           MR. SCHULTZ:  Jack, we've got
4       a copy of the settlement agreement
5       and release.
6           And mark that Exhibit 4.
7           (ADT Exhibit 4 for
8       identification, document entitled
9       "Settlement Agreement and
10      Release.")
11      Q.   Hannah, showing you what has
12  been marked as Exhibit No. 4.  Is that
13  the settlement agreement you are talking
14  about?
15      A.   Yes.
16      Q.   What I'm trying to identify or
17  understand is what entities did ADT
18  include in this settlement agreement that
19  may have made telemarketing calls.
20      A.   Okay.
21      Q.   So does ADT have an
22  understanding or a list of what entities
23  made calls that were included in and
24  resolved by this settlement agreement?
25      A.   What page is that?

HANNAH LIM
1
2      Q.   I think on page 1 there, in
3  paragraph 1.5, it talks about it
4  somewhat, but I just want to make sure I
5  fully explore what ADT's knowledge is.
6      A.   Okay.
7      Q.   So in paragraph 1.5, the
8  agreement states about how ADT filed a
9  third-party complaint against, and I'm
10  summarizing here, but against entities
11  that were connected to the calls at
12  issue.
13           Do you see that part?
14      A.   What was it, 1-point what?
15      Q.   1.5.
16      A.   Okay, go ahead.
17      Q.   Page 1.  So the entities
18  identified there as being entities that
19  ADT believed were connected to the calls
20  at issue, and to the plaintiffs' amended
21  complaint, include Pete Tolman, Leads
22  Direct Marketing, Voice Tel Corporation,
23  Christopher Long, EMI, JMB Enterprises,
24  City VIP, Direct Savings USA, Oscar
25  Montenegro, Eversafe Security Systems and

HANNAH LIM
1
2  Safe Streets USA.  Right.
3      A.   Yes, that's correct.
4      Q.   I mean, that's what the
5  agreement says; right?
6      A.   Yes, correct.
7      Q.   And was there any other entity
8  that ADT was aware of that may have been
9  connected to the calls in the plaintiffs'
10  amended complaint?
11      A.   Any other -- say it again.
12      Q.   Were there any other entities,
13  or whatever you want to call them, but
14  I'm just using the word entity, were
15  there any other entities that ADT
16  believed were connected to the calls at
17  issue by the plaintiffs' amended
18  complaint, besides the ones contained in
19  paragraph 1.5?
20      A.   I mean, we have real claims
21  against you guys, so, yes.
22      Q.   I get that.
23           So other than Saveology, and
24  then the entities identified in paragraph
25  1.5, are there any other entities that

Page 66

HANNAH LIM

1 ADT believes were connected to the calls
2 at issue?
3
4    A.   Yes.  I mean, it would be the
5 entities that you guys hired, so any
6 partners or affiliates of Saveology.
7    Q.   Is it ADT's position that
8 those calls would have been included in
9 the covered call under the settlement
10 agreement?
11    A.   That those calls would have
12 been -- well, I mean, you're talking
13 about two different things.  You're
14 talking about two different things.
15        One is the class settlement,
16 and, yes, we made a very broad
17 definition.  But the thing is those are
18 the covered calls for the class people,
19 the class.  You are not part of the
20 class.  We have an indemnity claim
21 against you guys.  So we're not releasing
22 our indemnity claim against you guys.
23    Q.   I'm not suggesting that.  What
24 I'm trying to figure out, Hannah, is if
25 the calls that you believe were the

Page 67

HANNAH LIM

1
2 responsibility of Elephant Group or
3 Saveology, were those calls included as a
4 covered call in the settlement with the
5 plaintiffs and released.
6        MS. GOLDBERG:  Objection to
7    the extent it calls for a legal
8    conclusion.
9    Q.   In other words, did ADT in
10 settling this case contribute to pay for
11 calls that it believes were connected to
12 Saveology?  I'm just trying to figure
13 that out.
14    A.   I'm sorry, I don't understand
15 the question.  Are you saying -- go
16 ahead.
17    Q.   Let me just try again.
18    A.   Okay.
19    Q.   Paragraph 1.5 identifies the
20 parties that ADT believed were connected
21 to the calls at issue.  I'm using that
22 term because it's in the language of
23 paragraph 1.5.
24    A.   Yes, but, I mean, we didn't
25 include Saveology because we didn't

Page 68

HANNAH LIM

1
2 release Saveology or its affiliates from
3 those calls.  Right?
4        MS. GOLDBERG:  Can I object?
5    By directing her to 1.5, you
6    haven't pointed out 1.6.
7        MR. SCHULTZ:  I'm not
8    directing her to anything, Sara.
9        MS. GOLDBERG:  You pointed her
10    to 1.5, but that's not the complete
11    story.
12        MR. SCHULTZ:  Okay.  I'm
13    sorry, I didn't think this was that
14    complicated of a question.
15    Q.   All I really want to know,
16 Hannah, is, in paragraph 1.5 ADT spells
17 out the individual entities that it
18 believes were connected to the calls at
19 issue.
20    A.   No, not comprehensively, no.
21    Q.   That's the question, exactly.
22        I asked you before who else
23 was included, and you said Saveology and
24 the people that they hired.
25    A.   Correct.

Page 69

HANNAH LIM

1
2    Q.   Or something like that.
3 Correct?
4    A.   Correct, yes.
5    Q.   So besides the entities and
6 individuals identified in paragraph 1.5,
7 as well as Saveology and the people that
8 they hired to do lead generation, is ADT
9 aware of any other entities that were
10 connected to any of the calls that were
11 covered by this settlement agreement?
12    A.   Not specifically.  But -- yes,
13 I mean not specifically, no.
14    Q.   And then this was really the
15 question I was trying to get to, and
16 obviously I'm having trouble articulating
17 what I'm trying to say.  But the calls
18 that were made by Elephant Group or any
19 of the people that they hired to do lead
20 generation, were those calls included
21 in -- does ADT believe that those calls
22 were included in the settlement agreement
23 and those people class members?
24        MS. GOLDBERG:  The agreement
25    speaks for itself.

18 (Pages 66 - 69)

HANNAH LIM

1
2    A.   Yes.  We threw a very wide
3  net.  We had a very large and broad class
4  release, correct, yes.
5    Q.   So what I'm trying to confirm
6  then is that it is ADT's position that to
7  the extent they faced exposure because of
8  calls made by or at the direction of
9  Elephant Group, those calls would have
10 been settled and released as part of this
11 class action settlement?
12    A.   And that's our basis for
13 indemnity against you folks, that's
14 correct.
15    Q.   That's all I was trying to
16 get.  So, in other words, ADT -- well,
17 ADT no longer works with Saveology;
18 right?  They terminated that agreement?
19    A.   Correct.
20    Q.   And that agreement got
21 terminated before this settlement
22 agreement; correct?
23    A.   Terminated before the
24 settlement agreement?  No.  That
25 relationship terminated before the

HANNAH LIM

1
2  settlement agreement?
3    Q.   Yes.
4    A.   You know, I'm not aware --
5    Q.   I don't know, either.
6         What I'm trying to get to,
7  though, is, does ADT believe that there
8  is any potential TCPA exposure it faces
9  out there for additional calls that were
10 made by or on behalf of Saveology that
11 weren't included in the settlement
12 agreement?
13         I'm not trying to be tricky
14 here, Hannah.  All I'm trying to get an
15 understanding of is the entirety of the
16 indemnity claim against Elephant Group
17 what would be their the settlement
18 agreement and not some other additional
19 calls or things like that?
20    A.   No, I can't say that, either,
21 because currently we're litigating
22 another TCPA class action, and depending
23 on what the discovery shows, and, you
24 know, we haven't, you know, gotten to
25 that stage yet where I have reviewed

HANNAH LIM

1
2  discovery, Saveology could be implicated.
3  But at this point I can't say for
4  certain, no.
5    Q.   You're talking about the
6  Fitzhenry case?
7    A.   Correct.  And there's also a
8  case called Saegh and Goble, but Goble I
9  don't think you guys are involved in.
10 It's a staff thing.
11    Q.   What was that case name,
12 Goble?
13    A.   Yes.
14    Q.   Did you say a Vage and Goble?
15 Did you say an earlier name?
16    A.   I'm sorry, Saegh was dismissed
17 without any costs.  We weren't involved.
18    Q.   Just so I understand, then,
19 there's three potential claims that ADT
20 has gotten since the settlement that
21 could have implicated Elephant Group,
22 being Fitzhenry, Saegh and Goble?
23    A.   No, Goble is fax, relating to
24 faxes, and Saegh, we found out that it
25 was a company that was spoofing us or

