# Exhibit 3

Page 1

1

2        UNITED STATES DISTRICT COURT

    FOR THE NORTHERN DISTRICT OF ILLINOIS

3            EASTERN DIVISION

    -------------------------------x

4  VISHVA DESAI,

5                      Plaintiff,

6

         -against-         No. 11C1925

7

    ADT SECURITY SERVICES, INC.,

8  et al.,

9                      Defendants.

    -------------------------------x

10

11                    June 18, 2014

12                    1:15 p.m.

13

14     Deposition of REID SHAPIRO,

15  pursuant to notice and subpoena, at the

16  offices of Veritext Legal Solutions,

17  301 Northeast 51st Street, Boca Raton,

18  Florida, before Jack Finz, a Shorthand

19  Reporter and Notary Public within and

20  for the State of Florida.

21

22

23

24

25

Page 2

```
 1
 2 A P P E A R A N C E S:
 3   C. SANDERS McNEW, ESQ.
     McNEW P.A.
 4   Attorneys for Defendant
     ADT SECURITY SERVICES, INC.
 5       2385 New Executive Center Drive
         Suite 100
 6       Boca Raton, FL 33431
 7
 8   JAMES K. SCHULTZ, ESQ.
     SESSIONS FISHMAN NATHAN & ISRAEL LLC
 9   Attorneys for Third-Party Defendant
     THE ELEPHANT GROUP
10       55 West Monroe Street
         Suite 1120
11       Chicago, IL 60603-5130
12
13 ALSO PRESENT:
14   HANNAH S. LIM, ESQ.
     Chief Litigation Counsel
15   ADT Security Services
         1501 Yamato Road
16       Boca Raton, FL 33431
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2     E X H I B I T S
 3 (Shapiro Exhibit 1 for        38
   identification, Agreement dated
 4 as of May 28, 2008, Bates
   stamped SAV-000038 through 105.)
 5 (Shapiro Exhibit 2 for        41
   identification, document
 6 entitled "ADT Contract (6/14/07)
   Non-Financial Highlights," Bates
 7 stamped SAV-000033.)
   (Shapiro Exhibit 3 for        45
 8 identification, document
   entitled "Addendum One to
 9 Paramount Media Group," Bates
   stamped SAV-000301 through 307.)
10 (Shapiro Exhibit 4 for        52
   identification, document
11 entitled "ADT Third Party
   Marketer Due Diligence Request
12 for Information," Bates stamped
   ADT 0000925 through 957.)
13 (Shapiro Exhibit 5 for        64
   identification, email dated
14 April 20, 2011, Bates stamped
   RYANNEILL 000236.)
15 (Shapiro Exhibit 6 for        67
   identification, Elephant Group,
16 Inc.'s Answers to Third Party
   Plaintiff ADT's First Set of
17 Interrogatories.)
   (Shapiro Exhibit 7 for        69
18 identification, email dated
   August 16, 2011, Bates stamped
19 SAV005552 and 5553.)
   (Shapiro Exhibit 8 for        78
20 identification, letter dated
   April 19, 2012, Bates stamped
21 ADT 183 through 188.)
22
23
24
25
```

Page 4

```
 1              REID SHAPIRO
 2         R E I D   S H A P I R O,
 3     having been first duly affirmed by
 4     the Notary Public (Jack Finz), was
 5     examined and testified as follows:
 6 EXAMINATION BY
 7 MR. McNEW:
 8     Q.    State your name for the
 9 record, please.
10     A.    Reid Shapiro.
11     Q.    And your address?
12     A.    7111 Mandarin Drive, Boca
13 Raton, Florida 33433.
14     Q.    Have you been deposed before?
15     A.    Yes.
16     Q.    I will spare you the
17 directions.
18           Are you currently employed by
19 Elephant Group?
20     A.    No.
21     Q.    When did you leave the employ
22 of Elephant Group?
23     A.    On or about March 31 -- end of
24 March.
25     Q.    And why did you leave the
```

Page 5

```
 1              REID SHAPIRO
 2 company?
 3     A.    Restructuring and management
 4 change.
 5     Q.    Was there a purchase of the
 6 company in March?
 7     A.    I guess it was re-funded.  I
 8 don't really know.
 9     Q.    Since your departure in March,
10 do you have any connection with the
11 company at all?
12     A.    Zero.
13     Q.    Do you have any equity
14 interest in the company?
15     A.    No.
16     Q.    No consulting arrangement?
17     A.    Zero.
18     Q.    I see you are accompanied
19 today by Jim Schultz.  Is he your lawyer?
20     A.    Yes.
21     Q.    Do you know somebody named
22 Daphne Fernandez?
23     A.    Yes.
24     Q.    Who is she?
25     A.    She is, when I was there, and
```

2 (Pages 2 - 5)

Page 6

REID SHAPIRO

1  she could still be there, an employee of
2  Saveology.
3      Q.   And what were Ms. Fernandez's
4  duties?
5      A.   She ran -- I think she ran the
6  day-to-day operations for the ADT
7  business, and also she does something in
8  the billing department.
9      Q.   Was she the person at Elephant
10  Group who was responsible for ensuring
11  that Elephant Group adhered to the
12  provisions of the ADT contract?
13      A.   It would go to her, yes.
14  There's a compliance team, but then it
15  would fall back on her.
16      Q.   And when you say compliance
17  team, who was on that team?
18      A.   I don't know.
19      Q.   Were they people who reported
20  to Daphne Fernandez?
21      A.   I'm not sure.
22      Q.   Who would they have reported
23  to?
24      A.   Possibly Joseph.

Page 7

REID SHAPIRO

1      MR. SCHULTZ:  We don't want to
2  speculate.  If you don't know the
3  answer to a question --
4      A.   I don't know.
5      Q.   That's a good piece of advice.
6  If you don't know, just say you don't
7  know.
8      A.   Okay.  I don't know.
9      Q.   How many people were on this
10  team?
11      A.   I have no idea.
12      Q.   Was it more than five?
13      A.   I don't know.
14      Q.   More than two?
15      A.   I really don't know.  It
16  wasn't my role.
17      Q.   But you are aware that there
18  was something called a compliance team?
19      A.   Correct.
20      Q.   And it is also your
21  understanding that Daphne Fernandez was
22  also responsible for compliance issues?
23      A.   I don't know if she was
24  responsible, but she was involved.

Page 8

REID SHAPIRO

1      Q.   And to whom did Daphne report?
2      A.   She really didn't have a
3  person that she reported to.  There was,
4  you know, a group for different things.
5      Q.   Would it surprise you to know
6  that she testified that she reported to
7  you on compliance matters?
8      A.   It would surprise me, yes.
9      Q.   So it is your testimony that
10  Daphne Fernandez did not report to you on
11  compliance matters?
12      A.   On compliance matters?
13      Q.   Making sure that the ADT
14  contract terms were abided by.
15      A.   She would tell me if they
16  were -- it was her responsibility to make
17  sure that the compliance was followed, by
18  the ADT guidelines.
19      Q.   And it is your testimony she
20  did not report to you on this?
21      A.   She reported -- I was a
22  relationship guy, so I managed the
23  relationship for the company on a much
24  higher level with ADT, not on anything

Page 9

REID SHAPIRO

1  during the day-to-day on the business
2  side.
3      Q.   And so who would know who
4  Daphne Fernandez reported to if not you?
5  Would Joseph Bamira know that?
6      A.   I don't know.  You could ask
7  him.
8      Q.   Did Daphne report to Joseph on
9  compliance matters?
10      A.   I don't know.
11      Q.   Who else in Elephant Group
12  exercised overall management of the
13  company, besides you?
14      A.   Say that question again.  When
15  you say exercise management, because --
16      Q.   I want to understand the
17  organizational structure of Elephant
18  Group.  I know you have told me that
19  Daphne Fernandez is involved in
20  compliance.  Who in the ordinary course
21  of daily affairs did Daphne Fernandez
22  report to, generally?
23      A.   She would speak to, in
24  different areas, she would speak to

Page 10

REID SHAPIRO

1  Joseph Bamira, maybe the CEO.
2
3      Q.   And who is that?
4      A.   Benny Aboud.
5      Q.   Was Benny Aboud ever involved
6  in ensuring compliance with ADT's
7  contracts?
8      A.   I don't know.
9      Q.   Is there anyone in the company
10 who would know?
11     A.   I'm not sure.
12     Q.   What was your title in the
13 company?
14     A.   Chief development officer.
15     Q.   And to whom did you report?
16     A.   I guess the CEO.  I didn't
17 report to anyone.  I was a partner in the
18 company.
19     Q.   So at the top of the company
20 there is yourself, and there is Benny
21 Aboud --
22     A.   And Joseph Bamira.
23     Q.   And Joseph Bamira.  And
24 everybody in the company who has a
25 managerial function would report to one

Page 11

REID SHAPIRO

1  or the other of the three of you,
2  directly or indirectly?
3      A.   Yes, correct.
4      Q.   So Daphne, you don't know who
5  she reported to?
6      A.   On different things.  As far
7  as, you know, incentive trip coming up
8  with ADT, she would tell me, Reid, you
9  know, trade show coming out in Las Vegas,
10 you know, go out there and speak to the
11 ADT guys, Dan Geiger.
12     Q.   What about compliance with
13 TCPA issues?  To whom would she report on
14 those issues?  If a question came up
15 regarding the company's compliance with
16 the TCPA provisions of the ADT contract,
17 to whom would she take those issues?
18     A.   I don't know.
19     Q.   Would she take them to Benny
20 Aboud?
21     A.   I don't think so.
22     Q.   Would she take them to Joseph?
23     A.   Possibly.
24     Q.   Did she ever bring them to

Page 12

REID SHAPIRO

1  you?
2      A.   Explain to me what you mean by
3  TCPA rules.
4      Q.   If it came to her attention
5  that a third party working for Elephant
6  Group had been making unsolicited
7  outbound telemarketing calls, to whom
8  would she take that information?
9          MR. SCHULTZ:  I object to the
10 form.  You can still answer.
11     Q.   Generally speaking, if he
12 objects, you just answer the question,
13 unless he tells you not to respond.  If
14 he tells you not to respond, then stop.
15 But otherwise he will make objections for
16 the record, but you just answer the
17 question after that.
18     A.   Okay.
19          Probably Joseph.
20     Q.   So she would --
21     A.   Because he was involved with
22 the TCPA.
23     Q.   Telephone Consumer Protection
24 Act?

