# Exhibit 4

Page 1

1

2          UNITED STATES DISTRICT COURT

     FOR THE NORTHERN DISTRICT OF ILLINOIS

3              EASTERN DIVISION

   -------------------------------x

4  VISHVA DESAI,

5                        Plaintiff,

6

          -against-          No. 11C1925

7

   ADT SECURITY SERVICES, INC.,

8  et al.,

9                        Defendants.

   -------------------------------x

10

11                      June 19, 2014

12                      9:10 a.m.

13

14      Deposition of JOSEPH BAMIRA,

15  pursuant to notice and subpoena, at the

16  offices of Veritext Legal Solutions,

17  301 Northeast 51st Street, Boca Raton,

18  Florida, before Jack Finz, a Shorthand

19  Reporter and Notary Public within and

20  for the State of Florida.

21

22

23

24

25

Page 2

1
2  A P P E A R A N C E S :
3  C. SANDERS McNEW, ESQ.
     SARA GOLDBERG, ESQ.
4  McNEW P.A.
     Attorneys for Defendant
5  ADT SECURITY SERVICES, INC.
          2385 New Executive Center Drive
6      Suite 100
          Boca Raton, FL 33431
7
8
     JAMES K. SCHULTZ, ESQ.
9  SESSIONS FISHMAN NATHAN & ISRAEL LLC
     Attorneys for Third-Party Defendant
10 THE ELEPHANT GROUP
          55 West Monroe Street
11      Suite 1120
          Chicago, IL 60603-5130
12
13
     ALSO PRESENT:
14
     HANNAH S. LIM, ESQ.
15 Chief Litigation Counsel
     ADT Security Services
16      1501 Yamato Road
          Boca Raton, FL 33431
17
18
19
20
21
22
23
24
25

Page 3

JOSEPH BAMIRA

1                    JOSEPH BAMIRA
2          J O S E P H   B A M I R A ,
3      having been first duly sworn by the
4      Notary Public (Jack Finz), was
5      examined and testified as follows:
6  EXAMINATION BY
7  MR. McNEW:
8      Q.   Can you state your fall name
9  for the record, please.
10     A.   Yes.  Joseph Bamira.
11     Q.   And your address?
12     A.   15 Shadowlawn Drive, Oakhurst,
13 New Jersey.
14     Q.   Have you been deposed before?
15     A.   Yes.
16     Q.   So I will spare you a lengthy
17 set of instructions, but if you don't
18 understand something that I ask you,
19 please ask me to clarify.
20          And I'm sure your lawyer has
21 already told you this, but you needn't
22 speculate.  If you don't know an answer,
23 just say you don't know.  That's fine.
24          My first question to you, how
25 many people worked in -- let's set up a

Page 4

JOSEPH BAMIRA

1  groundrule.  For the purposes of the
2  discussion, can we talk about Elephant
3  Group and Saveology together as Elephant
4  Group?
5      A.   Absolutely, yes.
6      Q.   And then if there is an answer
7  that you have that for some reason
8  depends on a distinction between one or
9  the other, you will make that for me?
10     A.   Yes, sir.
11     Q.   Tell me, how many people
12 worked in the compliance department at
13 Elephant Group?
14     A.   I don't know the exact number,
15 and it varied from time to time.
16 Somewhere between 15 to 20.
17     Q.   Did they sit together in a
18 part of the office?
19     A.   They sat together in a part of
20 an office, yes.
21     Q.   Was there a sign that said
22 compliance?
23     A.   No.
24     Q.   Can you give me names of the

Page 5

JOSEPH BAMIRA

1  people who worked there?
2      A.   Well, the guy who was in
3  charge of it, let's say, one of them was
4  James Flynn.  And then there was a girl
5  by the name of -- working there, there
6  were different parts of the compliance.
7  So if you care about it, I will describe
8  it to you.
9          There was a Nikki.  I don't
10 remember the last name.  And so I don't
11 remember the names.  I didn't work
12 directly with them on a day-to-day basis.
13     Q.   Who did?
14     A.   There was a Mary Couton.
15     Q.   Can you spell the last name,
16 please?
17     A.   I'm not sure.
18     Q.   With a K or C?
19     A.   C.  I'm not quite sure how she
20 spelled it.
21     Q.   You said that you didn't work
22 directly with compliance.  To whom did
23 the compliance department report?
24     A.   Usually the ones that was the

Page 6

JOSEPH BAMIRA

1  head of the compliance department. I
2  mean, in the last four or five months
3  before I left it was pretty much me. And
4  before that they had a head of the
5  compliance department, and he usually --
6  I was not the head of the compliance
7  department, but in the corporate
8  structure, because it had to do with
9  legal issues, they talked to me if there
10 were legal issues, such as should we fire
11 someone, should we not fire someone, what
12 were the issues, stuff like that.
13     Q.   One more groundrule. For the
14 purposes of this deposition, let's assume
15 that my questions are all going to the
16 time before the Desai lawsuit was served,
17 which I think was March 2011. That will
18 make things easier. I understand that
19 things changed a bit after the lawsuit.
20     A.   They have.
21     Q.   So let's focus on the time
22 before the lawsuit. And, again, if your
23 answer leads you into post-lawsuit
24 things, just flag that for me. But we

Page 7

JOSEPH BAMIRA

1  will assume we are talking about 2011.
2        So what I hear you telling me
3  is that you were the person in the
4  company responsible for the resolution of
5  legal issues. Is that correct?
6     A.   Correct. I managed it. I was
7  not the attorney, because I am not. But,
8  yes, I dealt with legal issues of the
9  company.
10    Q.   You said that there were
11 different parts of compliance, and I want
12 to come back to that and break that down.
13       Was the compliance department
14 responsible for enforcing compliance with
15 the ADT contract?
16    A.   The compliance department did
17 not do the actual day-to-day, but they
18 more reacted -- again, it depends before
19 and after. And I'm not quite sure how it
20 evolved, because the compliance
21 department did not react really to the
22 Desai issue, because it was not an issue
23 of compliance per se. So they did not
24 work on the actual enforcement of any

Page 8

JOSEPH BAMIRA

1  particular contract.
2     Q.   So if they weren't involved in
3  the enforcement of any particular
4  contract, what were they involved in?
5     A.   Let's say somebody complains,
6  or two -- there's two separate types of
7  structures. A, there was a team which
8  listened in to calls and see how the
9  calls were, and did the agents answer it
10 correctly.
11       Then there were subsequently
12 we replaced it with a voice recognition
13 system that analyzed pretty much what all
14 the calls and see if the calls were
15 legit. Every call, or 60, 70 percent of
16 the calls, it would listen, and it's the
17 software, and then people would listen
18 in, if there were infractions, and report
19 the infractions.
20       Then there were people, and
21 before that they would listen manually.
22 It didn't change it because of Desai,
23 because we always looked to make sure
24 things are being done correctly. And

Page 9

JOSEPH BAMIRA

1  primarily because of TCPA rules.
2        Then there are things, because
3  of the TCPA rules, that I made sure that,
4  let's say, Daphne is aware that what
5  websites have to include, what they don't
6  have to include. Let's say, I will give
7  you an example, she got instructions that
8  each website is up, which let's say like
9  ADT, that the website, that the people
10 who work for us, they keep the records,
11 keep the calls, that they are scrubbing
12 the calls, especially against the
13 internal ADT situation, if we talk about
14 ADT, that the website includes the right
15 wording, that people ask -- you know,
16 they ask people to opt in, however they
17 did. But there is a wording saying that
18 let's say they agree that they will be
19 called specifically for security, home
20 security companies. We had it even
21 people should be called for, even though
22 none of them did not allow that, but just
23 in case, let's say for robocalling, which
24 you can ask for specific separate

3 (Pages 6 - 9)

JOSEPH BAMIRA

1
2  permission.
3          So there were rules and
4  regulations, and I made sure that we were
5  aware they were implemented, and if there
6  was a complaint, I asked her to check if
7  everybody kept the rules.  So we had
8  pretty good tabs on did people keep the
9  rules or didn't.
10          From time to time ADT would
11  ask questions, and then we would go, and
12  we would go to the vendor and he would
13  supply us with the information, and we
14  reacted to that.
15      Q.   A big piece of the work with
16  the compliance department was monitoring
17  phone calls?
18      A.   Correct.
19      Q.   Were those phone calls that
20  were being made or received by Elephant
21  Group or by other companies?
22      A.   Calls received by us.
23      Q.   So they were not involved in
24  listening to phone calls made by
25  third-party vendors that you would engage

JOSEPH BAMIRA

1
2  to help perform the ADT contract; is that
3  correct?
4      A.   That's correct, because those
5  people were supposed to have only people
6  called in.  They were subcontractors.  We
7  cannot control what they are saying.  We
8  cannot tell them how to do their job,
9  except put parameters on what the call
10  should be and what the quality of the
11  call should be.  But we did not listen to
12  their calls.
13      Q.   You talked about the need to
14  ensure that the numbers had been
15  scrubbed.  Were you making outbound
16  calls?
17      A.   No, we were not, only inbound.
18  But in this particular instance, even
19  though someone allows you to call him,
20  since we did not, you know, in the
21  website it not necessarily always say
22  ADT, it's a security company, or whatever
23  it said.  Even though a person said you
24  can call me, and according to TCPA, on
25  the national -- even if you put yourself,

JOSEPH BAMIRA

1
2  your name, on the national, that's okay,
3  so you get permission.
4          However, they might have put
5  themselves on ADT's internal do not call
6  list.  So even though they called us and
7  we called them back, I wanted to make
8  sure that nobody calls, even if you get
9  permission, if he was on the internal ADT
10  do not call list.
11      Q.   So the calls that were being
12  monitored by your compliance department,
13  were any of those calls outbound calls?
14      A.   No.  We didn't make outbound
15  calls.
16      Q.   And they did not monitor the
17  calls made by third-party vendors, or
18  received by third-party vendors?
19      A.   That is true, in the ADT case.
20  In the other we didn't have people make
21  calls for us.
22      Q.   So for the purposes of
23  ensuring compliance with -- are you aware
24  that the ADT contract required written
25  consent for the engagement of third-party

JOSEPH BAMIRA

1
2  vendors to assist in the performance of
3  the ADT contract?
4      A.   I'm aware now.  I don't
5  remember when I got aware.
6      Q.   The compliance department,
7  would it have been involved in ensuring
8  compliance with adherence to that
9  contractual provision?
10      A.   No.  Because usually we did
11  not -- the compliance department did not
12  like read contracts and make sure that
13  everybody is keeping their side of the
14  contract.  That did not happen.
15          However, it was never raised
16  by ADT, either, so it never became a
17  complaint, because that's what everybody
18  did.  ADT pretty much knew very closely
19  what we were doing.  Nobody ever
20  complained about it.  So nobody asked us
21  to do things differently than we actually
22  have.  So it never came to anybody's
23  attention that it is an area that needs
24  to be enforced literally.
25      Q.   And how do you know that ADT

Page 14

JOSEPH BAMIRA

1
2 knew that?
3     A.   Because ADT talked to Daphne
4 all the time.  They came to our office.
5 They knew pretty much what we do.  They
6 knew we were working with other vendors.
7 They never came and complained, hey, we
8 saw you working with other vendors, we
9 don't have any written, or any request to
10 have a written permission, you cannot do
11 that.  There was never such a complaint,
12 even though they knew and got quite a bit
13 of traffic, and they knew how the traffic
14 got to them.
15     Q.   When you say ADT, what
16 individuals are you referring to?  What
17 individuals came to you and made those
18 statements to you?
19     A.   For one, Dan Geiger.  But
20 there were, I suppose, other people, you
21 know, that talked to Daphne.  So I didn't
22 speak to them.  But there were other
23 individuals, I suppose.  Steve Dribben, I
24 suppose.  I don't know.
25     Q.   Do you have any knowledge of

Page 15

JOSEPH BAMIRA

1
2 Steve Dribben ever speaking with Daphne
3 Fernandes about this?
4     A.   Directly, not.
5     Q.   Did you ever speak to Steve
6 Dribben about this?
7     A.   If he spoke to Daphne?
8     Q.   No.  Did you ever speak to
9 Steve Dribben about this?
10    A.   About this, you mean what?
11    Q.   About whether or not it would
12 be appropriate to use a third-party
13 vendor to help perform the ADT contract
14 without ADT's written approval.
15    A.   No.  I didn't see any need to,
16 so I didn't ever discuss it with him.
17    Q.   Are you aware that the ADT
18 contract also barred the making of
19 unsolicited outbound telemarketing calls?
20    A.   I think I knew about it, but
21 it was not initially.  We were not doing
22 these kinds of things.
23    Q.   Are you aware of whether your
24 third-party vendors were making
25 unsolicited outbound telemarketing calls?

