# Exhibit 5

Page 1

```
 1
 2         UNITED STATES DISTRICT COURT
      FOR THE NORTHERN DISTRICT OF ILLINOIS
 3              EASTERN DIVISION
    -------------------------------x
 4  VISHVA DESAI,
 5                    Plaintiff,
 6
            -against-          No. 11C1925
 7
    ADT SECURITY SERVICES, INC.,
 8  et al.,
 9                    Defendants.
    -------------------------------x
10
11                    June 27, 2014
12                    9:00 a.m.
13
14       Deposition of ADT SECURITY
15  SERVICES, INC., by RENATA BERGMAN,
16  pursuant to notice and subpoena, at the
17  offices of Veritext Legal Solutions,
18  301 Northeast 51st Street, Boca Raton,
19  Florida, before Jack Finz, a Shorthand
20  Reporter and Notary Public within and
21  for the State of Florida.
22
23
24
25
```

Page 2

1
2  A P P E A R A N C E S:
3    SARA GOLDBERG, ESQ.
     McNEW P.A.
4    Attorneys for Defendant
     ADT SECURITY SERVICES, INC.
5        2385 New Executive Center Drive
         Suite 100
6        Boca Raton, FL 33431
7
8  JAMES K. SCHULTZ, ESQ.
     SESSIONS FISHMAN NATHAN & ISRAEL LLC
9    Attorneys for Third-Party Defendant
     THE ELEPHANT GROUP
10       55 West Monroe Street
         Suite 1120
11       Chicago, IL 60603-5130
         (Via telephonic conference call)
12
13 ALSO PRESENT:
14   HANNAH S. LIM, ESQ.
     Chief Litigation Counsel
15   ADT Security Services
         1501 Yamato Road
16       Boca Raton, FL 33431
17
18
19
20
21
22
23
24
25

Page 3

1
2        E X H I B I T S
3
     (ADT Exhibit 1 for          8
4    identification, Second Amended
     Notice of Deposition.)
5
     (ADT Exhibit 2 for          29
6    identification, document
     entitled "ADT Third Party
7    Marketer Due Diligence Request,"
     Bates stamped ADT 0000941
8    through 0000947.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1            RENATA BERGMAN
2         R E N A T A   B E R G M A N,
3      having been first duly sworn by the
4      Notary Public (Jack Finz), was
5      examined and testified as follows:
6  EXAMINATION BY
7  MR. SCHULTZ:
8      Q.   Could you please state your
9  fall name, spelling your last name for
10 the record, ma'am?
11     A.   Yes.  My name is Renata
12 Bergman, R-e-n-a-t-a, last name Bergman,
13 B-e-r-g-m-a-n.
14     Q.   Thank you.
15          MR. SCHULTZ:  Let the record
16     reflect that this is the deposition
17     of Renata Bergman, being taken in
18     the case of ADT Security Systems
19     versus Elephant Group, et al.
20     Today's deposition is being taken
21     pursuant to notice and continued to
22     today's date by agreement of the
23     parties.
24     Q.   Ms. Bergman, have you ever
25 been deposed before?

Page 5

1            RENATA BERGMAN
2      A.   Yes, once or twice in the
3  past, yes.
4      Q.   When was the last time you
5  gave a deposition?
6      A.   It had to be at least ten
7  years ago.
8      Q.   I am going to go over a couple
9  of groundrules with you then, and hope to
10 make sure that we are all on the same
11 page.  And I think this is especially
12 important when we are doing this by
13 telephone because it's a little bit
14 tougher for our court reporter as well as
15 for us to talk and make sure we are
16 communicating in a way that is going to
17 come across on the record.  Okay?
18     A.   Okay.
19     Q.   I am here today to ask you a
20 series of questions, and your job is to
21 answer them to the best of your ability.
22 Do you understand that?
23     A.   Yes.
24     Q.   And you are being presented
25 today pursuant to what is called Federal

2 (Pages 2 - 5)

Page 6

1        RENATA BERGMAN
2  Rules of Civil Procedure 30(b)(6).  Do
3  you know what that means?
4     A.   Generally, yes, that I'm --
5  yes.
6     Q.   Are you aware that you are
7  being produced as a corporate
8  representative?
9     A.   Yes.
10    Q.   And you understand that the
11 testimony you are giving today is not
12 based just on what you personally know
13 but any information that you may have
14 learned, and you are speaking on behalf
15 of the corporation?
16    A.   Yes.
17    Q.   If at any point during today's
18 deposition I ask you a question that you
19 don't understand, please just ask me to
20 rephrase it.  It's my job to make the
21 question clear to you.  Okay?
22    A.   Yes.
23    Q.   And if you could keep giving
24 verbal answers like the yeses and noes
25 that you are doing right now, we would

Page 7

1        RENATA BERGMAN
2  appreciate that, especially by phone,
3  because I can't see any shakes of the
4  finger or shakes of the head or something
5  you might give.  Okay?
6     A.   Understood.
7     Q.   And you are doing a great job
8  of this.  If you could let me fully ask
9  my question before you give an answer, so
10 that we are not talking over each other,
11 then I will try to give you the same
12 courtesy.  Okay?
13    A.   Yes.
14    Q.   And then if at any point in
15 time I ask you a question -- I'm sorry, I
16 did that.  But if at any time you need to
17 take a break or anything, just let me
18 know and we will accommodate that.  This
19 is not an endurance contest or anything
20 like that.  Okay?
21    A.   Yes.
22       MR. SCHULTZ:  Jack, can you
23    show the witness the amended notice
24    of deposition, and mark that as
25    Exhibit 1.

Page 8

1        RENATA BERGMAN
2       (ADT Exhibit 1 for
3    identification, Second Amended
4    Notice of Deposition.)
5     Q.   Ms. Bergman, the court
6  reporter has handed you an exhibit marked
7  Exhibit 1.  It is a notice of deposition.
8  Have you ever seen that before?
9     A.   I've seen a version of this.
10 I didn't see the one dated June 27.
11    Q.   Most importantly, though, on
12 the second and third pages there is a
13 list of 17 different topics.  Do you see
14 that?
15    A.   Yes.
16    Q.   Those are the various topics
17 that we are here to talk about in today's
18 deposition, and I understand that you are
19 going to be the corporate representative
20 for some but not all of those topics.  Is
21 that your understanding as well?
22    A.   Yes.
23    Q.   Going through this list, and
24 you can do it whichever way is easier,
25 can you tell me either the topics that

