# Exhibit 6

**In The Matter Of:**

*Vishva Desai v.*
*ADT Security Services*

---

*Videotaped Deposition of Ryan M. Neill*
*July 26, 2012*

---



1

UNITED STATES DISTRICT COURT
IN AND FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION
HONORABLE ELAINE E. BUCKLO
CASE NO. 11 C 1925/MAGISTRATE KEYS


VISHVA DESAI, on behalf of herself
and others similarly situated, et al.,


       Plaintiffs,

-vs-

ADT SECURITY SERVICES, INC., et al.,

       Defendants.
_____/



VIDEOTAPED DEPOSITION OF RYAN M. NEILL
TAKEN AT THE INSTANCE OF THE DEFENDANTS

Thursday, July 26, 2012
9:03 a.m. - 11:51 a.m.




250 Australian Avenue South
Suite 1504
West Palm Beach, Florida 33401




Reported By:
Debra Duran-Bornstein, RPR
Notary Public, State of Florida
Debra Duran & Associates

2

APPEARANCES:

On behalf of the Plaintiffs:

    ANTHONY PARONICH, ESQUIRE
    BRODERICK LAW, P.C.
    125 Summer Street
    10th Floor
    Boston, MA  02110
    Phone: 508-221-1510

On behalf of the Plaintiffs:

    MATTHEW MCCUE, ESQUIRE
    LAW OFFICE OF MATTHEW MCCUE
    340 Union Avenue
    Framingham, MA  01702
    Phone: 508-498-3795

On behalf of the Defendant: (Elephant Group)

    DANIEL PISANI, ESQUIRE
    SESSIONS, FISHMAN, NATHAN & ISREAL
    55 West Monroe Street
    Suite 1120
    Chicago, Illinois  60603
    Phone: 312-578-0990

On behalf of the Defendant: (Elephant Group)

    JOSHUA SPOONT, ESQUIRE
    GARY BETENSKY, ESQUIRE
    RICHMAN GREER, P.A.
    250 Australian Avenue South
    Suite 1504
    West Palm Beach, Florida  33401
    Phone: 561-803-3500

---

3

On behalf of the Defendant: (ADT)

    MICHAEL E. BAUGHMAN, ESQUIRE
    PEPPER HAMILTON, LLP
    3000 Two Logan Square
    Eighteenth and Arch Streets
    Philadelphia, PA  19103
    Phone: 215-981-4000

On behalf of the Defendant: (Eversafe/Safe Streets)

    QUINTIN F. LINDSMITH, ESQUIRE
    100 South Third Street
    Columbus, OH  43215
    Phone: 614-227-2300

ALSO PRESENT:

    Robert Neill, Esq.
    Hannah S. Lim, Esq. (Tyco)
    Jeff Abbot, Visual Evidence

---

4

- - -
I N D E X
- - -

WITNESS:      DIRECT    CROSS   REDIRECT   RECROSS

RYAN NEILL

BY MR. PISANI:     7
BY MR. BAUGHMAN:         29
BY MR. LINDSMITH:        69
BY MR. PARONICH:         71
BY MR. BAUGHMAN:                        126

- - -
DEFENDANTS' EXHIBITS
- - -

NUMBER           DESCRIPTION          PAGE

DEFENDANTS' EX. 1    PURCHASE ORDER       16
DEFENDANTS' EX. 2    ADDENDUM TO AFFILIATE  19
                   AGREEMENT
DEFENDANTS' EX. 3    AFFIDAVIT          25
DEFENDANTS' EX. 4    E-MAIL DATED 4-13-11   44
DEFENDANTS' EX. 5    E-MAIL DATED 6-10-11 FROM 53
                   DAPHNE FERNANDES

PLAINTIFFS' EXHIBITS

NUMBER           DESCRIPTION          PAGE

PLAINTIFFS' EX. 6    E-MAIL DATED 6-20-11 FROM 78
                   DAPHNE FERNANDES
PLAINTIFFS' EX. 7    E-MAIL DATED 4-6-11 FROM  85
                   DAPHNE FERNANDES

---

5

PLAINTIFFS' EX. 9    DAPHNE FERNANDES
                   LIST OF NAMES/PHONE   105
                   NUMBERS
PLAINTIFFS' EX. 10   REVENUE SPREADSHEET   110
PLAINTIFFS' EX. 11   E-MAIL DATED 4-20-11 FROM 119
                   DAPHNE FERNANDES

6

```
1              P R O C E E D I N G S
2                    -  -  -
3        Videotaped Deposition taken before Debra
4    Duran-Bornstein, Registered Professional Reporter and
5    Notary Public in and for the State of Florida at Large,
6    in the above cause.
7                    -  -  -
8        THE VIDEOGRAPHER:  This is the 26th day of
9    July, 2012.  The time is 9:03 a.m.  This is the
10   videotaped deposition of Ryan M. Neill in the
11   matter of Desai et al versus ADT Security Services,
12   et al.
13        This deposition is being held at 250
14   Australian Avenue South, West Palm Beach, Florida.
15   My name is Jeff Abbot.  I'm the videographer
16   representing Visual Evidence, Incorporated.
17        Would the attorneys please announce their
18   appearances for the record?
19        MR. SPOONT:  Josh Spoont of Richman Greer on
20   behalf of Elephant Group.
21        MR. PISANI:  Daniel Pisani of the Sessions
22   firm for Elephant Group.
23        MR. BAUGHMAN:  Mike Baughman from Pepper
24   Hamilton, LLP for ADT.
25        MR. LINDSMITH:  Quentin Lindsmith, Bricker &
```

7

```
1    Eckler here for Eversafe, now Safe Streets.
2        MR. MCCUE:  Matthew McCue for the plaintiffs,
3    Vishva Desai and Philip Charvat.
4        MR. PARONICH:  Anthony Paronich of Broderick
5    Law also for the plaintiffs.
6        MR. NEILL:  I'm just an observer.
7    Thereupon,
8              (RYAN NEILL)
9    having been first duly sworn or affirmed, was examined
10   and testified as follows:
11            DIRECT EXAMINATION
12   BY MR. PISANI:
13       Q.  Could you please state your full name and
14   spelling both your first and last name?
15       A.  Ryan N. Neill.  N-e-i-l-l.
16       Q.  Thank you.  Let the record reflect that this
17   is the deposition of Ryan Neill taken pursuant to
18   notice.
19       This deposition is being taken in accordance
20   with the Federal Rules of Civil Procedure and all
21   applicable rules of the US District Court for the
22   Northern District of Illinois.
23       Mr. Neill, my name is Dan Pisani.  We were
24   introduced previously before the deposition began.  I'm
25   going to be asking you some questions today, and I'm
```

8

```
1    sure the other attorneys in the room are going to be
2    asking you questions as well.
3        I just want to go over a few of the ground
4    rules for you.  As you can see, we have a court
5    reporter, Debra, here that is taking down everything
6    that we say in addition to a videographer.  All of your
7    answers do have to be out loud, okay?
8        A.  Sure.
9        Q.  You're nodding your head and I understand you
10   agree with what I'm saying, but just please make sure
11   that all your responses are verbal.
12       If you don't understand one of my questions or
13   one of the other questions posed to you by another
14   attorney, just feel free to say so and we will try to
15   rephrase it or restate so we can understand one another.
16       A.  Sure.
17       Q.  Okay.  If, at any time, you want to take a
18   break just say so and we can take a break and go off the
19   record, okay?
20       A.  Sure.
21       Q.  Can you give us your date of birth?
22       A.  January, 25th, 1974.
23       Q.  And your name is Ryan Neill.  Have you been
24   known by any other names?
25       A.  No.
```

9

```
1        Q.  Where do you currently live?
2        A.  I live at 2255 Date Palm Road.
3        Q.  In what city?
4        A.  Boca Raton.
5        Q.  And how long have you lived at that address?
6        A.  Four months.
7        Q.  And who do you live there with?
8        A.  My wife, Andrea, and my two children.
9        Q.  As you sit here today do you have any current
10   plans of moving from that address?
11       A.  None as of today.
12       Q.  Can you tell us about your educational
13   background?  How far did you go in school?
14       A.  I have a bachelor's degree from C.W. Post.  I
15   have a two year degree from Nassau Community College.
16   My degrees are in psychology and sociology.
17       Q.  When did you obtain those degrees?
18       A.  C.W. Post.
19       Q.  What year?
20       A.  Oh, '98 I believe I completed.
21       Q.  And are you currently employed?
22       A.  Yes.
23       Q.  And how are you employed presently?
24       A.  Self.
25       Q.  Do you own a business at the present time?
```

10

```
1      A.   Yes.
2      Q.   And what is the business that you're currently
3  involved in?
4      A.   The name of it is Altitude Group.
5      Q.   Is that a corporation, LLC?
6      A.   It's an LLC.
7      Q.   Florida LLC?
8      A.   Yes.
9      Q.   What kind of business is Altitude Group?
10      A.   Marketing.
11      Q.   And how long has Altitude Group been in
12  business?
13      A.   I believe about a little under two years.
14      Q.   Are there any other members of the Altitude
15  Group, or are you the only member?
16      A.   I'm the only member.
17      Q.   You were previously involved in a business
18  known as Paramount Media Group, correct?
19      A.   Correct.
20      Q.   Was that an LLC?
21      A.   Yes.
22      Q.   A Florida LLC?
23      A.   Yes.
24      Q.   Were you the only member of that LLC?
25      A.   I believe my wife was a member.  I'm not
```

11

```
1  100 percent on that.
2      Q.   And when was that LLC formed?
3      A.   I believe Paramount was formed in October of
4  '10 to the best of my knowledge.
5      Q.   And is that LLC still operating?
6      A.   No.
7      Q.   Was it dissolved?
8      A.   Yes.
9      Q.   And when was it dissolved?
10      A.   I don't have an exact date.  Somewhere within
11  the last six months.  The company had no assets, it had
12  no business.
13      Q.   So sometime in the six months prior to today?
14      A.   I believe so to the best of my knowledge.
15      Q.   And when you dissolved Paramount did you file
16  something with the State of Florida?
17      A.   Yes.  The person who managed the books
18  obviously did all of that.
19      Q.   And who is that person?
20      A.   Vanessa Autray.
21      Q.   Can you spell the last name?
22      A.   A-u-t-r-a-y.
23      Q.   And that's somebody you hired to manage the
24  books or was --
25      A.   Yeah, someone that helps me from time-to-time
```

12

```
1  with books, QuickBooks, things like that.
2      Q.   When did -- so you dissolved the LLC sometime
3  in the last six months.  When did you actually stop
4  performing business with Paramount Media Group?
5      A.   I don't have an exact date.  You know,
6  basically what occurred here put the company out of
7  business.
8      Q.   When you say "what occurred here," the
9  situation behind the lawsuit we're here about today?
10      A.   Yeah.  I mean, we were a new company.  We were
11  trying to get off the ground and just didn't make it.
12      Q.   Now, the business of Paramount Media Group was
13  alarm sales?
14      A.   Alarm sales.
15      Q.   And as I understand it you operated an inbound
16  call center?
17      A.   Correct.
18      Q.   And tell me how that worked.  What did you do
19  at the inbound call center?
20      A.   You buy leads.  You take calls.  You try and
21  convert them to sales.  You try and turn the sales into
22  revenue.  Pay your staff.  You get up again the next day
23  and try it again.
24      Q.   And how many staff members did you have at
25  Paramount Media Group?
```

13

```
1      A.   I would say anywhere between ten and 18, you
2  know, I couldn't give you an exact number.  Sales staff
3  in South Florida is a very tough thing to maintain.
4      Q.   So it fluctuated over the course of the --
5      A.   Yeah.
6      Q.   You say that you -- you mentioned buying
7  leads, correct?
8      A.   Uh-huh.
9      Q.   Can you tell us what that means?
10      A.   Sales is very simple.  You know, you buy leads
11  from people that generate their own leads.  You utilize
12  those leads for a conversion, and you try to turn a
13  conversion into revenue.  So I mean, buying leads is
14  just buying leads.  I don't know how to elaborate on it
15  further.
16      Q.   Okay.  And when you bought leads you bought
17  them from a number of different companies?
18      A.   Lead vendors.
19      Q.   And was one of the lead vendors that you
20  bought leads from a company called EMI?
21      A.   Yes.
22      Q.   Did you buy leads from other companies as
23  well?
24      A.   Yeah.
25      Q.   What other companies did you buy leads from?
```

## 14

```
1        A.   You know what?  I don't even have the --
2   buying leads is very come and go.  You get an insertion
3   order, you purchase the leads, you try the lead.  If
4   they're good you utilize the leads.  I don't necessarily
5   have that information.
6        Q.   How did you first become involved with a
7   company known as EMI?
8        A.   I saw on a Craig's list ad home security
9   leads.  I called the person.  The person answered the
10  phone.  They said, yeah, anyone who is big in security
11  uses us.  I started using them.
12       Q.   And when was that call, do you recall when
13  that --
14       A.   I don't have a date for it.
15       Q.   Do you remember who you spoke with at EMI?
16       A.   I believe it was Chris Long.
17            MR. LINDSMITH:  I'm sorry, is that Chris Long?
18            THE WITNESS:  I believe so, yeah.  To the best
19  of my recollection.
20  BY MR. PISANI:
21       Q.   And after this conversation with Chris Long,
22  what did you do?  How did you further the relationship
23  with EMI?
24       A.   I said send me a purchase order.
25       Q.   Okay.
```

## 15

```
1        A.   I'll, you know, tell me a bit about your
2   leads.  He told me they're live transfer leads coming
3   from an agent.  He told me that they were all compliant
4   to standards, opt-in, his data, and that his agents
5   call, warm it up, like a warm transfer, which is a type
6   of lead, and transfer it to me.  To my agent.  So it was
7   coming from a live person.
8        Q.   So somebody at EMI would transfer a live phone
9   call to somebody at Paramount Media Group?
10       A.   Correct.  I had someone, a live agent would
11  say "I have Bill Smith on the line.  He has interest in
12  a home security system," and transfer it.
13       Q.   And then you would pay EMI for each --
14       A.   Per lead.
15       Q.   So for each phone call that was transferred
16  into Paramount Media Group you would pay for that phone
17  call?
18       A.   Correct.
19       Q.   How much would you pay for each phone call?
20       A.   I believe it was like 30 bucks or 25 bucks.  I
21  don't have an exact number.  But that's pretty much the
22  going rate.  A warm transfer, in any industry, can range
23  from $25 to $40.
24       Q.   And I'm going to show you a document that
25  we'll go ahead and mark.
```

## 16

```
1            (Defendants' Exhibit No. 1 was marked for
2   identification.)
3            THE WITNESS:  Yeah, it's a purchase order.
4            MR. PISANI:  Okay.
5            MR BAUGHMAN:  What is this marked?
6            MR. PISANI:  It's marked as Exhibit 1.
7            MR BAUGHMAN:  Just 1?
8   BY MR. PISANI:
9        Q.   So Mr. Neill, what we have before you is a
10  document marked as Exhibit 1.  You said this is a
11  purchase order?
12       A.   Correct.
13       Q.   And at the top of it it reads, transfer
14  service order.  Is that another name for a purchase
15  order?
16       A.   Yes.
17       Q.   And so according to this document you
18  purchased 100 total transfers?
19       A.   Yes.
20       Q.   And then you paid EMI $20 per phone call that
21  was transferred?
22       A.   Correct.
23       Q.   And was this the only type of written
24  agreement that you had, or document that you had with
25  EMI?
```

## 17

```
1        A.   Yes.
2        Q.   Now, when you had this conversation with Chris
3   Long initially, he told you that they were fully
4   compliant, correct?
5        A.   Yes.
6        Q.   Did he tell you they complied with all federal
7   regulations regarding telemarketing?
8        A.   Yes.  When someone says to you that everything
9   we do is compliant, you umbrella the situation as a
10  business owner in your mind.
11       Q.   And other than that did you have any knowledge
12  regarding how EMI actually obtained its own leads?
13       A.   To the best of my knowledge I was under the
14  impression that EMI was dialing outbound with their
15  agents as it appeared, because they were sending you a
16  live transfer from a live person on their own opt-in
17  data.
18       Q.   You didn't know, though, that EMI was
19  robo-dialing, did you?
20       A.   No.
21       Q.   And you did not know that EMI was sending
22  prerecorded messages to consumers, did you?
23       A.   No.
24       Q.   After you received these transfers into your
25  inbound call center what would you do with those phone
```

18

1   calls?
2       A.   I would explain the product, which we were
3   selling, you know, it started out as alarms.  I sold
4   some alarm for a company called Protect America.  And
5   then we moved to -- after we signed up with Saveology we
6   moved to the ADT product, which just seemed to -- people
7   have more recognition of it.  We would tell them, hey,
8   this is what you get, this is how it works, come out to
9   your house, we install it.  Very simple, very
10  straightforward.
11      Q.   And so you sold, you said you sold, basically,
12  two different products, Protect America and ADT?
13      A.   (Nodding head.)
14      Q.   Is that "yes?"
15      A.   Yes.
16      Q.   Did you sell any other products during the
17  course of your involvement with Paramount Media Group?
18      A.   We sold -- we sold Dish network for one week.
19      Q.   Now, you mentioned a relationship with
20  Saveology.
21      A.   Uh-huh.
22      Q.   Correct?  Yes?
23      A.   Correct.  Yes.
24      Q.   And you entered into an affiliate agreement
25  with Saveology?

