# Exhibit 7

Page 1

```
1            IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
2                     EASTERN DIVISION
3                  CASE NO.: 1:11-CV-1925
4
5   ADT SECURITY SERVICES, INC.,
6              Plaintiff,
7   v.
8   ELEPHANT GROUP, INC.,
9              Defendant.
    _____/
10
11                    Veritext, Inc.
                      301 NE 51st Street, Ste. 1240
12                    Boca Raton, Florida 33431
                      Thursday, May 8, 2014
13                    9:00 a.m. - 3:00 p.m.
14
15              DEPOSITION OF DAPHNE FERNANDES
                      Pages 1-177
16
17         Taken before Tambria Lee Dery, RPR, FPR,
18   Registered Professional Reporter, Florida
19   Professional Reporter and Notary Public in and for
20   the State of Florida at Large, pursuant to Notice of
21   Taking Deposition filed in the above cause.
22                    _ _ _ _ _ _
23
24
25     Job No. CS1837727
```

Page 2

1 APPEARANCES:
2
3          SARA GOLDBERG, ESQUIRE
           SANDERS MCNEW, ESQUIRE
4          McNew, P.A.
           2385 NW Executive Center Dr. #100
5          Boca Raton, Florida 33431
           on behalf of the Plaintiff.
6
7
           DANIEL W. PISANI, ESQUIRE
8          JAMES K. SCHULTZ, ESQUIRE
           Sessions Fishman Nathan & Israel, LLC
9          55 West Monroe Street, Suite 1120
           Chicago, Illinois 60603
10         on behalf of the Defendant.
11
12
13 ALSO PRESENT:
14         DAN GEIGER, ADT.
           JOSEPH BAMIRA, ELEPHANT GROUP.
15         PAULA MCKANE, ELEPHANT GROUP.
16
17
18
19
20
21
22
23
24
25

Page 3

1              I-N-D-E-X
2
3 EXAMINATION                         PAGE
4 DIRECT EXAMINATION BY MS. GOLDBERG:    5
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1          E-X-H-I-B-I-T-S
2 PLAINTIFF'S EXHIBIT 1:        16
   (Agreement)
3
   PLAINTIFF'S EXHIBIT 2:        22
4  (ADT Contract 6/14/07)
5 PLAINTIFF'S EXHIBIT 3:        33
   (Addendum One To PMG)
6
   PLAINTIFF'S EXHIBIT 4:        60
7  (4/8/11 E-mail)
8 PLAINTIFF'S EXHIBIT 5:        70
   (3/18/11 E-mail)
9
   PLAINTIFF'S EXHIBIT 6:        75
10 (4/11/11 & 4/13/11 E-mails)
11 PLAINTIFF'S EXHIBIT 7:        77
   (4/20/11 E-mail)
12
   PLAINTIFF'S EXHIBIT 8:        88
13 (6/10/11 E-mail)
14 PLAINTIFF'S EXHIBIT 9:        95
   (2/28/11 E-mail)
15
   PLAINTIFF'S EXHIBIT 10:       97
16 (2/25/11 & 2/28/11 E-mails)
17 PLAINTIFF'S EXHIBIT 11:       97
   (2/16/11 E-mail)
18
   PLAINTIFF'S EXHIBIT 12:       99
19 (6/20/11 E-mail)
20 PLAINTIFF'S EXHIBIT 13:      101
   (5/19/11 E-mail)
21
   PLAINTIFF'S EXHIBIT 14:      108
22 (Plaintiff's 1st Set of Interrogatories)
23 PLAINTIFF'S EXHIBIT 15:      116
   (Addendum One to Affiliate)
24
   PLAINTIFF'S EXHIBIT 16:      126
25 (PMG Commissions)

Page 5

1 PLAINTIFF'S EXHIBIT 17:       137
   (8/16/11 E-mail)
2
   PLAINTIFF'S EXHIBIT 18:      144
3 (8/25/11 E-mail)
4 PLAINTIFF'S EXHIBIT 19:       147
   (EMI Transfer Service Order)
5
   PLAINTIFF'S EXHIBIT 20:      153
6 (9/29/11 E-mail)
7 PLAINTIFF'S EXHIBIT 21:       155
   (4/26/11 E-mail)
8
   PLAINTIFF'S EXHIBIT 22:      157
9 (10/20/11 E-mail)
10 PLAINTIFF'S EXHIBIT 23:      161
   (10/6/11 E-mail)
11
   PLAINTIFF'S EXHIBIT 24:      161
12 (1/16/12 & 1/17/12 E-mails)
13 PLAINTIFF'S EXHIBIT 25:      161
   (5/13/11 E-mail)
14
   PLAINTIFF'S EXHIBIT 26:      166
15 (5/16/11 E-mail)
16 PLAINTIFF'S EXHIBIT 27:      168
   (4/21/11 E-mail)
17
   PLAINTIFF'S EXHIBIT 28:      168
18 (7/15/11 E-mail, Confidential)
19
20
21
22
23
24
25

2 (Pages 2 - 5)

Page 6

1 THEREUPON,
2           DAPHNE FERNANDES
3 having been first duly sworn, and answered,
4 "Yes," testified upon her oath as follows:
5           DIRECT EXAMINATION
6 BY MS. GOLDBERG:
7    Q    Good morning. My name is Sarah Goldberg.
8 I'm an attorney and I represent ADT in this action.
9 Have you ever been deposed before?
10   A    Yes.
11   Q    Okay. I'm just going to quickly review
12 some of the basics just so you know. I'm going to
13 ask you a series of questions which you're going to
14 answer under oath. If at any time, you don't
15 understand any of my questions, let me know and I'll
16 rephrase it.
17   A    Okay.
18   Q    All your answers have to be verbal. We
19 have a court reporter that's writing it down, so
20 don't just nod your head, actually verbalize your
21 answer.
22   A    Okay.
23   Q    Finally, if you need a break at any point,
24 just let me know. My only request is that if
25 there's a question pending, you answer the question

Page 7

1 and then we can take a break.
2    A    Okay.
3    Q    Can you please state your full name for
4 the record?
5    A    Daphne Fernandez.
6    Q    And where do you work?
7    A    Saveology.
8    Q    You are appearing here today in your
9 personal capacity and as a representative of the
10 company, is that correct?
11   A    Correct.
12   Q    Okay. I'm just going to show you, these
13 are Amended Notices of Deposition. Have you seen
14 these?
15   A    Yes.
16   Q    Okay. And you're appearing here today
17 under both of those deposition notices?
18       MR. PISANI: Well, the deposition notice
19   was for the 30(b)(6). And then we --
20       MS. GOLDBERG: And a personal one, right.
21 BY MS. GOLDBERG:
22   Q    So if I ask you a question and your answer
23 differs based on your personal knowledge or the
24 knowledge of the company, please let me know.
25   A    Okay.

Page 8

1    Q    Do you understand what I'm saying?
2    A    No.
3    Q    You're here as a representative of the
4 company. If I ask you a question and you may or my
5 not have personal knowledge about the answer, but
6 the company has knowledge about it, if there's a
7 distinction between what you know and what the
8 company knows, then just so indicate in your answer.
9    A    Okay.
10   Q    What is Saveology's business?
11   A    Home services. We are resellers of phone,
12 internet, cable, satellite.
13   Q    You're resellers?
14   A    Resellers.
15   Q    And how long has Saveology been in this
16 business?
17   A    I don't know the exact date.
18   Q    Can you explain to me more in detail, what
19 does that mean that you're resellers?
20   A    Oh, we have partners, just as we did with
21 ADT and resold their products and services.
22   Q    How do you do that?
23   A    Through different marketing channels.
24   Q    Can you give me examples of some of those
25 marketing channels?

Page 9

1    A    Sure, online and off line, paid search,
2 direct mail.
3    Q    Do you do telemarketing as well?
4    A    Not unsolicited, no.
5    Q    What is the relationship between Saveology
6 and Elephant Group?
7    A    Elephant Group is the parent company.
8    Q    During the period from let's say 2007
9 through 2012, did Saveology provide services for a
10 variety of companies during that period, 2007
11 through 2012?
12   A    Through a variety of partner companies?
13 I'm not sure I understand that question.
14   Q    Did Saveology work for ADT during that
15 period?
16   A    Yes.
17   Q    What other companies did it work for
18 during that period?
19   A    Comcast, Verizon, AT&T, Tom Warner, Cox.
20 There's about 20 providers.
21   Q    Okay. What is your job title?
22   A    Currently, director of merchant services.
23   Q    How long has that been your title?
24   A    Since about I want to say July or so of
25 2013.

3 (Pages 6 - 9)

1    Q    And prior to July, 2013, what was your
2 title?
3    A    Director of operations.
4    Q    How long did you hold that position?
5    A    From about 2008 until July I guess of last
6 year.
7    Q    Okay.  And as director of operations, what
8 were your duties and responsibilities?
9    A    It was for the home security division.
10    Q    Can you tell me specifically what did you
11 do as director of operations for the home security
12 division?
13    A    Managed all operations within the ADT
14 business.
15    Q    Just for ADT?
16    A    There were some other providers I worked
17 for, yes.
18    Q    Could you describe some of your daily
19 responsibilities, the kinds of things you would do
20 on a day-to-day basis?
21    A    Oversee what the sales are, the marketing
22 channels, the DNC scrubs, numbers.
23    Q    Prior to your position as director of
24 operations, did you have another title at Saveology?
25    A    Yes, I did.

1    Q    What was that?
2    A    Well, it was director of operations for
3 another division.
4    Q    And what division was that?
5    A    Homes media.
6    Q    What did that division do?
7    A    It was the new mover program.  It was
8 package inserts where it was direct mail to new
9 homeowners.
10    Q    Did that involve work with security
11 systems?
12    A    We inserted the ADT pamphlet into the
13 direct mail offer.
14    Q    And had you been at Saveology in another
15 position prior to that?
16    A    No.
17    Q    Approximately how long have you been
18 working at Saveology?
19    A    Since March of 2007.
20    Q    Where did you work before Saveology?
21    A    For a few different list companies, Fred
22 Singer.
23    Q    I'm sorry, what were those companies?
24    A    I think it's called Singer Direct and also
25 Media Advisers Group.

1    Q    And what do those companies do?
2    A    List management package inserts as well.
3 It's all direct mail.
4    Q    During that time that you were director of
5 operations, you said from approximately 2008 to
6 2013, who did you report to?
7    A    Reid Shapiro.
8    Q    And did anybody report to you?
9    A    Yes.
10    Q    Who did?
11    A    All the employee's names?
12    Q    Was it a particular group or if it was a
13 number of employees, could you tell me how many
14 employees?
15    A    It was everyone that worked on the home
16 security, so approximately five direct reports.
17    Q    Okay.  So everyone who worked in the home
18 security division reported to you?
19    A    Yes.
20    Q    Was that more than five people?
21    A    Of my direct reports?
22    Q    Direct reports, right.  Five people
23 directly reported to you, but are there other people
24 in the division?
25    A    Yes.

1    Q    And who did they report to?
2    A    The agents reported to the call center
3 managers.
4    Q    And the call center managers reported to
5 you?
6    A    Reported to a VP or a director of the call
7 center to which I had, I had a relationship with
8 there.
9    Q    I'm sorry, if you could just give me a
10 sense of how many people there were and who they
11 reported to in the divisions so I understand the
12 structure of the division.
13    A    There are call center agents.
14    Q    Uh-huh.
15    A    That actually take the phone calls that
16 report up to team leads.  The team leads then report
17 to a director within the call center.  Call center
18 operations.
19    Q    And that's you?
20    A    No.
21    Q    Oh.
22    A    That's a different director.  That's a
23 call center operations.
24    Q    And who did the director of call center
25 operations report to?

4 (Pages 10 - 13)

Page 14

1    A   I don't know.  I don't remember.
2    Q   And you said there were five direct
3  reports that reported to you?
4    A   Yes.
5    Q   What was the position of those five
6  individuals?
7    A   To process all of the orders, to do the
8  verification of every order, to communicate back and
9  forth with someone at ADT, who to report the scores
10  to and things like that, the credit scores.
11   Q   Did you have responsibility for
12  telemarketing compliance issues?
13       MR. PISANI:  I'm going to object to the
14       use of the term telemarketing.  She's already
15       made a distinction between the unsolicited
16       telemarketing, so maybe you can define that
17       term.
18  BY MS. GOLDBERG:
19   Q   Tell me what kind of telemarketing did
20  Saveology do?
21   A   In regards to ATD?
22   Q   ATD.
23   A   It was telemarketing was defined as any
24  outbound call to an opt in.
25   Q   So we'll use that definition, outbound

Page 15

1  calls to an opt in.
2    A   Absolutely.  Nothing unsolicited.
3    Q   I understand.  We'll use that definition
4  for telemarketing.  Did you have responsibilities
5  for telemarketing compliance?
6    A   Yes.
7    Q   Were you trained in telemarketing
8  compliance?
9    A   Yes.
10   Q   Who were you trained by?
11   A   My previous positions, there was many
12  dealings with list.
13   Q   Did you have any formal training or was it
14  just training on-the-job sort of experience?
15   A   It was training on the job.  We had
16  courses, I don't remember the names of the courses,
17  though.
18   Q   Who would you generally consult with when
19  you had a question or concern about telemarketing
20  compliance?
21   A   Internally?
22   Q   Uh-huh.
23   A   Joseph Bamira, our paralegals.  And then
24  we also had a direct contact at compliance point,
25  which is also PossibleNow.  There's two different

Page 16

1  divisions now.
2    Q   Was there anyone else in the company that
3  was responsible for telemarketing compliance?
4    A   For ADT?
5    Q   For ADT.
6    A   Not that I can remember.
7    Q   Okay.
8        MS. GOLDBERG:  Why don't we mark this as
9        Exhibit 1.
10       (Plaintiff's Exhibit 1 was marked for
11       identification.)
12  BY MS. GOLDBERG:
13   Q   Have you ever seen this before?
14   A   Yes.
15   Q   Was this produced by Saveology?
16   A   What do you mean?
17   Q   You'll note on the bottom, it has a Bates
18  number SAV with a number.  Do you know, was this
19  produced by Saveology in this litigation?
20       MR. PISANI:  Don't guess if you don't
21       know.
22       THE WITNESS:  I don't know.
23  BY MS. GOLDBERG:
24   Q   Okay.  When was the first time you saw
25  this agreement?

Page 17

1    A   Somewhere in 2008.
2    Q   Do you know who negotiated this agreement?
3    A   I do not know.
4    Q   Do you know who drafted the agreement?
5    A   No idea.
6    Q   Can you tell me who signed the agreement
7  on behalf of Saveology?
8    A   Do I get to look at it?
9    Q   Yes, of course.  Feel free.
10   A   I don't want to take a guess.
11   Q   Take a look at Page 28, the signature page
12  is Page 28.
13   A   Well, I didn't know if it was a test.
14  Benny Aboud.
15   Q   Thank you.  You said you first saw it
16  sometime in 2008.  Did you read the agreement?
17   A   I did.
18   Q   Were you aware that the agreement
19  prohibits assignment without ATD's express written
20  consent?
21       MR. PISANI:  I'm going to object to the
22       assumption of what the agreement provides.  If
23       you could point her to a specific page?
24       MS. GOLDBERG:  Sure.
25

5 (Pages 14 - 17)

Page 18

1 BY MS. GOLDBERG:
2   Q   Take a look at Paragraph 17, Page 11.
3 There's a paragraph there entitled Assignment. Were
4 you aware of this assignment provision in the
5 agreement?
6   A   Do I have a moment to read this?
7   Q   Yes, of course, please. Take your time.
8   A   Okay.
9   Q   Were you aware that this agreement has
10 restrictions on assignment that requires ADT's
11 express written consent?
12     MR. PISANI: I'm just going to object as
13   to the potential mischaracterization of the
14   contract. I think the contract speaks for
15   itself. If you want to ask her --
16     MS. GOLDBERG: So let me rephrase that
17   question.
18 BY MS. GOLDBERG:
19   Q   Were you aware that there was a provision
20 concerning assignment of this agreement?
21   A   I'm still not really understanding what
22 you're asking me.
23   Q   Okay. Let me think of a way to rephrase
24 this. Let me go another route. Can you tell me,
25 what was the purpose of this agreement?

Page 19

1   A   What was the purpose?
2     MR. PISANI: Do you understand the
3   question?
4     THE WITNESS: No.
5 BY MS. GOLDBERG:
6   Q   What is your understanding of what this
7 agreement was intended to do?
8   A   Allow us to resell ADT. I'm really not
9 sure, you know.
10   Q   What was Saveology's, what was Saveology
11 supposed to do during the terms of this agreement?
12     MR. PISANI: I'm going to object. I think
13   it's an unfair question. I think it's a
14   68-page document, it has a lot of provisions in
15   it. I think -- so I mean, there's a lot of --
16     MS. GOLDBERG: Fair enough. I'm not
17   asking her for a legal conclusion.
18 BY MS. GOLDBERG:
19   Q   What was the nature of Elephant Group and
20 ADT's relationship, why was this agreement done?
21   A   Do you want me to make an assumption?
22   Q   No, I'm just asking what was your
23 understanding of this agreement?
24     MR. PISANI: That's the same objection.
25   It's a lengthy document, the agreement speaks

Page 20

1   for itself. I mean, if you want to ask -- I
2   just think it's an unfair question.
3     MS. GOLDBERG: Let me rephrase it.
4 BY MS. GOLDBERG:
5   Q   Let me ask you something else. Was there
6 ever any discussion among anyone at Saveology
7 concerning the terms of this agreement?
8   A   Yes.
9   Q   Were you a part of those discussions?
10   A   When, when I was asking a question, yes.
11 The initial negotiation of this, no.
12   Q   Okay. And you said you had asked some
13 questions about the terms of the agreement?
14   A   Yes, specifically the marketing
15 guidelines.
16   Q   Okay. And to whom did you direct those
17 questions?
18   A   At the time who the CMO was.
19   Q   And who was this?
20   A   In the very beginning, Zevi Friedman.
21   Q   Did you ever hear anyone at Saveology
22 discuss the assignment provision in this agreement?
23   A   No.
24   Q   Did you ever see any documents at
25 Saveology, whether e-mails or memos, concerning the

Page 21

1 assignment provision in this agreement?
2   A   Not that I'm aware of.
3     MS. GOLDBERG: Let's mark this as 2.
4     (Plaintiff's Exhibit 2 was marked for
5   identification.)
6     MS. GOLDBERG: Take a moment to look at
7   it. When you're done, you can look up.
8     THE WITNESS: Okay.
9 BY MS. GOLDBERG:
10   Q   Have you ever seen this before?
11   A   No. Not that I can recall.
12   Q   Do you have any idea who wrote it?
13   A   No.
14   Q   Do you know to whom it was distributed?
15   A   I do not.
16   Q   Do you know if this was an attachment to
17 an e-mail or a memorandum?
18   A   I don't know.
19   Q   Who in the company would know who wrote
20 this document?
21   A   I don't know.
22   Q   Do you have a custodian who is in charge
23 of maintaining documents at the company?
24   A   I would assume our paralegal.
25   Q   Is it standard practice at Saveology for

6 (Pages 18 - 21)

Page 22

1 somebody to draft a document concerning the
2 highlights of a specific contract?
3    A   I can't speak on behalf of the company for
4 that.
5    Q   You're here today to speak on behalf of
6 the company.
7        MR. PISANI:  Not with regard to a -- just
8    for the record, the Exhibit 2 you've just
9    handed her is referencing a contract.
10        MS. GOLDBERG:  I'm well aware.
11        MR. PISANI:  Predating the prior exhibits.
12 BY MS. GOLDBERG:
13    Q   I'm just asking is it standard practice at
14 Saveology to have Saveology employees write up the
15 standards of a contract?
16    A   I don't know.
17    Q   Have you ever seen similar highlights of a
18 different contract?
19    A   Yes.
20    Q   You've seen other documents that list the
21 main points of another contract?
22    A   Yes.
23    Q   Have you ever seen a document similar to
24 this that lists contractual highlights for the
25 May 28th, 2008 contract, what we've marked as

