IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| VISHVA DESAI and PHILIP J. CHARVAT on behalf of themselves and others similarly situated, | |
| Plaintiffs, | |
| v. | |
| ADT Security Services, Inc., | |
| Defendant/Third-Party Plaintiff, | |
| v. | Case No. 1:11-cv-1925 |
| PETE TOLMAN, LEADS DIRECT MARKETING, VOICE TEL CORPORATION, CHRISTOPHER LONG, EMI, INC., JMB ENTERPRISES, CITY VIP, LLC, DIRECT SAVINGS, USA, INC., OSCAR MONTENEGRO, EVERSAFE SECURITY SYSTEMS, INC., SAFE STREETS USA, LLC, PARAMOUNT MEDIA GROUP, THE ELEPHANT GROUP, INC., AND UNKNOWN JOHN DOE DEFENDANTS I THROUGH XX, | Judge Bucklo<br>Magistrate Judge Keys |
| Third-Party Defendants. | |
| SAFE STREETS USA, LLC, SUCCESSOR BY MERGER TO EVERSAFE SECURITY SYSTEMS, INC., | |
| Fourth-Party Plaintiff, | |
| v. | |
| DIRECT SAVINGS USA, LLC, | |
| Fourth-Party Defendant. | |

**MEMORANDUM IN SUPPORT OF**
**ADT'S MOTION FOR SUMMARY JUDGMENT**

Rather than risk bankruptcy, ADT paid $15 million to settle this class action, which had alleged *millions* of violations of the TCPA, 47 U.S.C. § 227. Even though ADT made *none* of the unlawful calls at issue in this action – indeed, was itself unaware of them – ADT was stuck with staggering liabilities caused by the recklessness of Elephant Group and its affiliates. Unbeknownst to ADT, and in direct violation of the parties' contract, Elephant Group, through its unauthorized agent Paramount, and Paramount's agent EMI, placed millions of "robocalls" in ADT's name in violation of the TCPA, including the call to plaintiff Vishva Desai that sparked this class action. ADT now moves the Court for summary judgment to enforce its contractual indemnity rights against Elephant Group, whose reckless violations of the parties' contract and the TCPA exposed ADT to liability in this lawsuit.

**INTRODUCTION**

ADT contracted with Elephant Group to solicit customers through online ads. Their Agreement (Exhibit 2 to the accompanying Statement of Facts) expressly forbade Elephant Group from engaging others to perform the Agreement without ADT's *express written consent*. And because the TCPA imposes onerous penalties for unsolicited robocalls, the Agreement *expressly forbade* Elephant Group, and its affiliates and agents, from making any such calls.

Elephant Group violated each of these prohibitions. Elephant Group hired a number of "affiliates" to generate sales leads for ADT without ADT's written consent. Worse yet, Elephant Group knew that these affiliates in turn obtained their sales leads from anonymous subagents, at least some of whom were making prohibited robocalls. Elephant Group made no effort to identify the subagents, or to supervise their work. Why? Because Elephant Group says it

1

considered its agents' agents to be off-limits – the "secret sauce" that drove the sales leads that Elephant Group delivered to ADT under the Agreement.

One of Elephant Group's unauthorized agents, Paramount Media, used an anonymous subagent, now known to be EMI – a robocaller – to generate sales leads for ADT. EMI robocalled Vishva Desai, the plaintiff who filed this class action. Elephant Group claims no knowledge of EMI's work for Paramount – EMI was Paramount's "secret sauce" – and argues that it is not responsible for EMI's acts. [DE 170 at 2-3.] *To the contrary: It is precisely Elephant Group's ignorance of EMI that requires Elephant Group to indemnify ADT.* Elephant Group was reckless in its unauthorized, unsupervised, and irresponsible engagement of agents like Paramount to generate ADT sales leads through a network of unknown and thus unaccountable subagents like EMI. As shown below, Elephant Group is indisputably liable as a matter of law for EMI's violations of the Agreement and the TCPA.

Two separate indemnity provisions in the Agreement oblige Elephant Group to indemnify ADT for damages (1) caused by Elephant Group's violations of the telemarketing provisions of the Agreement, (2) caused by Elephant Group's own negligence, or (3) caused by the negligent and intentional misconduct of Elephant Group's affiliate, Paramount Media Group ("Paramount"). As shown below, both provisions require Elephant Group to indemnify ADT under the undisputed facts here presented.

