IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| VISHVA DESAI and PHILIP J. CHARVAT on behalf of themselves and others similarly situated, | |
| Plaintiffs, | |
| v. | |
| ADT Security Services, Inc., | |
| Defendant/Third-Party Plaintiff, | |
| v. | Case No. 1:11-cv-1925 |
| PETE TOLMAN, LEADS DIRECT MARKETING, VOICE TEL CORPORATION, CHRISTOPHER LONG, EMI, INC., JMB ENTERPRISES, CITY VIP, LLC, DIRECT SAVINGS, USA, INC., OSCAR MONTENEGRO, EVERSAFE SECURITY SYSTEMS, INC., SAFE STREETS USA, LLC, PARAMOUNT MEDIA GROUP, THE ELEPHANT GROUP, INC., AND UNKNOWN JOHN DOE DEFENDANTS I THROUGH XX, | Judge Bucklo Magistrate Judge Keys |
| Third-Party Defendants. | |
| SAFE STREETS USA, LLC, SUCCESSOR BY MERGER TO EVERSAFE SECURITY SYSTEMS, INC., | |
| Fourth-Party Plaintiff, | |
| v. | |
| DIRECT SAVINGS USA, LLC, | |
| Fourth-Party Defendant. | |

**ADT'S STATEMENT OF UNDISPUTED MATERIAL FACTS
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

ADT Security Services, Inc. ("ADT"), pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1, states that the following material facts are not in genuine dispute, and support entry of summary judgment on ADT's Corrected First Amended Third Party Complaint:

1. Each and every factual allegation in ADT's Corrected First Amended Third Party Complaint is "conclusively established" because defendant chose not to answer the complaint. *Modrowski v. Pigatto*, 712 F.3d 1166, 1170 (7th Cir. 2013); *see* FED. R. CIV. P. 8(b)(6).

2. This Court has supplemental jurisdiction of the claims in ADT's third-party complaint pursuant to 28 U.S.C. §1367(a) because the claims are part of the same case or controversy as the claims in the plaintiffs' amended complaint. (Exhibit 1 at ¶ 19.)

3. Venue is proper before this Court pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claims at issue occurred in this district. (Exhibit 1 at ¶ 22.)

4. On May 28, 2008, Elephant Group, Inc. and its subsidiary (collectively "Elephant Group") entered into a written Agreement with ADT whereby Elephant Group would generate sales leads through online advertisements for ADT Authorized Dealers (the "Agreement"). (Exhibit 2; Exhibit 1 at ¶ 50.)

5. The Agreement was amended in December 2008 when Elephant Group's subsidiary changed its name to Saveology. (Exhibit 3.) The amendment expressly made Saveology a party to the Agreement and bound by all of the Agreement's terms and conditions. (Exhibit 3.)

6. Elephant Group did not distinguish between itself and Saveology. (Exhibit 4 at 28.)

7. Pursuant to the terms of the Agreement, Elephant Group agreed to comply with all federal, state, and local laws concerning telemarketing, including the TCPA, as well as ADT's telemarketing guidelines. (Exhibit 2 at ¶ 23A.1; Exhibit 1 at ¶¶ 51, 52.)

8. In particular, Elephant Group agreed: "Under no circumstances will Elephant Group make any unsolicited outbound telephone calls as part of a plan, program or campaign directly or indirectly through telemarketing agents or others on behalf of ADT to any person." (Exhibit 2 at ¶ 23.A.)

9. The Agreement also prohibited Elephant Group from using "prerecorded messages in connection with Telemarketing Services on ADT's behalf without prior written approval from ADT." (Exhibit 2 at ¶ 23A.1.)

10. Elephant Group never received written approval from ADT to use prerecorded messages. (Exhibit 6 at 27; Exhibit 5 at ¶ 7; Exhibit 1 at ¶ 52.)

11. The Agreement also expressly prohibited Elephant Group from assigning any duties under the Agreement to any third party without ADT's "express written consent." (Exhibit 2 at ¶ 17.)

12. The Agreement provided that for any provision requiring the consent of ADT, such consent shall be given in writing by ADT's Vice President Chief Marketing Officer or Vice President of Residential Sales. (Exhibit 2 at ¶ 21.)

13. Prior to plaintiffs' filing of the underlying action, ADT did not grant express written consent to Elephant Group for an assignment to any third party. (Exhibit 5 at ¶ 7; Exhibit 6 at 121-22.)