HANNAH LIM

1
2  claiming that they were ADT but it was
3  not.  So we weren't involved.
4    Q.   And as part of that
5  investigation, did any evidence come out
6  or did you ever figure out that Elephant
7  Group or Saveology was related to any of
8  that spoofing?
9    A.   We didn't take any discovery
10 in that case.  It was just our own
11 investigation.  We did this before any
12 discovery ensued.
13    Q.   The Fitzhenry case, it looks
14 like it was filed in December of 2013?
15    A.   Yes.
16    Q.   Again, I am going to ask a
17 question, but I'm pretty sure I know the
18 answer, do you know exactly or
19 approximately when ADT terminated the
20 agreement with Saveology?
21    A.   I don't actually know the
22 date.
23    Q.   I don't want to get too
24 involved in the Fitzhenry case, because
25 I'm sure your lawyer won't like me to do

19 (Pages 70 - 73)

Page 74

HANNAH LIM

1
2  that and would object, and rightfully so.
3  But is what you said before, Hannah, is
4  that your investigation of that is
5  continuing and that you're not
6  foreclosing the possibility that
7  Saveology or Elephant Group might have
8  contributed to cause any exposure there?
9      A.   I don't have any information
10  one way or another, because it is a class
11  that's proceeding, a putative class
12  that's proceeding, and so we have to wait
13  and see.  I can't speak one way or
14  another to say if one entity is involved
15  or another.  It's too premature.
16     Q.   We pulled up before a copy of
17  the ADT's Securities Services Brief in
18  Support of Unopposed Motion For
19  Preliminary Approval.
20     A.   Where is that?
21        MS. GOLDBERG:  It hasn't been
22     marked yet.
23        MR. SCHULTZ:  We will mark
24     that Exhibit 5.
25        (ADT Exhibit 5 for

Page 75

HANNAH LIM

1
2     identification, document entitled
3     "ADT's Securities Services Brief in
4     Support of Unopposed Motion For
5     Preliminary Approval.")
6  A.   Okay.
7  Q.   Have you ever seen this
8  document before, Hannah?
9     A.   I have, yes.
10    Q.   What I was curious about is I
11  had asked you before if ADT had any idea
12  of how many calls were in the class, or
13  how many people, and I think you said you
14  had really no idea to this point.
15  Correct?
16    A.   Well, I mean, the
17  administrator would have probably -- you
18  know, the class is very broad.  There's a
19  million, potentially, part of the class.
20  Even from the Dynamic Interactive log we
21  received, there are millions of calls on
22  those logs.  And they weren't
23  comprehensive, apparently, because the
24  plaintiffs' counsel only asked for
25  certain time frames because they already

Page 76

HANNAH LIM

1
2  had millions of calls on the logs
3  existing for only a few months.  But the
4  class definition is much broader than
5  that.
6        But then there's class
7  participants.  I don't know through the
8  administrator how many class participants
9  there were that received a check.
10    Q.   What I'm looking for, and feel
11  free to read as much of this as you want.
12  But what I'm hoping to ask you a couple
13  of questions about was one paragraph that
14  begins on page 2 and goes into the top of
15  page 3, that talks about the notice
16  program used to administer the class.
17        So could you just read that to
18  yourself and let me know, the one that
19  begins with "Specifically, ADT."  If you
20  feel like you need to read the whole
21  thing, we can take a minute and you can
22  read it, but that's what I'm going to ask
23  you some questions about.
24    A.   Yes, okay, I am familiar with
25  this paragraph.

Page 77

HANNAH LIM

1
2     Q.   And are you generally familiar
3  with the notice process that was used to
4  administer the class settlement?
5     A.   Yes.  So the Dynamic
6  Interactive call logs, we decided,
7  because there's going to be a cost
8  associated with sending out postcards to
9  each of the folks on that log, so we did
10  a representative list for that log, from
11  that log, and then we did publication
12  notice for the balance of the class.
13    Q.   So, as I understand, and
14  correct me if I'm wrong, but in ADT's
15  brief it states that the people that were
16  identified then through Dynamic or EMI
17  are going to get direct notice of this
18  settlement.  Right?
19    A.   Correct, yes.
20    Q.   And then you were going to use
21  publication notice for the remainder of
22  the class?
23    A.   Right.  But then it's not all
24  of the Dynamic calls that were going to
25  receive direct notice, only the ones that

HANNAH LIM

1
2 were produced in discovery, I believe.
3    Q.   And then towards the end of
4 that paragraph there is a statement,
5 "This means all most of the class will
6 only receive publication notice."
7        Do you see that?
8    A.   The vast majority, correct,
9 yes.
10    Q.   Does that mean that ADT was
11 under the understanding that the vast
12 majority of the class were people that
13 were contacted independent of Dynamic or
14 EMI?
15    A.   No.  So maybe you didn't
16 understand my earlier testimony.  But the
17 Dynamic call logs were voluminous, and
18 plaintiffs only subpoenaed -- well, they
19 subpoenaed all the call records from
20 Dynamic once they found out that it
21 existed.  But they had to pay for the
22 call logs, and apparently they were
23 expensive to get.
24        So what they did was they only
25 asked for like two months or three

HANNAH LIM

1
2 months, and that's all part of the record
3 in Desai, two or three months of those
4 call records.
5        And then after they started
6 receiving the call records, they realized
7 how voluminous it was, they said, "Okay,
8 you can stop now," because they didn't
9 want to keep on paying Dynamic for those
10 call records.  Because even from a couple
11 of months, it was millions and millions
12 of calls -- not millions and millions,
13 but it was a lot of calls.  Maybe, you
14 know -- I don't know exactly how many
15 calls, actually, but it was a large
16 number of calls already.
17        So then plaintiffs said,
18 "Well, let's just go by these calls and
19 submit it to the court."  So we submitted
20 those for direct notification, direct
21 notice, and then we used publication
22 notice for the rest.
23        So we didn't receive all of
24 the direct Dynamic Interactive calls,
25 because no one wanted to pay for those

HANNAH LIM

1
2 call logs.  And so we got about a month
3 or two, two months of those call logs,
4 and then we said, okay, Court, let's
5 submit these call logs for direct notice,
6 and then the balance of the class will
7 just get publication notice, because it
8 was cheaper.
9    Q.   So --
10    A.   Which is standard practice.
11    Q.   Do you have an understanding
12 of how many months or years of Dynamic
13 call records there were?
14    A.   There was probably, I believe,
15 two years, possibly, that we had
16 knowledge they were using Dynamic.
17    Q.   And who is "they"?
18    A.   Paramount.  I'm sorry,
19 Paramount for these call campaigns.  So
20 via Saveology/Elephant Group.
21    Q.   How about EMI?
22    A.   EMI, and then EMI to
23 Paramount, and then Paramount to
24 Saveology.
25    Q.   So it is ADT's understanding

HANNAH LIM

1
2 then that there was approximately a
3 two-year period of time where Saveology
4 was using Paramount, who was using EMI,
5 who was using Dynamic?
6        MS. GOLDBERG:  Objection.
7    A.   I can't say for certain.  But
8 I know that they used Dynamic for a
9 certain time frame, and I know that we
10 only got a very small time frame.  Let's
11 look at the Bernal affidavit.  It might
12 even --
13    Q.   You can look at Bernal in a
14 second, Hannah, but you keep using the
15 term "they," and I just want to make sure
16 I understand it for the record.  When you
17 say "they" were using Dynamic, do you
18 specifically mean EMI or is there other
19 people that you mean when you use the
20 word "they" were you're using Dynamic?
21    A.   No, EMI.  Look at the Bernal
22 affidavit.  These were only for certain
23 days, you know.  So...
24    Q.   Did ADT have any evidence as
25 far as how long the relationship between

Page 82

HANNAH LIM

1
2  Saveology and Paramount lasted?
3      A.   I don't know.  You would know
4  that.
5      Q.   Does ADT have any information
6  as far as for how long Paramount used
7  EMI?
8      A.   We didn't even know they
9  existed, so, no, and I don't think they
10  ever produced that type of discovery in
11  the case.
12      Q.   I'm just trying to
13  reconcile --
14      A.   Yes, I mean, I kind of
15  understand where you're trying to go.
16  But from my recollection of Neill's
17  deposition, it was several years ago now,
18  he said that because of the bankruptcy or
19  them shutting their doors, they didn't
20  really have any paper documents.  They
21  couldn't pull any contracts or any other
22  documentary evidence at all.
23      Q.   I am not trying to be
24  difficult or argumentative, again,
25  Hannah.  But the Neill deposition or the

Page 83

HANNAH LIM

1
2  Long deposition?
3      A.   The Neill deposition.  I think
4  Long, wasn't that like a bankruptcy
5  hearing, creditors hearing?
6      Q.   Long was EMI, and Neill was
7  Paramount.  Right?
8      A.   Yes.  But then Long was a
9  bankruptcy proceeding.  It wasn't a
10  deposition.
11      Q.   I think it was a 529 meeting
12  of creditors, or whatever.
13      A.   Exactly.
14      Q.   Regardless.  What I'm trying
15  to understand, though, is the scope of
16  who this class was.  And if you look on
17  the bottom of page 3 of Exhibit 5 there,
18  the brief again.
19      A.   Bottom of page 3?
20      Q.   The last sentence says,
21  "During discovery aimed at identifying
22  potential class members, plaintiffs
23  identified approximately 50 million
24  prerecorded telemarketing calls placed by
25  a telemarketer called EMI."