Page 13

REID SHAPIRO

1      A.   Correct.
2      Q.   Do you have any idea why Ms.
3  Fernandez would have testified that she
4  reported to you on matters involving
5  Telephone Consumer Protection Act?
6      A.   She might have mentioned it to
7  me, but she didn't report directly to me.
8  I had nothing to do with compliance, or
9  anything of that matter.  I was in charge
10 of building out new call centers for the
11 company and traveling, just so you know.
12     Q.   That's useful to know.  Tell
13 me more about what you did.
14     A.   Me moved from one location to
15 another facility.  I was in charge
16 building facilities, facilities
17 management, and building out our new
18 office, which is 180,000 square feet.  So
19 it took up a lot of time.  That's my role
20 in the company.
21     Q.   So when you say when you were
22 moving from one location to another
23 location, was it common for Elephant
24 Group to move physical locations?  Or was

4 (Pages 10 - 13)

Page 14

REID SHAPIRO

1 it just one move that you were making?
2
3    A.   Expansion.
4    Q.   And expansion of
5 administrative offices, calling
6 facilities?
7    A.   Both.
8    Q.   And where were these centers
9 located?
10   A.   One was in Margate, Florida,
11 and we opened up in Jamaica.  So I was
12 busy flying --
13   Q.   That's the island of Jamaica?
14   A.   Correct.
15   Q.   Not Queens?
16   A.   No.
17   Q.   You have been there?
18   A.   Where?
19   Q.   Jamaica, Queens.
20   A.   Sure.
21   Q.   Palm trees.
22   A.   Not there.
23   Q.   Long Island Railroad station.
24   A.   That was my role in the
25 company.  I was building out new

Page 15

REID SHAPIRO

1 locations for us.  I didn't run the
2 day-to-day.  Daphne did.
3
4    Q.   Daphne ran the day-to-day?
5    A.   Operation, yes, like the
6 nitty-gritty, dealing with all the people
7 at ADT, dealing with, you know...
8    Q.   Is it possible that Daphne
9 Fernandez managed compliance issues on
10 the ADT contract without reporting them
11 to any of the three of your?
12   A.   Repeat that question.
13   Q.   Daphne Fernandez testified
14 that she reported to you.  You have
15 testified that she didn't report to you.
16 Is it possible that Daphne Fernandez, in
17 exercising the supervision over the ADT
18 contract to ensure compliance with its
19 provisions, reported to no one?
20       MR. SCHULTZ:  I object to the
21 form.
22   A.   I think she would have told
23 somebody in the company at a higher
24 level.
25   Q.   But you don't know?

Page 16

REID SHAPIRO

1
2    A.   But I don't know who.
3    Q.   Is there another layer of
4 management between Daphne Fernandez and
5 the three partners?  Is there another
6 person in the company to whom she might
7 have reported?
8    A.   No.
9    Q.   So to the extent she did
10 report, she reported either to you or to
11 Joseph?
12   A.   Or Joseph, yes.
13   Q.   But not to Benny?
14   A.   No, on that.
15   Q.   On questions of compliance --
16   A.   On anything.  The truth is on
17 anything.
18   Q.   So then would it be fair to
19 say that the paragraph of the ADT
20 contract that banned the use of
21 affiliates without written permission,
22 that it would have been Daphne
23 Fernandez's job to ensure compliance with
24 that contractual provision?  Is that
25 correct?

Page 17

REID SHAPIRO

1
2    A.   Correct.
3    Q.   Did Daphne Fernandez ever
4 speak with you about issues arising from
5 the use of third parties to generate
6 leads on behalf of ADT under the ADT
7 contract?
8    A.   I think when the lawsuit came
9 up for --
10   Q.   Before the lawsuit.
11   A.   No.
12   Q.   We have talked about the
13 paragraph in the ADT contract that bars
14 the making of unsolicited outbound
15 telemarketing calls without scrubbing the
16 numbers.  You remember that provision of
17 the contract?
18   A.   I never saw the contract.  I
19 just know that we, as -- we, when I was
20 there, never made any outbound phone
21 calls.
22   Q.   "We" being Elephant Group?
23   A.   Correct, Saveology, Elephant
24 Group.
25   Q.   But you are aware of the

5 (Pages 14 - 17)

Page 18

```
1              REID SHAPIRO
2  company that the company, Elephant
3  Group -- can we just call Saveology and
4  Elephant Group Elephant Group for
5  purposes of this?
6      A.  Perfect, yes.
7      Q.  And if your answer changes
8  depending on which entity, you will tell
9  me?
10     A.  For purposes of our
11 conversation, Elephant Group is what we
12 are talking about.  Right?
13     Q.  Yes.
14     A.  It doesn't matter what it says
15 on any paper.  That's what we are talking
16 about.
17     Q.  Are you aware that Elephant
18 Group used third parties to generate
19 leads for ADT?
20     A.  Yes.
21     Q.  Are you aware that there was a
22 contract term in the ADT contract that
23 barred the use of third parties to
24 generate leads without ADT's written
25 approval?
```

Page 19

```
1              REID SHAPIRO
2      A.  I am not aware of that.
3      Q.  Do you recall Daphne Fernandez
4  ever coming to you and discussing that
5  issue with you?  For this purpose, that
6  we are talking about, before the lawsuit.
7      A.  For this whole discussion we
8  are talking before the lawsuit?
9      Q.  Correct.  I'm assuming there
10 are a lot of conversations after the
11 lawsuit.
12     A.  Yes.
13     Q.  Before the lawsuit, do you
14 ever recall Daphne Fernandez ever coming
15 to you with an issue relating to that
16 paragraph of the ADT contract?
17     A.  No.
18     Q.  Do you remember anybody coming
19 to you to talk about the use of third
20 parties to generate leads under the ADT
21 contract?
22     A.  Ask me that question again.
23         MR. McNEW:  Can you read it
24 back.
25         (The pending question was
```

Page 20

```
1              REID SHAPIRO
2  read.)
3      A.  To bring new business in?
4         MS. LIM:  Do you understand
5  the question?
6         THE WITNESS:  No, I don't
7  understand.  Tell me the rules.
8      Q.  If you don't understand the
9  question, tell me you don't understand
10 the question.
11     A.  I don't understand the
12 question.
13     Q.  Absolutely.  I started off
14 with you cold because you said you had
15 done depositions before, and I apologize
16 for that.
17     A.  No problem.
18     Q.  Any time you have a question,
19 please ask the question.  If you think
20 the question requires you to speculate,
21 say I would have to speculate.
22     A.  Okay, I get it.
23     Q.  We are not trying to put you
24 in a box by making you say things that
25 you didn't mean to say.
```

Page 21

```
1              REID SHAPIRO
2         So you were aware of the
3  contractual provision that barred the use
4  of third-party affiliates without ADT's
5  written permission?
6      A.  I was not aware of that.
7         MR. SCHULTZ:  I object to the
8      form of the question.  It
9      mischaracterizes what he said.
10     A.  I was not aware of that.  I
11 never saw the ADT contract.  I didn't
12 sign the ADT contract.
13     Q.  Were you aware of the
14 provision that barred the making of
15 unsolicited outbound telemarketing calls
16 without written permission?
17     A.  We didn't make any outbound
18 telemarketing calls as a company.
19     Q.  But you did hire affiliates to
20 assist you in performing the ADT
21 contract; correct?
22         MR. SCHULTZ:  I object to the
23     form of the question.
24     A.  Do we call them affiliates?
25     Q.  Third parties.
```

6 (Pages 18 - 21)

Page 22

REID SHAPIRO

1         REID SHAPIRO
2    A.   Yes, third parties would call
3 us to do business with us.
4    Q.   Would one of those have been
5 Paramount Media Group?
6    A.   Again, this is purposes --
7    Q.   This is before.  This is
8 before the beginning of the lawsuit.
9    A.   Yes.
10    Q.   So when you say that "we
11 didn't make unsolicited outbound
12 telemarketing calls," you are referring
13 to Elephant Group; correct?
14    A.   Correct.
15    Q.   Is that your testimony also
16 with respect to third parties like
17 Paramount that were working on your
18 behalf to generate leads under the ADT
19 contract?
20        MR. SCHULTZ:  I object to the
21 form.
22    A.   I don't know that.  I can't
23 vouch for them.  I know they have to
24 follow specific rules of the guidelines,
25 and Daphne would be the best person to

Page 23

REID SHAPIRO

1         REID SHAPIRO
2 know them, explain them, and check up on
3 them.
4    Q.   And do you recall anyone ever
5 coming to you with an issue relating to
6 that paragraph, discuss that subject with
7 you?
8    A.   No.
9    Q.   Did you personally ever
10 communicate with Paramount or any other
11 third party with respect to the
12 performance of the ADT contract?
13    A.   I don't understand your
14 question.
15    Q.   Did you ever speak directly
16 with Paramount?
17    A.   I'm sure I have, maybe once,
18 twice.
19    Q.   Do you recall the reason for
20 the call?
21    A.   I don't remember.
22    Q.   Was it a call or a meeting?
23    A.   I don't remember if they came
24 to our office or it was over the phone.
25 I don't remember.  Three years ago.