Page 16

JOSEPH BAMIRA

1
2     A.   We forbade, in the contract we
3 had with them, to make outbound
4 unsolicited calls.  It was a very
5 specific type of calls and function that
6 they were contracted to do.  That was not
7 one of them.
8     Q.   What did your compliance
9 department do to ensure compliance with
10 those contractual provisions?
11    A.   Again, it was more to the
12 marketing department, because this was
13 more legal instructions, not compliance.
14 Because compliance, as you understand,
15 was more make sure that all the agents
16 and everybody else sticks to TCPA, so
17 you're talking more about legal
18 enforcement.  That's not the compliance.
19 Compliance is a big word.
20    Q.   Let's assume -- I will assume,
21 and you will correct me if I am wrong,
22 but I will assume for the purposes of our
23 discussion that the compliance department
24 had nothing to do with ensuring the
25 enforcement of either of these

Page 17

JOSEPH BAMIRA

1
2 contractual provisions or related
3 provisions with your third-party vendors.
4 Is that correct?
5     A.   The compliance department not.
6 But personally I myself discussed it with
7 Daphne, discussed it with other people,
8 as some of the issues were.  You know,
9 very often we made a synopsis of what are
10 the requirements, and then with all the --
11 what is a contract.  But there was not
12 a compliance that says go every day and
13 see that everybody is doing that.  That
14 was the job of Daphne.  She was the
15 head of the department.  She had the
16 exact instructions what she should do,
17 what she shouldn't do.  We changed it
18 from time to time, reacted a lot of
19 times to what came to our attention, to
20 what we listened to, what complaints
21 were.  And that was her job, to make
22 sure the implementation of it.
23    Q.   So what I hear you telling me
24 is that with respect to the third-party
25 vendor compliance with the restrictions

5 (Pages 14 - 17)

Page 18

JOSEPH BAMIRA

1
2 of what they could or couldn't do, the
3 oversight of ensuring compliance with
4 those provisions was the responsibility
5 of Daphne Fernandes; is that correct?
6     A.   The provision of the
7 agreements, yes.
8     Q.   And to whom did she report on
9 that?
10     A.   She reported either to Benny
11 Aboud or to me, because it depends what
12 part of it.  If it became a legal issue,
13 or anything of that nature, I cannot say
14 all the time because I don't know what
15 she did all the time.  But, you know, you
16 work with people, you see how they
17 approach things.  She told me she
18 checked.  I asked her, you know these
19 people, do they put in the provisions,
20 and I lived by her answers.  But I did
21 not go to check it myself.  That was her
22 job.
23     Q.   So yesterday Reid Shapiro
24 testified that Benny Aboud was not
25 involved in these kind of compliance and

Page 19

JOSEPH BAMIRA

1
2 enforcement issues.  What you mentioned
3 just now, are you aware of Benny's
4 involvement in any of this?
5     A.   Again, in general he was not
6 involved, but he could have been involved
7 from time to time, if he was the CEO, and
8 maybe people talked to him or asked him.
9 And --
10     Q.   But that's just speculation?
11     A.   That's just speculation.  I
12 don't know that.  But I know that people
13 used to talk to him.
14     Q.   Are you aware of any instance
15 when Benny was involved in a question
16 relating to --
17     A.   As we speak right now, I
18 cannot give any example.
19     Q.   So it sounds as if, to the
20 extent that Daphne Fernandes had any
21 supervision, it came from you.  Is that
22 correct?  Is there anyone else that she
23 would have as her supervisor?
24     A.   Again, supervision in respect
25 to what?

Page 20

JOSEPH BAMIRA

1
2     Q.   In respect to performance of
3 the ADT contract, and with respect to the
4 third-party vendor engagements to perform
5 the ADT contract.
6     A.   Again, only if it created, if
7 there were legalities of the issues, if
8 it was understanding with a vendor.
9 Let's say he said you have to fill this
10 form for me to know that's going on.
11 That will not come to me.  That was
12 entirely her responsibility.
13       If a vendor complained she
14 didn't do anything, which never happened,
15 by the way, then it would come to me.
16 But if he made an arrangement, the vendor
17 made an arrangement with Daphne, this is
18 what we do, it was her responsibility to
19 implement it.
20       Yes, from time to time, there
21 were complaints, so there was general
22 supervision.  But not on the day-to-day
23 her work to make sure that everything
24 works in accordance with what was agreed
25 to.

Page 21

JOSEPH BAMIRA

1
2     Q.   Was there anyone else besides
3 you to whom she reported with respect to
4 the ADT contract?
5     A.   Again, with respect to the ADT
6 contract, in what context?
7     Q.   In any context.
8     A.   I think in general she can
9 report on how many calls she had, how
10 many people she talked to.  She would
11 report to Benny, I suppose, because it's
12 more on the marketing side.  It has more
13 to do with the vendor relationship.  He
14 would be the person to talk to, that is,
15 vendor relationship.  I was more if
16 trouble arose, or other legal issues that
17 should be paid attention to.
18     Q.   And with respect to any issues
19 regarding compliance with the ADT
20 contract, as opposed to compliance issues
21 we were talking about earlier, compliance
22 with the contract, those would all be
23 legal issues and they would all come to
24 you; is that correct?
25     A.   No.  Because the compliance

6 (Pages 18 - 21)

JOSEPH BAMIRA

1    JOSEPH BAMIRA
2  with the ADT contract -- this is a big
3  word.  It would come to me if there were
4  legal issues with the implementation.  If
5  nobody felt that there were legal issues
6  with the implementation, it would not
7  come to me.
8    Q.   What about with respect to the
9  adherence to the paragraph of the
10  contract that barred the use of
11  third-party vendors without the written
12  consent of ADT?  Is that a legal issue
13  that she would have reported to you on or
14  is that something that she would have
15  reported to someone else on?
16    A.   If she had an issue with that,
17  and it became an issue between us and
18  ADT, she would tell me.  Apparently
19  everything went smoothly.  There was no
20  need to alert me.  There was no problem.
21  Nobody raised an issue.
22          We worked with vendors.  ADT
23  never raised a flag and said, hey, we
24  have a problem here, because if they did
25  they could have written a letter.  They

1    JOSEPH BAMIRA
2  didn't write a letter, nothing.  So there
3  was nothing for her to discuss with me on
4  this particular paragraph.
5    Q.   So from the period up to the
6  filing of the lawsuit, did you ever have
7  a conversation with Daphne Fernandes
8  about this provision of the contract?
9    A.   No.
10    Q.   And if she had had an issue
11  with it, she would have raised it with
12  you?
13    A.   I would assume so.  You have
14  to ask her.
15    Q.   We already have.  You are
16  sitting here.
17    A.   I cannot tell you what she
18  would do or not.  I'm telling you, it
19  would have been the right thing to do, to
20  raise it with me, but apparently it never
21  was an issue.
22    Q.   And with respect to the
23  third-party vendors, your testimony to me
24  is that, correct me if I'm wrong, is that
25  it was Daphne's responsibility to ensure

1    JOSEPH BAMIRA
2  the enforcement of contractual
3  restrictions that Elephant Group placed
4  upon third-party vendors with respect to
5  outbound telemarketing calls; is that
6  correct?
7    A.   Yes.  Because she made sure
8  that all the vendors that worked for us,
9  they all signed -- basically in their
10  contract was a copy in that respect of
11  the contract with ADT.  So they all
12  signed that this is what they're going to
13  do.  It was, I think, word-by-word of
14  what ADT requirements were.
15    Q.   That would be a legal issue.
16  So would Daphne have reported -- would
17  you have the ultimate responsibility in
18  the company for making sure that Daphne
19  was enforcing the compliance with these
20  provisions?  Is that your responsibility?
21    A.   Again, this is execution.
22    Q.   Correct.
23    A.   So if there was no problem
24  with the execution, she would not come to
25  me.  She knew what has to be done, and

1    JOSEPH BAMIRA
2  she had her pretty much instructions, and
3  I think she did it.
4    Q.   Were there any written
5  guidelines for Daphne about what she was
6  supposed to do to ensure the vendors'
7  compliance with these contractual
8  provisions?
9    A.   I don't know.
10    Q.   Was there any formal reporting
11  structure that required her to report to
12  you with respect to their compliance with
13  these provisions?
14    A.   There was not a reporting
15  structure, but she knew that she comes to
16  me because I got involved if there was a
17  problem, and if she got into a problem
18  and it's a legal situation, she would
19  come.  She has her own -- you know, she
20  is an intelligent woman.  She didn't fail
21  us.  So if there was no issue, she knew,
22  when there was a problem, she would come.
23    Q.   So you delegated pretty broad
24  authority to Daphne to ensure compliance
25  with these third-party vendor contracts;

JOSEPH BAMIRA

1 is that correct?
2
3    A.   Yes.
4    Q.   And what did --
5    A.   It's not even so much that I
6 delegated.  That was her job.  So I
7 didn't say, hey, you know, that is part
8 of her job, to make sure that all the
9 things, provisions and instructions, are
10 being executed.
11   Q.   So unless a problem arose, you
12 would not be checking on what Daphne was
13 doing to ensure the compliance with these
14 contracts; is that correct?
15   A.   That's true, yes.
16   Q.   So --
17   A.   Just let me correct.
18   Q.   Sure.
19   A.   I might have occasionally
20 asked her are there any issues, any
21 problems.  But there was general
22 conversation.  It was not like a report
23 on specific things.
24   Q.   Water cooler?
25   A.   Yes.