Page 9

1        RENATA BERGMAN
2  you are prepared to testify about or the
3  ones that you are not?
4     A.   Yes.  I'm prepared to testify
5  on number 13, 14, 15 and 16.
6     Q.   I want to make sure I was
7  perfectly clear, the topics that you are
8  going to testify on is 13, 14, 15 and 16?
9     A.   Yes, sir.
10    Q.   And your understanding is that
11 a different witness will testify on
12 topics 1 through 12 as well as number 17?
13    A.   Not me, yes.
14    Q.   The good news for you, I
15 guess, is that's probably going to make
16 your deposition a lot shorter.
17    A.   That's good news.  Thank you.
18    Q.   And we talked about this
19 briefly, but you understand that when you
20 testify on the topics 13, 14, 15 and 16,
21 you are doing so as ADT's corporate
22 representative; right?
23    A.   Yes, sir.
24    Q.   And the answers that you
25 provide are as if ADT itself was

Page 10

RENATA BERGMAN

1
2  speaking.  Do you understand that?
3     A.   Yes.
4     Q.   During the course of preparing
5  for today's deposition, what did you do,
6  if anything, to prepare to speak on those
7  four topics?
8     A.   I met with two attorneys for
9  ADT, and actually reviewed a series of
10 communications and some documentation to
11 refresh chronology, and those kinds of
12 things.
13    Q.   What two attorneys did you
14 meet with?
15    A.   Sara Goldberg and Dan McGrath.
16    Q.   Dan McGrath?
17    A.   Dan McGrath, yes.
18    Q.   Who is Dan McGrath?  Is he an
19 ADT internal counsel or is he outside
20 counsel?
21    A.   He's internal counsel.
22    Q.   How often did you meet with
23 Sara and Dan?
24    A.   Well, since this deposition,
25 the schedule changed three times, I met

Page 11

RENATA BERGMAN

1
2  with Dan and Sara once, and then with
3  Sara one more time after that.
4     Q.   And what documents did you
5  look at to refresh your recollection?
6     A.   We looked at this deposition
7  notice.  We looked at a series of email
8  communications.  For the most part, some
9  policy documents were used as reference,
10 but I'm relatively familiar with them
11 already.
12    Q.   Is there any information that
13 you feel you still need before you could
14 fully testify on topics 13 through 16?
15    A.   Not that I'm aware of.
16    Q.   And as you sit here today, do
17 you feel that you are the person at ADT
18 that is most qualified to testify on
19 those topics?
20    A.   Yes.
21    Q.   And, in your mind, do you feel
22 that you are fully prepared to testify on
23 those topics?
24    A.   Yes.
25    Q.   Is there any reason why you

Page 12

RENATA BERGMAN

1
2  feel that we can't go forward with your
3  deposition here today?
4     A.   No, sir.
5     Q.   Just by way of background --
6  is it okay if I call you Renata?
7     A.   Please, yes.
8     Q.   Renata, I am Jim, by the way,
9  if you need to interrupt me.
10         Just as backup, do you have an
11 understanding of what this case is about?
12    A.   Yes.
13    Q.   Can you explain that to me?
14    A.   It involves unsolicited
15 outbound telemarketing by unauthorized
16 third parties of Elephant
17 Group/Saveology.
18    Q.   So, in broadest form, would
19 you say it's got to do about
20 telemarketing of ADT products and
21 service?
22         MS. GOLDBERG:  Objection to
23    form.
24    Q.   If that's not fair, then
25 correct me.

Page 13

RENATA BERGMAN

1
2     A.   Indirect marketing of ADT
3  products and services.
4     Q.   And what is your relationship
5  with the indirect telemarketing of ADT's
6  products and services?
7     A.   I am a -- I had a primary role
8  in building the contact compliance team,
9  which basically is active in the
10 marketing and telemarketing space of
11 ADT's programs for our direct and
12 indirect programs.  So I'm a technical
13 consultant.
14    Q.   Is it fair to say then that
15 ADT generally has two different marketing
16 programs, the direct program and the
17 indirect program?
18    A.   Well, we telemarket ourselves,
19 and then we have an indirect program,
20 yes.
21    Q.   Can you just briefly describe
22 what the direct telemarketing of ADT,
23 what does that consist of?
24    A.   Well, it's typically ADT, with
25 its own employees, doing its own selling

4 (Pages 10 - 13)

Veritext Florida Reporting Co.

800-726-7007                                                305-376-8800

Page 14

1  RENATA BERGMAN
2 and its own business activities, you
3 know, by employees of the organization.
4     Q.   And how do they do that?  Is
5 it mailing, is it email, is it faxing, is
6 it phone calls?  How do ADT employees go
7 about marketing ADT products and
8 services?
9         MS. GOLDBERG:  Objection to
10    form.  Can you give us a time frame
11    for this question?
12    Q.   Let's talk about during the
13 class period.  How about from 2007 to
14 2013?
15    A.   Yes.  There's a series of
16 things that we do generally, but we have
17 a direct mail program.  We have
18 advertising.  We do have a series of web
19 forums.  We have call centers that take
20 inbound calls.  And there's -- we do web
21 banners.  You know, there's a series of
22 things that we do with our customers and
23 with consumers that actually reach out to
24 us to ask about our products and
25 services.

Page 15

1  RENATA BERGMAN
2    Q.   And how many call centers does
3 ADT operate?
4    A.   ADT operates one -- well, they
5 operate multiple call centers, but they
6 are not all marketing centers.  They have
7 one marketing center.
8    Q.   And where is that marketing
9 center located?
10    A.   Jacksonville, Florida.
11    Q.   And how many employees work in
12 the marketing center, doing the
13 telemarketing?
14    A.   Well, it's primarily an
15 inbound telemarketing center.  At last
16 count there were about 450 employees on
17 the inbound side.  There's a very small
18 outbound team that's under 75
19 individuals.
20    Q.   That's exactly where I was
21 heading.
22         Most of the calls, then, that
23 ADT is handling are inbound calls?
24    A.   A majority, yes, sir.
25    Q.   Has that been basically true

Page 16

1  RENATA BERGMAN
2 since 2007?
3    A.   Yes.
4    Q.   But you said you've got
5 approximately 75 employees that do
6 outbound calling?
7    A.   Yes, a small team that does
8 outbound, yes, sir.
9    Q.   The outbound team of 75
10 employees, are those full-time employees?
11    A.   Yes, sir.
12    Q.   And where do those individuals
13 get the telephone numbers that they use
14 to make calls?
15    A.   A majority of those are coming
16 from lead generation programs, with
17 partners that work with ADT.  They are
18 coming into that center and actually
19 processed for the outbound through our
20 compliance process.
21    Q.   Beginning in 2007, what
22 vendors did ADT use to generate leads?
23    A.   We were using a company called
24 EMSI, whose name has changed.  I believe
25 their now name is Budco and I think