19

1       A.   That's correct.
2            (Defendants' Exhibit No. 2 was marked for
3   identification.)
4   BY MR. PISANI:
5       Q.   Mr. Neill, what I've just shown you is a
6   document marked as Exhibit 2.  Do you recognize that
7   document?
8       A.   Yes, I do.
9       Q.   This is an addendum to the affiliate agreement
10  you had with Saveology?
11      A.   Yes.
12      Q.   And on the first page of that document it has
13  your signature, correct?
14      A.   Correct.
15      Q.   And then on the bottom left corner of each
16  page of the document it has your initials, correct?
17      A.   Correct.
18      Q.   And when you entered into your agreement with
19  Saveology, you knew that there were certain rules and
20  regulations that you were required to comply with,
21  correct?
22      A.   Correct.
23      Q.   And ADT had specific marketing guidelines that
24  needed to be complied with as well, correct?
25      A.   Correct.

20

1       Q.   Those marketing guidelines were lined out in
2   this Exhibit 2, correct?
3       A.   Correct.
4       Q.   If you turn to the third page of that document
5   you see a section that's referenced "telemarketing
6   guidelines," correct?
7       A.   Correct.
8       Q.   And under the terms of your agreement with
9   Saveology one of the requirements was that you make no
10  unsolicited outbound telephone calls, correct?
11      A.   Correct.
12      Q.   And during the course of Paramount Media Group
13  you didn't make any out -- unsolicited outbound
14  telephone calls trying to sell ADT products, did you?
15      A.   Correct.
16      Q.   And this agreement also requires that you not
17  use any prerecorded messages in connection with any
18  telemarketing services on ADT's behalf, correct?
19      A.   That's correct.
20      Q.   And during the course of your relationship
21  with Saveology you didn't use any prerecorded messages,
22  did you?
23      A.   That's correct.  I did not.
24      Q.   At any point while you were operating
25  Paramount Media Group did you ever make any outbound

21

1   sales calls?
2       A.   Any number that was dialed outbound was a
3   redial on a number that came in.  So realistically the
4   answer to your question, if we spoke to Bill Smith
5   hypothetically and he said call me back at five, yeah,
6   we're -- if that's what you classify.
7       Q.   So it would be only in response to somebody
8   you had already spoken with?
9       A.   All of our dialing information was information
10  that had came in and if it went back out, I mean, it
11  depends on how you classify it.
12      Q.   Let me put it to you this way:  At any point
13  while you were operating Paramount Media Group did you
14  make any cold sales calls outbound?
15      A.   No.  No.  No.
16      Q.   When did you first become aware that EMI was
17  using prerecorded messages?
18      A.   I'm not -- I wasn't aware they were using them
19  so I can't speak for what other people do.
20      Q.   So at no point while you were operating
21  Paramount Media Group and obtaining transfers from EMI
22  were you aware that EMI was using prerecorded messages,
23  correct?
24      A.   No.
25      Q.   That's correct, you were not aware of that?

22

1  A.  I mean, the reality of -- I'm going to retort
2  back to my question, I don't know what EMI did.  Did I
3  come to a point where, you know, when I had an issue
4  with a person by the name of Jay Conner, is the first
5  time that I ever was aware of anything that could have
6  been problematic.
7       Realistically as I investigated, you know, he
8  was -- this is a professional telemarketing-type of
9  person that -- he's a scam artist.  So that was the
10 first time where I felt there was smoke which, you know,
11 there's fire.
12      Q.  And Jay Conner was somebody that had filed a
13 lawsuit or made a claim?
14      A.  Yeah.  He's an individual that sits home and
15 puts fake opt-in information in, you know, websites of
16 interest and he does this for a living.
17      Q.  And do you know when that occurred, when you
18 found out about this Jay Conner?
19      A.  The date should be -- I don't have the date in
20 my head.  It should be in the information that has been
21 sent to everyone here.
22      Q.  So after you had this involvement with Jay
23 Conner, did he contact you directly, Jay Conner?
24      A.  Oh, yeah.  He was extorting me.
25      Q.  And what did he tell you?

23

1  A.  He told me that someone called him with a
2  prerecorded message.  At that point I knew protocol was
3  to request the information and, you know, I got his
4  opt-in information.  And I called my legal counsel.
5  And, you know, I just found out that this guy does this
6  all over the country all day for a living.
7       So I settled the issue with him, and like I
8  said, where there's smoke there's fire.  And that was
9  the tenure, I notified Saveology what I was told, but
10 once again I don't know what they did.  For all I know
11 this guy just opted in, got a phone call, and felt like
12 messing with somebody.
13      Q.  And after you found out this information
14 related to Jay Conner, is that when you ended your
15 relationship with EMI?
16      A.  Uh-huh.
17      Q.  Is that a "yes?"
18      A.  Yes.  There was obviously an investigation at
19 the point.  You know, I notified Saveology, and they
20 said terminate the relationship and I did.
21      Q.  Because you knew pursuant to your agreement
22 with Saveology that you were not allowed to use
23 prerecorded messages, correct?
24      A.  That is correct.
25      Q.  During the course of this litigation you've

24

1  spoken to some of the lawyers involved in this case,
2  correct?
3       A.  A little bit of everybody.
4       Q.  Okay.  And you spoke to counsel for the
5  plaintiffs in this case, right?  Do you remember
6  speaking with --
7       A.  These guys?
8       Q.  Anthony Paronich?
9       A.  Oh, yeah, they've reached out to me.
10      Q.  In fact they -- how many conversations did you
11 have?
12      A.  Verbal?
13      Q.  Yes.
14      A.  Zero.
15      Q.  Was it all by e-mail?
16      A.  You know, it was all by -- it was all by
17 subpoena, I would say.  I know my counsel at the time
18 had spoken to them.  And, yeah, I mean, I never e-mailed
19 directly because I didn't feel that was the proper way
20 to -- the proper way for them is to speak to my
21 attorney.
22      Q.  Okay.
23      A.  So I never had the luxury of having a chat.
24      Q.  At some point they did, the plaintiffs'
25 attorneys, request that you sign an affidavit for them?

25

1       A.  Yes, they did.
2       Q.  Okay.  And did that come directly to you or
3  through your attorney?
4       A.  The affidavit came to my attorney, and after
5  reviewing the affidavit I chose not to sign it because I
6  did feel a lot of the things in the affidavit were, in
7  my business what you would call a loaded question.
8       Q.  Let's go ahead and mark this, please.
9       (Defendants' Exhibit No. 3 was marked for
10 identification.)
11      THE WITNESS:  This is the affidavit?
12 BY MR. PISANI:
13      Q.  Well, why don't you take a look at it and let
14 us know.  What you have before you is a document we've
15 marked as Exhibit 3.  Is this --
16      A.  To the best of my knowledge this is it.  I
17 mean, the amount of paperwork, it's very tough.
18      Q.  Well, you said a few moments ago that the
19 affidavit you had looked at contained some loaded
20 questions, correct?
21      A.  Yes.  That's how I felt.
22      Q.  And is that another way of saying that the
23 questions, the statements just weren't true?
24      MR. MCCUE:  Objection.
25

26

```
1   BY MR. PISANI:
2       Q.   You can answer.
3       A.   The way I read the affidavit, and tell me if
4   I'm right or wrong, because I might have been wrong, an
5   affidavit is your words, correct?
6       Q.   I can't really answer questions.
7       A.   I just felt an affidavit is your words.  So if
8   someone sends me something that says these are your
9   words, sign it, well, that to me, and I don't know the
10  law, I'm not a lawyer, is loaded.
11      Q.   So you didn't --
12      A.   If someone said, hey, I'll fly you up to here
13  and sit down and we'll have a chat, well, okay.  I'll
14  chat with anybody.  I let, from the beginning of this
15  situation, I let everyone know I'm open to chatting.
16  But, you know, I just don't want to be -- someone send
17  me something and saying well this is what happened.
18      Q.   Okay.  So the affidavit that you were sent
19  wasn't a summary of a conversation you had with anybody?
20      A.   No.  It's not a summary but it's going -- if
21  you look at this affidavit, I'll give you an example,
22  No. 7.  It was my understanding that the business of EMI
23  was to telemarket via prerecorded messages.  There's
24  nothing I've ever stated to anyone that has said that,
25  so why would I sign a document, a legal document
```

27

```
1   agreeing to that?
2       Q.   So what is written there in Paragraph 7,
3   that's completely false?
4       A.   It's loaded.
5       Q.   It's false, right?
6       A.   Yes, it's false.
7       Q.   And so after receiving this affidavit you
8   never executed it because you thought it was loaded and
9   you thought the paragraphs, or at least some of them
10  were completely false?
11      A.   Loaded.
12      MR. PISANI:  One second.
13      MR. BAUGHMAN:  Off the record for a second.
14      (Discussion held off the record.)
15      (At 9:28 a.m. a recess was taken.)
16      THE VIDEOGRAPHER:  Stand by, please.  Back on
17  the record at 9:30.
18      THE WITNESS:  For the record, instead of me
19  using my terms, it's false.
20  BY MR. PISANI:
21      Q.   Okay.  When you say it's false, the statements
22  in the affidavit?
23      A.   Correct.
24      MR. MCCUE:  Objection.  You're talking about
25  one paragraph, correct?
```

28

```
1       MR. PISANI:  Objection.  You have time to ask
2   your own questions.
3       THE WITNESS:  What I was saying was I answered
4   it in a -- in my way where I should have answered
5   the question correctly.  There are statements in
6   the affidavit that are false.
7   BY MR. PISANI:
8       Q.   And one of those examples of a statement
9   that's false is Paragraph 7, correct?
10      A.   Correct.
11      Q.   And then also in Paragraph 11, if you take a
12  look at that, that statement in Paragraph 11 is also
13  false, correct?
14      A.   That's correct.
15      MR BAUGHMAN:  I'm sorry, it's correct that
16  it's false?  It was a double negative.  Is
17  Paragraph 11 false?
18      A.   Correct.  It is false.
19      MR. BAUGHMAN:  I think that's clear enough.
20  BY MR. PISANI:
21      Q.   I think we got it.  Paragraph 11 is false?
22      A.   Correct.
23      MR. PISANI:  All right.  Okay, Mr. Neill, that
24  is all the questions that I have for you right now.
25  I'm sure these other lawyers have some questions
```

29

```
1   for you as well.
2       THE WITNESS:  All right.
3       MR. PISANI:  Why don't we take a break and
4   that way we can switch.
5       (Discussion held off the record and a brief
6   recess was taken.)
7       THE VIDEOGRAPHER:  We're back on the record at
8   9:42.
9               CROSS (RYAN NEILL)
10  BY MR. BAUGHMAN:
11      Q.   Good morning, Mr. Neill.
12      A.   How are you?
13      Q.   Good.  My name is Michael Baughman.  We met
14  once before.  And I came down to Florida to meet with
15  you to talk about this case a little bit; is that
16  correct?
17      A.   That's correct.
18      Q.   And I asked you a lot of the same questions
19  that we asked today, right?
20      A.   Correct.
21      Q.   And I just asked you to tell me truthfully
22  what happened, correct?
23      A.   Correct.
24      Q.   And I didn't tell you to give any particular
25  answers to any particulars questions, I just asked you
```

30

1    what happened, correct?
2        A.   That's correct.  We had a chat.
3        Q.   We had a chat, correct.  Can you pull up
4    Exhibit 2 there?
5        A.   This is --
6        Q.   That's the addendum 1 to the Paramount Media
7    Group agreement.
8        A.   There it is.
9        Q.   And we've discussed earlier, this is your
10   agreement with Paramount Group; is that right?
11       A.   This is Paramount's agreement with Saveology.
12       Q.   I'm sorry, Paramount's agreement with
13   Saveology.  And your contract was with Saveology; is
14   that correct?
15       A.   That is correct.
16       Q.   You did not have a contract with ADT, correct?
17       A.   That's correct.
18       Q.   Did you have any contact with anyone from ADT
19   while you were working for Paramount?
20       A.   No.
21       Q.   Did you have any conversations with anyone
22   from ADT?
23       A.   No.
24       Q.   Ever exchange any correspondence with ADT?
25       A.   No.

31

1        Q.   So your agreement was to work with Saveology,
2    correct?
3        A.   That's correct.
4        Q.   The agreement was not to work with ADT,
5    correct?
6        A.   That's correct.
7        Q.   And you were paid by Saveology, correct?
8        A.   Correct.
9        Q.   You weren't paid by ADT, correct?
10       A.   That's correct.
11       Q.   You never received any payment from ADT,
12   correct?
13       A.   Correct.
14       Q.   Now, did you have an understanding, the leads
15   that you were generating for Saveology, do you know
16   where they went?
17       A.   I don't understand.
18       Q.   Let's say you get a lead and you pass that
19   along.  The lead comes into you, you convince them to
20   buy product, then what happens after that?
21       A.   There's an order entry system.
22       Q.   Okay.  Whose order entry system is that?
23       A.   I believe Saveology's.
24       Q.   Okay.  And so Saveology, does Saveology then
25   get that lead, is that the terminology?

32

1        A.   Yes.
2        Q.   Do you know what Saveology does with that lead
3    thereafter?
4        A.   No.
5        Q.   Do you know whether it goes to ADT dealers or
6    ADT direct, ADT corporate?  You just don't know?
7        A.   I can't answer that.  I don't know.
8        Q.   So you've never had any conversation with ADT
9    about your business, correct?
10       A.   Correct.
11       Q.   You never had any conversations with ADT about
12   how you were conducting your business?
13       A.   Correct.
14       Q.   Never had any conversations with ADT about how
15   you were generating your leads?
16       A.   Correct.
17       Q.   Never told anyone from ADT that you had
18   retained EMI, correct?
19       A.   Correct.
20       Q.   Never got approval from anyone at ADT to hire
21   EMI, correct?
22       A.   Correct.
23       Q.   And you received no direction from ADT about
24   generally how you should be marketing product, correct?
25       A.   Any direction I received is in this document.

33

1        Q.   So there were certain restrictions on what you
2    could do, correct?
3        A.   Correct.
4        Q.   But generally speaking it was up to you to
5    determine how to sell, or how to generate leads,
6    correct?
7        A.   Correct.
8        Q.   So --
9        A.   With the restrictions, of course.
10       Q.   Subject to the restrictions you decided how to
11   market, correct?
12       A.   Correct.
13       Q.   You were an independent in that respect?
14       A.   Correct.
15       Q.   And you weren't an employee of Saveology,
16   right?
17       A.   Correct.
18       Q.   You were an independent contractor for
19   Saveology, correct?
20       A.   Correct.
21       Q.   You had your own business that had a contract
22   with Saveology, correct?
23       A.   Paramount had a contract with Saveology.
24       Q.   Now, did you have an understanding of whether
25   your relationship -- I think you said you sold some

34

1 other product, as well; is that right?
2    A.   Correct.
3    Q.   And that was while you were working with
4 Saveology?
5    A.   Correct.
6    Q.   So your relationship with Saveology wasn't
7 exclusive, right?
8    A.   Correct.
9    Q.   You could work with others, right?
10    A.   Correct.
11    Q.   You could sell security leads to others if you
12 wanted, correct?
13    A.   Correct.
14    Q.   And the same question I asked you about ADT,
15 but Saveology put certain restrictions on what you could
16 do in marketing, correct?
17    A.   Correct.
18    Q.   But subject to those restrictions, Saveology
19 didn't tell you how to generate leads, right?
20    A.   Correct.
21    Q.   That was up to you?
22    A.   Correct.
23    Q.   And you determined the appropriate marketing
24 methods to do that, right?
25    A.   Paramount did.

35

1    Q.   Paramount did.  Paramount determined the
2 appropriate marketing methods to generate leads,
3 correct?
4    A.   Correct.
5    Q.   Now, we discussed that the agreement that you
6 had with Saveology put certain restrictions on what you
7 could do, right?
8    A.   Correct.
9    Q.   And you understood, among other things, you
10 had to follow ADT's marketing guidelines, right?
11    A.   Correct.
12    Q.   And ADT had some very strict marketing
13 guidelines, right?
14    A.   Correct.
15    Q.   ADT was very concerned about compliance,
16 right?
17    A.   Extremely.
18    Q.   ADT was very concerned about telemarketing
19 compliance, right?
20    A.   Right.
21    Q.   ADT wanted anyone working -- anyone selling
22 anything relating to ADT, ADT wanted them to comply with
23 all laws and regulations, right?
24    A.   That's correct.
25    Q.   And so did Saveology, right?