Page 23

1 Exhibit 1?
2    A   Not that I could recall.
3    Q   This says ADT contract 6-14-07.  Are you
4 familiar with a contract with ADT of that date?
5    A   I am not.
6    Q   Okay.  Can you tell me why this was
7 drafted?
8    A   I --
9        MR. PISANI:  She's said she's never seen
10    it before.  I don't know if she's going to be
11    able to answer that question.
12 BY MS. GOLDBERG:
13    Q   Take a look at Paragraph 5.  It says
14 assignment.  Assignment is not permitted without
15 prior consent of, and then it says AT&T.  Is it fair
16 to assume that that was a typo?
17        MR. PISANI:  Objection.  She's never seen
18    the document, I don't know how she's going to
19    assume anything about this document.
20 BY MS. GOLDBERG:
21    Q   Did Saveology have a relationship with
22 AT&T?
23        MR. PISANI:  At what point in time?
24        MS. GOLDBERG:  2007, 2008.
25        THE WITNESS:  I don't know when they

Page 24

1 started their contract with AT&T.
2 BY MS. GOLDBERG:
3    Q   They currently have a contract with AT&T?
4    A   Yes.
5    Q   And you don't know when that first began?
6    A   No.
7    Q   Do you believe that this provision is
8 intended to name AT&T?
9        MR. PISANI:  Objection.  You're asking
10    her -- you're asking about a document that
11    she's never seen before and you're showing her
12    for the first time and you're asking her what
13    she believes about it.  I think it's an unfair
14    question and improper.
15        MS. GOLDBERG:  She's here as a
16    representative of the company.  This is a
17    document produced by the company.
18 BY MS. GOLDBERG:
19    Q   It says ADT contract nonfinancial
20 highlights.  So when I saw AT&T, I wanted to ask, do
21 you believe that was intended to be AT&T or is it a
22 typo?
23        MR. PISANI:  Same objection.  You can
24    answer if you want.
25        THE WITNESS:  I can't answer on behalf of

Page 25

1 whoever wrote this.
2 BY MS. GOLDBERG:
3    Q   Read the rest of Paragraph 5.
4    A   Okay.
5    Q   Is Paragraph 5 concerning the restrictions
6 on assignment, is that consistent with your
7 understanding of the ADT agreement that we've marked
8 as Exhibit 1?
9        MR. PISANI:  Objection.
10        MS. GOLDBERG:  You can answer.
11        THE WITNESS:  Repeat the question.
12 BY MS. GOLDBERG:
13    Q   Is Paragraph 5 consistent with your
14 understanding of the agreement with ADT that we've
15 marked as Exhibit 1?
16        MR. PISANI:  Same objection.  You're
17    asking her whether this is, this Paragraph 5 in
18    a different, some different document summarizes
19    or is consistent with a subsequent document?  I
20    think the document, I think the documents speak
21    for themselves.  You can answer if you
22    understand the question.
23        THE WITNESS:  I don't know.
24 BY MS. GOLDBERG:
25    Q   Have you ever seen any other document at

7 (Pages 22 - 25)

Page 26

1 Saveology that demonstrated a different
2 understanding of the assignment provision with ADT?
3    A   Not that I'm aware of.
4    Q   Did you see any other document at all that
5 referred to assignment of an ADT contract?
6    A   Not that I can recall.
7    Q   Does Saveology maintain a written
8 telemarketing policy?
9    A   Yes.
10   Q   Is it distributed to others?
11   A   Yes.
12   Q   To whom is it distributed?
13   A   The compliance department.
14   Q   Anyone else?
15   A   The trainers, the agents, the agents are
16 all trained.
17   Q   And do you maintain a Do Not Call List?
18   A   Yes.
19   Q   And do you update it?
20   A   Yes.
21   Q   How often?
22   A   Immediately, daily.
23   Q   And do you use a DNC compliance provider?
24   A   Yes.
25   Q   Who is that?

Page 27

1    A   PossibleNow.
2    Q   Are you familiar with the Telephone
3 Consumer Protection Act?
4    A   Not in detail, not word by word, but yes,
5 I'm familiar.
6    Q   Okay.  Have you ever discussed that with
7 others at Saveology, aside from counsel?
8    A   As to what it means?
9    Q   Yes, what the requirements of the TCPA,
10 for example.
11   A   Oh, yes.
12   Q   Did you ever obtain written approval from
13 ADT to use prerecorded messages?
14   A   No.
15   Q   Are you familiar with Paramount Media
16 Group?
17   A   Yes.
18   Q   Can you tell me who were they?
19   A   They're one of our partner companies.
20   Q   When did Saveology first have a
21 relationship with Paramount?
22   A   At the end of 2010.
23   Q   And how did that come about?
24   A   It was a referral from one of our other
25 partner companies.

Page 28

1    Q   Somebody referred Paramount to Saveology?
2    A   Yes.
3    Q   And who was that?
4    A   I don't remember the name of the company
5 at the time.  It was one of our other partner
6 companies that was working with a different division
7 of our company.
8    Q   Do you refer to Paramount also as an
9 affiliate of Saveology?
10   A   Internally, that's kind of what we call
11 them.
12   Q   And why did this other company refer
13 Paramount to Saveology?
14   A   As a, as a lead provider.
15   Q   Had that other company used Paramount as a
16 lead provider?
17   A   I don't know.  I don't recall.
18   Q   Who specifically at Saveology was
19 contacted about Paramount?
20   A   Initially, Thariana.
21   Q   I'm sorry?
22   A   Thariana.
23   Q   Who was that?
24   A   She was one of my direct reports.
25   Q   What's her last name?

Page 29

1    A   Chupina.
2    Q   And what was her position?
3    A   She was an assistant to me.
4    Q   And what was her experience with
5 Paramount?
6    A   She didn't have any.  She forwarded the
7 e-mail to me.
8    Q   Oh.
9    A   You asked who was the first contact.
10 That's what I know.
11   Q   And did you reach out and contact
12 Paramount?
13   A   Yes, I did.
14   Q   What did that e-mail say that she
15 forwarded to you?
16   A   Oh, I don't remember word-for-word off the
17 top of my head.
18   Q   Was that e-mail from Paramount or from
19 someone else that was referring them?
20   A   Yes, it was from Paramount.
21   Q   And you don't recall the contents of that
22 e-mail at all?
23   A   What it said?
24   Q   Approximately what it said, the general
25 nature of that e-mail.

8 (Pages 26 - 29)

Veritext Corporate Services

800-567-8658                                     973-410-4040

Page 30

1    A   No.  I would have to see it in front of
2  me.  Sorry.
3    Q   Okay.
4    A   It was --
5    Q   And what did you do with that e-mail once
6  you received it?
7    A   I contacted Ryan Neill.
8    Q   And what was the substance of that
9  conversation?
10    A   He was interested in providing home
11  security leads, so it was an introduction to each
12  other.
13    Q   Any other items discussed in that
14  conversation?
15    A   It was general about becoming a partner
16  company with us.
17    Q   Okay.  And following that conversation,
18  what did you do then?
19    A   I had Ryan Neill go to Saveology Networks
20  to fill out the agreement online.
21    Q   Fill me in, because I'm not familiar.
22  What is Saveology Networks?
23    A   That is the department that handles most
24  of our partner companies.
25    Q   And there is an online application to

Page 31

1  become a partner company?
2    A   Yes.
3    Q   And did Paramount fill out an online
4  application?
5    A   Yes.
6    Q   And what's done with that application?
7    A   It goes through the partner company
8  division.
9    Q   What does the partner company division do
10  with the application?
11    A   Reviews it, checked out the name, does
12  their due diligence.
13    Q   Can you tell me what specifically what due
14  diligence did they do?
15    A   I don't know.  I don't know exactly what
16  they did for Paramount.
17    Q   What is their usual practice when they get
18  an application to be a partner company?
19    A   To my knowledge, because I do not work for
20  that department, it's just the review of the name,
21  check the database.  I really can't answer it more
22  what exactly they do.
23    Q   What do you mean check the database?
24    A   Check our partner company database of all
25  the other, any other partner company that we work

Page 32

1  with for any other product.
2    Q   I'm sorry, what are they looking for when
3  they check the database?
4    A   To see if they're working on any of our
5  other products.
6    Q   To see if they have an existing
7  relationship with Paramount?
8    A   Correct, or had a prior relationship.
9    Q   Did Saveology have a prior relationship
10  with Paramount?
11    A   Not to my knowledge.
12    Q   When I ask you specifically what due
13  diligence was done, you said you're not familiar
14  with that?
15    A   I'm not exactly sure what the checklist
16  is, no.
17    Q   Who would know that?
18    A   Someone in the product company division.
19    Q   Who is in charge of product division?
20    A   We've had some changes internally, so to
21  the best of my knowledge, John Hyatt.
22    Q   What's the last name?
23    A   Hyatt.
24        MR. PISANI:  Like the singer Hyatt?
25        THE WITNESS:  H-Y-A-T-T.  I don't know.

Page 33

1  BY MS. GOLDBERG:
2    Q   Had Saveology worked with Ryan Neill
3  before?
4    A   Not to my knowledge.
5        MS. GOLDBERG:  Let's mark this as 3.
6        (Plaintiff's Exhibit 3 was marked for
7        identification.)
8        MS. GOLDBERG:  Take a moment to look at
9        that and you can just look up when you're
10        ready.
11  BY MS. GOLDBERG:
12    Q   Is this your agreement with, is this
13  Saveology's agreement with Paramount Media Group?
14    A   Yes.
15    Q   At the top, it says Addendum 1 to
16  Paramount Media Group.  And the first line says,
17  This Addendum 1, dot dot dot, amends the affiliate
18  agreement, the agreement dated 10-12-10.  Is there a
19  separate agreement called an Affiliate Agreement?
20    A   That's the Saveology Network Agreement
21  online that we discussed prior.
22    Q   So is that an application or an actual
23  agreement between the two parties?
24    A   I guess you would call it an agreement.
25  It's one of -- it's both.  There's different pieces

9 (Pages 30 - 33)

Page 34

1 to the, to the online application and agreement.
2    Q    Is that online agreement signed by both
3 Saveology and Paramount?
4    A    It's electronically signed.
5    Q    And was that done on 10-12-10?
6    A    I don't know the exact date that that was
7 done.
8    Q    Approximately that day?
9    A    I guess.
10    Q    Okay.  Did anyone from Saveology sign this
11 agreement, this Addendum 1?
12    A    The one that you have in front of me, no.
13    Q    Did someone from Saveology typically sign?
14    A    Yes.
15    Q    Is there a reason why no one signed this
16 one?
17    A    I don't know.
18    Q    Who typically signs these agreements for
19 Saveology?
20    A    At this time, it would have been Reid
21 Shapiro.
22    Q    Is this Saveology's standard contract for
23 its affiliates?
24    A    It's a standard addendum for an ADT
25 affiliate.

Page 35

1    Q    Did Paramount request any modification or
2 amendment to this addendum?
3    A    Not that I can recall.
4    Q    To your knowledge, was there ever an
5 amendment done to this addendum?
6    A    Another one to this one?
7    Q    Correct.
8    A    I don't -- not that I can remember.
9    Q    Okay.  So is this the only agreement
10 between Saveology and Paramount, and you had
11 mentioned an online one?
12    A    Right, that's the standard terms and
13 conditions to work with Saveology.
14    Q    Okay.  Do you know if that online
15 application, a copy of that has been produced in
16 this action?
17    A    I don't know.
18    Q    Earlier, ADT sent a Request for Production
19 of Documents to Saveology.  Have you seen that?
20    A    There's be many, I'm not sure exactly
21 which one you're referring to.
22    Q    Were you at all involved in collecting
23 documents to be produced for this lawsuit?
24    A    I'm sure I've provided a few.
25    Q    Do you know if you provided a copy of the

Page 36

1 online application?
2    A    I don't know.
3    Q    Okay.  Aside from that online application
4 and this addendum, were there any other written
5 agreements between Saveology and Paramount?
6    A    Not that I'm aware of.
7    Q    Okay.  If you can turn to Exhibit B to
8 this document.
9    A    Okay.
10    Q    It says Saveology ADT affiliates.  And
11 then it has a couple of pages.  Who drafted these
12 pages in Exhibit B?
13    A    I did.
14    Q    Was it reviewed by anyone?
15    A    The paralegal.
16    Q    And how did you decide what to put in this
17 Exhibit B?
18    A    I took exactly what was in the agreement
19 with ADT and Saveology and just changed it to not
20 read ADT and Saveology, but ADT and the partner
21 company.
22    Q    So are you referring to what was in
23 Exhibit 1 that we marked today?
24    A    Yes.
25    Q    Okay.

Page 37

1    A    Hold on, let me just make sure it's in
2 this one.
3    Q    Why don't you take a look.
4    A    Because there's multiple in here.  This
5 hasn't been updated.  Yeah, that's how -- yeah,
6 under no circumstances.
7        MR. PISANI:  She's pointing to Page 14.
8        THE WITNESS:  I apologize, Page 14, number
9 23A.
10 BY MS. GOLDBERG:
11    Q    So you copied each from Page 14 of
12 Exhibit 1 and used that to create Exhibit B to the
13 Paramount addendum, is that correct?
14    A    Correct.
15    Q    Did ADT review your Exhibit B?
16    A    I don't recall.
17    Q    Did you send it to ADT?
18    A    I don't remember.
19    Q    And when was this given to Paramount?
20    A    According to the front of the page,
21 10-12-10, on or about that date.
22    Q    Well, that's the date --
23    A    Twelfth day of November, I apologize.
24    Q    So 12th day of November, 2010?
25    A    Correct.

10 (Pages 34 - 37)

Page 38

1    Q    Is that when Paramount started actually
2 performing services?
3    A    I don't know the exact date, but it
4 wouldn't have been on this exact -- I don't know if
5 it was the exact date.
6    Q    Do you know approximately when Paramount
7 began performing services?
8    A    Somewhere around that time.
9    Q    So mid November, 2010?
10    A    Yes.
11    Q    Okay. Can you explain to me in your own
12 words, what was the purpose of this agreement?
13      MR. PISANI: I'm going to object to the
14 extent that the exhibit, agreement, Exhibit
15 Number 3, the agreement, speaks for itself.
16      MS. GOLDBERG: I understand.
17 BY MS. GOLDBERG:
18    Q    What was your understanding of what
19 Paramount was supposed to be doing?
20    A    What were they supposed to be doing?
21    Q    Why did Saveology contract with them?
22    A    To provide additional home security leads.
23    Q    To provide leads?
24    A    Yes. Home security, yes.
25    Q    And how did Paramount do that?

Page 39

1    A    To my knowledge, they were receiving opt
2 in leads, opt in home security leads.
3    Q    From where?
4    A    From online.
5    Q    When you say online, what specifically do
6 you mean?
7    A    Which exact marketing technique they have,
8 I don't know, but it would have been submitted to
9 Kim Bands and ADT to be approved for the content.
10    Q    Do you mean if they had a website?
11    A    Yes.
12    Q    I just want to make sure I understand. So
13 you're saying Paramount received opt in, opt ins to
14 its own website?
15    A    To a website, yes. Whether they owned it
16 or not, I don't know, but to a website, yes. It
17 would have been qualified leads.
18    Q    Did they have various websites?
19    A    I would have to check.
20    Q    And what did it do when it received some
21 opt in leads?
22      MR. PISANI: You're asking her what
23 Paramount did?
24 BY MS. GOLDBERG:
25    Q    What is the process that Paramount did

Page 40

1 when they got an opt in lead?
2      MR. PISANI: If you know.
3      THE WITNESS: Paramount was set up with
4 our account at PossibleNow, which is our DNC
5 scrub. That is also a third party for ADT's Do
6 Not Call List, scrubbed the leads against
7 Saveology, ADT and then as long as they were
8 not on there within the timeframe allotted,
9 they would call the customers -- call the
10 leads, I apologize.
11 BY MS. GOLDBERG:
12    Q    And if a customer was interested in
13 purchasing a security system, what did Paramount do
14 next?
15    A    We provided a script and they went through
16 the script to qualify the customer, to check the
17 credit score, to make sure they understood the
18 package, the price.
19    Q    And if the customer agreed, yes, I want to
20 purchase, then what happened?
21    A    Then the qualified lead would be entered
22 into the system.
23    Q    By Paramount?
24    A    Yes. And then sent over to Saveology to
25 my team.

Page 41

1    Q    At that point, was it considered a sale?
2    A    Well, per the agreement, it's not
3 considered a sale, it's a qualified lead, qualified
4 referral.
5    Q    And what did your team do with it then?
6    A    We then scheduled, checked the, you know,
7 got the, did the due diligence of the e-port, we did
8 have a verification process, making sure the
9 customer was who they said they were on the phone,
10 just reaffirming that they were interested and then
11 we set up an installation date, confirmed the
12 installation date.
13    Q    And then what did Saveology do with that
14 once it actually had an installation date?
15    A    We sold it off to the dealers.
16    Q    To the ADT?
17    A    ADT authorized dealers, right.
18    Q    How many different dealers did you sell
19 to?
20    A    In the beginning, there was probably 15 to
21 20.
22    Q    And were these called sales at this point
23 or installations or what were you selling to the
24 dealers, what's the term that you would use?
25    A    Qualified customers.

11 (Pages 38 - 41)

Page 42

1    Q   Qualified customers, okay. Did you sell
2 qualified customers to Ever Safe?
3    A   Yes.
4    Q   Did you sell to Safe Streets?
5    A   Yes.
6    Q   Did you sell to Defender?
7    A   Yes.
8    Q   Are there any other ways that you can
9 think of that Paramount obtained leads?
10    A   They were home security opt in leads.
11 That's all I can tell you.
12    Q   But you said they obtained their leads
13 through websites, is that correct?
14    A   Correct, from online.
15    Q   Any other methods of obtaining leads?
16    A   Online, I'm going to assume just online
17 home security leads.
18    Q   Did you ever ask anyone at Paramount how
19 do they obtain their leads?
20    A   Yes.
21    Q   When was that?
22    A   In the initial conversations. I've also
23 been to Paramount.
24    Q   I'm sorry?
25    A   I've also been to Paramount.

Page 43

1    Q   Okay. The initial conversations, you mean
2 prior to signing the contract?
3    A   Yes.
4    Q   And what specifically did you say in that
5 conversation?
6    A   I don't remember word-for-word, but they
7 had, they were an online or a lead company for
8 another provider that we worked with, so they had
9 experience in that world.
10    Q   Do you remember who those other company
11 was that you worked with?
12    A   That we worked with?
13    Q   You're saying they were a lead provider
14 for another company that you worked with?
15    A   Right, that they had worked with. It was
16 a similar, a mutual -- it was dish. They also
17 worked with dish.
18    Q   Okay. How much experience did Paramount
19 have as a lead provider, do you know?
20    A   I don't remember off the top of my head.
21    Q   What else did they tell you about how they
22 got their leads?
23    A   Through, through online for home security
24 opt in leads, also through warm transfers of
25 possibly an upsell from another product.

Page 44

1    Q   Can you explain to me what that is, a warm
2 transfer?
3    A   A warm transfer would be if someone else
4 was selling let's say Leapfrog and at the end of the
5 call, they would say throughout the phone call if
6 you were qualified as a homeowner with certain
7 criteria and are you interested in a home security
8 offer and somebody would say yes and then they would
9 transfer the call.
10    Q   So it was a company selling a different
11 product and then after they sold that product, they
12 would offer are you interested in a home security
13 too to the customer?
14    A   Correct.
15    Q   Okay.
16    A   In laymen's terms.
17    Q   Did you ever ask Paramount for the names
18 of the companies from which they purchased their
19 leads?
20    A   No.
21    Q   Under Addendum 1, was Paramount authorized
22 to make outbound calls?
23    A   Provided under the scrubbing, provided
24 that they followed the guidelines for Exhibit B.
25    Q   Okay. So there's nothing in this

Page 45

1 agreement that prohibited them from making outbound
2 calls?
3    A   Correct, unsolicited outbound calls, yes,
4 but outbound calls to their database, to their opt
5 in leads.
6    Q   Did you contact dish for a reference for
7 Paramount before contracting with Paramount?
8    A   I did not.
9    Q   I'm sorry?
10    A   I did not.
11    Q   Did somebody else at Saveology do that?
12    A   I don't know.
13    Q   Did you research Paramount's principals
14 prior to contracting with Paramount?
15    A   Did I? No.
16    Q   Did anyone else at Saveology?
17    A   I don't know.
18    Q   Did you check to see whether Paramount was
19 registered with the State of Florida as a
20 telemarketer?
21    A   I did not.
22    Q   Did anyone at Saveology?
23    A   I don't know.
24    Q   Did you check to see if there were any
25 complaints pending against Paramount?