## FACTS

The uncontested facts are set forth in the Statement of Undisputed Facts ("UF") and the Court is respectfully referred to it for the facts governing this motion.

## **ARGUMENT**

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. *See* FED. R.CIV. P. 56(c); *Chaklos v. Stevens*, 560 F.3d 705, 710 (7th Cir. 2009); *Hackman v. Dickerson Realtors, Inc.*, 746 F. Supp. 2d 962, 966 (N.D. Ill. 2010) (Bucklo, J.). A party moving for summary judgment must show the absence of a genuine issue as to any material fact; once shown, the opposing party must then "identify specific facts showing that there is a genuine issue for trial." *Hackman*, 746 F. Supp. 2d at 966, *citing Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The non-movant 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Hackman,* 746 F. Supp. 2d at 966, *quoting Matsushita,* 475 U.S. at 586. "Contract interpretation is a subject particularly suited to disposition by summary judgment." *Grun v. Pneumo Abex Corp.*, 163 F.3d 411, 419 (7th Cir. 1998) (directing lower court to enter summary judgment on breach of contract claim), *citing Metalex Corp. v. Uniden Corp. of America*, 863 F.2d 1331, 1333 (7th Cir. 1988). Since interpretation of a written contract is generally a question of law, *see Grun,* 163 F.3d at 420, summary judgment is appropriate for contractual indemnity claims. *See, e.g., United States v. Hardage*, 985 F.2d 1427 (10th Cir. 1993) (affirming summary judgment on contractual indemnity claim).

Here, the Court should enter summary judgment on ADT's contractual indemnity claim because the undisputed record supports at least three separate grounds for judgment. First: Elephant Group must indemnify ADT because the law of the case requires it. Elephant Group chose not to answer ADT's complaint, thereby admitting its allegations; this Court has already ruled [DE 217] that the complaint's allegations, if true, state a claim for contractual indemnity. *See* Part I. Second: Elephant Group must indemnify ADT for losses caused by breaches of the telemarketing provisions of the parties' Agreement by Elephant Group and its agents. *See* Part

3

II. Third: Elephant Group must indemnify ADT for losses caused by the negligence of Elephant Group and its agents. Here, Elephant Group *recklessly* placed ADT in jeopardy. As shown below, the Agreement's indemnity provisions provide multiple bases for entering judgment on ADT's indemnity claims against Elephant Group in this case.

**I.     The Law Of The Case Requires Entry Of Judgment.**

The "law of the case" doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618 (1983). "This presumption against reopening matters already decided reflects interests in consistency, finality, and the conservation of judicial resources, among others." *Minch v. City of Chicago*, 486 F.3d 294, 301 (7th Cir. 2007). The Court has discretion to revisit its prior rulings, but that discretion typically is exercised only where "there is a compelling reason, such as a change in, or clarification of, law that makes clear that the earlier ruling was erroneous." *Santamarina v. Sears*, 466 F.3d 570, 572 (7th Cir. 2006).

The law of the case here requires entry of judgment in ADT's favor on the contractual indemnity claim. In September 2012, this Court denied Elephant Group's motion to dismiss ADT's contractual indemnity claim against it. [DE 217.] The Court found that ADT had alleged facts sufficient to state claims for indemnity under the two indemnity provisions of the parties' Agreement, reasoning:

> The third party complaint can reasonably be read to allege that EMI has committed negligence or an intentional tort by placing phone calls in violation of the TCPA and that Paramount was negligent in its use of EMI's services. Elephant Group does not deny that Paramount is an "affiliate" under the terms of the contract. Elephant Group also fails to offer a substantive response to ADT's contention that the complaint alleges facts to support a claim that Paramount itself was negligent. As such, I will not dismiss the claim for contractual indemnification.

4

[DE 217 at 6-7.]