14. Nevertheless, Saveology assigned duties under the Agreement to between five and ten unauthorized affiliates prior to 2012. (Exhibit 6 at 56, 118.)

15. The Agreement contains two separate indemnification provisions requiring Elephant Group to indemnify ADT. (Exhibit 2 at ¶ 23.F and ¶ 6(b).)

16. Specifically, Elephant Group agreed "to indemnify, defend and hold ADT harmless from and against any claims, actions, proceedings and damages, including reasonable attorney's fees and costs, and all monetary penalties and costs imposed upon ADT arising out of Elephant Group's breach of the provisions set forth in Sections A and B, hereinabove." (Exhibit 2 at ¶ 23.F.) Section A of paragraph 23 expressly prohibits Elephant Group from using prerecorded messages and making unsolicited outbound calls. (Exhibit 2 at ¶ 23.A.)

17. In addition to the indemnification provision in Paragraph 23.F, Paragraph 6(b) of the Agreement states that Elephant Group

> shall indemnify, defend and hold ADT, its Affiliates, officers, directors, employees and agents (collectively the "ADT Group") harmless from and against any and all damages, costs, (including court costs and attorney's fees), losses, fees, and expenses suffered by the ADT Group resulting from or relating to, any negligence or intentional torts by Elephant Group, its Affiliates, officers, directors, employees, and agents, in connection with or related to this Agreement, except to the extent that any such claim or action is due to any negligent acts, omissions, wrongful acts, fault or willful misconduct of ADT, its employees, agents, or invitees.

(Exhibit 2 at ¶ 6(b).)

18. On October 12, 2010, Saveology entered into an Affiliate Agreement with Paramount Media Group ("Paramount"), in which Saveology authorized Paramount to conduct certain marketing of ADT products and services for Saveology. (Exhibit 7.)

4

19. The Addendum to the Affiliate Agreement required Paramount to follow ADT's telemarketing guidelines and precluded Paramount from using prerecorded messages. (Exhibit 7.)

20. ADT was not a party to the agreement between Saveology and Paramount. (Exhibit 7.)

21. ADT had no involvement in Saveology's selection of Paramount. (Exhibit 1 at ¶ 55.)

22. Saveology did not request ADT's express written consent to assign its duties to Paramount. (Exhibit 5 at ¶ 6.)

23. ADT never consented in writing for Saveology to assign its duties under the Agreement to Paramount or any other entity. (Exhibit 5 at ¶ 7; Exhibit 6 at 121.)

24. Paramount never had any communications with ADT, did not have a contract with ADT, and was not paid by ADT. (Exhibit 8 at 30, 31, 68.)

25. Other than its relationship with Saveology, Paramount did not work with any ADT Authorized Dealers, Authorized Marketers or Authorized Telemarketers. (Exhibit 9 at Response no. 4.)

26. The Addendum to the Affiliate Agreement did not prohibit Paramount from sub-contracting with another entity. (Exhibit 7.)

27. Saveology knew that Paramount and its other affiliates who marketed ADT products and services used sub-affiliates and/or third party lead generators to make telephone calls. (Exhibit 6 at 102-05; Exhibits 10-12; Exhibit 8 at 76-77, 84.)

28. Saveology maintained that it is a common practice in the lead generation industry for companies like Paramount to use anonymous subagents to assist them in generating sales leads. (Exhibit 6 at 106-08.)

29. Saveology did not know the names or identities of the sub-affiliates used by Paramount and its other affiliates. (Exhibit 6 at 105-08; Exhibit 13 at 31-32.)

30. For example, on April 20, 2011, Saveology's Director of Operations, Daphne Fernandes, asked Ryan Neill of Paramount: "Are you working with a lead provider called American Protection Services? They have been calling an ADT high level person for several months now, who has repeatedly asked to be put on the DNC list." (Exhibit 10.)

31. On April 21, 2011, Fernandes asked Neill: "Can you check and see if your databases show that you or any of your partners have called either of the numbers below? . . . They are both complaints naming the same company "Home Solutions," but I'm sure it's a sub-affiliate of one of my affiliates. I've sent this to all of my lead partners so as of right now, I don't know who is calling these numbers." (Exhibit 12.)

32. In another e-mail exchange, Fernandes asked Paramount: "Did you find out if those 3 caller ID's were your lead providers?" (Exhibit 14.)