Page 84

HANNAH LIM

1
2      MS. GOLDBERG:  Hold it.  We're
3  are in the wrong place.
4      MR. SCHULTZ:  Bottom of page
5  3.
6      Q.   Bottom of page 3.
7      A.   Okay, go ahead.
8      Q.   So we know -- and, again, I'm
9  just trying to understand what ADT's
10  position is.  There are 50 million calls
11  that the plaintiffs identified as being
12  telemarketing calls from EMI, and then
13  going on in that same brief, onto page 4,
14  we then talk about how there was roughly
15  4 million that were identified that
16  mentioned ADT?
17      A.   "Plaintiffs' counsel have
18  indicated that they have identified 4
19  million calls from the 50 million
20  transmitted that delivered a prerecorded
21  message that mentioned ADT.  Not all the
22  50 million calls were analyzed.
23  Plaintiffs' counsel further
24  represented."
25      Okay, yes, I remember the

Page 85

HANNAH LIM

1
2  call -- well, we didn't produce -- we
3  don't have all the call logs.  So, the
4  thing is --
5      Q.   Yes, I get it.  So then it
6  looks like we figured out that 4 million
7  of the 50 million related to ADT, and
8  then going further, of those 4 million,
9  approximately 1.4 million were actually
10  completed.
11      A.   Correct, of the calls that we
12  could confirm from a call log, identified
13  ADT.  But of the other 50 million calls,
14  or the balance of the 50 million calls,
15  we could not analyze whether ADT was in
16  the message, and we never attempted to do
17  so.  And so the class, of course, covered
18  all of those calls as well.
19      Q.   Of the 1.4 million completed
20  calls, AB Data, who I'm guessing is the
21  class administrator, I'd say they were
22  going to identify 700,000 to 900,000
23  mailing addresses?
24      A.   Correct, right.
25      Q.   So are the 1.4 million people,

22 (Pages 82 - 85)

HANNAH LIM

1
2 then, those that were going to get the
3 direct notice?
4    A.   No, it looks like it was going
5 to be the 700,000 to 900,000.
6    Q.   The 700,000 to 900,000 was
7 going to be a subset of the class of 1.4
8 million people that were called by
9 Dynamic for EMI that had an ADT message?
10    A.   Correct.  That are going to be
11 receiving mail notice.
12    Q.   I'm just going to call it
13 700,000 people, approximately, that got
14 direct mail notice.
15    A.   Right.  And the others
16 received publication notice.
17    Q.   So the 700,000 would be, what
18 I think you said before, would be the
19 minority of who got notice?  I know you
20 didn't use the word "minority."  But
21 that's a smaller number.  There's a lot
22 more people that just got publication
23 notice; correct?
24    A.   And that was due to cost, not
25 because of any other reason.  Because it

HANNAH LIM

1
2 would have been cost prohibitive to send
3 postcards or letters, because it was, I
4 think, 40-something cents per notice,
5 including postage, so you multiply that
6 out even by -- I mean, she would have
7 never -- there was never going to be a
8 class approved if the administration
9 costs were going to be a third of the
10 entire class pot, you know.
11    Q.   So of these 700,000 to 900,000
12 people, though, that got direct notice,
13 again, I'm sorry, but I want to make sure
14 I understand this, those are people that
15 would have been called for like a one or
16 two-month period by EMI?
17    A.   That we got call logs for.  We
18 didn't, as I explained before, we didn't
19 get all the call logs, because it was too
20 expensive to get that in discovery.
21    Q.   But I'm just trying to figure
22 out how big the capture was.  You said, I
23 think, it was one to two months; right?
24    A.   If you look at the logs, I
25 can't say it was a couple of months,

HANNAH LIM

1
2 because it only has certain days.  So we
3 know that --
4    Q.   What logs are you talking
5 about, Hannah?
6    A.   Bernal affidavit.  It's from
7 page 5 to 10.
8    Q.   So those are the same logs
9 then that were used to identify these
10 700,000 to 900,000 people?
11    A.   No.  Well, these are like a
12 summary.  So basically you could see, for
13 example, at the top of page 6, you see
14 Paramount Media Group, and then you see
15 the ANI number, and then you see 14,000
16 calls made on February 9.
17    Q.   So it's not like just taking
18 one month, January, of 2011, for example?
19 It was just based on what this --
20    A.   It was a very ad hoc process,
21 yes.  Because we didn't get comprehensive
22 logs due to the cost to litigate this
23 claim was very, very significant.
24    Q.   Got it.
25    I know you said you have a

HANNAH LIM

1
2 hard stop here in about five minutes,
3 Hannah.  I'm kind of at a logical
4 stopping point here, because I'm pretty
5 much done with what we were just talking
6 about.  I was going to go on to a new
7 topic, but I guess we're kind of out of
8 time.
9    A.   We can continue, if you want.
10 What do you want to do?
11    Q.   I've got a while still to go.
12 I am not even close to done.
13    A.   Then do you want to continue
14 on Monday?  What's easier for you?
15    MR. SCHULTZ:  We can go off
16 the record.
17    (Discussion off the record.)
18    MR. SCHULTZ:  Sara, I am going
19 to represent that the parties have
20 agreed that we are going to suspend
21 the deposition at this point and
22 continue it until 9 o'clock on
23 Monday morning, June 30.
24    Sara, and I apologize if we
25 didn't talk about this

23 (Pages 86 - 89)

Page 90

```
1        HANNAH LIM
2  specifically, but is that fair?
3        MS. GOLDBERG:  That's fine.  I
4  need to make some arrangements to
5  switch things around for Monday,
6  but I think I should be able to do
7  that.
8        MR. SCHULTZ:  We are going to
9  be done.
10       (Time noted:  11:45 a.m.)
11
12  _____
13  HANNAH LIM
14  Subscribed and sworn to before me
15  this _____ day of _____, 2014.
16  _____
17
18
19
20
21
22
23
24
25
```

Page 91

```
1        HANNAH LIM
2   I, JACK FINZ, Shorthand Reporter,
3  certify that I was authorized to and
4  did stenographically report the
5  deposition of HANNAH LIM, the witness
6  herein, on June 27, 2014; that a review
7  of the transcript was requested; that
8  the foregoing pages numbered from 1
9  through 90, inclusive, is a true and
10  complete record of my stenographic
11  notes of the deposition by said
12  witness; and that this computer-
13  assisted transcript was prepared under
14  my supervision.
15   I further certify that I am not a
16  relative, employee, attorney or counsel
17  of the parties, nor am I a relative or
18  employee of any of the parties'
19  attorney or counsel connected with the
20  action.
21     DATED this ___day of_____, 2014.
22
23         _____
24         JACK FINZ
25
```

24 (Pages 90 - 91)

Page 92

1

2       UNITED STATES DISTRICT COURT

    FOR THE NORTHERN DISTRICT OF ILLINOIS

3            EASTERN DIVISION

    -------------------------------x

4   VISHVA DESAI,

5                       Plaintiff,

6

            -against-          No. 11C1925

7

    ADT SECURITY SERVICES, INC.,

8   et al.,

9                       Defendants.

    -------------------------------x

10

11                    June 30, 2014

12                    9:00 a.m.

13

14       Continued deposition of ADT

15   SECURITY SERVICES, INC., by HANNAH LIM,

16   pursuant to notice and subpoena, at the

17   offices of Veritext Legal Solutions,

18   301 Northeast 51st Street, Boca Raton,

19   Florida, before Jack Finz, a Shorthand

20   Reporter and Notary Public within and

21   for the State of Florida.