Page 24

REID SHAPIRO

1         REID SHAPIRO
2    Q.   Paramount is one of the third
3 parties that helped Elephant Group
4 perform the ADT contract; correct?
5    A.   Yes.
6    Q.   Can you tell me the names of
7 other third parties that Elephant Group
8 engaged to assist in performing the ADT
9 contract?
10    A.   I don't remember any of them
11 offhand.  It's been so long.  Daphne
12 would know that.
13    Q.   Do you recall how you located
14 the other third parties to assist you in
15 performing the ADT contract?
16    A.   Say that again.
17    Q.   Do you recall how Elephant
18 Group located companies like Paramount to
19 assist it in performing the ADT contract?
20    A.   I think the norm would be they
21 would find us, the third parties, but I'm
22 sure -- yeah, they would probably call
23 us.  I never made any calls to solicit
24 them.
25    Q.   When you say "call us," would

Page 25

REID SHAPIRO

1         REID SHAPIRO
2 they call you?
3    A.   Call the company.
4    Q.   And who at the company would
5 that call be referred to?
6    A.   Probably the marketing group.
7    Q.   And who is in the marketing
8 group?
9    A.   I don't know.  It would go
10 under maybe -- I don't even know their
11 names.
12    Q.   Do they still work at the
13 company?
14    A.   I have no idea.  I've been out
15 of it.
16    Q.   But you have only been gone
17 since March; right?
18    A.   Yes, but who knows what's
19 going on.  I don't know.
20    Q.   When you were at the company,
21 who ran the marketing department?
22    A.   There was multiple people that
23 did that.  There was different channels.
24    Q.   In the channel of third-party
25 lead generators, who in the marketing

7 (Pages 22 - 25)

Page 26

REID SHAPIRO

1  department would handle those people?
2  A.  I don't remember.
3  Q.  Did the marketing department
4  report to you?
5  A.  No.
6  Q.  Did it report to Joseph?
7  A.  No.
8  Q.  Did it report to Benny?
9  A.  I think ultimately they might
10  have reported to Benny on the marketing
11  side, yes.
12  Q.  Do you have any knowledge of
13  what the people in the marketing
14  department would do when a third party
15  called and said we would like to help you
16  generate leads for ADT?
17  A.  I have no idea.  I don't deal
18  with that.  I wasn't involved.
19  Q.  Are you aware of any vetting
20  the company would do prior to hiring a
21  third party?
22  A.  Daphne would know that.  I'm
23  sure there's a compliance thing and
24  vetting process they do to bring on board

Page 27

REID SHAPIRO

1  the right companies.  But I personally
2  was never involved with that.
3  Q.  And so to the extent the
4  company has knowledge about that, it
5  would be Daphne Fernandez who would know
6  that?
7  A.  Correct.
8  Q.  And if Daphne said that she
9  reported to and obtained approval from
10  you for those hires, what would your
11  response to that be?
12  A.  That she told me what?
13  Q.  If it was Daphne Fernandez's
14  testimony that she reported to you on the
15  retention of third parties to perform the
16  ADT contract.
17  A.  She might have mentioned to me
18  that she onboarded somebody, but I'm not
19  involved in the process of vetting.
20  Q.  That would have been only --
21  A.  Daphne.
22  Q.  -- Daphne?
23  A.  Correct.  Just as a regular
24  partner, just knowing what's going on.

Page 28

REID SHAPIRO

1  In the hallway you talk, you know.
2  Q.  Is it fair to say that if
3  Daphne Fernandez was unaware of the
4  particulars of a third party performing
5  under the ADT contract, no one else at
6  Elephant Group would be aware of that
7  knowledge, either?
8  A.  Correct.
9  Q.  Before this lawsuit began, did
10  ADT ever -- are you aware of whether ADT
11  ever granted written consent to use any
12  affiliates or third parties to perform
13  any tasks under the ADT contract?
14  A.  Say that again.
15  Q.  Before the lawsuit began, are
16  you aware as to whether ADT ever granted
17  written consent for Elephant Group to use
18  third parties?
19  A.  I have no idea.  Daphne would
20  know that.
21  Q.  And if Daphne didn't know,
22  would anyone else in the company know?
23  A.  No.
24  Q.  Before the lawsuit began, are

Page 29

REID SHAPIRO

1  you aware as to whether ADT ever granted
2  written consent to make unsolicited
3  outbound telemarketing calls under the
4  ADT contract?
5  A.  We never made outbound calls,
6  for the whole company.
7  Q.  But you weren't aware whether
8  third parties working on the ADT contract
9  did or not; is that correct?
10  A.  Daphne would know that.  I
11  wasn't aware.
12  Q.  If Daphne did not know, would
13  anyone else in the company know?
14  A.  No.  She was the SME, subject
15  matter expert.  She ran the business.
16  Q.  Is that true?
17  A.  She was deeply involved.  I
18  went to the trade show.  That's it.
19  Q.  You went to Queens to make
20  sure the palm trees were in good shape.
21  Do you have any knowledge of
22  the relationship between Paramount and
23  Elephant Group?
24  A.  Do I have any knowledge of the

8 (Pages 26 - 29)

Page 30

REID SHAPIRO

1  relationship? I think they were a vendor
2  of ours.
3      Q.   And you testified that you had
4  spoken with them once?
5      A.   Yes.
6      Q.   But you don't remember the
7  substance of that conversation?
8      A.   Correct.
9      Q.   Are you aware they had a
10  contract with Elephant Group, Paramount?
11      A.   I'm sure they had one.
12      Q.   Do you recall whether ADT was
13  a party to that contract?
14      A.   ADT was --
15      Q.   Do you recall whether ADT was
16  a party to your contract with Paramount?
17      A.   I don't know.
18      Q.   Do you recall speaking with
19  ADT before engaging Paramount to assist
20  Elephant Group in the performance of the
21  ADT contract?
22      A.   Say that again.
23      Q.   Do you recall whether anyone
24  at Elephant Group consulted ADT before

Page 31

REID SHAPIRO

1  engaging Paramount to assist Elephant
2  Group in the performance of the ADT
3  contract?
4      A.   Yes. Yes, for sure. She
5  would always do that, with everybody.
6      Q.   That would be Daphne?
7      A.   Daphne, sorry. She would
8  never take, let's call it for purposes of
9  this conversation, an affiliate and just
10  launch them. She would always clear them
11  with somebody at ADT. So, yes, ADT knew
12  about Paramount.
13      Q.   Did you ever have any
14  communications with ADT about Paramount?
15      A.   Yes.
16      Q.   With whom?
17      A.   Dan Geiger.
18      Q.   And did you commit that to
19  writing?
20      A.   This is before the lawsuit or
21  after?
22      Q.   Before. It's all before.
23      A.   No, probably not -- no, no, I
24  spoke to Dan after. Daphne spoke to him

Page 32

REID SHAPIRO

1  before.
2      Q.   So you had no conversations
3  with Dan Geiger before the lawsuit about
4  Paramount or other third parties working
5  on ADT's contract?
6      A.   Correct. Daphne.
7      Q.   And you have no direct
8  knowledge of that? That's what you
9  believe Daphne would have done? Are you
10  aware that Daphne actually did have
11  conversations?
12      A.   Daphne -- yes, Daphne for sure
13  would mention and bring up all
14  third-party companies that are doing
15  business with the appropriate partner for
16  some sort of approval.
17      Q.   If Daphne had testified at her
18  deposition that the identities of vendors
19  and subvendors were part of the, quote,
20  "secret source," close quote, that the
21  company did not examine, would that
22  surprise you?
23      MR. SCHULTZ: I object to
24  form.

Page 33

REID SHAPIRO

1      A.   I have no idea what she's
2  talking about.
3      Q.   Are you aware that Elephant
4  Group's vendors used subvendors to
5  generate leads for ADT?
6      A.   So what we would call -- I
7  have no idea. I guess you are saying
8  like subaffiliates?
9      Q.   Correct.
10      A.   I have no idea.
11      Q.   Are you aware that Paramount
12  used vendors to provide leads for the ADT
13  account?
14      A.   I'm not aware. Again, you're
15  asking me all pre.
16      Q.   Absolutely. This is all pre
17  lawsuit.
18      A.   No, I did not know. I don't
19  know that.
20      Q.   All these questions are
21  involving before the lawsuit.
22      A.   Okay.
23      Q.   Obviously, after the lawsuit a
24  lot of stuff gets talked about.

9 (Pages 30 - 33)

Page 34

REID SHAPIRO

1  
2    A.   Right.  So, no, I don't know.
3    Q.   I am just going to read
4  something to you that is testimony from
5  Daphne Fernandez.
6        "Question:  Paramount never
7  disclosed to you from whom they obtained
8  that lead; is that correct?
9        "Answer:  Correct.
10       "Question:  And Saveology
11  never required Paramount to disclose from
12  whom it obtained a lead?
13       "Answer:  The name, no,
14  because of the secret source."  That's at
15  page 107.
16       And then the following page:
17       "As a matter of practice, did
18  Saveology ask Paramount to disclose the
19  names of its third-party lead vendors?
20       "Answer:  Again, it's their
21  proprietary information.
22       "Question:  So, no?
23       "Answer:  No."
24    A.   Right.  So she is basically
25  saying -- a marketing company never lets

Page 35

REID SHAPIRO

1  
2  a marketing company know how you acquire
3  your leads.  You are bound by contracts
4  and documents.  That's what she's
5  referring to, I'm assuming.
6    Q.   And her testimony sounds
7  accurate to you?
8    A.   That Paramount would not tell
9  her how they are acquire leads?
10   Q.   Correct.
11   A.   That makes sense to me.
12   Q.   And you don't have any
13  knowledge to the contrary?
14   A.   No.
15       For example, Paramount still
16  has to follow the rules and regulations
17  of whatever contracts there are.  But no
18  marketing company would ever give up
19  their, I guess what she's calling secret
20  source on how they market.
21   Q.   When did you start working
22  with Saveology?
23   A.   '98.  One of the founders.
24   Q.   So you were there for 15
25  years?