JOSEPH BAMIRA

1
2    Q.   So what did Daphne do to
3 ensure the third-party vendors'
4 compliance with this provision?
5    A.   Listen, I heard her testimony,
6 so I can't quote her.  I cannot recall
7 her testimony.  I don't know all the
8 things she has done.  But I understand
9 that in this particular situation that
10 she went to the vendor, she listened in
11 to calls.  She wanted to understand how
12 they bring it in.  She, from time to
13 time, especially when people complained,
14 she checked if they had on the websites
15 the right wording, because she knew I
16 would check with her, and so she knew
17 she's responsible for it.  So whatever
18 she did she has done, but I don't know
19 everything she has done.
20   Q.   And you have that knowledge
21 because you were present at her
22 deposition and heard her testimony?
23   A.   No, no, no.  I didn't -- I
24 only said that because it's what came to
25 my mind right now.

JOSEPH BAMIRA

1
2    No, sometimes complaints would
3 come in.  I would ask her, did you do
4 this, did you do that.  And complaints
5 did come in.  And people claimed all kind
6 of we called, we didn't call correctly,
7 or that we called them without them
8 opting in.  And so every time I checked,
9 you know, she was responsible to bring
10 the call, and the data on the opt-in, and
11 does the vendor have the opt-in, a copy
12 of the opt-in.  And so since that
13 happened, not very frequently, but it
14 happened, I pretty much knew that she's
15 doing the right thing, because she always
16 supplied me with the right answers, and
17 she showed me that actually the
18 instructions were followed.
19   Q.   So how did Daphne ensure that
20 the companies who were barred from making
21 unsolicited outbound telemarketing calls,
22 in fact, were not making unsolicited
23 outbound telephone calls?
24   A.   I don't know how she was
25 making sure, but I will tell you -- you

JOSEPH BAMIRA

1
2 know, if somebody wants to make outbound
3 calls unbeknown to us, under the radar,
4 unless somebody complains, took
5 complaints, and says he got an
6 unsolicited outbound call, it's no way to
7 discover it.  And I don't know what she's
8 done exactly.  It's very difficult.  If
9 people want to break the law, you cannot
10 always know about it, because they don't
11 do it for you to know that.
12   Q.   Isn't it true that, in fact,
13 Daphne -- because I was sitting here also
14 for Daphne's testimony.  But wasn't it
15 true that Daphne testified that, in fact,
16 the third-party vendors that you used in
17 turn used subvendors, and that she did
18 not inquire into the subvendors'
19 identities because that was the secret
20 source, quote-unquote, that she felt was
21 out of --
22   A.   I'm not sure that was her
23 words, but --
24      MR. SCHULTZ:  Hold on.  Let e
25 just object to the form of the

Page 30

JOSEPH BAMIRA

1  question, please.
2      I object to form of the
3  question.
4  Q.  You can answer.
5  A.  I don't remember her exact
6  words, so I cannot relate to exactly what
7  she said. I think what she said is that
8  they would not disclose the names, only
9  because it's a commercial relationship,
10  and people will not tell you how they
11  always do what they do. They just
12  contract that they do it correctly,
13  because they are afraid you will go
14  directly to them and circumvent them. So
15  that's a way for them to keep their
16  business. And even if you could ask,
17  nobody will give you the list of the
18  names.
19      So I suppose that some of the
20  things you have to rely on them that they
21  fulfill the contract, and sometimes you
22  just have to rely on that.
23  Q.  So you would rely on the
24  third-party vendor to enforce the ban on
25

Page 31

JOSEPH BAMIRA

1  outbound telemarketing calls on their
2  vendors; is that correct?
3  A.  I would say that, to the
4  extent that they had, not all of them had
5  subvendors, not all of them made calls.
6  Again, it is basically they were hired
7  for people who do opt-ins, in other
8  words, give permission for people to
9  call. It was never designed for people
10  just to make blind calls, unsolicited
11  calls.
12      And, yes, it is that we had to
13  rely on them because they would not give
14  us the third-party names.
15      But, you know, again, if there
16  were issues, or frequent problems, people
17  complained, if it was a little bit more
18  than, you know, if it was really
19  justified a complaint, we would fire
20  them. So they knew that we would not
21  keep them. To what extent does it always
22  help? Probably not always helps.
23  Q.  So if you didn't know the
24  identities of the third-party vendors'
25

Page 32

JOSEPH BAMIRA

1  subcontractors, then you wouldn't know
2  how the third-party vendor had filtered
3  or vetted the subcontractors in the first
4  place; correct?
5  A.  You have to ask that -- you
6  know, she worked with that every day, so
7  you have to ask Daphne. I don't know the
8  answer to that, because that was her
9  responsibility.
10  Q.  But just --
11  A.  I really don't know the answer
12  to that.
13  Q.  It is really just a matter of
14  logic, isn't it? If you don't know who
15  the subcontractor is, you can't possibly
16  know what the qualifications of the
17  subcontractor were?
18  A.  Correct.
19      MR. SCHULTZ: I object to the
20      form of the question. It's been
21      asked and answered. You can still
22      answer. Or you can still try to.
23  Q.  Another groundrule. You can
24  only not answer a question if it raises a
25

Page 33

JOSEPH BAMIRA

1  question of privilege, and then your
2  lawyer will tell you do not answer that
3  question. Otherwise he can make whatever
4  objections he wants to make. You still
5  have to answer the question.
6  A.  No, I know. I pretty much
7  know the rules. Please repeat the
8  question.
9      MR. McNEW: Could you read the
10      question back, please.
11      (The pending question was
12      read.)
13      MR. SCHULTZ: I noted an
14      objection.
15  A.  I don't have an answer to
16  that, because Daphne worked with them.
17  So I don't know if she asked in general,
18  and if she checked from time to time, or
19  I don't know what she did for that.
20  Q.  Is it fair to say that you
21  yourself had no involvement in ensuring
22  that the subcontractors, your third-party
23  vendor's contractors, abided by the terms
24  of the ADT contract?
25

9 (Pages 30 - 33)

Page 34

JOSEPH BAMIRA

1
2      A.   I was not involved.  But I
3  will tell that -- and, again, you have to
4  know, I don't know how many of them
5  actually had subcontractors.  I'm not
6  even sure that Daphne would allow them to
7  have subcontractors.  And it assumes that
8  all had subcontractors.  I don't know if
9  that's the case.  So you have to ask her
10  how she exactly assured that that would
11  happen.
12     Q.   Do you know if Daphne barred
13  your third-party vendors from using
14  subcontractors?
15     A.   She might have, she might have
16  not.  I don't know.  You have to ask her.
17     Q.   We are both in a deposition --
18     A.   I don't remember, so let's
19  look at the deposition.  I really don't
20  remember.  Frankly, I don't.
21     Q.   So let me refresh your
22  recollection with what Ms. Fernandes
23  testified at a deposition.  This is at
24  page 107 of her transcript, and I will
25  just read it to you.

Page 35

JOSEPH BAMIRA

1
2         "Question:  But Paramount
3  never disclosed to you from whom they
4  obtained that lead?  Is that correct?
5         "Answer:  Correct.
6         "Question:  And Saveology
7  never required Paramount to disclose from
8  whom it obtained a lead?
9         "Answer:  The name, no.
10  Because of the secret source."
11         Skipping ahead a few lines on
12  page 108.
13         "Question:  As a matter of
14  practice, did Saveology ask Paramount to
15  disclose the names of its third-party
16  lead vendors?
17         "Answer:  Again, it's their
18  proprietary information.
19         "Question:  So, no?
20         "Answer:  No."
21         So wouldn't you agree that
22  Daphne Fernandes was aware that your
23  third-party vendors were using
24  subcontractors to perform the ADT
25  contract?

Page 36

JOSEPH BAMIRA

1
2         MR. SCHULTZ:  I object to the
3  form of the question to the extent
4  it mischaracterizes the testimony.
5     Q.   You can answer.
6     A.   I really think that whatever
7  refers to her testimony should be asked
8  her.  But if I may put an interpretation
9  on what she's saying, I think she's
10  talking about people who operate
11  websites, not about people who make
12  calls.  And I don't think that we were
13  permitted to have other people qualify
14  and make calls.
15         So this is what websites, who
16  are the vendors with whom they worked to
17  operate the websites, to bring in the
18  opt-in calls.
19     Q.   What did Daphne Fernandes do
20  to ensure that those subvendors adhered
21  to the restrictions of the ADT contract,
22  or the restrictions of your own contract
23  with the vendor?
24     A.   Again, it's my understanding
25  of what she's saying.  What she's saying

Page 37

JOSEPH BAMIRA

1
2  is the operator of websites, the websites
3  has only two requirements, in my
4  opinion -- I don't know, maybe she had
5  others.  But to the extent that you
6  operate a website, obviously it could be
7  a website which adheres to all the
8  regulations, such as I opt in, I agree to
9  be called by a security-related company.
10  And they would then give this list of
11  people that agreed to our vendor.  That
12  is, the requirement was that the website
13  should have these particular wordings.
14         How she made sure or not sure,
15  you have to ask her.  But, again, they
16  would not let her know who are the
17  operators of the websites.  But these are
18  not people who made calls.  It's very
19  different.
20     Q.   First of all, you yourself had
21  no involvement in ensuring -- the
22  Elephant Group contract's bar on
23  outgoing telemarketing calls by its
24  third-party vendors, you weren't
25  involved in the enforcement of those

10 (Pages 34 - 37)

Page 38

JOSEPH BAMIRA

1
2 contract provisions; correct?
3     A.   Again, we have not made
4 outbound calls.  This was prohibited
5 across-the-board.
6     Q.   I am speaking about the
7 contracts with your third-party vendors.
8     A.   The contracts were not
9 allowed -- they were not allowed to make
10 calls, outbound calls, period, not them
11 and not their vendors.
12     Q.   And my question to you is,
13 were you in any way involved in making
14 sure that your vendors obeyed those
15 provisions?
16     A.   I was involved to the extent
17 that, you know, people do complain.  They
18 are not shy about complaining and suing
19 if they can and make, in many cases, make
20 a little bit of money.  And whenever I
21 asked for the website, for the opt-in,
22 for the wording, I was supplied with
23 that.  So there was nothing there.
24     Q.   In the absence of a complaint,
25 were you in any way involved in ensuring

Page 39

JOSEPH BAMIRA

1
2 the enforcement of these contractual
3 provisions?
4     A.   No.
5     Q.   In the absence of a complaint,
6 what did Daphne Fernandes do to ensure
7 that the vendors were complying with this
8 contractual provision?
9     A.   Again, you have to refer to
10 her testimony.  I will not try and tell
11 you what Daphne did.
12     Q.   You are not aware of what
13 Daphne did?
14     A.   Not in specifics, no.  That
15 was her job.
16     Q.   Anyone else in the company
17 aware of what Daphne did?
18     A.   I doubt it.  She was
19 responsible for it.
20     Q.   And with respect to the
21 enforcement of that provision with the
22 vendors' vendors, the subcontractors, in
23 the absence of a contract, did Daphne
24 Fernandes do anything to ensure that the
25 vendor was enforcing this on its