Page 17

1  RENATA BERGMAN
2 recently in the last two months the name
3 changed again.  I think it's the Dialogue
4 Company, but, for the most part, they
5 have been working with ADT for a number
6 of years.
7    Q.   And has that been the
8 exclusive lead generation vendor that ADT
9 has used for the direct marketing since
10 2007?
11    A.   They are a primary provider,
12 yes, sir.
13    Q.   Are there others?
14    A.   Not that I'm aware of.
15    Q.   Let's talk then about the
16 indirect telemarketing of ADT.  What does
17 the indirect telemarketing process of ADT
18 since 2007 consist of?
19    A.   The indirect marketing was
20 primarily a party of three companies that
21 did mostly lead generation for the ADT
22 authorized dealers.
23    Q.   Renata, I appreciate that last
24 answer, but, again, I'm a little slow.
25 So can you just maybe say that again in

5 (Pages 14 - 17)

Veritext Florida Reporting Co.
800-726-7007                                                                                        305-376-8800

Page 18

1  RENATA BERGMAN
2  more common use language, what you
3  actually meant?
4  A.  Yes.  ADT has authorized
5  dealers that work independently of ADT.
6  We had three companies that actually
7  worked on providing lead generation, so
8  leads for marketing purposes, that was
9  their exclusive role.  Those companies go
10 out and do direct marketing, advertising,
11 web ads, banners, things like that, to
12 generate leads.  And then those leads
13 would then be qualified and provided to
14 the ADT authorized dealers that
15 potentially would help close the sale.
16 Q.  Got it.
17    And who are those three
18 entities or vendors that did that?
19 A.  Trident was one of those
20 companies, Security Choice, and Elephant
21 Group/Saveology.
22 Q.  Security Choice, did you say?
23 A.  Security Choice, yes, sir.
24 Q.  And are those three entities
25 still working for ADT doing lead

Page 19

1  RENATA BERGMAN
2  generation?
3  A.  Two of them are, Trident and
4  Security Choice.
5  Q.  Elephant Group is no longer?
6  A.  No.
7  Q.  Do you have an understanding
8  of what happened to the Elephant Group
9  relationship?
10 A.  Yes.  Yes, I do.
11 Q.  What happened?
12 A.  The lawsuit, Desai lawsuit,
13 was filed.  ADT mounted an in-depth
14 investigation as part of discovery.
15 There were some noncompliance activities
16 discovered.  Elephant Group was asked to
17 stop using unauthorized third parties.
18 They were required to actually complete
19 detailed forms on those third parties and
20 submit them to ADT for evaluation.  And
21 there was a subsequent audit done on
22 Saveology.
23 Q.  Was that type of discovery
24 also done in relation to Trident and
25 Security Choice?

Page 20

1  RENATA BERGMAN
2  A.  We have always mounted a very
3  due diligent contact compliance program,
4  that's what we call it, so the due
5  diligence was always in-depth.  I would
6  say that as a result of the lawsuit there
7  was a reason to question maybe what we've
8  been told in the Saveology/Elephant Group
9  circumstance, and so it warranted a, I
10 guess you'd call it a deeper dive.
11 Q.  And so there was nothing that
12 ADT found during discovery in the Desai
13 lawsuit that you felt compelled a deeper
14 dive as it relates to Trident and
15 Security Choice?
16    MS. GOLDBERG:  Objection,
17    irrelevant.
18 Q.  You could still answer the
19 question.
20 A.  I can still answer the
21 question?
22    No, not that I'm aware of.
23 Q.  What is the contact compliance
24 program?  What does that mean?
25 A.  That's what we call all of the

Page 21

1  RENATA BERGMAN
2  processes that relate to telemarketing
3  and marketing programs.  Everything from
4  our guidelines that require ADT and our
5  partners in this space to adhere to law,
6  to regulations, to the TCPA, to the TSR,
7  to make sure they are compliant and they
8  maintain compliance, everything from that
9  to the guidelines that require a third
10 party to get express consent explicitly
11 from ADT to assign any responsibility to
12 third parties.
13 Q.  Is there an individual at ADT
14 that is responsible for running or
15 operating or supervising the contact
16 compliance program?
17 A.  No.  It's actually a team of
18 dedicated professionals, fully compliant.
19 It consists of a complaint team, ADT's
20 legal, technical consultants.  It's
21 really a group of dedicated professionals
22 that actually oversee the space.
23 Q.  How many professionals are
24 dedicated to overseeing the space then?
25 A.  I'd say probably seven or

Page 22

```
 1            RENATA BERGMAN
 2  eight on a regular basis, including our
 3  complaint team.
 4       Q.   Has that been true since 2007?
 5       A.   Yes, sir.
 6       Q.   Has the number fluctuated at
 7  all or has it been consistent between
 8  approximately seven or eight since 2007
 9  to the present?
10       A.   I'd say we probably added
11  people to our complaint team, one or two
12  people to our complaint team.  That's
13  really been the only change.
14       Q.   But it's roughly stayed the
15  same?
16       A.   Yes.
17       Q.   Is there one person on that
18  team who is either the highest ranking
19  supervisor or the person that's
20  ultimately in charge?
21       A.   No.  It's kind of a
22  dotted-line organization.  There's a
23  complaint team with a manager there.
24  There's the legal participation, with a
25  manager there.  There's the business
```

Page 23

```
 1            RENATA BERGMAN
 2  manager of contact compliance.
 3            And then there are the
 4  participants from the channel, the dealer
 5  channel, of the program overall.  And
 6  then there could be a partner manager
 7  involved in these individual partners
 8  which is outside of contract compliance.
 9       Q.   Renata, is part of what you do
10  serving on this team?
11       A.   Yes.
12       Q.   And were you involved in any
13  of the either discovery or what you
14  called the deep dig into Elephant Group?
15       A.   No, sir.
16       Q.   Do you have any knowledge
17  about the results of that deep dig into
18  Elephant Group?
19       A.   Beyond that we audited, that
20  they were audited, and that we no longer
21  use them, no.
22       Q.   Do you know what like the
23  results of that audit were?
24       A.   No.
25       Q.   And are you aware of -- I
```

Page 24

```
 1            RENATA BERGMAN
 2  think you said earlier that there was
 3  some noncompliance activity that was
 4  discovered related to Elephant Group
 5  during the Desai litigation.  Are you
 6  aware of what that noncompliance activity
 7  was?
 8       A.   Specifically, third parties
 9  were engaged that were not approved by
10  ADT.  There was no express consent given
11  to use third parties.
12       Q.   And these were third parties
13  being used to generate additional leads?
14       A.   Unsolicited outbound
15  telemarketing.
16       Q.   So your understanding is that
17  Elephant Group had hired a third party,
18  or third parties, to perform outbound
19  telemarketing?
20       A.   Yes.
21       Q.   And by outbound, you mean
22  making phone calls; right?
23       A.   Yes, sir.
24       Q.   I just want to make sure
25  that's clear.
```