36

1    A.   That's correct.
2    Q.   And you understood that Exhibit B to --
3         MR. PISANI:  2.
4 BY MR. BAUGHMAN:
5    Q.   Deposition Exhibit 2, see Exhibit B there,
6 Saveology ADT affiliates updated 6/16/10.  These were
7 some of the restrictions, correct?
8    A.   Some of them.
9    Q.   But there were more?
10    A.   A small novel of War and Peace.
11    Q.   ADT was very serious about telemarketing
12 compliance?
13    A.   So was Paramount.
14    Q.   And Paramount was very serious about it.
15    A.   (Nodding head.)
16    Q.   Saveology was very serious about it?
17    A.   (Nodding head.)
18    Q.   If you take a look at Exhibit B on Exhibit 2,
19 among the restrictions here it says "under no
20 circumstances will any Saveology.com affiliate make any
21 unsolicited outbound telephone calls."
22         Did you understand that you were restricted
23 from making unsolicited outbound telemarketing calls?
24    A.   Correct.
25    Q.   You were not permitted to do that under your

37

1 agreement with Saveology?
2    A.   Correct.
3    Q.   Saveology did not want you to do that?
4    A.   That's correct.
5    Q.   ADT didn't want you to do that?
6    A.   That's correct.
7    Q.   ADT didn't want anyone selling ADT products to
8 do that, right?
9    A.   That's correct.
10    Q.   And you understood that if you did do that, if
11 you made unsolicited outbound telemarketing, that would
12 be contrary to your agreement with Saveology, right?
13    A.   Correct.
14    Q.   You didn't have any authority to do that,
15 right?
16    A.   Correct.
17    Q.   You had no authority to make unsolicited
18 outbound telemarketing calls?
19    A.   That's correct.
20    Q.   And if you did that you would be acting
21 contrary to Saveology's interest, correct?
22    A.   Correct.
23    Q.   You would be acting contrary to ADT's
24 interest, right?
25    A.   Correct.

38

```
1      Q.   Let's take a look and go to the next page of
2  that.
3           (Ms. Lim entered the proceedings.)
4  BY MR. BAUGHMAN:
5      Q.   The first paragraph:  "Affiliate agrees that
6  they will comply with all applicable laws, rules and
7  regulations of the jurisdictions from and into which the
8  affiliates makes calls."  Do you see that?
9      A.   Yes.
10      Q.   You were contractually obligated to follow all
11  telemarketing laws, correct?
12      A.   That's correct.
13      Q.   And if you didn't follow those telemarketing
14  laws you were violating your contract with Saveology,
15  right?
16      A.   That's correct.
17      Q.   You didn't have authority to do anything other
18  than follow the telemarketing laws, correct?
19      A.   Correct.
20      Q.   And if you did violate those laws you would be
21  acting contrary to Saveology's interest, right?
22      A.   Correct.
23      Q.   And you would be acting contrary to ADT's
24  interest, correct?
25      A.   That's correct.
```

39

```
1      Q.   That bottom of that paragraph it says
2  "Affiliates may not use prerecorded messages, in
3  connection with telemarketing services on ADT's behalf."
4           Do you see that?  It's at the end of that
5  paragraph that we were just looking at.
6      A.   Yes, I see that.
7      Q.   And you understood that you were prohibited
8  from using prerecorded messages, correct?
9      A.   Correct.
10      Q.   And you weren't to buy any leads that involved
11  prerecorded messages, correct?
12      A.   Correct.
13      Q.   And if you did that you would be violating
14  your contract, correct?
15      A.   Correct.
16      Q.   You had no authority to use prerecorded
17  messages in telemarketing, correct?
18      A.   Correct.
19      Q.   And you had no authority to purchase leads
20  that were generated using prerecorded messages, correct?
21      A.   Correct.
22      Q.   And if you did that you would be acting
23  contrary to Saveology's interest, right?
24      A.   Correct.
25      Q.   And you would be acting contrary to ADT's
```

40

```
1  interest, right?
2      A.   Correct.
3      Q.   You would be acting contrary to Paramount's
4  interest, right?
5      A.   Correct.
6      Q.   Did you have any understanding as to what you
7  were permitted to do with respect to ADT's name?  Were
8  there limits on what you could say?
9      A.   Yes.
10      Q.   What were those limits?
11      A.   You were not allowed to use ADT's name as if
12  the company, you are ADT.
13      Q.   Because you weren't ADT, right?
14      A.   No.
15      Q.   And you had no authority to hold yourself out
16  as ADT?
17      A.   Correct.
18      Q.   Or as associated with corporate ADT, correct?
19      A.   Correct.
20      Q.   Were there restrictions on your advertisement
21  or your marketing with respect to ADT's name?
22      A.   Yes.  You were not allowed to say you were
23  ADT.
24      Q.   Okay.  You weren't allowed to say you were
25  calling on behalf of ADT, right?
```

41

```
1      A.   No.
2      Q.   Because you weren't calling on behalf of ADT?
3      A.   Correct.
4      Q.   And if you made calls suggesting that you were
5  calling on behalf of ADT, you had no authority to do
6  that, right?
7      A.   That's correct.
8      Q.   That would be contrary to Saveology's
9  instructions, correct?
10      A.   Correct.
11      Q.   It would be contrary to ADT's instructions,
12  correct?
13      A.   Correct.
14      Q.   It would be contrary to Saveology's interest,
15  correct?
16      A.   Correct.
17      Q.   It would be contrary to ADT's interest,
18  correct?
19      A.   Correct.
20      Q.   I think I asked you this but I'll ask you
21  again.  Saveology took telemarketing compliance very
22  seriously, right?
23      A.   Extremely.
24      Q.   And you understood in part that was because
25  ADT took that very seriously, right?
```

---

42

1      A.   Correct.

2      Q.   And you understood that ADT told Saveology

3  you've got to make sure you follow all telemarketing

4  laws, correct?

5      A.   Correct.

6      Q.   Did you have -- were you provided with

7  telemarketing guidelines?

8      A.   Yes.

9      Q.   Did you follow those?

10     A.   Yes.

11     Q.   Did you get any training on them?

12     A.   Yes.

13     Q.   I think you said you didn't make any outbound

14 calls unless you were returning a message; is that

15 right?

16     A.   Callbacks.

17     Q.   And when you made the callbacks were there any

18 restrictions on what you could do when you -- or in how

19 could you do those?  Were there any steps or procedures

20 you needed to follow?

21     A.   I don't recall.  When the calls came in all

22 the data was posted at the time, and we called them

23 back.

24     Q.   Did you need to do any scrubbing on those

25 numbers before you called them?

---

43

1      A.   There was an ADT scrub list, I believe.  It

2  had to be scrubbed.  Yes, we had to scrub.  I apologize,

3  it's going back so far.

4      Q.   I understand.

5      A.   Yes.  I believe the procedure is every three

6  days or every day scrub the list against ADT's Do Not

7  Call list.  If, to the best of my knowledge, the data

8  that provided was, the opt-in information was allowing

9  you to call the person back, I believe the federal

10 guidelines was seven days.

11     Q.   Okay.  So the federal guidelines put some

12 limits on you calling people back for opt-in; is that

13 right?

14     A.   Correct.

15     Q.   But in addition to that Saveology required you

16 to scrub --

17     A.   Scrub it, yes.

18     Q.   Let me finish my question.

19     A.   Sorry.

20     Q.   In addition to those federal guidelines

21 Saveology required that before you make any phone call

22 you scrub that against ADT's internal Do Not Call list,

23 right?

24     A.   Correct.

25     Q.   And you followed those procedures, right?

---

44

1      A.   Yes.

2      Q.   And ADT took those procedures very seriously,

3  right?

4      A.   Yes.

5      Q.   Let's mark this as --  what are we up to, 4?

6           COURT REPORTER:  Four.

7           (Defendants' Exhibit No. 4 was marked for

8  identification.)

9  BY MR. BAUGHMAN:

10     Q.   Luckily I brought a lot of copies.

11          This is an e-mail.  Who is Bruce Cohen?

12     A.   At the time he was just one of my data

13 managers.

14     Q.   He is somebody that worked with Paramount; is

15 that right?

16     A.   He was just an independent.  He wasn't

17 employed by Paramount.  He was a subcontractor.

18     Q.   So, but he was working -- he had an agreement

19 with Paramount and was performing work?

20     A.   Yeah.  He was one of those people that knew

21 how to technologically do that stuff.

22     Q.   Good.  And you're copied on this e-mail.  It's

23 an e-mail from Daphne Fernandes; is she at Saveology?

24     A.   Yes.

25     Q.   And it's to Bruce Cohen, you're copied, right?

---

45

1      A.   Yes.

2      Q.   And it's dated April 13, 2011.

3      A.   Yes.

4      Q.   And it's an e-mail to Bruce.  In the last

5  paragraph it says "ADT requires all phone numbers that

6  require an outbound dial to be scrubbed against the ADT

7  DNC."  That's the ADT internal Do Not Call list?

8      A.   Yes.

9      Q.   "They do not permit telemarketing and consider

10 telemarketing any opt-in lead to a home security

11 officer.  Generally, if you have to dial it by your

12 fingers or a dialer it must be scrubbed prior to

13 dialing.  (keeps all of us out of ADT legal department.)

14 It has to be scrubbed every 7 days on the same day of

15 the week for max of 90 days or if state laws requires

16 stricter guidelines."  Do you see that?

17     A.   Yes.

18     Q.   Is that consistent with your understanding

19 that ADT requires any phone number that you pick up the

20 phone and dial has to be scrubbed, right?

21     A.   Yes.

22     Q.   They took that very seriously, right?

23     A.   Yes.

24     Q.   I want to follow-up on the some of the

25 questions regarding your contact with EMI.  I think you

46

1   said you think your initial contact was with Chris Long;
2   is that right?
3       A.   Chris Lopez.
4       Q.   Chris Lopez.
5       A.   Yes.
6       Q.   Did you ever speak with a guy named Chris
7   Long?
8       A.   No, I spoke with Chris Lopez.
9       Q.   Is there anyone else at EMI who you spoke to?
10      A.   A girl.  I don't know her name.
11      Q.   Was it Samantha Omar?
12      A.   I believe so, yes.
13      Q.   What type of things did you discuss with
14  Ms. Omar?
15      A.   Call volume.
16      Q.   Okay.  What do you mean by that?
17      A.   How many transfers her agents, or whoever's
18  agents they were, were going to send us for that day.
19  Billing.
20      Q.   Got it.
21      A.   Nothing too internal.
22      Q.   It was more ministerial issues with her?
23      A.   Yeah.
24      Q.   Now, Chris Lopez, do you know what his
25  position was at EMI?

47

1       A.   I don't.
2       Q.   But he's the person that you had sort of
3   direct contact with?
4       A.   He was my original contact.  After that I got
5   pushed off to, I believe Samantha was her name.
6       Q.   Gotcha.  But you never spoke with Chris Long?
7       A.   No.
8       Q.   So Chris Long would have no idea of the
9   content of communications with Paramount since you
10  didn't have them, right?
11      A.   To the best of my knowledge.
12      Q.   No one from Paramount, to your knowledge, had
13  any conversation with EMI except you; is that right?
14      A.   No.  Correct.
15      Q.   You have to let me finish my question so, she
16  is taking down what I say, otherwise, the record gets a
17  little mumbled.
18      A.   Sorry.
19      Q.   And you said that you found EMI on Craig's
20  List; is that right?
21      A.   Correct.
22      Q.   Did you have any conversations with anyone at
23  Saveology about EMI, prior to that lawsuit involving Jay
24  Conner?
25      A.   I don't believe so.

48

1       Q.   So to your knowledge Saveology had no idea
2   that you were using EMI; is that right?
3       A.   That's correct.
4       Q.   And certainly since you never talked to anyone
5   from ADT, ADT had no idea you were using EMI, right?
6       A.   That's correct.
7       Q.   I take it then you didn't tell, when you found
8   EMI on Craig's List, you didn't tell Saveology that's
9   how you found them, correct?
10      A.   Correct.
11      Q.   And the initial conversation you had with
12  Mr. Lopez, I think you said you asked him generally sort
13  of what they do; is that right?
14      A.   Correct.
15      Q.   And he told you they were compliant in all
16  respects?
17      A.   Correct.
18      Q.   Did you do any sort of due diligence on them?
19      A.   No.
20      Q.   Did you go to their website or anything or
21  look them up?
22      A.   No.
23      Q.   And I take it sort following up on the earlier
24  questions I asked about Craig's List, you never told
25  Saveology about what, if any, due diligence you did in

49

1   hiring EMI if they didn't know you were using them,
2   right?
3       A.   Correct.
4       Q.   Same with respect to ADT, they had no idea?
5       A.   None.
6       Q.   And I think you said you didn't have a formal
7   signed agreement with them; is that right?
8       A.   No, it wasn't -- there was nothing, you know,
9   Paramount had nothing contractually with EMI except a
10  purchase order.
11      Q.   Okay.
12      A.   Which, you know, at the end of those purchase
13  orders at any time you can just stop.
14      Q.   Uh-huh.  Did they ever present you with an
15  agreement and ask you to sign it?
16      A.   No.
17      Q.   Did they ever give you anything in writing
18  sort of saying that, you know, their telemarketing
19  compliance guidelines or what they were doing?
20      A.   No.
21      Q.   And you testified earlier your understanding
22  was that EMI had its own opt-in database with generic
23  security leads, right?
24      A.   That was my understanding.
25      Q.   And your understanding was that they were

50

```
1   picking up the phone and dialing people with a live
2   person talking to another person; is that right?
3       A.  That's how the call came over, yeah.
4       Q.  Did you ever have any conversations with
5   anyone at EMI as to whether that was the case that they
6   were using live people to make the calls?
7       A.  Yeah.  That's when the original relationship
8   started.  Everything we did -- I was -- the message put
9   across to me was everything's compliant.  We work with a
10  lot of big -- you know, it really did give me the, We do
11  everything the right way.  We work with a lot of the
12  guys in the industry.  We're one of the greatest of
13  all-times.  And that as a new, young business,
14  Paramount, that gave, you know, a level of
15  comfortability.
16      Q.  They never told you that they were using
17  prerecorded messages to dial, right?
18      A.  No.
19      Q.  They never told you specifically where their
20  leads were coming from?
21      A.  No.  You know to -- no.
22      Q.  Other than their own opt-in generic database?
23      A.  Sure.
24      Q.  Okay.  Now, if EMI were, in fact, robo-dialing
25  people using prerecorded messages, that would be
```

51

```
1   contrary to what they told you, right?
2       A.  Correct.
3       Q.  They would have basically lied to you,
4   correct?
5       A.  Correct.
6       Q.  And if, in fact, they were using prerecord
7   messages you think that they deceived you, EMI?
8       A.  Yeah.
9       Q.  Did you ever give EMI permission to use ADT's
10  name?
11      A.  No.
12      Q.  Did you ever tell them they couldn't use ADT's
13  name?
14      A.  In terms of -- no, I don't know if I -- if I
15  really understand the question.  Did I tell them they
16  cannot?
17      Q.  Yeah.
18      A.  I'm sure I did.  But it's really not my
19  position to, you know -- everything I knew coming over
20  was generic.
21      Q.  Right.
22      A.  And at the time, a generic lead is a generic
23  lead.
24      A.  A generic lead is not a lead that is trying to
25  sell ADT?
```

52

```
1       A.  That's correct.
2       Q.  So if they were using ADT's name, they didn't
3   have any authority to do that, did they?
4       A.  That's correct.
5       Q.  They were acting contrary to what they told
6   you, right?
7       A.  That's correct.
8       Q.  They didn't have any authority to put ADT's
9   name in a prerecorded message that they sent out to
10  people, right?
11      A.  That's correct.
12      Q.  That would be completely unauthorized.
13      A.  Correct.
14      Q.  Do you know about how many leads you actually
15  received?  How many call transfers you actually received
16  from EMI?
17      A.  I don't, off the top of my head, no.  But I'm
18  sure it's somewhere in some of this paperwork here.
19      Q.  Do you recall it being about 9,700?  Sound
20  about right?
21      A.  That's probably a safe number.
22      Q.  Any idea how many of those transferred into
23  actual sales?
24      A.  I don't.
25      Q.  Okay.  And those that transferred into sales,
```

53

```
1   you have no idea what happened to those sales after you
2   transferred them over to Saveology?
3       A.  No.  Correct.
4       Q.  You don't know if they ever went to an ADT
5   dealer, correct?
6       A.  I don't.
7       Q.  Do you know, are there records that would show
8   once you transferred that that sale actually closed with
9   the dealer, or somebody else?
10      A.  No.  I don't know, I don't -- the visibility
11  for me after the sale is gone.
12      Q.  Okay.  I think you said at some point you got
13  a complaint regarding a gentleman named Jay O'Conner?
14      A.  Jay Conner.
15      Q.  Do you remember about when that came in?
16      A.  I think it was sometime in March.  I'm not
17  100 percent.  That's a guesstimate.
18          (Defendants' Exhibit No. 5 was marked for
19  identification.)
20  BY MR. BAUGHMAN:
21      Q.  I'm showing you an exhibit we've marked as
22  Deposition Exhibit 5.  It's an e-mail, actually an
23  e-mail chain titled at the top "Jay Conner settlement."
24  And if you look down the sort of e-mail traffic here
25  there's an e-mail from you to Jeremy Torisk and Daphne
```