12 (Pages 42 - 45)

Page 46

1    A   I did not.
2    Q   Did anyone at Saveology?
3    A   I don't know.
4    Q   Okay.  Did you or anyone at Saveology
5   check to see if there were legal judgments filed
6   against Paramount or its officers or directors or
7   members related to marketing?
8    A   I did not.
9    Q   Did anyone else at Saveology?
10   A   I don't know.
11   Q   Okay.  Did you check to see whether
12  Paramount was the subject of any government
13  investigation?
14   A   I don't know.
15   Q   And you don't know if anyone else did?
16   A   I don't know.
17   Q   Okay.  Aside from giving this addendum
18  with Exhibit B, did Saveology do anything else to
19  satisfy itself that Paramount was knowledgeable
20  about the telemarketing laws?
21   A   There was training.  We provided training
22  to them.
23   Q   What did that training consist of?
24   A   There's a pamphlet.  There's a whole
25  training deck.

Page 47

1    Q   It's a written document that you give to
2   them?
3    A   Yes.  And I trained many of their agents
4   as well.
5    Q   By training, do you mean there was
6   actually a course where you sat and explained things
7   or you just handed them documents?
8    A   Oh, no, I was there, I was there in their
9   offices training agents.
10   Q   When did you go to their offices?
11   A   Somewhere around this timeframe prior to
12  them making calls.
13   Q   How many times did you do that?
14   A   I was there a few times.
15   Q   For the purposes of training?
16   A   Training and also just going to the
17  offices, listening to some of the calls.
18   Q   And this was around the time of the
19  contract?
20   A   Yes.
21   Q   Did you ever go to Paramount's offices at
22  any other time aside from at the inception of the
23  relationship?
24   A   Yes.
25   Q   Okay.  When else would you have been at

Page 48

1   Paramount's offices?
2    A   I've been there a few times just to sit in
3   the office, meet with Ryan, listen to calls.
4    Q   What was the purpose of those visits?
5    A   It's my QA to listen to calls, I can
6   listen to random calls, listen to agents on the
7   calls.
8    Q   How frequently would you do that?
9    A   I've done it a few times with Paramount, a
10  few, I don't know, I don't know the exact number.
11   Q   Did you do it once a quarter, once a
12  month, once a year?
13   A   Not once a month.  I've been there a few
14  times in our tenure of the relationship.
15   Q   A few times?
16   A   More than a handful of times.
17   Q   Less than ten?
18   A   Probably.
19   Q   Less than five?
20   A   I don't know.  Somewhere around there.
21   Q   Okay.  Did you ask if Paramount maintained
22  its own internal Do Not Call List?
23   A   Yes.
24   Q   And did it?
25   A   Yes.

Page 49

1    Q   Did you do anything to ascertain whether
2   they accurately suppressed numbers against the
3   federal and state Do Not Call Lists?
4    A   They had our access to that, so yes, I can
5   see every time that phone numbers were scrubbed.
6    Q   Paramount had access to Saveology's?
7    A   To PossibleNow.
8    Q   Okay.
9    A   Uh-huh.
10   Q   So you would have evidence -- you would be
11  able to see when they scrubbed?
12   A   Correct.
13   Q   How often did they scrub?
14   A   As required.
15   Q   Did Paramount have its own written do not
16  call policy?
17   A   I do not know.
18   Q   Do you know if anyone, any consumers ever
19  requested a copy of that policy?
20   A   From Paramount?
21   Q   Uh-huh.
22   A   I don't recall.
23   Q   Did you do anything to ascertain whether
24  Paramount was knowledgeable about federal and state
25  calling time restrictions?

13 (Pages 46 - 49)

Page 50

1    A    Yes, I actually provided the list from
2 PossibleNow.
3    Q    Who did you provide it to?
4    A    Ryan.
5    Q    Aside from the training that you provided
6 you said when you were there a few times --
7    A    Yes, uh-huh.
8    Q    -- did Paramount do any other training
9 for its telephone representatives?
10    A    I don't know.  I don't know.
11    Q    Were you the person at Saveology who was
12 responsible for the Paramount relationship?
13    A    Yes.
14    Q    Did Paramount do telemarketing in
15 connection with products other than ADT products?
16    A    I don't know.  Within our company?
17    Q    For Saveology.
18    A    Not that, not that I'm aware of.
19    Q    So Paramount's relationship with Saveology
20 was exclusively for ADT products and services?
21    A    To my knowledge, yes.
22    Q    Does Saveology have any written protocols
23 for supervising affiliates?
24    A    Written protocols?  Can you ask me the
25 question again?

Page 51

1    Q    Does Saveology have any kind of written
2 document about how to supervise affiliates?
3    A    I don't know.
4    Q    Have you ever seen such a document?
5    A    Not that I'm aware of.
6    Q    Were there any either formal or informal
7 procedures for overseeing affiliates?
8    A    That I did myself?
9    Q    Sure.
10    A    Yes.  By going to Paramount, listening to
11 their calls and things like that.  Making sure they
12 were following the script.
13    Q    What I'm trying to ascertain, does
14 Saveology have a formal process by which someone in
15 your position say would regularly go and monitor
16 what an affiliate's doing or did you just decide on
17 your own this would be the thing and let me go check
18 it out?
19    A    I don't know if there's written formal
20 documents, but that's what I did, yes.
21    Q    Aside from what you've already told me,
22 did you do anything else to monitor Paramount's
23 activities?
24    A    No, I can see the scripts.  Other than
25 what I told you, no, I don't believe so.

Page 52

1    Q    Did you ask for a copy of Paramount's
2 telemarketing policies?
3    A    I don't recall.
4    Q    Did you obtain any kind of written proof
5 that Paramount had a telemarketing policy?
6    A    I don't believe so.
7    Q    Earlier, you said you would go and you
8 would observe, listen to calls and look for scrubs.
9 Did you do anything else to verify that Paramount
10 was complying with the telemarketing policies?
11    A    I provided the calling time restrictions,
12 I provided the PossibleNow link to do that directly,
13 to the best of my ability.
14    Q    Were there any regular checks with
15 Paramount, any periodic, you know, every three weeks
16 or five weeks, whatever, where you would check in on
17 their compliance?
18    A    Well, I could randomly listen to all
19 calls.  I would randomly ask for calls just so I
20 can --
21    Q    How frequently would you do that?
22    A    It's random.  I don't -- I don't recall
23 how often.
24    Q    And what would you do if you noticed
25 something that wasn't correct?

Page 53

1    A    If I noticed that something was incorrect
2 based off of just the call that I listened to or the
3 way an order was placed, I would communicate with
4 Ryan and his team.
5    Q    And what did you do to ascertain whether
6 that was corrected?
7    A    To what my knowledge is of how to process
8 orders and how to speak to customers and things like
9 that, I would correct them with, with a verbal, we
10 would have a conversation about it.
11    Q    How often did you communicate with Ryan?
12    A    Often.  Especially in the beginning of any
13 relationship, just to be able to provide all the
14 do's and don'ts and things like that.
15    Q    So daily, weekly?
16    A    Could have been daily at times, could have
17 been weekly at times.
18    Q    After the first say two months of the
19 relationship, how frequently would you communicate
20 with Ryan?
21    A    I don't recall.  I can't give you an exact
22 thing.
23    Q    Was Ryan Neill your main contact person at
24 Paramount?
25    A    Yes.

14 (Pages 50 - 53)

Page 54

1    Q    Was there anyone else at Paramount that
2 you would speak with?
3    A    There were the technical guys that would
4 do the PossibleNow scrubs and the order processing
5 manager.
6    Q    Did you do anything to check to see if
7 they used prerecorded messages when calling
8 consumers?
9    A    Just listening to the random phone calls,
10 I can hear the beginning of the conversation, hi,
11 may I speak to so-and-so. And it was very clear no
12 prerecorded messages whatsoever.
13    Q    Could you go back to the addendum and take
14 a look at Page 4? Towards the middle of the page,
15 it says, Upon Saveology's request, affiliate will
16 promptly provide any outbound call list or dialer
17 records of calls placed by affiliate within the
18 preceding 24 months.
19    A    Okay.
20    Q    Did Saveology ever request an outbound
21 call list or dialer records from Paramount?
22    A    I don't, I don't remember.
23    Q    Do you recall ever requesting any
24 documentation of their calls?
25    A    Any documentation of their calls? Could

Page 55

1 you --
2    Q    Any kind of call lists or records of calls
3 that they had placed.
4    A    Sure, when I would ask for random, random
5 phone calls and I can also see that the numbers that
6 were scrubbed through PossibleNow.
7    Q    So you would randomly check, but did you
8 ever ask them to produce to you a list of calls they
9 had made in the last month, let's say?
10    A    I don't recall. I requested a lot of
11 things.
12    Q    Did Saveology ever request from its other
13 affiliates that they submit dialer records to
14 Saveology?
15    A    I can't speak to that, Saveology in that
16 manner. I don't know.
17        MR. PISANI: I'm going to object that it's
18    outside the scope of this deposition.
19        MS. GOLDBERG: I'm trying to understand
20    what Saveology's general practice was vis-a-vis
21    its affiliates.
22 BY MS. GOLDBERG:
23    Q    Would it be common for Saveology to ask
24 for their outbound call lists or their dialer
25 records?

Page 56

1        MR. PISANI: Same objection. You can
2    answer if you know.
3        THE WITNESS: I don't know.
4 BY MS. GOLDBERG:
5    Q    Were you responsible for supervising any
6 other affiliates?
7    A    For?
8    Q    Any other Saveology affiliates.
9    A    For home security, yes.
10    Q    Who were those other affiliates?
11    A    Savilo. Do you want the name of all of
12 them?
13    Q    Sure.
14    A    I couldn't remember all the names.
15    Q    Let's start with approximately how many
16 other affiliates, home security affiliates did
17 Saveology have?
18    A    Ten.
19    Q    Do you remember the names of any others
20 besides Paramount and Savilo?
21    A    Not off the top of my head. I really
22 focused on Paramount for this deposition.
23    Q    Among Saveology's home security
24 affiliates, which one generated the most sales?
25    A    The most qualified leads?

Page 57

1    Q    The most qualified leads.
2    A    Throughout the tenure?
3    Q    Let's say in 2011.
4    A    Oh, I don't know off the top of my head.
5 I don't know.
6    Q    And you were responsible for all ten of
7 those affiliate relationships?
8    A    As it pertained to home security.
9    Q    Right. Was there anyone else aside from
10 you who had oversight responsibility for those
11 affiliate relationships?
12    A    Who had oversight responsibility? That
13 also knew the affiliates?
14    Q    That knew the affiliates and had
15 responsibility for the relationships.
16    A    Yes.
17    Q    And who is that?
18    A    Reid Shapiro.
19    Q    Anyone else?
20    A    Not that I can remember.
21    Q    Okay. Did Saveology ever do an audit of
22 Paramount?
23    A    An audit? Besides me going out there and
24 auditing the daily activity of what was going on?
25    Q    Well, I know you said you went out there

15 (Pages 54 - 57)

Page 58

1 and occasionally looked at the daily activity, but
2 was there ever any formal audit?
3     MR. PISANI:  I'm going to object to the
4  term audit.  I don't think she understands what
5  you mean based on her last response.
6 BY MS. GOLDBERG:
7   Q   Do you understand what I'm saying?
8   A   No.
9   Q   Aside from you going out and randomly
10 checking, was there any other method Saveology used
11 to check up on Paramount's activities?
12   A   To check up?
13   Q   To monitor, to oversee Paramount's
14 activities.  Aside from your random checking in.
15   A   No.
16   Q   Did Saveology ask Paramount to produce any
17 documents to it concerning its calls or the source
18 of its leads?
19   A   Just the websites and the content of how
20 they obtained their leads was provided and approved
21 by the marketing division.
22   Q   That was all at the beginning of the
23 relationship, correct?
24   A   Correct, and any type of, any type of
25 change that would have occurred, it would have had

Page 59

1 to have been approved first by ADT's marketing.
2     (Mr. McNew entered the proceedings.)
3 BY MS. GOLDBERG:
4   Q   Aside from your initial conversation with
5  Ryan, did you get any other information as to the
6  source of Paramount's leads?
7   A   No.  I'm not sure I understand.  What do
8  you mean?
9   Q   You said in the initial conversation, you
10 asked where they got leads, correct?
11   A   Correct.
12   Q   Did you do anything else to verify where
13 they were getting their leads from?
14   A   No.
15   Q   Aside from what you've already told me,
16 did Saveology take any other measures to ensure that
17 Paramount was in compliance with the telemarketing
18 laws?
19   A   Besides -- not, not to my knowledge.
20   Q   Okay.  Did you do anything to investigate
21 their leads or the source of their leads?
22   A   Other than the documentation I was
23 provided, no.
24   Q   What documentation were you provided with?
25   A   Well, we already spoke about it, whatever

Page 60

1 type of marketing tactics they had that was already
2 approved by ADT.
3   Q   The websites you're saying that were
4  approved?
5   A   Correct.
6   Q   Okay.
7     MS. GOLDBERG:  Let's mark this.
8     (Plaintiff's Exhibit 4 was marked for
9  identification.)
10     MS. GOLDBERG:  Take a moment to read it.
11  When you're done, just look up.
12 BY MS. GOLDBERG:
13   Q   Was this e-mail sent by you?
14   A   Yes.
15   Q   It says it was sent to Ryan Neill and
16 Chris.  Who is Chris?
17   A   One of Ryan's co-workers.
18   Q   So someone who worked at Paramount?
19   A   I believe so.  I don't see the e-mail
20 address, though.
21   Q   And who is Robin Feinglas?
22   A   Our paralegal at the time.
23   Q   At Saveology?
24   A   Yes.
25   Q   Okay.  In the second paragraph, you say,

Page 61

1 Are your call centers making outbound calls, if so,
2 we must scrub those numbers prior to calling the
3 consumers even though they opt in.  I was under the
4 impression that all of your calls were inbound
5 calls.  What gave you that impression?
6   A   In the beginning of our relationship, it
7  would have been there's a phone number on the
8  website as well that you can call in, so sometimes,
9  you have to make outbound calls to call them back.
10 So once that came up, then they would have to scrub.
11   Q   So you didn't know at this point in time
12 whether Paramount was just taking inbound calls or
13 whether it was also making outbound calls?
14   A   I don't know, that's what that -- that's
15 what they would say.
16   Q   That you weren't aware?
17   A   Correct.
18   Q   Okay.  And this is dated 4-8-2011, so it's
19 been approximately four months, is that correct,
20 that Paramount and Saveology have been working
21 together?
22   A   November, yes.
23   Q   Okay.  Isn't it something you would want
24 to know whether they were just receiving inbound
25 calls or whether they were also making outbound

16 (Pages 58 - 61)

Page 62

1  calls?
2      A   Correct.
3      Q   A provider that is making outbound calls
4  has responsibilities to scrub as you mentioned?
5      A   Correct.
6      Q   So how come Saveology was not aware
7  whether Paramount was doing inbound or outbound?
8          MR. PISANI:  Objection.  That
9      mischaracterizes her testimony.
10  BY MS. GOLDBERG:
11     Q   Why is it you're asking if your call
12  centers are making outbound calls?  Isn't that
13  something that you would have known?
14     A   There's guidelines that they have to agree
15  to in the addendum.  So if there's any outbound
16  calls, they would have to abide by this.
17     Q   But you didn't know as of the date of this
18  e-mail, correct, whether they were making outbound
19  calls?
20         MR. PISANI:  Objection.  That
21     mischaracterizes her testimony.
22  BY MS. GOLDBERG:
23     Q   I'm asking you on the date you sent this
24  e-mail, you're asking these questions, did you know
25  whether Paramount was making outbound calls or not?

Page 63

1      A   Well, according to this e-mail, it's
2  asking them the question.
3      Q   So you didn't know?
4          MR. PISANI:  Objection.
5  BY MS. GOLDBERG:
6      Q   I mean, you're asking the question I
7  assume because you're not knowing the answer?
8          MR. PISANI:  You don't need to assume.
9      I'm going to instruct her not to answer if
10     she's asked to assume something.
11  BY MS. GOLDBERG:
12     Q   I'm not asking her to assume, I'm asking
13  her whether Paramount was making outbound calls.
14     A   Did I know at that particular moment?  I
15  don't know.
16     Q   What was Paramount's response to this
17  e-mail?
18     A   I don't know.  It's not here.  I can't
19  remember from 2011.
20     Q   No, I understand.  Do you recall if they
21  sent you a response to this?
22     A   I don't know.
23     Q   Prior to this date, had you ever checked
24  to see if there were any records of Paramount
25  scrubbing calls?

Page 64

1      A   Prior to -- I don't know.  I don't know
2  what date.
3      Q   When was the first time you checked to see
4  that Paramount was scrubbing its calls?
5      A   What was the first date?  I don't know.  I
6  would have to go look.  I don't know.
7      Q   How regularly would you check to see that
8  they were scrubbing calls?
9      A   What do you mean how regularly?  I would
10  get a notification from PossibleNow once they
11  scrubbed them.
12     Q   Aside from what you received from
13  PossibleNow, where would you look to see whether
14  Paramount scrubbed its calls?
15     A   Where --
16     Q   If you wanted to ascertain whether
17  Paramount scrubbed its calls or not, how would you
18  do that?
19     A   How would I -- I don't know.  I don't --
20  I'm not sure.
21         MR. PISANI:  Do you understand the
22     question?
23         THE WITNESS:  No.
24  BY MS. GOLDBERG:
25     Q   Earlier, you had said you'd have to look,

Page 65

1  so what would you look at?
2      A   I'd have to look at to know what part of
3  the question?  There's three questions here.  Which
4  one are we -- you are --
5          MS. GOLDBERG:  Sorry, could you read back
6      a couple questions?
7          THE COURT REPORTER:  Question, "Aside from
8      what you received from PossibleNow, where would
9      you look to see whether Paramount scrubbed its
10     calls?"
11  BY MS. GOLDBERG:
12     Q   So where would you look?
13     A   In PossibleNow.
14     Q   And that would tell you the date on which
15  they scrubbed?
16     A   If, if nothing has changed, yes.  If
17  nothing has changed within PossibleNow.  We haven't
18  been doing any of that type of work with PossibleNow
19  since we haven't been doing any outbound calls with
20  them.  I would have to look at PossibleNow's system.
21     Q   And would the PossibleNow system tell you
22  the dates on which Paramount scrubbed its calls?
23     A   Yes.
24     Q   Okay.  So you would -- and you would be
25  able to look back for several months and see how

17 (Pages 62 - 65)

Page 66

1 frequently they scrubbed?
2    A   I don't know.  I would have to conduct
3 someone at PossibleNow to see if they can pull up
4 that stuff.
5    Q   But it's possible to get a record of that
6 if you wanted to?
7       MR. PISANI:  I think she said to contact
8 PossibleNow.
9 BY MS. GOLDBERG:
10    Q   No, I understand that you would have to
11 contact -- does Saveology itself have such records?
12    A   Of?
13       MR. PISANI:  Wait.
14 BY MS. GOLDBERG:
15    Q   Paramount scrubbing?
16    A   Such records as?
17    Q   Does Saveology have a record of when
18 Paramount scrubbed its calls?
19    A   Did we keep a daily record?  No.
20    Q   So those are not records that you would
21 maintain in the regular course of business?
22    A   The date of a scrub?  Not to my knowledge.
23    Q   Why not?  Wouldn't you want to know that
24 your affiliates are scrubbing as required by law?
25    A   Well, yeah, but PossibleNow is a third

Page 67

1 party DNC that is also contracted by ADT, so they
2 have record of all of that as well.
3    Q   And does Saveology have independent
4 records of that?
5    A   I don't know.
6       MR. PISANI:  Aside from PossibleNow?
7       MS. GOLDBERG:  Aside from PossibleNow.
8 I'm just trying to ascertain if Saveology has a
9 record of that.
10       MR. PISANI:  Of PossibleNow's records?  I
11 think that's where the disconnect is.  She's
12 talking about PossibleNow's third party
13 software.
14 BY MS. GOLDBERG:
15    Q   But Saveology doesn't have your own
16 records of that?
17    A   Records of the days of the scrubs that
18 Paramount would do?
19    Q   Yes.
20    A   Not that I can recall.
21    Q   Aside from the date of the scrub, would
22 Saveology be able to figure out whether Paramount
23 scrubbed or not, the fact that it scrubbed, even if
24 it didn't know the date?
25    A   Yes.