Following the Court's 2012 ruling, Elephant Group chose not to answer ADT's complaint within the 14 days permitted by Rule 12(a)(4)(A). In fact, apart from withdrawals of Elephant Group's counsel, [DE 249; DE 254; DE 266-68] the docket shows that Elephant Group did nothing more to defend itself following the ruling, until called to appear for a status conference on January 15, 2014. And even then, after taking and answering written discovery, producing documents, and taking and defending numerous depositions through the May 30, 2014, discovery cutoff, [DE 265] Elephant Group chose not to answer.[1]

It is a fundamental rule of federal practice that a party served with a complaint must "admit or deny the allegations asserted against it." FED. R. CIV. P. 8(b)(1)(B). A complaint's allegations are deemed "admitted if a responsive pleading is required and the allegation[s are] not denied." FED. R. CIV. P. 8(b)(6). The allegations of a plaintiff's complaint are "conclusively established" where, as here, the defendant fails "to file a timely answer," because "failure to deny an allegation constitutes an admission." *Modrowski v. Pigatto*, 712 F.3d 1166, 1170 (7th Cir. 2013). Rule 8(b)(6) therefore requires the Court here to accept the allegations of ADT's complaint as admitted and established.

In these circumstances, Rule 8(b)(6) returns the Court and the parties to the position the Court already occupied when it denied Elephant Group's motion to dismiss in 2012. There, the Court assumed the truth of ADT's allegations, and ruled that on the facts alleged in the complaint, ADT had stated claims for contractual indemnity as a matter of law. [DE 217 at 6-7.]

---

[1] Elephant Group belatedly answered the complaint *four days ago*, [DE 274] well past the discovery deadline, nearly two years after its answer was due, without any accompanying motion for leave to file the answer, and without any showing of "excusable neglect" as required by Rule 6(b)(2). ADT has moved to strike the answer because it violates Rules 6, 8 and 12, prejudices ADT, and disrupts the orderly litigation of this matter – all without any apparent justification. [DE 275.] The Court should grant DE 275, strike the newly-filed answer, and disregard it for the purposes of this part of the Argument.

5

Now, those same facts have been "conclusively established" by operation of Rule 8 as a result of Elephant Group's failure to answer ADT's complaint. *Modrowski,* 712 F.3d at 1170. ADT is not aware of any "change in, or clarification of, law that makes clear that the earlier ruling was erroneous," *Santamarina*, 466 F.3d at 572, that might justify a different result now. The Court should enter summary judgment in ADT's favor on its indemnity claim for this reason alone.

II.  **Elephant Group Must Indemnify ADT For Elephant Group's Breach of the Telemarketing Provisions of the Agreement.**

Elephant Group's liability turns on two independent indemnity terms in the Agreement. The first, found in Paragraph 23.F of the Agreement, requires Elephant Group "to indemnify, defend and hold ADT harmless from and against any claims, actions, proceedings and damages, including reasonable attorney's fees and costs, and all monetary penalties and costs imposed upon ADT **arising out of Elephant Group's breach of the provisions set forth in Sections A and B, hereinabove**." (emphasis added). Section A (Agreement ¶ 23.A) prohibits Elephant Group from (1) using prerecorded telephone messages in telemarketing calls, and (2) making unsolicited outbound telemarketing calls – both subject to regulation and penalties under the TCPA. Section A's prohibitions expressly extend beyond Elephant Group itself, to reach the conduct of Elephant Group's agents and subagents operating "as part of a plan, program or campaign directly or indirectly through telemarketing agents or others." (Id.)

The undisputed facts demonstrate that Elephant Group violated both of Section A's prohibitions. *First:* Elephant Group violated the mandate that "Elephant Group may not use prerecorded messages in connection with Telemarketing Services on ADT's behalf *without prior written approval from ADT*." (Agreement ¶ 23.A.1; emphasis added.) Elephant Group concedes that it never obtained written approval from ADT to use prerecorded messages (UF 10) – a concession that in itself is dispositive. Yet, Elephant Group, through the actions of its affiliate

6

Paramount, and Paramount's agent EMI, placed *millions* of outbound prerecorded telemarketing calls to promote ADT products and services. (UF 55, 57.) One such prerecorded call was sent by EMI to Vishva Desai, prompting Ms. Desai to initiate the underlying class action lawsuit against ADT for violations of the TCPA. (UF 58.)