33. In early May 2011, Fernandes sent Neill the following message: "Can you please review the below complaint from ADT's legal department and provide me with your call logs (Date and times) that you dialed this number? "You" meaning your lead provider as well. . . . Can you please let me know if your affiliates own these CIDs? Remember, I need all of your CIDs "you" PMG use and that includes your affiliates/lead providers." (Exhibit 11.)

34. Saveology did not require Paramount to disclose the names of its lead vendors, as Saveology considered such information to be a proprietary "secret sauce." (Exhibit 6 at 105-08; Exhibit 13 at 31.)

35. On February 25, 2011, about three weeks prior to the filing of the Desai action, ADT received a consumer complaint naming Paramount, and alleging that Paramount was a partner of Saveology. (Exhibit 15.) ADT immediately tendered the complaint to Saveology and inquired whether Saveology did in fact have a relationship with Paramount. (*Id.*)

36. On February 28, 2011, Saveology assured ADT that Paramount was "not an outbound team." (Exhibit 15.)

37. On April 8, 2011, more than five months after execution of the Affiliate Agreement with Paramount, Daphne Fernandes, who had responsibility for Saveology's telemarketing compliance, sent the following e-mail to Paramount: "Are your call centers making outbound calls? If so, we must scrub those number [sic] prior to calling the consumers even if they opted in. I was under the impression that all of your calls were inbound calls. If you are dialing we have to start the scrub today." (Exhibit 16; Exhibit 6 at 15.)

38. Five days later, on April 13, 2011, Fernandes sent instructions on the ADT DNC scrubbing process to Paramount. (Exhibit 17.)

39. In late 2010, Neill discovered a lead vendor called EMI through an ad on Craig's List advertising home security leads. (Exhibit 8.)

40. From late 2010 through May 2011, Neill signed various purchase orders (also known as Transfer Service Orders) with EMI. (Exhibit 18; Exhibit 19.)

41. In total, Paramount purchased more than 9,700 home security leads from EMI. (Exhibit 8 at 52; Exhibit 18.)

42. Paramount converted many of the leads into sales for Saveology. (Exhibit 8 at 31; Exhibit 20.)

43. To do so, Paramount entered customers' information into Saveology's order entry system, and Saveology paid Paramount per installation. (Exhibit 8 at 31.)

44. Saveology paid Paramount $1,367,977 during the course of the approximately ten month relationship between them. (Exhibit 20.)

45. ADT had no knowledge of Paramount's relationship with EMI, or Paramount's purchase of EMI leads. (Exhibit 1 at ¶ 59; Exhibit 6 at 141; Exhibit 13 at 100-01.)

46. EMI did not inform Paramount how it obtained its leads. (Exhibit 8 at 50.)

47. EMI purchased millions of leads from 2freenites.com, a lead generator. (Exhibit 21 at ¶¶ 4-9.)

48. The Terms and Conditions and Privacy pages of the 2freenites.com website included a disclosure that consumers participating in promotions on 2freenites.com were providing consent to receive telemarketing calls from EMI. (Exhibit 21 at ¶ 10.) The disclosure on 2freenites.com did not mention ADT or Saveology. (Exhibit 21 at ¶¶ 26-27.)

49. Most of the leads that 2freenites.com sold to EMI, however, did not come from the 2freenites.com website, but rather came from a network of twenty to thirty lead generation websites. (Exhibit 21 at ¶¶ 13-14.)

50. These websites contained a hyperlink to 2freenites.com, but did not contain any disclosure related to EMI or consent to receive telemarketing calls from EMI. (Exhibit 21 at ¶¶ 17-23.)

8

51. Rather, the consent language on those lead generation websites typically informed consumers that by participating in a promotion, a consumer was consenting to receive telemarketing calls from "affiliates" of that site. (Exhibit 21 at ¶ 20.)

52. EMI's Transfer Service Orders did not contain any warranties or representations that EMI complied with federal, state, and local telemarketing laws. (Exhibit 19.)

53. Paramount did not do any due diligence on EMI prior to purchasing EMI leads. (Exhibit 8 at 48, 94.)

54. In particular, Paramount did not obtain any written representations or warranties from EMI regarding EMI's compliance. (Exhibit 8 at 49.) According to Neill's testimony, EMI's representative told Neill during their initial conversation that EMI complied with all telemarketing rules, and Neill did not inquire further. (Exhibit 8 at 48, 103, 123-24.)

55. In fact, EMI utilized pre-recorded messages to telemarket ADT products and services on behalf of Paramount. (Exhibit 22 at 9, 14.)