22

23

24

25

Page 93

1
2 A P P E A R A N C E S:
3   SARA GOLDBERG, ESQ.
    McNEW P.A.
4   Attorneys for Defendant
    ADT SECURITY SERVICES, INC.
5     2385 New Executive Center Drive
      Suite 100
6     Boca Raton, FL 33431
7
8   JAMES K. SCHULTZ, ESQ.
    SESSIONS FISHMAN NATHAN & ISRAEL LLC
9   Attorneys for Third-Party Defendant
    the ELEPHANT GROUP
10    55 West Monroe Street
      Suite 1120
11    Chicago, IL 60603-5130
      (Via telephonic conference call)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 94

1
2       E X H I B I T S
3   (Shapiro Exhibit 6 for        119
    identification, Declaration of
4   Daniel Bernal.)
    (Shapiro Exhibit 7 for        122
5   identification,Third-Party
    Plaintiff ADT's Objections and
6   Responses to Elephant Group
    Inc.'s First Discovery Requests
7   to ADT.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 95

1           HANNAH LIM
2    MR. SCHULTZ:  Let's go back on the
3 record.
4     H A N N A H   L I M,
5   resumed, having been previously
6   duly sworn, was examined and
7   testified further as follows:
8 CONTINUED EXAMINATION
9 BY MR. SCHULTZ:
10    Q.   Good morning, Hannah.
11    A.   Good morning.  How are you?
12    Q.   Good.  Yourself?
13    A.   Good.
14    Q.   You recall, Hannah, you are
15 still under oath; right?
16    A.   Yes, I do.
17    Q.   When we had left off we were
18 talking about a variety of things, but I
19 guess where I want to start is discussing
20 the settlement between ADT and the
21 plaintiffs in the underlying case.  Okay?
22    A.   Okay.
23    Q.   And we talked about this a
24 little bit.  And I was trying to
25 understand, if you look on Exhibit 4,

Page 96

1           HANNAH LIM
2 which is the settlement agreement release
3 between the plaintiffs and ADT.
4    A.   I am going to get it.  Okay.
5    Q.   Specifically, I was looking at
6 page 3, paragraph 2.13, "Covered Calls."
7    A.   Yes.
8    Q.   Do you have that section?
9    A.   I do.
10    Q.   I am just trying to make sure
11 I understand what the covered calls were.
12 In your understanding, or ADT's
13 understanding, were any of the covered
14 calls involved in this case made by ADT?
15    A.   No.
16    Q.   So is this a situation where
17 the ADT settlement was just resolving any
18 vicarious liability that ADT would have
19 had for calls that were made by others?
20    MS. GOLDBERG:  Objection to
21 form.
22    A.   That's correct.  We didn't
23 have any evidence during the course of
24 discovery that demonstrated ADT made any
25 calls directly.  However, the covered

2 (Pages 93 - 96)

HANNAH LIM

1
2 calls did encompass any calls that we
3 could have made directly, just to be all-
4 encompassing.
5    Q.   Just to buy your peace?
6    A.   Yes.
7    Q.   But the reality is when you
8 guys were looking into this, ADT did not
9 think that any of their calls were a
10 triggering event or any calls that
11 actually had any exposure?
12    A.   They didn't uncover any calls
13 that ADT made directly that violated the
14 TCPA.
15    Q.   And as part of the
16 investigation that ADT did, was there an
17 effort made to identify all of the
18 entities that may have made a call that
19 was covered by paragraph 2.13?
20    A.   That wasn't our obligation.
21 That was plaintiff's obligation.  So they
22 identified certain call campaigns and
23 made us aware of them, and we did
24 followup investigations to determine if
25 those calls or campaigns were in any way

HANNAH LIM

1
2 related to ADT or could be related back
3 to the company, and we were able to
4 confirm that a number of these calls were
5 linked to the company, or were made on
6 behalf of the company, without our
7 express written consent and knowledge.
8    Q.   Just so I'm clear, what do you
9 mean, they were linked to the company?
10 Meaning linked to ADT?
11    A.   Correct.
12    Q.   How were they linked?
13    A.   Well, we later determined that
14 these calls were prerecords marketing ADT
15 goods and services, and those calls were
16 being made without our express written
17 consent or knowledge.  But, nonetheless,
18 plaintiff's theory was that because ADT
19 received a, quote, benefit from those
20 calls, we were vicariously liable.
21    Q.   And I think that's exactly the
22 clarification I was hoping to get, but I
23 want to make sure I understood.  The call
24 campaigns that were identified by the
25 plaintiffs and confirmed by ADT in the

HANNAH LIM

1
2 investigation, those were not calls that
3 ADT had themselves made; right?
4    A.   No.
5    Q.   And those were not calls that
6 ADT was involved in directing any entity
7 to make on their behalf?
8    A.   No.  We did not direct any
9 entity to make any prerecorded calls
10 marketing ADT goods or services without
11 our knowledge or consent.
12    Q.   And none of those calls, then,
13 were directed to be made by ADT?
14    A.   Not specifically directed, no.
15    Q.   Did ADT have any role in
16 creating the content or the script of the
17 messages that were being used?
18    A.   No.
19    Q.   Did ADT give any directions to
20 any of the calling parties on how the
21 calls were to be made?
22    A.   We didn't know that any calls
23 were being made on our behalf using
24 prerecords.
25    Q.   And so I assume then that ADT

HANNAH LIM

1
2 had no role then in choosing the dates or
3 the timing of any of the calls?
4    A.   No.  I mean, there were -- we
5 recall seeing scripts later, during the
6 course of discovery, but those scripts
7 didn't come to our attention for
8 authorization or approval to us prior to
9 us seeing them in discovery.
10    Q.   And I think you said before
11 that your understanding was that
12 plaintiff's theory was that ADT had
13 gotten a benefit from these calls?
14    A.   The theory was that since the
15 calls were marketing ADT goods and
16 services, we somehow benefited from those
17 calls, although we weren't able to
18 determine, for example, if Saveology
19 hired Paramount and Paramount hired EMI
20 and EMI hired Two Free Nights, whether a
21 lead that was generated from Two Free
22 Nights led to transfers up the chain and
23 ADT made a purchase of that account.
24 There is no proof demonstrating that ADT
25 actually received the benefit, but there

3 (Pages 97 - 100)

HANNAH LIM

1
2 was a perceived benefit because they were
3 marketing our goods or services.
4      Q.   Correct me if I'm wrong, but
5 did ADT knowingly accept any benefit that
6 may have come from these calls?
7      A.   No.  Well, as I understand
8 your question, are you saying did ADT
9 know about those calls being made and
10 then accept the benefit of those calls?
11      Q.   That's what I'm asking,
12 correct.
13      A.   No.
14      Q.   Maybe you should just ask
15 yourself questions and we could be a lot
16 more efficient here.  That was a better
17 question than mine.
18      A.   Go ahead.
19      Q.   So at any point in time did
20 ADT consent to the conduct of EMI?
21      A.   No, absolutely not.  We didn't
22 even know EMI existed.
23      Q.   And I assume then that ADT
24 never gave EMI authority to use the ADT
25 name, the logo, trademark, or anything

HANNAH LIM

1
2 like that?
3      A.   That's correct.  We did not
4 hire EMI, nor did we have knowledge of
5 EMI.  But we do know that Saveology
6 required Paramount, and the breach was
7 that when ADT hired Saveology, we had a
8 very clear articulated contract with a
9 number of requirements.  One of them was
10 not to subcontract without our express
11 written consent.  And because of that, we
12 had that provision in the contract so we
13 could protect ourselves so that in the
14 event that Saveology was going to
15 subcontract, we could then vet any
16 sub-affiliates they were going to be
17 hiring.
18           The breach that we are
19 claiming is that -- one of the breaches
20 is that Saveology failed to notify ADT
21 that they were using specific
22 sub-affiliates and ge express written
23 consent so that we could do a formal
24 vetting of those sub-affiliates to
25 confirm that they were following ADT's

HANNAH LIM

1
2 requirements for calls, for outbound
3 calls, or any lead-gen activities.
4      Q.   I think that answer opens up
5 just a very broad followup question.  You
6 said that one of the breaches was the
7 failure to notify ADT on the use of the
8 sub-affiliates.  Are there any other
9 breaches --
10      A.   Yes.
11      Q.   -- that ADT contends Elephant
12 Group committed here?
13      A.   Yes.  There are a number of
14 additional breaches, so there are legal
15 conclusions for our attorneys to make
16 arguments on, but I could tell you that
17 one of them --
18      Q.   With all respect, Hannah, I am
19 not interested in a legal conclusion.
20 What I am wondering is factually what
21 else Elephant Group may have done that
22 ADT feels breached the agreement.  I
23 understand that ADT contends that
24 Elephant Group hiring Paramount without
25 getting the prior express approval was a

HANNAH LIM

1
2 factual breach.  Is there any other
3 factual breaches that you think Elephant
4 Group committed?
5           MS. GOLDBERG:  I object to
6      form.
7      A.   Failure to supervise, failure
8 to -- negligent hiring, negligent
9 supervision.  We believe that there were
10 no requirements put in place when
11 Saveology hired Paramount, and no
12 requirements when Paramount hired EMI.
13 There is no vetting process.  So those
14 are all facts that contributed to the
15 negligent hiring and supervision.
16      Q.   Isn't that all related to the
17 same essential factual problem in that it
18 was Elephant Group hiring Paramount?
19           MS. GOLDBERG:  Objection to
20      form.
21      A.   Yes.  And failure to supervise
22 them.  And they were also --
23      Q.   So would it be fair to say,
24 then, that the summary of the facts is
25 that Elephant Group hired and failed to