Page 36

REID SHAPIRO

1  
2    A.   Yes.
3    Q.   And throughout that period you
4  were one of the partners of the company?
5    A.   Correct.  Minority.
6    Q.   So the company was owned by
7  you and Joseph and Benny?
8    A.   Yes.
9    Q.   Were there any other owners of
10  the company?
11   A.   When?
12   Q.   At any time.
13   A.   We had an investment group.
14   Q.   And what was their name?
15   A.   Falcon Investments.
16   Q.   When did they come in?
17   A.   I don't know the exact date.
18   Q.   Were they a pain?
19   A.   Say that again.
20   Q.   Were they a pain?
21   A.   They were very nice people.
22   Q.   And when did they come in?
23   A.   I don't remember.  I'm not
24  sure.  A couple of years ago.
25   Q.   And they took an equity

Page 37

REID SHAPIRO

1  
2  position in the company?
3    A.   Correct.
4    Q.   And how big was that position?
5    A.   I don't know.
6    Q.   More than half?
7    A.   No.
8    Q.   Did you and Joseph and Benny
9  have equal shares of the company?
10   A.   No.
11   Q.   How were the shares divided?
12   A.   76, 12 and 12.
13   Q.   Who had 76?
14   A.   Benny.
15   Q.   Following the restructuring in
16  March, is Benny still affiliated with the
17  company?
18   A.   I don't think so.  I'm not
19  sure.  He's not there every day.
20   Q.   Does he continue to have an
21  equity position in the company?
22   A.   I don't know.
23   Q.   Joseph?
24   A.   I don't think so.
25   Q.   So does Falcon own the entire

10 (Pages 34 - 37)

Page 38

REID SHAPIRO

1 company now?
2
3     A.   No.
4     Q.   Do you have any knowledge of
5 who owns the company?
6     A.   I think there's another group
7 called the Goad Group.
8     Q.   Can you spell that?
9     A.   G-o-a-d.  I was not involved
10 in any negotiations, nothing.  I'm out.
11        MR. McNEW:  Can you mark this
12     as Shapiro 1.
13        (Shapiro Exhibit 1 for
14     identification, Agreement dated as
15     of May 28, 2008, Bates stamped
16     SAV-000038 through 105.)
17     Q.   All I want to do is I want to
18 ask you if you have ever seen this
19 document before.
20     A.   No.
21     Q.   Do you know what it is?
22     A.   No.
23     Q.   If I told you this is what we
24 have been referring to as the ADT
25 contract, does that look right to you?

Page 39

REID SHAPIRO

1
2     A.   I'll take your word for it,
3 just by glancing at it, sure.
4     Q.   But you have never seen this
5 document before today?
6     A.   No.
7     Q.   Do you know who drafted the
8 agreement?
9     A.   I have no idea.
10     Q.   Do you know who signed it on
11 behalf of Elephant Group?
12     A.   I have no idea.  I didn't
13 look.
14     Q.   I didn't, either.  Page SAV
15 92, it looks like.
16     A.   Page 55?
17     Q.   Yes.
18     A.   I have no idea.
19     Q.   It looks like it says Dave.
20     A.   No.  This name is Dale Motyl,
21 and he was vice president of information
22 technology.
23     Q.   Who is Dale Motyl?
24     A.   I don't know.  He hasn't
25 worked for us in years.

Page 40

REID SHAPIRO

1
2        MR. SCHULTZ:  Vice president
3     of information technology.
4     A.   Vice president.
5     Q.   Did Dale Motyl report to you?
6     A.   No.
7        Here it is, SAV 098.  Page 61,
8 that's what you need.
9     Q.   I actually just said SAV 65.
10     A.   I'm on the record here?
11     Q.   Yes, we are.
12     A.   So SAV 98 shows another
13 signature.
14     Q.   That's a promotion agreement.
15        Turn to page SAV 65.
16     A.   Yes.
17     Q.   That appears to be the end of
18 the main document.
19     A.   Same thing.  Correct.  I
20 guess, yes.
21     Q.   And the signature for Elephant
22 Group?
23     A.   Benny Aboud.
24        MR. McNEW:  If you can mark
25     this as Shapiro 2, please.

Page 41

REID SHAPIRO

1
2        (Shapiro Exhibit 2 for
3     identification, document entitled
4     "ADT Contract (6/14/07)
5     Non-Financial Highlights," Bates
6     stamped SAV-000033.)
7     A.   I never saw this.
8     Q.   You have never seen this
9 document?
10     A.   No.
11        MR. SCHULTZ:  Just so the
12     record is clear, Deposition No. 2
13     has just been put in front of the
14     witness, and he said he had never
15     seen it before.
16     Q.   So this is a document you have
17 never seen before?
18     A.   Correct.  I've never seen
19 this.
20     Q.   Do you know if it was in the
21 ordinary course of business for Elephant
22 Group to prepare summary documents of
23 contracts that it was performing?
24     A.   I was never involved in that
25 part of the business.  I was out building

11 (Pages 38 - 41)

Page 42

REID SHAPIRO

1
2 call centers.
3      Q.   Do you know if Elephant Group
4 maintained a written telemarketing
5 policy?
6      A.   I'm sure they have, but I
7 don't know.
8      Q.   Have you ever seen it?
9      A.   No.
10     Q.   So you don't know for sure
11 whether there is one, do you?
12     A.   No, I don't.  I'm saying I
13 don't know.
14     Q.   You are assuming there is one?
15     A.   I don't know.
16     Q.   And I believe it was your
17 testimony that Elephant Group never used
18 prerecorded messages in telemarketing in
19 connection with ADT's products and
20 services?
21     A.   Correct.
22     Q.   Just to be sure, it is your
23 testimony that you are not aware whether
24 your third-party vendors were using
25 outbound calls or not; is that correct?

Page 43

REID SHAPIRO

1
2      A.   I have no idea.
3      Q.   Going back to Paramount, I
4 believe it was your testimony that it was
5 the marketing group's decision to
6 contract with Paramount; is that correct?
7      A.   I don't know whose
8 responsibility it was.  That would be a
9 Daphne question.
10     Q.   So if anyone knew the answer
11 to that, it would be Daphne Fernandez?
12     A.   Correct.
13     Q.   Do you know if Daphne
14 Fernandez was part of the marketing
15 group?
16     A.   I don't think she was part of
17 the marketing group.
18     Q.   But I believe it was your
19 testimony earlier that the third-party
20 vendors would have come in through the
21 marketing group.  Is that correct?
22     A.   Correct.
23     Q.   But their ultimate approval
24 would have been through Daphne Fernandez?
25     A.   Correct, on ADT.

Page 44

REID SHAPIRO

1
2      Q.   So to make sure I
3 understand -- I am just trying to make
4 sure I understand the testimony.
5      A.   She vetted the companies when
6 it came down to in regard to the ADT.
7      Q.   So your marketing group would
8 have received queries by lead generators,
9 but then it would have been --
10     A.   Could be anybody.
11     Q.   I thought earlier you said
12 that --
13     A.   When you said -- go ahead.
14     Q.   I thought earlier you said
15 that when you had a third-party lead
16 generator call in to ask to work for
17 Elephant Group, they were referred to
18 your marketing department.
19     A.   Okay, sorry.  Just the
20 terminology, lead generator versus
21 affiliate.  If an outside vendor wanted
22 to do business with us, it would go first
23 to the marketing department and then go
24 to the proper person to go and vet that
25 marketing partner.  When it came down to

Page 45

REID SHAPIRO

1
2 ADT, that would get passed along to
3 Daphne from the marketing department.
4 The marketing department would say
5 someone called and said they are
6 interested in selling ADT.  Daphne hears
7 the guy's name and number, or whatever it
8 might be, go and follow up.
9      Q.   So all roads lead back to
10 Daphne?
11     A.   Correct.
12        MR. McNEW:  Mark this as
13     Shapiro 3.
14        (Shapiro Exhibit 3 for
15     identification, document entitled
16     "Addendum One to Paramount Media
17     Group," Bates stamped SAV-000301
18     through 307.)
19     Q.   And I will ask you if you have
20 ever seen this document before.
21     A.   No.
22     Q.   It appears to be an addendum
23 to a Saveology contract with Paramount
24 Media Group.  Is that correct?
25     A.   It says Addendum 1 to

12 (Pages 42 - 45)

Page 46

REID SHAPIRO

1 REID SHAPIRO
2 Paramount Media Group, yes.
3    Q.   I will represent to you that
4 we have asked many times for the
5 underlying affiliate agreement referenced
6 in the first line here, and we haven't
7 been provided a copy.  Have you ever seen
8 a copy of the affiliate agreement?
9    A.   Me personally, no.
10       MR. McNEW:  Jim, we would ask
11 again for that.
12       MR. SCHULTZ:  I thought you
13    were working with Dan on that.  I
14    don't know if it's at.  I know
15    Daphne says it's on the computer.
16    I don't know what the hangup is.  I
17    thought Dan and you were working on
18    it.  So your request is noted.
19    Q.   You will notice the signature
20 line is blank for Saveology.com LLC.
21    A.   Yes.
22    Q.   Who in the ordinary course of
23 business for the company would be binding
24 the company to contracts like the
25 Paramount Media contract?