Page 40

JOSEPH BAMIRA

1
2 subvendors?
3     A.   You have to ask her, again.
4 But again let me just say one thing.  I
5 doubt that you put vendors and subvendors
6 in the same categories.  Vendors had one
7 function.  How they get the calls, how
8 they get the opt-ins, this is what the
9 operation was, opt-ins, it was not
10 outbound calls.  This was opt-ins.  So to
11 the extent that they knew that they have
12 to have a website that has to contain
13 this thing, I think that from time to
14 time she checked.  You have to ask her.
15 If somebody strayed away from this, I
16 don't think we knew about it or could
17 have known about it.
18     Q.   I am not making distinctions
19 because I am trying to understand a
20 process I think doesn't turn on that
21 distinction.  I am trying to understand
22 what, if anything, Elephant Group did to
23 make sure that a vendor of its, like
24 Paramount, take Paramount as an example,
25 what Elephant Group did -- what your

Page 41

JOSEPH BAMIRA

1
2 testimony to me is that when Elephant
3 Group signs a contract with a company
4 like Paramount, that it has a provision
5 in that contract that says you cannot
6 make outbound unsolicited telemarketing
7 calls.
8     A.   Correct.
9     Q.   Paramount, in turn, goes out
10 and hires a company, EMI.  What did
11 Elephant Group do -- in the absence of a
12 complaint, what did Elephant Group do to
13 ensure that its contractual restriction
14 on Paramount was enforced in Paramount's
15 relationship with EMI?
16     A.   They were not allowed to hire
17 EMI.  EMI is not a web operator.  They
18 were not allowed to hire EMI.
19     Q.   And so --
20     A.   So if to the extent they
21 wanted to hire EMI, then they would have
22 come and said we want to hire EMI, and we
23 would have checked them out, and we would
24 have probably, same as we do to Paramount
25 we would have done to EMI.  EMI was

Page 42

JOSEPH BAMIRA

1 against the understanding of the
2 contract. They were not allowed to hire
3 them. They were not supposed to hire
4 them. It was not what we were doing, all
5 that we did in order to get calls in.
6 Because if we wanted to get EMI, we could
7 have hired them directly. We don't need
8 Paramount. We knew about EMI. We could
9 have hired them. We did not. So why
10 would we allow a subvendor to hire the
11 same person, just closing our eyes. They
12 were not allowed to.
13 Q. And so what enforcement
14 mechanisms, if any, what did you or
15 Daphne do to make sure that a company
16 like Paramount could not hire a company
17 like EMI?
18 A. You have a contractual
19 agreement with a company. There's a
20 little bit control that you can expect to
21 exercise over an independent contractor.
22 They have their offices. They are not
23 geographically the same place. What they
24 do in a back room, or unbeknown to us, or

Page 43

JOSEPH BAMIRA

1 undisclosed to us, is impossible to
2 really ascertain. Unless you want to sit
3 there 24/7, have a police type of
4 operation, and make sure that every
5 person in that company is really abiding
6 by every particular law, and might as
7 well be your company.
8 So when you hire a vendor, in
9 any business, then they have a certain
10 amount of -- not discretion. They have
11 to abide by the contract. If not, they
12 are in breach of contract. You cannot
13 sit there and look at the time all the
14 time, because if that were the case ADT
15 should have been sitting in our office
16 24/7 and do the same thing.
17 There is a certain amount of
18 responsibility which goes with the
19 contract, and unless it's shown that
20 somebody breached a contract, it's very
21 hard to discover it.
22 Q. And isn't that the reason why
23 companies put indemnification provisions
24 in their contracts, so that when there is

Page 44

JOSEPH BAMIRA

1 a breach, the responsibility of the
2 breach lands on the company, whoever saw
3 the breach?
4 A. A, you are asking me a legal
5 question, so I --
6 Q. You are the legal guy.
7 A. Yeah, but I will give you --
8 listen, I will not give you probably a
9 legal opinion. I'm not allowed to. But
10 I will tell you that indemnification
11 usually is for the purposes that the
12 company did something wrong, not people
13 who are under -- are not under the
14 company's control. And indemnification
15 doesn't say that. So to the extent that
16 indemnification provisions, they are for
17 wrongdoing by the company.
18 Now, yes, you can sometimes
19 claim supervision, all kind of things,
20 that is wrong with the company. But the
21 indemnification is really to try and make
22 sure that everybody is trying to do the
23 right thing, and reasonable thing, which
24 is under control, to fulfill the

Page 45

JOSEPH BAMIRA

1 contract. That's what indemnification
2 is. We cannot always know what a
3 subcontractor does, because he is not
4 entirely 24/7 under our control. We can
5 check from time to time, like Daphne did.
6 She went to the offices. She listened to
7 call. We checked, when we did get
8 complaints, that things were done
9 correctly.
10 Q. Whose offices did she visit?
11 A. I'm sorry?
12 Q. You said she visited offices.
13 Whose offices did she visit?
14 A. She did.
15 Q. Whose offices?
16 A. Paramount's offices. She
17 testified to that.
18 Q. What were the names of the
19 other third-party vendors that Elephant
20 Group used, apart from Paramount?
21 A. I don't remember all their
22 names. One of them was Savelo. I don't
23 remember the names exactly.
24 Q. How many were there?

12 (Pages 42 - 45)

Page 46

JOSEPH BAMIRA

1
2    A.  I don't know.  Not many.  I
3 think you were given the list.  So that's
4 a better source.
5    Q.  Actually, we weren't.  We
6 don't know the names.  Do we have a list?
7        MS. GOLDBERG:  No.
8    Q.  If there is a list, can we
9 have it?
10   A.  I don't know if there's a
11 list.  But you can find out who we worked
12 with.  You can ask Daphne who she worked
13 with.  I think she mentioned names.  You
14 asked her.  She mentioned names.
15   Q.  She mentioned Visor.  Does
16 that sound right to you?
17   A.  What name?
18   Q.  Visor.
19   A.  No.
20   Q.  So apart from Daphne and you,
21 would there be anybody else in the
22 company that would be aware of affiliates
23 being engaged to perform the ADT
24 contract?
25   A.  Aware in what form?  Just

Page 47

JOSEPH BAMIRA

1
2 information?
3    Q.  I am trying to understand how
4 a company of your size could effectively
5 put all of the responsibility for
6 performing a contract of this size on the
7 desk of Daphne Fernandes, with apparently
8 no systemic oversight.  And I am asking a
9 bunch of questions to try and figure out
10 the reporting structure, and you keep
11 telling me, well, if there was a legal
12 issue that arose, she would talk to you.
13 But to no one else --
14   A.  Listen, on her relationship
15 with vendors, there was the marketing
16 people, there was Benny Aboud.  She was
17 not an island.  And if she had issues
18 with vendors, she would go from the
19 marketing side, I have an issue with a
20 vendor, I would like to fire him and get
21 somebody else.  That would not be coming
22 to me.  That would be probably going to
23 the marketing department.
24        But she would be smart enough
25 to know when she has a problem and when

Page 48

JOSEPH BAMIRA

1
2 she doesn't have a problem, when she
3 needs to replace somebody, when she
4 doesn't need to replace.  She was not
5 doing it on her own, full discretion,
6 nobody knows what she's doing.  That's
7 not the case.
8    Q.  She wasn't smart enough to
9 avoid this lawsuit, was she?
10       MR. SCHULTZ:  Objection.  It
11    was ADT that wasn't smart enough.
12   A.  That's an observation that you
13 are entitled to make.
14   Q.  You said that if she had a
15 problem with a vendor she would go to
16 marketing.  What type of problems with a
17 vendor would lead her back to the
18 marketing department?  Who in the
19 marketing department would she report to?
20   A.  You ask her.  I think she
21 talked to Reid Shapiro, who was overall
22 in the marketing.  But she might have
23 talked to -- you know, there were
24 different marketing people over time.  So
25 I suggest you ask her.  I'm not sure.

Page 49

JOSEPH BAMIRA

1
2    Q.  Reid testified yesterday that
3 she did not report to him.
4    A.  She was not directly reporting
5 to him.
6    Q.  Reid also testified that he
7 didn't know who was in the marketing
8 department.  But your testimony is that
9 Reid was the head of the marketing
10 department?
11   A.  No, I did not say that.
12   Q.  I'm sorry.  Please explain.
13   A.  I said he probably was aware.
14 But the marketing department, people from
15 time to time changed, and then
16 ultimately, I think it was a bigger
17 marketing issue, I'm just speculating,
18 she would probably talk to Benny Aboud.
19 I don't know.  You would have to ask her.
20   Q.  So what kind of marketing
21 issues would lead her to the marketing
22 department on the ADT contract?
23   A.  You have to ask her.
24   Q.  So you are generally unaware
25 of what Daphne Fernandes did in terms of

13 (Pages 46 - 49)

Page 50

JOSEPH BAMIRA

1
2 how she reported to the marketing
3 department; is that correct?
4    A.   Not enough to testify here.
5 You have to ask her.
6        MR. McNEW:  Can we take ten
7    minutes.
8        (A recess was taken.)
9 BY MR. McNEW:
10    Q.   Let me backtrack and o what I
11 normally do at the beginning of the
12 deposition.
13        Are you currently working at
14 Elephant Group?
15    A.   No.
16    Q.   When did your employment
17 terminate?
18    A.   April 6.
19    Q.   Are you working now?
20    A.   I'm trying to be an
21 entrepreneur, with a few things here, but
22 I'm not employed.
23    Q.   You are not on a salary with
24 another company?
25    A.   No.

Page 51

JOSEPH BAMIRA

1
2    Q.   Do you have any contact now
3 with Elephant Group?
4    A.   Yes, I do.  I'm still on the
5 board, and that's pretty much it.
6    Q.   Do you draw a salary for your
7 board work?
8    A.   No.  I think the company has
9 no money so there's no salary, but at
10 some point it will be, I suppose.  I
11 don't know how long I will stay on the
12 board.  But eventually I must guess that
13 they will pay a salary, whatever they do.
14    Q.   Does either Benny or Reid sit
15 on the board also?
16    A.   Benny does.  Reid not.
17    Q.   Do you know if Benny has any
18 continuing relationship with the company,
19 apart from his service on the board?
20    A.   I think pro forma he has some
21 consulting agreement.  I don't think he
22 has a relationship.  You have to ask him.
23 I'm not sure what he does.
24    Q.   When did you join Elephant
25 Group?

Page 52

JOSEPH BAMIRA

1
2    A.   The year 2000.
3    Q.   Did you create the Elephant
4 Group?
5    A.   Elephant Group is evolved --
6 it wasn't really created -- evolved from
7 a different company, which really the
8 first one was Benny.  I was not around
9 in, I think, '98 or something like that.
10 But it evolved from a different company.
11    Q.   And did you join before or
12 after Reid?
13    A.   After.
14    Q.   So first Benny created a
15 company.  Do you remember the name of
16 that company?
17    A.   I'm not sure if it was Direct
18 Communications, something like that,
19 which was two or three, which was a
20 subsidiary of a company where Benny
21 worked, and he decided to create a
22 division.  I'm not sure.  But eventually
23 they created a separate company, which
24 then was separated from the company which
25 created them.