Page 25

```
 1            RENATA BERGMAN
 2       A.   Yes.
 3       Q.   Do you have an understanding
 4  of what vendors or what entities Elephant
 5  Group hired, what these third parties
 6  were?
 7       A.   Only because of the
 8  investigation.  We did have -- there was
 9  one partner that we were communicating
10  with Saveology about just before Desai
11  was filed, three weeks before Desai, and
12  we were in the midst of communicating and
13  asking for information.  We were
14  reassured by Saveology that that partner
15  was not making outbound calls.
16            But other than that, I'm
17  familiar with two names of partners that
18  were involved in the investigation.
19       Q.   And what are those two names?
20       A.   Paramount and EMI.
21       Q.   Is it your understanding that
22  Elephant Group hired Paramount?
23       A.   It's my understanding that
24  they were using third-party services from
25  that partner, yes, sir.
```

Page 26

RENATA BERGMAN

Q. And do you have an understanding as to whether or not Elephant Group hired EMI?
A. I don't.
Q. Are you aware, in preparing for the deposition and reviewing documents, did you see anything that suggested that Elephant Group at any point in time hired EMI?
A. Not explicitly, no.
Q. Is there anything implicitly, something that you saw that led you to believe that EMI may have been hired by Elephant Group?
A. I think the communication at that time was really more investigatory. We were asking for substantiation on alleged consumer complaints. And in that process, if the caller ID or the vendor name came up, we would include that in our inquiry to Saveology. And at that point we were reassured, we had no reason to doubt the information we were being provided, until the lawsuit was filed.

Page 27

RENATA BERGMAN

Q. Did ADT ever investigate, during the course of discovery, whether or not Trident had hired any third parties to do lead generation for them?
A. Lead generation was not an issue of concern, but -- no, I have no knowledge of that.
Q. Did ADT ever investigate whether or not Security Choice had hired any third parties to perform lead generation for them?
A. I would say no, but the investigation was a result of the lawsuit being filed, the deeper dive.
Q. So is it fair to say, then, that the deeper dive only related to Elephant Group and not Trident or Security Choice?
    MS. GOLDBERG: Objection to form.
Q. You can still answer.
A. Ask again. I'm sorry.
Q. Would it be fair to say, then, that what we're calling the deeper dive,

Page 28

RENATA BERGMAN

as a result of this lawsuit, was only made in relation to Elephant Group and not Trident and Security Choice?
A. I think it's fair to say that the focus of that investigation as a result of the Desai lawsuit was on Saveology and their compliance and practices, yes.
Q. Just for the record here, when we're talking about Elephant Group and Saveology, is it your understanding that those are the same companies, basically?
A. Yes.
Q. And it seems that I'm saying Elephant Group and you're saying Saveology, but you understand those are the same then?
A. Yes.
Q. And I'm going to try to adjust and I'm going to start calling them Saveology, but when we say Saveology would it be fair that we're talking about both Saveology and Elephant Group?
A. Yes, sir.

Page 29

RENATA BERGMAN

    MR. SCHULTZ: Jack, in the exhibits we sent over, there was something that's titled the "ADT Third Party Marketer Due Diligence Request."
    Sara, this is designated as confidential. Do you guys want to not mark this and we'll just reference it by Bates numbers, or do you care?
    MS. GOLDBERG: It's fine. You can mark it as an exhibit.
    MR. SCHULTZ: I just don't want to break any confidentiality rules.
    If we can mark that as Exhibit No. 2.
    (ADT Exhibit 2 for identification, document entitled "ADT Third Party Marketer Due Diligence Request," Bates stamped ADT 0000941 through 0000947.)
Q. Renata, could you take a look at this. I want you to just familiarize

Page 30

1        RENATA BERGMAN
2   yourself with the form there. If you
3   could let me know once you have had a
4   chance to look through it.
5      A.   All right. Ready.
6      Q.   Have you ever seen -- again,
7   without going into the specific contents
8   of the fill in the blanks, the
9   handwritten fill in the blanks, again, I
10  just want to talk about this form. Have
11  you ever seen this form before?
12     A.   Yes.
13     Q.   Can you just describe for us
14  what the form is?
15     A.   The form is for an ADT vendor
16  to submit a third party for express
17  written permission by ADT to use that
18  third party for the services described.
19     Q.   And would this form then be
20  something that would be provided to all
21  of the ADT authorized marketers, like
22  Trident, Security Choice, and what used
23  to be Elephant Group, or Saveology?
24     A.   Yes, it would have been. When
25  this form was used, it was actually for

Page 31

1        RENATA BERGMAN
2   the purpose of getting ADT's express
3   written permission to use the third party
4   for whatever service was described.
5      Q.   And would this form also apply
6   to the authorized sellers or just for the
7   marketers of ADT?
8      A.   You're talking about
9   authorized sellers being -- it's too
10  broad a term for me to respond.
11         MS. GOLDBERG: Objection to
12     form.
13     Q.   I'm sorry, let me just move
14  on.
15     A.   Okay.
16     Q.   Do you know when this form,
17  Exhibit 2, was first created?
18     A.   I know that it was -- this
19  form was -- I don't know exactly when,
20  but I know it was after the Desai lawsuit
21  was filed, and we intended to make this
22  an easier process for our partners to
23  actually submit their requests and make
24  them detailed.
25     Q.   Was there a form that operated

Page 32

1        RENATA BERGMAN
2   the same way as far as being used for the
3   third parties to obtain the express
4   written permission of ADT to use third
5   parties? Did ADT have a predecessor form
6   to this that they used prior to the Desai
7   lawsuit?
8      A.   Not that I'm aware of, but
9   they were required to submit a -- they
10  were required to adhere to the express
11  written consent submission and approval
12  process for any third party assignment,
13  under the contract.
14     Q.   Would it be fair to say that
15  this form was then created by ADT in
16  response to the Desai lawsuit?
17     A.   I think it's fair to say that
18  we formalized this document to make it
19  easier and to give these partners an
20  opportunity to provide all of the
21  information or extended information.
22     Q.   And was this a form then that
23  ADT provided to Trident, Security Choice
24  and Elephant Group?
25     A.   It would have been, yes.

Page 33

1        RENATA BERGMAN
2      Q.   Prior to the implementation of
3   this form, had ADT ever received a
4   request in writing from Elephant Group to
5   use a third-party vendor to assist in
6   their lead generation?
7      A.   I wouldn't have that direct
8   knowledge. I didn't have any affiliate
9   approval role.
10     Q.   Who would be in charge or who
11  would be involved in the affiliate
12  approval role?
13     A.   At that time, it would have
14  been Steve Gribbon, VP of sales, in
15  conjunction with ADT legal.
16     Q.   I am going to ask you the same
17  question, but I suspect I know the answer
18  already. But are you aware of whether or
19  not either Trident or Security Choice had
20  ever asked for written permission to use
21  a vendor prior to the Desai lawsuit?
22     A.   No. It wasn't part of my
23  role, no.
24     Q.   I understand. I just thought
25  I'd ask.