54

1  Fernandes. Who is Jeremy Torisk?
2      A.  He is another Saveology employee.
3      Q.  Okay. It's dated June 9th, 2011. Take a look
4  at this e-mail. It starts out, If you recall we were
5  working with a lead provider, American Protection
6  Services they were calling all the wrong people after we
7  had purchased their leads.
8          Is American Protection Services, is that the
9  same as EMI?
10     A.  A lot of these lead providers, whether you're
11 selling alarm or whatever the vertical is, they use a
12 D/B/A or pseudo name at the time. It could have been.
13 I'm not 100 percent.
14     Q.  Do you recall if you were referring to EMI in
15 this e-mail? Take your time and read as of much of it
16 as you like.
17     A.  I don't recall.
18     Q.  You just don't recall one way or the other?
19     A.  It was so long ago.
20     Q.  I understand. When you got that Jay Conner
21 lawsuit, what did you do with it?
22     A.  I got the -- I got, automatically I got the
23 opt-in information. Then I called my attorney, because
24 I really did feel that the Jay Conner case was boarder
25 line extortion, you know. I felt like, okay, to the

55

1  best of my knowledge here's the opt-in information.
2  Then when I called my counsel he said, it doesn't
3  matter. He's either going to -- funny thing in the
4  legal system is you can fight and just waste money, or
5  you can, you know, and the company wasn't strong enough
6  to go through the rounds of a boxing match.
7      Q.  Gotcha. So you settled it?
8      A.  Yeah. My attorney is like I have lot of cases
9  and realistically this is what he does.
10     Q.  And you settled it on behalf of everyone, you
11 just got the whole case dismissed; is that right?
12     A.  Yeah.
13     Q.  Did you have any conversations with anyone at
14 ADT about that Jay Conner lawsuit?
15     A.  No.
16     Q.  Did you pass it along to anyone at ADT?
17     A.  No.
18     Q.  Do you have any knowledge as to whether ADT
19 knew about that case or not?
20     A.  No.
21     Q.  But you settled on behalf of everybody, right?
22     A.  Correct.
23     Q.  And you did that on your own?
24     A.  Correct.
25     Q.  Now, I think you testified earlier that as a

56

1  result of that Jay Conner lawsuit, it raised some
2  questions in your mind about EMI?
3      A.  Sure.
4      Q.  What did you do as a result of those
5  questions?
6      A.  You know, I did my due diligence and, you
7  know, I can't tell a person what another person does.
8  All I can go on is what I'm told. So realistically,
9  like I said, where there's smoke there's fire, and at a
10 certain point after that the relationship is terminated.
11     Q.  Okay. You terminated them when you had
12 questions about what they were doing?
13     A.  Yeah.
14     Q.  When did you first find out about this present
15 lawsuit, the lawsuit we're here about today?
16     A.  I believe that was via a subpoena in August.
17 I'm not 100 percent on that.
18     Q.  Okay. What happened next after you got that
19 subpoena?
20     A.  You know, I got the information. I got this
21 subpoena. Paramount was not doing any business. It
22 was, you know, more or less out of business. Was out of
23 business. I gave the -- you know, to the best of my
24 ability I gave all the information and, you know, that
25 was it. I really...

57

1      Q.  Let me take you back. How did it come about
2  that Paramount went out of business?
3      A.  Well, you know, like I said, we started in
4  2010 and we started telling Protect America. Then we
5  started selling ADT. And when we were selling ADT we
6  were, you know, barely off the ground. So when you get
7  a notice, an official termination notice from Saveology,
8  there's nothing left to do.
9      Q.  Did you have an understanding as to why you
10 got that termination notice?
11     A.  I had assumed that, you know, being the Jay
12 Conner thing had happened. No. I mean, I did, yeah.
13 There was a Jay Conner lawsuit I -- I didn't have any
14 direct visibility to ADT, so I can't speak on behalf of
15 what ADT corporate saw, felt, got, received.
16     Q.  But did you have an understanding that ADT
17 corporate had told Saveology to cut you off?
18     A.  I would have -- I didn't -- I would assume.
19     Q.  Okay. What is your assumption based on? Did
20 you have any conversations with anyone?
21     A.  My assumption is that Saveology doesn't wake
22 up one day and terminate someone unless something is
23 wrong.
24     Q.  Did you have an understanding that the
25 termination had something to do with concerns about

58

1   telemarketing?
2       A.   Well, with Jay Conner, you know, settlement
3   case behind you, yeah.
4       Q.   And is that sort of consistent with your
5   testimony earlier that ADT had sort of a zero tolerance
6   policy for anything remotely problematic with
7   telemarketing?
8       A.   That's correct.
9       Q.   You testified earlier that Paramount, LLC
10  recently dissolved; is that right?
11      A.   That's correct.
12      Q.   Was that before or after the lawsuit, do you
13  know?
14      A.   I don't know.
15      Q.   Do you know whether anything was done -- I'm
16  not a corporate attorney -- but do you know whether
17  anything was done in the dissolution process with
18  respect to this litigation?  Was there any sort of
19  reserve made or any sort of contingency made for the
20  pending litigation against Paramount?
21      A.   Reserve?  I don't understand.
22      Q.   Was there any -- I don't know if I understand.
23  Was there any kind of accommodations made when you
24  dissolved the company for the fact that there's
25  presently a lawsuit against Paramount LLC?

59

1       A.   I don't know.
2       Q.   Okay.  In responding to the subpoenas in this
3   case have you produced all records that relate in any
4   way to the work that you did for Saveology?
5       A.   Everything that was requested from me that I
6   had on hand I produced.
7       Q.   Do you have records, does Paramount have
8   records showing opt-in information for any call that you
9   got from EMI?
10      A.   Currently?
11      Q.   Yes.
12      A.   No.
13      Q.   Did it ever?
14      A.   Yes.  When we had a contract with Saveology
15  and we were selling ADT, our contract was to keep all
16  records and documentation.
17      Q.   Okay.  And when you would get a call from EMI,
18  would that include --
19      A.   The opt-in.
20      Q.   -- the opt-in information?
21      A.   Yes.
22      Q.   So they would give that to you at the time of
23  the call, or how would that work?
24      A.   Yes.  At the time of the call.
25      Q.   What -- how would they give that to you?

60

1       A.   They would post it.
2       Q.   On a computer or something?
3       A.   Yeah.  On a computer.
4       Q.   Did you have like some computer link with them
5   or did they e-mail it to you?
6       A.   Yeah, they just post it.  It's like, send it
7   over.
8       Q.   Okay.  And would that opt-in information
9   include the IP, like the address that opted in and the
10  website and all that stuff?
11      A.   I'm not 100 percent on that.  I couldn't
12  answer it properly.  They give you the opt-in
13  information and the one time, the Jay Conner issue, they
14  provided all the information that was relevant.
15      Q.   Okay.  But you don't have any of that data
16  anymore?
17      A.   No.
18      Q.   Do you know where, like what happened to it?
19      A.   Paramount was gone, you know, it went out of
20  business.  Anything that was -- every bit of stuff
21  pretty much, you know, it's like asking if you have, you
22  know, old ties.  I just don't keep stuff from businesses
23  that fail.
24      Q.   Gotcha.  You never forwarded that information
25  to ADT, right?

61

1       A.   No.
2       Q.   ADT had no control over what you did with that
3   information, correct?
4       A.   That's correct.
5       Q.   Is there anyone else that would have that
6   information?
7       A.   No.
8       Q.   And that was your decision, to, what is the
9   right word, get rid of it?
10      A.   Paramount's.
11      Q.   Paramount's decision.  Okay.  And you didn't
12  tell anybody you were doing that?
13      A.   No.  I didn't feel a need to.
14      Q.   I think this was asked earlier, I just never
15  knew the answer, you were getting leads from other folks
16  as well?
17      A.   Yes, I believe so.
18      Q.   Do you remember the names of any of those
19  leads?
20      A.   No, I do not recall.
21      Q.   Pull out Exhibit 3, please.  And this is the
22  affidavit that the plaintiffs' lawyers drafted and
23  somehow made its way to you?
24      A.   Uh-huh.
25           MR. SPOONT:  Is that a yes?

62

1     THE WITNESS:  Yes, I apologize.
2  BY MR. BAUGHMAN:
3     Q.   You said you got this through your lawyer; is
4  that right?
5     A.   Yeah.
6     Q.   Was there any sort of message sent with this
7  affidavit when it made its way to you?
8     A.   At the time Paramount could not afford, as a
9  company that was defunct, to afford legal counsel.  So
10 to this day from the beginning of this I have an
11 outstanding legal bill.  And, you know, like, there's
12 only so much a lawyer will protect you when they don't
13 get their retainers.
14    Q.   Right.
15    A.   So, as someone who has been my counsel for a
16 good amount of time, I would say a portion of it became
17 helping a friend to a point where, you know.  So my
18 attitude is I'm like, I don't know what to say, I've
19 done everything I can do, and I just felt like people
20 who kept asking me.  And I'm like I've done -- I feel
21 like I could do everything I possibly could do.  I'm
22 willing to help anyone and everyone but -- and then I
23 got this.
24    Q.   I think I didn't maybe ask you the right
25 question.

63

1     A.   Okay.
2     Q.   First of all, you didn't have any
3  conversations with the plaintiffs' lawyers; is that
4  right?
5     A.   No.
6     Q.   So they didn't -- did you offer to sit down
7  with them and talk to them?
8     A.   I offered to help anyone and everyone in the
9  case.
10    Q.   You took that up with me, you sat down and
11 gave me truthful answers as to what happened, right?
12    A.   Correct.
13    Q.   But you didn't sit down with them.
14    A.   Correct.
15    Q.   And then this affidavit shows up that is full
16 of inaccuracies; is that fair to say?
17       MR. MCCUE:  Objection.
18       THE WITNESS:  That is fair to say.
19 BY MR. BAUGHMAN:
20    Q.   Did you have any sense that there was some
21 pressure being put on you to sign this affidavit?
22    A.   Yes.
23    Q.   What kind of pressure was being put on you?
24    A.   I got the feeling that if I sign this people
25 would leave me alone.

64

1     Q.   So you got the sense that you were being asked
2  to sign an affidavit that was false and then the
3  plaintiffs would leave you alone?
4        MR. MCCUE:  Objection.
5  BY MR. BAUGHMAN:
6     Q.   Is that right?
7     A.   That's how I felt.
8     Q.   Let's go through some of this.  Let's look at
9  Paragraph 6 of this draft affidavit that you were asked
10 to sign under oath.
11    A.   Uh-huh.
12    Q.   It says "In approximately November 2010, per a
13 written agreement, PMG retained Europe Media
14 International, Inc., or 'EMI' to use telemarketing to
15 generate home security leads that PMG could then sell to
16 Saveology and ADT."  Let's start with "per written
17 agreement."  There's no written agreement, right?
18    A.   The only -- an agreement is something that is
19 binding, isn't it?  I don't know, I'm not a lawyer.
20 There's just a purchase order.  I'll buy this from you.
21 That's it.  There's no agreement.
22    Q.   There was no written agreement --
23    A.   Retained.  I didn't retain them.  I bought
24 something.
25    Q.   That's false?

65

1     A.   Yes.
2        MR. SPOONT:  Can I get a copy?
3        MR. BAUGHMAN:  Sure.
4  BY MR. BAUGHMAN:
5     Q.   And then it goes onto say, "to use
6  telemarketing to generate home security leads that PMG
7  could then sell to Saveology and ADT."  You weren't
8  selling leads to ADT, right?
9     A.   No.
10    Q.   So that is also false?
11    A.   Correct.
12    Q.   Paragraph 7.  "It was my understanding that
13 the business of EMI was to telemarket via prerecorded
14 message."  That's false, correct?
15    A.   Correct.
16    Q.   The opposite is true, right?
17    A.   Correct.
18    Q.   You had no idea they were using prerecorded
19 messages, right?
20    A.   Correct.
21    Q.   Paragraph 8.  "It was my understanding that
22 when a potential customer was contacted by EMI via
23 prerecorded message, the consumer would hear an
24 advertisement for an alarm system and if they were
25 interested they would press a button on their

66

1  telephone." Totally false, right?

2      A.  Correct.

3      Q.  Complete fiction, right?

4      A.  Correct.

5      Q.  You never told the plaintiffs anything like

6  that, right?

7      A.  Never.

8      Q.  But they asked you to sign that under oath,

9  right?

10     A.  That's correct.

11     Q.  Paragraph 11. "PMG advised Saveology that it

12 was using third parties, such as EMI, to generate home

13 security leads for Saveology and ADT."  False, right?

14     A.  False.

15     Q.  Paragraph 16. "I do not know the exact number

16 of prerecorded calls that were made by EMI in order to

17 generate 11,600 leads, but I would estimate that

18 millions of calls were made to generate this many

19 leads." Do you see that?

20     A.  Yeah.

21     Q.  Totally false, right?

22     A.  Correct.

23     Q.  That didn't come from you, right?

24     A.  No.

25     Q.  But you were asked to sign it under oath,

67

1  right?

2      A.  That's correct.

3      Q.  Paragraph 17. "PMG then determined whether

4  these interested customers were qualified to enter into

5  a home security contract with ADT.  Consumers who were

6  deemed 'qualified' by PMG were then transferred to

7  Saveology and ADT."

8          You never transferred a single customer to ADT

9  ever, right?

10     A.  Correct.

11     Q.  False, right?

12     A.  False.

13     Q.  Paragraph 23. "EMI assured me that it was

14 only sending pre-recorded telemarketing messages to

15 consumers that had consented to receive such calls."

16         They didn't tell you they were using

17 prerecorded messages, did they?

18     A.  No.

19     Q.  False, again.

20     A.  False.

21     Q.  But you were asked to sign under oath?

22     A.  Correct.

23     Q.  Paragraph 25. "When PMG received any demand

24 letters or lawsuits, Saveology and ADT would be

25 notified," right?  That's what it says?

68

1      A.  That's what it says.

2      Q.  You never had a conversation with ADT ever,

3  right?

4      A.  That's correct.

5      Q.  You didn't notify them of demand letters or

6  lawsuits, right?

7      A.  Paramount Media Group had no relationship with

8  ADT.

9      Q.  So Paragraph 25 is also false?

10     A.  Correct.

11     Q.  What did you do -- strike that.

12         You weren't willing to sign this affidavit,

13 right?

14     A.  No.

15     Q.  And even though you thought that maybe if you

16 did plaintiffs would leave you alone you didn't want to

17 sign it because you didn't think it was true, right?

18     A.  That's correct.

19         MR. BAUGHMAN:  That's all the question I have.

20 Want to take a break?

21         MR. LINDSMITH:  Yeah.

22         THE VIDEOGRAPHER:  Off the record at 10:21.

23         (A brief recess was taken.)

24         THE VIDEOGRAPHER:  Stand by, please.  This is

25 the beginning of Tape No. 2.  We're back on the

69

1      record at 10:32.

2              CROSS (RYAN NEILL)

3  BY MR. LINDSMITH:

4      Q.  Mr. Neill, my name again is Quentin Lindsmith.

5  I'm here as counsel for, what had been known as Eversafe

6  is now Safe Streets, but for ease of reference I'll just

7  say Eversafe.

8          If I understand your testimony your contract

9  with Saveology was entered into in October of 2010, and

10 your purchase order, what you called your purchase order

11 with EMI, if I look at Exhibit 1 was late November 2010;

12 is that right?

13     A.  Yes.

14     Q.  In your first conversation with Mr. Lopez

15 prior to signing that purchase order, did he indicate to

16 you that he had been fired by Eversafe?

17     A.  No.

18     Q.  Did he even reference Eversafe?

19     A.  No.

20     Q.  So he didn't tell you that two months before

21 Eversafe had fired you?

22     A.  No.

23     Q.  I saw your contract with Saveology.  In the

24 time frame we've been talking, did you have any contract

25 with Eversafe?