Page 68

1    Q   And would you have to go to PossibleNow or
2 would you have that record yourself?
3    A   I would go into PossibleNow's system.  I
4 would get a notification once they scrub.
5    Q   Okay.
6    A   From PossibleNow.
7    Q   Did you receive notifications from
8 PossibleNow?
9    A   Yes.
10    Q   Every time they scrubbed?
11    A   Yes.
12    Q   And earlier, I asked you how frequently
13 they scrubbed and you said as required by law.
14    A   As required, uh-huh.
15    Q   But this e-mail suggests that they hadn't
16 been scrubbing prior to this date.
17       MR. PISANI:  I'm going to object to what
18 the e-mail states.  The e-mail says what it
19 says.
20 BY MS. GOLDBERG:
21    Q   Did you ever get evidence that Paramount
22 scrubbed prior to 4/8/2011?
23    A   Oh, I don't know.  I wouldn't know.
24    Q   Did you produce any documents showing that
25 Paramount scrubbed as required by law?

Page 69

1       MR. PISANI:  Did she produce?
2       MS. GOLDBERG:  Did Saveology produce.
3       THE WITNESS:  To whom?
4       MS. GOLDBERG:  In this litigation.
5       THE WITNESS:  Oh.  I don't know.  I don't
6    know what's produced.
7       MR. PISANI:  Well, there's been around
8    20,000 pages of documents that have been
9    produced.
10 BY MS. GOLDBERG:
11    Q   To your knowledge, has that been produced?
12       MR. PISANI:  We can go off the record if
13    you want to talk about production responses.
14 BY MS. GOLDBERG:
15    Q   I wanted to follow up on something you had
16 said earlier.  You had testified I believe that for
17 its websites, Paramount got approval from ADT for
18 the content of its website?
19    A   For any content, yes.
20    Q   Who submitted that website content for ADT
21 approval?
22    A   I would have or one of the people who work
23 for me.
24    Q   So Paramount never sent anything directly
25 to ADT, is that correct?

18 (Pages 66 - 69)

Page 70

1 A No.
2 Q Everything went through Saveology?
3 A Correct.
4 Q And when ADT granted approval, did they
5 notify Saveology of the approval?
6 A Yes.
7 Q And you notified Paramount?
8 A Correct.
9 Q ADT never directly sent approval to
10 Paramount, is that correct?
11 A No.
12 Q Okay.
13 MS. GOLDBERG: Let's mark another exhibit.
14 This is actually two pages, two separate
15 e-mails, but we'll mark them together, please.
16 She will mark a copy for you in a second.
17 (Plaintiff's Exhibit 5 was marked for
18 identification.)
19 BY MS. GOLDBERG:
20 Q Okay. Earlier, you mentioned the
21 requirement to submit all do not call requests, is
22 that correct?
23 A To submit the customers that ask to be put
24 on the DNC, correct.
25 Q Thank you. So here you say, I'm assuming

Page 71

1 you have daily DNC requests, this is very important.
2 In your experience, have you found that there are
3 DNC requests every single day?
4 A From our, from our internal agents, yes.
5 Q Was this a matter of concern or a red flag
6 for you that you hadn't received an opt out report
7 for Paramount in a week?
8 A Was it a concern? Yes, if there was opt
9 out to be put on, yes.
10 Q I assume you were concerned, that's why
11 you were writing that e-mail, right?
12 MR. PISANI: Objection. E-mail speaks for
13 itself.
14 BY MS. GOLDBERG:
15 Q I'm asking you why did you write this
16 e-mail? I'm assuming it's because you were
17 concerned that you hadn't seen any opt outs for a
18 week.
19 MR. PISANI: Same objection.
20 MS. GOLDBERG: You can answer.
21 THE WITNESS: I think the e-mail as you
22 said speaks for itself.
23 BY MS. GOLDBERG:
24 Q If you had another affiliate that had not
25 submitted DNCs for seven days, would you contact

Page 72

1 them and ask why?
2 A If they were doing outbounds, yes, or even
3 for the inbounds, yes.
4 Q Isn't that something you're required to
5 follow up on to make sure you're submitting the DNC
6 requests?
7 A Correct.
8 Q Did Ryan ever send you the opt out report
9 that you asked for in this e-mail?
10 A I don't, I don't see a response to this.
11 Q Look at the second page.
12 A Which one is 1 and which one is 2?
13 MR. PISANI: This is the second page.
14 MS. GOLDBERG: The one that doesn't have
15 the sticker.
16 THE WITNESS: Got you.
17 BY MS. GOLDBERG:
18 Q Here you said, That was the last report we
19 received. We do not have anything beyond 3-11.
20 That is what we need as that was a week ago.
21 A Okay.
22 Q Now, this second e-mail is about an
23 hour-and-a-half after the first e-mail. And it
24 looks like from the bottom of the page, that Rudy
25 sent you a list and you're responding that that's

Page 73

1 not the correct list. Did you ever receive a
2 correct list?
3 MR. PISANI: I'm going to --
4 THE WITNESS: I'm saying this is not
5 correct.
6 BY MS. GOLDBERG:
7 Q You're saying these are all the DNCs
8 through 3-11. We have through 3-11. That was the
9 last report we received. We do not have anything
10 beyond 3-11. That's what you were looking for in
11 your initial e-mail.
12 A Okay.
13 Q So my question to you is did they ever
14 respond and provide the DNC list after 3-11?
15 A I can't answer that, I don't know where
16 the response is.
17 MR. PISANI: Do you have any other e-mails
18 after this one?
19 MS. GOLDBERG: I don't.
20 BY MS. GOLDBERG:
21 Q To the best of your recollection, did Ryan
22 or Rudy respond with the DNC list you had requested.
23 A If I had asked for it, they would have
24 given it to me.
25 Q But they hadn't given it to you until you

19 (Pages 70 - 73)

Page 74

1 asked for it?
2    A    That's what this e-mail is saying, from
3 3-11 to whatever the date is.
4    Q    Is there a penalty for not timely posting
5 DNC numbers to the DNC list?
6    A    Penalty to who?
7    Q    To Saveology.
8        MR. PISANI:  Do you understand the
9    question?  A penalty to whom?
10 BY MS. GOLDBERG:
11   Q    What are the consequences of not timely
12 posting a customer's number to the DNC list?
13   A    I would have to look and see what the
14 exact consequences are, I don't know off the top of
15 my head.
16   Q    Is that a violation of law to not timely
17 post a customer's number?
18       MR. PISANI:  Objection.  She's not here to
19   answer what the requirements of law are.
20       MR. MCNEW:  Can we go off the record for a
21   second?
22       MS. GOLDBERG:  We're going to go off for a
23   minute.
24       (Off-the-record discussion.)
25

Page 75

1 BY MS. GOLDBERG:
2    Q    Earlier, you testified that you had
3 responsibility for the Paramount relationship,
4 correct?
5    A    Correct.
6    Q    And you also testified that you had
7 responsibility for compliance, correct?
8    A    Correct.
9    Q    So would it be a concern for you that
10 there was a potential violation if a company had not
11 submitted any DNCs for a week, would that be a
12 concern for you?
13   A    Yes.
14       MS. GOLDBERG:  Let's take a look at
15   another e-mail.
16       (Plaintiff's Exhibit 6 was marked for
17   identification.)
18 BY MS. GOLDBERG:
19   Q    This was an e-mail sent by you to Bruce
20 Cohen.  Was Bruce Cohen working for Paramount?
21   A    I don't know.  I don't recall.
22   Q    Do you know who he is?
23   A    This is from 2011, I don't remember the
24 name, sorry.
25   Q    I see the e-mail is also cc'd to Ryan

Page 76

1 Neill.  Does that refresh your recollection as to
2 whom this e-mail would be directed?
3    A    I don't remember.
4    Q    Well, it was also sent to Ryan Neill,
5 correct?
6    A    Okay, yes.
7    Q    And you have attached instructions on the
8 ADT DNC scrubbing process along with marketing
9 guidelines on which to be scrubbed.  Was this the
10 first time you sent such instructions to Paramount?
11   A    Was it the first time?  I don't know.  I
12 don't have all the e-mails.  I have no idea, to be
13 honest with you.
14   Q    Do you recall sending scrubbing
15 instructions to Paramount at any date prior to
16 4-13-2011?
17   A    I don't know.  I don't recall.  This is
18 years ago, I don't know.
19   Q    I understand, but you're testifying today
20 as the corporate representative for Saveology.
21   A    Okay.
22   Q    So I just want to understand, did
23 Saveology at any previous point send scrubbing
24 instructions and guidelines to Paramount?
25       MR. PISANI:  Objection, asked and

Page 77

1    answered.
2        THE WITNESS:  I thought I answered that.
3    I don't know if there's prior e-mails to this.
4    I don't know off the top of my head.
5 BY MS. GOLDBERG:
6    Q    Okay.  Who would know the answer to that?
7    A    I would assume the e-mail system.  I'm not
8 trying to be facetious, again, this is dated
9 4-13-2011, I don't know if there were prior e-mails.
10   Q    Well, I ask because I have looked through
11 all of the e-mails that were produced and I didn't
12 see anything indicating that, that's why I'm asking
13 you do you have any knowledge whether Saveology
14 produced scrubbing instructions and guidelines to
15 Paramount prior to this date?
16   A    I don't know.
17   Q    Okay.
18       MS. GOLDBERG:  Let's mark another e-mail.
19       (Plaintiff's Exhibit 7 was marked for
20   identification.)
21       THE WITNESS:  Okay.
22 BY MS. GOLDBERG:
23   Q    You asked Ryan, Are you working with a
24 lead provider called American Protection Services?
25 How come you didn't know who Ryan was working with?

20 (Pages 74 - 77)

Page 78

1      MR. PISANI: Objection to the form of the
2  question.
3      MS. GOLDBERG: You can answer.
4      THE WITNESS: Did --
5  BY MS. GOLDBERG:
6   Q   Why is it you didn't know which lead
7  providers Paramount was working with?
8      MR. PISANI: Objection. Assumes facts not
9  in evidence.
10     MS. GOLDBERG: You can answer.
11     THE WITNESS: I know what he told me.
12 BY MS. GOLDBERG:
13  Q   So he never told you he was working with
14 American Protection Services, is that what you're
15 saying?
16  A   Not to my knowledge, correct.
17  Q   Did you ever ask which lead providers
18 Paramount was working with?
19  A   It was very clear there was absolutely no
20 prerecorded messages whatsoever, so I can only take
21 what he provided and the auditing he gave me and he
22 had the guidelines of what he could or could not do.
23 He was a pretty reputable guy, I would assume.
24  Q   You would assume. Did Saveology ever
25 request a list of lead providers that Paramount

Page 79

1  worked with?
2   A   I would assume so.
3   Q   Is that Saveology's usual practice?
4   A   Yes.
5   Q   That it would ask its affiliates to
6  identify their lead providers?
7   A   The lead source. There's a lot of secret
8  sauce.
9   Q   Explain what their lead source is.
10  A   Is it an online opt in, if it's granted to
11 ADT, it has to be approved. As to exactly where
12 they're driving what, what websites they're on to
13 drive that traffic, that's their proprietary
14 information.
15  Q   So you don't know which companies they
16 work for, they work with to obtain leads, is that
17 what you're saying?
18  A   I know what they tell me.
19  Q   Did Paramount ever tell you what companies
20 it uses to obtain leads?
21  A   Yes.
22  Q   What did it tell you?
23  A   I don't remember off the top of my head.
24  Q   Did it give you a list of companies?
25  A   I don't know. I'd have to go back and

Page 80

1  reference.
2   Q   If it did give you a list of companies,
3  you would have known the answer to this question
4  then, are you working with a lead provider called
5  American Protection Services, right?
6   A   Correct.
7   Q   So the fact that you're asking the
8  question indicates that Paramount had never told you
9  that it was working with American Protection
10 Services, correct?
11  A   If they were, correct.
12  Q   Sorry, I didn't understand your answer.
13  A   Correct. I was not aware of American --
14 that's what this e-mail says, are you working with
15 American Protection Services.
16  Q   Okay. Did you do anything to investigate
17 the relationship between Paramount and American
18 Protection Services?
19  A   I don't recall. I don't know what Ryan's
20 response is. I don't have a response here.
21  Q   Did Saveology do anything to investigate
22 who is American Protection Services?
23  A   I don't know what, what is after this
24 e-mail. I don't know -- I don't see in front of me
25 what is after this e-mail.

Page 81

1   Q   I understand that, I'm just asking
2  generally, based on the complaint, if Saveology is
3  informed or learned that Paramount is using a lead
4  provider it hadn't previously known about, does
5  Saveology do any investigation on that lead
6  provider?
7   A   Yes.
8   Q   What kind of investigation do you do?
9   A   You would Google it, you would go see
10 American Protection Services, I'm not familiar with
11 who they are. So I would do some sort of
12 investigation on it.
13  Q   A Google type of search?
14  A   A Google search, speak to the other
15 partner companies, group within our company to ask
16 if they've ever worked with someone, et cetera.
17  Q   And did you do that in this situation?
18  A   I don't recall.
19  Q   Would you do any due diligence on American
20 Protection Services' compliance record?
21  A   Would I?
22  Q   Would Saveology?
23     MR. PISANI: Objection, calls for
24 speculation.
25     THE WITNESS: Yeah, I don't understand

21 (Pages 78 - 81)

1    what you're asking me there.
2  BY MS. GOLDBERG:
3     Q    You're testifying today, correct, as a
4  30(b)(6) representative of the company, is that
5  correct?
6        MR. PISANI:  She is.  We'll stipulate to
7     that.
8  BY MS. GOLDBERG:
9     Q    Great.  So I'm trying to ascertain is what
10  does Saveology do when it learns the name of another
11  company that its affiliate is using?
12        MR. PISANI:  Objection, calls for
13     speculation, not part of the 30(b)(6) notice.
14  BY MS. GOLDBERG:
15     Q    What is the process, if any, that
16  Saveology does, do you do anything to vet that other
17  company, that third party vendor?
18        MR. PISANI:  Objection.  If you can point
19     to me where that is?
20        MS. GOLDBERG:  Sure.  Do you have the
21     notice?
22        MR. PISANI:  Yeah.
23        MS. GOLDBERG:  That part of compliance.
24        MR. PISANI:  Falling under telemarketing
25     compliance?

1        MS. GOLDBERG:  Absolutely.  Telemarketing
2     compliance is a broad category.  This clearly
3     falls within telemarketing compliance.
4        MR. PISANI:  Okay.  And what's the
5     question?  You may need it read back unless you
6     want to ask it again.
7        MS. GOLDBERG:  Could you read it back?
8        THE COURT REPORTER:  Question, "What is
9     the process, if any, that Saveology does, do
10     you do anything to vet that other company, that
11     third party vendor?"
12        MR. PISANI:  I'm going to object.  I don't
13     think it's covered by the 30(b)(6) notice, but
14     she can answer over the objection.
15        THE WITNESS:  What is it that Saveology --
16     if we were not working with this company and it
17     was, nor was Ryan, as I don't know, I don't
18     know what's beyond this, then why would I vet
19     the company?  If they do prerecorded messages,
20     it's just a no.
21  BY MS. GOLDBERG:
22     Q    But if Paramount was working with such
23  company, would you do anything to vet that company?
24     A    Yes.
25     Q    What would you do to vet that company?

1     A    The process of the Google search, I could
2  possibly call them to ask them what type of
3  marketing they do.  Most of them clearly state what
4  they do online.
5     Q    Would you do anything beyond a Google
6  search or a telephone call?
7     A    No.
8        MR. PISANI:  Same objection.
9        THE WITNESS:  Depending on the nature, I
10     don't know.
11  BY MS. GOLDBERG:
12     Q    Would you look to see if they were
13  registered with the State of Florida to do
14  telemarketing?
15     A    Would I look?  No.
16     Q    Would Saveology?
17     A    I can't answer that.  I can make an
18  assumption that that's within the guidelines.
19     Q    You're speaking as a corporate
20  representative, so I want to understand what the
21  company would do.
22     A    Again, I was only focused on Paramount in
23  my relationship with home security.
24     Q    But you've been director of operations for
25  many, I don't know, seven years, is that what you

1  said?
2     A    For home security.
3     Q    For home security, right.  So I'm talking
4  about a home security question.  What would you do
5  to vet a third party vendor other than a Google
6  search and/or a telephone call to that vendor?
7        MR. PISANI:  I'm just going to object that
8     it's an incomplete hypothetical.  But you can
9     answer.
10        MS. GOLDBERG:  You can answer.
11  BY MS. GOLDBERG:
12     Q    Is there anything further that Saveology
13  would do in that situation?
14     A    That Saveology, their due diligence,
15  whatever that list is.
16     Q    You're saying the due diligence list that
17  they would do on affiliates?
18     A    Correct.
19     Q    And do you know for a fact that that's
20  what they would do for a third party or you're
21  speculating?
22     A    I'm speculating.
23     Q    I don't want you to speculate.  Because
24  then we all get in trouble.
25     A    Then I can't answer the question.

22 (Pages 82 - 85)

Page 86

1    Q   Okay.  Did you yourself do anything to
2  investigate American Protection Services after you
3  read this e-mail?
4    A   I don't remember.
5    Q   Did Reid Shapiro who is cc'd on the
6  e-mail, did he do anything to look into American
7  Protection Services?
8    A   I can't answer for him.
9    Q   Did he discuss this American Protection
10 Services with you?
11   A   I don't recall.
12   Q   Do you recall if he discussed this e-mail
13 with you?
14   A   I don't remember.  This is from 2011.
15   Q   I understand.  Did you instruct Paramount
16 to terminate its relationship with American
17 Protection Services?
18       MR. PISANI:  Can I just object for a
19   second and the only e-mail you're talking about
20   is this one where she's asking the question,
21   right?
22       MS. GOLDBERG:  Yes.
23       MR. PISANI:  I guess I'm, and I don't --  I
24   know the standard is with my speaking
25   objection, but I guess it's assuming facts not

Page 87

1  in evidence.  I mean, she's asking the question
2  and she's already said she's not aware of a
3  response, whether Ryan said he was working with
4  American Protection Services.
5       THE WITNESS:  You're asking me not to
6  speculate.  I don't have something in front of
7  me that tells me if they were, what their
8  response is.
9  BY MS. GOLDBERG:
10   Q   I understand.  But somebody with the
11 responsibility with compliance and somebody
12 responsible with the compliance relationship, this
13 is something well within your area of knowledge, so
14 I'm trying to ascertain what Saveology did.
15   A   Right.  And I don't remember the
16 specifics.
17   Q   Okay.  Let's look at the second paragraph,
18 it says, It is also wise to remove any 303 numbers
19 from any of your dialing efforts.
20   A   Uh-huh.
21   Q   To your knowledge, did Paramount remove
22 303 numbers as you suggested?
23   A   I don't remember.
24   Q   Did you do any follow-up to ensure that
25 Paramount removed those numbers?

Page 88

1    A   It's possible.
2    Q   How would you have done that?
3    A   Typically Ryan and I whenever we spoke and
4  whatever needed to be done would be done.
5    Q   How do you know that it would be done?
6    A   There would either be a response or he
7  never led me to believe otherwise.
8    Q   Did he send you a response informing you
9  that he had deleted the 303 numbers?
10   A   I don't know.
11   Q   Do you know if Reid did any follow-up to
12 ensure that Ryan removed the 303 numbers?
13   A   I don't know.
14   Q   Okay.  Let's move on to another exhibit.
15       (Plaintiff's Exhibit 8 was marked for
16   identification.)
17       THE WITNESS:  Okay.
18 BY MS. GOLDBERG:
19   Q   At the bottom of the page is an e-mail
20 from Ryan Neill to you and Jeremy Torisk.  Who is
21 Jeremy?
22   A   Jeremy was the, he came in to kind of
23 oversee the affiliates at a certain point in time
24 here.
25   Q   He was a Saveology employee?

Page 89

1    A   Yes.  Well, yes.
2    Q   And did he help you oversee the Paramount
3  relationship?
4    A   Yes.
5    Q   Did he report to you?
6    A   He reported to Reid.
7    Q   I'm just --
8    A   Shapiro.
9    Q   Was he junior to you or a senior to you?
10   A   Junior.
11   Q   In this e-mail, Ryan says that they had
12 been working with a lead provider, American
13 Protection Services, that was calling all the wrong
14 people, et cetera, and he says, I'm contacting my
15 lawyer to settle with this person.  Somebody who had
16 made a complaint.
17   A   Okay.
18   Q   At this point, did, when Saveology --
19 sorry, let me just go back and say the subject
20 matter is Jay Connor Settlement.  Do you know did
21 Paramount settle a complaint with Jay Connor?
22   A   I believe so.
23   Q   Did Paramount pay money towards that
24 settlement?
25   A   I don't, I don't remember if they actually

23 (Pages 86 - 89)

Page 90

1 paid money to them. I don't know.
2    Q    Okay.
3    A    I don't remember.
4    Q    When you were notified about this, did
5 Saveology do anything further to investigate whether
6 Paramount was using other third party vendors
7 besides American Protection Services?
8    A    I don't recall.
9    Q    Did Saveology do anything to investigate
10 what third party vendors Paramount was using?
11        MR. PISANI: Are you talking about after
12 this e-mail?
13        MS. GOLDBERG: Uh-huh.
14        THE WITNESS: After this e-mail, do I
15 recall? I'm sure that we had a conversation
16 with Ryan, but I don't remember.
17 BY MS. GOLDBERG:
18    Q    So you don't remember having a specific
19 conversation with Ryan?
20    A    I don't remember the dates of the calls
21 with Ryan.
22    Q    Did you have any phone call with Ryan
23 concerning what other third party vendors he was
24 using?
25    A    Specific to ADT?