    *Second:* Elephant Group also breached Paragraph 23.A's express direction that "[u]nder no circumstances will Elephant Group make any unsolicited outbound telephone calls as part of a plan, program or campaign directly or indirectly through telemarketing agents or others on behalf of ADT to any person." (Agreement ¶ 23.A.) This prohibition is deliberately broad, and encompasses any unsolicited outbound telephone calls whether made "directly" by Elephant Group or "indirectly through telemarketing agents or others." The Agreement clearly contemplates the possibility that Elephant Group could make unsolicited outbound calls through "telemarketing agents" or "others" (a catch-all category that is necessarily broader than "agents"), and expressly provides that Elephant Group would be liable to indemnify any losses resulting from such calls. *See Boulder Plaza Residential, LLC v. Summit Flooring, LLC*, 198 P.3d 1217, 1221 (Colo. App. 2008) (a "contract is to be interpreted in its entirety to harmonize and to give effect to all provisions").[2]

    Elephant Group, through its affiliate Paramount, engaged in just such a campaign of unsolicited outbound telephone calls as is barred by Paragraph 23.A, without ADT's permission. Specifically, Paramount paid EMI to generate leads for ADT. (UF 39-41, 55, 57-58.) EMI, however, purchased leads from websites for consumers who had not consented to receive unsolicited telemarketing calls about ADT's services. (UF 47-51.) EMI, on behalf of Paramount, then used automated dialing technology to rapidly deliver pre-recorded messages

---

[2] According to the Agreement, Colorado substantive law applies. (Agreement ¶19.)

about ADT home security systems to several million such consumers in violation of the TCPA. (UF 55, 57-58.) As a result of Paramount's unsolicited outbound calling campaign, that placed millions of calls in violation of the TCPA with statutory damages of up to $1,500 per call, *see* 47 U.S.C. § 227(b)(3), ADT was exposed to crippling damages in this class action. ADT ultimately settled the class claims in the amount of $15 million, [DE 240-1 at 7, ¶ 4.1] and in the process incurred costs and attorney's fees of over $2 million.[3] (UF 67, 70.) The clear and unambiguous language in the Agreement requires Elephant Group to indemnify ADT for the losses resulting from Elephant Group's breach of the telemarketing provisions in Paragraph 23.A of the Agreement.

### III. Elephant Group Must Indemnify ADT For Damages Caused by the Intentional Torts and Negligence of Elephant Group and its affiliates.

The second indemnity term is found in Paragraph 6(b) of the Agreement. (UF 17.) It requires Elephant Group to indemnify ADT for any and all damages and costs suffered by ADT "**resulting from or relating to, any negligence or intentional torts by Elephant Group, its Affiliates**, **officers, directors, employees, and agents**, in connection with or related to this Agreement, except to the extent that any such claim or action is due to any negligent acts, omissions, wrongful acts, fault or willful misconduct of ADT, its employees, agents, or invitees." (Emphasis added.) This Court has already noted that the facts alleged in ADT's complaint, if established, support a finding of negligence sufficient to trigger this provision. [DE 217 at 6-7.] Elephant Group is liable to ADT under this provision as well.

---

[3] ADT has received contribution or indemnification from certain other third parties in the aggregate amount of $7 million. (UF 68.) ADT here seeks indemnification for the remaining $8 million that it paid to settle the class claims, plus the more than $2 million expended in costs and fees to defend the underlying action. (UF 69-70.)

Paragraph 4.1 of the Agreement defines an "Affiliate" as "any corporation or other person or entity that directly or indirectly controls, is controlled by, a successor-in-interest to, or alter ego of, or is under common control with ADT or Elephant Group, respectively." Elephant Group's unit, Saveology,[4] and Paramount executed an Affiliate Agreement and Addendum, which granted Paramount authority to market ADT products and services for Elephant Group. (UF 18.) Elephant Group has conceded that Paramount was its Affiliate, [DE 170 at 6] and the Court has elsewhere recognized Elephant Group's concession that Paramount is an Elephant Group affiliate. [DE 217 at 7.] According to Daphne Fernandes, Elephant Group's Director of Operations in charge of compliance, Elephant Group contracted with five to ten such affiliates to generate sales leads for Elephant Group's performance of the Agreement – but Ms. Fernandes claimed not to recall the identities of the other affiliates. (UF 14.)

### A. Elephant Group is Liable for the Intentional Torts of its Affiliates, including Paramount.

It is undisputed that EMI, Paramount's agent, placed millions of outbound, unsolicited, prerecorded telemarketing calls that promoted ADT products and services using an automated dialing system. (UF 55, 57-58.) Those prerecorded calls violated the Agreement as well as the TCPA. Those calls were purposeful acts that prompted the underlying class action against ADT. According to the clear terms of Paragraph 6(b), Elephant Group is liable for all damages "resulting from or relating to" the intentional torts committed by Elephant Group's affiliates and agents, including Paramount and, through Paramount, EMI.