56. Through a contract with EngageTel, Inc., EMI was assigned a block of telephone numbers for its use, including the number (574) 970-0866. (Exhibit 23 at CHARVAT 000931-940.)

57. EMI retained a dialing company, Dynamic Interactive Corp., to provide the Voice Broadcasting technology platform for EMI's pre-recorded telemarketing campaigns. These campaigns used Dynamic's platform to rapidly deliver pre-recorded messages about ADT home security systems to several million recipients through the phone. (Exhibit 24 at ¶¶ 8-9, 31-32.)

58. On March 1, 2011, EMI, using the ANI (574) 970-0866, called class plaintiff Vishva Desai's cellular telephone using a pre-recorded message placed by Dynamic's automated

9

dialing system. ("Desai Call"). The Desai Call was part of a larger EMI telemarketing campaign for Paramount. (Exhibit 24 at ¶¶ 28-29; Exhibit 1 at ¶¶ 40, 41.)

59. Ms. Desai never gave anyone consent to contact her on her cell phone via auto-dialer and pre-recorded message on behalf of ADT. (Exhibit 25 at Response no. 2.)

60. ADT did not place the Desai Call, or any other call that led to the filing and prosecution of this lawsuit. (Exhibit 1 at ¶¶ 28, 34; Exhibit 24 at ¶ 32.)

61. ADT did not authorize the Desai Call, nor did ADT authorize Paramount or EMI to conduct any telemarketing services relating to ADT's products or services. (Exhibit 1 at ¶¶ 34-39, ¶ 59.)

62. Daphne Fernandes had heard the name EMI "somewhere along the way" and was told it was a voice broadcaster, "so it was somebody that I would never have touched" and a "no for us." (Exhibit 6 at 139, 141.)

63. As a result of the Desai call and other robocalls made by EMI and Paramount, ADT was sued by class plaintiffs in March 2011 for alleged violations of the TCPA. [DE 1.]

64. On August 25, 2011, ADT filed a third party complaint against various entities and individuals whom ADT believed were responsible for the calls at issue in the Desai complaint. [DE 75.]

65. In October 2011, ADT amended its third party complaint to name Elephant Group as a third-party defendant, and to assert claims for indemnification and contribution.[1] [DE 121.]

66. In January 2013, the class plaintiffs and ADT reached a settlement. [DE 240.]

67. ADT paid $15 million to settle the class claims. [DE 240-1 at ¶ 4.1.]

---

[1] On September 26, 2012, the Court dismissed ADT's claims for common law indemnification and contribution, but left intact ADT's claim for contractual indemnification. [DE 217.]

68. ADT has received contribution or indemnification from certain other third-party indemnitors in the aggregate amount of $7 million. (Exhibit 26 at Interrogatory Response no.2; Exhibit 27 at ¶ 7.)

69. ADT is entitled to indemnification for the remaining $8 million not already paid by other indemnitors. (*Id.*)

70. ADT incurred attorney's fees and costs in the amount of $2,083,790.30 to defend the class action, for which it now seeks indemnification as well. (Exhibit 27 at ¶ 5.)

71. As of July 14, 2014, ADT has incurred attorney's fees and costs in the amount of $189,514.41 to prosecute this third-party indemnity action. (Exhibit 27 at ¶ 6.) ADT continues to incur fees and costs in the prosecution of this action as it continues in this Court. (*Id.*)

Respectfully submitted,

By: ___/s/ John A. Leja___
John Leja (ARDC 6256269)
POLSINELLI PC
161 N. Clark Street, Suite 4200
Chicago, Illinois 60601
Telephone: (312) 819-1900
Facsimile: (312) 819-1910
*jleja@polsinelli.com*

C. Sanders McNew
McNEW P.A.
2385 NW Executive Center Drive
Suite 100
Boca Raton, Florida 33431
Telephone: (561) 299-0257
*mcnew@mcnew.net*

*Attorneys for Defendant/Third-Party Plaintiff ADT Security Services, Inc. (n/k/a The ADT Corporation or ADT, LLC)*

## **CERTIFICATE OF SERVICE**

Please take notice that on July 14, 2014, I caused the foregoing to be filed with the Clerk of the United States District Court for the Northern District of Illinois, utilizing the Court's ECF system which will send a copy of the said documents to all attorneys of record by electronic mail.

By: /s/ John A. Leja