4 (Pages 101 - 104)

HANNAH LIM

1
2 adequately monitor Paramount?
3      MS. GOLDBERG: Objection to
4 form.
5      A.   Also they were allowing them
6 to make prerecorded calls, and that was
7 without our understanding, knowledge or
8 consent. They were using agents to make
9 prerecorded outbound calls. That was an
10 express violation of our agreement.
11     Q.   Okay. Is there anything else?
12     A.   Those are the ones that come
13 to mind to me right now.
14     Q.   Got it.
15          When did ADT split off from
16 Tyco?
17     A.   Last day of September of 2011.
18 2011?
19     Q.   Did that split-off play any
20 role in ADT's decision to settle the
21 Desai litigation?
22     A.   No. Well, there were a number
23 of different factors why we felt like it
24 was the best time -- are you talking
25 about the timing of the settlement or how

HANNAH LIM

1
2 much?
3      Q.   Both the timing and the reason
4 to settle. I think we can all agree that
5 plaintiff's theory was a novel theory;
6 right?
7      MS. GOLDBERG: Objection.
8      A.   Actually, it wasn't novel.
9 The FTC was considering at that time
10 guidance by DISH Network, a briefing
11 submitted by brief Network on vicarious
12 liability, and that was the primary
13 reason why we settled, because we were in
14 close communications with Kelley Drye,
15 Kelley Drye does a lot of work for us as
16 well, and we learned through their
17 representation of DISH --
18     Q.   Let me just stop you, because
19 as much as I would like to know, anything
20 that Kelley Drye would have told you guys
21 when they were representing you, I don't
22 have the right to ask. So I want to make
23 sure, if you want to continue answering
24 the question, fine, but don't tell me
25 anything a lawyer told you.

HANNAH LIM

1
2      A.   There is no representation on
3 that. It's common knowledge.
4      Q.   I get sensitive. I don't want
5 to breach any privileges. Sorry to
6 interrupt.
7      A.   Kelley Drye does contact
8 compliance work for us, but they also do
9 contact compliance work for DISH Network.
10 So we learned through their feedback of
11 the DISH Network representation that the
12 commissioners were very much leaning
13 towards either strict liability or
14 vicarious liability. And so we were very
15 concerned, because if the hearing didn't
16 go as well as we thought it was, that if
17 they came up with strict liability or
18 vicarious liability, we would be sunk as
19 a company, because that would mean
20 hundreds of millions or billions of
21 dollars of liability for the company
22 based on the call records they already
23 submitted in litigation.
24          So we made a business decision
25 at that time to resolve the suit prior to

HANNAH LIM

1
2 the guidance issuing, and thank God we
3 settled it because there was a decision
4 that came out in May of 2012 that -- or
5 was it 2013 the guidance came out?
6      Q.   2013.
7      A.   Okay, 2013, because I remember
8 I was in Macchupicchu at the time, and I
9 remember getting that email, that the FTC
10 did come out with guidance saying that
11 vicarious liability would attach for
12 entities when any calls that were in
13 violation of the TCPA were made on behalf
14 of, and "on behalf of" was not defined
15 clearly at all, of any entity, like DISH
16 or ADT or Comcast, et cetera.
17          So we thought, in retrospect,
18 it was a very, very good and cheap
19 settlement in light of the huge exposure
20 that was potentially looming and how the
21 FTC did eventually come out on that
22 issue.
23     Q.   So did the split with Tyco
24 play any role in the decision to settle
25 the case?

Page 109

HANNAH LIM

1
2    A.   In what sense?
3    Q.   Just trying to clear up, you
4  know, a potential exposure on a balance
5  sheet, or trying to split up assets of
6  the various companies.  Were there any
7  decisions or did that play any role in
8  the decision to settle the case?
9    A.   Yes.  So the way Tyco split
10 off the entities was that it was like a
11 stock sale, if we were going to sell a
12 certain arm.  Any assets or liabilities
13 were going to continue with that entity.
14 So this settlement was not going to
15 affect at all our, you know, was not
16 going to affect ADT or Tyco one way or
17 another, because it's not like we could
18 have left that liability as a legacy
19 liability for the parent.  It was going
20 to stay with us regardless.
21        I know that we had discussions
22 with the plaintiffs, and I believe that
23 one of the things that the mediator was
24 using as leverage to the other side,
25 explaining to the plaintiffs, was, well,

Page 110

HANNAH LIM

1
2  you know, you might want to -- you might
3  have an opportunity to get settlements
4  now prior to split, but that was a
5  perceived benefit by the plaintiffs, not
6  an actual benefit, because the liability
7  was going to stay with the spun off
8  entity.  So it was going to be ADT's
9  responsibility regardless of, you know,
10 whether it was pre or post split.
11        So it didn't make a
12 difference.  I think it was more of a
13 perceived benefit by the plaintiffs so
14 that we could -- Green, the mediator,
15 wanted to explain to the other side that
16 they should push this towards resolution
17 prior to split because there would be
18 more of an opportunity to settle.  But
19 that was more mediator-speak and not
20 factually accurate.
21    Q.   Did ADT ever include a line
22 item for this case, or make any
23 accounting calculations as far as what
24 the potential exposure was prior to the
25 settlement?

Page 111

HANNAH LIM

1
2    A.   No.  We don't do that.  I
3  mean, we follow GAAP principles, and the
4  FASB 5 principles, and we did record what
5  their demand was, and I believe through
6  the course of litigation it was a couple
7  of hundred million, then they had another
8  statement that said one billion,
9  1.something billion.  Then in the last
10 round, I think they demanded something
11 like 80 million.
12        So there were different
13 numbers that were thrown about, but it's
14 not something that we recorded as a
15 reserve or anything like that.  We
16 recorded a reserve once we arrived at the
17 number.
18    Q.   The number being a settlement
19 amount?
20    A.   Correct, yes.
21    Q.   I think through the course of
22 discovery, and our earlier conversations,
23 I have become aware of, I guess, three
24 entities that were actually the ones
25 making the calls, that we know about.

Page 112

HANNAH LIM

1
2  And they are EMI, Leads Direct Marketing
3  and City VIP.  I know I just gave you a
4  list, and we switched topics here, but
5  other than EMI, Leads Direct Marketing or
6  City VIP, is ADT aware of any other
7  entities that were making any other calls
8  or engaged in any other campaigns that
9  would be a covered call under the
10 settlement?
11    A.   I am not.
12    Q.   Do you know if any of the
13 entities that actually made the calls,
14 EMI, Leads Direct or City VIP, did any of
15 those entities have access to ADT's sales
16 systems?
17    A.   No.
18    Q.   Or internal sales systems?
19    A.   No.  No.  I mean, you know,
20 there was voluminous documents, over 2
21 million documents that were produced in
22 this case.  So this is my recollection.
23 But I'm going to just ask you to refer to
24 the body of discovery that was produced
25 in the case on these types of questions,

6 (Pages 109 - 112)

HANNAH LIM

1
2 because it's just -- you know, it was
3 very detailed and complicated.
4       Q.   What I guess I am trying to
5 get to is trying to figure out what sort
6 of relationship, if any, existed between
7 the calling parties, EMI, Leads Direct
8 Marketing, City VIP, and ADT.  So what I
9 am wondering is what ADT may have known
10 about those companies.  For example, did
11 any of those entities have the ability to
12 enter customer information into ADT's
13 systems?
14       MS. GOLDBERG:  Objection;
15       asked and answered.
16       A.   No.  I mean, I don't know that
17 for certain, but I would be shocked if
18 any third party would have access to our
19 customer data.  We consider that
20 confidential and proprietary.
21       Q.   And at no point in time did
22 ADT authorize EMI, Leads Direct or City
23 VIP to market ADT products, did they?
24       A.   No.  They were hired by
25 Saveology or Paramount or, you know, by

HANNAH LIM

1
2 entities that we -- Saveology is an
3 entity we hired.  Saveology hired
4 affiliates or sub-affiliates that brought
5 these folks on board.
6       Q.   Let's talk just more
7 generally.  How does ADT go about selling
8 its services?  What sort of marketing
9 does it do?
10       A.   We have a wide swath of
11 marketing.
12       Q.   And that's all I'm looking
13 for, kind of like the 10,000 foot view
14 here.
15       A.   It's like commercials, radio,
16 print, you know, Internet.  Those are
17 like the you, know, direct mail, like the
18 Value Pak stuff.  We have a dealer
19 network that goes to market in various
20 different ways.  So those are the ones
21 that come to mind.
22       Q.   And is one of the approved
23 marketing procedures the use of just
24 making phone calls?
25       A.   We actually don't make phone