Page 47

REID SHAPIRO

1 REID SHAPIRO
2    A.   It could be either one of us.
3    Q.   "Us" being?
4    A.   Myself, Benny, Joseph.
5    Q.   Daphne did not --
6    A.   Legal.  It could be the legal
7 department.  Daphne wouldn't sign this.
8    Q.   Daphne wouldn't sign it?
9    A.   No.
10    Q.   Who is in the legal
11 department?
12    A.   Who?
13    Q.   You mentioned the legal
14 department.
15    A.   They have a paralegal.
16    Q.   You wouldn't have had a
17 paralegal binding the company?
18    A.   No.  She looked it over.  It
19 would have gone from, I guess -- it would
20 have went from Daphne to legal.  You know
21 what I'm saying?  I'm not involved in
22 these contracts like this.
23    Q.   So you would not have been the
24 person to bind the company on a vendor
25 contract for lead generation contracts

Page 48

REID SHAPIRO

1 REID SHAPIRO
2 like this; is that correct?
3    A.   I mean, it's possible, but I
4 don't think I would sign -- I didn't sign
5 this.
6    Q.   And so that means that it
7 would have had to have been either Joseph
8 or Benny who signed this document,
9 assuming somebody from the company signed
10 it?
11    A.   Someone would have had to, I
12 guess, sign it, o execute it, just by
13 normal course of business.
14    Q.   But the only three people who
15 had the ability to bind the company on a
16 contract like this would be the three
17 partners; is that correct?
18    A.   I'm not sure.
19    Q.   If it wasn't Benny or Joseph,
20 who would have been able to bind the
21 company in this contract?
22    A.   Could be the president, maybe.
23 I wasn't really involved with the
24 day-to-day.  But I'm sure the president
25 of the company back then.

Page 49

REID SHAPIRO

1 REID SHAPIRO
2    Q.   Who was the president back
3 then?
4    A.   Michael Aronowitz.
5    Q.   I thought that only the three
6 principals were at the top.  So you had a
7 president named Mike Aronowitz?
8    A.   Correct.
9    Q.   Was Mike Aronowitz involved in
10 any way in compliance measures and
11 contracts?
12    A.   No.
13    Q.   But he might have been
14 somebody who would have signed a vendor
15 contract like this?
16    A.   Probably not.  Probably not.
17 It would be probably the three of us.
18    Q.   What were Mike Aronowitz's
19 duties?
20    A.   He ran home services.
21    Q.   What were home services?
22    A.   Cable, telephone.
23    Q.   You mean he managed contracts
24 for telemarketing services in the home
25 services area?  Is that what you are

13 (Pages 46 - 49)

Page 50

REID SHAPIRO

1
2 saying? Explain to me what you mean when
3 you say he was responsible --
4     A.   Pay-per-click marketing.
5 That's what he would do.
6     Q.   Since you have never seen
7 this, you don't know if this contract was
8 ever amended or modified; is that
9 correct?
10     A.   Correct. I don't remember
11 seeing it. This is 2010.
12     Q.   Is it a fair assumption, going
13 back to Shapiro 1, the contract, that
14 since you have never seen this contract
15 before, are you aware of any of the work
16 that led to the formation of the
17 contract, or any of the conversations?
18     A.   No, I'm not aware of anything
19 with this.
20     Q.   Any negotiations with ADT?
21     A.   I was in no negotiation with
22 ADT whatsoever, ever.
23     Q.   Do you recall any discussions
24 with Joseph or Benny about the formation
25 of the contract or its terms?

Page 51

REID SHAPIRO

1
2     A.   No. I'm not involved.
3     Q.   Who at Elephant Group would
4 have been involved?
5     A.   I don't know.
6     Q.   Would it have been --
7     A.   This is seven years, or six
8 years. I don't remember.
9     Q.   But it is an important
10 contract, isn't it?
11     A.   Sure.
12     Q.   It was a big piece of your
13 business, wasn't it?
14     A.   Define big.
15     Q.   Big enough that it affected
16 your annual returns.
17     A.   Sure.
18     Q.   How much of the company's work
19 in a given year was comprised of work on
20 the ADT contract?
21     A.   Percentage of sales to revenue
22 in.
23     Q.   Yes.
24     A.   I have no idea.
25     Q.   10 percent?

Page 52

REID SHAPIRO

1
2     A.   No idea.
3     Q.   Less than 10?
4     A.   I really have no idea.
5     Q.   None?
6     A.   I don't. I wasn't involved
7 with the finance department. I was busy
8 building out call centers and traveling
9 all over the world.
10     Q.   So it is your testimony you
11 have no idea who negotiated this for the
12 company?
13     A.   I have no idea, honest to God.
14         MR. McNEW: Let me mark this
15 as Shapiro 4.
16         (Shapiro Exhibit 4 for
17 identification, document entitled
18 "ADT Third Party Marketer Due
19 Diligence Request for Information,"
20 Bates stamped ADT 0000925 through
21 957.)
22     A.   This is after lawsuit.
23     Q.   You are correct.
24     A.   That's a different story.
25     Q.   Do you recognize this

Page 53

REID SHAPIRO

1
2 document?
3     A.   Yes.
4     Q.   We were discussing the date of
5 this document while the reporter was
6 marking the exhibit. This is a document
7 that arose after the lawsuit; is that
8 correct?
9     A.   Correct.
10     Q.   Can you tell me what this --
11 this is actually a collection of
12 documents, isn't it?
13     A.   Hold on a second. Yes.
14     Q.   If you will turn to ADT 929.
15     A.   Yes.
16     Q.   Do you recognize the signature
17 at the bottom of that page?
18     A.   Yes.
19     Q.   Is that your signature?
20     A.   Yes, it is.
21     Q.   And did you complete these
22 forms?
23     A.   Hold on.
24     Q.   Do you recognize the
25 handwriting on the forms?

14 (Pages 50 - 53)

REID SHAPIRO

2 A. Yes, this is not my
3 handwriting.
4 Q. Do you know who prepared these
5 forms for your signature?
6 A. I don't remember.
7 Q. Would it have been Daphne
8 Fernandez?
9 A. I don't remember.
10 Q. I think it was your testimony
11 earlier that all matters having to do
12 with compliance with the ADT contract was
13 through Daphne; is that correct?
14 A. This is after the lawsuit.
15 Q. Correct.
16 A. So after the lawsuit someone
17 else came into that department.
18 Q. Do you know his name, or her
19 name? Was at man or woman?
20 A. A man. Jeremy Torisk.
21 Q. Can you spell the last name,
22 please?
23 A. T-o-r-i-s-k.
24 Q. Does this look like Daphne
25 Fernandez's handwriting?

REID SHAPIRO

2 A. No.
3 Q. Do you think it's Mr. Torisk
4 who filled this form out?
5 A. I don't remember. I don't
6 think so, no.
7 Q. So you were --
8 A. This form is from ADT.
9 Q. Yes. But it is your signature
10 on these documents; correct?
11 A. Correct.
12 Q. You were pretty emphatic that
13 these were forms that were completed and
14 submitted after the beginning of the
15 litigation; is that correct?
16 A. I think this was after -- this
17 was definitely after. This was when ADT
18 shut down all marketing for everybody in
19 the channel.
20 Q. Do you recall ever completing
21 and submitting forms like this, similar
22 to this, to ADT before the beginning of
23 the lawsuit?
24 A. No. They never required
25 anything, from what I understand. I

REID SHAPIRO

2 wouldn't know that.
3 Q. Are you aware generally of
4 what percentage of Saveology's ADT sales
5 were a function of third-party marketers
6 in 2011?
7 A. No.
8 Q. In 2011, before the lawsuit,
9 do you know, for example, Paramount, do
10 you know what percentage of Saveology's
11 ADT sales were generated by Paramount?
12 A. I have no idea.
13 Q. You don't?
14 A. I don't know.
15 Q. Do you know how much money
16 Saveology earned from the sales booked by
17 Paramount?
18 A. I have no idea.
19 MR. McNEW: I just need to
20 take five minutes.
21 (A recess was taken.)
22 BY MR. McNEW:
23 Q. A lot of my questions to you
24 earlier were with the assumption that you
25 were the person at the top layer, the

REID SHAPIRO

2 person among the partners responsible for
3 the compliance matters. But you are
4 shaking your head when I say this.
5 A. No.
6 Q. And your testimony this
7 afternoon has been that, in fact, you are
8 not.
9 A. I never. No. Repeat that
10 again, that I said earlier what?
11 Q. You said earlier that you were
12 not the person at the top that was in
13 charge of monitoring compliance with the
14 ADT contract terms.
15 A. Correct.
16 Q. That would be Daphne
17 Fernandez; is that correct?
18 A. Daphne Fernandez would get the
19 information, and then possibly, you know,
20 let me know, and then she would take it
21 to somewhere else. But I'm not in
22 charge of compliance.
23 Q. And that somewhere else would
24 have been --
25 A. I guess in the compliance

Page 58

REID SHAPIRO

1 department.
2    Q.   Did Daphne report to the
3 compliance department?
4    A.   No, Daphne wouldn't report to
5 them, no.
6    Q.   I believe it was your
7 testimony earlier that you are not aware
8 of the composition of the compliance
9 department.
10    A.   Correct.
11    Q.   How do you know there was a
12 compliance department?
13    A.   I know that part.
14    Q.   How?
15    A.   Joseph would -- Joseph would
16 know more about the compliance
17 department, so I know that there was a
18 compliance department.
19    Q.   How do you know that there was
20 a compliance department?
21    A.   Because one of our divisions
22 in the company was a compliance
23 department.
24    Q.   And you had nothing to do with
25