Page 53

JOSEPH BAMIRA

1
2    Q.   And so you joined the company
3 in 2000?
4    A.   Correct.
5    Q.   And what positions did you
6 hold in the company?  Walk me through
7 your tenure with the company.
8    A.   When I joined initially, I was
9 a consultant.  And then I became the CFO.
10 And after that I became the chairman.
11    Q.   Do you have an equity interest
12 in the company, or did you have an equity
13 interest in the company?
14    A.   Yes.
15    Q.   When did you acquire that?
16    A.   In 2001, I think.
17    Q.   You said you initially joined
18 as a consultant.
19    A.   Yes.
20    Q.   What was the substance of your
21 consulting work?
22    A.   Help Benny develop the
23 company, and see if they can raise money
24 in the public arena.
25    Q.   And what was your experience

14 (Pages 50 - 53)

Page 54

JOSEPH BAMIRA

1
2 before coming to Elephant Group? Where
3 did you work before Elephant Group?
4     A.   I worked for a broker-dealer
5 by the name of Josephthal.
6     Q.   Can you spell the last name?
7     A.   T-h-a-l, Josephthal, t-h-a-l,
8 Lyon & Ross.
9     Q.   And what was your work at
10 Josephthal?
11     A.   I was managing portfolios, but
12 I was doing also investment banking.
13     Q.   So your background was more in
14 finance?
15     A.   No. I had sufficient
16 knowledge of finance to work in finance,
17 but my background is really more in
18 marketing and in management.
19     Q.   And so when you came to work
20 at Elephant Group as a consultant, the
21 subjects of your work were in enlarging
22 the business and making it an attractive
23 company for investors?
24     A.   Yes.
25     Q.   Did you have any background in

Page 55

JOSEPH BAMIRA

1
2 telemarketing or in Internet marketing?
3     A.   No.
4     Q.   Did Benny?
5     A.   You have to ask Benny. I'm
6 not aware of it, but you have to ask him.
7     Q.   And how about Reid?
8     A.   Same answer.
9     Q.   So when you first came in 2000
10 you were a consultant. When did you
11 become the chief financial officer of the
12 company?
13     A.   About 2001, or shortly after
14 the end of 2001. Maybe early 2002. But
15 don't hold me to it.
16     Q.   Was this about the time that
17 you acquired an equity interest in the
18 company?
19     A.   Yes.
20     Q.   And how was the equity
21 divided? There were three equity owners;
22 is that correct?
23     A.   Correct.
24     Q.   You, Reid and Benny?
25     A.   Yes.

Page 56

JOSEPH BAMIRA

1
2     Q.   How was the equity divided
3 among the three of you?
4     A.   Benny had 76 percent. Reid
5 and I each had 12.
6     Q.   What did you give the company
7 in consideration for the equity share?
8     A.   Service.
9     Q.   You didn't make a capital
10 contribution?
11     A.   No.
12     Q.   When did you become chairman
13 of the company?
14     A.   I would say 2008. 2007 or '8.
15     Q.   Had there been a chairman
16 before 2008?
17     A.   No.
18     Q.   So it was a new position that
19 was created?
20     A.   I would believe so.
21     Q.   And what were your functions
22 as chairman?
23     A.   Basically, to overall -- what
24 chairmen of boards do, you know, get
25 involved in things that they think it's

Page 57

JOSEPH BAMIRA

1
2 fit to get involved with, and have an
3 overall say in the direction of the
4 company.
5     Q.   So you say you were chairman
6 of the board. You had a board of
7 directors?
8     A.   Yes.
9     Q.   And who sat on the board in
10 2008?
11     A.   A representative of Equistaff,
12 Benny and myself and Reid.
13     Q.   And who is Equistaff?
14     A.   It's a public company which
15 owns DISH Network.
16     Q.   When did Equistaff take a
17 position in the company?
18     A.   Again, I believe end of 2007,
19 but I'm not sure exactly. The second
20 half of 2007, I believe.
21     Q.   Did the company have a board
22 of directors before Equistaff acquired an
23 equity interest in the company?
24     A.   No. It was just us three.
25     Q.   So the company created a board

15 (Pages 54 - 57)

Page 58

JOSEPH BAMIRA

1  of directors to create a structure for an
2  outside investor to come in and put money
3  into the company; is that correct?
4      A.   Specifically, for them to come
5  in, yes.
6      Q.   And how large was the equity
7  share that Equistaff took in the company?
8      A.   I think 22 percent.
9      Q.   And what was the capital
10 contribution they made in exchange for
11 the 22 percent stake?
12     A.   I think -- it was a little bit
13 more complex.  It was not a straight
14 capital contribution.
15     Q.   Explain for me, please.
16     A.   I don't remember the details,
17 really, so I don't want to testify to
18 something that may not be accurate.  But
19 I would say in the magnitude of --
20 because they paid us for different
21 things, I would say around $40 million,
22 or $37 million.  But I don't remember the
23 composition to tell you exactly what is
24 equity contribution because they have had

Page 59

JOSEPH BAMIRA

1  some a claw, so we had to pay them back
2  $10 million.  So it ended up probably at
3  the end of the day to be about 28, 27.  I
4  don't remember exactly how it evolved.
5      Q.   So based on the size of their
6  contribution and the size of the equity
7  position they took, the company at that
8  time was worth roughly $200 million?
9      A.   That's a very good question.
10 If just go straight valuation, you could
11 probably make that calculation.  But it
12 was not the value of the company at the
13 time, never was, because they paid us to
14 ensure a flow of business, so to them it
15 was worth whatever it was worth.  But it
16 had nothing to do specifically with the
17 value of the company.  The value of the
18 company was really not somebody looking
19 at EBITDA, multiples, and things of that
20 nature.  We had a particular value to
21 them, which we would not have to any
22 other third-party investor, because we
23 really gave them a fairly substantial
24 flow of business, so to them that was

Page 60

JOSEPH BAMIRA

1  part of the value.
2      Q.   So Equistaff took a position
3  in Elephant Group because it wanted to
4  feed leads to DISH Network through
5  Elephant Group?  Is that what you are
6  saying?
7      A.   No, leads is not the right
8  word.  We were one of the marketing
9  partners of Equistaff, and we sold for
10 them.  And, yes.
11     Q.   I apologize for using the
12 wrong word.  You have been doing this
13 longer than I have.
14     A.   No, no.  I'm just trying to be
15 a little bit more accurate.
16     Q.   And I appreciate that.
17          But the bottom line was that
18 the company had particular value to
19 Equistaff because of the synergy it would
20 provide with DISH?
21     A.   Correct.
22     Q.   Whereas an arm's length
23 investor, investing strictly on an EBITDA
24 basis, might assign it a lower value?

Page 61

JOSEPH BAMIRA

1      A.   Yes.
2      Q.   Did you remain the CFO after
3  you became chairman of the board?
4      A.   Yes.  Actually, let me correct
5  that.
6      Q.   Sure.
7      A.   No.  Pretty much shortly after
8  we finished I became chairman, and we
9  took somebody else as the CFO.
10     Q.   Did you remain involved in the
11 finances of the company, the financial
12 reporting of the company?
13     A.   Not directly, no.  I mean, for
14 a while I assisted, and as time passed by
15 my direct involvement was less.
16 Obviously I saw reports, I had comments,
17 what a board member or chairman would do.
18     Q.   Did you continue to be a
19 marketing partner of DISH Network through
20 2011?
21     A.   Yes.
22     Q.   And today?
23     A.   Yes.
24     Q.   And about how much of your,

16 (Pages 58 - 61)

JOSEPH BAMIRA

1
2 whatever measure you want to use, NOI,
3 reverse revenues, about how much of
4 Elephant Group's revenues, pick a year,
5 2010, would have been attributable to the
6 DISH contract?
7      A.   I have to look it up. I don't
8 remember.
9      Q.   Just rough. I'm not asking
10 for a number. It's not a memory test.
11          MR. SCHULTZ: You are asking
12      him to speculate?
13          MR. McNEW: No, I am not
14      asking him to speculate. I am
15      asking him to give me a rough idea
16      of how much of the company's
17      business was attributable to DISH.
18          MR. SCHULTZ: If you can't do
19      it, don't do it.
20      A.   I cannot do it. I really
21 don't. Because it went through all kinds
22 of --
23      Q.   More than half?
24      A.   No, no, not even close.
25      Q.   More than a quarter?

JOSEPH BAMIRA

1
2      A.   Not even a quarter.
3      Q.   So what about the ADT
4 contract? In 2010, about -- again, I am
5 not asking for a number. As a rough
6 percentage, was it less than half of
7 Elephant Group's business?
8      A.   Yes, quite a bit less.
9      Q.   Less than a quarter?
10      A.   I would say so.
11      Q.   Less than 10 percent?
12      A.   10 percent is probably -- I
13 don't know. I don't remember. You asked
14 me, but I don't know. It was less than a
15 quarter.
16      Q.   But it was an amount that had
17 a material effect on the company's
18 financial performance?
19      A.   Every relationship we had had
20 an effect on the performance.
21      Q.   You are a finance guy and CFO,
22 or at least former CFO, so I'm using
23 material in an accounting sense. Did the
24 ADT contract have a material effect on
25 the balance sheet of the company?

JOSEPH BAMIRA

1
2      A.   It's hard for me to answer
3 because I don't know your definition of
4 "material." It definitely had an impact.
5      Q.   Are you familiar with GAAP?
6      A.   Yes.
7      Q.   Generally Applicable
8 Accounting Principles?
9      A.   Yes.
10      Q.   You understand how materiality
11 is used under GAAP?
12      A.   Again, I'm not an accountant,
13 so I cannot tell you that I want to voice
14 an opinion.
15      Q.   Can you tell me about what
16 happened with the ADT account after the
17 filing of the Desai lawsuit?
18      A.   What happened to the account?
19 Okay.
20          Initially, not much.
21 Actually, it was supposed to go up,
22 because ADT approached us to expand our
23 operation with them. Actually, asked us
24 to go through a due diligence on our
25 operation, because they wanted to give us

JOSEPH BAMIRA

1
2 part of their own call center's overflow,
3 so they wanted to give us some of their
4 calls to go through us, to answer it.
5          We went through an extensive
6 three, four, five months, because they
7 couldn't find anybody who can pass that
8 due diligence in the sense of a
9 compliance point, and then hired an
10 attorney from Ohio to come in and check
11 us in the name of ADT. So that went on
12 for four or five months. And then
13 eventually it didn't go through, for a
14 myriad of reasons.
15          And after that, maybe half a
16 year later, the business slowed down, but
17 actually, because I am not sure of the
18 exact reasons, but ADT sent also a legal
19 team and asked us to vet all the
20 different people we were working with,
21 which they did, and pretty much okayed
22 all the people who worked with us.
23          And then when the actual
24 litigation started, it started going
25 south, obviously.