9 (Pages 30 - 33)

Veritext Florida Reporting Co.
800-726-7007                                          305-376-8800

Page 34

RENATA BERGMAN

2 Q. Did you have any involvement
3 then in the vendor approval or the
4 process?
5    A.   No.  No, sir.
6    Q.   So if there had been a
7 modification to the approval process
8 whereby ADT and a vendor may have agreed
9 that the approval could be given orally,
10 would you have any knowledge about that?
11   A.   I don't have that knowledge.
12 And I would answer by --
13   Q.   Have you reviewed any of the
14 depositions that have been taken in this
15 case?
16       MS. GOLDBERG:  I think she was
17    still talking.
18   A.   I guess I would qualify that
19 by saying that express written consent
20 was required in the contract, and it was
21 explicit.  So, to my knowledge, that
22 process was never altered.
23   Q.   And, again, your role with
24 ADT, though, wasn't involved in the
25 execution of that process at all, was it?

Page 35

RENATA BERGMAN

2    A.   I was not involved in
3 affiliate approval, no.
4    Q.   And if there had been a
5 modification to the affiliate approval
6 process, is that something that likely in
7 the regular course of your job you would
8 have been made aware of?
9    A.   I guess it depends on what
10 level.  If there was a change to our
11 guidelines, or, you know, what we were
12 asking our partners to adhere to,
13 generally I would be aware of a policy
14 change.  But I would not be aware of a
15 specific explicit change in this form.
16   Q.   This form didn't exist before
17 the Desai lawsuit; right?
18   A.   In its current iteration here,
19 no.  But the obligation to get express
20 written consent from ADT, in writing, to
21 use these third parties, was an
22 obligation explicitly stated.
23   Q.   Would the in-writing
24 permission be satisfied by an exchange of
25 emails?  Would ADT consider that to be

Page 36

RENATA BERGMAN

2 express written permission?
3    A.   I would say not likely.  It
4 would have to be approved by both Steve
5 Gribbon and ADT legal.
6    Q.   Let me just talk specifics.
7 Have you had an opportunity to review any
8 of the depositions of any of the
9 employees of Saveology?
10   A.   No.
11   Q.   So are you aware of any of the
12 testimony that they have provided as it
13 relates to the approval process for the
14 use of affiliates?
15   A.   No, sir.
16   Q.   Are you aware that Saveology
17 is taking the position in this lawsuit
18 that ADT would orally approve the use of
19 certain affiliates by Saveology?
20   A.   No.
21   Q.   Do you know when ADT first
22 became aware that Saveology was using
23 Paramount?
24   A.   I believe it was three weeks
25 before Desai was filed, approximately.

Page 37

RENATA BERGMAN

2    Q.   So that would be -- do you
3 have an understanding of when that would
4 have been?
5    A.   Well, Desai was March 2011, so
6 it was a few weeks prior to that filing.
7    Q.   So sometime maybe in late
8 February or early March of 2011?
9    A.   Yes, beginning of March, or
10 late February, early March.
11   Q.   And as ADT became aware of
12 Saveology's use of Paramount, what
13 response did ADT make?
14   A.   The typical complaint process,
15 to give you just a little bit of
16 understanding, is when a consumer calls
17 in a complaint we log that complaint and
18 investigate.  If they provide a caller ID
19 or the name of a third party, we tender
20 that complaint and all the details to the
21 third party.
22       So in this case we would have
23 received a complaint and tendered that
24 complaint to Saveology, and we were in
25 the midst of that investigative period,

10 (Pages 34 - 37)

Page 38

1    RENATA BERGMAN
2 getting documentation and/or feedback
3 from Saveology formally on that
4 complaint.
5    Q.  And do you know what complaint
6 that was?
7    A.  Specifically, no.  But I know
8 that shortly thereafter we were reassured
9 by Saveology that Paramount was not
10 making unsolicited outbound calls on
11 their behalf.
12   Q.  Do you know what the results
13 of the investigation into that complaint
14 were?
15   A.  Specifically, no.
16   Q.  Do you know if the person that
17 was making the complaint was either Desai
18 or Charvat, the plaintiffs in this
19 lawsuit?
20   A.  No.
21   Q.  So sometime, say, in March of
22 2011, by March of 2011 ADT was aware that
23 Saveology was using Paramount then;
24 correct?
25       MS. GOLDBERG:  Objection to

Page 39

1    RENATA BERGMAN
2    form.  You can answer.
3    A.  I would say that we had an
4 alleged complaint that was pointing to
5 the use of third parties.  We were
6 exchanging investigative information with
7 Saveology, asking them to substantiate.
8 They had responded with a reassurance
9 that Paramount was not making unsolicited
10 outbound calls on their behalf.  And we
11 didn't have a reason to doubt Saveology.
12       I think what's -- you know, I
13 think it's important to understand that
14 the complaints we tendered were
15 addressed.  Documentation was provided.
16 And there was a low number of complaints
17 involved.
18   Q.  So when you say that there
19 were investigative documents provided,
20 what documentation are you talking about?
21   A.  Well, typically we would --
22 this was primarily an email exchange to
23 start.  Our complaint team would tender
24 the alleged information about the
25 complaint, what the consumer said, who

Page 40

1    RENATA BERGMAN
2 called, what caller ID they used, did
3 they mention a company name other than
4 ADT during the conversation, and that
5 would be tendered in its entirety to the
6 third party named, or the partner named,
7 like Saveology.
8       So that would go typically to
9 Daphne Fernandes, and then Daphne was
10 given a window of opportunity to respond.
11 She would respond typically with an
12 opt-in substantiation, that the call had
13 come in to Saveology, and basically
14 demonstrate whether there was an issue, a
15 process gap, or anything like that
16 associated with the particular complaint,
17 did they make a return call, what were
18 the circumstances of that activity.
19   Q.  So as it relates to this
20 complaint in which Paramount was
21 identified and Saveology assured that
22 they weren't making outbound calls --
23   A.  That they were not.
24   Q.  -- do you know, did Saveology
25 provide substantiation of the opt-in?