70

```
1        A.   No.
2        Q.   In terms of the orders that were placed, I
3   think you testified earlier you weren't sure where the
4   orders went after they were placed; is that right?
5        A.   That's correct.
6        Q.   So is it correct that you didn't know if any
7   went to Eversafe?
8        A.   That's correct.
9        Q.   Now, you've testified you didn't know that,
10  until this Conner thing happened, you were unaware that
11  EMI had been using prerecorded phone calls.  I take it
12  that you were, likewise, unfamiliar with their use of
13  caller ID numbers?
14       A.   That's correct.  I was unfamiliar with -- I
15  was told one thing, I think I testified earlier, I can't
16  determine how someone else, you know, does...
17       Q.   I take it, then, you have no knowledge about
18  whether they used some of the same caller ID numbers
19  after you signed the purchase order, the same caller ID
20  numbers they had been using when they were generating
21  leads for Eversafe; you don't know anything about that?
22       A.   No.
23            MR. LINDSMITH:  Thank you.  I have no other
24  questions.
25            MR. PARONICH:  Want to take two minutes
```

71

```
1   outside?
2            THE VIDEOGRAPHER:  Off the record at 10:35.
3            (At 10:35 a.m. a brief recess was taken.)
4            THE VIDEOGRAPHER:  We're back on the record at
5   10:37.
6                 CROSS (RYAN NEILL)
7   BY MR. PARONICH:
8        Q.   Hello, Mr. Neill.  My name is Anthony
9   Paronich.  I'm one of the attorneys who represent the
10  plaintiffs who have brought claims against ADT in this
11  case.
12            I'm going to first talk about this affidavit
13  that has previously been marked as Exhibit 3.
14            Do you have a copy there?
15       A.   I do.
16       Q.   I believe you testified earlier, and I would
17  like you to confirm that you and I never had a
18  conversation prior to today, correct?
19       A.   Correct.
20       Q.   And you and I never -- you, however, did have
21  a conversation with Attorney Baughman, correct?
22       A.   Correct.
23       Q.   In Florida?
24       A.   Yes.
25       Q.   About how long ago was that?
```

72

```
1        A.   I don't recall.  It was six months, something
2   like that.
3        Q.   He flew down, you guys met?
4        A.   I don't know how he got here.
5        Q.   Where did you meet?
6        A.   We met at my counsel's office, I believe.
7        Q.   At Greenspoon Marder?
8        A.   Yes.
9        Q.   Speaking of counsel, do you have any knowledge
10  of whether or not I spoke to Robbie Birnbaum?
11       A.   I believe you did.
12       Q.   Do you have any knowledge of whether or not he
13  asked me to prepare an affidavit that could perhaps save
14  Paramount Media Group the time and expense of appearing
15  for a deposition?
16            MR. BAUGHMAN:  Object to form.
17       A.   I don't have that information.
18  BY MR. PARONICH:
19       Q.   Do you have any knowledge of whether or not he
20  made edits to this affidavit that's in front of you?
21       A.   I believe you sent him -- to the best of my
22  knowledge you sent him the affidavit and he made
23  comments.
24       Q.   Okay.  Great.  So, how did Paramount Media
25  Group first get in touch with Saveology?
```

73

```
1        A.   Via phone call.
2        Q.   Did you call them?
3        A.   I don't recall, but I assume.
4        Q.   And you said that Paramount Media Group was
5   going to be in the home security business and we'd would
6   like to work with you?
7        A.   We're in the home security business and we'd
8   like to sell ADT.
9        Q.   Because currently you were selling Protect
10  America?
11       A.   (Nodding head.)
12       Q.   I see.  Do you recall how many conversations
13  you had prior to entering --
14       A.   No.
15       Q.   20, or two or three?
16       A.   I don't recall.
17       Q.   No idea?
18       A.   (Shaking head.)
19       Q.   Exhibit 2, the Paramount Media Group addendum.
20  Exhibit 2.
21            MR. PISANI:  Yes.
22  BY MR. PARONICH:
23       Q.   Please turn to page four.  I'm going to be
24  referring you to the section that starts with "Upon
25  Saveology's request" about halfway through the page.
```

```
                                                    74
1       A.   Yes.
2            MR. BAUGHMAN:  Where are you?
3            MR. PARONICH:  I'm referring to the section
4       that starts with "Upon Saveology's request" about
5       halfway down the page at Page 4.
6   BY MR. PARONICH:
7       Q.   Do you see where the context says that PMG,
8   the contract says that PMG will promptly provide any
9   outbound call list or dialer records of calls placed by
10  Affiliate within the preceding 24 months?
11      A.   Yes.
12      Q.   Did Saveology ever request that from you?
13      A.   Pertaining to what?
14      Q.   Any of your dialers or your dialing records?
15      A.   I believe so.
16      Q.   When?
17      A.   I don't have -- I don't recall the dates but,
18  you know, in terms of Saveology's compliance, anything
19  they requested they got.
20      Q.   Sure.  But you don't remember whether or not
21  they requested it?
22      A.   I'm sure at times they did.  I just don't have
23  a explicit date and time of a situation.
24      Q.   Was it your -- was it Paramount Media Group's
25  call records that they requested?
```

Debra Duran & Associates
Phone 561.313.8000  Fax 561.820.4857

```
                                                    75
1       A.   Paramount Media Group is the only thing
2   involved in Saveology.
3       Q.   Well, I think we talked today extensively
4   about how EMI was involved with Paramount Media Group
5   who was involved with Saveology?
6            MR. PISANI:  Object to form.
7            MR. BAUGHMAN:  Object to form.
8       A.   Correct.
9   BY MR. PARONICH:
10      Q.   We haven't talked about EMI today.
11      A.   We have spoke about EMI today.  The only thing
12  we spoke about today in direct relationship with
13  Saveology was Paramount Media Group.
14      Q.   Did Saveology ever request you to get dialing
15  records from EMI?
16           MR. BAUGHMAN:  Objection.
17      A.   We spoke today, Saveology had no understanding
18  of EMI until there was a problem and then there was a
19  termination.
20  BY MR. PARONICH:
21      Q.   The Jay Conner lawsuit?
22      A.   Uh-huh.
23      Q.   So, did Saveology know you were using any lead
24  providers?
25           MR. BAUGHMAN:  Objection.
```

Debra Duran & Associates
Phone 561.313.8000  Fax 561.820.4857

```
                                                    76
1            MR. PISANI:  Objection.
2            MR. LINDSMITH:  Objection.
3   BY MR. PISANI:
4       Q.   Prior to the Jay Conner lawsuit?
5            MR. PISANI:  Objection; asked and answered.
6            MR. BAUGHMAN:  Calls for speculation.
7       A.   Can you repeat the question?
8   BY MR. PARONICH:
9       Q.   Did Saveology know that Paramount Media Group
10  was using lead providers prior to the Jay Conner
11  lawsuit?
12           MR. PISANI:  Objection as to what Saveology
13      knew.
14           MR. BAUGHMAN:  Objection.
15      A.   Saveology -- I don't even know how -- can you
16  repeat it one more time?  I don't even know how to
17  answer it.
18  BY MR. PARONICH:
19      Q.   That's fine.  Did Saveology have any -- did
20  you ever inform Saveology that Paramount Media Group was
21  using lead providers?
22      A.   Saveology provided Paramount Media Group with
23  ADT compliance and with Saveology's compliance
24  requirements.  Without marketing leads you can't sell
25  anything and that's just a fact.
```

Debra Duran & Associates
Phone 561.313.8000  Fax 561.820.4857

```
                                                    77
1       Q.   Sure.
2       A.   I was -- my contract with Saveology was to
3   abide by those rules.
4       Q.   I understand that.  But did you ever inform
5   Saveology that you were using lead providers?
6       A.   I'm sure that's just kind of a common sense
7   thing.  Did I inform them, hey, I'm using lead
8   providers?  I don't see where your question is.
9       Q.   So your assumption, as someone who is in the
10  marketing business, is that Saveology must have known
11  you were using lead providers.
12           MR. PISANI:  Object to form.
13           MR. BAUGHMAN:  Object to form.
14           MR. SPOONT:  Objection.
15           THE WITNESS:  Saveology's assumption was
16  probably I'm marketing by the guidelines they
17  provide.
18           MR. PISANI:  Objection.  Move to strike.
19  Calls for speculation.
20           MR. BAUGHMAN:  Can we have an agreement that
21  one objection is good for all?
22           MR. LINDSMITH:  Thank you.
23           MR. MCCUE:  That's fine with me.
24           MR. PARONICH:  What exhibit are we on?
25           COURT REPORTER:  Number 6.
```

Debra Duran & Associates
Phone 561.313.8000  Fax 561.820.4857

78

```
1        (Plaintiffs' Exhibit No. 6 was marked for
2   identification.)
3   BY MR. PARONICH:
4        Q.   I'll ask the reporter to mark this as Exhibit
5   6.  It is 5 in the binder.
6            Mr. Neill, would you please review this e-mail
7   that I'm showing you that the court reporter has marked
8   as Exhibit 6.
9            Please take your time and review it and let me
10  know when you're ready.
11           MR. SPOONT:  Anthony, do you have another copy
12     of that binder?
13           MR. PARONICH:  I do.  We're on Tab 5.
14           MR. SPOONT:  Great.
15  BY MR. PARONICH:
16       Q.   Have you reviewed that?  What is this?
17       A.   What is what?
18       Q.   What does this e-mail describe?
19       A.   This e-mail describes a company that took a
20  creative of my website and, says here, did a text
21  advertising.
22       Q.   Okay.  So this was not Paramount Media Group?
23       A.   Paramount Media did not do that, no.
24       Q.   Who was it?
25       A.   You know what?  I never knew.  I never found
```

79

```
1   out.  If someone -- if you have any understanding of
2   internet marketing, it's very easy to go onto a website,
3   copy the creative, because it's just cutting and
4   pasting, and then utilize it.  That is what was done
5   there.
6        Q.   Do you know why someone would do that?
7            MR. PISANI:  Objection.
8            MR. BAUGHMAN:  Objection.
9        A.   Because it makes life easier.
10  BY MR. PARONICH:
11       Q.   But it seems like it would be sending traffic
12  to your website?
13       A.   That's not that -- that is not necessarily
14  true.
15       Q.   Okay.  Could you please explain?
16       A.   Sure.  If you turn around and you cut and
17  paste something, there was never any traffic received to
18  my website via this -- there was never an explanation
19  for this.  There was never a purchase order for this.
20  This was -- Paramount never approved this.
21       Q.   I understand that.  But this is your website.
22       A.   It was, correct.  It was Paramount's website.
23       Q.   Paramount's website.  Excuse me.  So if
24  someone responded to the text message ad, wouldn't they
25  go to your website?
```

80

```
1        A.   I don't know how it would be set up.  They
2   would have to get to my website.
3        Q.   Sure.  But they could copy, they could take
4   this link and they would end up at Paramount's former
5   website?
6        A.   That's correct.
7            MR. BAUGHMAN:  Objection.
8   BY MR. PARONICH:
9        Q.   But you have no idea how this got sent out?
10       A.   No.
11       Q.   Did you investigate?
12       A.   I did, but I mean, how do you find out when
13  someone is sending traffic to your website which you
14  never got.
15       Q.   Which you never -- no one visited the website
16  because of this text message ad?  How could --
17       A.   No, I never -- this whole situation, I never
18  got anything from it.  I was just confused by it.
19       Q.   Okay.  So how did you investigate it?
20       A.   I looked into if I had gotten any leads from
21  it, and I hadn't.
22       Q.   What is it?
23       A.   The website.
24       Q.   You looked into whether or not you got any
25  leads from your own website?
```

81

```
1        A.   Yes.  On this situation you asked me if I
2   investigated it.  Not in general, just this situation.
3        Q.   How could you differentiate between this
4   situation and website traffic in general?
5        A.   Something one of my old IT guys could have
6   answered, not me.
7        Q.   So you had your IT personnel investigate if
8   this text message led to any traffic to your website?
9        A.   Yes.
10       Q.   Who was the IT individual who did that
11  investigation?
12       A.   At the time I don't know which one of the
13  people.  I had an IT department that would answer
14  questions like that.
15       Q.   How many were in your IT department?
16       A.   Probably three.
17       Q.   Who were they?
18       A.   One guy's name was Chris.  One guy's name was
19  Rudy.  I don't even know.  A lot of it was subcontracted
20  work.  I don't know how to do internal web stuff so I
21  would let people that are professionals do it.
22       Q.   Chris who?
23       A.   I think his name was Deesa (phonetic).
24       Q.   Is Chris Deesa a resident of Florida?
25       A.   I don't know where he is now.
```

82

```
1      Q.   How did you get in touch with him?
2      A.   Word of mouth.
3      Q.   How about Rudy's last name?
4      A.   Goda.
5      Q.   Is Rudy a resident of Florida?
6      A.   I would assume so.
7      Q.   How did you get in touch with Rudy?
8      A.   He just -- I don't know how.  You hire
9  someone, you meet someone.
10     Q.   Sure.  You meet someone before you hire them,
11 I assume.
12     A.   Sure.
13     Q.   Okay.  Okay.  So turning back to the contract,
14 you never -- Saveology never requested that you obtain
15 EMI call records and provide them to them?
16          MR. BAUGHMAN:  Object to form.
17     A.   Can you repeat the question?
18 BY MR. PARONICH:
19     Q.   Saveology never requested that you provide
20 them with EMI call records, correct?
21     A.   Well, if I'm scrubbing all my call records
22 weekly then they're obviously getting them.
23     Q.   Is that a no?  They never requested you to
24 obtain EMI's call records?
25          MR. PISANI:  Objection to the form.
```

83

```
1      A.   Your questions are confusing.  I had, on any
2  follow up call I made, I had a -- I scrubbed them
3  through, you know, a call list.
4      Q.   Sure.
5      A.   So they would be getting my call list,
6  correct?
7      Q.   You scrubbed them through the ADT Do Not Call
8  list, correct?
9      A.   Correct.
10     Q.   Because you could not call them if they were
11 on the ADT Do Not Call list.
12     A.   Correct.
13     Q.   But my question is whether or not Saveology
14 asked you to go to EMI and obtain their call detail
15 records?
16          MR. PISANI:  Objection to the form.
17          MR. SPOONT:  Object.
18          MR. PISANI:  Saveology didn't know about EMI.
19     A.   Yeah.  Saveology had no understanding of EMI.
20 They didn't know EMI.
21 BY MR. PARONICH:
22     Q.   So Saveology never asked you to go to any of
23 your lead providers, which you testified you assumed
24 they knew about, and obtain any kind of call records,
25 correct?
```

84

```
1          MR. PISANI:  Objection.
2          MR. BAUGHMAN:  Objection to the form of the
3      question.
4          MR. LINDSMITH:  Objection.
5          COURT REPORTER:  Wait.  Wait.
6      A.   I assume -- I assumed -- you asked me if
7  Saveology knew I used lead providers.  I said yes.  I
8  assume that they knew I used lead providers how else
9  would you get sales?
10          Then you kind of went once again and put EMI
11 in the middle of it where prior to any, you know, Jay
12 Conner situation.  Sales groups do not say, here, these
13 are all the lead providers I'm using.  It's a
14 competitive thing.
15 BY MR. PARONICH:
16     Q.   So, you're saying generally in your experience
17 as a businessman who does this kind of work you don't
18 tell the people you work for who you're using to
19 generate leads?
20          MR. BAUGHMAN:  Objection.
21     A.   The people I work for?
22 BY MR. PARONICH:
23     Q.   Saveology.
24     Q.   Tell them the lead provider?
25     Q.   Yes.  That's my question.
```

85

```
1      A.   No, you do not tell them the lead provider.
2  You follow a guidance of a compliance standard.
3      Q.   Okay.
4      A.   Pertaining to each industry.
5      Q.   Okay.  We're on Tab 12.
6          (Plaintiffs' Exhibit No. 7 was marked for
7      identification.)
8  BY MR. PISANI:
9      Q.   I'm handing you a document that the court
10 reporter has marked as Exhibit 7.  Would you please read
11 that e-mail?
12     A.   "I'm writing up an agreement for someone
13 else --"
14     Q.   Not necessarily out loud.  That's okay.
15     A.   Okay.
16     Q.   So perhaps some of the disconnect we're
17 experiencing here is because I don't understand the
18 industry.  Can you explain to me what a sub-affiliate
19 is?
20     A.   A sub-affiliate could be one of many things.
21 In this situation it could be someone that either -- let
22 me read it one more time.
23     Q.   Sure.  Take your time.
24     A.   In this situation I would assume that a
25 sub-affiliate would be maybe a company I introduced to
```

---

86

1   Saveology.
2       Q.   A company you introduced to Saveology?  Could
3   you give me an example?
4       A.   YXZ Company down the street sells alarms.
5   They want to speak to Saveology about selling ADT.
6   Saveology takes it upon themselves to do due diligence
7   on the company, meet with them.  Sub-affiliate.  I'm an
8   affiliate, so a sub would be someone else.
9       Q.   As opposed to someone you hire, wouldn't they
10  just be an affiliate?
11      A.   No, because at the end of the day I've got to
12  basically book all their sales which I can't do.
13      Q.   Okay.  So, you read this e-mail today that was
14  drafted on April 6, 2011, and do you have a specific
15  recollection about what this was about?
16      A.   Probably just introducing people.  You know,
17  in terms of sales, you're trying to get volume.  If
18  you're going to do a sub-affiliate would be, hey, here's
19  another guy that wants to sell alarm.  Meet him, deal
20  with him.
21      Q.   What affiliates did you introduce to
22  Saveology?
23      A.   Through Paramount?  None.
24      Q.   Through Paramount.
25      A.   Yeah.

---

87

1       Q.   And this is in April 6 of 2011.  Paramount was
2   still in business at that point, correct?
3       A.   What month?
4       Q.   April 6th.
5       A.   I don't know if this was coming to the end.  I
6   can't give you specific dates.
7       Q.   You don't specifically recall?
8       A.   I don't specifically recall, no.
9       Q.   Okay.
10      A.   And I don't even recall if I had ever -- I
11  might have.  I can't give you 100 percent if I
12  introduced people.  South Florida is a place where you
13  introduce people to people.
14      Q.   Okay.
15      A.   So I can't really speak.
16      Q.   But, again, so I can understand --
17      A.   Sure.
18      Q.   -- and we can get through this quicker, would
19  a lead provider, would you call them a sub-affiliate?
20      A.   No.
21      Q.   No.  You would only call them a lead provider?
22      A.   Correct.  If you said I have a great lead
23  source, it's a lead source.  It's not --
24      Q.   You would say give me the number.
25      A.   Sure.