Page 91

1    Q    Yes.
2    A    Specific to ADT, yeah, I would want to
3 know who he was using.
4    Q    So you would have asked him?
5    A    I would have asked him at some point.
6    Q    Do you know that you asked him or are you
7 guessing that you asked him?
8    A    I'm sure that we've had conversations as
9 to very clear as to what the marketing guidelines
10 say and that there's no prerecorded messages.
11    Q    I understand that, but I'm asking
12 something different. Did you have conversations
13 where you asked Ryan to give you the names of all
14 the third party vendors that he was using?
15    A    I don't recall.
16    Q    Did anybody at Saveology ask Paramount to
17 provide a list of the third party vendors that it
18 was using?
19    A    I don't remember.
20    Q    Was it Saveology's practice to obtain a
21 list of third party vendors used by its affiliates?
22    A    Was it a practice? Yes.
23    Q    It was Saveology's practice to do that?
24    A    To understand the marketing tactics. Like
25 I said, they don't always tell you who exactly their

Page 92

1 resources, but the tactics, yes.
2    Q    So you don't always know the source of the
3 lead?
4    A    The source, correct.
5    Q    You said it's Saveology's practice to ask
6 about their marketing tactics.
7    A    Correct.
8    Q    What does that mean?
9    A    How they're marketing, obtaining leads,
10 how the outbound calls are coming in. To me that's
11 a tactic.
12    Q    That's fine. I just wanted to understand
13 what you're saying. That's different, though, from
14 asking who their third party vendors are, correct?
15    A    Correct.
16    Q    So a tactic would be we're getting them
17 from the website, for example?
18    A    Yes, specific to what website.
19    Q    And they would tell you the name of the
20 website?
21    A    Right, and what the content is on the
22 website.
23    Q    If they were purchasing leads from a third
24 party vendor, is that something Saveology would
25 know?

Page 93

1    A    Purchasing leads from a third party
2 vendor? Is that something Saveology would know?
3 Exactly who the lead source was? Possibly, possibly
4 not.
5    Q    Okay.
6    A    Again, it's a secret, proprietary thing
7 sometimes.
8    Q    So there are times that your affiliate
9 might not disclose to you what third party vendors
10 they were using?
11    A    The name of them, no.
12    Q    Was there ever a time that Saveology
13 formally asked for a list of third party vendors
14 from each of their affiliates?
15    A    I don't know if we asked. Again, this is
16 about Paramount, I don't know if we've asked them
17 for it. I don't recall.
18    Q    I think earlier you testified that you
19 manage about ten affiliates.
20    A    Uh-huh.
21    Q    Have you ever asked any of those
22 affiliates to provide a list of the third party
23 vendors that they use?
24    A    I don't remember.
25    Q    I just want to understand. In the six or

24 (Pages 90 - 93)

Page 94

1 seven years that you were director of operations,
2 you were managing about ten affiliates, is that
3 correct?
4    A   Yes.
5    Q   So in those years as director of
6 operations, you don't recall ever asking an
7 affiliate for a list of its third party vendors?
8    A   Could I have?  Yes.
9    Q   But you don't recall doing so?
10   A   It's not that I don't remember
11 specifically if I asked Paramount in an e-mail or
12 something to provide me all the names of the
13 companies, it's more the marketing tactics.
14   Q   Okay.  But is it a formal requirement of
15 Saveology that its affiliates provides a list of its
16 third party vendors?
17   A   Is it a policy?  I don't know.
18   Q   To your knowledge as the director of
19 operations, have you ever implemented such a
20 practice?
21   A   Have I asked for names of third party
22 vendors?
23   Q   Correct.
24   A   Could I have?  Sure.
25   Q   Well, as a representative of the company,

Page 95

1 did you ever?
2    A   I don't remember.  I don't -- I don't, I
3 don't remember off the top of my head.
4        MS. GOLDBERG:  Okay.  Let's look at
5    another exhibit.
6        (Plaintiff's Exhibit 9 was marked for
7    identification.)
8 BY MS. GOLDBERG:
9    Q   This is an e-mail to you from Ryan and it
10 concerns a complaint, somebody called in and said a
11 call rep is calling me saying "This is Dan with ADT
12 Home Security."  Did Paramount greet its customers
13 saying, "This is Dan with ADT Home Security"?
14   A   In our script thing and in my audits of
15 them, it was no, this is so-and-so from, by ADT
16 powered by Saveology or something.  But we were
17 never able to represent ourselves as ADT.
18   Q   Did you ask Ryan Neill if any of his
19 telephone agents ever answered the phone by saying,
20 "This is Dan with ADT Home Security"?
21   A   Did I ask Ryan?  I'm sure I asked Ryan,
22 because it says it here, but if I did, it was
23 corrected.
24   Q   I'm sorry, you're saying if Paramount was
25 doing that, you corrected that?

Page 96

1    A   If anyone representing themselves as ADT
2 Home Security, it would be corrected as no, this is
3 how the greeting is.
4    Q   Did you recall whether Ryan said to
5 you, yes, we're doing that?
6    A   No, no.
7    Q   No, you don't recall?
8    A   No, I don't recall.
9    Q   Okay.  Do you remember what Ryan's, says,
10 Please call me.  Do you remember if you had a
11 conversation with Ryan after this e-mail?
12   A   Do I remember?  Well, I'm sure I had many
13 conversations with Ryan after this e-mail, but in
14 pertaining to this, I don't remember the
15 conversation in depth, no.
16   Q   Do you remember if you responded to ADT
17 about this complaint?
18   A   I'm sure I would have.  I responded to
19 anything ADT sent.
20   Q   Do you remember what your response to ADT
21 was?
22   A   No, not verbatim.
23   Q   Okay.
24       MS. GOLDBERG:  I want to mark this.  I
25   apologize, I don't have another copy of this.

Page 97

1    It was marked yesterday.
2        (Plaintiff's Exhibit 10 was marked for
3    identification.)
4 BY MS. GOLDBERG:
5    Q   Was this your response to ADT following
6 Exhibit 9?
7    A   Correct.  Yes, sorry.
8    Q   That's okay.  You told Dan Geiger, Yes, we
9 do work with Paramount, but they aren't an outbound
10 team?
11   A   Correct.
12   Q   Okay.  That's all on this, thank you.
13       MS. GOLDBERG:  Let's mark another exhibit.
14       MR. PISANI:  Sorry, are we marking this?
15       MS. GOLDBERG:  Can we just go off the
16   record for a minute.
17       (Off-the-record discussion.)
18       (Plaintiff's Exhibit 11 was marked for
19   identification.)
20 BY MS. GOLDBERG:
21   Q   In the ADT Elephant Group contract,
22 Saveology was prohibited from representing itself as
23 ADT, correct?
24   A   Correct.
25   Q   And is that why you wrote, PS - please

25 (Pages 94 - 97)

Page 98

1 remove that ADT logo from your e-mails. That is the
2 wrong logo - we cannot put the ADT logo on our
3 e-mails?
4   A   Correct.
5   Q   Had anyone given Paramount permission to
6 use that logo?
7   A   This says this is the wrong logo, there's
8 an ADT corporate logo and there's an ADT dealer
9 logo.
10   Q   Right. And on the second page, the
11 Paramount Home Security Expert was using the ADT
12 authorized dealer logo.
13   A   Yeah, but that was the, I believe that
14 that logo at that time was outdated.
15   Q   So this is the wrong logo?
16   A   I believe. I know at some point, ADT did
17 change their logo and gave us updates. Exactly what
18 the date is, I don't know, but if I would guess, it
19 would be somewhere around there, I assume.
20   Q   Did Saveology ever use a logo that said
21 ADT authorized dealer?
22   A   Yes, that was the logo we were permitted
23 to use.
24   Q   Okay.
25       MS. GOLDBERG: Let's mark this as 12.

Page 99

1       (Plaintiff's Exhibit 12 was marked for
2   identification.)
3 BY MS. GOLDBERG:
4   Q   On the bottom of the page is an e-mail
5 from you to Ryan saying, Let me know if you are
6 doing text messages to phones.
7   A   Okay.
8   Q   If Paramount had been doing text messages
9 to phones, is that something they would have been
10 required to tell Saveology?
11   A   Yes.
12   Q   And they hadn't informed you that they
13 were doing that, correct?
14   A   That's what this e-mail is asking,
15 correct.
16   Q   Okay. If you move slightly up in the
17 page, Ryan responds, Daphne, this is our sleep
18 safely now website which has been approved and is
19 generic. And at the top of the page, you respond to
20 him, It's not generic because the terms and
21 conditions have ADT specifics all over it. Is that
22 permissible?
23   A   Was it permissible?
24   Q   Were they allowed to have a website like
25 that?

Page 100

1   A   With ADT's specifics on it? No. As you
2 see, it would need to be approved.
3   Q   And second line, you say, We will be fined
4 for texting the phone number without it being
5 scrubbed. Were you fined for any texting in this
6 situation?
7   A   I don't recall any fines from ADT.
8   Q   Did you do anything to ensure that
9 Paramount did not do any text messages to phone
10 without scrubbing?
11   A   Did I do anything to ensure that it's not
12 a tactic that they had told me and it wasn't, if
13 it's not a tactic they had told me and I don't know
14 where the response is to this. I don't recall
15 Paramount doing any text messaging.
16   Q   Do you know if they did any text messaging
17 after the date of this e-mail?
18   A   Not to my knowledge.
19   Q   Did you do anything to verify that they
20 weren't text messages after the date of this e-mail?
21   A   I don't recall. If they said they weren't
22 text messages, as you can see in Ryan's response, it
23 says, I did not create this page, it was off
24 immediately. So -- and then it says, We as a
25 company are not doing any text messages. But

Page 101

1 obviously, someone else is trying to generate leads
2 for Paramount. This creative was not approved by us
3 and they are doing this on their own and will be
4 turned off ASAP. That's from Ryan to me.
5   Q   So there were text messages, you didn't
6 know the source of those text messages, he said he's
7 not doing any, did you do anything to investigate
8 the source of these text messages?
9   A   No.
10   Q   It says, Obviously someone else is trying
11 to generate leads for Paramount. Did you
12 investigate who that someone else is?
13   A   I did not.
14       MS. GOLDBERG: Let's mark this as 13.
15       (Plaintiff's Exhibit 13 was marked for
16   identification.)
17 BY MS. GOLDBERG:
18   Q   Here you've asked Ryan to let me know how
19 and when a specific phone call, phone number was
20 dialed by Paramount. You say you had personally put
21 it on the Do Not Call List, correct?
22   A   Correct. That's what the e-mail says,
23 yes.
24   Q   Did Paramount respond to you with the
25 information that you had requested in this e-mail?

26 (Pages 98 - 101)

Page 102

1    A   I don't know.
2    Q   Did Paramount typically respond with the
3 requested information?
4    A   Yes.
5    Q   Was it at all a concern to you that you
6 had personally put a number on the DNC list and now
7 you see that there's an allegation that it had been
8 dialed by Paramount?
9    A   Correct, so I asked to provide the
10 information as to why it was being dialed.
11   Q   Did you do anything further to ensure that
12 Paramount was complying with the Do Not Call List
13 rules and regulations?
14   A   Did I do anything further such as?
15   Q   Did you --
16   A   Ask me the question further, I'm sorry.
17   Q   Sure.  Did you do anything further to
18 ascertain that Paramount was in compliance with the
19 do not call rules?
20   A   I don't know.  I don't know.
21   Q   Okay.  Earlier, you said that you became
22 aware that Paramount was using third party lead
23 providers, is that correct?
24   A   Correct, according to that, yes.
25   Q   Were affiliates permitted to use third

Page 103

1 party lead providers?
2    A   If they were approved through us.
3    Q   Did Paramount seek approval for those
4 third party lead providers?
5    A   Any one that I was aware of, yes.
6    Q   I think earlier, I had asked you, did they
7 give you a list of third party lead providers and
8 you said no.
9    A   Right.  That's the marketing tactics.  So
10 when you asked me was the name of a third party
11 approved by us, I don't know.  I don't know if there
12 was e-mails back and forth with it.  I can't answer
13 a specific to that.  I would have to see it.
14   Q   Okay.  I'm confused.  Sorry.  Is there
15 anybody else who would know?
16   A   Who would know what?  The question, just
17 read it back to me, I'm sorry.
18       MS. GOLDBERG:  Can you read it back?
19       THE COURT REPORTER:  Question, "Did
20   Paramount seek approval for those third party
21   lead providers?"  Answer, "Any one that I was
22   aware of, yes."  Question, "I think earlier, I
23   had asked you, did they give you a list of
24   third party lead providers and you said no."
25   Answer, "Right.  That's the marketing tactics.

Page 104

1    So when you asked me was the name of a third
2    party approved by us, I don't know.  I don't
3    know if there was e-mails back and forth with
4    it.  I can't answer a specific to that.  I
5    would have to see it."  Question, "Okay.  I'm
6    confused.  Sorry.  Is there anybody else who
7    would know?"
8        THE WITNESS:  I don't know what you're
9    asking me.  Who would know what?
10       MS. GOLDBERG:  Let's start again, because
11   I'm a little confused now.
12 BY MS. GOLDBERG:
13   Q   I may have asked it, but I'm confused, so
14 I apologize.  I'm going to go through it again.  Did
15 Paramount ask you for approval to use third party
16 lead providers?
17   A   Specific to their name or to the marketing
18 tactic?  I think that's where I'm confused with
19 this.
20   Q   Okay.  Not for the marketing tactics, as
21 in we want to use the website, is this content okay,
22 but if they were purchasing leads from a third
23 party, did they ask Saveology's approval to do that?
24   A   Did they -- I'm guessing so.  Did they
25 ask --

Page 105

1    Q   Let me start from the beginning.  Did
2 Saveology require Paramount to get approval in order
3 to purchase leads from third parties?
4    A   Yes.
5    Q   Was there a specific process that
6 Paramount would have to go through to obtain consent
7 for that?
8    A   Yes, the marketing tactics would have to
9 be approved.
10   Q   The marketing tactics would have to be
11 approved?
12   A   Correct.
13   Q   But would Paramount have to submit the
14 name of a vendor from whom it was purchasing leads
15 in order to go ahead and purchase leads?
16   A   No.  That's what I was saying earlier,
17 that's kind of proprietary to them.
18   Q   So it's proprietary to them who they use
19 as third party vendors?
20   A   The name.
21   Q   The name.  So Saveology did not know who
22 Paramount was purchasing leads from, is that
23 correct?
24   A   I can't answer that.  Not specifically.
25   Q   I don't understand that answer.  Did

27 (Pages 102 - 105)

Page 106

1 Saveology know the names of the vendors from whom
2 Paramount was purchasing leads?
3    A   No, no.
4    Q   Did Saveology ask for that information
5 ever?
6    A   The name? I don't know if we asked ever.
7    Q   Well, who would know, who at Saveology
8 would know if Saveology ever asked Paramount for the
9 names of its third party lead providers?
10    A   Who at Saveology would know? I don't
11 know. It's industry standard that there's a
12 proprietary thing of a secret sauce of a name.
13    Q   I don't know what secret sauce is.
14    A   I'm going to explain to it. Of a name of
15 where you're generating your leads from. What we do
16 is we approve the marketing tactics. Because if you
17 give us the name, why wouldn't I go directly to the
18 person, if you think of it from a marketing
19 perspective, and a competitor's. That's really in
20 our industry what that is when you're generating
21 leads.
22    Q   And the tactics, if you could explain it
23 to me again is simply the website content they put
24 up?
25    A   Is how they're updating the leads.

Page 107

1    Q   So give me examples of tactics.
2    A   Was it a direct mail, was it, it's the
3 marketing, it's a marketing channel as I described
4 earlier, that's what the tactics are.
5    Q   I'm sorry, I don't have a background in
6 marketing. So indulge me.
7    A   It's online and off line, so it's direct
8 mail, it could be paid search.
9    Q   What does paid search mean?
10    A   Paid search is online where you actually
11 pay to bid on a branded term. There's also generic
12 where it's not branded, where it's home security
13 versus ADT. So ADT's brand which is home security
14 would be generic.
15    Q   So they would tell you the method of how
16 they obtained the lead?
17    A   Correct, the tactic.
18    Q   But Paramount never disclosed to you from
19 whom they obtained that lead, is that correct?
20    A   Correct.
21    Q   And Saveology never required Paramount to
22 disclose from whom it obtained a lead?
23    A   The name, no. Because of the secret
24 sauce.
25    Q   Okay. So my statement was correct, that

Page 108

1 Saveology never required Paramount to disclose the
2 name of the vendor from whom it obtained the lead?
3    A   Well, it's not correct, because if you
4 look back in the e-mails, I'm asking specifically
5 are you working with X, Y and Z.
6    Q   That was in response to a specific
7 complaint.
8    A   I don't want to get hung up on the word.
9    Q   I understand. Fair enough. You said on
10 occasion, you would ask if that was in response to a
11 specific complaint, right?
12    A   Correct.
13    Q   As a matter of practice, did Saveology ask
14 Paramount to disclose the names of its third party
15 lead vendors?
16    A   Again, it's their proprietary information.
17    Q   So no?
18    A   No.
19    Q   Okay.
20    (Plaintiff's Exhibit 14 was marked for
21 identification.)
22    MR. PISANI: Off the record.
23    (Brief recess.)
24 BY MS. GOLDBERG:
25    Q   I've given you Exhibit 14, Elephant Group,

Page 109

1 Inc.'s Answers to Third Party Plaintiff ADT's First
2 Set of Interrogatories. Have you ever seen this
3 before?
4    A   Not to my knowledge. I'm reading this
5 now. I don't know -- no, I don't think so.
6    Q   Do you --
7    MR. PISANI: As we said off the record, I
8 never showed it to her.
9 BY MS. GOLDBERG:
10    Q   Do you know if anybody at Saveology has
11 seen this document?
12    A   I wouldn't know.
13    Q   These are answers to questions. Do you
14 know who provided information for the answers to
15 these questions?
16    A   No. I didn't read through this. No.
17    Q   If you want to take another minute, that's
18 fine. I don't want to rush you.
19    A   Okay. It's like eight pages. I wouldn't
20 know.
21    MR. PISANI: What's the question?
22    MS. GOLDBERG: I'm trying to ascertain who
23 provided the information to answer these
24 questions.
25    MR. PISANI: Do you know?