EMI's intentional misconduct must be imputed to Elephant Group under basic principles of Colorado agency law. A principal is responsible under Colorado law for the torts of its

---

[4] Throughout discovery, Elephant Group did not distinguish between itself and Saveology, and the parties agreed to treat them as the same entity. (UF 6.) As Elephant Group itself saw no reason to distinguish between the two entities, this brief refers to them both as Elephant Group.

9

agent's agents where, *inter alia*, "the appointment of subagents for the performance of such transactions is usual, or the principal has reason to know that the agent employs subagents." *Stat Tech Liquidating Trust v. Fenster*, 981 F. Supp. 1325, 1345 (D. Colo. 1997), *quoting* RESTATEMENT (SECOND) AGENCY § 80. *Accord Norton v. Jim Phillips Horse Transp., Inc.*, 901 F.2d 821, 825 (10th Cir. 1989); *Rohauer v. Little*, 736 P.2d 403, 407 (Colo. 1987). Under Colorado law, a "subagent is the agent of both the appointing agent *and the principal*." *Stortroen v. Beneficial Finance Co. of Colorado*, 736 P.2d 391, 395-96 (Colo. 1987) (emphasis added).

Here, Elephant Group clearly knew that Paramount used subagents (UF 27-33) – it just did nothing to identify or supervise them. Daphne Fernandes testified that she understood it to be common practice in the lead generation industry to hire anonymous subagents to help produce sales leads. (UF 28.) Elephant Group's Affiliate Agreement and Addendum with Paramount (to which ADT was not a party) did not bar Paramount from contracting with sub-affiliates. (UF 26.) To the contrary: Elephant Group knew throughout its relationship with Paramount that Paramount in fact did routinely use sub-affiliates to market ADT products and services. (UF 27-33.) According to Daphne Fernandes, Elephant Group never asked Paramount to identify these subagents (let alone attempt to supervise their work in Elephant Group's behalf, or to confirm that their work complied with the Agreement and the TCPA) because Elephant Group considered the subagents' identities to be Paramount's proprietary information, or "secret sauce," (UF 34) completely beyond Elephant Group's knowledge, supervision, or control.

This lawsuit is the direct result of that willful ignorance. Ms. Fernandes testified that EMI was generally known to Elephant Group as a robocaller, and that Elephant Group would never itself have hired EMI to generate sales leads for ADT. (UF 62.) But Elephant Group's laissez-faire relationship with its own agents enabled Paramount to exploit EMI's robocalling

10

technology, in violation of the Agreement and the TCPA, despite Elephant Group's own judgment that EMI should never be used to generate ADT sales leads.

Given Elephant Group's knowledge and approval of Paramount's use of subagents, Elephant Group is liable under basic agency principles for the torts of Paramount's agents, including EMI. "A principal has the same liability to third parties for the commission of torts by his subagents as he has for the tortious acts of his agents." *Stat Tech*, 981 F. Supp. at 1345, *citing* RESTATEMENT (SECOND) AGENCY §§ 255, 264. Elephant Group's complete indifference to the identities and the intentional misconduct of its subagents such as EMI, under the guise of deference to its agents' "secret sauce," boggles the mind in its recklessness. "A principal may not turn loose his agent on the general public, and then merely sit back and exercise little or no supervision." *Gilmore v. Constitution Life Ins. Co.*, 502 F.2d 1344, 1348 (10th Cir. 1974).

> It is always incumbent on [a principal] to conduct his business with care. He is not bound to watch his agent, nor bound to be constantly on the lookout to see that he is not cheated. But he is certainly obligated to keep himself advised of the course of his business, and to know whether his agent is using the specific authority which is granted him.

*Id.,* 502 F.2d at 1349, *quoting Witcher v. Gibson*, 15 Colo. App. 163, 170, 61 P. 192, 194 (1900); *see id.*, *citing Zeller v. Taylor*, 95 Colo. 503, 37 P.2d 391 (1934). "It is a general principle that the principal is bound to know what his agent does," *Witcher*, 15 Colo. App. at 171, 61 P. at 194, yet Elephant failed that obligation spectacularly in this case. Elephant Group's complete failure to exercise due care in Paramount's use of EMI and other subagents directly led to this class action lawsuit, and requires a finding that EMI's intentional torts be imputed to Elephant Group under Paragraph 6(b) of the Agreement.