HANNAH LIM

1
2 calls.  We receive phone calls.  So if we
3 run a television ad, it will show a 1-800
4 number.  You know, we actually track and
5 monitor this.  So let's say we are
6 running three different commercials, but
7 they will have different 800 numbers
8 associated with those commercials, so we
9 can track how effective a commercial is.
10 And we might even have different phone
11 numbers for time of day or different
12 markets to track that as well.
13       So we will have inbound
14 telephone calls to our call center in
15 Jacksonville, and they will, you know,
16 basically address any of the potential
17 customers' questions, discuss pricing,
18 and that type of stuff.  But we do not
19 have any outbound calls being made.
20       Q.   And has that been the case
21 since, let's say, 2007?
22       A.   Yes.
23       Q.   We had looked earlier, on
24 Friday, Hannah, at some of the settlement
25 agreements between ADT and the three

HANNAH LIM

1
2 contributing third parties, Eversafe,
3 Defender and Absolute.  We didn't mark
4 them, but I think you should have them
5 there.  They start ADT 1505.  Can you put
6 your hands on those again?
7       A.   Okay.
8       Q.   If we go into the background,
9 on page 1 of the Eversafe agreement, ADT
10 1505.
11       A.   Okay.
12       Q.   The fourth paragraph,
13 "Whereas, the action plaintiffs have
14 indicated that if the action is not
15 settled they will assert claims directly
16 against Eversafe."
17       Do you see that?
18       A.   Yes.  "Whereas, the action
19 plaintiffs have indicated that if the
20 action is not settled they will assert
21 claims," yes, I see that.
22       Q.   I was just curious if you knew
23 what claims were being threatened against
24 Eversafe there.
25       MS. GOLDBERG:  Objection to

Page 117

HANNAH LIM

1
2 the extent it calls for a legal
3 conclusion.
4        A.   I haven't reviewed this
5 document thoroughly.  But, as I read it,
6 it's probably third-party claims that we
7 have against them.
8        Q.   The way I read it, correct me
9 if I'm wrong, but I just read this to say
10 the plaintiffs indicated to somebody that
11 they were going to file a claim directly
12 against Eversafe.  So I'm just curious if
13 you knew what the plaintiff's theory
14 against Eversafe was going to be.
15       A.   Yes, I don't know, actually.
16 I mean, I guess --
17       Q.   That's fine.
18            Do you know, during the course
19 of ADT's investigation of this case, did
20 you ever determine if there was any
21 relationship between Elephant Group and
22 Eversafe?
23       A.   I don't recall either way at
24 this point.
25       Q.   And during the course of that

Page 118

HANNAH LIM

1
2 same investigation, did ADT ever
3 determine if there was any type of
4 relationship between Elephant Group and
5 Absolute Security Services?
6        A.   I don't have a specific
7 recollection.  I know that they had a
8 direct relationship with Defender, and --
9        Q.   Okay.  That was my next
10 question.
11       A.   And Defender was our largest
12 dealer.
13       Q.   Let's talk about what the
14 relationship is with Defender then.  What
15 is your understanding of that?
16       A.   Well, Defender is our largest
17 dealer, and my understand is that
18 Defender had a relationship -- but
19 actually I do believe that Eversafe also
20 had a relationship with Saveology as
21 well.  I'm not sure about Absolute.
22       Q.   I'm trying to see if I can cut
23 to the chase here.  Just give me a
24 second.
25            We looked before at the Bernal

Page 119

HANNAH LIM

1
2 affidavit.  Do you remember that, Hannah?
3        A.   Yes.
4        Q.   And I don't think we have
5 marked it, but maybe we should now.
6            (Shapiro Exhibit 6 for
7            identification, Declaration of
8            Daniel Bernal.)
9        Q.   Let me know when you have a
10 chance to look it over, Hannah.
11       A.   I have it, yes.
12       Q.   We looked at this a little bit
13 already, I know.  But I would ask you to
14 turn to page 5, which is where the graph
15 of the different campaigns starts.
16 That's where we see the client campaign
17 name, where there's one for Alarm Pros
18 and two for Home Alert; right?
19       A.   Okay, yes.
20       Q.   Do you know, did Home Alert
21 ever get written permission from ADT to
22 use EMI?
23       A.   No.
24       Q.   Did Alarm Pros ever get
25 written permission from ADT to use EMI?

Page 120

HANNAH LIM

1
2        A.   No.
3        Q.   Did ADT sue Alarm Pros?
4        A.   Let's see.  Do you have the
5 third-party complaint?
6            They are not named here.
7 Again --
8        Q.   And ADT didn't settle any case
9 with EMI, did they?
10       A.   Are they listed in the
11 release?  I have to check that.
12       Q.   The three settlement
13 agreements we looked at, beginning at
14 1505, no.
15       A.   We didn't have a settlement
16 agreement with them, that's correct.  But
17 were they included in the release?
18       Q.   Do you know why they may not
19 have been included in the release?
20            MS. GOLDBERG:  Objection to
21       form.
22       A.   I mean, I can only guess.  My
23 guess would be --
24            MS. GOLDBERG:  Don't guess.
25       A.   My guesses are that it would

8 (Pages 117 - 120)

HANNAH LIM

1
2  be either Alarms Pros came in later,
3  after we filed a third-party amended
4  complaint, and we discovered later, right
5  before settling, that they were involved,
6  and we were going to encompass all of the
7  calls under the covered call section, and
8  just settle it that way.
9        Or they didn't have any assets
10 so we didn't believe that it would be
11 worthwhile to sue them. I mean, there's
12 a lot of different reasons why, but I
13 can't think of the exact reason now.
14    Q.   The same thing with Home
15 Alert, ADT didn't sue Home Alert, did
16 they?
17    A.   No. And if that's the Georgia
18 entity, it's because they had no assets.
19 It's a mom-and-pop entity I mentioned to
20 you.
21    Q.   That's who you think the
22 Georgia entity is?
23    A.   I believe so, but I'm not --
24 we have to check.
25        MR. SCHULTZ: Could you mark

HANNAH LIM

1
2  the Third-Party Plaintiff ADT's
3  Objections and Responses to
4  Elephant Group Inc.'s First
5  Discovery Requests to ADT.
6        (Shapiro Exhibit 7 for
7  identification,Third-Party
8  Plaintiff ADT's Objections and
9  Responses to Elephant Group Inc.'s
10 First Discovery Requests to ADT.)
11    Q.   Hannah, handing you what has
12 been marked as Exhibit 7, which is ADT's
13 discovery responses to Saveology. Have
14 you seen these before?
15    A.   I haven't seen them recently,
16 but I'm sure I saw them before they went
17 out at the time.
18    Q.   Feel free to look at as many
19 as you want, but I just have a couple of
20 questions on interrogatory number 19,
21 which is on page 9.
22    A.   Okay.
23    Q.   If you just read that to
24 yourself, and let me know when you are
25 done.

HANNAH LIM

1
2  A.   Yes.
3  Q.   Does the answer to
4  interrogatory 19 appear to be accurate as
5  you sit here today?
6  A.   Yes.
7  Q.   And so ADT is aware that EMI
8  was hired by other companies besides
9  Paramount; correct?
10    A.   Correct. Then it says
11 Paramount then sold those leads to
12 Saveology, which sold leads to various
13 ADT dealers.
14    Q.   But does ADT know what
15 happened to the leads that EMI would have
16 sold to either Alarm Pros, Home Alert or
17 Eversafe?
18    A.   What do you mean? Explain.
19    Q.   The response talks about
20 how -- it says EMI sold leads to each of
21 those entities, being Paramount, Alarm
22 Pros, Home Alert and Eversafe. Do you
23 see that?
24    A.   Yes, I do.
25    Q.   And then it says -- then the

HANNAH LIM

1
2  next sentence talks about how Paramount
3  then sold those leads to Saveology.
4  Right?
5  A.   Right.
6  Q.   I am curious, did ADT ever
7  figure out what happened to the leads
8  that were sold from EMI to, say, Alarm
9  Pros?
10    A.   Well, the leads that -- it
11 looks like, based on this response, EMI
12 contracted with Paramount, Alarm Pros,
13 Home Alert and Eversafe. Right? Then
14 EMI sold leads to those entities. But it
15 also says Paramount then sold those leads
16 to Saveology, which sold leads to various
17 ADT dealers.
18        So my interpretation of this
19 is that EMI generated leads for
20 Paramount, Alarm Pros, Home Alert and
21 Eversafe, but they did that through the
22 vehicle of Saveology, because Eversafe,
23 Home Alert and Alarm Pros, those are all
24 dealers. So my read of this is Paramount
25 sold those leads to Saveology, which then