Page 59

REID SHAPIRO

1 that department?
2    A.   Correct.  I personally had
3 nothing to do with it.
4    Q.   And I believe it was your
5 testimony earlier that Benny had nothing
6 to do with the compliance department.  Is
7 that correct?
8    A.   Correct.
9    Q.   So if it wasn't you and it
10 wasn't Benny, it must have been Joseph?
11    A.   Correct.
12    Q.   So we should ask Joseph about
13 the composition of the department?
14    A.   Yes.
15    Q.   Who is in the department, who
16 reported to Joseph in that department?
17 You don't know any of the answers to
18 those questions?
19    A.   I don't know.  Joseph would
20 probably be the best person to ask.
21    Q.   If contract compliance wasn't
22 your field, why were you the person
23 executing these forms?  These forms being
24 Shapiro 4.
25

Page 60

REID SHAPIRO

1    A.   Why would I be the one doing
2 it?
3    Q.   Yes.
4    A.   Probably because this was
5 something new that -- this is something
6 new that, I guess, ADT instructed us that
7 they want, and I wanted to be a little
8 bit more involved.  Now that I found out
9 there was some sort of lawsuit, I said --
10 maybe I took the bull by the horns and
11 said let me handle the -- let me be more
12 involved with the due diligence, this
13 form, these forms, that I signed.
14    Q.   Was that your reaction because
15 you perceived there to be a lack of
16 oversight on these subjects in the
17 company before the lawsuit?
18    A.   No.
19    Q.   Why did you feel it was
20 important to become more involved in the
21 oversight of the ADT contract after the
22 lawsuit?
23    A.   Because when they did this,
24 they --
25

Page 61

REID SHAPIRO

1    Q.   "They" being ADT?
2    A.   ADT, yes.  When ADT asked for
3 this, I believe, I think I remember, they
4 shut down the whole marketing channel for
5 everybody.  So that might have affected
6 our revenue, and I said, well, let me --
7 whoever, you know, try to get it approved
8 through ADT, let me see if I can get it
9 through ADT, because they completely shut
10 down the channel.
11       MR. SCHULTZ:  Just so we are
12    clear, when you say "this," you
13    mean Deposition Exhibit 4?
14       THE WITNESS:  Yes, Exhibit 4.
15    A.   ADT shut down -- when I
16 received this, ADT had already shut down
17 the whole marketing channel for all -- I
18 guess for us, I can't speak for anybody
19 else, for us.  In order for us to get
20 marketing partners back on, they asked us
21 to fill this out, and this is when I
22 signed.
23    Q.   If this was Joseph's area of
24 the company, why didn't you let Joseph
25

16 (Pages 58 - 61)

Page 62

REID SHAPIRO

1
2 sign these documents?
3     A.   Maybe he was traveling,
4 because he lives in New Jersey, so he
5 goes back and forth.  I don't remember.
6 I don't know.
7     Q.   So it is your recollection,
8 then, that you signed these instead of
9 Joseph because Joseph wasn't available to
10 sign them?
11    A.   Yes.
12    Q.   Wasn't it also your testimony
13 that you had taken it upon yourself to
14 sign these because you felt that you
15 should be taking a greater role in the
16 company in light of ADT shutting down the
17 sales channel?
18    A.   Well, I wanted to try to get
19 business back with ADT, so the only way
20 to do that was to -- the only way to do
21 that was to fill out their new form,
22 which they never had before, and try to
23 get it approved, which I don't think this
24 form ever mattered because they never got
25 back to us.

Page 63

REID SHAPIRO

1
2        MS. LIM:  What form never got
3 back?
4        THE WITNESS:  Shapiro 4,
5 Exhibit 4.
6     Q.   Are you aware of whether
7 Elephant Group had a written policy
8 regarding the engagement of outside
9 vendors to help perform the contract?
10    A.   Am I aware that we had our
11 own --
12    Q.   Whether the company had
13 written guidelines.
14    A.   I'm sure we had, yes.
15    Q.   Requiring --
16    A.   To follow ADT's rules?  Yes.
17    Q.   No, due diligence, to perform
18 due diligence in connection with the
19 engagement of third-party vendors to help
20 execute the contract, like Paramount.
21    A.   I don't understand the
22 question.
23    Q.   When Elephant Group hired
24 companies like Paramount to help it on
25 the ADT contract, did it have written

Page 64

REID SHAPIRO

1
2 guidelines as to how to perform a due
3 diligence to make sure that the company
4 they were hiring was a responsible
5 company?
6     A.   I'm sure we had that.  Daphne
7 would know that answer.
8     Q.   Would anybody besides Daphne
9 know that?
10    A.   Daphne would be the right
11 person to ask, as I stated before.  She
12 did the vetting.
13    Q.   And it is your testimony that,
14 with respect to the engagement and
15 supervision and management of these
16 outside vendors, you had no involvement
17 in those efforts; is that correct?
18    A.   Of managing them?
19    Q.   Hiring them, managing them.
20    A.   No.
21    Q.   Supervising them?
22    A.   No, I did not have any.
23        MR. McNEW:  Mark this as
24 Shapiro 5, please.
25        (Shapiro Exhibit 5 for

Page 65

REID SHAPIRO

1
2 identification, email dated April
3 20, 2011, Bates stamped RYANNEILL
4 000236.)
5     Q.   Could you look at what has
6 been marked as Shapiro 5, please.
7     A.   Okay.
8     Q.   Do you recognize this
9 document?
10    A.   No.
11    Q.   Do you know who Ryan Neill is?
12    A.   I think he's the Paramount
13 guy.  We are talking about Paramount.
14    Q.   And you are copied on this
15 email; is that correct?
16    A.   Yes, this is correct.  Yeah,
17 but if you read it --
18    Q.   Why would Daphne have copied
19 you on this email?
20        MR. SCHULTZ:  I object to the
21 form.
22    A.   I have no idea.  You have to
23 ask her that question.  But from what I'm
24 reading, it shows that she's doing her
25 own due diligence here, asking him.

17 (Pages 62 - 65)

REID SHAPIRO

1
2    Q.   And you don't know why she
3  copied you on this email?
4    A.   No, no idea.  Five years ago,
5  four years ago.
6    Q.   Did Daphne Fernandez often
7  copy you on emails involving Paramount?
8    A.   No.
9    Q.   Regarding other affiliates
10 working on the ADT contracts?
11   A.   Not out of the norm, no.
12   Q.   Did you communicate much with
13 Daphne Fernandez?
14   A.   Like anybody else.
15   Q.   I mean apart from water cooler
16 talk.  In terms of communications in the
17 company regarding her functions within
18 the company.
19   A.   No, not really.  This is pre
20 lawsuit?
21   Q.   Pre lawsuit.
22   A.   Not really.
23   Q.   I believe it was your
24 testimony earlier that apart from
25 Paramount you weren't familiar with the

REID SHAPIRO

1
2  names of the third-party marketers who
3  were helping you perform the ADT
4  contract; is that correct?
5    A.   Yeah, I remember.
6    Q.   Do you remember how many
7  third-party marketers you had helping
8  you?
9    A.   I don't remember.
10   Q.   And as far as the process,
11 that would be with Daphne; is that
12 correct?
13   A.   All rolls up to Daphne.
14   Q.   Let me show you what we will
15 mark as Shapiro 6.
16       (Shapiro Exhibit 6 for
17    identification, Elephant Group,
18    Inc.'s Answers to Third Party
19    Plaintiff ADT's First Set of
20    Interrogatories.)
21   Q.   Have you seen this document
22 before?
23   A.   Never.
24   Q.   And this document being
25 Shapiro 6?

REID SHAPIRO

1
2    A.   Correct.
3        MR. McNEW:  This is directed
4    to counsel.  We still haven't
5    received verification of this.
6        MR. SCHULTZ:  I will work with
7    Dan to get that resolved, along
8    with your other requests.
9    Q.   If you look at page 4, the
10 answer to question number 8, it says
11 "Paramount Media Group was not permitted
12 to subcontract any services without
13 receiving prior written approval."
14       Do you know anything about
15 that statement?
16   A.   No.
17   Q.   You don't know --
18   A.   Wait.  I personally don't
19 know.  You have to ask Daphne that
20 question.
21   Q.   Is there anyone in the company
22 besides Daphne who would know the answer,
23 know anything about that statement?
24   A.   Daphne would know that answer,
25 I assume.  I assume.  I don't think

REID SHAPIRO

1
2  anybody else.
3        MR. McNEW:  Let me have this
4    marked as Shapiro 7.
5        (Shapiro Exhibit 7 for
6    identification, email dated August
7    16, 2011, Bates stamped SAV005552
8    and 5553.)
9    Q.   My first question to you is,
10 have you seen this document before?
11   A.   No.
12   Q.   Do you know who Robin Feinglas
13 is?
14   A.   She was our old paralegal.
15   Q.   Old in terms of age or --
16   A.   No, I'm sorry.  No, she was
17 one of our -- she was a paralegal in the
18 company.
19   Q.   She was a paralegal at least
20 as of August 16, 2011?
21   A.   Correct.
22   Q.   Can you read aloud the first
23 two sentences?
24   A.   Sure.  "I don't know who that
25 is - ask Reid - he is the one that set up

18 (Pages 66 - 69)

REID SHAPIRO

1        REID SHAPIRO
2 all of these guys with leads. I have no
3 idea what is going on today with ADT."
4    Q.  So is it correct that, if you
5 read through this email chain, it appears
6 they are talking about a company called
7 EMI that is being used by Paramount. Is
8 that correct?
9       MR. SCHULTZ: I object to the
10   form of the question.
11   A.  This is now pre or post?
12   Q.  It is not important to the
13 question.
14   A.  I have never heard of EMI.
15   Q.  Do you know why Daphne would
16 have identified you as the person setting
17 up the third-party vendors with leads?
18   Let me back up. In the
19 passage I asked you to read, which is the
20 first email in this chain, "he is the one
21 that set up all of these guys with
22 leads," is it a correct assumption that
23 these guys are third-party vendors
24 working for the company?
25       MR. SCHULTZ: I object to the