Page 66

JOSEPH BAMIRA

1
2   Q.   So everything you were just
3 describing was before the institution of
4 the lawsuit?
5   A.   No, that is after.  Everything
6 I said is after the lawsuit.  You said
7 after the lawsuit.
8   Q.   I thought your last remark was
9 after the litigation began everything
10 started heading south.
11   A.   Correct.  Because, you know,
12 it took some time for this whole
13 litigation to develop.  And obviously we
14 met, and over a few months we had
15 mediation attempts, and things started to
16 go south.
17   Q.   You mentioned mediation.
18 Explain that a bit.
19   A.   Explain to you in what way?
20   Q.   You said there were mediation
21 efforts.  Can you describe what the
22 mediation efforts were?
23   A.   Yes.  ADT got the different
24 vendors they sued into a room and said we
25 would like everyone, we have to settle

Page 67

JOSEPH BAMIRA

1
2 this case, for reasons A, B, C and D, and
3 we want each one of you to get that much
4 money so we can settle the case.  And we
5 were about five or six.  And initially I
6 think everybody rejected that, all of the
7 people they invited.
8        And then subsequently there
9 was a formal mediation up in Boston, I
10 think three of them.  The first one I
11 didn't even go.
12   Q.   You did not go to the first
13 one?
14   A.   No, I did not go to the first
15 one.
16   Q.   Why did you not attend the
17 first one?
18   A.   We sent legal representation.
19 I didn't want to go because I didn't
20 think we had anything to do with it.  So
21 I didn't want to appear in mediation,
22 which could imply that we had any --
23 because nobody showed us any evidence
24 that the calls even came to us, this
25 particular Desai.  We never had the

Page 68

JOSEPH BAMIRA

1
2 calls.  We could not trace any
3 interaction with this particular
4 complainant.
5        But then, obviously, we wanted
6 to maintain the relationship with them,
7 and we were willing to work because
8 obviously we had a commercial
9 relationship, so we were willing to
10 entertain doing our part.
11        And so for the second, which
12 didn't amount to much, too, and then
13 there was third it attempt, the last two
14 I attended, and that's what the mediation
15 was.
16   Q.   Do you remember who the
17 mediator was?
18   A.   The name of him?
19   Q.   Yes.
20   A.   No.
21   Q.   Does Eric Green sound
22 familiar?
23   A.   It could be.  I'm not good at
24 retaining names, seriously.
25   Q.   When you say that ADT

Page 69

JOSEPH BAMIRA

1
2 addressed the group and asked for
3 contributions, was there an individual
4 who you recall who made that demand from
5 ADT?
6   A.   First was a group meeting with
7 the attorneys for ADT.  And then we were
8 taken, each one of us, to a side room.
9 I'm not sure if Hannah was present or
10 not.  I can't recall exactly who was
11 present in the group.
12   Q.   By Hannah, you mean Hannah
13 Lim?
14   A.   Hannah Lim, sorry.
15   Q.   And you say in the first of
16 the three mediations you attended by
17 sending counsel; is that correct?
18   A.   Correct.
19   Q.   And who was the counsel that
20 you sent to the first mediation?
21   A.   My good friend to the left.
22   Q.   That would be Jim Schultz?
23   A.   Yes.
24   Q.   When ADT said it had to settle
25 this lawsuit, did you in any way object

18 (Pages 66 - 69)

Page 70

JOSEPH BAMIRA

1
2 with that assessment?
3     A.    Yes, because -- let me put it
4 this way:  They gave three different
5 reasons.  At least two I remember.  One
6 of them, they believed that the judge who
7 was hearing the case is a pro-plaintiff
8 judge, or consumer judge, and so they
9 were concerned with that.
10        They were concerned that it
11 was a very big number of calls made over
12 the years, and so that the exposure to
13 them is about, I don't know, two or three
14 billion dollars, I'm not sure exactly
15 what number it was.  They were concerned
16 that that overhangs their balance sheet.
17 They did not want that to overhang their
18 balance sheet.
19     Q.    That would be a material risk.
20     A.    I agree with you, that's a
21 material risk, especially since I think
22 they were planning on separating from
23 Tyco at the time.  And so it was
24 important to them t settle.  They
25 believed that the value of the settlement

Page 71

JOSEPH BAMIRA

1
2 was about $15 million, and they believed
3 that, given the exposure, and given the
4 relationship, and that we are the
5 major -- because at the end of the day I
6 think they sued, I think, 13, or 12 or
7 13, but there was only four left standing
8 because everybody else I think pretty
9 much went bankrupt.  So, based on the
10 exposure, but also the fact that we do
11 business, it's probably a better business
12 decision to settle it.
13     Q.    Do you disagree with that?
14     A.    Not from their perspective.  I
15 understand where they came from.  And I
16 did understand that a relationship has
17 some value.  But I did not agree to
18 contribute.  Obviously, we didn't agree
19 initially.
20        On a legal base, if ADT as a
21 defendant would have a good chance, I
22 think, given the TCPA background of that,
23 it think they had a pretty good chance.
24 But, you know, even if the chances are
25 small, which I pointed out, and that they

Page 72

JOSEPH BAMIRA

1
2 will be certified, I don't think they had
3 a great chance of being certified, but
4 even if the chance was small, given the
5 number that they faced, the
6 probabilities, probably from their
7 perspective, it was probably on good
8 decision.
9     Q.    In fact, a $15 million
10 settlement of a $2 billion risk is a
11 pretty good deal, would you say?
12        MR. SCHULTZ:  Objection.
13     A.    I don't know.  Yeah, if you
14 have to choose between losing 15 and
15 risking 2 billion, if that's the case,
16 the mathematics is probably fair.
17     Q.    So it is your testimony that,
18 from ADT's perspective, you think the
19 settlement was a reasonable settlement?
20        MR. SCHULTZ:  I object to the
21 form.
22        MR. McNEW:  I am just
23 repeating what he said.
24     A.    Listen, I understood in what
25 shoes they were standing.

Page 73

JOSEPH BAMIRA

1
2     Q.    Why did you say ADT had a good
3 defense in the case?  You said that ADT
4 probably could have --
5     A.    Listen, I don't remember all
6 the details.  But at the time I looked at
7 it, you know, and I think a few of us in
8 the meeting raised why don't we fight it,
9 you know.  And I don't remember all the
10 different reasons, so I don't want to
11 repeat it.  I didn't look at the case in
12 a long time.  But that was my impression
13 at the time.
14     Q.    Did you voice an objection in
15 any of the mediations to the $15 million
16 settlement?
17     A.    I was not asked about it.  I
18 was not asked to contribute my opinion on
19 any of the negotiations with the
20 plaintiff.
21     Q.    Why do you suppose you were
22 asked to attend the mediations?
23        MR. SCHULTZ:  Objection to
24 form.
25     A.    So we would make our

19 (Pages 70 - 73)

Page 74

```
1          JOSEPH BAMIRA
2  contribution to ADT. I never met even
3  the other side. I don't even know how
4  they look.
5     Q.   They are pretty scary-looking.
6     A.   I can see, because they sued
7  ADT again. So, professional, whatever.
8  I agree they are not nice people.
9     Q.   My memory fails me. That's
10 why I was asking my colleague. She is
11 failing me, too. So I have to ask you
12 again. In any of the mediations, and I
13 think I know what your answer was, and I
14 apologize, and he will say asked and
15 answered.
16    A.   Whatever you want, I'll
17 repeat.
18        MR. SCHULTZ: I object to
19    form.
20    Q.   He even made the objection
21 before I asked the question.
22        So you did not voice an
23 objection to the $15 million settlement;
24 is that correct?
25    A.   I was not asked.
```

Page 75

```
1          JOSEPH BAMIRA
2     Q.   And so I assume from that --
3     A.   I didn't even know that it
4  would end up with 15. That was not
5  during the mediation.
6     Q.   So is it a fair assumption
7  from your answer that because you weren't
8  asked to object you didn't make an
9  objection?
10    A.   Correct.
11    Q.   I am jumping around a little
12 bit. Sorry about that.
13    A.   Just so you understand, the
14 context of the mediation between us and
15 ADT was different than between them and
16 the plaintiff. Our context was
17 third-party notice and indemnification.
18 Theirs was a TCPA case.
19    Q.   There was a hearing in the
20 court to determine whether the $15
21 million settlement was an appropriate
22 settlement. Are you aware of that?
23    A.   No.
24    Q.   Did your lawyers ever ask you
25 whether you wanted to present an
```

Page 76

```
1          JOSEPH BAMIRA
2  objection to the settlement?
3     A.   That's a lawyer privilege.
4        MR. SCHULTZ: My objection is,
5     to the extent that that calls for
6     attorney-client it's lawyer
7     privilege and he shouldn't answer
8     that question.
9        MR. McNEW: I think I can ask
10    the fact.
11       MR. SCHULTZ: You can ask all
12    you want, but he is not going to
13    answer it.
14    Q.   So Elephant Group -- so is it
15 fair to say Elephant Group did not raise
16 objection to the settlement at the
17 settlement hearing in the court?
18       MR. SCHULTZ: I object to the
19    form of the question.
20    A.   Elephant, as far as I'm
21 concerned, didn't know that there is such
22 a hearing. We were not even asked. So
23 obviously we cannot voice an opposition
24 to something we didn't know takes place
25 or we were not asked. It is just
```

Page 77

```
1          JOSEPH BAMIRA
2  technically impossible.
3     Q.   Okay. That's a good answer.
4        Outside of the mediations, did
5  Elephant Group ever voice an objection to
6  the settlement?
7     A.   We were not asked, and we did
8  not discuss it. It was never raised with
9  us. It was never a subject of a
10 discussion.
11    Q.   You were represented by
12 counsel in the case.
13    A.   And we didn't even know it was
14 $15 million.
15    Q.   You were represented by
16 counsel in the case, were you not?
17    A.   Yes.
18    Q.   Were you aware whether your
19 counsel ever voiced an objection to the
20 settlement?
21    A.   You have to ask him.
22    Q.   I am asking you if you are
23 aware.
24    A.   No, I'm not aware that he
25 raised or not. I'm not aware.
```

Page 78

JOSEPH BAMIRA

1
2    Q.    I want to go back to something
3 else we were talking about earlier.  I
4 think it was your testimony that your
5 vendors did not make unsolicited outbound
6 telemarketing calls.  Is that correct?
7    A.    Correct.
8    Q.    And it is your testimony --
9    A.    They were not allowed to.  I
10 didn't say they didn't.  I said they were
11 not allowed to.
12    Q.    And I think it was also your
13 testimony that Elephant Group didn't make
14 outbound telephone calls.  Is that
15 correct?
16    A.    Correct.
17    Q.    And your vendor contracts did
18 not permit your vendors to make outbound
19 telemarketing calls; is that correct?
20    A.    Correct.
21    Q.    You said, I believe, correct
22 me if I'm mistaken, I believe it was your
23 testimony that Dan Geiger was aware of
24 Elephant Group's use of third-party
25 vendors to perform the ADT contract.  Is

Page 79

JOSEPH BAMIRA

1
2 that correct?
3    A.    Yes.
4    Q.    Is it your testimony that Dan
5 Geiger was aware that third-party vendors
6 were making outbound telemarketing calls?
7    A.    You have to ask him.  I doubt
8 it, because I don't think that was part
9 of what we were doing, and so I don't
10 know.  But you have to ask him.
11    Q.    But you have no knowledge of
12 Dan Geiger's awareness that your vendors
13 were making outbound telemarketing calls?
14    A.    I cannot tell you specifically
15 if it is not outbound, because I don't
16 have knowledge if it's outbound, so I
17 don't know if he had.
18        MR. SCHULTZ:  I just want to
19    note an objection to the form of
20    the last question, assuming facts
21    not in evidence.
22    Q.    I am just asking, trying to
23 clarify your earlier remark that Dan
24 Geiger was aware of all of this.  So I
25 wanted to make what all of this means.