Page 41

1    RENATA BERGMAN
2   A.  Saveology provided
3 documentation in response that said
4 Paramount was not making outbound calls
5 for them.
6   Q.  Are you aware of any examples
7 where there was a complaint that was
8 forwarded to Saveology where they were
9 unable to provide substantiation of the
10 opt-in?
11   A.  We have a small number of
12 complaints.  I am not.  Everything that
13 we tendered to Saveology was answered
14 either with opt-in documentation or
15 reassurance that a third party was not
16 being used, and they substantiated all
17 the compliance activity necessary to
18 satisfy the complaint.
19       Paramount, like I said, was in
20 investigation just before Desai was
21 filed, and we received assurance from
22 Saveology on that complaint.
23   Q.  I just want to make sure I
24 understood that.  Is it your
25 understanding, then, Renata, as you sit

Page 42

1  RENATA BERGMAN
2 here today, that at no point in time did
3 ADT obtain a complaint that involved
4 Saveology where Saveology was not able to
5 provide substantiation of the opt-in?
6     A.  I would say of the 19
7 complaints we had on file, they were all
8 addressed to our satisfaction, and that
9 was prior to Desai being filed and the
10 deeper investigation.
11     Q.  In approximately -- and,
12 again, the exact date doesn't matter, but
13 it's a period of about three weeks before
14 the Desai case was filed, it was at that
15 point in time when Saveology told ADT
16 that they were using Paramount?
17        MS. GOLDBERG:  Could you
18     repeat that, Jim?
19     Q.  I think you said before that
20 about three weeks before the Desai
21 litigation is where ADT received a
22 complaint that related to calls involving
23 Paramount.  Is that fair?
24     A.  Involving alleged activity
25 from a company named Paramount, yes.

Page 43

1  RENATA BERGMAN
2     Q.  And as part of the
3 investigation by ADT, did you determine
4 that Saveology was using Paramount to
5 generate leads?
6     A.  I would say that before Desai
7 was filed we got reassurance from
8 Saveology that they were not using
9 Paramount.  I think that any discovery
10 after Desai was filed might have pointed
11 to the fact that that reassurance was not
12 valid.
13     Q.  What was the assurance then?
14 Because I thought the assurance was that
15 Paramount wasn't making outbound calls,
16 as opposed to not using them.
17     A.  These partners -- it's not
18 unusual to have a relationship with third
19 parties for lead generation and web ads
20 and advertising, so that's not unusual.
21 What's the prohibition here is
22 unsolicited outbound calls.
23        So we were reassured that
24 Paramount was not involved in any
25 activity like that.  They were not acting

Page 44

1  RENATA BERGMAN
2 on Saveology's behalf and making
3 unsolicited outbound calls.
4        MR. SCHULTZ:  I apologize for
5     this, but could you read that
6     answer back, please.
7        (Requested portion of record
8     read.)
9     Q.  So is it ADT's understanding
10 that Paramount was making outbound calls?
11        MS. GOLDBERG:  Objection to
12     form.  If you could give a time
13     frame perhaps for the question.
14        MR. SCHULTZ:  Okay, we will
15     break it down.
16     Q.  At any point in time, did ADT
17 determine that Paramount was making
18 outbound calls on behalf of or for
19 Saveology?
20     A.  I can say that I think the
21 investigation demonstrated that there
22 were third parties acting on Saveology's
23 behalf that were not given express
24 written consent by ADT, so they assigned
25 responsibilities to third parties that

Page 45

1  RENATA BERGMAN
2 did not have ADT's consent.
3     Q.  And those responsibilities
4 that were being assigned, what
5 responsibilities?
6     A.  Outbound, unsolicited outbound
7 telemarketing.
8     Q.  And the third parties that
9 Saveology hired without the consent of
10 ADT to make the outbound calls were who?
11     A.  I know of Paramount and EMI.
12     Q.  Is there any others that
13 you're aware of?
14     A.  We had a complaint involving a
15 vendor Savilo.
16     Q.  And is it your understanding
17 that Savilo made outbound calls as well?
18     A.  I think that the discovery
19 from the lawsuit demonstrated that these
20 partners did not have permission, ADT's
21 express written consent, to have any
22 responsibilities assigned to them under
23 the contract by Saveology.
24     Q.  And those responsibilities
25 would have been related to making

Page 46

1  RENATA BERGMAN
2  outbound calls?
3     A.   Unsolicited outbound
4  telemarketing, yes.
5     Q.   Got it, okay.
6          And so I've been dancing
7  around, I'm trying to get an answer to
8  this question, though.  Did ADT become
9  aware that Saveology was using Paramount
10 then in approximately March of 2011,
11 three weeks before the Desai lawsuit?
12    A.   ADT received an alleged
13 complaint that a company named Paramount
14 was involved in a telemarketing call that
15 we tendered to Saveology.  So at that
16 point we tendered the complaint to
17 Saveology.  Daphne Fernandes responded
18 and reassured us that Paramount was not
19 involved.
20    Q.   Did Daphne advise ADT that
21 they were using Paramount but just not to
22 make outbound calls, or did she say --
23    A.   No, sir.
24    Q.   -- that Saveology was not
25 using Paramount?

Page 47

1  RENATA BERGMAN
2     A.   Do you have a document you
3  want me to look at and get familiar with
4  on this particular exchange?  Would that
5  be helpful?
6     Q.   No.  If there's a document you
7  think exists, that would be fine.  But it
8  seems to me, and I'm not trying to be
9  difficult, Renata, but it seems to me
10 like you are trying to draw a distinction
11 between what role Paramount was being
12 used as.  My question is just more
13 general.
14         What I want to know is when
15 did ADT first become aware that Saveology
16 was using Paramount in any way to help
17 effectuate the ADT Saveology contract?
18    A.   After Desai was filed.
19    Q.   After Desai was filed?
20    A.   Yes, sir.  An alleged
21 complaint is exactly that.  We tender it
22 to the partner and give them an
23 opportunity to provide substantiation,
24 and Saveology did, and reassured us they
25 were not using Paramount.

Page 48

1  RENATA BERGMAN
2     Q.   How long after the Desai
3  lawsuit was filed, then, did ADT become
4  aware that Saveology was using Paramount?
5     A.   That was part of the in-depth
6  discovery and investigation that was a
7  part of the lawsuit, so I couldn't tell
8  you.  But I know that it was after March
9  2011, sometime after March.
10    Q.   The reason why I'm asking, I'm
11 just wondering, how far after, do you
12 know?  And if you don't know, don't
13 speculate.
14    A.   No.  I don't.  I'm sorry, I
15 don't.
16    Q.   What did ADT find out after
17 the lawsuit, while doing a deep dive,
18 that Saveology was having Paramount do?
19    A.   I don't know the specifics.
20 As I said, we did ultimately audit
21 Saveology.  They were required to stop
22 using all third parties that were not
23 given express written consent by ADT,
24 submit this detailed form on those
25 parties, and ADT reviewed those requests