---

88

1       Q.   Again, turning back to, this is the contract.
2   I believe it's Exhibit 2.
3       A.   Uh-huh.
4       Q.   We're on page four.  You testified today about
5   how ADT and Saveology as well as Paramount Media Group
6   took compliance very seriously.
7       A.   That's correct.
8       Q.   So do you see in the section of the contract
9   that requires PMG to produce -- and now I'm reading --
10  any other information required by ADT in any manner
11  relating to affiliates, telemarketing guidelines.
12           MR. BAUGHMAN:  Services.
13  BY MR. PARONICH:
14      Q.   Services.
15      A.   What paragraph is it?
16      Q.   Down the page.  We're on page four, I think.
17      A.   Here?  Okay.  Affiliate agrees --
18      Q.   Right here.
19      A.   Okay.
20      Q.   Do you see that?
21      A.   Yes.  Yes.
22      Q.   You testified today about how you would
23  produce opt-in information, and I think you specifically
24  referenced Jay Conner?
25      A.   Yes.

---

89

1       Q.   Would you -- were you asked to produce any
2   other information other than what you've testified about
3   today?
4            MR. BAUGHMAN:  Objection.
5       A.   I don't recall.  I mean, your questions are a
6   little bit more confusing.  You're asking me if I was
7   ever asked to provide information on --
8   BY MR. PARONICH:
9       Q.   In any manner relating to the affiliates
10  telemarketing guidelines which is Paramount Media Group?
11           MR. BAUGHMAN:  I object.  He's testified to a
12       number of different things and your initial
13       question made it sound like you were just talking
14       about one.  So I think the question is misleading,
15       but...
16  BY MR. PARONICH:
17      Q.   I'll move on.  That's fine.
18           How would you get the opt-in information that
19  you produced to Saveology?
20      A.   From?  From my lead provider?
21      Q.   Yes.
22      A.   It comes in with the lead.
23      Q.   So again, I'm just trying to understand, does
24  it appear on the computer in front of the agent, your
25  agent?

90

1    A.    Yes.

2    Q.    And so John Smith is calling from EMI and we

3 have Theresa Jones on the phone who wants ADT.

4    A.    Wants an alarm system, correct.

5    Q.    They just say an alarm system?

6    A.    I'm not the guy who answers the phone, but it

7 was, the understanding was it's a generic alarm sale.

8 That's the same reason I started selling -- how would I

9 start selling Protect America if they were saying ADT?

10   Q.    I'm just trying to understand.

11   A.    I'm just trying to help you out.

12   Q.    Okay.  Thank you.  So then it appears on the

13 screen -- what appears on the screen?

14   A.    Name, phone number, e-mail address.  I'm not

15 100 percent sure if the opt-in, but it was always

16 available.  You know what I mean?  Because it is someone

17 else's data.

18   Q.    Yeah, I'm trying to understand, so --

19   A.    Date, time stamp.

20   Q.    -- you're not sure if the opt-in information

21 appeared in the initial transfer?

22   A.    Not 100 percent.  I'm pretty sure it did.

23   Q.    Okay.

24   A.    I'm not one 100 percent.  I'm being

25 speculative.

91

1    Q.    Okay.  So then when the Jay Conner complaint

2 comes in, I read these documents and it's very clear

3 that you tried to take compliance seriously, what is

4 your first step?

5    A.    I needed the opt-in information.

6    Q.    And how do you get that?

7    A.    I requested it from EMI at the time.

8    Q.    I see.  Did you do that via e-mail?

9    A.    No, I probably did it on the phone.

10   Q.    And would they send it to you via e-mail?

11   A.    Yeah, I assume so.

12   Q.    Do you know if you produced any of those

13 e-mails in this litigation?

14   A.    I produced everything I had.

15   Q.    But do you know if you produced any e-mails

16 from EMI giving you opt-in information that you

17 requested?

18   A.    I believe I've seen it in the paperwork here,

19 yes, on one of the e-mails to Saveology.

20   Q.    And who at EMI was that e-mail from?

21   A.    I don't recall who it was at that time.  I

22 know I request it, I get it.

23   Q.    Probably either Samantha or Chris Lopez?

24         MR. SPOONT:  Objection.

25         MR. BAUGHMAN:  Objection.

92

1         MR. PISANI:  Objection.

2 BY MR. PARONICH:

3    Q.    No idea?

4    A.    No idea.

5    Q.    So this Jay Conner complaint came in.  At that

6 time did Saveology ever say we need to do an audit of

7 Paramount Media Group's practices?

8    A.    They said you need to terminate the

9 relationship immediately.

10   Q.    You need to terminate the relationship

11 immediately, not Saveology's terminating Paramount Media

12 Group?

13   A.    I believe after that is when the termination

14 for Paramount occurred.

15   Q.    You believe Paramount was terminated in

16 April of 2011?

17   A.    No, I didn't say that.  I said after that

18 situation I believe is when it was terminated.

19   Q.    But you don't recall when it was?

20   A.    No.  We're going back two years.  I mean, a

21 year and a half.

22   Q.    Okay.  So Saveology never said you need to

23 come have a meeting with us and we need to talk about

24 what is happening over at Paramount Media Group because

25 this is important to us?

93

1         MR. BAUGHMAN:  Objection.

2    A.    Paramount Media Group, prior to the Jay Conner

3 situation, was doing everything that it understood to

4 the best of its knowledge complying with.  What other

5 people do really doesn't have relevance, you know, on

6 me, because people tell you you do something right, to

7 this day, I don't know what EMI did.

8    Q.    Sure, I understand that.  But I guess the

9 issue I'm having is that you all took compliance very

10 seriously and you know Saveology took it extremely

11 seriously?

12   A.    Yes.

13   Q.    So wouldn't you want to do some extensive due

14 diligence on what EMI is doing if they're your lead

15 provider?

16         MR. BAUGHMAN:  Objection.

17   A.    I did.  I got the opt-in information.

18 BY MR. PARONICH:

19   Q.    I mean -- I'm sorry.  Finish.

20   A.    Before, you mean?

21   Q.    I meant before entering into the relationship

22 with them.

23   A.    Well, let me ask you --

24   Q.    Just try to answer my question.  I know it's

25 difficult.

94

1     A.  The question is -- everything they were doing
2  to this opt-in information, your own general alarm data
3  was compliant.  The situation here is I had no knowledge
4  of the other things that occurred at EMI.
5     Q.  So they told you that -- EMI told you we abide
6  by all guidelines and that's where your investigation or
7  due diligence ended?
8     A.  Yes.  Someone -- if you do business with
9  another company, you know, you buy things from them,
10  you -- sure, provide opt-in information.  I'm providing,
11  by what you believe in this, is the right thing to do,
12  and you get, you know, blindsided.
13     Q.  So, is it your memory that the Jay Conner
14  issue was the first telemarketing complaint Paramount
15  Media Group had?
16          MR. BAUGHMAN:  Objection.
17  BY MR. PARONICH:
18     Q.  You can answer.
19     A.  I don't recall.
20     Q.  Sure.  It was a long time ago.
21     A.  Sure.
22     Q.  Tab 17.
23          (Plaintiffs' Exhibit No. 8 was marked for
24  identification.)
25          THE WITNESS:  Which one are we on now?

Debra Duran & Associates
Phone 561.313.8000  Fax 561.820.4857

95

1  BY MR. PARONICH:
2     Q.  This is a new one.  Take your time.  It's an
3  e-mail trail, so it's two pages.  Tab 17.
4          Have you had an opportunity to review this?
5     A.  Yeah.
6     Q.  It's a long e-mail chain.  So this is an
7  e-mail -- the first e-mail is from Daphne who was at
8  Saveology, correct?
9     A.  Uh-huh.
10     Q.  Was she your main contact at Saveology?
11     A.  Yeah.
12     Q.  To you on February 28, 2011 with the subject
13  line "please call me."  And it says, "Good morning,
14  Ryan.  Please read the below that we received from legal
15  ADT legal Friday night.  Please call me when you get in
16  as I have to answer ADT."
17     A.  I think I'm missing a page.
18     Q.  It's right there.
19     A.  Okay.  Okay.
20     Q.  Are you with me now?
21     A.  Yeah.
22     Q.  Now we're going on to the second page.  This
23  is Daphne saying "This is an e-mail from ADT.  I was
24  told that you manage the Saveology relationship.
25  Apparently, there has been a complaint about a marketing

Debra Duran & Associates
Phone 561.313.8000  Fax 561.820.4857

96

1  partner they use to sell ADT products.  Please read
2  complaint below.  Can you ask Saveology (1) to confirm
3  whether or not they use them, and if they do, (2) to
4  forward Paramount the complaint and ask them to respond
5  accordingly (provide their response to ADT), and lastly,
6  could you ask Saveology to produce a copy of the
7  agreement with Paramount, thanks."
8          And I'm still reading, "below is a more in
9  depth description of what folks are experiencing from
10  calls by this company working with Saveology.  I got
11  another call from these guys this morning.  (they have
12  been trying me multiple times a day) The call rep said
13  'this is Dan with ADT Home Security.'  I spoke with his
14  supervisor.  He confirmed they were with Paramount Media
15  Group of Boca Raton, Fl.  I asked if they were working
16  with ADT corporate or a dealer and he said they are a
17  partner of Saveology.  Saveology gives them lists to
18  call.  So even though I told Saveology to put me on the
19  DNC list, my name still got sent over to their
20  partner" -- and we'll stop there.
21          Again, this is in February of 2011.  What is
22  your memory of this complaint?
23     A.  My memory of this complaint is just speaking
24  to someone that didn't want us calling back his
25  information, which we had got.

Debra Duran & Associates
Phone 561.313.8000  Fax 561.820.4857

97

1     Q.  That happens.
2     A.  I spoke with him.  I made him happy.  And if
3  you went on to the 1-800 notes you'll see I addressed it
4  properly.  I told Daphne.  I felt everything I was doing
5  was in compliance.  I put him on the ADT call list, and
6  on 1-800 notes he goes onto say how nice of a guy I was
7  dealing with it.
8     Q.  I have not read the 800 notes site so do you
9  mind explaining to me what that's about?
10     A.  No.  I mean -- explaining 1-800 notes?
11     Q.  This specific site.
12     A.  Well, it's just one of those sites that when
13  people get bored they blog on.
14     Q.  When people get bored they blog?  It's a blog?
15     A.  Yes.  Are you familiar with what blogging is?
16     Q.  So, on this site someone blogged about you?
17     A.  Yeah.  My company, not me.
18     Q.  But they said what a nice guy you were?
19     A.  Correct.  Because I called back and I said,
20  you know, we received your lead via an opt-in.  You had
21  either called and requested a generic home security.  My
22  company followed up.  He obviously didn't want us
23  following up.  I took the call.  I notified Saveology.
24  And I spoke with the client.  I put him on the DNC list
25  both with ADT, within our company, and everybody was

Debra Duran & Associates
Phone 561.313.8000  Fax 561.820.4857

98

1  good.
2      Q.   Okay.  So, your -- the call rep for Paramount
3  Media Group -- I'm reading from the e-mail -- said this
4  is Dan with ADT Home Security.  Is that how you greeted
5  customers?
6      A.   No.  If you look at the next sentence.  Spoke
7  with supervisor.  He confirmed that this is Paramount
8  Media Group of Boca Raton.  The concept of an angry
9  customer who's saying doesn't want a call, speculating
10 that one of my reps said this is ADT, I can't even
11 address that, because my reps were trained thoroughly in
12 their training that this is Paramount Media Group.
13     Q.   Okay.  That's what I wanted to clarify.  Your
14 reps were told --
15     A.   Yeah, 100 percent.
16     Q.   I know it's hard, but just wait for me to
17 finish even if you already know the answer.
18     A.   No problem.
19     Q.   So you think whoever drafted this e-mail that
20 got forwarded to you is just an angry blogger?
21     A.   I think at the time of this, yes.  I think
22 they were angry.  After they spoke to a supervisor,
23 myself, they weren't angry.
24     Q.   Okay.  And this is in, again, this is February
25 of 2011.  And so, who were you getting leads from at

99

1  that time?
2      A.   A multitude of people.
3      Q.   Who?
4      A.   I don't recall.  I know -- in February?
5      Q.   Yeah, February of 2011.
6      A.   EMI was one of them.  I don't really remember
7  the list of alarm people.
8      Q.   So the only lead source that you remember as
9  we speak today from this time period is EMI?
10     A.   Correct.
11     Q.   Did you call EMI when this complaint came in,
12 because it seemed serious?
13          MR. BAUGHMAN:  Objection.
14     A.   This complaint wasn't formal.  This complaint
15 was the guy wanted a conversation with the supervisor.
16     Q.   Sure.  But it seems like someone messed up by
17 contacting him, right?
18          MR. PISANI:  Objection.
19          MR. BAUGHMAN:  Objection.
20     A.   No, not by law.  It's a follow-up.  He called
21 in.  I called back.  The time he was scrubbed, he said I
22 don't wish to get a call.  I then went to Paramount's
23 procedure, DNC with ADT, DNC with Paramount, end of
24 situation.
25     Q.   That was the end of the situation.  Okay.

100

1          So when you entered, when Paramount Media
2  Group entered into the contract with Saveology, what was
3  your understanding of the relationship between ADT and
4  Saveology?
5      A.   How would I have an understanding?
6      Q.   I don't know.  I'm asking you.
7      A.   It's above my pay grade.
8      Q.   But you knew you were marketing the ADT
9  product?
10     A.   I knew I had guidelines specifically to
11 follow, which Paramount did to the best of its ability,
12 and what happened was this one situation terminated that
13 relationship.
14     Q.   So this situation terminated the relationship?
15     A.   No.  The Jay Conner.
16     Q.   Okay.
17     A.   That's what I understood.  I don't know the
18 internals of ADT.  I don't know the internals of
19 Saveology.  I was a managing member of Paramount.
20 That's all I can really speak for.
21     Q.   Okay.  So you, if I'm understanding your
22 testimony correctly, you had no idea what the
23 relationship between ADT and Saveology was?
24     A.   How would I?
25     Q.   I don't know.  I'm just trying to ask

101

1  questions.
2      A.   The answer is no.  No.
3      Q.   Okay.  Again, I know a lot of people have
4  asked you questions today, so I apologize.
5      A.   It's okay.
6      Q.   Your contact at EMI, now I'm remembering, is
7  Chris Lopez?
8      A.   Most of the time I believe it was Samantha and
9  Chris, yes.
10     Q.   Samantha Omar; is that about right?
11     A.   Uh-huh.
12     Q.   And you would correspond with them regularly
13 e-mail?
14          MR. BAUGHMAN:  Objection.
15     A.   Most of it was verbal.
16 BY MR. PARONICH:
17     Q.   Most of it was verbal?  What would you talk to
18 them about?
19     A.   Volume of calls.
20     Q.   So, again, I apologize, I don't understand the
21 ins and outs, but how would you make an order with them?
22     A.   You have a transfer service.
23     Q.   Every single time that you bought leads from
24 EMI there was a transfer service order?
25     A.   Yeah.