28 (Pages 106 - 109)

Page 110

1    THE WITNESS: I haven't read this, but no,
2  I don't know. I don't know who wrote this.
3  I'm reading.
4  BY MS. GOLDBERG:
5    Q   As the representative of the company,
6  you're speaking on behalf of Saveology right now, so
7  I'm trying to understand this is Saveology's
8  response to our discovery request, who provided the
9  information in this?
10    A   I don't know. You asked me to read this
11  and I'm asking to give me a moment to read this.
12    Q   Sure, absolutely.
13    A   I have no idea what I'm even looking at.
14    Q   Take as much time as you need.
15    MR. PISANI: And I'm going to object.
16  It's beyond the scope of the 30(b)(6).
17    MR. MCNEW: Off the record.
18    (Off-the-record discussion.)
19  BY MS. GOLDBERG:
20    Q   Can I direct your attention to Page 4,
21  specifically question and answer number 8 and number
22  9. Question 8 says, Identify any limitations,
23  restrictions or rules you placed on Paramount
24  concerning the subcontracting of marketing services.
25  And the answer says, In part, Paramount Media Group

Page 111

1  was not permitted to subcontract any services
2  without receiving prior written approval.
3    A   Okay.
4    Q   My question to you is what is the factual
5  basis for that answer?
6    MR. PISANI: I'm going to object. First
7  of all, she's testified she's never seen this
8  before.
9    MS. GOLDBERG: She's reading it now.
10    MR. PISANI: Fine.
11    MS. GOLDBERG: I want to ascertain what
12  are the facts that underlie this answer.
13    MR. PISANI: She's reading this now. How
14  can she provide a factual basis of something
15  she's just reading now? She didn't write the
16  answers, how can she provide an answer?
17    MS. GOLDBERG: She's speaking about the
18  company.
19    MR. PISANI: This is not on the 30(b)(6)
20  notice.
21    MS. GOLDBERG: This is compliance.
22    MR. PISANI: If you want ask her a
23  question about compliance.
24    MS. GOLDBERG: This is compliance, guys.
25    MR. PISANI: This is not compliance. This

Page 112

1  is a specific interrogatory question. You're
2  asking for a factual basis for an answer that
3  she didn't write.
4    MS. GOLDBERG: Elephant/Saveology
5  Telemarketing Compliance. This falls within
6  telemarketing compliance.
7    MR. PISANI: If you want to ask her about
8  telemarketing compliance, ask her about
9  telemarketing compliance.
10    MS. GOLDBERG: Whether their telemarketing
11  affiliates are allowed to subcontract or not
12  falls within telemarketing compliance.
13    MR. PISANI: You can ask her that
14  question, sure. But that's a different
15  question than you asked.
16    MS. GOLDBERG: I'm trying to find out what
17  is the factual basis for this answer.
18    MR. PISANI: Sure, and I think that's an
19  improper question.
20    MR. MCNEW: She's the corporate witness.
21    MR. PISANI: Sure.
22    MR. MCNEW: This is a question going to
23  the corporate compliance issues. It's squarely
24  at issue in this case and you're saying that
25  she can't testify because she's never seen the

Page 113

1  interrogatory response before?
2    MR. PISANI: What I'm saying, that's not
3  the question, counsel. The question is the
4  factual basis for this particular interrogatory
5  answer. If she wants to ask a question about
6  telemarketing compliance, Ms. Fernandez is here
7  to testify on behalf of the corporation, but
8  that wasn't the question. The question was
9  with regard to this specific interrogatory
10  answer and the basis for that answer.
11    MR. MCNEW: Which is an answer offered by
12  the corporation in an interrogatory.
13    MR. PISANI: That she's never, she's never
14  seen this document before.
15    MR. MCNEW: She is answering as the
16  corporation.
17    MR. PISANI: We can go back and forth. We
18  can go back and forth on this, but I'm
19  objecting to --
20  BY MS. GOLDBERG:
21    Q   I'm just going to read to you a sentence.
22  Paramount Media Group is not permitted to
23  subcontract any services without receiving prior
24  written approval. Do you have any understanding as
25  to what the basis of that statement is?

29 (Pages 110 - 113)

1    A   Of this particular statement or are you
2  asking me what the prior consent says?  I don't know
3  if you're asking me about this statement or what the
4  prior written consent, receiving prior written
5  approval.
6    Q   Is it true that Paramount Media Group was
7  not permitted to subcontract without receiving prior
8  written approval?
9    A   Is it true, yes.  That's what our
10 guidelines state.
11   Q   Can you show me where in the guidelines it
12 says that?  Are you talking about the guidelines
13 attached to the addendum?  I believe that was
14 Exhibit 2?  What exhibit number was the addendum?
15   A   3.
16   Q   Okay.
17   A   I don't see it in this agreement.  I don't
18 know verbatim what the Saveology Network Agreement
19 says.
20   Q   I'd ask again if that network agreement
21 could be produced to us.  I've asked previously and
22 we haven't had that yet.  Do you have any other
23 knowledge that would support this statement in the
24 answer to number 8?
25      MR. PISANI:  Same objection.

1  BY MS. GOLDBERG:
2    Q   Do you have any other knowledge for the
3  statement that Paramount Media Group was not
4  permitted to subcontract any services without
5  receiving prior written approval?
6    A   Any other knowledge?  Again, I don't know
7  if I'm not understanding the question.
8    Q   I apologize.  Let me rephrase it.  Where
9  else would that rule or restriction be contained, if
10 it's not in the addendum, is there anyplace where
11 that rule might be?
12   A   It would be verbal.  It would be in
13 conversation and I don't know if it's in that other
14 agreement.
15   Q   Okay?
16   A   I don't know if those exact words are in
17 that other agreement.
18   Q   Okay.  We will check the agreement.  Did
19 anybody at Saveology ever verbally inform Paramount
20 Media Group that it wasn't able to subcontract?
21   A   As I stated earlier, the marketing tactics
22 needed to be approved.
23   Q   And that is only concerning the marketing
24 tactics themselves, correct?
25   A   Correct.

1    Q   Not use of the third party vendor?
2    A   Sorry, third party vendor?  Well, a third
3  party vendor could be putting up, the name, no, the
4  marketing tactic, yes, it needs to be approved.
5    Q   But the identity of the third party vendor
6  does not need to be approved?
7    A   Again, that's the secret sauce that could
8  be proprietary to that affiliate.
9    Q   I want to make sure I understand.  So
10 Saveology would not know the entity of its third
11 party vendors, correct?
12   A   It is possible that they don't want to
13 disclose it, correct.  Does that answer?
14   Q   Okay.  I'm going to show you another
15 exhibit.
16      THE WITNESS:  This one's done?
17      MS. GOLDBERG:  Yes.  I guess this is 15.
18      (Plaintiff's Exhibit 15 was marked for
19      identification.)
20 BY MS. GOLDBERG:
21   Q   In this e-mail, Jeremy Torisk says, How
22 about adding or creating another addendum
23 requesting/mandating sub affiliate approval as well
24 as lead source approval?  Was that ever done?
25   A   I don't know.  I can't answer.  This was

1  Jeremy to Robin Feinglas.
2    Q   As the corporate representative for
3  Saveology, can you tell me if Saveology ever created
4  another addendum mandating sub affiliate approval as
5  well as lead source approval?
6    A   I'm not aware.
7    Q   So you're not aware of any document or
8  contract that required sub affiliate approval?
9    A   I don't recall.
10   Q   Is there anybody who would know that?
11   A   Robin Feinglas would.
12   Q   If the company had created another
13 addendum mandating sub affiliate approval, wouldn't
14 that be something that you would use in your
15 interactions with your affiliates?
16   A   If the company mandated it, yes.
17   Q   Have you ever seen any document either
18 given to an affiliate or returned from an affiliate
19 mandating sub affiliate approval?
20   A   Have I ever seen?  I don't recall.
21   Q   Did you yourself create any addendum
22 mandating sub affiliate or lead source approval?
23   A   I don't remember.
24   Q   Are you aware of anyone else at Saveology
25 who created such a document?

30 (Pages 114 - 117)

1    A   I think -- I don't remember.
2    Q   Okay.  I just want to clarify something
3  you had testified earlier.  You said you had
4  supervised ten affiliates, is that correct?
5    A   I think I said five to ten.
6    Q   Approximately.  Were all of those
7  affiliates marketing ADT products and services?
8    A   That I supervised, yes.
9    Q   Okay.  I know you said that there was an
10  application process.  Who ultimately decided, who
11  ultimately approved whether a company becomes an
12  affiliate or not?
13    A   Who ultimately -- the company, the company
14  where the application is coming through.  The
15  company, myself, Reid, the paralegal.
16    Q   Right.  But I'm just trying to figure out
17  the identify of the individuals who would make that
18  decision, so it would be you, Reid and Robin
19  Feinglas?
20    A   Right.  And from time to time our CEO,
21  chief marketing officer.
22    Q   In 2010, '11, do you know who that was?
23    A   I want to say Michael Aronowitz.
24    Q   And what criteria did you use in
25  determining whether to approve a company as an

1  affiliate of Saveology?
2    A   The marketing tactics.
3    Q   Anything else?
4    A   What did I personally do?
5    Q   You and/or Reid and Robin.
6    A   I can't answer on their behalf.
7    Q   Yes, you can, because you're representing
8  the company.
9        MR. PISANI:  That's not true.  She's
10  representing the company, but she can't answer
11  on their behalf.  I think it's unfair.
12  BY MS. GOLDBERG:
13    Q   What criteria did the company use in
14  determining whether to approve an affiliate?
15    A   What criteria I chose?
16        MR. PISANI:  The company.  She's asking
17  about what the company did.
18        THE WITNESS:  Well, as we discussed
19  earlier, it would go through the application
20  online, the Saveology Network, it would go
21  through that process of that group who was in
22  charge of the affiliates, the contract and the
23  agreement regarding the application was to,
24  most of these guys were referred.  Most of any
25  type of partner company that we worked with

1    were referred to us, the due diligence,
2    obviously the website, any type of prerecorded
3    message or anything like that, they just were
4    done, it was a no.
5  BY MS. GOLDBERG:
6    Q   How frequently did you disapprove or
7  refuse approval status to an affiliate applicant?
8    A   Oh, I've refused quite a few.  Quite a
9  few.  I don't know what the number is, but I've
10  refused quite a few.
11    Q   Did all affiliates have signed contracts
12  with Saveology?
13    A   For home security?
14    Q   Yes, yes.  Home security division,
15  correct.
16    A   Yes, to my knowledge, yes.
17    Q   Let me state that slightly differently.
18  Did all affiliates who were marketing ADT products
19  and services have signed contracts with Saveology?
20    A   Have signed contracts?  I believe they're
21  called agreements and addendums.  I don't want to
22  get hung up on words.
23    Q   That's fine.  So did all affiliates who
24  were marketing ADT products and services have signed
25  addendums with Saveology?

1    A   Yes, they had an agreement with Saveology,
2  correct.
3    Q   Okay.  Did you obtain ADT's written
4  consent for any of the affiliates that were
5  marketing ADT's products and services?  Did you
6  meaning you the company?
7    A   Did we receive written consent?  No.
8  Not -- it may, there may be e-mails back and forth
9  that says yes, this is okay for you to use them.
10    Q   Are you aware of any document that grants
11  written consent to Saveology to use affiliates?
12        MR. PISANI:  To Saveology?
13  BY MS. GOLDBERG:
14    Q   Let me rephrase that.  Are you aware of
15  any document in which ADT gives written consent to
16  Saveology to use as an affiliate?
17    A   I'm aware of it after the effect of all of
18  this, that there's a questionnaire.
19    Q   After the Desai lawsuit?
20    A   Yes.
21    Q   Okay.  Let's talk about prior to the Desai
22  lawsuit.  Are you aware of any document in which ADT
23  grants consent to Saveology to use an affiliate?
24    A   Am I aware of any document, meaning do I
25  know what it looks like?

31 (Pages 118 - 121)

Page 122

1    Q    No, do you know the existence of any
2  document in which ADT granted written consent to
3  Saveology to use as an affiliate?
4    A    There could be e-mails back and forth with
5  Dan Geiger, I'm not -- I'm not sure how to answer
6  that question.  I do know of that document after the
7  lawsuit.  That's why I'm trying to --
8    Q    I understand.  I want to talk pre-lawsuit
9  at this point.  With whom at ADT did you
10  communicate?
11    A    Primarily Dan Geiger and Kim Bandz.
12    Q    Now, Kim Bandz is the woman who would
13  review and approve website content, correct?
14    A    She was the marketing guidelines director,
15  I think.
16    Q    Aside from Kim and Dan Geiger, is there
17  anyone else at ADT that you would communicate with?
18    A    Yes.  Do I know all their names?  Is that
19  what you're asking me, all the names?
20    Q    No, I just wanted a sense of generally who
21  you communicated with.  If you don't know their
22  names, maybe their department or their position.
23    A    Yes, the compliance department.
24    Q    Okay.  Did you ever communicate with a man
25  named Steve Gribbon?

Page 123

1    A    Yes.
2    Q    Did you ever -- what did you communicate
3  with Steve Gribbon about, what topics?
4    A    Oh, the topics, I don't necessarily know.
5  He was at most of the functions that I was at that
6  ADT had invited us to, but to just call him on the
7  phone, I don't recall if I've ever called him
8  personally.
9    Q    Did you ever exchange written
10  correspondence with him?
11    A    I could have over the seven years.  I
12  don't know.  He could have been cc'd on an e-mail.
13  There's people that I talk to there, I don't
14  remember specifically if I had a one-on-one
15  communication with.
16    Q    That's fine.  Prior to the Desai lawsuit,
17  did Saveology ever request ADT's express written
18  consent to use an affiliate?
19    A    Prior to me, I don't know.
20    Q    What do you mean?
21    A    Prior to me, there was someone else
22  managing the account, I don't know.
23    Q    From your tenure on.
24    A    No, I had a relationship with Dan Geiger
25  that I verbally would communicate many of these

Page 124

1  questions to.
2    Q    Did you ever verbally communicate with Dan
3  Geiger concerning consent for use of an affiliate?
4    A    Yes.
5    Q    And what was the substance of that
6  communication, how many times, let me start with
7  that, how many times did you communicate with Dan
8  Geiger?
9    A    I can't give you a number, but I've
10  communicated with Dan on numerous occasions as to
11  hey, Dan, did you ever hear of this particular
12  affiliate partner company, let's say Tom Jones, you
13  know, Dan kind of knew who, who to use and who not
14  to use and we always had the kind of conversation of
15  Dan, hey, is so-and-so in the earshot, no, or Dan
16  would give me a head's up and say, hey, by the way,
17  don't use so-and-so.
18    Q    So were these sort of informal requests
19  for information?
20    A    I don't know if you'd call them informal,
21  but it was an ongoing communication Dan and I had.
22    Q    Did anyone at Saveology ever explicitly
23  request ADT's express written consent to use an
24  affiliate?
25    A    Explicitly request?  Just define, I'm not

Page 125

1  sure I understand.
2    Q    Specifically request ADT to provide
3  written consent to use an affiliate?
4    A    I don't know.
5    Q    Who would know?
6    A    After the lawsuit, yes.  That's when we
7  were given the questionnaire.
8    Q    My question concerns prior to the lawsuit.
9    A    Did I expressly -- like I said, there
10  could be e-mail communication back and forth between
11  Dan and I.
12    Q    But you're not aware of any specific
13  e-mail that does so?
14    A    Specific, no.  You could bring one up, I'm
15  sure.
16    Q    I don't have any, that's why I'm asking.
17  I'm not aware of any such e-mail.  Are you aware of
18  any such e-mail?
19    A    I'm sure there's communication back and
20  forth just like there's one that Dan says are you
21  working with Paramount, yes.
22    Q    No, no, I'm not talking about
23  communications generally.  Are you ever on any
24  e-mail in which Saveology requested ADT's express
25  written consent to use an affiliate?

32 (Pages 122 - 125)

Page 126

1    A    There could be.
2    Q    But you're not aware of any specific
3 e-mail?
4    A    I don't recall a specific e-mail, right.
5         MS. GOLDBERG:  Okay.  How about we take a
6 lunch break?
7         (Lunch recess.)
8 BY MS. GOLDBERG:
9    Q    When did Saveology's relationship with
10 Paramount end?
11    A    September, 2011.
12    Q    And how did it end?
13    A    They were terminated.
14    Q    Saveology terminated Paramount?
15    A    Yes.
16    Q    Okay.  Can you tell me approximately how
17 much money did Paramount make from Saveology over
18 the course of the relationship?
19    A    That I don't know.
20    Q    Okay.
21         MS. GOLDBERG:  Let's mark this.
22         (Plaintiff's Exhibit 16 was marked for
23    identification.)
24 BY MS. GOLDBERG:
25    Q    This document is entitled PMG Commissions.

Page 127

1 Is PMG Paramount Media Group?
2    A    Yes.
3    Q    If you look at line 45, it has a date of
4 10-14-11.
5    A    Uh-huh.
6    Q    And there's an amount paid.  Was that the
7 last date that Paramount sold ADT security systems
8 for Saveology?
9    A    They were paid based on install date, so
10 that wouldn't be a sale date.  This is pay dates of
11 installs for the prior week.
12    Q    So you're saying 10-14-11 is when the
13 systems were installed?
14    A    Well, 10-14-11 appears to be, no, that's
15 the pay date.
16    Q    Oh, that's when Saveology paid Paramount?
17    A    Correct.  Yeah, if you look at number 4,
18 it says pay date.  Line number 4.
19    Q    Got it, right.  So would this at all
20 inform you as to when Paramount stopped working for
21 Saveology or no?
22    A    Would it inform me when they stopped
23 working?  I'm not sure I understand exactly the
24 question.
25    Q    Earlier, you said that Paramount stopped

Page 128

1 working with Saveology at about September, 2011.
2 And here I see that they were paid in October.  I
3 was just wondering, were they continuing to work in
4 October or was it just the payment a few weeks after
5 they stopped working?
6    A    The payment was a few weeks after they
7 stopped working.
8    Q    Thanks.  It says that they're paid to
9 date, year to date payment is $1,335,525 and change.
10 Do you see that?
11    A    Correct, yes.
12    Q    Do you believe that's the correct amount
13 of money?
14    A    Yes, according to this document, yes.
15    Q    Okay.  And they were paid per install, is
16 that correct?
17    A    By install, correct.
18    Q    Did the amount per install differ
19 depending on which dealer bought it?
20    A    Yes, it did differ by package.
21    Q    Oh, by package, okay.
22    A    And by Beacon score.
23    Q    And Beacon score is a credit score?
24    A    Is a credit score.
25    Q    Let's go to Page 5.  If you could just

Page 129

1 walk me through, if you could just walk me through
2 and explain what the comments are.  Payment ID, is
3 that an internal Saveology number?
4    A    Yes, from the system, from the data entry
5 system.
6    Q    And the next column B, is that Paramount's
7 number?
8    A    Yes, from their system to ours, yes.
9    Q    Okay.  Sale date, I understand.  Install
10 date, customer, what is an MMR?
11    A    Monthly monitoring rate.  That's the
12 package.
13    Q    Got it.  And what does amount stand for?
14    A    Amount?  The amount of payment.  The
15 amount of -- yeah, 250, yeah.
16    Q    Okay.  And status, paid in full, does that
17 mean Saveology paid Paramount in full or the
18 customer?
19    A    Correct, they were paid in full for that
20 customer.
21    Q    Got you.  And then if we could just flip
22 back to Page 2.  It says the 2010 total was
23 $32,452.50.
24    A    Okay.
25    Q    Does that seem correct to you?

33 (Pages 126 - 129)

Page 130

1    A    According to this document, yes.
2    Q    Did Paramount also earn bonuses from
3 Saveology?
4    A    I don't know. I don't know if they
5 particularly did. It's possible. I don't know if
6 they did. If they referred somebody. I don't know.
7    Q    Who would know that?
8    A    I would have to see the payment files to
9 see if they were one of the groups that did receive
10 bonuses.
11    Q    So did certain affiliates who did ADT
12 products get bonuses?
13    A    Yes.
14    Q    And how were those bonuses calculated?
15    A    Each one was different.
16    Q    How often would an affiliate receive a
17 bonus?
18    A    As in weekly payments?
19    Q    Were the bonuses based on the number of
20 installations?
21    A    Yes, because they were only paid on
22 installs.
23    Q    Okay. And you don't know if Paramount
24 received bonuses?
25    A    I don't know, I'd have to look. Did you

Page 131

1 want me to look?
2    Q    Oh, if it's in here, sure.
3    A    I don't know if it is. These all appear
4 to be PMG, which is from their system to us.
5    Q    Well, this was produced by them.
6    A    Right, okay.
7    Q    Do you have any idea how many calls
8 Paramount made over the course of the relationship
9 between Paramount and Saveology?
10    A    No.
11    Q    Do you have any idea of what their
12 percentage of closing on a sale was?
13    A    No.
14    Q    Meaning how many calls they made versus
15 how many sales they actually closed?
16    A    No.
17    Q    And on Page 1 of this, is it correct that
18 in year 2011, they made 2,990 installs?
19    A    Well, that's what they were paid on, but
20 number of installs is lower, because they have 18
21 chargebacks.
22    Q    Okay. Chargebacks means somebody changed
23 their mind?
24    A    Yes, you have a three-day right of
25 rescission as a consumer to have it uninstalled.