11

### B. Elephant Group is Liable for Paramount's Negligence in Using EMI.

For the same reasons, Elephant Group is liable for Paramount's negligence in hiring EMI to supply sales leads for the ADT account. Ryan Neill, Paramount's principal, discovered EMI through *a Craig's List ad* for home security customer leads. (UF 39.) Neill admitted that he did absolutely no due diligence on EMI prior to purchasing leads from EMI. (UF 53.) Nor did Paramount obtain any written representations or warranties from EMI regarding EMI's compliance with the telemarketing laws. (UF 54.) Rather, Neill testified that EMI's representative told Neill during their initial conversation that EMI complied with all telemarketing rules, and Neill took him at his word. (UF 54.) Neill did nothing to verify EMI's claim. (UF 54.) Significantly, Neill did not ask EMI about the source of its leads, (UF 46), and thus could not confirm that the customers on EMI's lists had given their consent to be called by telemarketers. (They had not.)

Paramount thus failed to exercise reasonable care (indeed, no care at all!) in hiring EMI to generate sales leads for ADT. *See*, *e.g.*, *Dolin v. Contemporary Financial Sols., Inc.*, 622 F. Supp. 2d 1077, 1083-84 (D. Colo. 2009). As shown in the preceding section, Elephant Group is responsible for Paramount's negligence under basic principles of Colorado agency law as well as the express terms of Paragraph 6(b) of the Agreement. Elephant Group must indemnify ADT for losses caused by Paramount's negligent engagement and supervision of EMI.

### C. Elephant Group Itself Was Negligent in Failing to Supervise Paramount.

Finally, as noted above, Elephant Group was *itself* grossly negligent (indeed, reckless) in failing to oversee Paramount's telemarketing activities. Elephant Group breached the Agreement by contracting with Paramount and other agents without first obtaining ADT's "express written

consent." (UF 11, 13.) Despite this breach, Elephant Group nevertheless was required to abide by all of the telemarketing provisions of the Agreement, *and to ensure that its affiliates would do the same*. Paragraph 17 of the Agreement expressly provides that in the event Elephant Group attempts to assign any of its duties or obligations under the Agreement, all of the terms and conditions contained in the Agreement, including the telemarketing provisions, "shall apply to the assignee with the same force and affect as they do to Elephant Group as the signatory party hereto." (Agreement ¶ 17.)

Having contracted with Paramount, Elephant Group had a duty to monitor and supervise Paramount to ensure that all calls made under the Paramount contract to market ADT services complied with the telemarketing laws and ADT's written guidelines. *See, e.g., Moses v. Diocese of Colorado*, 863 P.2d 310, 329 (Colo. 1993) (employer had a duty to supervise an employee who posed a risk of harm). Elephant Group breached that duty. As shown above, Elephant Group failed to monitor Paramount to ensure that its telemarketing practices complied with all legal requirements. In addition to Elephant Group's complete indifference toward the identity and conduct of EMI and Paramount's other agents, Elephant Group's neglect is apparent throughout its correspondence with Paramount. For example: Paramount worked on the ADT Agreement for Elephant Group *for more than five months* before it occurred to Ms. Fernandes, who was charged with managing the affiliates' work, that Paramount might be making outbound telemarketing calls. (UF 37.) Then Ms. Fernandes sent the following e-mail to Paramount:

> Are your call centers making outbound calls? If so, we must scrub those number [sic] prior to calling the consumers even if they opted in. I was under the impression that all of your calls were inbound calls. If you are dialing we have to start the scrub today.

(UF 37.) Five days later, more than five months after execution of the Paramount Affiliate Agreement, Fernandes for the first time sent instructions to Paramount on the ADT Do Not Call scrubbing process. (UF 38.)