HANNAH LIM

1
2 directed them to the dealers.
3    Q.   The answer is that EMI sold
4 the leads to each of those entities;
5 right?
6    A.   Yes.
7    Q.   EMI told the leads to Alarm
8 Pros?
9    A.   Yes, but it doesn't say they
10 sold it to them directly.  It would have
11 been through the vehicle of Saveology,
12 which is how I read it.
13    Q.   Does ADT have any evidence
14 that EMI sold the lead to Alarm Pros
15 through the vehicle of Saveology?
16    A.   Well, Alarm Pros wouldn't have
17 likely hired EMI directly.  They went
18 through -- the ADT relationship, we had a
19 contract with Saveology.  Okay?  And
20 Saveology was supposed to generate leads
21 for our dealers.  That was their job, and
22 they were contracted to do that.
23        So that's not -- I mean, you
24 know, we didn't hire these sub-affiliates
25 to create leads or do anything for our

HANNAH LIM

1
2 dealer network.  ADT had a contract with
3 Saveology to generate leads on behalf of
4 its dealer organization.  So that's the
5 structure that we had in place.  So any
6 leads that EMI or Paramount or Saveology
7 generated, it would have then been
8 funneled to one of our dealers, not to
9 ADT directly.  So that's how the
10 structure operated.
11    Q.   But does ADT have any evidence
12 that any of the leads that were sold
13 through to Alarm Pros went through
14 Saveology?
15    A.   Yes, that was done in the
16 course of discovery.  Alarm Pros would
17 have never contracted with those entities
18 directly.  What they did was they worked
19 with Saveology.  The dealers weren't
20 allowed to hire any lead-gen partners
21 directly.  That was in direct violation
22 of their marketing agreement.  So they
23 weren't allowed to --
24    Q.   If you look back at the Bernal
25 affidavit, on page 5, which is Exhibit 6,

HANNAH LIM

1
2 can you reconcile that with the idea that
3 the first client campaign name is named
4 Alarm Pros?
5    A.   Yes, because that was
6 probably -- that was done because those
7 leads were being funneled to Alarm Pros.
8 But, again, the way the structure -- and
9 if you go through the discovery in the
10 case, it's clear.  We hired Saveology.
11 Saveology then was supposed to create
12 leads on behalf of our dealers, and any
13 benefit that ADT received would be if an
14 ADT dealer generated an account that was
15 then transferred or purchased by ADT.
16 But the ADT dealers weren't allowed to
17 contract directly with any lead-gen
18 partners, because that would be in
19 violation of their marketing agreement.
20    Q.   Do you know whether or not
21 Alarm Pros did that?
22    A.   I would be shocked if they
23 did.
24    Q.   Do you know if Home Alert
25 contracted directly with EMI?

HANNAH LIM

1
2    A.   No.  I would be surprised if
3 they did.  My understanding was --
4    Q.   Or Eversafe contracted
5 directly with EMI?
6    A.   No.  I don't see any evidence
7 of that.  Can you point --
8    Q.   What did ADT do to ensure that
9 Elephant Group did not use a lead
10 generator like Paramount without first
11 obtaining express written permission?
12    A.   Okay.  Could you repeat that
13 question?
14    Q.   What did ADT do to ensure that
15 Elephant Group did not use a lead
16 generator like Paramount without express
17 written permission?
18    A.   We had a provision in the
19 contract that said that you could not use
20 any agents or affiliates without express
21 written consent.  And the express
22 consent had to be secured by two
23 individuals in the company with the DOA,
24 or the delegation of authority,
25 appropriate to do a proper vetting.

10 (Pages 125 - 128)

HANNAH LIM

1
2     So if Elephant Group wanted to
3 use certain sub-affiliates or agents,
4 they would have to proffer that to ADT.
5 ADT would do an investigation of that
6 entity and make sure that that entity was
7 in compliance with the TCPA and any rules
8 and regulations.
9    Q.  Was there anything else that
10 ADT did?
11    A.  Well, we probably would
12 have -- well, no, I think we would have
13 done an investigation of them.  We would
14 have vetted them and found out what
15 calling platform, how they called, how
16 they generated leads, and then made a
17 decision whether it was, you know, too
18 risky or they were willing to move
19 forward with that entity.
20    Q.  That investigation, would that
21 have been before the contract was signed
22 or after the contract?
23       MS. GOLDBERG:  Objection to
24    form.
25    A.  What contract exactly?

HANNAH LIM

1
2    Q.  The contract between ADT and
3 Elephant Group.  Before you testified
4 that one of the things that ADT did was
5 had a contract provision that prohibited
6 Elephant Group from hiring the
7 third-party lead generators without
8 permission.
9    A.  Right.
10    Q.  And then you also said there
11 was an investigation that was done into
12 the calling platform and how they
13 generate leads.  I was just curious, that
14 investigation, was that something that
15 was done before the contract, at the time
16 of the contract, or after the contract?
17    A.  Well, no, it was never done,
18 because we never knew that they were
19 using affiliates or agents until after
20 Desai was filed.
21    Q.  So did ADT do anything other
22 than rely on the contractual prohibition
23 to ensure that Elephant Group wasn't
24 hiring lead generators like Paramount
25 without express permission?

HANNAH LIM

1
2    A.  Yes, we did.  We had a huge
3 RFP process with Saveology and Elephant
4 Group.  We checked references.  They said
5 that they were doing this on behalf of
6 large companies.  We checked references.
7 We did an RFP.  We found out in detail
8 what their contact compliance department
9 looked like, how they were going to
10 operate, who was going to communicate
11 with ADT on issues.
12     We had a specific person that
13 they said was to be assigned to all
14 of our accounts, to find out if -- so we
15 could get information quickly in real
16 time.
17     So, yes, there was a very big
18 vetting process before we onboarded them,
19 because they were going to be doing a
20 material function for the company.
21    Q.  Just so I'm clear, what is an
22 RFP?
23    A.  Request for proposal.  Like we
24 send out RFPs for any large body of work
25 we do.

HANNAH LIM

1
2    Q.  So this whole vetting process,
3 then, again, there was before the
4 contract, before Elephant Group started
5 working for ADT?
6    A.  Sure, absolutely.  Before we
7 send the contract.
8    Q.  The contract formation, when
9 ADT was actually working with Elephant
10 Group, was there any sort of followup in
11 terms of auditing, site inspections,
12 anything like that, where ADT checked to
13 ensure that Elephant Group was not hiring
14 lead generators without express written
15 permission?
16    A.  Yes.  We had probably
17 quarterly in-person meetings with their
18 folks and our folks.  We had almost daily
19 or every other day email communications
20 with Daphne Fernandes and her team on
21 contact compliance issues that would
22 arise and we asked them to investigate
23 and, you know, provide a response to us
24 with their investigation results.
25     So, yes, we had very robust

11 (Pages 129 - 132)

Page 133

HANNAH LIM

1 communication and ongoing communication,
2 and that was for the course of a
3 relationship with them.
4     Q.   And these quarterly in-person
5 meetings, who was involved in them?
6     A.   It probably varied, but likely
7 Dan Geiger was involved, Steve Gribbon
8 would have been involved, Renata Bergman
9 or anyone from her team would have been
10 involved.
11     Q.   And when they were in-person,
12 were these at ADT's offices, Elephant
13 Group's offices, or did it vary?
14     A.   Well, according to testimony
15 of Geiger, it was mostly Elephant Group's
16 offices, or, you know, they would have a
17 conference and they would invite us to
18 those meetings.
19     Q.   And at those meetings, one of
20 the agenda items would be to ensure that
21 Elephant Group was not hiring third-party
22 lead generators?
23     A.   No, I think it was just a
24 quarterly meeting on how things were

Page 134

HANNAH LIM

1 going with the relationship.  We relied
2 on them to not breach the contract and
3 hire affiliates without our express
4 written consent.  We, you know, didn't
5 ask them specifically whether they were
6 following each term of the contract on a
7 quarterly basis.
8     Q.   Got it.
9     A.   We assumed that they followed
10 the contract, because they signed it.
11     Q.   If you take a look at the
12 contract which I think we have marked
13 about a dozen times in this case, but the
14 contract between Elephant Group and ADT.
15     A.   What number is that?
16     Q.   Dated May 28, 2008.  I don't
17 think we have marked it here, Hannah, and
18 quite honestly, I wasn't planning on
19 marking it again unless we need to.  But
20 I just had one question, I think, on it.
21     A.   Okay.
22     Q.   Do you know who wrote this?
23     A.   I do not.
24     Q.   Does this appear to be kind of

Page 135

HANNAH LIM

1 a standard ADT agreement, from what you
2 could tell?
3     A.   Well, I don't know if we have
4 a standard ADT agreement for this type of
5 work because it's so specialized.  So I
6 would say that this is probably a
7 mutually negotiated agreement, with terms
8 that were negotiated back and forth,
9 because this is so specific.
10     Q.   How would ADT categorize the
11 relationship it had with Elephant Group?
12 I mean, was it an agent, was it a vendor,
13 was it an independent contractor?  How
14 did ADT view that?
15     A.   That's a legal determination.
16     Q.   I am just wondering what ADT
17 internally considered it, if anything, if
18 there was ever a decision that was made
19 on that, or any view.
20         MS. GOLDBERG:  Objection to
21     form.
22     A.   Yeah, that's a legal
23 conclusion.
24     Q.   I am not asking for the legal.