REID SHAPIRO

1        REID SHAPIRO
2   form.
3   A.  I've never set anybody up -- I
4 personally never set anybody up with
5 leads.
6   Q.  Do you have idea why Daphne
7 would have identified you as the person
8 who was connecting your vendors with
9 leads?
10   A.  I have no idea.
11   Q.  Do you have any idea why
12 Daphne would say "I have no idea what is
13 going on today with ADT"?
14   A.  I don't know why. This email
15 wasn't to me. It's the first time I'm
16 seeing it.
17   Q.  Everything you said to me
18 today is that Daphne was the person at
19 Elephant Group who was charged with
20 operating the ADT contract. Is that
21 correct?
22       MR. SCHULTZ: I am just going
23   to object to the form of the
24   question. I think the witness has
25   been very clear about drawing a

REID SHAPIRO

1        REID SHAPIRO
2   distinction between pre lawsuit and
3   post lawsuit.
4       MR. McNEW: That's fair.
5   Q.  If Daphne had no idea what was
6 going on with ADT, who at the company
7 would?
8   A.  I have no idea. I think
9 that's just a blanket statement by
10 Daphne, because she deals with them every
11 day, she has dealt with it day-to-day, so
12 maybe she didn't get a call back from
13 someone, or she didn't get an email back
14 from someone, and that's why she said "I
15 have no idea what is going on today with
16 ADT." I don't know the reason why she
17 wrote that. Ask her.
18   Q.  Are you working today?
19   A.  No.
20   Q.  Are you aware that your
21 colleague, Joseph, had originally
22 instructed your lawyer to file a
23 protective order to prevent this
24 deposition from going forward?
25   A.  I'm not aware of that.

REID SHAPIRO

1        REID SHAPIRO
2   Q.  Do you know why Joseph would
3 have preferred that you not testify in
4 this proceeding?
5   A.  I have no idea.
6   Q.  I believe it was your
7 testimony that you said Benny doesn't go
8 into the office every day. Is Benny
9 going into the office at all these days?
10   A.  I have no idea. I haven't
11 spoken -- I don't know. We are not
12 together anymore.
13   Q.  When was the last time you
14 spoke with Joseph?
15   A.  Today.
16   Q.  How about Benny?
17   A.  Maybe last week.
18   Q.  What did you talk about?
19   A.  Nothing regarding ADT.
20   Q.  How about Joseph?
21   A.  What did I talk to Joseph
22 about?
23   Q.  Yes.
24   A.  Going for my deposition. We
25 were trying to schedule timings. I was

Page 74

REID SHAPIRO

1 supposed to come tomorrow.
2     Q.   We had some problems with
3 that.
4         MR. McNEW:  Give us a few
5     minutes.
6         (A recess was taken.)
7 BY MR. McNEW:
8     Q.   I just want to ask you a few
9 more questions about the period when the
10 lawsuit was filed.
11         I believe it was your
12 testimony that you became involved in
13 compliance issues with the ADT contract
14 after the lawsuit was filed.  Is that
15 correct?
16     A.   I don't know if they call it
17 compliance, but I signed the forms,
18 ratified the forms.
19     Q.   And I believe it was also your
20 testimony that you chose to become more
21 involved after the lawsuit because of the
22 effect of the lawsuit on ADT's
23 willingness to go forward with the
24 contract in the light of the complaint's

Page 75

REID SHAPIRO

1 allegations.  Is that correct?
2     A.   I don't understand your
3 question.
4     Q.   I kind of got lost.
5     A.   I will tell you what you were
6 trying to say.
7     Q.   You tell me what I was trying
8 to say.
9     A.   Because I got involved with
10 filling out the forms, or more involved,
11 because they shut us all down, and I
12 wanted to know -- you know, it hurt our
13 revenue.
14     Q.   So when you say it hurt your
15 revenue, can you be more specific?  How
16 did it hurt your revenue?
17     A.   We get paid, I believe,
18 commissions from ADT.
19     Q.   And do you have any sense as
20 to the size of the loss of ADT business
21 that occurred as a result of the lawsuit?
22     A.   I don't.  You asked me that.
23 I don't know.
24     Q.   I know I did.

Page 76

REID SHAPIRO

1     A.   I don't know.
2     Q.   You said you knew there was a
3 loss of revenue, so I thought maybe the
4 line of questions may have refreshed your
5 recollection as to the size of the loss.
6     A.   I don't know.
7     Q.   So you don't know how much you
8 lost?  You just know there was a loss of
9 revenue?
10     A.   Yes.
11     Q.   Did it affect your draw as a
12 partner?
13     A.   No.
14     Q.   You made the same amount of
15 money going forward as you had before,
16 you personally?
17     A.   I believe so.
18     Q.   Do you know where the loss of
19 revenue was absorbed?
20     A.   I don't understand your
21 question.
22     Q.   I'm assuming, and I may be
23 wrong in this, but I'm assuming that the
24 three partners sit and take equally, or

Page 77

REID SHAPIRO

1 share in accordance with their ownership
2 interest.  Is that correct?
3     A.   No.
4     Q.   How was compensation decided
5 among the three?
6     A.   It's just been like that for
7 years, the way it would be structured.
8     Q.   So the loss of the ADT account
9 had no effect on the income of any of the
10 three partners?
11     A.   I don't know about that.  I'm
12 not sure.  It might have went down a
13 little.  I don't remember.
14     Q.   You mentioned that you filed
15 these forms with ADT, what I think was
16 Shapiro 4.  The forms that we have marked
17 as Shapiro 4 you submitted to ADT, and I
18 believe your characterization was they
19 didn't come back.  Is that right?
20     A.   From what I understand, they
21 didn't come back all at once.  We were
22 waiting for approvals from ADT to do
23 this.
24     Q.   And did you receive those

Page 78

REID SHAPIRO

1
2 approvals?
3    A.   I don't remember.  I don't
4 think so.
5    Q.   And do you have any sense as
6 to why Elephant Group didn't receive
7 approval to continue with those vendors?
8    A.   Why we didn't get a response
9 back?
10   Q.   Yes.
11   A.   I think ADT was scrambling,
12 because this was a brand new form and I
13 don't think they had their whole back and
14 infrastructure ready on how to handle
15 this type of thing, because they had
16 never done this before.
17       MR. McNEW:  Let me mark one
18       more mark one more exhibit.  This
19       is 8.
20       (Shapiro Exhibit 8 for
21       identification, letter dated April
22       19, 2012, Bates stamped ADT 183
23       through 188.)
24   Q.   My first question is, do you
25 recognize this document?

Page 79

REID SHAPIRO

1
2    A.   Yes.
3    Q.   Can you tell me what this
4 document is?
5    A.   Yes.  This document was me
6 begging Lee Jackson, the vice president
7 and general counsel of ADT, to let us
8 use, after they cut off all of our
9 marketing for ADT, I asked for a company,
10 Blue Dolphin, to be allowed to -- we
11 weren't getting approval, so I wrote this
12 letter to Lee, asking for approvals on
13 this one company, that would keep us
14 going.
15   Q.   Is it a fair inference that --
16 the letter talks about how ADT related
17 referrals are plummeting to record lows.
18 Do you see that?  The second line.
19   A.   Okay.
20   Q.   Is it a fair inference that
21 they were plummeting to record lows
22 because ADT was not permitting Elephant
23 Group to use third-party vendors to
24 generate leads for ADT?
25   A.   They shut down the whole

Page 80

REID SHAPIRO

1
2 channel, for everybody.
3    Q.   They didn't shut down
4 Saveology itself; right?  Saveology still
5 could operate?
6    A.   They shut down the indirect
7 marketing channel for all outside
8 vendors, until they gave us this new form
9 to fill out.
10   Q.   And what is your understanding
11 as to why ADT shut down the channel?
12       MR. SCHULTZ:  I object to the
13       form.
14   A.   I have no idea.
15   Q.   Really?
16   A.   Why they shut down the
17 marketing channels?  There's a lawsuit.
18 They were getting sued.
19   Q.   And why do you suppose ADT
20 started using the forms that we have
21 marked as Shapiro 4?
22       MR. SCHULTZ:  I object again
23       to the form.
24   A.   That's their -- we always
25 followed their guidance and direction,

Page 81

REID SHAPIRO

1
2 and we did what we were supposed to do,
3 and when they gave this out, this is how
4 they wanted to get approvals on a new
5 process that they were putting in place,
6 which they never did in the past.
7    Q.   Are you aware that the forms
8 marked as Shapiro 4, in fact, were
9 created to enforce the rules that were
10 originally set forth in the ADT contract
11 marked as Shapiro 1?
12       MR. SCHULTZ:  I object to the
13       form.
14   A.   I don't know why they were
15 created.  They asked us to get approvals
16 this way now.  So we did what they asked
17 us to do.  They never had anything like
18 this before.
19   Q.   And it is your understanding
20 that the requirements set forth in those
21 documents in Shapiro 4 were new
22 requirements on the company?
23   A.   You are just saying that this
24 document, Shapiro 4, it was a new policy
25 or process that ADT came out with for us

21 (Pages 78 - 81)

Page 82

REID SHAPIRO

1  to fill out to get approvals for outside,
2  I will call them vendors, you call them
3  lead generators. Yes, this is new.
4      Q.   It's a knew document; correct?
5      A.   Correct.
6      Q.   You never used that document
7  before. But are you aware that the
8  written consent required in the documents
9  set forth in Shapiro 4 were, in fact, the
10  same written consent that was required in
11  the contract that we began the deposition
12  that?
13      MR. SCHULTZ:  I object to
14      form.
15      A.   I don't know that.
16      Q.   So when in the first sentence
17  of Shapiro 8 you say that your ADT
18  related referrals plummeted to record
19  lows, it doesn't say that they stopped;
20  right? You say the channel was shut
21  down, but the way the letter is written
22  suggests that you were still generating
23  leads, just much lower.
24      A.   No. Referrals -- what are you