Page 80

JOSEPH BAMIRA

1
2        MR. SCHULTZ:  Let him finish.
3    Q.    So if you want to clarify that
4 for me, that would be helpful.
5    A.    I cannot tell you what is he
6 aware or not aware.  But I know he was
7 aware that we were using vendors,
8 regardless -- that's what my testimony
9 was -- regardless whether it was asked in
10 writing or it was not asked in writing.
11 He understood the operation.  He knew
12 what the operation is.  In the depth, you
13 have to ask him.
14        I don't know about outbound
15 calls.  I don't know if he knows about
16 it.  That I don't know, in that detail.
17 But he is aware that we used vendors.
18 That he was definitely aware of.
19    Q.    But you have no knowledge that
20 he was aware of your vendors making
21 outbound calls?
22        MR. SCHULTZ:  Objection,
23    again, to the form of the question.
24    A.    Let me repeat, I didn't know,
25 and I don't know if it existed.  So I

Page 81

JOSEPH BAMIRA

1
2 cannot tell you that he knows about it
3 because I don't know if it existed.  I
4 don't know if anybody told him, because
5 maybe nobody else knew.  So I have no
6 such knowledge to tell you that he knew
7 about it, because I don't know.
8    Q.    Perfect.
9        So let's talk a bit about your
10 third-party vendors.  Yesterday when I
11 was talking to Reid we got kind of hung
12 up on this conversation because sometimes
13 I would use affiliates and sometimes I
14 would use third-party vendors, and he
15 would tell me that they were different.
16 In your mind, what is an affiliate?  How
17 does it differ from a third-party vendor,
18 with respect to the ADT contract?
19    A.    We did not have affiliates, in
20 this term.  This is just now we used the
21 terminology.  Third-party vendors are the
22 people who operated the websites.
23    Q.    Would Paramount be a
24 third-party vendor?
25    A.    I'm not sure how they used the

21 (Pages 78 - 81)

1          JOSEPH BAMIRA
2   terminology. You know, however they
3   used -- listen, Reid knows probably
4   better than me, because it's marketing
5   terminology. This is not a legal
6   terminology in that context. It is in
7   the indemnification context, not in that
8   context.
9       Q.   I don't really care what word
10  we use. I just want to make sure we
11  understand each other as we talk.
12      A.   So ask me substance, because
13  I'm not sure myself what the difference
14  is, what Reid referred to, because I wish
15  you would have found out from him.
16      Q.   Unfortunately, he says you are
17  the guy that knows all this stuff.
18      A.   I understand, and it's very
19  good that he thought, but I don't.
20      Q.   So, look, I believe Paramount
21  signed something called an affiliate
22  agreement with you. Does that sound
23  right to you?
24      A.   It could be. I'm not sure. I
25  have to see the agreement, if it says.

1          JOSEPH BAMIRA
2   It probably says affiliate, but I'm not
3   sure.
4       Q.   Does that term, affiliate,
5   have any particular meaning to you?
6       A.   No. It is people who we do
7   business with who give us a marketing
8   channel that we hire people. Instead of
9   us doing it directly, then we hire a
10  third party to do it for us, as an
11  affiliate. Whatever function.
12      Q.   So when you are performing the
13  ADT contract and you hire companies like
14  Paramount -- should we call them, for the
15  purposes of this discussion, call them
16  third- party vendors? Does that make it
17  easier?
18      A.   Yes, fine.
19      Q.   I believe it was Daphne's
20  testimony that there were between five
21  and ten third-party vendors engaged by
22  Elephant Group to help perform
23  the ADT contract. Does that sound right
24  to you?
25      A.   If she says, if she put a

1          JOSEPH BAMIRA
2   number, it's probably true. I think more
3   like five or six, maybe even five. I
4   doubt it's more. She probably has better
5   information.
6       Q.   And two of those would have
7   been Paramount and Savelo; is that
8   correct?
9       A.   That's correct.
10      Q.   Who at Elephant Group was
11  responsible for engaging Paramount to be
12  a third-party vendor on the ADT contract?
13      A.   It's the marketing department.
14  I don't know how they -- you have to ask
15  the marketing department, and probably
16  Daphne. People probably called us, heard
17  about it. I'm not sure.
18      Q.   Do you know anything about
19  Paramount?
20      A.   No.
21      Q.   Do you know anything about how
22  long they were in business before they
23  came to be engaged by Elephant Group?
24      A.   No.
25      Q.   Who did the marketing

1          JOSEPH BAMIRA
2   department report to on the engagement of
3   third-party vendors?
4       A.   Can you repeat the question,
5   please?
6       Q.   Sure.
7       MR. McNEW: Could you read
8   that back, please.
9       (The pending question was
10  read.)
11      Q.   I will rephrase the question.
12  Who was the individual who made the
13  decision to engage Paramount?
14      A.   I'm not sure.
15      Q.   Was it you?
16      A.   No.
17      Q.   I believe Reid said yesterday
18  it wasn't him. Does that mean it was
19  Benny, Benny Aboud?
20      A.   It could have been Benny. It
21  could have been the head of the marketing
22  department at the time. I don't know.
23      Q.   Who was the head of the
24  marketing department?
25      A.   I don't know. I really don't

Page 86

JOSEPH BAMIRA

1
2 know.
3    Q.   How many hours a week did you
4 spend in the Elephant Group offices?
5        MR. SCHULTZ:  At what time?
6    Q.   In 2008. I believe they were
7 engaged in 2008. Is that correct, the
8 Paramount contract in 2008?
9    A.   No, I don't know that.
10   Q.   I'm sorry, 2010.
11       In 2010-2011, about how many
12 hours a week did you spend in the
13 Elephant Group offices?
14   A.   35, 40.
15   Q.   And to whom did the marketing
16 department report?
17   A.   The marketing department
18 reported to Benny.
19   Q.   So your testimony is that the
20 engagement of Paramount would have been
21 done through the marketing department
22 under the supervision of Benny Aboud; is
23 that correct?
24   A.   No, I said I don't know.
25 That's what I said.

Page 87

JOSEPH BAMIRA

1
2    Q.   Are you aware of the
3 engagement of the other five to ten
4 third-party vendors that Daphne Fernandes
5 spoke of? Do you know who engaged any of
6 those other companies?
7    A.   No.
8    Q.   Is it likely that Daphne
9 Fernandes made the decision to hire those
10 companies?
11   A.   You have to ask her. I said I
12 don't know.
13   Q.   I believe her testimony was
14 that, in fact, she did.
15   A.   She did or she didn't?
16   Q.   Did.
17       Are you aware of any due
18 diligence that Elephant Group did with
19 respect to the hiring of Paramount Group
20 before hiring them?
21   A.   You have to ask Daphne.
22   Q.   You have no knowledge?
23   A.   No.
24   Q.   And do you have any knowledge
25 with respect to what the company did in

Page 88

JOSEPH BAMIRA

1
2 terms of due diligence before hiring the
3 other third-party vendors to perform the
4 ADT contract?
5    A.   It wasn't my job, not even
6 with Paramount, to have a check with due
7 diligence. I'm sure they did due
8 diligence, but I have no knowledge. I
9 was not involved in that.
10   Q.   That would have been Daphne
11 Fernandes?
12   A.   Again, I said I don't know.
13   Q.   I am only asking because you
14 said I have to ask Daphne, so I
15 figured --
16   A.   No, I said I don't really
17 know. I know it was done. I don't know
18 who has done it. So you ask me is it
19 likely it is Daphne.
20   Q.   How do you know it was done?
21   A.   Because I was told by Daphne
22 that they looked into these people, they
23 talked to them, and I believe that they
24 understand that they don't want to work
25 just with any Tom, Dick and Harry. These

Page 89

JOSEPH BAMIRA

1
2 are reasonable people. They are not
3 small, little workers in the company. So
4 they had responsibility.
5    Q.   When you say that Daphne said
6 they had looked at them, who is "they"?
7    A.   I don't know. It night have
8 been her. It might have been somebody
9 else. I seriously don't know. I was not
10 involved with that.
11   Q.   So when you say that you know
12 that because Daphne told you, Daphne
13 wasn't reporting to you in the course of
14 her work, because it wasn't something
15 that you were responsible for; is that
16 right?
17   A.   Correct.
18   Q.   Were you aware of any written
19 procedures the company maintained with
20 respect to the engagement of third-party
21 vendors to perform contracts like the ADT
22 contract?
23   A.   I think there was a procedure,
24 and they had to sign contracts.
25   Q.   Was that a written procedure?

23 (Pages 86 - 89)

Page 90

JOSEPH BAMIRA

1
2    A.   Oh, you mean written
3 procedure?
4    Q.   Yes.
5    A.   Could be.  I don't know.
6 Maybe it was oral procedure.
7    Q.   Like a manual or --
8    A.   No, I'm not aware of a manual.
9    Q.   And if there was a written
10 procedure, where would it have been
11 maintained?
12    A.   If there was?
13    Q.   Yes.
14    A.   I don't know.  I cannot tell
15 you.  There isn't such a thing.
16    Q.   Have you ever seen one?
17    A.   What, a written manual?
18    Q.   Well, a page, or a pamphlet, a
19 stapled document.
20    A.   If it had to do with HR, it
21 would be in HR, it would be in the legal
22 department.  I don't know this kind of --
23 we did not have a manual for that, so I
24 cannot tell you where we put it.  It's
25 speculation.

Page 91

JOSEPH BAMIRA

1
2    Q.   You have never seen any
3 writings in the company about this is
4 what we do, this is a checklist -- for
5 example, this is a checklist of things to
6 make sure that this company is able to do
7 before we decide to hire them to perform
8 one of our contracts?  You never saw
9 anything?
10    A.   A written instruction?  I
11 haven't seen it.  There might have been,
12 but I haven't seen it.
13    Q.   And your only knowledge of any
14 efforts to investigate a third-party
15 vendor before hiring them is Daphne
16 mentioning to you that "they" made that
17 investigation?
18    A.   I think she asked.  I think
19 she asked sometimes and if it was ADT.  I
20 think she asked Dan Geiger at ADT if they
21 heard about these people.  Actually, I
22 think she told me, if my memory doesn't
23 fail me, that EMI got in touch with us,
24 and she asked Dan Geiger, said they are
25 not good people, and we did not work with

Page 92

JOSEPH BAMIRA

1
2 them, or something like that.  And so she
3 did ask around, but I don't know.  There
4 was no manual or checklist, to my
5 knowledge.  But I know that she asked.
6         By the way, when I said
7 independently, I think the name came to
8 her attention and she asked about it, and
9 she said she specifically did not want to
10 work with them.
11         MS. LIM:  Could you repeat
12     that last sentence.
13         (Requested portion of record
14     read.)
15    A.   They asked, I said, not she
16 asked.  It came to her attention, and she
17 asked about it, and we did not want to
18 work with them subsequently.  That's what
19 she was telling me.
20    Q.   So apart from Daphne calling
21 the people at ADT, do you know of any
22 efforts that Daphne made to ensure that
23 the third-party vendors that she was
24 engaging were reliable or responsible
25 vendors?