Page 49

1  RENATA BERGMAN
2  for use of those parties.  So that's what
3  I know.
4     Q.   Got it.
5          This audit that was done of
6  Saveology by ADT, were you involved in
7  that audit?
8     A.   No, sir.
9     Q.   Are you aware of the results
10 of that audit?
11         MS. GOLDBERG:  Objection to
12    the extent it calls for
13    attorney-client privilege.
14         You can answer without
15    revealing --
16    A.   What I know is when it was
17 conducted, and that it was conducted by a
18 law firm.  That's the extent of what I
19 know.
20    Q.   Do you know what law firm?
21    A.   No, sir.
22    Q.   Did ADT, independent of
23 anything that they were told by a lawyer,
24 but did ADT reach any conclusions as to
25 whether or not Elephant Group was

Page 50

RENATA BERGMAN

1
2 complying with ADT's telemarketing rules
3 and guidelines?
4     A.  As a result of that audit?
5     Q.  Yes.
6     A.  I don't have that information.
7     Q.  Independent of that audit, in
8 any other capacity, did ADT reach any
9 conclusions as to whether or not
10 Saveology was operating in compliance
11 with ADT's telemarketing rules and
12 guidelines?
13         MS. GOLDBERG:  Objection to
14     the extent it calls for a legal
15     conclusion.
16         You can answer it, to the
17     extent you can answer it, without
18     legal knowledge.
19     A.  I would say that, prior to
20 Desai being filed, ADT had a small number
21 of complaints involving Saveology.  They
22 were tendered to Saveology for
23 substantiation.  In each case they
24 provided that documentation,
25 substantiated the compliance activity

Page 51

RENATA BERGMAN

1
2 that occurred, and we had no reason to
3 doubt Saveology up to the point that the
4 lawsuit was filed.
5     Q.  Did the filing of the lawsuit
6 change that conclusion?
7     A.  The filing of the lawsuit
8 initiated an( in-depth investigation, and
9 as a result the facts, the discovery that
10 occurred, at least helped ADT understand
11 that a portion of the contractual
12 relationship was not being met, the
13 express written consent.
14     Q.  And what portion of the
15 contractual relationship wasn't being
16 met, according to ADT?
17     A.  The express written consent to
18 assign any responsibilities under the
19 contract to third parties had not been
20 met.
21     Q.  Any others?
22     A.  Not that I'm aware of.
23     Q.  And I think we talked about
24 this a little bit before, but I want to
25 make sure I fully understand and give you

Page 52

RENATA BERGMAN

1
2 an opportunity to fully answer the
3 question.
4         Saveology's failure to comply
5 with ADT's telemarketing rules and
6 guidelines related to obtaining express
7 written consent, that had to do with
8 Saveology hiring vendors or affiliates to
9 assist them; correct?
10         MS. GOLDBERG:  Objection to
11     form.
12         MR. SCHULTZ:  That's fair.
13     Let me try it a different way.
14     Q.  What was Saveology's
15 shortcomings, according to ADT, in
16 failing to obtain the express written
17 consent, in relation to what third
18 parties?
19         MS. GOLDBERG:  Objection to
20     form.  I'm sorry, go ahead if you
21     understand the question.
22     Q.  If you don't understand the
23 question, just let me know, Renata.
24     A.  I would say that this program
25 did not permit Saveology to use third

Page 53

RENATA BERGMAN

1
2 parties for unsolicited outbound
3 telemarketing unless they had express
4 written consent from ADT to do so.
5     Q.  And I guess what I'm asking
6 is, what entity did ADT identify as
7 having been used by Saveology to make the
8 unsolicited outbound telemarketing calls?
9     A.  I don't have firsthand
10 knowledge of the results of the
11 investigation of the audit.  I know that
12 Paramount and EMI were two of the company
13 names involved in questionable
14 activities.
15     Q.  Other than Paramount and EMI,
16 is ADT aware of any other third parties
17 that Saveology was using to make
18 unsolicited outbound telemarketing calls?
19     A.  Only the name I gave already,
20 which is Savilo.  We had one complaint
21 involving Savilo.
22     Q.  Renata, I want to shift gears
23 and kind of move past the last subject
24 and move on to the FTC consent decree
25 with ADT.  Okay?

Page 54

1      RENATA BERGMAN
2   A.   Yes.
3   Q.   Again, just to be clear, this
4  is one of the topics you are prepared to
5  testify about; right?
6   A.   Yes, sir.
7   Q.   I don't think I have a lot of
8  questions, but I just want to understand,
9  were you employed by ADT back in 2007?
10  A.   Yes, sir.
11  Q.   And what was your position
12 back then?
13  A.   I was a senior business
14 analyst involved with the deployment of
15 our telemarketing processes at ADT.
16  Q.   Were you involved in any of
17 the litigation related to the FTC
18 investigation?
19  A.   I was not involved in the
20 litigation, no.
21  Q.   When did you first become
22 aware of the consent decree?
23  A.   I was aware of it -- I was
24 aware of the discussions underway prior
25 to the consent decree being issued. Once

Page 55

1      RENATA BERGMAN
2  it was issued, I was aware of the
3  reporting requirements in the consent
4  decree.
5   Q.   But were you involved in any
6  way as far as the discovery or
7  investigation prior to the consent decree
8  being entered?
9   A.   No, sir.
10  Q.   Do you know what type of
11 investigation this was of the FTC? Was
12 it like a CID, or do you know, a
13 subpoena?
14  A.   I wouldn't know the legal form
15 it took. I know that it was a request
16 for information, basically.
17  Q.   And do you know, information
18 related to what?
19  A.   ADT's -- actually there was a
20 request for telemarketing records from
21 ADT's national sales center in
22 Jacksonville.
23  Q.   So was the FTC investigation
24 related just to the direct marketing that
25 was being done by ADT?

Page 56

1      RENATA BERGMAN
2   A.   That's the information they
3  requested.
4   Q.   As far as you understand it,
5  was that the entire scope of the
6  information that they requested?
7   A.   Well, it's fair to say that
8  prior to the consent decree being issued
9  it was the primary information, actual
10 outbound telemarketing transaction
11 records from ADT's national sales center.
12  Q.   Was ADT doing the indirect
13 type of marketing that we talked about
14 earlier in 2007?
15  A.   You mean --
16  Q.   Where they were using vendors
17 such as Saveology, Trident and Security
18 Choice.
19  A.   I'm trying to think back. I'm
20 trying to recall. So the consent decree
21 was primarily direct. We were
22 definitely -- we had dealers that were
23 actually involved in the indirect
24 program. I couldn't tell you if Trident
25 and Security Choice were active in 2007.