---

**102**

```
 1      Q.   Okay.  And have you produced those?
 2      A.   I produced what I have.  It's not something I
 3  keep around, or to be honest with you, with any lead
 4  provider take very seriously.  They feel it's their
 5  security.  It has nothing to do with me.
 6      Q.   Pay and move on?  I understand that.
 7      A.   They got their money.
 8      Q.   I'm sure.  Do you remember if this was
 9  e-mailed over to you or faxed?
10           MR. BAUGHMAN:  What?
11           MR. PARONICH:  The transfer service order.
12           MR. BAUGHMAN:  Exhibit what?
13  BY MR. PARONICH:
14      Q.   Exhibit 1.
15      A.   I'm sure a little bit of both.
16      Q.   You don't remember?
17      A.   No.  I mean, probably both.
18      Q.   Okay.  And you believe that you produced every
19  transfer service order that you have?
20      A.   Correct.
21      Q.   Okay.  Do you remember how often you'd get one
22  of these?
23      A.   I don't remember.  Sometimes maybe biweekly.
24      Q.   Okay.  And would it be -- would you call Sam
25  or Chris and say, I want another X amount of leads and
```

---

**103**

```
 1  they would send you a transfer service order?
 2      A.   Uh-huh.
 3      Q.   And then the calls came in; that's how the
 4  whole thing works?
 5      A.   Uh-huh.
 6      Q.   Again, I'm afraid this might be a repeat, but
 7  you had no idea that EMI was sending robocalls,
 8  prerecorded messages?
 9      A.   No.
10      Q.   And your basis for that is because when a call
11  came into the Paramount Media Group center it was a live
12  person saying they had a potential customer for you.
13           MR. BAUGHMAN:  Objection; mischaracterizes his
14  testimony.
15      A.   No.  My basis for that was on the opening
16  relationship with EMI, which was verbal, said I'm doing
17  everything compliantly and properly.
18      Q.   Okay.  And when EMI called you with a
19  potential lead internally did Paramount Media Group
20  refer to these as inbound calls?
21      A.   Yes.
22      Q.   And then you tried to sell a customer and make
23  money, right?
24      A.   Uh-huh.
25      Q.   And you had between ten and 18 sales agents,
```

---

**104**

```
 1  or is that total employees?
 2      A.   Probably employees.  Sales agents are tough to
 3  keep around.
 4      Q.   What was the turnover like on sales agents?
 5      A.   You know, I probably had a core couple of
 6  people.
 7      Q.   Do you remember any of your sales agents from
 8  Paramount Media Group?
 9      A.   I remember their names, a couple of them.
10      Q.   Could you give me another?
11      A.   Christine Anderson.  Nick Faller.
12      Q.   Turnover was high?
13      A.   No, I mean --
14      Q.   No?
15      A.   The turnover was pretty -- for the tenure of
16  time Paramount was in business, it had the core four or
17  five people, and then, you know, an additional five or
18  six reps on the phone.  To be very frank, I tried not to
19  get to know my sales people.  I tried to put my managers
20  in place and....
21      Q.   Sure.  Okay.  Did any of the sales agents who
22  worked for you at the Paramount Media Group work for you
23  at the Altitude Group?
24      A.   No.  No.
25      Q.   Okay.  Is it the Altitude Group?
```

---

**105**

```
 1      A.   Yes.
 2      Q.   Was the Altitude Group in existence while
 3  Paramount Media Group was doing business?
 4      A.   I'd have to look that up for you.
 5      Q.   Okay.  Do they do similar --
 6      A.   No.
 7      Q.   They do not?
 8      A.   No.
 9      Q.   What does the Altitude Group do?
10      A.   Marketing.  Helps companies with marketing.
11      Q.   Okay.  Just, again, because I'm uninitiated, I
12  think of both of these things as marketing.  How does it
13  differ from Paramount Media Group?
14      A.   Paramount Media Group's marketing was
15  salespeople.  Altitude Group is not with salespeople.
16      Q.   Okay.  Is it with companies directly?
17      A.   Yeah.
18      Q.   Okay.  I'm going to show you another document.
19           (Plaintiffs' Exhibit No. 9 was marked for
20  identification.)
21  BY MR. PISANI:
22      Q.   Tab 7, everyone.
23           I'm showing you what the court reporter has
24  marked as Exhibit No. 9, again, for everyone else it is
25  Tab 7.
```

```
                                                    106
1          MR. BAUGHMAN:  Anthony, what is this?  It's
2    not Bates numbered.
3          MR. PARONICH:  It's not Bates?
4          MR. BAUGHMAN:  It's not.
5    BY MR. PISANI:
6     Q.   It's an Excel spreadsheet that is entitled EMI
7    inbounds that Mr. Neill and Paramount Media Group
8    produced.
9          MR. BAUGHMAN:  So it was produced in
10   electronic form?
11         MR. PARONICH:  It was.
12         MR. LINDSMITH:  Who produced it?
13         MR. PARONICH:  Mr. Neill and Paramount Media
14   Group.  And it was produced in PDF form originally,
15   and then you all should have it in native form, as
16   well.
17   BY MR. PARONICH:
18    Q.   You do have that?
19    A.   (Nodding head.)
20    Q.   Do you want to review it or do you know what
21   that is?
22    A.   What would you like me to review?
23    Q.   Take a look at the document itself and just --
24   -- I'm assuming, do you recognize the document?
25    A.   I do recognize the document.  I'm sure when
```

```
                                                    107
1    this all started you guys asked for information.  I gave
2    you, to the best of my ability, all the information I
3    could find.
4     Q.   Sure, and I appreciate that.  But right now as
5    we sit here do you know what this document is?
6     A.   No.
7     Q.   If I suggested to you that it was entitled EMI
8    inbounds when you produced it, would that refresh your
9    memory as to what it is?
10    A.   No.
11    Q.   Okay.  Well, let's take a look at it.
12         MR. SPOONT:  Is this document incomplete?
13         MR. PARONICH:  Yes, it is about 250 pages so
14   this is --
15         MR. MCCUE:  An excerpt.
16         MR. PARONICH:  An excerpt from the EMI
17   inbounds native.
18         MR. LINDSMITH:  Is there a cover first page
19   that would show it's EMI inbounds?
20         MR. PARONICH:  This is the fist page, so, no.
21         MR. BAUGHMAN:  I'm going to lodge an objection
22   to this line of questions on the document because
23   it's incomplete and there's no foundation, because
24   he hasn't testified to what it is.
25         MR. PISANI:  He testified he doesn't know what
```

```
                                                    108
1    it is.
2    BY MR. PARONICH:
3     Q.   So you have no idea what it is?
4     A.   You just handed me a list of names, phone
5    numbers, and dates.  I mean...
6     Q.   And if I wanted to talk to about an Excel
7    spreadsheet labeled EMI inbounds that Paramount
8    Media Group produced, would you know what that is?
9     A.   I don't recall.  Anything I've given to you is
10   what you requested.
11    Q.   Okay.  I appreciate that.
12         MR. LINDSMITH:  If there's a document labeled
13   EMI inbounds, how is it labeled?
14         MR. PARONICH:  The file name is EMI inbounds.
15         MR. PISANI:  That is a general file that this
16   is an excerpt from?
17         MR. PARONICH:  Yes.
18         MR. SPOONT:  Are you suggesting that he
19   produced this document, or someone else did?
20         MR. PARONICH:  His attorneys produced it.
21         MR. SPOONT:  Was it Bates labeled?
22         MR. PARONICH:  I think the PDF form, which was
23   illegible was Bates'd in the native format, which
24   this is, was not.  I'll take this back and we'll
25   avoid it.  That is fine.  You should keep this.
```

```
                                                    109
1         It's already been labeled as an exhibit.
2    BY MR. PARONICH:
3     Q.   So EMI leads come in.  How does Paramount
4    Media -- did Paramount Media Group keep track of the
5    leads that EMI was sending so they would know how much
6    to pay?
7     A.   In terms of revenues?
8     Q.   Yes.
9     A.   We got a sheet sent to us.
10    Q.   The sheet like the transfer service order?
11    A.   No.  Pay whom?
12    Q.   EMI.
13    A.   No.  You paid them.  They gave you what they
14   gave you.
15    Q.   Okay.
16    A.   You got to a certain amount and then you paid
17   them again if you wanted more.
18    Q.   So my question is who would keep track of that
19   certain amount?
20    A.   At the time I believe I had a system that
21   could count it.
22    Q.   A computer system?
23    A.   Yeah.
24    Q.   Do you remember the name of that system?
25    A.   I don't.
```

## Page 110

```
 1    Q.    Okay.  Tab 10.
 2          MR. BAUGHMAN:  Ten is ten?
 3          MR. PARONICH:  Yes.
 4          (Plaintiffs' Exhibit No. 10 was marked for
 5   identification.)
 6   BY MR. PARONICH:
 7    Q.    Mr. Neill, do you recognize this document?
 8    A.    I believe I do.
 9    Q.    And what do you recognize it as?
10    A.    Revenue.  PMG revenue.
11    Q.    From who?
12    A.    Saveology.
13    Q.    So these payments, your understanding is these
14   payments, this document reflects payments made from
15   Saveology to Paramount Media Group?
16    A.    That's correct.
17    Q.    All for leads?
18    A.    Paramount did not provide leads to Saveology.
19   Sales.
20    Q.    Sales, I'm sorry.
21    A.    Sales.
22    Q.    How does a lead become a sale?
23    A.    We sell it.  We put it in the portal, the
24   Saveology portal, lead tracks.
25    Q.    Lead tracks is?
```

Debra Duran & Associates
Phone 561.313.8000  Fax 561.820.4857

## Page 111

```
 1    A.    Is Saveology, at the time was the portal.  You
 2   put the sale in.  You sell it, put it in and they let
 3   you know whether it installs or not.
 4    Q.    I see.  So Saveology takes care of installing
 5   the customer?
 6    A.    Yeah.
 7    Q.    So is there any written contract between the
 8   customer and Paramount Media Group?
 9          MR. BAUGHMAN:  Objection.
10    A.    No.
11   BY MR. PARONICH:
12    Q.    Okay.  And so how often were you paid by
13   Saveology?
14    A.    The date's right here.  Weekly.
15    Q.    Every week.  And would you get an e-mail every
16   week reflecting how much you were going to get paid, or
17   would a transfer show up?  How were you paid?
18    A.    Yeah.
19    Q.    Yes, you would get an e-mail every week?
20    A.    Yeah, I believe so.
21    Q.    At the bottom of the document there is a cell
22   that says "low Beacon percentage."  What is that?
23    A.    Low Beacon percentage means percentage of
24   customers that are under a certain Beacon score.
25    Q.    What is a Beacon score?
```

Debra Duran & Associates
Phone 561.313.8000  Fax 561.820.4857

## Page 112

```
 1    A.    Your credit score.
 2    Q.    So did you get paid a different amount of
 3   money for different Beacons?
 4    A.    Correct.
 5    Q.    Presumably less money for lower Beacons?
 6    A.    Correct.
 7    Q.    So after -- Paramount Media Group never sold
 8   Protect America installs to Saveology, correct?
 9    A.    That's correct.
10    Q.    Only ADT?
11    A.    That's correct.
12          MR. BAUGHMAN:  Object to form.
13   BY MR. PARONICH:
14    Q.    So, all of these payments are for ADT
15   installations?
16          MR. BAUGHMAN:  Objection.  What do you mean?
17          ADT installations is not defined, but -- objection.
18    A.    To the best of my knowledge all of these
19   payments are for ADT.
20   BY MR. PARONICH:
21    Q.    And is this all of the amount that you --
22   excuse me.  Strike that.
23          Would these payments represent all the monies
24   you received from Saveology?  Let me clarify.  Were they
25   just for ADT products or did you also sell anything else
```

Debra Duran & Associates
Phone 561.313.8000  Fax 561.820.4857

## Page 113

```
 1   to Saveology?
 2          MR. PISANI:  Object to the form.
 3          MR. BAUGHMAN:  Objection.
 4    A.    These payments are relating, to the best of my
 5   knowledge, ADT.
 6   BY MR. PARONICH:
 7    Q.    Okay.  And at the bottom of the document, I
 8   don't have it in front of me, cell -- row 48 it says
 9   "paid to date."  And then it says "2990."  Those are
10   installations that go in the ground?
11          MR. BAUGHMAN:  The what?
12   BY MR. PARONICH:
13    Q.    That go in the ground, the alarms that get
14   installed?
15    A.    Correct.
16    Q.    Okay.  What is a change or charge-back, which
17   is in the next row over?
18    A.    A charge-back would be, once again my
19   visibility is limited, if you go out and you install
20   a -- to my recollection of ADT sales -- ADT sells
21   something called a 3-2-1, which is three-point of
22   contacts, two motion detectors and one panel.  If
23   someone gets to the home and says, well, I want two
24   motion detectors, you know, they're going to say, okay,
25   they're going to take that additional equipment value
```

Debra Duran & Associates
Phone 561.313.8000  Fax 561.820.4857

114

1   from an affiliate.
2        Q.   So is it another way Paramount Media Group
3   loses a little money on the sale?
4        A.   Well, I would assume every party involved
5   would.
6        Q.   Sure.
7        A.   Yeah, I mean, I guess.
8        Q.   So then, again, in that same row 48, we just
9   went over the number of low beacons and total amount
10  paid.
11       A.   Uh-huh.
12       Q.   It says $1,335,525.22, correct?
13       A.   Uh-huh.
14       Q.   Does that sound about right to you?
15            MR. BAUGHMAN:  Sound about right?
16            MR. PISANI:  Object to the form.
17       A.   That's what the sheet says, yeah.
18  BY MR. PARONICH:
19       Q.   Sure.  So that is just, in 2011 Paramount
20  Media Group received over $1.3 million from Saveology?
21       A.   Correct.
22       Q.   That seems like a lot of money.
23            MR. PISANI:  Objection.
24            MR. BAUGHMAN:  Objection.
25

115

1   BY MR. PARONICH:
2        Q.   What was your overhead like at Paramount Media
3   Group?
4        A.   High.
5        Q.   High?
6        A.   Yeah.  Sales agents.  Rent.
7        Q.   Rent?
8        A.   Electric.  I mean, I don't question whether
9   people's pay rates are high.
10       Q.   Sure.  Understood.  I didn't mean to offend
11  you.
12       A.   No, you didn't.  For a company that, you know,
13  it's -- I don't know.  Look at a lot of companies.  You
14  think Apple's revenue is high?
15       Q.   So on the column pay date, it starts on row
16  four, the last date is October 14, 2011.
17       A.   Yes.
18       Q.   Did Paramount Media Group work with Saveology
19  all through that date, through October 14, 2011?
20       A.   I can't answer that.  I don't have the
21  information in front of me.
22       Q.   That's okay.  After the Jay Conner lawsuit
23  came in you got rid of EMI?
24       A.   Uh-huh.
25       Q.   There are a substantial number of -- there are

116

1   sales after that date.  What did you use for a lead
2   provider?
3            MR. SPOONT:  Objection.
4            MR. BAUGHMAN:  Objection.
5            MR. SPOONT:  It's not sales.
6            MR. PISANI:  Objection.
7        A.   I had said earlier I don't recall what lead
8   providers I was using.
9   BY MR. PARONICH:
10       Q.   After EMI?
11       A.   The one I remember because lead providers
12  aren't something -- you know, it's just a lead provider.
13       Q.   So throughout the life of Paramount Media
14  Group the only lead provider that you recall today is
15  EMI?
16            MR. BAUGHMAN:  Objection.
17       A.   To the best of my knowledge.
18            MR. BAUGHMAN:  That he can name?
19       A.   To the best of my knowledge.
20  BY MR. PARONICH:
21       Q.   Would Paramount Media Group ever receive
22  volume bonuses from Saveology?
23       A.   Yes.
24       Q.   How did those work?
25       A.   It's basically a production reward.  If you do

117

1   well, obviously, if someone sells a product and you're
2   selling five, well the value isn't as much as if you're
3   selling 50 or 100.
4        Q.   Sure.
5        A.   So it's probably, to the best of my knowledge
6   from a business owner a margin differential.
7        Q.   Sure.  And did you know what number of
8   installs Paramount Media Group had to hit in order to
9   get the volume bonus?
10       A.   I don't recall off the top of my head.  I
11  mean, the volume bonus, you're talking ten, 15-dollars
12  to whatever member.  So it's nominal.
13       Q.   Ten, 15-dollars per extra install?
14       A.   Per install, something like that.  I don't
15  recall the arrangement.  I recall saying that, you know,
16  I need to increase revenues to keep up with hard costs
17  and labor costs.  And they, as I got tenured in the
18  business and I did a little more and a little more and
19  that was obviously the objective.
20       Q.   Okay.  I see.  You don't recall who American
21  Protection Services was?
22       A.   No.  I don't recall whether that was --
23  through everything I don't recall if that was a pseudo
24  name of EMI or it was another one of our providers.
25       Q.   And so, I'm assuming you didn't -- you don't

118

1   remember anyone you talked to at American Protection
2   Services?
3          MR. BAUGHMAN:  Objection.
4      A.   No, I don't recall.
5          MR. PARONICH:  Let's take a short break.  I
6      might be done.
7          MR. BAUGHMAN:  Okay.
8          (At 11:27 a.m. a recess was taken.)
9          THE VIDEOGRAPHER:  We are back on the record
10     at 11:35.
11  BY MR. PISANI:
12     Q.   Mr. Neill, welcome back.
13     A.   Thank you.
14     Q.   When Paramount Media Group began, the first
15  company that they sold leads for was Protect America,
16  correct?
17     A.   I believe that's correct.
18     Q.   And when did Paramount Media Group begin?
19     A.   I believe in October; September, October.  I
20  don't have the exact date.
21     Q.   Of 2010?
22     A.   Yes.
23     Q.   And how long did Paramount Media Group sell
24  Protect America for?
25     A.   I don't recall.

119

1      Q.   Did Paramount Media Group stop selling Protect
2   America after you had talked to Saveology about selling
3   for them?
4      A.   I believe so, yes.
5      Q.   And so then for most of the duration of
6   Paramount Media Group it sold Saveology?
7          MR. PISANI:  Object to the form.
8      A.   I'm not 100 percent on that answer.
9   BY MR. PARONICH:
10     Q.   Besides Protect America and Saveology, did
11  Paramount Media Group sell to anyone else?
12         MR. BAUGHMAN:  Objection; asked and answered.
13     A.   I believe I already answered.  I believe I
14  already answered that.  I believe the answer is no.
15     Q.   Okay.  So, I'm going to show you a document
16  that was produced by your counsel.  Everyone, it's Tab
17  3.
18         (Plaintiffs' Exhibit No. 11 was marked for
19  identification.)
20  BY MR. PARONICH:
21     Q.   Would you please read that over?
22         MR. BAUGHMAN:  What is this, 11 or 12?
23         MR. PARONICH:  Exhibit 12.
24  BY MR. PARONICH:
25     Q.   Have you had a chance to review the e-mail?