Page 132

1    Q    So their total number of installs for 2011
2 were 2,972?
3    A    That they were paid on, yes.
4    Q    Okay. Does Elephant Group have similar
5 documents that would show Paramount's sales?
6    A    Yes.
7    Q    Does Saveology's documents contain not
8 just the consumer's name, but also the consumer's
9 telephone number?
10    A    Yes.
11    Q    So for any particular sale, is it possible
12 to trace back that sale to the original lead source?
13    A    Yes.
14    Q    Can you walk me through how you would do
15 that?
16    A    Are we talking Paramount or Saveology?
17    Q    If Saveology wanted to determine where
18 this sale came from, how would it do that?
19    A    To ask for the original opt in lead or if
20 the consumer called in, then obviously the phone
21 recording.
22    Q    So you have -- I'm just trying to
23 understand what the document looks like. You have a
24 document that has consumer's name and consumer phone
25 number and that phone number you would be able to

Page 133

1 tell where you got that phone number from?
2    A    In Saveology, yes.
3    Q    And the phone number would tell you which
4 affiliate it came from?
5    A    Which lead source it came from.
6    Q    And you would ask Paramount where did it
7 obtain the lead from?
8    A    Right, correct.
9    Q    And they would give you what's called opt
10 in information?
11    A    Yes, if it was an online, yes. If not, if
12 it was a consumer calling in, they would give me the
13 full recording.
14    Q    Okay. Do you know what percentage of
15 Saveology's ADT sales were made by Paramount during
16 the year 2011?
17    A    No.
18    Q    Do you have any idea how Paramount
19 compared with the other ADT affiliates in numbers of
20 sales?
21    A    In 2011?
22    Q    Yes.
23    A    No, I would have to research that.
24    Q    Okay. Which of your ADT affiliates made
25 the most sales for Saveology?

34 (Pages 130 - 133)

Page 134

1  A   Over the course of my tenure?
2  Q   Yes.
3  A   The majority of the sales came from our
4 own internal transfers. Which affiliate, I don't
5 know, I'd have to research that.
6  Q   Okay. Generally speaking, how did you
7 keep, how did Saveology keep track of Paramount's
8 sales?
9  A   Through our systems.
10  Q   So when Paramount would enter a sale into
11 the computer system, if you could walk me through
12 that?
13  A   They would enter a sale on their side, on
14 their version of the security tracks and then once
15 they hit sell, that's a button, it would come over
16 to our system. And then we had complete
17 transparency to go see exactly what else was in
18 their system.
19  Q   So you could see when they sold it, to who
20 the customer they sold it to, that customer's phone
21 number?
22  A   Yes.
23  Q   Would you also be able to see their opt
24 in?
25  A   The lead source, no.

Page 135

1  Q   If you asked them for this, they could get
2 it for you?
3  A   Correct.
4  Q   Okay. I think you testified earlier that
5 Saveology then sells these to dealers, authorized
6 dealers?
7  A   Yes.
8  Q   Does ADT pay Saveology anything?
9  A   ADT dealers. They facilitate the payment.
10 ADT does.
11  Q   ADT facilitates the payment from the
12 authorized dealer to Saveology, correct?
13  A   Correct.
14  Q   How much money did Saveology earn from the
15 sales booked by Paramount?
16  A   Oh, I don't know.
17  Q   Any estimate?
18  A   I'd have to -- no, I'd have to -- because
19 I would have to go by each MMR, we were paid
20 differently by all dealers, so they were Class A, B,
21 C, D, each one paid us differently on each package.
22 So I could not make a guesstimate right now.
23  Q   Okay. So are you paid on -- you're not
24 just paid on the install, you're paid on the install
25 based on what the monthly rate is?

Page 136

1  A   Correct. And which dealer we sold it to.
2  Q   So different dealers would charge
3 different amounts and different amounts depending on
4 which package?
5  A   Correct, which was dictated by ADT.
6  Q   As a general proposition, is it correct
7 that the more installations Saveology has, the more
8 money it makes?
9  A   From whom? Well, yeah, the more volume.
10  Q   Right. I guess that was obvious. Do you
11 keep copies of the records that contain customer
12 names and customer phone number and entity?
13  A   Do I? Our systems do, yes.
14  Q   It does?
15  A   Yes.
16  Q   Do you have any idea how long it keeps
17 those records for?
18  A   Whatever we're required by law.
19  Q   And would you run commission payments to
20 Paramount on a weekly basis?
21  A   Yes. 10-7, that's what this is.
22  Q   Okay. When did you first encounter the
23 name EMI?
24  A   When, I don't know what document it is,
25 but when it was produced to us to Robin Feinglas, to

Page 137

1 Saveology.
2      MS. GOLDBERG: Let's mark this.
3      (Plaintiff's Exhibit 17 was marked for
4 identification.)
5      THE WITNESS: Okay.
6 BY MS. GOLDBERG:
7  Q   Robin asked you, have you ever heard of
8 EMI and you say, I don't know who that is, ask Reid,
9 he's the one that set up all of these guys with
10 leads. Who are you referring to when you say these
11 guys?
12  A   Well, because in the e-mail, they're
13 talking about Visor, Jim Landon, that's what we were
14 talking about here. When we set up these guys.
15  Q   Who is Jim Landon?
16  A   Jim Landon, he is from Visor, which is a
17 new one from Visor. It says it in the e-mail. I
18 don't know who he is specifically.
19  Q   Who is Visor?
20  A   Visor is an affiliate.
21  Q   Is it an affiliate that sold ADT products?
22  A   Visor, yes.
23  Q   So he is the one that set up all of these
24 guys with leads. Is all of these guys referring to
25 ADT affiliates?

35 (Pages 134 - 137)

1    A    Not -- not all ADT affiliates. I'm sorry,
2  ask me the question again.
3    Q    I'm just not sure. Who is these guys
4  referring to?
5    A    Because at this time, this would be Reid
6  and Jeremy at this time in this e-mail, this
7  August 16th e-mail.
8    Q    Okay. Does --
9    A    That would be these affiliates, these
10  guys.
11    Q    Which affiliates are you referring to?
12  You mentioned Visor. Who else?
13    A    Who you're reading right here in the
14  e-mail. We're referring to this e-mail.
15    Q    So it Paramount and Savilo and Visor?
16    A    Oh, then there's Savilo. Savilo, if you
17  look, it says Savilo was started back in 2000 -- it
18  was just Savilo was started last year.
19    Q    Right. But the preceding e-mails refer to
20  Savilo, Paramount and Visor. Is that who you were
21  referring to when you said these guys?
22    A    It appears so.
23    Q    And what does that mean that Reid set up
24  with leads, how did he obtain leads for them?
25    A    Well, we had a few different types. We

1  have internal, our own internal leads.
2    Q    Okay.
3    A    That we have from opt in data as well.
4    Q    What other types?
5    A    At the time, who else was this, the survey
6  leads were on the end of a, I'm sorry, I'm recalling
7  in my brain. The survey leads were on another
8  product as I talked to you before about the warm
9  transfer. There was a survey, I want to say it was
10  some sort of medical survey and somewhere along the
11  way in there would be an offer for, a home security
12  offer. That's what the survey is.
13    Q    Any other leads that this refers to?
14    A    I don't know.
15    Q    Okay.
16    A    Could, I don't know.
17    Q    Okay. When you first heard the name EMI,
18  did you do any investigation to determine who that
19  was?
20    A    EMI, somewhere along the way I heard that
21  they were some type of voice broadcaster. We have
22  conversations internally and through other leads, so
23  it was somebody that I would never have touched,
24  EMI. There's a couple of them.
25    Q    What was your understanding of the

1  Paramount/EMI relationship?
2    A    That there was none. There was not a
3  relationship with them. Ryan, we even asked if he
4  had a relationship with EMI, to which he told us no.
5    Q    Who asked Ryan?
6    A    We did.
7    Q    Who did?
8    A    Saveology.
9    Q    Do you know who at Saveology?
10    A    Probably Robin Feinglas. I'm sure I did
11  at some point, after we were served this lawsuit.
12    Q    And what did Ryan say?
13    A    There's an e-mail detailing exactly what
14  he said, that he was not working with them for us.
15  I think there's a few reiterations going back and
16  forth.
17    Q    But he was working with EMI for other
18  relationships?
19    A    For another home security, correct.
20    Q    Was it your understanding that EMI was not
21  in compliance with the telemarketing laws?
22        MR. PISANI: Objection, calls for
23    speculation.
24        MS. GOLDBERG: You can go ahead and
25    answer.

1        THE WITNESS: That wasn't my job to know
2    what they were doing. It was voice
3    broadcasting, which is prerecorded messages,
4    which is no. No for us.
5  BY MS. GOLDBERG:
6    Q    Meaning you would not use EMI because you
7  were aware that it was voice broadcasting?
8    A    That they were involved in prerecorded
9  messages, correct.
10    Q    Did anyone at Saveology consider
11  terminating Paramount at this point knowing that
12  Paramount had a relationship with EMI?
13    A    When we were served this paperwork, that's
14  when they were terminated. When we found out about
15  the -- it was September, I think we were served
16  August 28th, September they were terminated.
17    Q    Did Paramount terminate EMI or did
18  Saveology terminate EMI?
19    A    Wait, go back. We never terminated EMI,
20  because we don't have any relationship with EMI.
21  Let me make that clear.
22    Q    Did Saveology say anything to Paramount
23  that it should terminate EMI?
24    A    We were not aware of them working with EMI
25  until this lawsuit came out and if you look at some

Page 142

1  of the documents, they had terminated EMI well
2  before I guess once they discovered what they did.
3      Q    Previously, you said they were aware that
4  Paramount worked with EMI in a different
5  relationship.
6      A    Through this lawsuit.
7      Q    So that was not when you first learned?
8      A    Correct.  When we were given insertion
9  orders.  We were given the information from you guys
10 or from someone, I should say, I shouldn't say you
11 guys.
12     Q    I just want to go back to make sure I
13 understood your previous testimony.  Earlier, you
14 said you called Ryan and asked do you have a
15 relationship with EMI and he said I don't use EMI
16 for Saveology, but I have a relationship with them
17 for another?
18     A    I didn't state that.  Say that again.  I
19 didn't say that I had a previous conversation with
20 Ryan that he worked with EMI.  This was all through
21 this paperwork that we discovered that he worked
22 with EMI.
23     Q    Okay.  So you had never heard of EMI prior
24 to August, 2011?
25     A    Through Paramount, no.  Well, whatever

Page 143

1  these dates are, yeah.  We knew about EMI and
2  Paramount through these papers.
3      Q    These papers meaning --
4      A    That whatever these e-mails are, I'm
5  sorry.
6      Q    Robin had asked Ryan, When did you start
7  working with EMI?  He first said March, then he said
8  it was May.  Ryan answers here, Per my IT, we
9  started on 2-14.  But then Robin says, I have a
10 bunch of IOs that he signed with EMI on 11-10, 1-11,
11 2-11, et cetera.  Were you ever able to determine
12 exactly when Paramount worked with EMI?
13     A    Was I able to determine?
14     Q    Was Saveology able to determine?
15     A    I'm sure the lawyers did based off these
16 IOs.  That's not for me to determine.
17     Q    Well, does Saveology believe that
18 Paramount was working with EMI as early as November,
19 2010 or that that relationship started in 2011?
20         MR. PISANI:  Objection, form of the
21 question.
22         THE WITNESS:  Could you repeat that?
23 BY MS. GOLDBERG:
24     Q    Could you identify what period of time
25 Paramount was working with EMI?

Page 144

1      A    Through the insertion orders.
2      Q    Okay.  Just based on the dates on those
3  orders?
4      A    Correct.
5      Q    Okay.
6         (Plaintiff's Exhibit 18 was marked for
7  identification.)
8  BY MS. GOLDBERG:
9      Q    If you look at the second and third page,
10 are these the insertion orders you were referring to
11 earlier?
12     A    Just referring to, yes.
13     Q    And when did you first see these?
14     A    I'm cc'd on this e-mail, so I would assume
15 around August 25th of that time.
16     Q    Okay.  Did you ever see any documentation
17 in which EMI certified that it was compliant with
18 the telemarketing laws?
19     A    No.
20     Q    Did Saveology have any agreement with EMI?
21     A    No.
22     Q    Did Saveology ever speak to EMI?
23     A    As a company, I couldn't answer.  Did I
24 for home security?  No.
25     Q    Did Saveology ever obtain any assurances

Page 145

1  from anyone that EMI did not do robo calling?
2      A    No.
3      Q    Who is Savilo?
4      A    An affiliate.  A partner company.
5      Q    Who did you deal with primarily at Savilo?
6      A    Mike Jones.
7      Q    Was there a fellow Eric Oakley that you
8  dealt with as well?
9      A    Eric Oakley.  Yeah.  Mike Jones and Eric
10 Oakley and Steve Sansbury.
11     Q    Did Saveology obtain ADT's consent to
12 contract with Savilo?
13     A    Once we were given all the questionnaires
14 in writing, yes.  Verbally, ADT was well aware of
15 our relationship with Savilo.
16     Q    What makes you say that?
17     A    There's numerous e-mails back and forth
18 from their compliance department.
19     Q    What period of time are you referring to?
20     A    They were prior to Paramount -- I don't
21 know the exact dates.
22     Q    Was it before or after the Desai
23 litigation was filed, do you know?
24     A    That what was?
25     Q    That there were e-mails between, with ADT

37 (Pages 142 - 145)

Page 146

1 concerning Savilo.
2 A Oh, I don't know.
3 Q Are you aware of any telemarketing
4 violations by Savilo?
5 A As a company?
6 Q Uh-huh.
7 A As Savilo as a company? I don't know.
8 Q Well, you were responsible for that
9 relationship, correct?
10 A Correct.
11 Q And you're also responsible for
12 compliance, correct?
13 A Correct.
14 Q So were you aware of any violations during
15 your tenure as director of operations?
16 A Violations of what?
17 Q By Savilo.
18 A From who?
19 Q Violations by Savilo of the telemarketing
20 laws.
21 A I'm not sure. I don't -- I don't recall.
22 That was a while ago. If there were any violations,
23 they would have been termed.
24 Q They would have been what?
25 A Terminated.

Page 147

1 Q Terminated?
2 A Terminated by us if I was aware.
3 MS. GOLDBERG: Let's mark another exhibit.
4 (Plaintiff's Exhibit 19 was marked for
5 identification.)
6 BY MS. GOLDBERG:
7 Q On Page 2, the bottom of your e-mail, you
8 asked the folks at Savilo to confirm in writing by
9 replying to this e-mail that Savilo Support Services
10 does not in any way, shape or form reach out to
11 customers on Saveology's behalf with any type of
12 prerecorded messages so we can keep on file.
13 A Correct.
14 Q Did you ever get the e-mail that you
15 requested from Savilo stating that it does not reach
16 out to customers with prerecorded messages?
17 A I'm sure.
18 Q Why are you sure? Because the response
19 from Mike Jones does not provide any assurance, in
20 fact, it says we will pay the money if we have to
21 just to make it go away.
22 A I'm sure because it's my duty to make sure
23 anyone that's working on our behalf with ADT does
24 not have anything prerecorded messages whatsoever to
25 have in writing.

Page 148

1 Q So did you ultimately get a writing from
2 Savilo saying that it does not reach out to
3 customers on Saveology's behalf with any type of
4 prerecorded messages?
5 A I'm sure.
6 Q Do you know in what form that documents
7 exists, was it an e-mail to you?
8 A I would say yes. I would say yes. I'm
9 sure Savilo replied to this and said no, we don't
10 use prerecorded messages.
11 Q When you say you're sure, is that because
12 you believe what happened or do you have in mind a
13 specific document?
14 A I've made it very clear to all we work
15 with that there's no prerecorded messages, to have
16 them acknowledge, that's something I would have
17 pushed.
18 Q Do you recall a specific document in
19 writing where Savilo says that?
20 A No, I don't recall a specific date and
21 time.
22 Q At the very top of the e-mail, that first
23 paragraph --
24 A Uh-huh.
25 Q -- let me go back for a minute. You said

Page 149

1 that you feel confident that you would have obtained
2 a response from Savilo?
3 A Yes.
4 Q Do you know if you produced that response?
5 A I don't know what the attorneys produced.
6 Q Would you have produced it if you had it?
7 A Sure, if it was in my e-mails.
8 Q Okay. The first paragraph of your e-mail
9 at the top of this page, is it your understanding
10 that Savilo had robo called this person?
11 A No, the securities solutions person
12 answered. This is saying a security solutions
13 person answered. That is when the guy pressed 1 to
14 go ahead and speak to one of our agents. It was a
15 reaffirmation that he wasn't interested.
16 Q You say, The consumer is not calling them,
17 ugh.
18 A Yeah, that I don't know.
19 Q Why did you say ugh?
20 A That I don't know. You're asking me
21 something from 2011.
22 Q I understand. I'm reading this. It seems
23 to me that this was not an inbound call because you
24 said the consumer is not calling them, which tells
25 me the dialer called this person. So is it your

38 (Pages 146 - 149)

Page 150

1 understanding that Savilo had made a robo call to
2 this complainant?
3        MR. PISANI:  I'm going to object to the
4    form of the question as to what it's telling,
5    counsel.
6        MS. GOLDBERG:  You can answer.
7        THE WITNESS:  Well, again, the dialer does
8    not mean a prerecorded message.  A dialer's
9    mechanism is used to call phone numbers where a
10   live agent then answers the phone.
11 BY MS. GOLDBERG:
12   Q   I understand, but reading the entire first
13 paragraph together, is it your testimony that Savilo
14 had not sent a robo call?
15       MR. PISANI:  Objection, calls for
16   speculation.
17       THE WITNESS:  Yeah, I would have to --
18   there's going to be more information here.  I
19   would have to go research this.  I'm here to
20   talk about Paramount, not so much Savilo.
21 BY MS. GOLDBERG:
22   Q   But you are responsible for the Savilo
23 relationship as well, correct?
24   A   Right, but I was not prepared to speak on
25 this.

Page 151

1    Q   How did Saveology respond to this
2 incident?
3    A   I don't know.  Do you have the e-mail?
4 There would be an e-mail of how we responded to ADT.
5 I don't know that off the top of my head.
6    Q   I don't know, either.
7    A   Okay.
8    Q   This is what I have.  Let me ask you about
9 the second paragraph in your e-mail.  Is it your
10 understanding that Saveology's representative was
11 not providing accurate information about ADT?
12   A   Correct.
13   Q   After receiving this e-mail and responding
14 to it, did you take any steps to assure that Savilo
15 was not doing robo calls?
16   A   Yes, I'm sure there was verbal
17 communication and I did the same thing with them,
18 audited their calls as well.  And their calls came,
19 they were all transferred directly to our call
20 center.
21   Q   So I'm saying following this, you said
22 there was verbal communication, was that by you to
23 Mike Jones?
24   A   Yes.  I'm sure myself or --
25   Q   And what was the substance of that?

Page 152

1    A   Going back to here, that I wanted in
2 writing that they are not using any type of
3 prerecorded messages at all.
4    Q   And then you said you did an audit?
5    A   I would have followed up on this, yes.
6    Q   Explain what you did in the audit.
7    A   When you say audit, for me to be able to
8 do, listen to their calls and then also provide me
9 opt ins as to where they're getting these, some of
10 their, every time that Savilo transferred over a
11 call, the phone number and the person's contact
12 information came into our system.
13   Q   And after you did this audit, were you
14 able to conclude that Savilo was operating in
15 compliance with the telemarketing laws?
16   A   With what we gave them that they could not
17 do prerecorded messages.  If they were found doing
18 prerecorded messages, they would be termed.
19   Q   So you felt satisfied that they weren't
20 doing prerecorded messages?
21   A   With the information they provided me
22 with.
23       MS. GOLDBERG:  Let's go ahead and mark
24   another one.
25       (Plaintiff's Exhibit 20 was marked for

Page 153

1    identification.)
2 BY MS. GOLDBERG:
3    Q   On the bottom of Page 1, this is another
4 incident in which you said to Savilo, Please confirm
5 that you did not do any robo dial, no automated
6 messages were left as stated below.
7    A   Okay.
8    Q   You then follow up and say, Savilo, I have
9 not heard a response.
10   A   Okay.
11   Q   That was about four days after your
12 initial request.  Did you ever get a response from
13 Savilo confirming that it did not do robo dialing?
14   A   I'm sure.
15   Q   And do you have any specific document in
16 mind or are you just guessing?
17   A   Please provide me the recording from start
18 to finish so they would know that this is not robo
19 dialed.
20   Q   Did Savilo provide you with that
21 recording?
22   A   They would have had to if this was closed.
23 I don't know what date this is.  Do you have the
24 e-mails beyond this?
25   Q   This is what I have.  But the subject line

Page 154

1 says DNC Robert Braver?
2   A   Okay.
3   Q   Did Savilo ultimately reach a settlement
4 with Robert Braver?
5   A   Oh, I don't know. I don't know. It's
6 possible.
7   Q   Are you aware of Savilo reaching a
8 settlement with any customer?
9   A   I believe that there is, there's
10 something, yes, that they did.
11   Q   Why would Savilo have settled with a
12 customer?
13     MR. PISANI: Objection, calls for
14   speculation.
15 BY MS. GOLDBERG:
16   Q   This is a different complainant. This is
17 about a man named Robert Martino who complained.
18 ADT asks Robin and you, The consumer has advised ADT
19 that Savilo has settled with him. Please help us
20 understand what the basis for settlement was, if
21 there was a valid opt in and a prerecorded message
22 was not used to initiate contact with the consumer.
23   A   Okay.
24   Q   Do you recall whether you responded to
25 ADT?