Fernandes' comments demonstrate that it was more than five months of working together before Elephant Group realized that Paramount and its agents were making unsolicited outbound calls in violation of the Agreement as well as the TCPA. Had Elephant Group bothered to supervise Paramount's work, it would have known that Paramount was making outbound calls. In fact, just a few weeks prior to the filing of this action, Elephant Group assured ADT that Paramount was *not* making outbound calls. (UF 36.) This assertion, of course, proved to be false. Either (1) Elephant Group intentionally misled ADT about Paramount's activities or (2) Elephant Group's supervision was so lax that Elephant Group itself had no idea what types of marketing its own affiliate was performing in its behalf. Either explanation establishes Elephant Group's negligence beyond genuine dispute.

As already shown, Elephant Group was aware that Paramount (as well as Elephant Group's other affiliates) used sub-affiliates to make outbound calls, (UF 27-28) but did nothing to identify them. (UF 29, 34.) Without knowing their identity, Elephant Group had no way to verify the sub-affiliates' compliance with the telemarketing laws or the Agreement's requirements. Numerous e-mails confirm that Ms. Fernandes, who oversaw the Paramount relationship, knew that Paramount subcontracted with other entities who made outbound calls – knowledge that should have led her, and Elephant Group, to stop using these sub-affiliates, or else devise appropriate controls to manage their work. For example, in one e-mail Ms. Fernandes asked Ryan Neill, of Paramount: "Did you find out if those 3 caller ID's were your lead providers?" (UF 32.) In another e-mail exchange, Ms. Fernandes asked Mr. Neill:

14

> Can you please review the below complaint from ADT's legal department and provide me with your call logs (Date and times) that you dialed this number? "You" meaning your lead provider as well. . . . *Can you please let me know if your affiliates own these CIDs? Remember, I need all of your CIDs "you" PMG use and that includes your affiliates/lead providers.*

(UF 33; emphasis added.) On yet another occasion, Ms. Fernandes asked:

> Can you check and see if your databases show that you or any of your partners have called either of the numbers below? . . . They are both complaints naming the same company "Home Solutions," but I'm sure it's a sub-affiliate of one of my affiliates. I've sent this to all of my lead partners so as of right now, I don't know who is calling these numbers.

(UF 31.) Rather than investigate "who is calling these numbers" on its behalf, Elephant Group considered the identities of the sub-affiliates to be Paramount's proprietary information, or "secret sauce," (UF 34) completely beyond Elephant Group's knowledge, supervision or control.

Elephant Group knowingly permitted unidentified and untested entities to make outbound calls promoting ADT products and services on its behalf, in knowing violation of the Agreement and the TCPA. Instead of stopping this practice, Elephant Group allowed Paramount to continue to use unknown sub-affiliates for telemarketing despite the obvious risk of harm to ADT. In so doing, Elephant Group abdicated its oversight responsibilities and thereby breached the duty of care it owed to ADT. *See Gilmore*, 502 F.2d at 1348-49; *Prymak v. Contemporary Financial Sols., Inc.*, 2007 WL 4250020 at *16 (D. Colo. 2007). Elephant Group's negligent hiring and supervision of Paramount enabled Paramount, in turn, to hire EMI and other unknown sub-affiliates who placed millions of prerecorded calls to consumers in violation of federal law. The damages incurred by ADT in this action were a direct result of Elephant Group's negligent hiring and supervision of Paramount. Elephant Group's own negligence, therefore, is sufficient to trigger its indemnity obligation to ADT under Paragraph 6(b).

## **CONCLUSION**

The motion should be granted.

Respectfully submitted,

By:   /s/ John A. Leja
John Leja (ARDC 6256269)
POLSINELLI PC
161 N. Clark Street, Suite 4200
Chicago, Illinois 60601
Telephone: (312) 819-1900
Facsimile: (312) 819-1910
*jleja@polsinelli.com*

C. Sanders McNew
McNEW P.A.
2385 NW Executive Center Drive
Suite 100
Boca Raton, Florida 33431
Telephone: (561) 299-0257
*mcnew@mcnew.net*

*Attorneys for Defendant/Third-Party Plaintiff ADT Security Services, Inc. (n/k/a The ADT Corporation or ADT, LLC)*

## **CERTIFICATE OF SERVICE**

Please take notice that on July 14, 2014, I caused the foregoing to be filed with the Clerk of the United States District Court for the Northern District of Illinois, utilizing the Court's ECF system which will send a copy of the said documents to all attorneys of record by electronic mail.

By: /s/ John A. Leja

16