Page 136

HANNAH LIM

1 If you don't know, or it wasn't done,
2 that's fine, Hannah.  I am not asking for
3 a legal conclusion.  I am asking for what
4 ADT's personal belief was or how they
5 considered the relationship.
6     A.   I mean, they marketed our
7 products, so they were a third-party
8 marketer, from our perspective, not a
9 direct marketer.
10     Q.   They were a third party,
11 though?  They weren't a part of the ADT
12 family of companies?
13     A.   They are not.  No, there is no
14 affiliation with us and them, other than
15 through this relationship and contract.
16     Q.   When did ADT first learn that
17 Elephant Group was using Paramount?
18     A.   I think like ten or fourteen
19 days prior to the Desai suit being filed.
20     Q.   And what did ADT do in
21 response to learning that?
22     A.   We asked them to investigate
23 to see whether this information that was
24 accurate or true, and we were waiting for

12 (Pages 133 - 136)

Page 137

HANNAH LIM

1
2  Daphne Fernandes to respond.
3      Q.   Did ADT ever tell Elephant
4  Group to stop using Paramount?
5      A.   Well, we didn't have time,
6  because we got hit with a suit right
7  away.  Yes, we certainly did, after we
8  got the suit and learned what they were
9  doing.
10     Q.   When?  Do you know how long a
11 time it was from when ADT first learned
12 of Elephant Group's use of Paramount to
13 when Elephant Group instructed -- let me
14 start again.
15          Do you know how long a time it
16 was from when ADT first learned about the
17 use of Paramount by Elephant Group to
18 when they said stop?
19     A.   When we learned that they were
20 making outbound calls in violation of the
21 TCPA.  It was done immediately.
22     Q.   When did ADT learn then that
23 Paramount was making outbound calls?
24     A.   I don't remember the exact
25 date.  But when we did learn it, we

Page 138

HANNAH LIM

1
2  immediately asked them to cease.
3      Q.   Do you have any understanding
4  of how long a time it was between the
5  time ADT learned of the existence of
6  Paramount and when ADT told Elephant
7  Group to stop using them?
8      A.   I don't have a specific
9  recollection, but I'm sure there's
10 documents in the record that can address
11 that timing.
12     Q.   Any idea?  Was it days, weeks,
13 months, years?
14     A.   I wish I had a clue, but I
15 don't have a clue.
16     Q.   Okay, that's fine.
17          Hannah, did you ever see a
18 statement that ADT took of Chris Long of
19 EMI?
20     A.   I perused it.
21          MS. GOLDBERG:  Objection to
22     form.  Lacks foundation.  The
23     question assumes that there was a
24     statement from Chris Long.
25          MR. SCHULTZ:  She just said

Page 139

HANNAH LIM

1
2  she perused it.
3      A.   Are you talking about the
4  bankruptcy proceeding, or which --
5      Q.   It was a statement of Chris
6  Long that was identified in discovery,
7  that ADT took.
8      A.   I thought there was a 529
9  transcript.
10     Q.   I'm not talking about that.  I
11 am talking about a statement that ADT's
12 lawyers took of Chris Long.
13     A.   Oh, that --
14          MS. GOLDBERG:  That was
15     produced in this case?
16          MR. SCHULTZ:  No, it hasn't
17     been produced.  It's been
18     identified, though.
19          MS. GOLDBERG:  To my
20     knowledge, there was no statement
21     taken.
22     Q.   Hannah, is that your
23 understanding as well, that there was no
24 statement taken of Chris Long?
25     A.   I don't have a recollection.

Page 140

HANNAH LIM

1
2  What I have in my binder of prep
3  materials is the creditors hearing, and I
4  did peruse that transcript.
5      Q.   ADT has never purchased any
6  leads from EMI; right?
7      A.   Never purchased leads from
8  EMI?  What do you mean by that?  Like
9  direct from EMI?
10     Q.   ADT ever had a relationship
11 where EMI sold a lead to ADT.
12     A.   I mean, EMI sold leads to
13 Saveology.  We didn't know that they were
14 leads that were generated by EMI.  And
15 then Saveology sold them to ADT.
16     Q.   I am asking something more
17 direct.  Did ADT ever purchase a lead
18 from EMI directly?
19     A.   No.  We didn't even know they
20 existed.
21     Q.   Did ADT ever make any
22 determination as to how calls of the
23 covered calls in the settlement were
24 actually made by EMI as opposed to any
25 other callers?

13 (Pages 137 - 140)

Page 141

HANNAH LIM

2     A.   Millions.  Probably tens of
3  millions.
4     Q.   So EMI made millions, but how
5  many other calls were made besides those
6  made by EMI?
7     A.   That I can't tell you.  We
8  know that the Direct or Dynamic
9  Interactive platform, there is testimony
10  that the call logs were in the tens of
11  millions.  They were very voluminous.
12     Q.   The call logs, that was EMI,
13  though; right?
14     A.   Correct, yes.  But Dynamic
15  Interactive --
16     Q.   What I am curious about, was
17  there ever any discovery or investigation
18  done to identify calls made by somebody
19  other than EMI?
20     A.   Plaintiffs didn't produce any
21  records related to that.  We received
22  documentary evidence that EMI, they were
23  using a calling platform called Dynamic
24  Interactive, and Dynamic Interactive made
25  tens of millions of calls.

Page 142

HANNAH LIM

2     Q.   I suspect that Sara is going
3  to object to the next couple of
4  questions, and I don't want to get into a
5  lot of the details about it, Hannah, and
6  we alluded to this a little bit on
7  Friday, but ADT has been named in another
8  class action lawsuit brought by Mark
9  Fitzhenry; right?
10     A.   Correct.
11     Q.   And when we talked on Friday
12  you said that you were not foreclosing
13  the possibility of Elephant Group having
14  participated or played a role in causing
15  that case; correct?
16     A.   It's too early to make that
17  assessment.
18     Q.   And to the extent you can
19  answer this question without divulging
20  any sort of attorney-client
21  communications or any work product, what
22  type of investigation does ADT need to
23  make to determine if Elephant Group
24  played a role in that case?
25          MS. GOLDBERG:  I am going to

Page 143

HANNAH LIM

2  make the objection to the extent it
3  calls for disclosure of privileged
4  privilege.
5     A.   Yes.  I mean, we were not at
6  that stage yet.  So I don't know what you
7  are asking, like what we would do to make
8  that assessment.  We would probably wait
9  to see what the discovery showed.
10     Q.   That's what I kind of
11  suspecting, but I wanted to know if like
12  at maybe an operational side, something
13  nonlegal, that ADT was able to make any
14  determinations.  I didn't know if there
15  was or not, and that's all I was asking.
16  So if it's all a legal issue, then that's
17  fine.  But I thought I would ask.
18     A.   I mean, I'm not going to make
19  their case for them, but if they
20  demonstrate or show us that XYZ calls
21  were made by ABC, we will certainly
22  investigate that.
23     Q.   Who is Security Solutions,
24  Inc.?
25     A.   That is a dealer, or former

Page 144

HANNAH LIM

2  dealer.
3     Q.   Are they an authorized dealer
4  of ADT?
5     A.   I believe they were -- I'm not
6  sure what their status is currently,
7  actually.  I know that they were an
8  authorized dealer as of maybe three or
9  four months ago.
10     Q.   Do you know if they do any
11  telemarketing for ADT?
12     A.   Yeah, I'm going to decline to
13  answer that on the basis of privilege.
14     Q.   That's fine.
15          You know what, I think I'm
16  going to be done.  I don't have anything
17  further.
18          (Time note 9:55 a.m.)
19
20
21          HANNAH LIM
22
23  Subscribed and sworn to before me
24  this _____ day of _____, 2014.
25  _____

14 (Pages 141 - 144)

Page 145

```
 1          HANNAH LIM
 2    I, JACK FINZ, Shorthand Reporter,
 3  certify that I was authorized to and
 4  did stenographically report the
 5  deposition of HANNAH LIM, the witness
 6  herein, on June 30, 2014; that a review
 7  of the transcript was requested; that
 8  the foregoing pages numbered from 92
 9  through 144, inclusive, is a true and
10  complete record of my stenographic
11  notes of the deposition by said
12  witness; and that this computer-
13  assisted transcript was prepared under
14  my supervision.
15    I further certify that I am not a
16  relative, employee, attorney or counsel
17  of the parties, nor am I a relative or
18  employee of any of the parties'
19  attorney or counsel connected with the
20  action.
21    DATED this ___day of_____, 2014.
22
23          _____
24          JACK FINZ
25
```