Page 83

REID SHAPIRO

1  referring to referrals meaning?
2      Q.   You are the letter writer.
3  You tell me.
4      A.   So we had our own internal
5  channel that we did, so we call them
6  referrals, meaning our own marketing,
7  whether it's search engine optimizing, or
8  whatever, you know, our own record lows.
9  You know, they stopped one side, but we
10  still had some business coming in, just
11  one side of the channel.
12      Q.   So the channel wasn't actually
13  shut down, it was just confined to what
14  you what you, Saveology, could generate
15  yourself without the use of outside
16  vendors?
17      A.   We could not use outside
18  vendors.
19      Q.   And without the ability to use
20  outside vendors, your referrals plummeted
21  to record lows; is that correct?
22      A.   Correct.
23      Q.   And it was unprofitable for
24  you to continue to serve ADT without the

Page 84

REID SHAPIRO

1  use of outside vendors; is that correct?
2      A.   The way we were operating.
3      MS. LIM:  Would you repeat his
4      response?
5      (Requested portion or record
6      read.)
7      A.   I would have to fire employees
8  to keep up with the market.
9      MS. LIM:  Could you explain
10      that?
11      MR. SCHULTZ:  Are you going to
12      be asking questions.
13      MR. McNEW:  That's fair.
14      Q.   Could you explain that,
15  please?
16      A.   If sales were not coming in, I
17  would have to get rid of, I guess, call
18  center reps. Right?
19      Q.   Right.
20      A.   So I can't carry the carrying
21  costs. They were too high. You can't
22  operate that way.
23      Q.   Do you have any recollection
24  as to how much your referrals for ADT

Page 85

REID SHAPIRO

1  fell as a result of not being able to use
2  outside vendors?
3      A.   I don't remember.
4      Q.   Half?
5      A.   I don't know.
6      Q.   More than half?
7      A.   I don't know. It would be
8  unfair for me. I don't know.
9      Q.   I believe it is your testimony
10  that you haven't been working since you
11  left the company. Is that correct?
12      A.   Correct.
13      Q.   Did the company give you a
14  severance package?
15      A.   Yes.
16      Q.   Can you tell us what it is?
17      A.   No.
18      Q.   Why not?
19      A.   It's irrelevant.
20      MR. SCHULTZ:  I am going to
21      object to that, too.
22      MR. McNEW:  You are going to
23      object to --
24      THE WITNESS:  It's irrelevant.

22 (Pages 82 - 85)

Page 86

REID SHAPIRO

1 Come on.
2     MR. SCHULTZ: I am not going
3 to have him sit here and testify as
4 to what his severance package is.
5 That has zero to do with anything
6 having to do with this case, yes.
7     MS. LIM: It demonstrates how
8 much Saveology was making. It
9 shows that they are flush with
10 cash. It goes to a lot of
11 different things that goes to the
12 merits of the case.
13     MR. SCHULTZ: It doesn't have
14 anything to do with the merits of
15 the case. It might have your
16 ability to recover to the extent
17 that you do have a case, but that
18 is not the merits of the case,
19 Hannah. And he is not going to
20 answer that question. If you want
21 to take that up with Judge Bucklo,
22 fine. If he wants to answer it,
23 no, but I would agree with him, I
24 wouldn't answer that.

Page 87

REID SHAPIRO

1     Q.   Would you say that the
2 Elephant Group is a company that
3 generated a large amount of cash?
4     A.   I have no idea what you're
5 talking about.
6     Q.   In terms of revenue over
7 expenses, was it a profitable company?
8     A.   I don't know. I wasn't
9 involved with finance. I was building
10 out call centers.
11     Q.   I'm sorry?
12     A.   I wouldn't know that answer.
13     Q.   You are not aware of the
14 company's financial performance?
15     A.   I'm not a hundred percent
16 clear on their performance, no. I was
17 not involved in finances.
18     Q.   I am not asking if you were a
19 hundred percent clear. I am just asking
20 if you are aware of whether the company
21 was profitable.
22     A.   I don't think we were
23 profitable. I would be there.
24     Q.   Between 2007 and 2011?

Page 88

REID SHAPIRO

1     A.   I don't know. I don't
2 remember. I think if we were profitable
3 I would still be there.
4     Q.   That's after the lawsuit.
5 What about before the lawsuit?
6     A.   I don't remember.
7     Q.   Really?
8     A.   Yeah. I wasn't involved.
9     Q.   You owned the company.
10     A.   Yeah, but there's different --
11 there's CFOs, there's CEOs, Joseph,
12 whatever, chairmen. I was out on the
13 road. I was out in the field a lot.
14     Q.   I hear all that. But you are
15 the owner of the company.
16     MR. SCHULTZ: He has answered
17 the question.
18     Q.   It is your testimony that you
19 have no idea whether your company was
20 profitable or not?
21     A.   I don't know. And it's
22 honest. I'm telling you the truth. I
23 don't know. It wasn't my field.
24     Q.   You said you had a call center

Page 89

REID SHAPIRO

1 in Kingston?
2     A.   No.
3     Q.   You built a call center in
4 Jamaica?
5     A.   Correct.
6     Q.   Where was in Jamaica was it?
7     A.   Montego Bay.
8     Q.   Did the company maintain a
9 house in Jamaica?
10     A.   Yes.
11     Q.   And where was it located?
12     A.   Rose Hall.
13     Q.   And Rose Hall was?
14     A.   Six miles from our -- it's a
15 parish, part of Montego Bay.
16     Q.   And did the company own it or
17 rent it?
18     A.   Rent.
19     Q.   Do you remember what the rent
20 was on the house?
21     A.   I don't remember.
22     Q.   How big was the house?
23     A.   I don't know. I don't know
24 exactly. It had five bedrooms, six

23 (Pages 86 - 89)

Page 90

REID SHAPIRO

1
2  bedrooms, for employees, because it was
3  cheaper than putting them up at a hotel
4  when they were coming down.
5      Q.   Did you ever stay there?
6      A.   Yes.
7      Q.   Was it on the ocean?
8      A.   No.
9      Q.   Did the company provide, in
10  addition to cash, did the company provide
11  other elements of compensation to the
12  owners?
13      A.   For example?
14      Q.   Cars.
15      A.   To buy me a car?  No.
16      Q.   Did Benny drive a car, company
17  car?
18      A.   I'm sure he did.
19      Q.   Would it have been a Maserati?
20          MR. SCHULTZ:  Did you
21      understand the question?
22          THE WITNESS:  No.
23          MR. SCHULTZ:  He said did
24      Benny drive a company car that was
25      provided by the company.  He asked

Page 91

REID SHAPIRO

1
2  two questions.
3      A.   Go ahead.  Ask me again.
4      Q.   Did the company provide Benny
5  with a car?
6      A.   Yes.
7      Q.   Was it a Maserati?
8      A.   No.
9      Q.   Did the company provide anyone
10  with a Maserati?
11      A.   Oh, you know -- I don't know
12  how -- okay.  The company -- I don't know
13  how he structured his deal.  The Maserati
14  is under my name.  I don't know who paid
15  for it.  True.
16      Q.   Do you own the Maserati?
17      A.   On paper, yes.
18      Q.   And do you drive the Maserati?
19      A.   No.
20      Q.   Who drives it?
21      A.   Benny.
22      Q.   Why is your name on the car?
23      A.   I think probably maybe because
24  my credit was better.
25      Q.   Benny has bad credit?

Page 92

REID SHAPIRO

1
2      A.   I don't know.
3      Q.   You say you stayed at the Rose
4  Hall property?
5      A.   Yes.
6      Q.   Do you remember the address?
7      A.   No.
8      Q.   Did it have a name?
9      A.   Did the house have a name?
10      Q.   A lot of times on the islands
11  they have names for houses.
12      A.   Did someone tell you a name
13  you are asking me?
14      Q.   No.
15      A.   Then I don't know.  Maybe you
16  could refresh my memory if someone told
17  you.
18      Q.   No.  We are trying to
19  understand where it is.
20      A.   The house is in Rose Hall.
21      Q.   But there are a lot of houses
22  in Rose Hall, I guess.
23      A.   Yes.
24      Q.   Do you recall what the rent
25  was on the property?

Page 93

REID SHAPIRO

1
2      A.   I don't.  I didn't negotiate
3  the deal.
4      Q.   Do you know who did?
5      A.   I don't know.
6          MR. McNEW:  I have no more
7      questions.  Do you have any
8      questions?
9          MR. SCHULTZ:  I have nothing.
10      We will read.
11          (Time noted:  3:30 p.m.)
12
13
14          REID SHAPIRO
15
16  Subscribed and affirmed before me
17  this _____ day of _____, 2014.
18
19  _____
20
21
22
23
24
25

24 (Pages 90 - 93)

Page 94

```
 1        REID SHAPIRO
 2    I, JACK FINZ, Shorthand Reporter,
 3  certify that I was authorized to and
 4  did stenographically report the
 5  deposition of REID SHAPIRO, the witness
 6  herein, on June 18, 2014; that a review
 7  of the transcript was requested; that
 8  the foregoing pages numbered from 1
 9  through 93, inclusive, is a true and
10  complete record of my stenographic
11  notes of the deposition by said
12  witness; and that this computer-
13  assisted transcript was prepared under
14  my supervision.
15    I further certify that I am not a
16  relative, employee, attorney or counsel
17  of the parties, nor am I a relative or
18  employee of any of the parties'
19  attorney or counsel connected with the
20  action.
21    DATED this ___day of_____, 2014.
22
23        _____
24        JACK FINZ
25
```

Veritext Florida Reporting Co.

800-726-7007                                    305-376-8800