Page 93

JOSEPH BAMIRA

1
2    A.   I will assume she has.  But
3 you have to ask her what efforts she
4 made.
5    Q.   I am asking if you have any
6 knowledge.
7    A.   No.  Except for her to say to
8 me she has.
9    Q.   Did she explain?
10    A.   No.
11    Q.   Did she ever tell you of any
12 measures that she took, any
13 questionnaires she offered them to ask
14 for information?
15    A.   I cannot recall that.
16    Q.   Did she ever check with the
17 Better Business Bureau of their location,
18 to see if there were complaints filed
19 against them?
20    A.   I don't know that.
21    Q.   Or whether they were
22 capitalized?
23    A.   I don't know that.
24    Q.   Or whether they had another
25 history of complaints that the company

24 (Pages 90 - 93)

Page 94

JOSEPH BAMIRA

1  had received? Did they ever ask about
2  whether they had a history of any alleged
3  violations of the TCPA?
4      A.  I don't know if she has or if
5  she hasn't.
6      Q.   Did she ever check to see if
7  any of the proposed vendors had judgments
8  entered against them for TCPA violations?
9      A.  I don't know what she asked,
10 so if I cannot tell you. If I don't know
11 what she asked, I don't know any
12 particular line item if she asked or not.
13     Q.   What was Daphne's title?
14     A.  I can't recall. We changed
15 titles three or four times. I don't
16 know. I don't remember.
17     Q.   Do you remember any of them?
18     A.  No. I'm not good at that. I
19 usually disregard titles.
20     Q.   Do you remember what her
21 salary was?
22     A.  Not either, no.
23     Q.   Did she make more than $50,000
24 a year?

Page 95

JOSEPH BAMIRA

1      A.  Yes.
2      Q.   More than a hundred?
3      A.  I don't know. She might. I
4  don't know.
5      Q.   More than 150?
6      A.  I don't think so.
7      Q.   And when was Daphne hired?
8      A.  I'm not sure. 2006, 2005.
9      Q.   So she was with the company a
10 long time?
11     A.  Yes.
12     Q.   Is she still employed by the
13 company?
14     A.  Yes.
15     Q.   Do you know what her current
16 title is?
17     A.  No.
18     Q.   You don't pay attention to
19 titles.
20     A.  No. Sorry. Maybe I should,
21 but I don't.
22     Q.   That's okay. Life is short.
23        Who in the company is in
24 charge of TCPA compliance?

Page 96

JOSEPH BAMIRA

1      A.  Currently?
2      Q.   In 2011.
3      A.  I don't remember who it was.
4  We changed.
5      Q.   Would that have been Daphne?
6      A.  I don't think so, but I don't
7  know. We changed functions and moved
8  people around quite frequently, so it's
9  very hard for me, especially when you are
10 asking about a particular year. It's
11 hard for me to tell.
12     Q.   Can you give me, to the extent
13 that you can recall, can you give me a
14 list of individuals who from time to time
15 had been responsible for TCPA compliance
16 matters in the company? If you work
17 backward from the current persons, until
18 you run out of names.
19     A.  I can't. I just mentioned two
20 names to you, which I mentioned before.
21 I don't remember the other names. Maybe
22 if I give it some time I can think of a
23 couple of names more. But I don't
24 remember.

Page 97

JOSEPH BAMIRA

1      Q.   What were the names? I'm
2  sorry, I don't remember you giving me
3  names before.
4      A.  I gave you two names before,
5  James Flynn and Mary Couton, or something
6  like that. Didn't I say that?
7      Q.   I don't believe so.
8      A.  I'm quite sure I did.
9      Q.   Flynn is one?
10     A.  James Flynn, right.
11     Q.   James Flynn, you said?
12     A.  Um-hum.
13     Q.   And the second one was?
14     A.  Mary Couton.
15     Q.   Do you remember what Mr.
16 Flynn's title is?
17     A.  He was executive vice
18 president.
19     Q.   What were his functions in the
20 company?
21     A.  He was responsible for vendors
22 relationship primarily in the -- even in
23 ADT, I think. I'm not really sure. You
24 are going to have to ask him.

Page 98

JOSEPH BAMIRA

1
2      But, for the most part, for
3 vendor relationships, and for the
4 compliance.  And he wasn't for the
5 compliance all the time.  But I'm not
6 sure since when.  But he was an executive
7 vice president.
8      Q.   When you say he was in charge
9 of compliance, was he in charge of the
10 compliance department or was he in charge
11 of the kind of compliance issues that we
12 have been talking about today?
13      A.   No, no, no.  He was
14 ultimately -- he was not the head of
15 compliance.  They reported to him.  Okay?
16 He was not the head of the compliance
17 department.  They reported to him, I
18 think, as the executive in charge of
19 that.
20      Q.   And Couton?
21      A.   She was the head.  She was the
22 direct head of compliance.  But there
23 were a few others, and I don't remember
24 their names.
25      Q.   When you say head of

Page 99

JOSEPH BAMIRA

1
2 compliance, you are talking about the
3 compliance department?
4      A.   Yes.
5      Q.   And we agreed earlier that the
6 compliance department wasn't involved in
7 the issues that we have been discussing
8 here today.  Is that correct?
9      A.   Correct.
10      Q.   They listened to phone calls
11 that are coming in to Elephant Group to
12 ensure compliance with the
13 requirements --
14      A.   If there were complaints, they
15 were involved.  If there were phone calls
16 that people didn't record, or things like
17 that.  But they were not in charge of
18 implementation.  That they not.
19          Can I ask for five minutes?
20      Q.   Absolutely.
21          (A recess was taken.)
22 BY MR. McNEW:
23      Q.   We talked a little bit about
24 EMI.  When did you first become aware of
25 a company called EMI?

Page 100

JOSEPH BAMIRA

1
2      A.   I think after the institution
3 of the lawsuit, but I don't remember when
4 exactly.
5      Q.   I believe it was your
6 testimony that Dan Geiger, that Daphne
7 had inquired about the engagement of EMI
8 with Dan Geiger, and Dan Geiger said that
9 they were bad people.  Is that fair?
10      A.   No.  I said what Daphne told
11 me, on several occasions, independent of
12 this particular situation, sometimes in
13 the past I think EMI got in touch with
14 her, or however she learned about them,
15 and she inquired about them, if they are
16 good people or not, and she was told that
17 they weren't.  That's what Dan Geiger
18 told her.  But not in connection to that.
19 Independently of that.
20      Q.   So that was another time?
21      A.   It's another time, yes.
22      Q.   I believe it was your
23 testimony just now that you were not
24 aware of EMI before the commencement of
25 this lawsuit.  Is that correct?

Page 101

JOSEPH BAMIRA

1
2      A.   That's correct.
3      Q.   Do you know if Daphne had any
4 knowledge of EMI's work with Paramount
5 before the lawsuit?
6      A.   I can only tell you what she
7 told me, and the answer was no.
8      Q.   Do you know anything about the
9 relationship between Paramount and EMI?
10      A.   Not whatsoever.
11      Q.   Do you know if they provided
12 any compliance guidelines to EMI?
13      A.   I don't know.  But I think the
14 head of Paramount had a deposition, and
15 maybe you asked him.  I don't know.
16      Q.   I'm guessing from your
17 testimony that Elephant Group had no
18 contact with EMI before the lawsuit.
19      A.   No.
20      Q.   Any after the lawsuit?
21      A.   No.
22      Q.   With respect to the mediation,
23 you testified that you attended two of
24 the three sessions.  Is that correct?
25      A.   Correct.

26 (Pages 98 - 101)

Page 102

JOSEPH BAMIRA

1
2    Q.   Was there anyone else at
3 Elephant Group --
4    A.   I'm sorry.
5    Q.   Was there anyone else at
6 Elephant Group who participated in the
7 mediations?
8    A.   In the one in Boston?
9    Q.   Yes.
10    A.   No.  Just myself and Jim
11 Schultz.
12    Q.   Is it your view that Elephant
13 Group is responsible under the ADT
14 contract to indemnify ADT for the Desai
15 settlement?
16    A.   My view is that they are not.
17    Q.   And why not?
18    A.   Because I think --
19        MR. SCHULTZ:  Let me first
20    object to the extent that anything
21    you would say would be informed by
22    or relate to any discussions we
23    have had regarding the merits of
24    the case.  If you could testify as
25    to what you personally believe

Page 103

JOSEPH BAMIRA

1
2    outside of anything you have
3    learned from or you discussed with
4    counsel, can you answer that
5    question.
6    A.   I will not voice -- not
7 because of him, but I will not voice a
8 legal opinion.
9    Q.   Let me clarify.  To the extent
10 that you have an understanding of the
11 company's responsibilities, whether oral
12 or legal, you are obliged to give them to
13 me.  You are not allowed to disclose a
14 communication that you have had with your
15 lawyers.
16    A.   I understand.
17    Q.   So no communications with
18 them.  But to the extent you have an
19 understanding of the law, you have to
20 explain that to me.
21    A.   Nobody showed me any evidence
22 at the time that we were involved in
23 these two particular calls, or however
24 many calls there were, to these two
25 particular plaintiffs.  The calls did not

Page 104

JOSEPH BAMIRA

1
2 come to us.  We had nothing to do with
3 the calls.  We have not made the calls.
4 Nobody on our behalf.  We are not the
5 beneficiaries of the calls.  We haven't
6 received commission for the calls.  So
7 there's nothing there which connects us
8 to this particular case.  Except that we
9 are part of ADT's marketing operation.
10 And I believe that it is very difficult,
11 that's my opinion, it's very difficult to
12 come and say, okay, there's 13 people,
13 you all have to indemnify us for the same
14 acts.  There's got to be some sort of --
15 well, that's my legal interpretation.  It
16 has to really come and say it's because
17 of you, here's the evidence, you did it.
18        I did not see such evidence.
19 That's why I did not want to participate
20 in the mediation.  I did not think we
21 belonged in that lawsuit.  I think it was
22 ADT thrashing out, trying to find
23 somebody to foot the bill.
24    Q.   And when you said through that
25 answer "we did not do," you were speaking

Page 105

JOSEPH BAMIRA

1
2 about Elephant Group; correct?
3    A.   That's correct, yes.
4        MR. McNEW:  I have no further
5    questions.
6        MR. SCHULTZ:  Will read.
7        (Time noted:  11:45 a.m.)
8
9
10        JOSEPH BAMIRA
11
12 Subscribed and sworn to before me
13 this _____ day of _____, 2014.
14
15 _____
16
17
18
19
20
21
22
23
24
25

27 (Pages 102 - 105)

Page 106

```
 1        JOSEPH BAMIRA
 2    I, JACK FINZ, Shorthand Reporter,
 3  certify that I was authorized to and
 4  did stenographically report the
 5  deposition of JOSEPH BAMIRA, the
 6  witness herein, on June 19, 2014' that
 7  a review of the transcript was
 8  requested; that the foregoing pages
 9  numbered from 1 through 105, inclusive,
10  is a true and complete record of my
11  stenographic notes of the deposition by
12  said witness; and that this computer-
13  assisted transcript was prepared under
14  my supervision.
15    I further certify that I am not a
16  relative, employee, attorney or counsel
17  of the parties, nor am I a relative or
18  employee of any of the parties'
19  attorney or counsel connected with the
20  action.
21    DATED this ___day of_____, 2014.
22
23        _____
24        JACK FINZ
25
```