Page 57

1      RENATA BERGMAN
2   Q.   Do you know if Saveology was?
3   A.   I believe it was 2008 when
4  Elephant Group actually became an ADT
5  partner. I think it was May 2008.
6   Q.   Just so I'm clear, and I think
7  you just said this, but are you aware of
8  when Trident or Security Choice became a
9  partner?
10  A.   I'm not.
11  Q.   Do you know if it was before
12 or after Elephant Group, or Saveology,
13 for either one of those?
14  A.   I don't, I'm sorry, no.
15  Q.   That's fine.
16     What was the end result of the
17 FTC investigation?
18  A.   We were obligated for a
19 five-year period to provide periodic
20 reporting on various telemarketing
21 activities, was primarily the outcome,
22 for a five-year window.
23  Q.   And what was the nature of the
24 reporting? I'm sorry.
25  A.   We had to report on ADT's

Page 58

1  RENATA BERGMAN
2 direct telemarketing activities. We did
3 have to report on the telemarketing
4 activities of our dealers. We had to
5 report quarterly telemarketing
6 information on anybody marketing on our
7 behalf.
8      We had a series of, you know,
9 reporting obligations about any executive
10 changes in the company, and things like
11 that, just a standard in one of these
12 consent decrees. They wanted some direct
13 demonstration of the oversight in this
14 program.
15    Q.  So this direct reporting would
16 have occurred from roughly 2007 through
17 2012?
18    A.  Yes, November '07, actually it
19 was November 27, 2007, to November 27,
20 2012. There were various frequencies of
21 different reports.
22    Q.  And that reporting is now
23 ended?
24    A.  The obligation to report has
25 ended. There's a four-year lookback,

Page 59

1  RENATA BERGMAN
2 which we are in that active period. FTC
3 can ask for information from that same
4 window for another four years.
5    Q.  I want to make sure I
6 understood that. So from November 2012,
7 for the next four years, the FTC could
8 ask for information, but it would be
9 related to telemarketing done still
10 between 2007 and 2012?
11    A.  Yes.
12    Q.  Would the reporting that ADT
13 gave to the FTC include the use of
14 Saveology or Elephant Group?
15    A.  No, because there was no
16 outbound telemarketing involved.
17    Q.  So did ADT at any point in
18 time report to the FTC the use of
19 Saveology?
20    A.  No, I don't believe so.
21    Q.  Did ADT ever report to the FTC
22 the use of Trident or Security Choice?
23    A.  I don't believe -- those were
24 considered lead generation providers for
25 the dealers, and they were not

Page 60

1  RENATA BERGMAN
2 necessarily in the classification of
3 reporting obligations.
4    Q.  As a result of the FTC consent
5 decree, did ADT make any changes to its
6 telemarketing, indirect telemarketing
7 process?
8    A.  I would say that our program
9 is designed to identify how to strengthen
10 it, you know, continuously. So it's a
11 program that we're always looking to
12 improve. But we had to put some specific
13 processes in place to capture some of the
14 information that we may not have been
15 capturing up to that point, because the
16 obligations were rather extensive and
17 strenuous.
18      So we did actually expand the
19 obligations of our complaint team, and
20 make them very specialized, to ramp up
21 for the consent decree. One of the
22 things we were doing was reporting every
23 complaint. Every complaint we were
24 tendered during that time for U.S.
25 residential telemarketing was required.

Page 61

1  RENATA BERGMAN
2      So we did, and I guess in
3 context, while we might not have reported
4 on explicit activity by Trident,
5 Saveology or Security Choice, if there
6 were complaints related to those
7 partners, and they were alleged in the
8 activity, that information, all of those
9 investigations and all the details, were
10 required by the FTC.
11    Q.  Since the expiration of the
12 five-year reporting period in November of
13 2012, has the FTC asked for any
14 additional information?
15    A.  No.
16    Q.  All quiet on that front?
17    A.  Yes.
18    Q.  Since November of 2012, has
19 ADT gotten any others or additional, you
20 know, similar investigation demands or
21 any other requests for information
22 related to ADT's telemarketing?
23    A.  From the FTC?
24    Q.  Yes.
25    A.  No.

16 (Pages 58 - 61)

Veritext Florida Reporting Co.

800-726-7007                                                          305-376-8800

Page 62

1 RENATA BERGMAN
2 Q. What about from any other
3 federal government agencies?
4 A. No, not that I'm aware of, no.
5 Q. Has ADT ever received any
6 complaints or investigations or subpoenas
7 or the like from any states?
8 A. ADT has an ongoing
9 relationship with AGs around the country.
10 We have -- in tandem we are very often
11 provided complaint information involving
12 ADT's brand that we actually investigate.
13 We are kind of the investigative
14 legwork for the AGs, and we provide all
15 the information on those
16 investigations, and very often it's
17 enough information for them to
18 prosecute perpetrators, bad actors in
19 the industry. So it's not unusual for
20 us to be communicating with AGs in this
21 space.
22 Q. Is that generally for all 50
23 state AGs, or is there certain AGs that
24 ADT has this relationship with?
25 A. Well, I would say that we work

Page 63

1 RENATA BERGMAN
2 with Mississippi, we work with Indiana.
3 I'd say there's probably a handful that
4 we are active with on a regular basis.
5 Q. Since 2007, has ADT entered
6 into any sort of consent orders or
7 settlements with any state AGs related to
8 its telemarketing practices?
9 A. No. Anything that was out
10 there was dismissed, specifically, and we
11 have managed to satisfy the AGs for what
12 they have tendered and given them
13 information, so we're kind of helping
14 their effort.
15 Q. Is there any sort of ongoing
16 reporting obligations that ADT has with
17 any of the state AGs, similar to the
18 reporting obligations that you had with
19 the FTC?
20 A. No, sir.
21 Q. Has there been any monetary
22 penalties or settlements between ADT and
23 any state AGs since 2007?
24 A. Not that I'm aware of.
25 MR. SCHULTZ: Renata, I'm sure

Page 64

1 RENATA BERGMAN
2 this is going to break your heart,
3 but that's all I've got for you.
4 THE WITNESS: Thank you.
5 MR. SCHULTZ: I appreciate
6 your time. Thank you.
7 (Time noted: 10:07 a.m.)
8
9
10 _____
11 RENATA BERGMAN
12
13 Subscribed and sworn to before me
14 this _____ day of _____, 2014.
15
16 _____
17
18
19
20
21
22
23
24
25

Page 65

1 RENATA BERGMAN
2 I, JACK FINZ, Shorthand Reporter,
3 certify that I was authorized to and
4 did stenographically report the
5 deposition of RENATA BERGMAN, the
6 witness herein, on June 27, 2014; that
7 a review of the transcript was
8 requested; that the foregoing pages
9 numbered from 1 through 64, inclusive,
10 is a true and complete record of my
11 stenographic notes of the deposition by
12 said witness; and that this computer-
13 assisted transcript was prepared under
14 my supervision.
15 I further certify that I am not a
16 relative, employee, attorney or counsel
17 of the parties, nor am I a relative or
18 employee of any of the parties'
19 attorney or counsel connected with the
20 action.
21 DATED this ___day of_____, 2014.
22
23 _____
24 JACK FINZ
25