120

1      A.   Yeah.
2      Q.   I apologize if you've already been asked this,
3   but who is Reid Shapiro?
4      A.   Reid Shapiro, I believe, is one of the
5   partners at Saveology.
6      Q.   Okay.  The e-mail is dated April 20, 2011.  It
7   says, "Ryan, please read the e-mail below.  Are you
8   working with a lead provider called American Protection
9   Services?  They have been calling an ADT high level
10  person for several months now, who has repeatedly been
11  asked to be put on the DNC list.  Let me know your
12  findings.
13         "It is also wise to remove any 303-306-XXXX
14  numbers from any of your dialing efforts - this area
15  code and 1st 3 numbers are more than likely ADT
16  employees that you are dialing.
17         "Please provide me with the opt-in information
18  for this number below to show why this consumer would be
19  receiving calls from any of your transferring centers."
20         Do you remember this complaint?
21     A.   There's no person there complaining.  It's
22  just saying read the e-mail below.  "I received a near
23  daily telemarketing" -- no, I don't recall this
24  complaint.
25     Q.   Do you recall getting the instruction from

121

1   Saveology to remove these numbers from your dialing
2   efforts?
3      A.   Well, are you asking about right here?
4      Q.   The 303 numbers, yes.
5      A.   It says that in the e-mail.  It's not
6   something that is on the top of my head.
7      Q.   So do you remember if you, in fact, removed
8   those numbers from your dialing efforts?
9      A.   I don't remember that.  If you read this part
10  here it says "it is also wise."  It doesn't mean
11  formally you can't dial that area code.
12     Q.   Okay.  But the likelihood of reaching an ADT
13  employee didn't prompt you to say we should follow this
14  suggestion?
15     A.   I'm sure if, at the time, and once again, I'm
16  not 100 percent, I couldn't give you a proper answer on
17  that.  I don't really recall.
18     Q.   Okay.  Would Daphne often send you e-mails
19  with, it seems like further guidelines such as this,
20  suggestions for your dialing efforts?
21         MR. BAUGHMAN:  Objection.
22         MR. PISANI:  Objection.
23  BY MR. PARONICH:
24     Q.   Let me strike that.  Would Daphne often send
25  you e-mails with suggestions for your dialing efforts?

122

1          MR. PISANI:  Objection.
2          MR. BAUGHMAN:  Objection.
3      A.   I don't recall the e-mails between Daphne and
4   I.
5   BY MR. PARONICH:
6      Q.   You received a lot of them and --
7      A.   You know, I corresponded with Daphne
8   pertaining to the things in the agreements between
9   Paramount and Saveology.
10     Q.   You corresponded with Daphne about compliance
11  issues?
12     A.   Yeah.
13     Q.   Okay.  And so your compliance contact at
14  Saveology gives you a suggestion for numbers to be
15  removed from your dialing efforts and you may or may not
16  have followed that instruction?
17         MR. BAUGHMAN:  Objection.  You used the word
18     instruction, which is --
19     A.   I can't give you -- I can't give you a
20  concrete answer because I don't recall.
21  BY MR. PARONICH:
22     Q.   Okay.  So you've testified at length today
23  about how Paramount Media Group, Saveology and ADT took
24  their telemarketing guidelines very seriously, correct?
25     A.   That's correct.

123

1      Q.   You also testified today that the only lead
2   provider that you can remember is EMI, correct?
3          MR. PISANI:  Objection.
4          MR. BAUGHMAN:  Objection.
5          MR. PISANI:  That's not what he said.
6          MR. BAUGHMAN:  That's not at all what he said.
7      That is totally misleading.
8          MR. MCCUE:  That's what he said three times.
9          MR. BAUGHMAN:  No.  He said he can't remember
10     the names of them and your question made it sound
11     like he can only remember that there was one.  That
12     is totally misleading.
13  BY MR. PARONICH:
14     Q.   Do you remember the names of any lead
15  providers at Paramount Media Group other than EMI as we
16  sit here today?
17     A.   I don't recall the names of them.  I know we
18  had them.  I just, you know, I don't recall the names.
19     Q.   Okay.  So, specifically with EMI, as Paramount
20  Media Group took telemarketing guidelines very
21  seriously, did you provide the telemarketing guidelines
22  to EMI?
23     A.   I'm sure at one time or another.  I can't tell
24  you if I did or didn't.  I'm pretty sure that the
25  opening conversation between EMI and Paramount started

124

1   by EMI stating they know -- they know the industry
2   better than me.  They know the guidelines.  They
3   understood everything.  And that gave Paramount a level
4   of comfort.
5      Q.   Did they tell you that they understood the ADT
6   guidelines?
7      A.   They understood the guidelines for ADT, yes.
8      Q.   Okay.  Did you ask them how?
9      A.   No.  It's a pretty common sense question.  I
10  understand the guidelines of ADT.  Good, great.  We're
11  on the same page.
12     Q.   Okay.  Are you familiar with any third party
13  telemarketing audit entities, for example, Possible Now
14  or Compliance Point?
15     A.   Pertaining to Paramount or in general?
16     Q.   In general.
17     A.   I'm familiar with them, yes.
18     Q.   How are you familiar with them?
19     A.   They're the, I believe that is one of ADT's
20  partners in terms of compliance, I believe.  That's kind
21  of guessing.
22     Q.   Okay.  Have you ever used Possible Now or
23  Compliance Point?
24     A.   I believe we have used them -- we had to
25  scrub.  When we scrub information, I believe that is who

125

1   we scrub through.
2      Q.   Your understanding is that the information
3   that you scrubbed through was provided by those
4   entities?
5      A.   To the best of my knowledge.  I just kind of,
6   once again, you're going into a level that is above my
7   pay grade.
8      Q.   That's fine.  Paramount Media Group, did they
9   ever hire Possible Now or Compliance Point?
10     A.   I would assume if we had to scrub through
11  Saveology that that is who they used.
12     Q.   But Paramount Media Group didn't hire them
13  directly?
14     A.   I had a -- Paramount Media Group had a
15  relationship with Saveology.  Saveology had a
16  relationship with ADT.
17         If Paramount Media Group is following the
18  guidelines provided to us, we scrubbed through whoever.
19  I have no visibility inside of Saveology is my answer, I
20  guess.  So anything that was scrubbed, I don't know if
21  they used one or the other.
22     Q.   But just, Paramount Media Group never hired
23  either of these entities, correct?
24     A.   No, I don't know if -- I'm not 100 percent on
25  that.  I don't know if Paramount hired them or if we

126

1  utilized Saveology's.  I do not know.
2        MR. PISANI:  Okay.  That's all I have for now.
3        RECROSS (RYAN NEILL)
4  BY MR. BAUGHMAN:
5     Q.  I just have a couple of real quick follow up
6  questions.
7        THE VIDEOGRAPHER:  You need to grab a
8  microphone.
9        THE WITNESS:  Can I keep this?
10 BY MR. BAUGHMAN:
11    Q.  No.  The court reporter gets that.  By the
12 way, you have the right to read and sign the transcript,
13 meaning that after the court reporter writes this is all
14 down, you have the right to look through the transcript
15 and see if there's anything that you think is
16 inaccurate.
17    A.  Yeah, I think, you know, at the beginning I
18 said I spoke, one thing I said that kind of pinged in my
19 head is I spoke to Chris Long, and I never did.  I just
20 got the two Chris's confused.  So I'll take a peak at
21 it.
22    Q.  So you would like to exercise that right to
23 read and sign the transcript?
24    A.  A hundred percent.
25    Q.  So the court reporter will send that to you

127

1  and you have that right.
2        Real quickly, take a look at Exhibit 12, which
3  I just showed you.
4     A.  Do I have 12?
5     Q.  It was the last thing he showed you.  It's the
6  4/20/11 e-mail from Daphne to you.
7        COURT REPORTER:  I think that's 11.
8  BY MR. BAUGHMAN:
9     Q.  Is that not exhibit 12?
10       MR. PARONICH:  I think it's 11, Mike.
11 BY MR. BAUGHMAN:
12    Q.  My bad.  Exhibit 11.  Tab 3.  Sorry.
13    A.  Okay.
14    Q.  You've got it now?
15    A.  Yes, I do.
16    Q.  And you understood that this was passing along
17 a issue that ADT asked Saveology to resolve regarding
18 telemarketing, right?
19       Would you repeat the question?
20       MR. MCCUE:  Objection.
21 BY MR. BAUGHMAN:
22    Q.  You understood that this was passing along,
23 this was Saveology passing along to you a question that
24 ADT had regarding telemarketing that they wanted an
25 answer to, right?

128

1     A.  Yes, that's correct.
2     Q.  That was because ADT, when they got
3  complaints, wanted to get them resolved, right?
4     A.  Correct.
5        MR. MCCUE:  Objection as to ADT's knowledge.
6     A.  Correct.
7  BY MR. BAUGHMAN:
8     Q.  And down at the bottom here, The first
9  operator told me American Protection Services -- do you
10 see that?
11    A.  Uh-huh.
12    Q.  Remember earlier when I was asking you
13 questions I showed you an e-mail about American
14 Protection Services?
15    A.  Yeah.
16    Q.  It's your recollection that basically shortly
17 after you got this e-mail you terminated American
18 Protection Service?
19    A.  Correct.
20    Q.  Okay.  Pull up -- hopefully I've got the
21 exhibits right.  Pull up Tab 10 which I think is Exhibit
22 10.
23       MR. PARONICH:  That's right.
24 BY MR. BAUGHMAN:
25    Q.  And this is the commission payments to you.

129

1  Do you see that?
2     A.  Yes.
3     Q.  You were asked some questions about this and I
4  think you gave an answer along the lines of these were
5  sales relating to ADT, right?
6     A.  That's correct.
7     Q.  But I think you testified earlier you don't
8  know, once you pass the sale onto Saveology, you don't
9  know where that goes, right?
10    A.  Correct.
11    Q.  It could be to ADT's dealers, correct?
12    A.  Correct.
13    Q.  So all of this money could be coming not from
14 ADT, but from ADT dealers?
15    A.  That is correct.
16    Q.  Pull up Tab 17, which is Exhibit 8.
17       You were asked some questions about, this is
18 an e-mail string dated February 28, 2011.  And, again,
19 this is passing along to you a complaint.  Have you got
20 it yet?  I'm sorry.  It is Exhibit 8, an e-mail
21 February 28, 2011.
22    A.  What's the e-mail?
23    Q.  Daphne to you, February 28, 2011.  There's a
24 big Paramount Media Group on the first page.
25    A.  Okay.

130

```
1     Q.   You got it?
2     A.   Yup.
3     Q.   You were asked some questions about this
4  document earlier; do you remember that?
5     A.   I was asking questions?
6     Q.   You were asked some question about this
7  document earlier, right?
8     A.   Yes.  Yes.
9     Q.   And this is the situation where the person
10 wanted to speak to a supervisor, they spoke to you and
11 they were happy, right?
12    A.   Correct.
13    Q.   And I think you testified there was nothing --
14 well, first of all, this is passing along a complaint
15 that ADT received, got passed along to you for an
16 answer; is that right?
17    A.   I was under the impression that this wasn't a
18 formal complaint, and this was just someone coming from
19 my center, which company policy was for a manager to
20 speak to them.  I took it upon myself.
21         I vaguely recall.  But I had a nice
22 conversation with the gentleman.  I said I would take
23 care of all the proper procedures, and he went back on
24 to this blog and said, the owner of Paramount is a good
25 guy.
```

131

```
1     Q.   Okay.  And maybe I used the wrong terminology.
2  It was an issue that came to ADT in some way that made
3  its way to you; is that right?
4     A.   It made its way to me from Daphne.
5     Q.   Okay.  And I think you testified earlier, you
6  didn't think there was anything improper about this
7  call, it was just sort of a customer service issue,
8  right?
9     A.   Yeah.  He had come in with opt-in stuff and I
10 guess we had called him and he didn't want to be
11 bothered.  I do recall the gentleman saying he works in
12 a big call center and, you know, that type of thing.
13    Q.   So you even got, I mean, questions from ADT
14 came down to you about any sort of customer service
15 issue that involved do not contact, right?
16    A.   Yes.
17    Q.   They wanted to make sure even if it didn't
18 involve a legal violation, they wanted to make sure
19 their customers were happy, right?
20    A.   Correct.
21         THE VIDEOGRAPHER:  Do you have a phone on?
22         THE WITNESS:  Yes.
23         THE VIDEOGRAPHER:  I'm getting some
24 interference.  Can you turn it off?
25         THE WITNESS:  Sure.
```

132

```
1         THE VIDEOGRAPHER:  Thanks.
2         MR. BAUGHMAN:  I don't have any other
3  questions.  Thanks.
4         MR. PISANI:  We're good.
5         Based on the witness's prior comments he will
6  reserve signature.  You want to read it and make
7  sure everything is accurate.
8         THE WITNESS:  Yeah, I'll take a peak at it.
9         MR. MCCUE:  The only thing we'd like on the
10 record is that discovery is still ongoing, we
11 reserve the right to suspend the deposition and
12 recall the witness if we need to.
13        MR. BAUGHMAN:  To do what?  Resume?
14        MR. MCCUE:  Discovery is still ongoing so we
15 could get information from you, from Eversafe, from
16 any of these folks that would require us to come
17 back.
18        MR. PISANI:  Based on information you don't
19 have currently.
20        MR. PARONICH:  Correct.
21        MR. BAUGHMAN:  ADT reserves its right to
22 object.
23        MR. LINDSMITH:  We don't agree to that.
24        MR. PISANI:  Certainly we don't agree to that
25 either.
```

133

```
1         THE VIDEOGRAPHER:  Concluded at 11:51.
2         (At 11:51 a.m. the deposition was concluded.)
```

---

134

THE STATE OF FLORIDA)

COUNTY OF PALM BEACH)

        I, the undersigned authority, certify that the aforementioned witness personally appeared before me and was duly sworn.

        Dated this 30th day of July, 2012.

_____
Debra Duran-Bornstein, RPR, CLR
Notary Public - State of Florida
My Commission Expires:  8/20/15
My Commission No.:  EE 112218

---

135

C E R T I F I C A T E

THE STATE OF FLORIDA)

COUNTY OF PALM BEACH)

        I, Debra Duran-Bornstein, Registered Professional Reporter and Notary Public in and for the State of Florida at large, do hereby certify that I was authorized to and did report said deposition in stenotype; and that the foregoing pages are a true and correct transcription of my shorthand notes of said deposition.

        I further certify that said deposition was taken at the time and place hereinabove set forth and that the taking of said deposition was commenced and completed as hereinabove set out.

        I further certify that I am not attorney or counsel of any of the parties, nor am I a relative or employee of any attorney or counsel of party connected with the action, nor am I financially interested in the action.

        The foregoing certification of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or direction of the certifying reporter.

        Dated this 30th day of July, 2012.

_____
Debra Duran-Bornstein, RPR, CLR
Notary Public - State of Florida
My Commission Expires:  8/20/15
My Commission No.:  EE 112218

---

136

VISHVA DESAI,et al.,

        Plaintiff,

vs.

ADT SECURITY SERVICES, INC., et al

        Defendants.
_____/

In Re: The Deposition of: RYAN NEILL

Date Sent to Witness/Attorney: 8-1-12

TO:  Ryan Neill

    The referenced transcript has been completed and awaits reading and signing.
    Please have your client review your copy of the transcript at your convenience or if a copy was not ordered, to call our office at the below-listed number to schedule an appointment between the hours of 9:00 a.m. and 3:30 p.m., Monday through Friday to make an appointment to come to our office and read the deposition.  If desired, your client may also opt to waive signature.  If so, please have your client sign their name at the bottom and mail to our office to be attached to the original transcript.
    If the transcript is not reviewed and signed within 30 days, the original, which has already been sent to the ordering attorney, may be filed with the Clerk of the Court.

        Very truly yours,

        _____
        Debra Duran & Associates
        P.O. Box 30823
        Palm Beach Gardens, Fl  33420
        (561) 313-8000

I hereby waive my signature:
_____
RYAN NEILL

cc:  All Counsel

---

137

C E R T I F I C A T E
- - -

THE STATE OF FLORIDA)

COUNTY OF PALM BEACH)

    I hereby certify that I have read the foregoing deposition by me given, and that the statements contained herein are true and correct to the best of my knowledge and belief, with the exception of any corrections or notations made on the errata sheet, if one was executed.

    Dated this ____ day of _____, 2012.

_____
RYAN NEILL

138

E R R A T A   S H E E T

IN RE: DESAI VS. ADT    C.R. DD

DEPOSITION OF: RYAN NEILL

TAKEN: 7-26-12

   DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

PAGE #  LINE #   CHANGE              REASON
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Please forward the original signed errata sheet to this
office so that copies may be distributed to all parties.

Under penalty of perjury, I declare that I have read my
deposition and that it is true and correct subject to
any changes in form or substance entered here.

DATE: _____

SIGNATURE OF DEPONENT:_____

Debra Duran & Associates
Phone 561.313.8000  Fax 561.820.4857