Page 155

1   A   I'm sure we did. We respond to everything
2 ADT has. Where are the responses, I don't know.
3   Q   Do you recall what the response was?
4   A   No. I don't remember the specifics.
5   Q   Do you recall why Savilo settled with
6 Robert Martino?
7     MR. PISANI: Objection, asked and
8   answered. Calls for speculation.
9     MS. GOLDBERG: You can answer.
10     THE WITNESS: I don't know.
11   (Plaintiff's Exhibit 21 was marked for
12   identification.)
13 BY MS. GOLDBERG:
14   Q   You write to Mike Jones of Savilo, I just
15 received another large one and this person has been
16 on the ADT DNC since July and you just sent this to
17 us this week. The son is now filing a lawsuit.
18 He's the one that stopped the installer as his mom
19 has dementia. I hoped you stopped that data as we
20 requested a few days ago. This must stop.
21   A   Okay.
22   Q   What do you mean when you say that data,
23 what data?
24   A   Whatever data they were using at that
25 time, obviously if it was bringing up this, stop the

Page 156

1 data.
2   Q   I'm sorry, I don't understand. What data
3 are you referring to?
4   A   If they have data, if they have opt in
5 data and that's what this is, stop using that data,
6 because if it's generating complaints, stop using
7 it.
8   Q   Stop using the data?
9   A   Correct.
10   Q   Or stop using that opt in source?
11   A   Stop using the data which would come from
12 an opt in online. Everything that Savilo has done
13 is all online opt in data.
14   Q   I'm not sure I understand. What are you
15 asking Savilo to stop doing when you say stop the
16 data, do you mean --
17   A   Stop using that data. Stop using that
18 data. They use various websites.
19   Q   So stop using those websites?
20   A   Right, stop using those leads, correct.
21 Stop using that data. That data's generating
22 complaints, stop using it. There's no reference in
23 there to a prerecorded message.
24   Q   Do you know if Savilo stopped using the
25 data as you requested?

Page 157

1   A   I don't know where the response is, but
2 usually if we had told them to stop, yes, they would
3 stop.
4     MS. GOLDBERG: Let's look at one more.
5   24.
6   (Plaintiff's Exhibit 22 was marked for
7   identification.)
8 BY MS. GOLDBERG:
9   Q   You say to Mike Jones, He actually has the
10 recording of your prerecorded message and the
11 transcript so I really need all the calls made to
12 this consumer to prove that you did not call him
13 with a prerecorded message and then transfer him to
14 us.
15   A   Correct.
16   Q   Did you ever obtain a recording of the
17 call?
18   A   I'm sure we did.
19   Q   And was it a prerecorded message?
20   A   I'm sure it would not be.
21   Q   Why are you sure?
22   A   Because this is Jay Connor. You can
23 simply Google his name. He has sued everybody and
24 anybody out there. He's a professional.
25   Q   Did Savilo settle with him?

40 (Pages 154 - 157)

Page 158

1    A    I don't know.  I don't know.
2    Q    I understand that he may sue a lot of
3 people.
4    A    It's possible.
5    Q    And I have not seen his name, but my
6 question is do you know if he received a prerecorded
7 message?
8    A    To my knowledge, no.  Because that's what
9 I asked him, Could you please provide the calls to
10 show that you did not use a prerecorded message to
11 contact him.
12    Q    And did you listen to that call?
13    A    I'm sure I did.
14    Q    Because that generally would have what you
15 would have done?
16    A    That would have been the protocol, yes.
17    Q    But you don't specifically remember that
18 call?
19    A    Like I said, Jay Connor, his name is well
20 known.
21    Q    I just want to understand, do you remember
22 that call at all?
23    A    Do I remember the details of the call?
24 No.
25    Q    Do you remember if it was prerecorded or

Page 159

1 not?
2    A    I would make an assumption that it was
3 not.
4    Q    But that's an assumption?
5    A    Because we did not sanction that.
6    Q    Was there ever a time that Saveology did
7 anything to discipline Savilo?
8    A    There was constant communication of what
9 the guidelines are and what our agreement is and
10 based off the calls that he had said to me, I did
11 not hear prerecorded messages.
12    Q    And after doing an audit, was that also
13 your conclusion?
14    A    Right.  If I don't hear prerecorded
15 messages, I'm not sure how you want me to discipline
16 someone.
17    Q    I'm just asking what happened.  Given the
18 numerous complaints, why did Saveology continue to
19 do business with Savilo?
20    A    Because every time we had a complaint, the
21 opt in would prove that that person opted in on a
22 site, that it was scrubbed and that it wasn't a
23 prerecorded message.
24    Q    Did anyone at Saveology ever discuss
25 whether we should terminate Savilo or not?

Page 160

1    A    Eventually, they were terminated.
2    Q    Saveology terminated Savilo?
3    A    We would have sent the request to
4 terminate, yes.
5    Q    Do you know when that was?
6    A    Not off the top of my head, no.  Again, I
7 wasn't prepared to speak on that, just to Paramount.
8    Q    Did Saveology make any structural changes
9 to its compliance program in response to the
10 complaints against Savilo?
11    A    More specific?
12    Q    Did you change your compliance program or
13 make any modifications to the program in response to
14 all of the complaints against Savilo?
15    A    No.  We make modifications to our program.
16 The rules are set forth, no prerecorded messages,
17 you must call opt in data.  I'm not really sure what
18 you're asking me.
19    Q    Let me rephrase it.  Did Saveology change
20 the way it monitors affiliates after receiving
21 numerous complaints about Savilo?
22    A    I don't know if it was after, during, I
23 mean, we've always monitored them.  I'm not sure,
24 I'm really not sure what you're asking.
25        MS. GOLDBERG:  I'm going to take five

Page 161

1    minutes just to look through my notes.  We can
2    go off.
3        (Brief recess.)
4        (Plaintiff's Exhibits 23, 24 & 25 were
5    marked for identification.)
6 BY MS. GOLDBERG:
7    Q    In this e-mail, you ask Paramount, you
8 say, I need all of your caller IDs, "you" PMG used
9 and that includes your affiliates and lead
10 providers.  So is it correct to say that Saveology
11 was aware that PMG was using other entities to make
12 phone calls?
13    A    Was it clear you, PMG?  Was it clear that
14 they were using other --
15    Q    Entities to make phone calls.
16    A    Yeah, he had another, I don't know, to be
17 honest with you.  No, I don't know.
18    Q    Well --
19    A    You, it's just give me all of your CIDs.
20    Q    But you say you, And that includes your
21 affiliates, correct?
22    A    Okay, that's what the e-mail says.
23    Q    That's what the e-mail says.  So was it
24 Saveology's understanding that Paramount was using
25 other entities to make phone calls on its behalf?

41 (Pages 158 - 161)

1    A   I don't know, this was just a generic give
2 me all your CIDs.
3    Q   Well, I don't think this is generic.  You
4 later say, This is a robo dialer and is a major
5 complaint with ADT right now.
6    A   Right.  But if you read the sentence right
7 before, it's also calling me and this sends me to
8 somebody other than PMG.
9    Q   Right.  So my question is Saveology
10 understood then that somebody other than PMG was
11 making calls on behalf of PMG, correct?
12       MR. PISANI:  Objection, form of the
13    question.
14       THE WITNESS:  Could you rephrase that?
15       MS. GOLDBERG:  Sure.
16 BY MS. GOLDBERG:
17    Q   Did Saveology understand through this
18 e-mail that Paramount was using other entities to
19 make phone calls to consumers?
20    A   Did Paramount -- did Paramount use
21 somebody else?
22    Q   Well, isn't that what you're asking, to
23 give me the caller IDs from you and the entities
24 that make calls on your behalf, isn't that what
25 you're asking?

1    A   That's what it's saying.  Remember, I told
2 you, there's a warm transfer process at the end of a
3 call of selling something else if they wanted to
4 send over a lead, so yes, there could have been, but
5 it wasn't on behalf of home security or ADT.
6    Q   Well, did Saveology ask Paramount to send
7 the ADT guidelines to whom else was making phone
8 calls for Paramount?
9       MR. PISANI:  Objection, form of the
10    question.
11       THE WITNESS:  I don't get -- I don't
12    understand.
13 BY MS. GOLDBERG:
14    Q   In this e-mail, you communicate that you
15 understand that Paramount's making calls and its
16 affiliates are also making calls, right, you're
17 asking for Paramount's caller IDs and its affiliates
18 caller IDs, so my question is did you ask Paramount
19 to make sure that those calling on its behalf were
20 aware of the ADT telemarketing guidelines?
21       MR. PISANI:  I'm just objecting to the
22    form of the question and counsel's description
23    of what the e-mail says.  But you can answer
24    over the objection.
25       THE WITNESS:  The guidelines are very

1    clear in what Paramount had.
2 BY MS. GOLDBERG:
3    Q   Right.  But my question is did Saveology
4 do anything to ensure that the entities who are
5 calling on Paramount's behalf were aware of the ADT
6 guidelines?
7    A   Again, Paramount used another company to
8 my knowledge that was calling on something other
9 than home security, so for them to abide by the
10 guidelines, it's an upsell and then they transfer it
11 to PMG.
12    Q   But you're asking for all of the caller
13 IDs for Paramount and its affiliates, correct?
14    A   Correct.
15    Q   Now, if its affiliates are not calling for
16 home security, why are you asking for their caller
17 IDs?
18    A   To have them on file.
19    Q   Even if they're not doing home security
20 sales?
21    A   I want all the caller IDs.  Do I need a
22 reason why?
23    Q   Well, you just said to me if it's not
24 related to home security, why would I want it, so
25 I'm asking you, why did you then ask for the caller

1 ID?
2    A   That's what the e-mail says.  I don't know
3 how else you want me to answer that question.
4    Q   Did you discuss this e-mail with anyone
5 else at Saveology?
6    A   Oh, I don't know.  I don't know, Robin
7 Feinglas is cc'd on this, so she would be aware of
8 this.
9    Q   Did anyone at Saveology do any due
10 diligence on the other entities that were calling on
11 Paramount's behalf?
12    A   If they were calling out specifically to a
13 home security ADT Saveology, we would have of
14 course, but this, again, I'm asking for all the CIDs
15 that you use.
16    Q   And why were you asking for the caller
17 IDs?
18    A   I think I already answered that.  That's
19 just what this e-mail says.
20    Q   Right, but why were you asking them for
21 caller IDs?
22    A   I don't remember the specifics at that
23 particular time.  Why not have them?
24    Q   Is it because ADT's legal department had
25 asked for that?

Page 166

1    A    For all caller IDs?
2    Q    Uh-huh.
3    A    Yes, ADT had asked for that.
4    Q    Why would ADT ask for all caller IDs that
5 didn't relate to ADT products?
6        MR. PISANI:  I will object, calls for
7    speculation as to why ADT would do something.
8 BY MS. GOLDBERG:
9    Q    In your request to Paramount, were you
10 trying to get caller IDs for Paramount and its
11 affiliates for home security?
12   A    Again, the guidelines are very strict.  If
13 there's anything that they're using on our behalf,
14 to provide that with me.
15   Q    I understand.  But that doesn't answer my
16 question.
17   A    I don't know.  At the time of this e-mail,
18 I don't know.  I don't know how to answer that.
19   Q    Okay.
20       MS. GOLDBERG:  Let's mark this one 26.
21       (Plaintiff's Exhibit 26 was marked for
22       identification.)
23 BY MS. GOLDBERG:
24   Q    At the bottom of the e-mail, you request
25 Paramount, Do you have any affiliation with Direct

Page 167

1 Savings USA or Leads Direct Marketing?  Again, if
2 ever had any affiliation with those two companies,
3 please let me know either way.
4    A    Okay.
5    Q    Did Paramount respond to your question?
6    A    I'm sure they did.
7    Q    Did it have an affiliation with Direct
8 Savings USA or Leads Direct Marketing?
9    A    I don't remember.
10   Q    Did Saveology do anything to investigate
11 whether it had a relationship with Direct Savings
12 USA or Leads Direct Marketing?
13   A    Whether we did?  Yes.
14   Q    I'm sorry?
15   A    Whether we had an affiliation with them?
16   Q    No.  Did Saveology do anything to
17 investigate whether Paramount had an affiliation
18 with the Direct Savings USA or Leads Direct
19 Marketing?
20   A    Yeah, it would have been based off of
21 Ryan's response.
22   Q    I'm sorry, explain that.
23   A    I can only ask Ryan does he have any
24 affiliation with either one of these two companies,
25 because we did not.

Page 168

1    Q    Saveology did not have an affiliation with
2 those?
3    A    No.
4    Q    Did you do any investigation of Direct
5 Savings USA or Leads Direct Marketing?
6    A    Did I do any investigation?  Internally,
7 we checked all of our databases, all of our partner
8 companies to see if we had any affiliation with
9 these guys, the Saveology Network.
10   Q    Other than ask Ryan and Chris if they had
11 an affiliation, did Saveology do anything on its own
12 to determine if there was an affiliation between
13 Paramount and these companies?
14   A    I don't know.
15       MS. GOLDBERG:  We will do one more.
16   Actually, two more.
17       (Plaintiff's Exhibits 27 & 28 were marked
18       for identification.)
19 BY MS. GOLDBERG:
20   Q    In this e-mail to Paramount, you say, I'm
21 sure this is a sub affiliate of one of my
22 affiliates.  I've sent this to all of my leads
23 partners, so as of right now, I don't know who's
24 calling these numbers.
25   A    Okay.

Page 169

1    Q    So is it fair to say Saveology did not
2 have any idea how many sub affiliates its affiliates
3 had?
4    A    Is it a fair -- I apologize.
5    Q    Is that a correct statement, Saveology did
6 not have an idea of who the affiliates were of its
7 sub affiliates?
8    A    I think I answered that prior.
9    Q    Okay.  I apologize.  And the answer was
10 yes?  Yes, because you said it was the secret sauce?
11   A    Correct.
12   Q    Fine.  Did Saveology have any idea how
13 many sub affiliates each of its affiliates had?
14   A    Again, there was no list.  I think I
15 answered this prior.
16   Q    Okay.  That's fine.  And we'll move on to
17 the very last one.  The subject of the e-mail is ADT
18 Lead Providers Contract.  In informing Jeremy that
19 there are new affiliates that Robin does not have
20 signed copies for.
21   A    Okay.
22   Q    My question is, were there companies
23 marketing ADT products and services that did not
24 have signed contracts with Saveology?
25   A    This doesn't have Jeremy's response to it.

43 (Pages 166 - 169)

Page 170

1 Jeremy would have given me a detail as to what was
2 going on. Just because I saw something in security
3 tracks doesn't mean that they were actually driving
4 leads to us. Just because we set up a partner
5 company in security tracks doesn't mean that
6 everything was said and done.
7    Q    Meaning that it could have been at the
8 beginning of the relationship?
9    A    Correct.
10    Q    And they hadn't actually started providing
11 the services at this point?
12    A    Yes.
13    Q    Typically, how long is it from the time an
14 affiliate becomes an affiliate until the time they
15 start providing services?
16    A    Typically, there's not a typically, it's a
17 matter of all the approval process that we need to
18 go through, so sending out the agreement is to make
19 sure that they know that they need to abide by these
20 terms and conditions.
21    Q    And is there any process for ensuring that
22 the affiliates return the signed addendum to
23 Saveology?
24    A    Correct, they should not get any phone
25 numbers or training material until there.

Page 171

1    Q    But this e-mail says there are some new
2 affiliates that haven't signed a contract. So is
3 there a process to make sure that they timely return
4 their signed contracts?
5    A    Oh, correct, that we had an ADT
6 receivables drive and those signed addendums could
7 have been in there.
8    Q    I didn't hear you.
9    A    There's a shared drive, sorry. And if,
10 there could have been signed agreements in there
11 that Robin may not have had a copy of yet, of the
12 countersigned agreement.
13    Q    And it could have been where?
14    A    In our shared drive. In our internal
15 shared drive.
16    Q    Okay.
17       MR. MCNEW:  You'll see and produce it?
18       MR. PISANI:  Off the record.
19       (Off-the-record discussion.)
20       MS. GOLDBERG:  I have no further
21 questions.
22       MR. PISANI:  I have no follow-up. We will
23 reserve signature. Over at 250.
24       (Deposition concluded at approximately
25 2:50 o'clock p.m.)

Page 172

1       (Signatures and Formalities were not
2 waived.)

Page 173

1       CERTIFICATE OF OATH
2
3 STATE OF FLORIDA   )
                     :SS
4 COUNTY OF PALM BEACH)
5
6       I, the undersigned authority, certify that
7 DAPHNE FERNANDES, personally appeared before me and
8 was duly sworn.
9       WITNESS my hand and official seal this
10 19th day of May, 2014.
11
12
13 _____
14       TAMBRIA LEE DERY
15
16
17
18
19
20
21
22
23
24
25

44 (Pages 170 - 173)



Page 174

1          OATH OF REPORTER

2

3   STATE OF FLORIDA    )

                        :SS

4   COUNTY OF PALM BEACH)

5

6          I, TAMBRIA LEE DERY, Court Reporter,

7   certify that I was authorized to and did

8   stenographically report the deposition of DAPHNE

9   FERNANDES, that a review of the transcript was

10  requested, and that the transcript is a true and

11  complete record of my stenographic notes.

12         I further certify that I am not a

13  relative, employee, attorney, or counsel of any of

14  the parties, nor am I a relative or employee of any

15  of the parties' attorney or counsel connected with

16  the action, nor am I financially interested in the

17  action.

18         DATED this 19th day of May, 2014.

19

20  _____

21         TAMBRIA LEE DERY

22

23

24

25

Page 176

1               Veritext Legal Solutions
                290 W. Mt. Pleasant Ave. - Suite 3200
2               Livingston, New Jersey 07039
                Toll Free: 800-227-8440  Fax: 973-629-1287

3

4   _____, 2014

5

6   To: Daniel W. Pisani, Esq.

7
    Case Name: ADT Security Services, Inc. v. Elephant Group, Inc.
8   Veritext Reference Number: 1837727
    Witness:  Daphne Fernandez Deposition Date:  5/8/2014

9

10  Dear Sir/Madam:

11  The deposition transcript taken in the above-referenced
    matter, with the reading and signing having not been
12  expressly waived, has been completed and is available
    for review and signature.  Please call our office to
13  make arrangements for a convenient location to
    accomplish this or if you prefer a certified transcript
14  can be purchased, which can be sent to you or the
    deponent directly.

15

16
    If the jurat is not returned within thirty days of your
17  receipt of this letter, the reading and signing will be
    deemed waived.

18

19
    Sincerely,
20
    Production Department
21
    Cc: Sara Goldberg, Esq.
22

23

24

25

Page 175

1   ERRATA SHEET
       VERITEXT CORPORATE SERVICES
2          800-567-8658
    ASSIGNMENT NO. CS1837727
3   CASE NAME: ADT Security Services, Inc. v. Elephant Group, Inc.
    DATE OF DEPOSITION: 5/8/2014
4   WITNESS' NAME: Daphne Fernandez
5
    PAGE/LINE(S)/  CHANGE      REASON
6   __/__/_____/_____/_____

7   __/__/_____/_____/_____

8   __/__/_____/_____/_____

9   __/__/_____/_____/_____

10  __/__/_____/_____/_____

11  __/__/_____/_____/_____

12  __/__/_____/_____/_____

13  __/__/_____/_____/_____

14  __/__/_____/_____/_____

15  __/__/_____/_____/_____

16  __/__/_____/_____/_____

17  __/__/_____/_____/_____

18  __/__/_____/_____/_____

19  __/__/_____/_____/_____

20  _____
21         Daphne Fernandez

    SUBSCRIBED AND SWORN TO
22  BEFORE ME THIS_____DAY
    OF_____, 2014.

23  _____

24    NOTARY PUBLIC
25  MY COMMISSION EXPIRES_____

45 (Pages 174 - 176)