UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

-------------------------------x

VISHVA DESAI,

Plaintiff,

-against- No. 11C1925

ADT SECURITY SERVICES, INC., et al.,

Defendants.

-------------------------------x

June 19, 2014
9:10 a.m.

Deposition of JOSEPH BAMIRA, pursuant to notice and subpoena, at the offices of Veritext Legal Solutions, 301 Northeast 51st Street, Boca Raton, Florida, before Jack Finz, a Shorthand Reporter and Notary Public within and for the State of Florida.

A P P E A R A N C E S:

C. SANDERS McNEW, ESQ.
SARA GOLDBERG, ESQ.
McNEW P.A.
Attorneys for Defendant
ADT SECURITY SERVICES, INC.
2385 New Executive Center Drive
Suite 100
Boca Raton, FL 33431

JAMES K. SCHULTZ, ESQ.
SESSIONS FISHMAN NATHAN & ISRAEL LLC
Attorneys for Third-Party Defendant
THE ELEPHANT GROUP
55 West Monroe Street
Suite 1120
Chicago, IL 60603-5130

ALSO PRESENT:

HANNAH S. LIM, ESQ.
Chief Litigation Counsel
ADT Security Services
1501 Yamato Road
Boca Raton, FL 33431



JOSEPH BAMIRA

J O S E P H   B A M I R A,
having been first duly sworn by the Notary Public (Jack Finz), was examined and testified as follows:

EXAMINATION BY
MR. McNEW:

Q. Can you state your fall name for the record, please.
A. Yes. Joseph Bamira.
Q. And your address?
A. 15 Shadowlawn Drive, Oakhurst, New Jersey.
Q. Have you been deposed before?
A. Yes.
Q. So I will spare you a lengthy set of instructions, but if you don't understand something that I ask you, please ask me to clarify.
And I'm sure your lawyer has already told you this, but you needn't speculate. If you don't know an answer, just say you don't know. That's fine.
My first question to you, how many people worked in -- let's set up a



JOSEPH BAMIRA

groundrule. For the purposes of the discussion, can we talk about Elephant Group and Saveology together as Elephant Group?
A. Absolutely, yes.
Q. And then if there is an answer that you have that for some reason depends on a distinction between one or the other, you will make that for me?
A. Yes, sir.
Q. Tell me, how many people worked in the compliance department at Elephant Group?
A. I don't know the exact number, and it varied from time to time. Somewhere between 15 to 20.
Q. Did they sit together in a part of the office?
A. They sat together in a part of an office, yes.
Q. Was there a sign that said compliance?
A. No.
Q. Can you give me names of the



JOSEPH BAMIRA

people who worked there?
A. Well, the guy who was in charge of it, let's say, one of them was James Flynn. And then there was a girl by the name of -- working there, there were different parts of the compliance. So if you care about it, I will describe it to you.
There was a Nikki. I don't remember the last name. And so I don't remember the names. I didn't work directly with them on a day-to-day basis.
Q. Who did?
A. There was a Mary Couton.
Q. Can you spell the last name, please?
A. I'm not sure.
Q. With a K or C?
A. C. I'm not quite sure how she spelled it.
Q. You said that you didn't work directly with compliance. To whom did the compliance department report?
A. Usually the ones that was the

JOSEPH BAMIRA

head of the compliance department. I mean, in the last four or five months before I left it was pretty much me. And before that they had a head of the compliance department, and he usually -- I was not the head of the compliance department, but in the corporate structure, because it had to do with legal issues, they talked to me if there were legal issues, such as should we fire someone, should we not fire someone, what were the issues, stuff like that.

Q. One more groundrule. For the purposes of this deposition, let's assume that my questions are all going to the time before the Desai lawsuit was served, which I think was March 2011. That will make things easier. I understand that things changed a bit after the lawsuit.

A. They have.

Q. So let's focus on the time before the lawsuit. And, again, if your answer leads you into post-lawsuit things, just flag that for me. But we



JOSEPH BAMIRA

will assume we are talking about 2011.

So what I hear you telling me is that you were the person in the company responsible for the resolution of legal issues. Is that correct?

A. Correct. I managed it. I was not the attorney, because I am not. But, yes, I dealt with legal issues of the company.

Q. You said that there were different parts of compliance, and I want to come back to that and break that down.

Was the compliance department responsible for enforcing compliance with the ADT contract?

A. The compliance department did not do the actual day-to-day, but they more reacted -- again, it depends before and after. And I'm not quite sure how it evolved, because the compliance department did not react really to the Desai issue, because it was not an issue of compliance per se. So they did not work on the actual enforcement of any



JOSEPH BAMIRA

particular contract.

Q. So if they weren't involved in the enforcement of any particular contract, what were they involved in?

A. Let's say somebody complains, or two -- there's two separate types of structures. A, there was a team which listened in to calls and see how the calls were, and did the agents answer it correctly.

Then there were subsequently we replaced it with a voice recognition system that analyzed pretty much what all the calls and see if the calls were legit. Every call, or 60, 70 percent of the calls, it would listen, and it's the software, and then people would listen in, if there were infractions, and report the infractions.

Then there were people, and before that they would listen manually. It didn't change it because of Desai, because we always looked to make sure things are being done correctly. And



JOSEPH BAMIRA

primarily because of TCPA rules.

Then there are things, because of the TCPA rules, that I made sure that, let's say, Daphne is aware that what websites have to include, what they don't have to include. Let's say, I will give you an example, she got instructions that each website is up, which let's say like ADT, that the website, that the people who work for us, they keep the records, keep the calls, that they are scrubbing the calls, especially against the internal ADT situation, if we talk about ADT, that the website includes the right wording, that people ask -- you know, they ask people to opt in, however they did. But there is a wording saying that let's say they agree that they will be called specifically for security, home security companies. We had it even people should be called for, even though none of them did not allow that, but just in case, let's say for robocalling, which you can ask for specific separate

JOSEPH BAMIRA

permission.

So there were rules and regulations, and I made sure that we were aware they were implemented, and if there was a complaint, I asked her to check if everybody kept the rules. So we had pretty good tabs on did people keep the rules or didn't.

From time to time ADT would ask questions, and then we would go, and we would go to the vendor and he would supply us with the information, and we reacted to that.

Q. A big piece of the work with the compliance department was monitoring phone calls?

A. Correct.

Q. Were those phone calls that were being made or received by Elephant Group or by other companies?

A. Calls received by us.

Q. So they were not involved in listening to phone calls made by third-party vendors that you would engage



JOSEPH BAMIRA

to help perform the ADT contract; is that correct?

A. That's correct, because those people were supposed to have only people called in. They were subcontractors. We cannot control what they are saying. We cannot tell them how to do their job, except put parameters on what the call should be and what the quality of the call should be. But we did not listen to their calls.

Q. You talked about the need to ensure that the numbers had been scrubbed. Were you making outbound calls?

A. No, we were not, only inbound. But in this particular instance, even though someone allows you to call him, since we did not, you know, in the website it not necessarily always say ADT, it's a security company, or whatever it said. Even though a person said you can call me, and according to TCPA, on the national -- even if you put yourself,



JOSEPH BAMIRA

your name, on the national, that's okay, so you get permission.

However, they might have put themselves on ADT's internal do not call list. So even though they called us and we called them back, I wanted to make sure that nobody calls, even if you get permission, if he was on the internal ADT do not call list.

Q. So the calls that were being monitored by your compliance department, were any of those calls outbound calls?

A. No. We didn't make outbound calls.

Q. And they did not monitor the calls made by third-party vendors, or received by third-party vendors?

A. That is true, in the ADT case. In the other we didn't have people make calls for us.

Q. So for the purposes of ensuring compliance with -- are you aware that the ADT contract required written consent for the engagement of third-party



JOSEPH BAMIRA

vendors to assist in the performance of the ADT contract?

A. I'm aware now. I don't remember when I got aware.

Q. The compliance department, would it have been involved in ensuring compliance with adherence to that contractual provision?

A. No. Because usually we did not -- the compliance department did not like read contracts and make sure that everybody is keeping their side of the contract. That did not happen.

However, it was never raised by ADT, either, so it never became a complaint, because that's what everybody did. ADT pretty much knew very closely what we were doing. Nobody ever complained about it. So nobody asked us to do things differently than we actually have. So it never came to anybody's attention that it is an area that needs to be enforced literally.

Q. And how do you know that ADT

JOSEPH BAMIRA

knew that?

A. Because ADT talked to Daphne all the time. They came to our office. They knew pretty much what we do. They knew we were working with other vendors. They never came and complained, hey, we saw you working with other vendors, we don't have any written, or any request to have a written permission, you cannot do that. There was never such a complaint, even though they knew and got quite a bit of traffic, and they knew how the traffic got to them.

Q. When you say ADT, what individuals are you referring to? What individuals came to you and made those statements to you?

A. For one, Dan Geiger. But there were, I suppose, other people, you know, that talked to Daphne. So I didn't speak to them. But there were other individuals, I suppose. Steve Dribben, I suppose. I don't know.

Q. Do you have any knowledge of



JOSEPH BAMIRA

Steve Dribben ever speaking with Daphne Fernandes about this?

A. Directly, not.

Q. Did you ever speak to Steve Dribben about this?

A. If he spoke to Daphne?

Q. No. Did you ever speak to Steve Dribben about this?

A. About this, you mean what?

Q. About whether or not it would be appropriate to use a third-party vendor to help perform the ADT contract without ADT's written approval.

A. No. I didn't see any need to, so I didn't ever discuss it with him.

Q. Are you aware that the ADT contract also barred the making of unsolicited outbound telemarketing calls?

A. I think I knew about it, but it was not initially. We were not doing these kinds of things.

Q. Are you aware of whether your third-party vendors were making unsolicited outbound telemarketing calls?



JOSEPH BAMIRA

A. We forbade, in the contract we had with them, to make outbound unsolicited calls. It was a very specific type of calls and function that they were contracted to do. That was not one of them.

Q. What did your compliance department do to ensure compliance with those contractual provisions?

A. Again, it was more to the marketing department, because this was more legal instructions, not compliance. Because compliance, as you understand, was more make sure that all the agents and everybody else sticks to TCPA, so you're talking more about legal enforcement. That's not the compliance. Compliance is a big word.

Q. Let's assume -- I will assume, and you will correct me if I am wrong, but I will assume for the purposes of our discussion that the compliance department had nothing to do with ensuring the enforcement of either of these



JOSEPH BAMIRA

contractual provisions or related provisions with your third-party vendors. Is that correct?

A. The compliance department not. But personally I myself discussed it with Daphne, discussed it with other people, as some of the issues were. You know, very often we made a synopsis of what are the requirements, and then with all the -- what is a contract. But there was not a compliance that says go every day and see that everybody is doing that. That was the job of Daphne. She was the head of the department. She had the exact instructions what she should do, what she shouldn't do. We changed it from time to time, reacted a lot of times to what came to our attention, to what we listened to, what complaints were. And that was her job, to make sure the implementation of it.

Q. So what I hear you telling me is that with respect to the third-party vendor compliance with the restrictions

JOSEPH BAMIRA

of what they could or couldn't do, the oversight of ensuring compliance with those provisions was the responsibility of Daphne Fernandes; is that correct?

A. The provision of the agreements, yes.

Q. And to whom did she report on that?

A. She reported either to Benny Aboud or to me, because it depends what part of it. If it became a legal issue, or anything of that nature, I cannot say all the time because I don't know what she did all the time. But, you know, you work with people, you see how they approach things. She told me she checked. I asked her, you know these people, do they put in the provisions, and I lived by her answers. But I did not go to check it myself. That was her job.

Q. So yesterday Reid Shapiro testified that Benny Aboud was not involved in these kind of compliance and



JOSEPH BAMIRA

enforcement issues. What you mentioned just now, are you aware of Benny's involvement in any of this?

A. Again, in general he was not involved, but he could have been involved from time to time, if he was the CEO, and maybe people talked to him or asked him. And --

Q. But that's just speculation?

A. That's just speculation. I don't know that. But I know that people used to talk to him.

Q. Are you aware of any instance when Benny was involved in a question relating to --

A. As we speak right now, I cannot give any example.

Q. So it sounds as if, to the extent that Daphne Fernandes had any supervision, it came from you. Is that correct? Is there anyone else that she would have as her supervisor?

A. Again, supervision in respect to what?



JOSEPH BAMIRA

Q. In respect to performance of the ADT contract, and with respect to the third-party vendor engagements to perform the ADT contract.

A. Again, only if it created, if there were legalities of the issues, if it was understanding with a vendor. Let's say he said you have to fill this form for me to know that's going on. That will not come to me. That was entirely her responsibility.

If a vendor complained she didn't do anything, which never happened, by the way, then it would come to me. But if he made an arrangement, the vendor made an arrangement with Daphne, this is what we do, it was her responsibility to implement it.

Yes, from time to time, there were complaints, so there was general supervision. But not on the day-to-day her work to make sure that everything works in accordance with what was agreed to.



JOSEPH BAMIRA

Q. Was there anyone else besides you to whom she reported with respect to the ADT contract?

A. Again, with respect to the ADT contract, in what context?

Q. In any context.

A. I think in general she can report on how many calls she had, how many people she talked to. She would report to Benny, I suppose, because it's more on the marketing side. It has more to do with the vendor relationship. He would be the person to talk to, that is, vendor relationship. I was more if trouble arose, or other legal issues that should be paid attention to.

Q. And with respect to any issues regarding compliance with the ADT contract, as opposed to compliance issues we were talking about earlier, compliance with the contract, those would all be legal issues and they would all come to you; is that correct?

A. No. Because the compliance

JOSEPH BAMIRA

with the ADT contract -- this is a big word. It would come to me if there were legal issues with the implementation. If nobody felt that there were legal issues with the implementation, it would not come to me.

Q. What about with respect to the adherence to the paragraph of the contract that barred the use of third-party vendors without the written consent of ADT? Is that a legal issue that she would have reported to you on or is that something that she would have reported to someone else on?

A. If she had an issue with that, and it became an issue between us and ADT, she would tell me. Apparently everything went smoothly. There was no need to alert me. There was no problem. Nobody raised an issue.

We worked with vendors. ADT never raised a flag and said, hey, we have a problem here, because if they did they could have written a letter. They



JOSEPH BAMIRA

didn't write a letter, nothing. So there was nothing for her to discuss with me on this particular paragraph.

Q. So from the period up to the filing of the lawsuit, did you ever have a conversation with Daphne Fernandes about this provision of the contract?

A. No.

Q. And if she had had an issue with it, she would have raised it with you?

A. I would assume so. You have to ask her.

Q. We already have. You are sitting here.

A. I cannot tell you what she would do or not. I'm telling you, it would have been the right thing to do, to raise it with me, but apparently it never was an issue.

Q. And with respect to the third-party vendors, your testimony to me is that, correct me if I'm wrong, is that it was Daphne's responsibility to ensure



JOSEPH BAMIRA

the enforcement of contractual restrictions that Elephant Group placed upon third-party vendors with respect to outbound telemarketing calls; is that correct?

A. Yes. Because she made sure that all the vendors that worked for us, they all signed -- basically in their contract was a copy in that respect of the contract with ADT. So they all signed that this is what they're going to do. It was, I think, word-by-word of what ADT requirements were.

Q. That would be a legal issue. So would Daphne have reported -- would you have the ultimate responsibility in the company for making sure that Daphne was enforcing the compliance with these provisions? Is that your responsibility?

A. Again, this is execution.

Q. Correct.

A. So if there was no problem with the execution, she would not come to me. She knew what has to be done, and



JOSEPH BAMIRA

she had her pretty much instructions, and I think she did it.

Q. Were there any written guidelines for Daphne about what she was supposed to do to ensure the vendors' compliance with these contractual provisions?

A. I don't know.

Q. Was there any formal reporting structure that required her to report to you with respect to their compliance with these provisions?

A. There was not a reporting structure, but she knew that she comes to me because I got involved if there was a problem, and if she got into a problem and it's a legal situation, she would come. She has her own -- you know, she is an intelligent woman. She didn't fail us. So if there was no issue, she knew, when there was a problem, she would come.

Q. So you delegated pretty broad authority to Daphne to ensure compliance with these third-party vendor contracts;

JOSEPH BAMIRA

is that correct?

A. Yes.

Q. And what did --

A. It's not even so much that I delegated. That was her job. So I didn't say, hey, you know, that is part of her job, to make sure that all the things, provisions and instructions, are being executed.

Q. So unless a problem arose, you would not be checking on what Daphne was doing to ensure the compliance with these contracts; is that correct?

A. That's true, yes.

Q. So --

A. Just let me correct.

Q. Sure.

A. I might have occasionally asked her are there any issues, any problems. But there was general conversation. It was not like a report on specific things.

Q. Water cooler?

A. Yes.



JOSEPH BAMIRA

Q. So what did Daphne do to ensure the third-party vendors' compliance with this provision?

A. Listen, I heard her testimony, so I can't quote her. I cannot recall her testimony. I don't know all the things she has done. But I understand that in this particular situation that she went to the vendor, she listened in to calls. She wanted to understand how they bring it in. She, from time to time, especially when people complained, she checked if they had on the websites the right wording, because she knew I would check with her, and so she knew she's responsible for it. So whatever she did she has done, but I don't know everything she has done.

Q. And you have that knowledge because you were present at her deposition and heard her testimony?

A. No, no, no. I didn't -- I only said that because it's what came to my mind right now.



JOSEPH BAMIRA

No, sometimes complaints would come in. I would ask her, did you do this, did you do that. And complaints did come in. And people claimed all kind of we called, we didn't call correctly, or that we called them without them opting in. And so every time I checked, you know, she was responsible to bring the call, and the data on the opt-in, and does the vendor have the opt-in, a copy of the opt-in. And so since that happened, not very frequently, but it happened, I pretty much knew that she's doing the right thing, because she always supplied me with the right answers, and she showed me that actually the instructions were followed.

Q. So how did Daphne ensure that the companies who were barred from making unsolicited outbound telemarketing calls, in fact, were not making unsolicited outbound telephone calls?

A. I don't know how she was making sure, but I will tell you -- you



JOSEPH BAMIRA

know, if somebody wants to make outbound calls unbeknown to us, under the radar, unless somebody complains, took complaints, and says he got an unsolicited outbound call, it's no way to discover it. And I don't know what she's done exactly. It's very difficult. If people want to break the law, you cannot always know about it, because they don't do it for you to know that.

Q. Isn't it true that, in fact, Daphne -- because I was sitting here also for Daphne's testimony. But wasn't it true that Daphne testified that, in fact, the third-party vendors that you used in turn used subvendors, and that she did not inquire into the subvendors' identities because that was the secret source, quote-unquote, that she felt was out of --

A. I'm not sure that was her words, but --

MR. SCHULTZ: Hold on. Let e just object to the form of the

JOSEPH BAMIRA

question, please.

I object to form of the question.

Q. You can answer.

A. I don't remember her exact words, so I cannot relate to exactly what she said. I think what she said is that they would not disclose the names, only because it's a commercial relationship, and people will not tell you how they always do what they do. They just contract that they do it correctly, because they are afraid you will go directly to them and circumvent them. So that's a way for them to keep their business. And even if you could ask, nobody will give you the list of the names.

So I suppose that some of the things you have to rely on them that they fulfill the contract, and sometimes you just have to rely on that.

Q. So you would rely on the third-party vendor to enforce the ban on



JOSEPH BAMIRA

outbound telemarketing calls on their vendors; is that correct?

A. I would say that, to the extent that they had, not all of them had subvendors, not all of them made calls. Again, it is basically they were hired for people who do opt-ins, in other words, give permission for people to call. It was never designed for people just to make blind calls, unsolicited calls.

And, yes, it is that we had to rely on them because they would not give us the third-party names.

But, you know, again, if there were issues, or frequent problems, people complained, if it was a little bit more than, you know, if it was really justified a complaint, we would fire them. So they knew that we would not keep them. To what extent does it always help? Probably not always helps.

Q. So if you didn't know the identities of the third-party vendors'



JOSEPH BAMIRA

subcontractors, then you wouldn't know how the third-party vendor had filtered or vetted the subcontractors in the first place; correct?

A. You have to ask that -- you know, she worked with that every day, so you have to ask Daphne. I don't know the answer to that, because that was her responsibility.

Q. But just --

A. I really don't know the answer to that.

Q. It is really just a matter of logic, isn't it? If you don't know who the subcontractor is, you can't possibly know what the qualifications of the subcontractor were?

A. Correct.

MR. SCHULTZ: I object to the form of the question. It's been asked and answered. You can still answer. Or you can still try to.

Q. Another groundrule. You can only not answer a question if it raises a



JOSEPH BAMIRA

question of privilege, and then your lawyer will tell you do not answer that question. Otherwise he can make whatever objections he wants to make. You still have to answer the question.

A. No, I know. I pretty much know the rules. Please repeat the question.

MR. McNEW: Could you read the question back, please.

(The pending question was read.)

MR. SCHULTZ: I noted an objection.

A. I don't have an answer to that, because Daphne worked with them. So I don't know if she asked in general, and if she checked from time to time, or I don't know what she did for that.

Q. Is it fair to say that you yourself had no involvement in ensuring that the subcontractors, your third-party vendor's contractors, abided by the terms of the ADT contract?

JOSEPH BAMIRA

A. I was not involved. But I will tell that -- and, again, you have to know, I don't know how many of them actually had subcontractors. I'm not even sure that Daphne would allow them to have subcontractors. And it assumes that all had subcontractors. I don't know if that's the case. So you have to ask her how she exactly assured that that would happen.

Q. Do you know if Daphne barred your third-party vendors from using subcontractors?

A. She might have, she might have not. I don't know. You have to ask her.

Q. We are both in a deposition --

A. I don't remember, so let's look at the deposition. I really don't remember. Frankly, I don't.

Q. So let me refresh your recollection with what Ms. Fernandes testified at a deposition. This is at page 107 of her transcript, and I will just read it to you.



JOSEPH BAMIRA

"Question: But Paramount never disclosed to you from whom they obtained that lead? Is that correct?

"Answer: Correct.

"Question: And Saveology never required Paramount to disclose from whom it obtained a lead?

"Answer: The name, no. Because of the secret source."

Skipping ahead a few lines on page 108.

"Question: As a matter of practice, did Saveology ask Paramount to disclose the names of its third-party lead vendors?

"Answer: Again, it's their proprietary information.

"Question: So, no?

"Answer: No."

So wouldn't you agree that Daphne Fernandes was aware that your third-party vendors were using subcontractors to perform the ADT contract?



JOSEPH BAMIRA

MR. SCHULTZ: I object to the form of the question to the extent it mischaracterizes the testimony.

Q. You can answer.

A. I really think that whatever refers to her testimony should be asked her. But if I may put an interpretation on what she's saying, I think she's talking about people who operate websites, not about people who make calls. And I don't think that we were permitted to have other people qualify and make calls.

So this is what websites, who are the vendors with whom they worked to operate the websites, to bring in the opt-in calls.

Q. What did Daphne Fernandes do to ensure that those subvendors adhered to the restrictions of the ADT contract, or the restrictions of your own contract with the vendor?

A. Again, it's my understanding of what she's saying. What she's saying



JOSEPH BAMIRA

is the operator of websites, the websites has only two requirements, in my opinion -- I don't know, maybe she had others. But to the extent that you operate a website, obviously it could be a website which adheres to all the regulations, such as I opt in, I agree to be called by a security-related company. And they would then give this list of people that agreed to our vendor. That is, the requirement was that the website should have these particular wordings.

How she made sure or not sure, you have to ask her. But, again, they would not let her know who are the operators of the websites. But these are not people who made calls. It's very different.

Q. First of all, you yourself had no involvement in ensuring -- the Elephant Group contract's bar on outgoing telemarketing calls by its third-party vendors, you weren't involved in the enforcement of those

Page 38

JOSEPH BAMIRA

contract provisions; correct?

A. Again, we have not made outbound calls. This was prohibited across-the-board.

Q. I am speaking about the contracts with your third-party vendors.

A. The contracts were not allowed -- they were not allowed to make calls, outbound calls, period, not them and not their vendors.

Q. And my question to you is, were you in any way involved in making sure that your vendors obeyed those provisions?

A. I was involved to the extent that, you know, people do complain. They are not shy about complaining and suing if they can and make, in many cases, make a little bit of money. And whenever I asked for the website, for the opt-in, for the wording, I was supplied with that. So there was nothing there.

Q. In the absence of a complaint, were you in any way involved in ensuring

Page 39

JOSEPH BAMIRA

the enforcement of these contractual provisions?

A. No.

Q. In the absence of a complaint, what did Daphne Fernandes do to ensure that the vendors were complying with this contractual provision?

A. Again, you have to refer to her testimony. I will not try and tell you what Daphne did.

Q. You are not aware of what Daphne did?

A. Not in specifics, no. That was her job.

Q. Anyone else in the company aware of what Daphne did?

A. I doubt it. She was responsible for it.

Q. And with respect to the enforcement of that provision with the vendors' vendors, the subcontractors, in the absence of a contract, did Daphne Fernandes do anything to ensure that the vendor was enforcing this on its

Page 40

JOSEPH BAMIRA

subvendors?

A. You have to ask her, again. But again let me just say one thing. I doubt that you put vendors and subvendors in the same categories. Vendors had one function. How they get the calls, how they get the opt-ins, this is what the operation was, opt-ins, it was not outbound calls. This was opt-ins. So to the extent that they knew that they have to have a website that has to contain this thing, I think that from time to time she checked. You have to ask her. If somebody strayed away from this, I don't think we knew about it or could have known about it.

Q. I am not making distinctions because I am trying to understand a process I think doesn't turn on that distinction. I am trying to understand what, if anything, Elephant Group did to make sure that a vendor of its, like Paramount, take Paramount as an example, what Elephant Group did -- what your

Page 41

JOSEPH BAMIRA

testimony to me is that when Elephant Group signs a contract with a company like Paramount, that it has a provision in that contract that says you cannot make outbound unsolicited telemarketing calls.

A. Correct.

Q. Paramount, in turn, goes out and hires a company, EMI. What did Elephant Group do -- in the absence of a complaint, what did Elephant Group do to ensure that its contractual restriction on Paramount was enforced in Paramount's relationship with EMI?

A. They were not allowed to hire EMI. EMI is not a web operator. They were not allowed to hire EMI.

Q. And so --

A. So if to the extent they wanted to hire EMI, then they would have come and said we want to hire EMI, and we would have checked them out, and we would have probably, same as we do to Paramount we would have done to EMI. EMI was

JOSEPH BAMIRA

against the understanding of the contract. They were not allowed to hire them. They were not supposed to hire them. It was not what we were doing, all that we did in order to get calls in. Because if we wanted to get EMI, we could have hired them directly. We don't need Paramount. We knew about EMI. We could have hired them. We did not. So why would we allow a subvendor to hire the same person, just closing our eyes. They were not allowed to.

Q. And so what enforcement mechanisms, if any, what did you or Daphne do to make sure that a company like Paramount could not hire a company like EMI?

A. You have a contractual agreement with a company. There's a little bit control that you can expect to exercise over an independent contractor. They have their offices. They are not geographically the same place. What they do in a back room, or unbeknown to us, or



JOSEPH BAMIRA

undisclosed to us, is impossible to really ascertain. Unless you want to sit there 24/7, have a police type of operation, and make sure that every person in that company is really abiding by every particular law, and might as well be your company.

So when you hire a vendor, in any business, then they have a certain amount of -- not discretion. They have to abide by the contract. If not, they are in breach of contract. You cannot sit there and look at the time all the time, because if that were the case ADT should have been sitting in our office 24/7 and do the same thing.

There is a certain amount of responsibility which goes with the contract, and unless it's shown that somebody breached a contract, it's very hard to discover it.

Q. And isn't that the reason why companies put indemnification provisions in their contracts, so that when there is



JOSEPH BAMIRA

a breach, the responsibility of the breach lands on the company, whoever saw the breach?

A. A, you are asking me a legal question, so I --

Q. You are the legal guy.

A. Yeah, but I will give you -- listen, I will not give you probably a legal opinion. I'm not allowed to. But I will tell you that indemnification usually is for the purposes that the company did something wrong, not people who are under -- are not under the company's control. And indemnification doesn't say that. So to the extent that indemnification provisions, they are for wrongdoing by the company.

Now, yes, you can sometimes claim supervision, all kind of things, that is wrong with the company. But the indemnification is really to try and make sure that everybody is trying to do the right thing, and reasonable thing, which is under control, to fulfill the



JOSEPH BAMIRA

contract. That's what indemnification is. We cannot always know what a subcontractor does, because he is not entirely 24/7 under our control. We can check from time to time, like Daphne did. She went to the offices. She listened to call. We checked, when we did get complaints, that things were done correctly.

Q. Whose offices did she visit?

A. I'm sorry?

Q. You said she visited offices. Whose offices did she visit?

A. She did.

Q. Whose offices?

A. Paramount's offices. She testified to that.

Q. What were the names of the other third-party vendors that Elephant Group used, apart from Paramount?

A. I don't remember all their names. One of them was Savelo. I don't remember the names exactly.

Q. How many were there?

JOSEPH BAMIRA

A. I don't know. Not many. I think you were given the list. So that's a better source.

Q. Actually, we weren't. We don't know the names. Do we have a list?

MS. GOLDBERG: No.

Q. If there is a list, can we have it?

A. I don't know if there's a list. But you can find out who we worked with. You can ask Daphne who she worked with. I think she mentioned names. You asked her. She mentioned names.

Q. She mentioned Visor. Does that sound right to you?

A. What name?

Q. Visor.

A. No.

Q. So apart from Daphne and you, would there be anybody else in the company that would be aware of affiliates being engaged to perform the ADT contract?

A. Aware in what form? Just



JOSEPH BAMIRA

information?

Q. I am trying to understand how a company of your size could effectively put all of the responsibility for performing a contract of this size on the desk of Daphne Fernandes, with apparently no systemic oversight. And I am asking a bunch of questions to try and figure out the reporting structure, and you keep telling me, well, if there was a legal issue that arose, she would talk to you. But to no one else --

A. Listen, on her relationship with vendors, there was the marketing people, there was Benny Aboud. She was not an island. And if she had issues with vendors, she would go from the marketing side, I have an issue with a vendor, I would like to fire him and get somebody else. That would not be coming to me. That would be probably going to the marketing department.

But she would be smart enough to know when she has a problem and when



JOSEPH BAMIRA

she doesn't have a problem, when she needs to replace somebody, when she doesn't need to replace. She was not doing it on her own, full discretion, nobody knows what she's doing. That's not the case.

Q. She wasn't smart enough to avoid this lawsuit, was she?

MR. SCHULTZ: Objection. It was ADT that wasn't smart enough.

A. That's an observation that you are entitled to make.

Q. You said that if she had a problem with a vendor she would go to marketing. What type of problems with a vendor would lead her back to the marketing department? Who in the marketing department would she report to?

A. You ask her. I think she talked to Reid Shapiro, who was overall in the marketing. But she might have talked to -- you know, there were different marketing people over time. So I suggest you ask her. I'm not sure.



JOSEPH BAMIRA

Q. Reid testified yesterday that she did not report to him.

A. She was not directly reporting to him.

Q. Reid also testified that he didn't know who was in the marketing department. But your testimony is that Reid was the head of the marketing department?

A. No, I did not say that.

Q. I'm sorry. Please explain.

A. I said he probably was aware. But the marketing department, people from time to time changed, and then ultimately, I think it was a bigger marketing issue, I'm just speculating, she would probably talk to Benny Aboud. I don't know. You would have to ask her.

Q. So what kind of marketing issues would lead her to the marketing department on the ADT contract?

A. You have to ask her.

Q. So you are generally unaware of what Daphne Fernandes did in terms of

JOSEPH BAMIRA

how she reported to the marketing department; is that correct?

A. Not enough to testify here. You have to ask her.

MR. McNEW: Can we take ten minutes.

(A recess was taken.)

BY MR. McNEW:

Q. Let me backtrack and o what I normally do at the beginning of the deposition.

Are you currently working at Elephant Group?

A. No.

Q. When did your employment terminate?

A. April 6.

Q. Are you working now?

A. I'm trying to be an entrepreneur, with a few things here, but I'm not employed.

Q. You are not on a salary with another company?

A. No.



JOSEPH BAMIRA

Q. Do you have any contact now with Elephant Group?

A. Yes, I do. I'm still on the board, and that's pretty much it.

Q. Do you draw a salary for your board work?

A. No. I think the company has no money so there's no salary, but at some point it will be, I suppose. I don't know how long I will stay on the board. But eventually I must guess that they will pay a salary, whatever they do.

Q. Does either Benny or Reid sit on the board also?

A. Benny does. Reid not.

Q. Do you know if Benny has any continuing relationship with the company, apart from his service on the board?

A. I think pro forma he has some consulting agreement. I don't think he has a relationship. You have to ask him. I'm not sure what he does.

Q. When did you join Elephant Group?



JOSEPH BAMIRA

A. The year 2000.

Q. Did you create the Elephant Group?

A. Elephant Group is evolved -- it wasn't really created -- evolved from a different company, which really the first one was Benny. I was not around in, I think, '98 or something like that. But it evolved from a different company.

Q. And did you join before or after Reid?

A. After.

Q. So first Benny created a company. Do you remember the name of that company?

A. I'm not sure if it was Direct Communications, something like that, which was two or three, which was a subsidiary of a company where Benny worked, and he decided to create a division. I'm not sure. But eventually they created a separate company, which then was separated from the company which created them.



JOSEPH BAMIRA

Q. And so you joined the company in 2000?

A. Correct.

Q. And what positions did you hold in the company? Walk me through your tenure with the company.

A. When I joined initially, I was a consultant. And then I became the CFO. And after that I became the chairman.

Q. Do you have an equity interest in the company, or did you have an equity interest in the company?

A. Yes.

Q. When did you acquire that?

A. In 2001, I think.

Q. You said you initially joined as a consultant.

A. Yes.

Q. What was the substance of your consulting work?

A. Help Benny develop the company, and see if they can raise money in the public arena.

Q. And what was your experience

JOSEPH BAMIRA

before coming to Elephant Group? Where did you work before Elephant Group?
A. I worked for a broker-dealer by the name of Josephthal.
Q. Can you spell the last name?
A. T-h-a-l, Josephthal, t-h-a-l, Lyon & Ross.
Q. And what was your work at Josephthal?
A. I was managing portfolios, but I was doing also investment banking.
Q. So your background was more in finance?
A. No. I had sufficient knowledge of finance to work in finance, but my background is really more in marketing and in management.
Q. And so when you came to work at Elephant Group as a consultant, the subjects of your work were in enlarging the business and making it an attractive company for investors?
A. Yes.
Q. Did you have any background in



JOSEPH BAMIRA

telemarketing or in Internet marketing?
A. No.
Q. Did Benny?
A. You have to ask Benny. I'm not aware of it, but you have to ask him.
Q. And how about Reid?
A. Same answer.
Q. So when you first came in 2000 you were a consultant. When did you become the chief financial officer of the company?
A. About 2001, or shortly after the end of 2001. Maybe early 2002. But don't hold me to it.
Q. Was this about the time that you acquired an equity interest in the company?
A. Yes.
Q. And how was the equity divided? There were three equity owners; is that correct?
A. Correct.
Q. You, Reid and Benny?
A. Yes.



JOSEPH BAMIRA

Q. How was the equity divided among the three of you?
A. Benny had 76 percent. Reid and I each had 12.
Q. What did you give the company in consideration for the equity share?
A. Service.
Q. You didn't make a capital contribution?
A. No.
Q. When did you become chairman of the company?
A. I would say 2008. 2007 or '8.
Q. Had there been a chairman before 2008?
A. No.
Q. So it was a new position that was created?
A. I would believe so.
Q. And what were your functions as chairman?
A. Basically, to overall -- what chairmen of boards do, you know, get involved in things that they think it's



JOSEPH BAMIRA

fit to get involved with, and have an overall say in the direction of the company.
Q. So you say you were chairman of the board. You had a board of directors?
A. Yes.
Q. And who sat on the board in 2008?
A. A representative of Equistaff, Benny and myself and Reid.
Q. And who is Equistaff?
A. It's a public company which owns DISH Network.
Q. When did Equistaff take a position in the company?
A. Again, I believe end of 2007, but I'm not sure exactly. The second half of 2007, I believe.
Q. Did the company have a board of directors before Equistaff acquired an equity interest in the company?
A. No. It was just us three.
Q. So the company created a board

JOSEPH BAMIRA

of directors to create a structure for an outside investor to come in and put money into the company; is that correct?

A. Specifically, for them to come in, yes.

Q. And how large was the equity share that Equistaff took in the company?

A. I think 22 percent.

Q. And what was the capital contribution they made in exchange for the 22 percent stake?

A. I think -- it was a little bit more complex. It was not a straight capital contribution.

Q. Explain for me, please.

A. I don't remember the details, really, so I don't want to testify to something that may not be accurate. But I would say in the magnitude of -- because they paid us for different things, I would say around $40 million, or $37 million. But I don't remember the composition to tell you exactly what is equity contribution because they have had



JOSEPH BAMIRA

some a claw, so we had to pay them back $10 million. So it ended up probably at the end of the day to be about 28, 27. I don't remember exactly how it evolved.

Q. So based on the size of their contribution and the size of the equity position they took, the company at that time was worth roughly $200 million?

A. That's a very good question. If just go straight valuation, you could probably make that calculation. But it was not the value of the company at the time, never was, because they paid us to ensure a flow of business, so to them it was worth whatever it was worth. But it had nothing to do specifically with the value of the company. The value of the company was really not somebody looking at EBITDA, multiples, and things of that nature. We had a particular value to them, which we would not have to any other third-party investor, because we really gave them a fairly substantial flow of business, so to them that was



JOSEPH BAMIRA

part of the value.

Q. So Equistaff took a position in Elephant Group because it wanted to feed leads to DISH Network through Elephant Group? Is that what you are saying?

A. No, leads is not the right word. We were one of the marketing partners of Equistaff, and we sold for them. And, yes.

Q. I apologize for using the wrong word. You have been doing this longer than I have.

A. No, no. I'm just trying to be a little bit more accurate.

Q. And I appreciate that.

But the bottom line was that the company had particular value to Equistaff because of the synergy it would provide with DISH?

A. Correct.

Q. Whereas an arm's length investor, investing strictly on an EBITDA basis, might assign it a lower value?



JOSEPH BAMIRA

A. Yes.

Q. Did you remain the CFO after you became chairman of the board?

A. Yes. Actually, let me correct that.

Q. Sure.

A. No. Pretty much shortly after we finished I became chairman, and we took somebody else as the CFO.

Q. Did you remain involved in the finances of the company, the financial reporting of the company?

A. Not directly, no. I mean, for a while I assisted, and as time passed by my direct involvement was less. Obviously I saw reports, I had comments, what a board member or chairman would do.

Q. Did you continue to be a marketing partner of DISH Network through 2011?

A. Yes.

Q. And today?

A. Yes.

Q. And about how much of your,

JOSEPH BAMIRA

whatever measure you want to use, NOI, reverse revenues, about how much of Elephant Group's revenues, pick a year, 2010, would have been attributable to the DISH contract?

A. I have to look it up. I don't remember.

Q. Just rough. I'm not asking for a number. It's not a memory test.

MR. SCHULTZ: You are asking him to speculate?

MR. McNEW: No, I am not asking him to speculate. I am asking him to give me a rough idea of how much of the company's business was attributable to DISH.

MR. SCHULTZ: If you can't do it, don't do it.

A. I cannot do it. I really don't. Because it went through all kinds of --

Q. More than half?

A. No, no, not even close.

Q. More than a quarter?



JOSEPH BAMIRA

A. Not even a quarter.

Q. So what about the ADT contract? In 2010, about -- again, I am not asking for a number. As a rough percentage, was it less than half of Elephant Group's business?

A. Yes, quite a bit less.

Q. Less than a quarter?

A. I would say so.

Q. Less than 10 percent?

A. 10 percent is probably -- I don't know. I don't remember. You asked me, but I don't know. It was less than a quarter.

Q. But it was an amount that had a material effect on the company's financial performance?

A. Every relationship we had had an effect on the performance.

Q. You are a finance guy and CFO, or at least former CFO, so I'm using material in an accounting sense. Did the ADT contract have a material effect on the balance sheet of the company?



JOSEPH BAMIRA

A. It's hard for me to answer because I don't know your definition of "material." It definitely had an impact.

Q. Are you familiar with GAAP?

A. Yes.

Q. Generally Applicable Accounting Principles?

A. Yes.

Q. You understand how materiality is used under GAAP?

A. Again, I'm not an accountant, so I cannot tell you that I want to voice an opinion.

Q. Can you tell me about what happened with the ADT account after the filing of the Desai lawsuit?

A. What happened to the account? Okay.

Initially, not much.

Actually, it was supposed to go up, because ADT approached us to expand our operation with them. Actually, asked us to go through a due diligence on our operation, because they wanted to give us



JOSEPH BAMIRA

part of their own call center's overflow, so they wanted to give us some of their calls to go through us, to answer it.

We went through an extensive three, four, five months, because they couldn't find anybody who can pass that due diligence in the sense of a compliance point, and then hired an attorney from Ohio to come in and check us in the name of ADT. So that went on for four or five months. And then eventually it didn't go through, for a myriad of reasons.

And after that, maybe half a year later, the business slowed down, but actually, because I am not sure of the exact reasons, but ADT sent also a legal team and asked us to vet all the different people we were working with, which they did, and pretty much okayed all the people who worked with us.

And then when the actual litigation started, it started going south, obviously.

JOSEPH BAMIRA

Q. So everything you were just describing was before the institution of the lawsuit?

A. No, that is after. Everything I said is after the lawsuit. You said after the lawsuit.

Q. I thought your last remark was after the litigation began everything started heading south.

A. Correct. Because, you know, it took some time for this whole litigation to develop. And obviously we met, and over a few months we had mediation attempts, and things started to go south.

Q. You mentioned mediation. Explain that a bit.

A. Explain to you in what way?

Q. You said there were mediation efforts. Can you describe what the mediation efforts were?

A. Yes. ADT got the different vendors they sued into a room and said we would like everyone, we have to settle



JOSEPH BAMIRA

this case, for reasons A, B, C and D, and we want each one of you to get that much money so we can settle the case. And we were about five or six. And initially I think everybody rejected that, all of the people they invited.

And then subsequently there was a formal mediation up in Boston, I think three of them. The first one I didn't even go.

Q. You did not go to the first one?

A. No, I did not go to the first one.

Q. Why did you not attend the first one?

A. We sent legal representation. I didn't want to go because I didn't think we had anything to do with it. So I didn't want to appear in mediation, which could imply that we had any -- because nobody showed us any evidence that the calls even came to us, this particular Desai. We never had the



JOSEPH BAMIRA

calls. We could not trace any interaction with this particular complainant.

But then, obviously, we wanted to maintain the relationship with them, and we were willing to work because obviously we had a commercial relationship, so we were willing to entertain doing our part.

And so for the second, which didn't amount to much, too, and then there was third it attempt, the last two I attended, and that's what the mediation was.

Q. Do you remember who the mediator was?

A. The name of him?

Q. Yes.

A. No.

Q. Does Eric Green sound familiar?

A. It could be. I'm not good at retaining names, seriously.

Q. When you say that ADT



JOSEPH BAMIRA

addressed the group and asked for contributions, was there an individual who you recall who made that demand from ADT?

A. First was a group meeting with the attorneys for ADT. And then we were taken, each one of us, to a side room. I'm not sure if Hannah was present or not. I can't recall exactly who was present in the group.

Q. By Hannah, you mean Hannah Lim?

A. Hannah Lim, sorry.

Q. And you say in the first of the three mediations you attended by sending counsel; is that correct?

A. Correct.

Q. And who was the counsel that you sent to the first mediation?

A. My good friend to the left.

Q. That would be Jim Schultz?

A. Yes.

Q. When ADT said it had to settle this lawsuit, did you in any way object

JOSEPH BAMIRA

with that assessment?

A. Yes, because -- let me put it this way: They gave three different reasons. At least two I remember. One of them, they believed that the judge who was hearing the case is a pro-plaintiff judge, or consumer judge, and so they were concerned with that.

They were concerned that it was a very big number of calls made over the years, and so that the exposure to them is about, I don't know, two or three billion dollars, I'm not sure exactly what number it was. They were concerned that that overhangs their balance sheet. They did not want that to overhang their balance sheet.

Q. That would be a material risk.

A. I agree with you, that's a material risk, especially since I think they were planning on separating from Tyco at the time. And so it was important to them t settle. They believed that the value of the settlement



JOSEPH BAMIRA

was about $15 million, and they believed that, given the exposure, and given the relationship, and that we are the major -- because at the end of the day I think they sued, I think, 13, or 12 or 13, but there was only four left standing because everybody else I think pretty much went bankrupt. So, based on the exposure, but also the fact that we do business, it's probably a better business decision to settle it.

Q. Do you disagree with that?

A. Not from their perspective. I understand where they came from. And I did understand that a relationship has some value. But I did not agree to contribute. Obviously, we didn't agree initially.

On a legal base, if ADT as a defendant would have a good chance, I think, given the TCPA background of that, it think they had a pretty good chance. But, you know, even if the chances are small, which I pointed out, and that they



JOSEPH BAMIRA

will be certified, I don't think they had a great chance of being certified, but even if the chance was small, given the number that they faced, the probabilities, probably from their perspective, it was probably on good decision.

Q. In fact, a $15 million settlement of a $2 billion risk is a pretty good deal, would you say?

MR. SCHULTZ: Objection.

A. I don't know. Yeah, if you have to choose between losing 15 and risking 2 billion, if that's the case, the mathematics is probably fair.

Q. So it is your testimony that, from ADT's perspective, you think the settlement was a reasonable settlement?

MR. SCHULTZ: I object to the form.

MR. McNEW: I am just repeating what he said.

A. Listen, I understood in what shoes they were standing.



JOSEPH BAMIRA

Q. Why did you say ADT had a good defense in the case? You said that ADT probably could have --

A. Listen, I don't remember all the details. But at the time I looked at it, you know, and I think a few of us in the meeting raised why don't we fight it, you know. And I don't remember all the different reasons, so I don't want to repeat it. I didn't look at the case in a long time. But that was my impression at the time.

Q. Did you voice an objection in any of the mediations to the $15 million settlement?

A. I was not asked about it. I was not asked to contribute my opinion on any of the negotiations with the plaintiff.

Q. Why do you suppose you were asked to attend the mediations?

MR. SCHULTZ: Objection to form.

A. So we would make our

JOSEPH BAMIRA

contribution to ADT. I never met even the other side. I don't even know how they look.

Q. They are pretty scary-looking.

A. I can see, because they sued ADT again. So, professional, whatever. I agree they are not nice people.

Q. My memory fails me. That's why I was asking my colleague. She is failing me, too. So I have to ask you again. In any of the mediations, and I think I know what your answer was, and I apologize, and he will say asked and answered.

A. Whatever you want, I'll repeat.

MR. SCHULTZ: I object to form.

Q. He even made the objection before I asked the question.

So you did not voice an objection to the $15 million settlement; is that correct?

A. I was not asked.



JOSEPH BAMIRA

Q. And so I assume from that --

A. I didn't even know that it would end up with 15. That was not during the mediation.

Q. So is it a fair assumption from your answer that because you weren't asked to object you didn't make an objection?

A. Correct.

Q. I am jumping around a little bit. Sorry about that.

A. Just so you understand, the context of the mediation between us and ADT was different than between them and the plaintiff. Our context was third-party notice and indemnification. Theirs was a TCPA case.

Q. There was a hearing in the court to determine whether the $15 million settlement was an appropriate settlement. Are you aware of that?

A. No.

Q. Did your lawyers ever ask you whether you wanted to present an



JOSEPH BAMIRA

objection to the settlement?

A. That's a lawyer privilege.

MR. SCHULTZ: My objection is, to the extent that that calls for attorney-client it's lawyer privilege and he shouldn't answer that question.

MR. McNEW: I think I can ask the fact.

MR. SCHULTZ: You can ask all you want, but he is not going to answer it.

Q. So Elephant Group -- so is it fair to say Elephant Group did not raise objection to the settlement at the settlement hearing in the court?

MR. SCHULTZ: I object to the form of the question.

A. Elephant, as far as I'm concerned, didn't know that there is such a hearing. We were not even asked. So obviously we cannot voice an opposition to something we didn't know takes place or we were not asked. It is just



JOSEPH BAMIRA

technically impossible.

Q. Okay. That's a good answer.

Outside of the mediations, did Elephant Group ever voice an objection to the settlement?

A. We were not asked, and we did not discuss it. It was never raised with us. It was never a subject of a discussion.

Q. You were represented by counsel in the case.

A. And we didn't even know it was $15 million.

Q. You were represented by counsel in the case, were you not?

A. Yes.

Q. Were you aware whether your counsel ever voiced an objection to the settlement?

A. You have to ask him.

Q. I am asking you if you are aware.

A. No, I'm not aware that he raised or not. I'm not aware.

JOSEPH BAMIRA

Q. I want to go back to something else we were talking about earlier. I think it was your testimony that your vendors did not make unsolicited outbound telemarketing calls. Is that correct?

A. Correct.

Q. And it is your testimony --

A. They were not allowed to. I didn't say they didn't. I said they were not allowed to.

Q. And I think it was also your testimony that Elephant Group didn't make outbound telephone calls. Is that correct?

A. Correct.

Q. And your vendor contracts did not permit your vendors to make outbound telemarketing calls; is that correct?

A. Correct.

Q. You said, I believe, correct me if I'm mistaken, I believe it was your testimony that Dan Geiger was aware of Elephant Group's use of third-party vendors to perform the ADT contract. Is



JOSEPH BAMIRA

that correct?

A. Yes.

Q. Is it your testimony that Dan Geiger was aware that third-party vendors were making outbound telemarketing calls?

A. You have to ask him. I doubt it, because I don't think that was part of what we were doing, and so I don't know. But you have to ask him.

Q. But you have no knowledge of Dan Geiger's awareness that your vendors were making outbound telemarketing calls?

A. I cannot tell you specifically if it is not outbound, because I don't have knowledge if it's outbound, so I don't know if he had.

MR. SCHULTZ: I just want to note an objection to the form of the last question, assuming facts not in evidence.

Q. I am just asking, trying to clarify your earlier remark that Dan Geiger was aware of all of this. So I wanted to make what all of this means.



JOSEPH BAMIRA

MR. SCHULTZ: Let him finish.

Q. So if you want to clarify that for me, that would be helpful.

A. I cannot tell you what is he aware or not aware. But I know he was aware that we were using vendors, regardless -- that's what my testimony was -- regardless whether it was asked in writing or it was not asked in writing. He understood the operation. He knew what the operation is. In the depth, you have to ask him.

I don't know about outbound calls. I don't know if he knows about it. That I don't know, in that detail. But he is aware that we used vendors. That he was definitely aware of.

Q. But you have no knowledge that he was aware of your vendors making outbound calls?

MR. SCHULTZ: Objection, again, to the form of the question.

A. Let me repeat, I didn't know, and I don't know if it existed. So I



JOSEPH BAMIRA

cannot tell you that he knows about it because I don't know if it existed. I don't know if anybody told him, because maybe nobody else knew. So I have no such knowledge to tell you that he knew about it, because I don't know.

Q. Perfect.

So let's talk a bit about your third-party vendors. Yesterday when I was talking to Reid we got kind of hung up on this conversation because sometimes I would use affiliates and sometimes I would use third-party vendors, and he would tell me that they were different. In your mind, what is an affiliate? How does it differ from a third-party vendor, with respect to the ADT contract?

A. We did not have affiliates, in this term. This is just now we used the terminology. Third-party vendors are the people who operated the websites.

Q. Would Paramount be a third-party vendor?

A. I'm not sure how they used the

JOSEPH BAMIRA

terminology. You know, however they used -- listen, Reid knows probably better than me, because it's marketing terminology. This is not a legal terminology in that context. It is in the indemnification context, not in that context.

Q. I don't really care what word we use. I just want to make sure we understand each other as we talk.

A. So ask me substance, because I'm not sure myself what the difference is, what Reid referred to, because I wish you would have found out from him.

Q. Unfortunately, he says you are the guy that knows all this stuff.

A. I understand, and it's very good that he thought, but I don't.

Q. So, look, I believe Paramount signed something called an affiliate agreement with you. Does that sound right to you?

A. It could be. I'm not sure. I have to see the agreement, if it says.



JOSEPH BAMIRA

It probably says affiliate, but I'm not sure.

Q. Does that term, affiliate, have any particular meaning to you?

A. No. It is people who we do business with who give us a marketing channel that we hire people. Instead of us doing it directly, then we hire a third party to do it for us, as an affiliate. Whatever function.

Q. So when you are performing the ADT contract and you hire companies like Paramount -- should we call them, for the purposes of this discussion, call them third- party vendors? Does that make it easier?

A. Yes, fine.

Q. I believe it was Daphne's testimony that there were between five and ten third-party vendors that were engaged by Elephant Group to help perform the ADT contract. Does that sound right to you?

A. If she says, if she put a



JOSEPH BAMIRA

number, it's probably true. I think more like five or six, maybe even five. I doubt it's more. She probably has better information.

Q. And two of those would have been Paramount and Savelo; is that correct?

A. That's correct.

Q. Who at Elephant Group was responsible for engaging Paramount to be a third-party vendor on the ADT contract?

A. It's the marketing department. I don't know how they -- you have to ask the marketing department, and probably Daphne. People probably called us, heard about it. I'm not sure.

Q. Do you know anything about Paramount?

A. No.

Q. Do you know anything about how long they were in business before they came to be engaged by Elephant Group?

A. No.

Q. Who did the marketing



JOSEPH BAMIRA

department report to on the engagement of third-party vendors?

A. Can you repeat the question, please?

Q. Sure.

MR. McNEW: Could you read that back, please.

(The pending question was read.)

Q. I will rephrase the question. Who was the individual who made the decision to engage Paramount?

A. I'm not sure.

Q. Was it you?

A. No.

Q. I believe Reid said yesterday it wasn't him. Does that mean it was Benny, Benny Aboud?

A. It could have been Benny. It could have been the head of the marketing department at the time. I don't know.

Q. Who was the head of the marketing department?

A. I don't know. I really don't

JOSEPH BAMIRA

know.

Q. How many hours a week did you spend in the Elephant Group offices?

MR. SCHULTZ: At what time?

Q. In 2008. I believe they were engaged in 2008. Is that correct, the Paramount contract in 2008?

A. No, I don't know that.

Q. I'm sorry, 2010.

In 2010-2011, about how many hours a week did you spend in the Elephant Group offices?

A. 35, 40.

Q. And to whom did the marketing department report?

A. The marketing department reported to Benny.

Q. So your testimony is that the engagement of Paramount would have been done through the marketing department under the supervision of Benny Aboud; is that correct?

A. No, I said I don't know. That's what I said.



JOSEPH BAMIRA

Q. Are you aware of the engagement of the other five to ten third-party vendors that Daphne Fernandes spoke of? Do you know who engaged any of those other companies?

A. No.

Q. Is it likely that Daphne Fernandes made the decision to hire those companies?

A. You have to ask her. I said I don't know.

Q. I believe her testimony was that, in fact, she did.

A. She did or she didn't?

Q. Did.

Are you aware of any due diligence that Elephant Group did with respect to the hiring of Paramount Group before hiring them?

A. You have to ask Daphne.

Q. You have no knowledge?

A. No.

Q. And do you have any knowledge with respect to what the company did in



JOSEPH BAMIRA

terms of due diligence before hiring the other third-party vendors to perform the ADT contract?

A. It wasn't my job, not even with Paramount, to have a check with due diligence. I'm sure they did due diligence, but I have no knowledge. I was not involved in that.

Q. That would have been Daphne Fernandes?

A. Again, I said I don't know.

Q. I am only asking because you said I have to ask Daphne, so I figured --

A. No, I said I don't really know. I know it was done. I don't know who has done it. So you ask me is it likely it is Daphne.

Q. How do you know it was done?

A. Because I was told by Daphne that they looked into these people, they talked to them, and I believe that they understand that they don't want to work just with any Tom, Dick and Harry. These



JOSEPH BAMIRA

are reasonable people. They are not small, little workers in the company. So they had responsibility.

Q. When you say that Daphne said they had looked at them, who is "they"?

A. I don't know. It night have been her. It might have been somebody else. I seriously don't know. I was not involved with that.

Q. So when you say that you know that because Daphne told you, Daphne wasn't reporting to you in the course of her work, because it wasn't something that you were responsible for; is that right?

A. Correct.

Q. Were you aware of any written procedures the company maintained with respect to the engagement of third-party vendors to perform contracts like the ADT contract?

A. I think there was a procedure, and they had to sign contracts.

Q. Was that a written procedure?

JOSEPH BAMIRA

A. Oh, you mean written procedure?
Q. Yes.
A. Could be. I don't know. Maybe it was oral procedure.
Q. Like a manual or --
A. No, I'm not aware of a manual.
Q. And if there was a written procedure, where would it have been maintained?
A. If there was?
Q. Yes.
A. I don't know. I cannot tell you. There isn't such a thing.
Q. Have you ever seen one?
A. What, a written manual?
Q. Well, a page, or a pamphlet, a stapled document.
A. If it had to do with HR, it would be in HR, it would be in the legal department. I don't know this kind of -- we did not have a manual for that, so I cannot tell you where we put it. It's speculation.



JOSEPH BAMIRA

Q. You have never seen any writings in the company about this is what we do, this is a checklist -- for example, this is a checklist of things to make sure that this company is able to do before we decide to hire them to perform one of our contracts? You never saw anything?
A. A written instruction? I haven't seen it. There might have been, but I haven't seen it.
Q. And your only knowledge of any efforts to investigate a third-party vendor before hiring them is Daphne mentioning to you that "they" made that investigation?
A. I think she asked. I think she asked sometimes and if it was ADT. I think she asked Dan Geiger at ADT if they heard about these people. Actually, I think she told me, if my memory doesn't fail me, that EMI got in touch with us, and she asked Dan Geiger, said they are not good people, and we did not work with



JOSEPH BAMIRA

them, or something like that. And so she did ask around, but I don't know. There was no manual or checklist, to my knowledge. But I know that she asked.
By the way, when I said independently, I think the name came to her attention and she asked about it, and she said she specifically did not want to work with them.
MS. LIM: Could you repeat that last sentence.
(Requested portion of record read.)
A. They asked, I said, not she asked. It came to her attention, and she asked about it, and we did not want to work with them subsequently. That's what she was telling me.
Q. So apart from Daphne calling the people at ADT, do you know of any efforts that Daphne made to ensure that the third-party vendors that she was engaging were reliable or responsible vendors?



JOSEPH BAMIRA

A. I will assume she has. But you have to ask her what efforts she made.
Q. I am asking if you have any knowledge.
A. No. Except for her to say to me she has.
Q. Did she explain?
A. No.
Q. Did she ever tell you of any measures that she took, any questionnaires she offered them to ask for information?
A. I cannot recall that.
Q. Did she ever check with the Better Business Bureau of their location, to see if there were complaints filed against them?
A. I don't know that.
Q. Or whether they were capitalized?
A. I don't know that.
Q. Or whether they had another history of complaints that the company

JOSEPH BAMIRA

had received? Did they ever ask about whether they had a history of any alleged violations of the TCPA?
A. I don't know if she has or if she hasn't.
Q. Did she ever check to see if any of the proposed vendors had judgments entered against them for TCPA violations?
A. I don't know what she asked, so if I cannot tell you. If I don't know what she asked, I don't know any particular line item if she asked or not.
Q. What was Daphne's title?
A. I can't recall. We changed titles three or four times. I don't know. I don't remember.
Q. Do you remember any of them?
A. No. I'm not good at that. I usually disregard titles.
Q. Do you remember what her salary was?
A. Not either, no.
Q. Did she make more than $50,000 a year?



JOSEPH BAMIRA

A. Yes.
Q. More than a hundred?
A. I don't know. She might. I don't know.
Q. More than 150?
A. I don't think so.
Q. And when was Daphne hired?
A. I'm not sure. 2006, 2005.
Q. So she was with the company a long time?
A. Yes.
Q. Is she still employed by the company?
A. Yes.
Q. Do you know what her current title is?
A. No.
Q. You don't pay attention to titles.
A. No. Sorry. Maybe I should, but I don't.
Q. That's okay. Life is short.
Who in the company is in charge of TCPA compliance?



JOSEPH BAMIRA

A. Currently?
Q. In 2011.
A. I don't remember who it was. We changed.
Q. Would that have been Daphne?
A. I don't think so, but I don't know. We changed functions and moved people around quite frequently, so it's very hard for me, especially when you are asking about a particular year. It's hard for me to tell.
Q. Can you give me, to the extent that you can recall, can you give me a list of individuals who from time to time had been responsible for TCPA compliance matters in the company? If you work backward from the current persons, until you run out of names.
A. I can't. I just mentioned two names to you, which I mentioned before. I don't remember the other names. Maybe if I give it some time I can think of a couple of names more. But I don't remember.



JOSEPH BAMIRA

Q. What were the names? I'm sorry, I don't remember you giving me names before.
A. I gave you two names before, James Flynn and Mary Couton, or something like that. Didn't I say that?
Q. I don't believe so.
A. I'm quite sure I did.
Q. Flynn is one?
A. James Flynn, right.
Q. James Flynn, you said?
A. Um-hum.
Q. And the second one was?
A. Mary Couton.
Q. Do you remember what Mr. Flynn's title is?
A. He was executive vice president.
Q. What were his functions in the company?
A. He was responsible for vendors relationship primarily in the -- even in ADT, I think. I'm not really sure. You are going to have to ask him.

JOSEPH BAMIRA

But, for the most part, for vendor relationships, and for the compliance. And he wasn't for the compliance all the time. But I'm not sure since when. But he was an executive vice president.

Q. When you say he was in charge of compliance, was he in charge of the compliance department or was he in charge of the kind of compliance issues that we have been talking about today?

A. No, no, no. He was ultimately -- he was not the head of compliance. They reported to him. Okay? He was not the head of the compliance department. They reported to him, I think, as the executive in charge of that.

Q. And Couton?

A. She was the head. She was the direct head of compliance. But there were a few others, and I don't remember their names.

Q. When you say head of



JOSEPH BAMIRA

compliance, you are talking about the compliance department?

A. Yes.

Q. And we agreed earlier that the compliance department wasn't involved in the issues that we have been discussing here today. Is that correct?

A. Correct.

Q. They listened to phone calls that are coming in to Elephant Group to ensure compliance with the requirements --

A. If there were complaints, they were involved. If there were phone calls that people didn't record, or things like that. But they were not in charge of implementation. That they were not.

Can I ask for five minutes?

Q. Absolutely.

(A recess was taken.)

BY MR. McNEW:

Q. We talked a little bit about EMI. When did you first become aware of a company called EMI?



JOSEPH BAMIRA

A. I think after the institution of the lawsuit, but I don't remember when exactly.

Q. I believe it was your testimony that Dan Geiger, that Daphne had inquired about the engagement of EMI with Dan Geiger, and Dan Geiger said that they were bad people. Is that fair?

A. No. I said what Daphne told me, on several occasions, independent of this particular situation, sometimes in the past I think EMI got in touch with her, or however she learned about them, and she inquired about them, if they are good people or not, and she was told that they weren't. That's what Dan Geiger told her. But not in connection to that. Independently of that.

Q. So that was another time?

A. It's another time, yes.

Q. I believe it was your testimony just now that you were not aware of EMI before the commencement of this lawsuit. Is that correct?



JOSEPH BAMIRA

A. That's correct.

Q. Do you know if Daphne had any knowledge of EMI's work with Paramount before the lawsuit?

A. I can only tell you what she told me, and the answer was no.

Q. Do you know anything about the relationship between Paramount and EMI?

A. Not whatsoever.

Q. Do you know if they provided any compliance guidelines to EMI?

A. I don't know. But I think the head of Paramount had a deposition, and maybe you asked him. I don't know.

Q. I'm guessing from your testimony that Elephant Group had no contact with EMI before the lawsuit.

A. No.

Q. Any after the lawsuit?

A. No.

Q. With respect to the mediation, you testified that you attended two of the three sessions. Is that correct?

A. Correct.

JOSEPH BAMIRA

Q. Was there anyone else at Elephant Group --

A. I'm sorry.

Q. Was there anyone else at Elephant Group who participated in the mediations?

A. In the one in Boston?

Q. Yes.

A. No. Just myself and Jim Schultz.

Q. Is it your view that Elephant Group is responsible under the ADT contract to indemnify ADT for the Desai settlement?

A. My view is that they are not.

Q. And why not?

A. Because I think --

MR. SCHULTZ: Let me first object to the extent that anything you would say would be informed by or relate to any discussions we have had regarding the merits of the case. If you could testify as to what you personally believe



JOSEPH BAMIRA

outside of anything you have learned from or you discussed with counsel, can you answer that question.

A. I will not voice -- not because of him, but I will not voice a legal opinion.

Q. Let me clarify. To the extent that you have an understanding of the company's responsibilities, whether oral or legal, you are obliged to give them to me. You are not allowed to disclose a communication that you have had with your lawyers.

A. I understand.

Q. So no communications with them. But to the extent you have an understanding of the law, you have to explain that to me.

A. Nobody showed me any evidence at the time that we were involved in these two particular calls, or however many calls there were, to these two particular plaintiffs. The calls did not



JOSEPH BAMIRA

come to us. We had nothing to do with the calls. We have not made the calls. Nobody on our behalf. We are not the beneficiaries of the calls. We haven't received commission for the calls. So there's nothing there which connects us to this particular case. Except that we are part of ADT's marketing operation. And I believe that it is very difficult, that's my opinion, it's very difficult to come and say, okay, there's 13 people, you all have to indemnify us for the same acts. There's got to be some sort of -- well, that's my legal interpretation. It has to really come and say it's because of you, here's the evidence, you did it.

I did not see such evidence. That's why I did not want to participate in the mediation. I did not think we belonged in that lawsuit. I think it was ADT thrashing out, trying to find somebody to foot the bill.

Q. And when you said through that answer "we did not do," you were speaking



JOSEPH BAMIRA

about Elephant Group; correct?

A. That's correct, yes.

MR. McNEW: I have no further questions.

MR. SCHULTZ: Will read.

(Time noted: 11:45 a.m.)

JOSEPH BAMIRA

Subscribed and sworn to before me this _____ day of __________, 2014.

_________________________________________

JOSEPH BAMIRA

I, JACK FINZ, Shorthand Reporter, certify that I was authorized to and did stenographically report the deposition of JOSEPH BAMIRA, the witness herein, on June 19, 2014' that a review of the transcript was requested; that the foregoing pages numbered from 1 through 105, inclusive, is a true and complete record of my stenographic notes of the deposition by said witness; and that this computer-assisted transcript was prepared under my supervision.

I further certify that I am not a relative, employee, attorney or counsel of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action.

DATED this ___day of________, 2014.

___________________

JACK FINZ

**&**

**&** 2:9 54:8

**1**

**1** 106:9
**10** 59:3 63:11,12
**100** 2:6
**105** 106:9
**107** 34:24
**108** 35:12
**1120** 2:11
**11:45** 105:7
**11c1925** 1:6
**12** 56:5 71:6
**13** 71:6,7 104:12
**15** 3:12 4:17 71:2 72:9,14 73:15 74:23 75:4,20 77:14
**150** 95:6
**1501** 2:16
**19** 1:11 106:6

**2**

**2** 72:10,15
**20** 4:17
**200** 59:9
**2000** 52:2 53:3 55:9
**2001** 53:16 55:13,14
**2002** 55:14
**2005** 95:9
**2006** 95:9
**2007** 56:14 57:18,20
**2008** 56:14,16 57:10 86:6,7,8
**2010** 62:5 63:4 86:10
**2010-2011** 86:11
**2011** 6:18 7:2 61:21 96:3
**2014** 1:11 105:13 106:6,21
**22** 58:9,12
**2385** 2:5
**24/7** 43:4,17 45:5
**27** 59:4
**28** 59:4

**3**

**301** 1:17
**33431** 2:6,16
**35** 86:14
**37** 58:23

**4**

**40** 58:22 86:14

**5**

**50,000** 94:24
**51st** 1:17
**55** 2:10

**6**

**6** 50:18
**60** 8:16
**60603-5130** 2:11

**7**

**70** 8:16
**76** 56:4

**8**

**8** 56:14

**9**

**98** 52:9
**9:10** 1:12

**a**

**a.m.** 1:12 105:7
**abide** 43:12
**abided** 33:24
**abiding** 43:6
**able** 91:6
**aboud** 18:11,24 47:16 49:18 85:19 86:22
**absence** 38:24 39:5 39:23 41:11
**absolutely** 4:6 99:20
**account** 64:16,18
**accountant** 64:12
**accounting** 63:23 64:8
**accurate** 58:19 60:16
**acquire** 53:15
**acquired** 55:17 57:22
**action** 106:20
**acts** 104:14
**actual** 7:18,25 65:23
**address** 3:11
**addressed** 69:2
**adhered** 36:20
**adherence** 13:8 22:9
**adheres** 37:7
**adt** 1:7 2:5,15 7:16 9:10,14,15 10:10 11:2,22 12:9,19,24 13:3,16,18,25 14:3 14:15 15:13,17 20:3 20:5 21:4,5,19 22:2 22:12,18,22 24:11,14 33:25 35:24 36:21 43:15 46:23 48:11 49:22 63:3,24 64:16 64:22 65:11,18 66:23 68:25 69:5,7,24 71:20 73:2,3 74:2,7 75:15 78:25 81:18 83:13,23 84:12 88:4 89:21 91:19,20 92:21 97:24 102:13,14 104:22
**adt's** 12:5 15:14 72:18 104:9
**affiliate** 81:16 82:21 83:2,4,11
**affiliates** 46:22 81:13 81:19
**afraid** 30:14
**agents** 8:10 16:15
**agree** 9:19 35:21 37:8 70:20 71:17,18 74:8
**agreed** 20:24 37:11 99:5
**agreement** 42:20 51:21 82:22,25
**agreements** 18:7
**ahead** 35:11
**al** 1:8
**alert** 22:20
**alleged** 94:3
**allow** 9:23 34:6 42:11
**allowed** 38:9,9 41:16 41:18 42:3,13 44:10 78:9,11 103:13
**allows** 11:19
**amount** 43:11,18 63:16 68:12
**analyzed** 8:14
**answer** 3:22 4:7 6:24 8:10 30:5 32:9,12,23 32:25 33:3,6,16 35:5 35:9,17,20 36:5 55:8 64:2 65:4 74:13 75:7 76:7,13 77:3 101:7 103:4 104:25
**answered** 32:22 74:15
**answers** 18:20 28:16
**anybody** 46:21 65:7 81:4
**anybody's** 13:22
**apart** 45:21 46:20 51:19 92:20
**apologize** 60:12 74:14
**apparently** 22:18 23:20 47:7
**appear** 67:21
**applicable** 64:7
**appreciate** 60:17
**approach** 18:17
**approached** 64:22
**appropriate** 15:12 75:21
**approval** 15:14
**april** 50:18
**area** 13:23
**arena** 53:24
**arm's** 60:23
**arose** 21:16 26:11 47:12

**arrangement** 20:16 20:17
**ascertain** 43:3
**asked** 10:6 13:20 18:18 19:8 26:20 32:22 33:18 36:7 38:21 46:14 63:13 64:23 65:19 69:2 73:17,18,22 74:14,21 74:25 75:8 76:22,25 77:7 80:9,10 91:18 91:19,20,24 92:5,8 92:15,16,17 94:10,12 94:13 101:15
**asking** 44:5 47:8 62:9 62:11,14,15 63:5 74:10 77:22 79:22 88:13 93:5 96:11
**assessment** 70:2
**assign** 60:25
**assist** 13:2
**assisted** 61:15 106:13
**assume** 6:15 7:2 16:20,20,22 23:13 75:2 93:2
**assumes** 34:7
**assuming** 79:20
**assumption** 75:6
**assured** 34:10
**attempt** 68:13
**attempts** 66:15
**attend** 67:16 73:22
**attended** 68:14 69:16 101:23
**attention** 13:23 17:19 21:17 92:8,16 95:19
**attorney** 7:8 65:10 76:6 106:16,19
**attorneys** 2:4,9 69:7
**attractive** 54:22
**attributable** 62:5,17
**authority** 25:24
**authorized** 106:3
**avoid** 48:9
**aware** 9:5 10:5 12:23 13:4,5 15:17,23 19:3 19:14 35:22 39:12,17 46:22,25 49:13 55:6 75:22 77:18,23,24,25 78:23 79:5,24 80:6,6 80:7,17,18,20 87:2 87:17 89:18 90:8 99:24 100:24
**awareness** 79:12

**b**

**b** 3:2 67:2
**back** 7:13 12:7 33:11 42:25 48:17 59:2 78:2 85:8
**background** 54:13 54:17,25 71:22
**backtrack** 50:10
**backward** 96:18
**bad** 100:9
**balance** 63:25 70:16 70:18
**bamira** 1:14 3:1,10 4:1 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1,10 106:1 106:5
**ban** 30:25
**banking** 54:12
**bankrupt** 71:9
**bar** 37:22
**barred** 15:18 22:10 28:20 34:12
**base** 71:20
**based** 59:6 71:9
**basically** 24:9 31:7 56:23
**basis** 5:13 60:25
**began** 66:9
**beginning** 50:11
**behalf** 104:4
**believe** 56:20 57:18 57:20 78:21,22 82:20 83:19 85:17 86:6 87:13 88:23 97:8 100:5,22 102:25 104:10
**believed** 70:6,25 71:2
**belonged** 104:21
**beneficiaries** 104:5
**benny** 18:10,24 19:15 21:11 47:16 49:18 51:14,16,17 52:8,14,20 53:22 55:4,5,24 56:4 57:12 85:19,19,20 86:18,22
**benny's** 19:3
**better** 46:4 71:11 82:4 84:4 93:17
**big** 10:15 16:19 22:2 70:11
**bigger** 49:16
**bill** 104:23
**billion** 70:14 72:10 72:15
**bit** 6:20 14:12 31:18 38:20 42:21 58:13 60:16 63:8 66:18 75:12 81:9 99:23
**blind** 31:11
**board** 38:5 51:5,7,12 51:15,19 57:6,6,9,21 57:25 61:4,18
**boards** 56:24
**boca** 1:17 2:6,16
**boston** 67:9 102:8
**bottom** 60:18
**breach** 43:13 44:2,3 44:4
**breached** 43:21
**break** 7:13 29:9
**bring** 27:12 28:9 36:17
**broad** 25:23
**broker** 54:4
**bunch** 47:9
**bureau** 93:17
**business** 30:17 43:10 54:22 59:15,25 62:17 63:7 65:16 71:11,11 83:7 84:22 93:17

**c**

**c** 2:2,3 5:19,20 67:2
**calculation** 59:12
**call** 8:16 11:9,11,19 11:24 12:5,10 28:6 28:10 29:6 31:10 45:8 65:2 83:14,15
**called** 9:20,22 11:6 12:6,7 28:6,7 37:9 82:21 84:16 99:25
**calling** 92:20
**calls** 8:9,10,15,15,17 9:12,13 10:17,19,22 10:24 11:12,16 12:8 12:11,13,13,15,17,21 15:19,25 16:4,5 21:9 24:5 27:11 28:21,23 29:3 31:2,6,11,12

36:12,14,18 37:18,23 38:4,10,10 40:7,10 41:7 42:6 65:4 67:24 68:2 70:11 76:5 78:6 78:14,19 79:6,13 80:15,21 99:10,15 103:23,24,25 104:3,3 104:5,6
**capital** 56:9 58:10,15
**capitalized** 93:22
**care** 5:8 82:9
**case** 9:24 12:19 34:9 43:15 48:7 67:2,4 70:7 72:15 73:3,11 75:18 77:12,16 102:24 104:8
**cases** 38:19
**categories** 40:6
**center** 2:5
**center's** 65:2
**ceo** 19:7
**certain** 43:10,18
**certified** 72:2,3
**certify** 106:3,15
**cfo** 53:9 61:3,10 63:21,22
**chairman** 53:10 56:12,15,22 57:5 61:4,9,18
**chairmen** 56:24
**chance** 71:21,23 72:3 72:4
**chances** 71:24
**change** 8:23
**changed** 6:20 17:17 49:15 94:15 96:5,8
**channel** 83:8
**charge** 5:4 95:25 98:8,9,10,18 99:17
**check** 10:6 18:21 27:16 45:6 65:10 88:6 93:16 94:7
**checked** 18:18 27:14 28:8 33:19 40:14 41:23 45:8
**checking** 26:12
**checklist** 91:4,5 92:4
**chicago** 2:11
**chief** 2:15 55:11
**choose** 72:14
**circumvent** 30:15
**claim** 44:20
**claimed** 28:5
**clarify** 3:19 79:23 80:3 103:9
**claw** 59:2
**client** 76:6
**close** 62:24
**closely** 13:18
**closing** 42:12
**colleague** 74:10
**come** 7:13 20:11,15 21:23 22:3,7 24:24 25:19,22 28:3,5 41:22 58:3,5 65:10 104:2,12,16
**comes** 25:15
**coming** 47:21 54:2 99:11
**commencement** 100:24
**comments** 61:17
**commercial** 30:10 68:8
**commission** 104:6
**communication** 103:14
**communications** 52:18 103:17
**companies** 9:21 10:21 28:20 43:24 83:13 87:6,10
**company** 7:5,10 11:22 24:18 37:9 39:16 41:3,10 42:16 42:17,20 43:6,8 44:3 44:13,18,21 46:22 47:4 50:24 51:8,18 52:7,10,15,16,20,23 52:24 53:2,6,7,12,13 53:23 54:23 55:12,18 56:6,13 57:4,14,17 57:21,23,25 58:4,8 59:8,13,18,19 60:19 61:12,13 63:25 87:25 89:3,19 91:3,6 93:25 95:10,14,24 96:17 97:21 99:25
**company's** 44:15 62:16 63:17 103:11
**complain** 38:17
**complainant** 68:4
**complained** 13:20 14:7 20:13 27:13 31:18
**complaining** 38:18
**complains** 8:6 29:4
**complaint** 10:6 13:17 14:11 31:20 38:24 39:5 41:12
**complaints** 17:20 20:21 28:2,4 29:5 45:9 93:18,25 99:14
**complete** 106:10
**complex** 58:14
**compliance** 4:13,23 5:7,23,24 6:2,6,7 7:12,14,15,17,21,24 10:16 12:12,23 13:6 13:8,11 16:8,9,13,14 16:18,19,23 17:5,12 17:25 18:3,25 21:19 21:20,21,25 24:19 25:7,12,24 26:13 27:4 65:9 95:25 96:16 98:4,5,9,10,11 98:15,16,22 99:2,3,6 99:12 101:12
**complying** 39:7
**composition** 58:24
**computer** 106:12
**concerned** 70:9,10,15 76:21
**connected** 106:19
**connection** 100:18
**connects** 104:7
**consent** 12:25 22:12
**consideration** 56:7
**consultant** 53:9,18 54:20 55:10
**consulting** 51:21 53:21
**consumer** 70:8
**contact** 51:2 101:18
**contain** 40:12
**context** 21:6,7 75:14 75:16 82:6,7,8
**continue** 61:19
**continuing** 51:18
**contract** 7:16 8:2,5 11:2 12:24 13:3,14 15:13,18 16:2 17:11 20:3,5 21:4,6,20,22 22:2,10 23:8 24:10 24:11 30:13,22 33:25 35:25 36:21,22 38:2 39:23 41:3,5 42:3 43:12,13,20,21 45:2 46:24 47:6 49:22 62:6 63:4,24 78:25 81:18 83:13,23 84:12 86:8 88:4 89:22 102:14
**contract's** 37:22
**contracted** 16:6
**contractor** 42:22
**contractors** 33:24
**contracts** 13:12 25:25 26:14 38:7,8 43:25 78:17 89:21,24 91:8
**contractual** 13:9 16:10 17:2 24:2 25:7 39:2,8 41:13 42:19
**contribute** 71:18 73:18
**contribution** 56:10 58:11,15,25 59:7 74:2

**contributions** 69:3
**control** 11:7 42:21 44:15,25 45:5
**conversation** 23:7 26:22 81:12
**cooler** 26:24
**copy** 24:10 28:11
**corporate** 6:8
**correct** 7:6,7 10:18 11:3,4 16:21 17:4 18:5 19:22 21:24 23:24 24:6,22 26:2 26:14,17 31:3 32:5 32:19 35:4,5 38:2 41:8 50:3 53:4 55:22 55:23 58:4 60:22 61:5 66:11 69:17,18 74:24 75:10 78:6,7 78:15,16,19,20,21 79:2 84:8,9 86:7,23 89:17 99:8,9 100:25 101:2,24,25 105:2,3
**correctly** 8:11,25 28:6 30:13 45:10
**counsel** 2:15 69:17 69:19 77:12,16,19 103:4 106:16,19
**couple** 96:24
**course** 89:13
**court** 1:2 75:20 76:17
**couton** 5:15 97:6,15 98:20
**create** 52:3,21 58:2
**created** 20:6 52:6,14 52:23,25 56:19 57:25
**current** 95:16 96:18
**currently** 50:13 96:2

**d**

**d** 67:2
**dan** 14:19 78:23 79:4 79:12,23 91:20,24 100:6,8,8,17
**daphne** 9:5 14:3,21 15:2,7 17:7,14 18:5 19:20 20:17 23:7 24:16,18 25:5,24 26:12 27:2 28:19 29:13,15 32:8 33:17 34:6,12 35:22 36:19 39:6,11,13,17,23 42:16 45:6 46:12,20 47:7 49:25 84:16 87:4,8,21 88:10,14 88:19,21 89:5,12,12 91:15 92:20,22 95:8 96:6 100:6,10 101:3
**daphne's** 23:25 29:14 83:19 94:14
**data** 28:10
**dated** 106:21
**day** 5:13,13 7:18,18 17:12 20:22,22 32:7 59:4 71:5 105:13 106:21
**deal** 72:11
**dealer** 54:4
**dealt** 7:9
**decide** 91:7
**decided** 52:21
**decision** 71:12 72:8 85:13 87:9
**defendant** 2:4,9 71:21
**defendants** 1:9
**defense** 73:3
**definitely** 64:4 80:18
**definition** 64:3
**delegated** 25:23 26:6
**demand** 69:4
**department** 4:13 5:24 6:2,6,8 7:14,17 7:22 10:16 12:12 13:6,11 16:9,12,23 17:5,15 47:23 48:18 48:19 49:8,10,14,22 50:3 84:13,15 85:2 85:22,24 86:16,17,21 90:22 98:10,17 99:3 99:6
**depends** 4:9 7:19 18:11
**deposed** 3:14
**deposition** 1:14 6:15 27:22 34:17,19,23 50:12 101:14 106:5 106:11
**depth** 80:12
**desai** 1:4 6:17 7:23 8:23 64:17 67:25 102:14
**describe** 5:8 66:21
**describing** 66:3
**designed** 31:10
**desk** 47:7
**detail** 80:16
**details** 58:17 73:6
**determine** 75:20
**develop** 53:22 66:13
**dick** 88:25
**differ** 81:17
**difference** 82:13
**different** 5:7 7:12 37:19 48:24 52:7,10 58:21 65:20 66:23 70:4 73:10 75:15 81:15
**differently** 13:21
**difficult** 29:8 104:10 104:11
**diligence** 64:24 65:8 87:18 88:2,7,8
**direct** 52:17 61:16 98:22
**direction** 57:3
**directly** 5:13,23 15:4 30:15 42:8 49:4 61:14 83:9
**directors** 57:7,22 58:2
**disagree** 71:13
**disclose** 30:9 35:7,15 103:13
**disclosed** 35:3
**discover** 29:7 43:22
**discretion** 43:11 48:5
**discuss** 15:16 23:3 77:8
**discussed** 17:6,7 103:3
**discussing** 99:7
**discussion** 4:3 16:23 77:10 83:15
**discussions** 102:22
**dish** 57:15 60:5,21 61:20 62:6,17
**disregard** 94:20
**distinction** 4:9 40:21
**distinctions** 40:18
**district** 1:2,2
**divided** 55:21 56:2
**division** 1:3 52:22
**document** 90:19
**doing** 13:19 15:21 17:13 26:13 28:15 42:5 48:5,6 54:12 60:13 68:10 79:9 83:9
**dollars** 70:14
**doubt** 39:18 40:5 79:7 84:4
**draw** 51:6
**dribben** 14:23 15:2,6 15:9
**drive** 2:5 3:12
**due** 64:24 65:8 87:17 88:2,6,7
**duly** 3:3

**e**

**e** 2:2,2 3:2 29:24
**earlier** 21:21 78:3 79:23 99:5
**early** 55:14
**easier** 6:19 83:17
**eastern** 1:3
**ebitda** 59:20 60:24
**effect** 63:17,20,24

**effectively** 47:4
**efforts** 66:21,22 91:14 92:22 93:3
**either** 13:16 16:25 18:10 51:14 94:23
**elephant** 2:10 4:3,4 4:14 10:20 24:3 37:22 40:22,25 41:2 41:11,12 45:20 50:14 51:3,24 52:3,5 54:2,3 54:20 60:4,6 62:4 63:7 76:14,15,20 77:5 78:13,24 83:22 84:10,23 86:4,13 87:18 99:11 101:17 102:3,6,12 105:2
**emi** 41:10,15,17,17 41:18,21,22,25,25 42:7,9,18 91:23 99:24,25 100:7,13,24 101:9,12,18
**emi's** 101:4
**employed** 50:22 95:13
**employee** 106:16,18
**employment** 50:16
**ended** 59:3
**enforce** 30:25
**enforced** 13:24 41:14
**enforcement** 7:25 8:4 16:18,25 19:2 24:2 37:25 39:2,21 42:14
**enforcing** 7:15 24:19 39:25
**engage** 10:25 85:13
**engaged** 46:23 83:22 84:23 86:7 87:5
**engagement** 12:25 85:2 86:20 87:3 89:20 100:7
**engagements** 20:4
**engaging** 84:11 92:24
**enlarging** 54:21
**ensure** 11:14 16:9 23:25 25:6,24 26:13 27:3 28:19 36:20 39:6,24 41:13 59:15 92:22 99:12
**ensuring** 12:23 13:7 16:24 18:3 33:22 37:21 38:25
**entered** 94:9
**entertain** 68:10
**entirely** 20:12 45:5
**entitled** 48:13
**entrepreneur** 50:21
**equistaff** 57:11,13,16 57:22 58:8 60:3,10 60:20
**equity** 53:11,12 55:17,20,21 56:2,7 57:23 58:7,25 59:7
**eric** 68:21
**especially** 9:13 27:13 70:21 96:10
**esq** 2:3,3,8,14
**et** 1:8
**eventually** 51:12 52:22 65:13
**everybody** 10:7 13:13,17 16:16 17:13 44:23 67:6 71:8
**evidence** 67:23 79:21 103:21 104:17,18
**evolved** 7:21 52:5,6 52:10 59:5
**exact** 4:15 17:16 30:6 65:18
**exactly** 29:8 30:7 34:10 45:24 57:19 58:24 59:5 69:10 70:14 100:4
**examination** 3:6
**examined** 3:5
**example** 9:8 19:18 40:24 91:5
**exchange** 58:11
**executed** 26:10
**execution** 24:21,24
**executive** 2:5 97:18 98:6,18
**exercise** 42:22
**existed** 80:25 81:3
**expand** 64:22
**expect** 42:21
**experience** 53:25
**explain** 49:12 58:16 66:18,19 93:9 103:20
**exposure** 70:12 71:3 71:10
**extensive** 65:5
**extent** 19:20 31:5,22 36:3 37:5 38:16 40:11 41:20 44:16 76:5 96:13 102:20 103:9,18
**eyes** 42:12

**f**

**faced** 72:5
**fact** 28:22 29:12,15 71:10 72:9 76:10 87:14
**facts** 79:20
**fail** 25:20 91:23
**failing** 74:11
**fails** 74:9
**fair** 33:21 72:16 75:6 76:15 100:9
**fairly** 59:24
**fall** 3:8
**familiar** 64:5 68:22
**far** 76:20
**feed** 60:5
**felt** 22:5 29:20
**fernandes** 15:3 18:5 19:20 23:7 34:22 35:22 36:19 39:6,24 47:7 49:25 87:4,9 88:11
**fight** 73:8
**figure** 47:9
**figured** 88:15
**filed** 93:18
**filing** 23:6 64:17
**fill** 20:9
**filtered** 32:3
**finance** 54:14,16,16 63:21
**finances** 61:12
**financial** 55:11 61:12 63:18
**find** 46:11 65:7 104:22
**fine** 3:23 83:18
**finish** 80:2
**finished** 61:9
**finz** 1:18 3:4 106:2 106:24
**fire** 6:11,12 31:20 47:20
**first** 3:3,24 32:4 37:20 52:8,14 55:9 67:10,12,14,17 69:6 69:15,20 99:24 102:19
**fishman** 2:9
**fit** 57:2
**five** 6:3 65:6,12 67:5 83:20 84:3,3 87:3 99:19
**fl** 2:6,16
**flag** 6:25 22:23
**florida** 1:18,20
**flow** 59:15,25
**flynn** 5:5 97:6,10,11 97:12
**flynn's** 97:17
**focus** 6:22
**followed** 28:18
**follows** 3:5
**foot** 104:23
**forbade** 16:2
**foregoing** 106:8
**form** 20:10 29:25 30:3 32:21 36:3 46:25 72:21 73:24 74:19 76:19 79:19

80:23
**forma** 51:20
**formal** 25:10 67:9
**former** 63:22
**found** 82:15
**four** 6:3 65:6,12 71:7 94:16
**frankly** 34:20
**frequent** 31:17
**frequently** 28:13 96:9
**friend** 69:21
**fulfill** 30:22 44:25
**full** 48:5
**function** 16:5 40:7 83:11
**functions** 56:21 96:8 97:20
**further** 105:4 106:15

**g**

**gaap** 64:5,11
**geiger** 14:19 78:23 79:5,24 91:20,24 100:6,8,8,17
**geiger's** 79:12
**general** 19:5 20:21 21:8 26:21 33:18
**generally** 49:24 64:7
**geographically** 42:24
**girl** 5:5
**give** 4:25 9:7 19:18 30:18 31:9,14 37:10 44:8,9 56:6 62:15 64:25 65:3 83:7 96:13,14,23 103:12
**given** 46:3 71:3,3,22 72:4
**giving** 97:3
**go** 10:11,12 17:12 18:21 30:14 47:18 48:15 59:11 64:21,24 65:4,13 66:16 67:11 67:12,14,19 78:2
**goes** 41:9 43:19
**going** 6:16 20:10 24:12 47:22 65:24 76:12 97:25
**goldberg** 2:3 46:7
**good** 10:8 59:10 68:23 69:21 71:21,23 72:7,11 73:2 77:3 82:19 91:25 94:19 100:16
**great** 72:3
**green** 68:21
**groundrule** 4:2 6:14 32:24
**group** 2:10 4:4,5,14 10:21 24:3 37:22 40:22,25 41:3,11,12 45:21 50:14 51:3,25 52:4,5 54:2,3,20 60:4 60:6 69:2,6,11 76:14 76:15 77:5 78:13 83:22 84:10,23 86:4 86:13 87:18,19 99:11 101:17 102:3,6,13 105:2
**group's** 62:4 63:7 78:24
**guess** 51:12
**guessing** 101:16
**guidelines** 25:5 101:12
**guy** 5:3 44:7 63:21 82:17

**h**

**h** 3:2 54:7,7
**half** 57:20 62:23 63:6 65:15
**hannah** 2:14 69:9,12 69:12,14
**happen** 13:14 34:11
**happened** 20:14 28:13,14 64:16,18
**hard** 43:22 64:2 96:10,12
**harry** 88:25
**head** 6:2,5,7 17:15 49:9 85:21,23 98:14 98:16,21,22,25 101:14
**heading** 66:10
**hear** 7:3 17:23
**heard** 27:5,22 84:16 91:21
**hearing** 70:7 75:19 76:17,22
**help** 11:2 15:13 31:23 53:22 83:22
**helpful** 80:4
**helps** 31:23
**hey** 14:7 22:23 26:7
**hire** 41:16,18,21,22 42:3,4,11,17 43:9 83:8,9,13 87:9 91:7
**hired** 31:7 42:8,10 65:9 95:8
**hires** 41:10
**hiring** 87:19,20 88:2 91:15
**history** 93:25 94:3
**hold** 29:24 53:6 55:15
**home** 9:20
**hours** 86:3,12
**hr** 90:20,21
**hum** 97:13
**hundred** 95:3
**hung** 81:11

**i**

**idea** 62:15
**identities** 29:19 31:25
**il** 2:11
**illinois** 1:2
**impact** 64:4
**implement** 20:19
**implementation** 17:22 22:4,6 99:18
**implemented** 10:5
**imply** 67:22
**important** 70:24
**impossible** 43:2 77:2
**impression** 73:12
**inbound** 11:17
**include** 9:6,7
**includes** 9:15
**inclusive** 106:9
**indemnification** 43:24 44:11,15,17,22 45:2 75:17 82:7
**indemnify** 102:14 104:13
**independent** 42:22 100:11
**independently** 92:7 100:19
**individual** 69:3 85:12
**individuals** 14:16,17 14:23 96:15
**information** 10:13 35:18 47:2 84:5 93:14
**informed** 102:21
**infractions** 8:19,20
**initially** 15:21 53:8 53:17 64:20 67:5 71:19
**inquire** 29:18
**inquired** 100:7,15
**ins** 31:8 40:8,9,10
**instance** 11:18 19:14
**institution** 66:3 100:2
**instruction** 91:10
**instructions** 3:17 9:8 16:13 17:16 25:2 26:9 28:18
**intelligent** 25:20
**interaction** 68:3
**interest** 53:11,13 55:17 57:23

**internal** 9:14 12:5,9
**internet** 55:2
**interpretation** 36:8 104:15
**investigate** 91:14
**investigation** 91:17
**investing** 60:24
**investment** 54:12
**investor** 58:3 59:23 60:24
**investors** 54:23
**invited** 67:7
**involved** 8:3,5 10:23 13:7 18:25 19:6,6,15 25:16 34:2 37:25 38:13,16,25 56:25 57:2 61:11 88:9 89:10 99:6,15 103:22
**involvement** 19:4 33:22 37:21 61:16
**island** 47:17
**israel** 2:9
**issue** 7:23,23 18:12 22:12,16,17,21 23:10 23:21 24:15 25:21 47:12,19 49:17
**issues** 6:10,11,13 7:6 7:9 17:8 19:2 20:7 21:16,18,20,23 22:4 22:5 26:20 31:17 47:17 49:21 98:11 99:7
**item** 94:13

**j**

**j** 3:2
**jack** 1:18 3:4 106:2 106:24
**james** 2:8 5:5 97:6,11 97:12
**jersey** 3:13
**jim** 69:22 102:10
**job** 11:8 17:14,21 18:22 26:6,8 39:15 88:5
**join** 51:24 52:11
**joined** 53:2,8,17
**joseph** 1:14 3:1,10 4:1 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1,10 106:1 106:5
**josephthal** 54:5,7,10
**judge** 70:6,8,8
**judgments** 94:8
**jumping** 75:11
**june** 1:11 106:6
**justified** 31:20

**k**

**k** 2:8 5:19
**keep** 9:11,12 10:8 30:16 31:22 47:10
**keeping** 13:13
**kept** 10:7
**kind** 18:25 28:5 44:20 49:20 81:11 90:22 98:11
**kinds** 15:22 62:21
**knew** 13:18 14:2,5,6 14:12,13 15:20 24:25 25:15,21 27:15,16 28:14 31:21 40:11,16 42:9 80:11 81:5,6
**know** 3:22,23 4:15 9:16 11:20 13:25 14:21,24 17:8 18:14 18:15,18 19:12,12 20:10 25:9,19 26:7 27:7,18 28:9,24 29:2 29:7,10,11 31:16,19 31:24 32:2,7,8,12,15 32:17 33:7,8,18,20 34:4,4,8,12,16 37:4 37:16 38:17 45:3 46:2,6,10 47:25 48:23 49:7,19 51:11 51:17 56:24 63:13,14 64:3 66:11 70:13 71:24 72:13 73:7,9 74:3,13 75:3 76:21 76:24 77:13 79:10,17 80:6,14,15,16,24,25 81:3,4,7 82:2 84:14 84:18,21 85:22,25 86:2,9,24 87:5,12 88:12,17,17,17,20 89:7,9,11 90:5,14,22 92:3,5,21 93:20,23 94:5,10,11,12,17 95:4,5,16 96:8 101:3 101:8,11,13,15
**knowledge** 14:25 27:20 54:16 79:11,16 80:19 81:6 87:22,24 88:8 91:13 92:5 93:6 101:4
**known** 40:17
**knows** 48:6 80:15 81:2 82:3,17

**l**

**l** 54:7,7
**lands** 44:3
**large** 58:7
**law** 29:9 43:7 103:19
**lawsuit** 6:17,20,23,24 23:6 48:9 64:17 66:4 66:6,7 69:25 100:3 100:25 101:5,18,20 104:21
**lawyer** 3:20 33:3 76:3,6
**lawyers** 75:24 103:15
**lead** 35:4,8,16 48:17 49:21
**leads** 6:24 60:5,8
**learned** 100:14 103:3
**left** 6:4 69:21 71:7
**legal** 1:16 6:10,11 7:6 7:9 16:13,17 18:12 21:16,23 22:4,5,12 24:15 25:18 44:5,7 44:10 47:11 65:18 67:18 71:20 82:5 90:21 103:8,12 104:15
**legalities** 20:7
**legit** 8:16
**length** 60:23
**lengthy** 3:16
**letter** 22:25 23:2
**life** 95:23
**lim** 2:14 69:13,14 92:11
**line** 60:18 94:13
**lines** 35:11
**list** 12:6,10 30:18 37:10 46:3,6,8,11 96:15
**listen** 8:17,18,22 11:11 27:5 44:9 47:14 72:24 73:5 82:3

**listened** 8:9 17:20 27:10 45:7 99:10
**listening** 10:24
**literally** 13:24
**litigation** 2:15 65:24 66:9,13
**little** 31:18 38:20 42:21 58:13 60:16 75:11 89:3 99:23
**lived** 18:20
**llc** 2:9
**location** 93:17
**logic** 32:15
**long** 51:11 73:12 84:22 95:11
**longer** 60:14
**look** 34:19 43:14 62:7 73:11 74:4 82:20
**looked** 8:24 73:6 88:22 89:6
**looking** 59:19 74:5
**losing** 72:14
**lot** 17:18
**lower** 60:25
**lyon** 54:8

**m**

**m** 3:2
**magnitude** 58:20
**maintain** 68:6
**maintained** 89:19 90:11
**major** 71:5
**making** 11:15 15:18 15:24 24:18 28:20,22 28:25 38:13 40:18 54:22 79:6,13 80:20
**managed** 7:7
**management** 54:18
**managing** 54:11
**manual** 90:7,8,17,23 92:4
**manually** 8:22
**march** 6:18
**marketing** 16:12 21:12 47:15,19,23 48:16,18,19,22,24 49:7,9,14,17,20,21 50:2 54:18 55:2 60:9 61:20 82:4 83:7 84:13,15,25 85:21,24 86:15,17,21 104:9
**mary** 5:15 97:6,15
**material** 63:17,23,24 64:4 70:19,21
**materiality** 64:10
**mathematics** 72:16
**matter** 32:14 35:13
**matters** 96:17
**mcnew** 2:3,4 3:7 33:10 50:6,9 62:13 72:22 76:9 85:7 99:22 105:4
**mean** 6:3 15:10 61:14 69:12 85:18 90:2
**meaning** 83:5
**means** 79:25
**measure** 62:2
**measures** 93:12
**mechanisms** 42:15
**mediation** 66:15,17 66:20,22 67:9,21 68:14 69:20 75:5,14 101:22 104:20
**mediations** 69:16 73:15,22 74:12 77:4 102:7
**mediator** 68:17
**meeting** 69:6 73:8
**member** 61:18
**memory** 62:10 74:9 91:22
**mentioned** 19:2 46:13,14,15 66:17 96:20,21
**mentioning** 91:16
**merits** 102:23
**met** 66:14 74:2
**million** 58:22,23 59:3 59:9 71:2 72:9 73:15 74:23 75:21 77:14
**mind** 27:25 81:16
**minutes** 50:7 99:19
**mischaracterizes** 36:4
**mistaken** 78:22
**money** 38:20 51:9 53:23 58:3 67:4
**monitor** 12:16
**monitored** 12:12
**monitoring** 10:16
**monroe** 2:10
**months** 6:3 65:6,12 66:14
**moved** 96:8
**multiples** 59:20
**myriad** 65:14

**n**

**n** 2:2
**name** 3:8 5:6,11,16 12:2 35:9 46:17 52:15 54:5,6 65:11 68:18 92:7
**names** 4:25 5:12 30:9 30:19 31:15 35:15 45:19,23,24 46:6,13 46:14 68:24 96:19,21 96:22,24 97:2,4,5 98:24
**nathan** 2:9
**national** 11:25 12:2
**nature** 18:13 59:21
**necessarily** 11:21
**need** 11:13 15:15 22:20 42:8 48:4
**needn't** 3:21
**needs** 13:23 48:3
**negotiations** 73:19
**network** 57:15 60:5 61:20
**never** 13:15,16,22 14:7,11 20:14 22:23 23:20 31:10 35:3,7 59:14 67:25 74:2 77:8,9 91:2,8
**new** 2:5 3:13 56:18
**nice** 74:8
**night** 89:7
**nikki** 5:10
**noi** 62:2
**normally** 50:11
**northeast** 1:17
**northern** 1:2
**notary** 1:19 3:4
**note** 79:19
**noted** 33:14 105:7
**notes** 106:11
**notice** 1:15 75:17
**number** 4:15 62:10 63:5 70:11,15 72:5 84:2
**numbered** 106:9
**numbers** 11:14

**o**

**o** 3:2 50:10
**oakhurst** 3:12
**obeyed** 38:14
**object** 29:25 30:3 32:20 36:2 69:25 72:20 74:18 75:8 76:18 102:20
**objection** 33:15 48:10 72:12 73:14,23 74:20,23 75:9 76:2,4 76:16 77:5,19 79:19 80:22
**objections** 33:5
**obliged** 103:12
**observation** 48:12
**obtained** 35:4,8
**obviously** 37:6 61:17 65:25 66:13 68:5,8 71:18 76:23

**occasionally** 26:19
**occasions** 100:11
**offered** 93:13
**office** 4:19,21 14:4 43:16
**officer** 55:11
**offices** 1:16 42:23 45:7,11,13,14,16,17 86:4,13
**oh** 90:2
**ohio** 65:10
**okay** 12:2 64:19 77:3 95:23 98:15 104:12
**okayed** 65:21
**ones** 5:25
**operate** 36:10,17 37:6
**operated** 81:22
**operation** 40:9 43:5 64:23,25 80:11,12 104:9
**operator** 37:2 41:17
**operators** 37:17
**opinion** 37:4 44:10 64:14 73:18 103:8 104:11
**opposed** 21:20
**opposition** 76:23
**opt** 9:17 28:10,11,12 31:8 36:18 37:8 38:21 40:8,9,10
**opting** 28:8
**oral** 90:6 103:11
**order** 42:6
**outbound** 11:15 12:13,14 15:19,25 16:3 24:5 28:21,23 29:2,6 31:2 38:4,10 40:10 41:6 78:5,14 78:18 79:6,13,15,16 80:14,21
**outgoing** 37:23
**outside** 58:3 77:4 103:2
**overall** 48:21 56:23 57:3
**overflow** 65:2
**overhang** 70:17
**overhangs** 70:16
**oversight** 18:3 47:8
**owners** 55:21
**owns** 57:15

**p**

**p** 2:2,2 3:2
**p.a.** 2:4
**page** 34:24 35:12 90:18
**pages** 106:8
**paid** 21:17 58:21 59:14
**pamphlet** 90:18
**paragraph** 22:9 23:4
**parameters** 11:9
**paramount** 35:2,7,14 40:24,24 41:4,9,14 41:24 42:9,17 45:21 81:23 82:20 83:14 84:7,11,19 85:13 86:8,20 87:19 88:6 101:4,9,14
**paramount's** 41:14 45:17
**part** 4:19,20 18:12 26:7 60:2 65:2 68:10 79:8 98:2 104:9
**participate** 104:19
**participated** 102:6
**particular** 8:2,4 11:18 23:4 27:9 37:13 43:7 59:21 60:19 67:25 68:3 83:5 94:13 96:11 100:12 103:23,25 104:8
**parties** 106:17,18
**partner** 61:20
**partners** 60:10
**parts** 5:7 7:12
**party** 2:9 10:25 12:17,18,25 15:12,24 17:3,24 20:4 22:11 23:23 24:4 25:25 27:3 29:16 30:25 31:15,25 32:3 33:23 34:13 35:15,23 37:24 38:7 45:20 59:23 75:17 78:24 79:5 81:10,14,17,21,24 83:10,16,21 84:12 85:3 87:4 88:3 89:20 91:14 92:23
**pass** 65:7
**passed** 61:15
**pay** 51:13 59:2 95:19
**pending** 33:12 85:9
**people** 3:25 4:12 5:2 8:18,21 9:10,16,17 9:22 10:8 11:5,5 12:20 14:20 17:7 18:16,19 19:8,12 21:10 27:13 28:5 29:9 30:11 31:8,9,10 31:17 36:10,11,13 37:11,18 38:17 44:13 47:16 48:24 49:14 65:20,22 67:7 74:8 81:22 83:6,8 84:16 88:22 89:2 91:21,25 92:21 96:9 99:16 100:9,16 104:12
**percent** 8:16 56:4 58:9,12 63:11,12
**percentage** 63:6
**perfect** 81:8
**perform** 11:2 15:13 20:4 35:24 46:23 78:25 83:22 88:3 89:21 91:7
**performance** 13:2 20:2 63:18,20
**performing** 47:6 83:12
**period** 23:5 38:10
**permission** 10:2 12:3 12:9 14:10 31:9
**permit** 78:18
**permitted** 36:13
**person** 7:4 11:23 21:14 42:12 43:6
**personally** 17:6 102:25
**persons** 96:18
**perspective** 71:14 72:7,18
**phone** 10:17,19,24 99:10,15
**pick** 62:4
**piece** 10:15
**place** 32:5 42:24 76:24
**placed** 24:3
**plaintiff** 1:5 70:7 73:20 75:16
**plaintiffs** 103:25
**planning** 70:22
**please** 3:9,19 5:17 30:2 33:8,11 49:12 58:16 85:5,8
**point** 51:10 65:9
**pointed** 71:25
**police** 43:4
**portfolios** 54:11
**portion** 92:13
**position** 56:18 57:17 59:8 60:3
**positions** 53:5
**possibly** 32:16
**post** 6:24
**practice** 35:14
**prepared** 106:13
**present** 2:13 27:21 69:9,11 75:25
**president** 97:19 98:7
**pretty** 6:4 8:14 10:8 13:18 14:5 25:2,23 28:14 33:7 51:5 61:8 65:21 71:8,23 72:11

74:5
**primarily** 9:2 97:23
**principles** 64:8
**privilege** 33:2 76:3,7
**pro** 51:20 70:7
**probabilities** 72:6
**probably** 31:23 41:24 44:9 47:22 49:13,18 59:3,12 63:12 71:11 72:6,7 72:16 73:4 82:3 83:2 84:2,4,15,16
**problem** 22:20,24 24:23 25:17,17,22 26:11 47:25 48:2,15
**problems** 26:21 31:17 48:16
**procedure** 89:23,25 90:3,6,10
**procedures** 89:19
**process** 40:20
**professional** 74:7
**prohibited** 38:4
**proposed** 94:8
**proprietary** 35:18
**provide** 60:21
**provided** 101:11
**provision** 13:9 18:6 23:8 27:4 39:8,21 41:4
**provisions** 16:10 17:2,3 18:4,19 24:20 25:8,13 26:9 38:2,15 39:3 43:24 44:17
**public** 1:19 3:4 53:24 57:14
**purposes** 4:2 6:15 12:22 16:22 44:12 83:15
**pursuant** 1:15
**put** 11:9,25 12:4 18:19 36:8 40:5 43:24 47:5 58:3 70:3 83:25 90:24

**q**

**qualifications** 32:17
**qualify** 36:13
**quality** 11:10
**quarter** 62:25 63:2,9 63:15
**question** 3:24 19:15 30:2,4 32:21,25 33:2 33:4,6,9,11,12 35:2,6 35:13,19 36:3 38:12 44:6 59:10 74:21 76:8,19 79:20 80:23 85:4,9,11 103:5
**questionnaires** 93:13
**questions** 6:16 10:11 47:9 105:5
**quite** 5:20 7:20 14:12 63:8 96:9 97:9
**quote** 27:6 29:20

**r**

**r** 2:2 3:2
**radar** 29:3
**raise** 23:20 53:23 76:15
**raised** 13:15 22:21 22:23 23:11 73:8 77:8,25
**raises** 32:25
**raton** 1:17 2:6,16
**react** 7:22
**reacted** 7:19 10:14 17:18
**read** 13:12 33:10,13 34:25 85:7,10 92:14 105:6
**really** 7:22 31:19 32:12,14 34:19 36:6 43:3,6 44:22 52:6,7 54:17 58:18 59:19,24 62:20 82:9 85:25 88:16 97:24 104:16
**reason** 4:8 43:23
**reasonable** 44:24 72:19 89:2
**reasons** 65:14,18 67:2 70:5 73:10
**recall** 27:6 69:4,10 93:15 94:15 96:14
**received** 10:20,22 12:18 94:2 104:6
**recess** 50:8 99:21
**recognition** 8:13
**recollection** 34:22
**record** 3:9 92:13 99:16 106:10
**records** 9:11
**refer** 39:9
**referred** 82:14
**referring** 14:16
**refers** 36:7
**refresh** 34:21
**regarding** 21:19 102:23
**regardless** 80:8,9
**regulations** 10:4 37:8
**reid** 18:23 48:21 49:2 49:6,9 51:14,16 52:12 55:7,24 56:4 57:12 81:11 82:3,14 85:17
**rejected** 67:6
**relate** 30:7 102:22
**related** 17:2 37:9
**relating** 19:16
**relationship** 21:13,15 30:10 41:15 47:14 51:18,22 63:19 68:6 68:9 71:4,16 97:23 101:9
**relationships** 98:3
**relative** 106:16,17
**reliable** 92:24
**rely** 30:21,23,24 31:14
**remain** 61:3,11
**remark** 66:8 79:23
**remember** 5:11,12 13:5 30:6 34:18,20 45:22,24 52:15 58:17 58:23 59:5 62:8 63:13 68:16 70:5 73:5,9 94:17,18,21 96:4,22,25 97:3,16 98:23 100:3
**repeat** 33:8 73:11 74:17 80:24 85:4 92:11
**repeating** 72:23
**rephrase** 85:11
**replace** 48:3,4
**replaced** 8:13
**report** 5:24 8:19 18:8 21:9,11 25:11 26:22 48:19 49:3 85:2 86:16 106:4
**reported** 18:10 21:3 22:13,15 24:16 50:2 86:18 98:15,17
**reporter** 1:19 106:2
**reporting** 25:10,14 47:10 49:4 61:13 89:13
**reports** 61:17
**representation** 67:18
**representative** 57:11
**represented** 77:11,15
**request** 14:9
**requested** 92:13 106:8
**required** 12:24 25:11 35:7
**requirement** 37:12
**requirements** 17:10 24:14 37:3 99:13
**resolution** 7:5
**respect** 17:24 19:24 20:2,3 21:3,5,18 22:8 23:22 24:4,10 25:12 39:20 81:18 87:19,25 89:20 101:22
**responsibilities** 103:11
**responsibility** 18:4 20:12,18 23:25 24:17

Case: 1:11-cv-01925 Document #: 282-13 Filed: 07/14/14 Page 39 of 41 PageID #:4116



24:20 32:10 43:19 44:2 47:5 89:4
**responsible** 7:5,15 27:17 28:9 39:19 84:11 89:15 92:24 96:16 97:22 102:13
**restriction** 41:13
**restrictions** 17:25 24:3 36:21,22
**retaining** 68:24
**revenues** 62:3,4
**reverse** 62:3
**review** 106:7
**right** 9:15 19:17 23:19 27:15,25 28:15 28:16 44:24 46:16 60:8 82:23 83:23 89:16 97:11
**risk** 70:19,21 72:10
**risking** 72:15
**road** 2:16
**robocalling** 9:24
**room** 42:25 66:24 69:8
**ross** 54:8
**rough** 62:9,15 63:5
**roughly** 59:9
**rules** 9:2,4 10:3,7,9 33:8
**run** 96:19

**s**

**s** 2:2,14 3:2
**salary** 50:23 51:6,9 51:13 94:22
**sanders** 2:3
**sara** 2:3
**sat** 4:20 57:9
**savelo** 45:23 84:7
**saveology** 4:4 35:6 35:14
**saw** 14:8 44:3 61:17 91:8
**saying** 9:18 11:7 36:9 36:25,25 60:7
**says** 17:12 29:5 41:5 82:16,25 83:2,25
**scary** 74:5
**schultz** 2:8 29:24 32:20 33:14 36:2 48:10 62:11,18 69:22 72:12,20 73:23 74:18 76:4,11,18 79:18 80:2,22 86:5 102:11 102:19 105:6
**scrubbed** 11:15
**scrubbing** 9:12
**se** 7:24
**second** 57:19 68:11 97:14
**secret** 29:19 35:10
**security** 1:7 2:5,15 9:20,21 11:22 37:9
**see** 8:9,15 15:15 17:13 18:16 53:23 74:6 82:25 93:18 94:7 104:18
**seen** 90:16 91:2,11,12
**sending** 69:17
**sense** 63:23 65:8
**sent** 65:18 67:18 69:20
**sentence** 92:12
**separate** 8:7 9:25 52:23
**separated** 52:24
**separating** 70:22
**seriously** 68:24 89:9
**served** 6:17
**service** 51:19 56:8
**services** 1:7 2:5,15
**sessions** 2:9 101:24
**set** 3:17,25
**settle** 66:25 67:4 69:24 70:24 71:12
**settlement** 70:25 72:10,19,19 73:16 74:23 75:21,22 76:2 76:16,17 77:6,20 102:15
**shadowlawn** 3:12
**shapiro** 18:23 48:21
**share** 56:7 58:8
**sheet** 63:25 70:16,18
**shoes** 72:25
**short** 95:23
**shorthand** 1:18 106:2
**shortly** 55:13 61:8
**showed** 28:17 67:23 103:21
**shown** 43:20
**shy** 38:18
**side** 13:13 21:12 47:19 69:8 74:3
**sign** 4:22 89:24
**signed** 24:9,12 82:21
**signs** 41:3
**sir** 4:11
**sit** 4:18 43:3,14 51:14
**sitting** 23:16 29:13 43:16
**situation** 9:14 25:18 27:9 100:12
**six** 67:5 84:3
**size** 47:4,6 59:6,7
**skipping** 35:11
**slowed** 65:16
**small** 71:25 72:4 89:3
**smart** 47:24 48:8,11
**smoothly** 22:19
**software** 8:18
**sold** 60:10
**solutions** 1:16
**somebody** 8:6 29:2,4 40:15 43:21 47:21 48:3 59:19 61:10 89:8 104:23
**sorry** 45:12 49:12 69:14 75:12 86:10 95:21 97:3 102:4
**sort** 104:14
**sound** 46:16 68:21 82:22 83:23
**sounds** 19:19
**source** 29:20 35:10 46:4
**south** 65:25 66:10,16
**spare** 3:16
**speak** 14:22 15:5,8 19:17
**speaking** 15:2 38:6 104:25
**specific** 9:25 16:5 26:23
**specifically** 9:20 58:5 59:17 79:14 92:9
**specifics** 39:14
**speculate** 3:22 62:12 62:14
**speculating** 49:17
**speculation** 19:10,11 90:25
**spell** 5:16 54:6
**spelled** 5:21
**spend** 86:4,12
**spoke** 15:7 87:5
**stake** 58:12
**standing** 71:7 72:25
**stapled** 90:19
**started** 65:24,24 66:10,15
**state** 1:20 3:8
**statements** 14:18
**states** 1:2
**stay** 51:11
**stenographic** 106:11
**stenographically** 106:4
**steve** 14:23 15:2,5,9
**sticks** 16:16
**straight** 58:14 59:11
**strayed** 40:15
**street** 1:17 2:10
**strictly** 60:24
**structure** 6:9 25:11 25:15 47:10 58:2
**structures** 8:8

**stuff** 6:13 82:17
**subcontractor** 32:16 32:18 45:4
**subcontractors** 11:6 32:2,4 33:23 34:5,7,8 34:14 35:24 39:22
**subject** 77:9
**subjects** 54:21
**subpoena** 1:15
**subscribed** 105:12
**subsequently** 8:12 67:8 92:18
**subsidiary** 52:20
**substance** 53:20 82:12
**substantial** 59:24
**subvendor** 42:11
**subvendors** 29:17,18 31:6 36:20 40:2,5
**sued** 66:24 71:6 74:6
**sufficient** 54:15
**suggest** 48:25
**suing** 38:18
**suite** 2:6,11
**supervision** 19:21,24 20:22 44:20 86:22 106:14
**supervisor** 19:23
**supplied** 28:16 38:22
**supply** 10:13
**suppose** 14:20,23,24 21:11 30:20 51:10 73:21
**supposed** 11:5 25:6 42:4 64:21
**sure** 3:20 5:18,20 7:20 8:24 9:4 10:4 12:8 13:12 16:15 17:22 20:23 24:7,18 26:8,18 28:25 29:22 34:6 37:14,14 38:14 40:23 42:16 43:5 44:23 48:25 51:23 52:17,22 57:19 61:7 65:17 69:9 70:14 81:25 82:10,13,24 83:3 84:17 85:6,14 88:7 91:6 95:9 97:9 97:24 98:6
**sworn** 3:3 105:12
**synergy** 60:20
**synopsis** 17:9
**system** 8:14
**systemic** 47:8

**t**

**t** 54:7,7 70:24
**tabs** 10:8
**take** 40:24 50:6 57:16
**taken** 50:8 69:8 99:21
**takes** 76:24
**talk** 4:3 9:14 19:13 21:14 47:12 49:18 81:9 82:11
**talked** 6:10 11:13 14:3,21 19:8 21:10 48:21,23 88:23 99:23
**talking** 7:2 16:17 21:21 36:10 78:3 81:11 98:12 99:2
**tcpa** 9:2,4 11:24 16:16 71:22 75:18 94:4,9 95:25 96:16
**team** 8:8 65:19
**technically** 77:2
**telemarketing** 15:19 15:25 24:5 28:21 31:2 37:23 41:6 55:2 78:6,19 79:6,13
**telephone** 28:23 78:14
**tell** 4:12 11:8 22:18 23:17 28:25 30:11 33:3 34:3 39:10 44:11 58:24 64:13,15 79:14 80:5 81:2,6,15 90:14,24 93:11 94:11 96:12 101:6
**telling** 7:3 17:23 23:18 47:11 92:19
**ten** 50:6 83:21 87:3
**tenure** 53:7
**term** 81:20 83:4
**terminate** 50:17
**terminology** 81:21 82:2,5,6
**terms** 33:24 49:25 88:2
**test** 62:10
**testified** 3:5 18:24 29:15 34:23 45:18 49:2,6 101:23
**testify** 50:4 58:18 102:24
**testimony** 23:23 27:5 27:7,22 29:14 36:4,7 39:10 41:2 49:8 72:17 78:4,8,13,23 79:4 80:8 83:20 86:19 87:13 100:6,23 101:17
**theirs** 75:18
**thing** 23:19 28:15 40:4,13 43:17 44:24 44:24 90:15
**things** 6:19,20,25 8:25 9:3 13:21 15:22 18:17 26:9,23 27:8 30:21 44:20 45:9 50:21 56:25 58:22 59:20 66:15 91:5 99:16
**think** 6:18 15:20 21:8 24:13 25:3 30:8 36:6 36:9,12 40:13,16,20 46:3,13 48:20 49:16 51:8,20,21 52:9 53:16 56:25 58:9,13 67:6,10,20 70:21 71:6,6,8,22,23 72:2 72:18 73:7 74:13 76:9 78:4,12 79:8 84:2 89:23 91:18,18 91:20,22 92:7 95:7 96:7,23 97:24 98:18 100:2,13 101:13 102:18 104:20,21
**third** 2:9 10:25 12:17 12:18,25 15:12,24 17:3,24 20:4 22:11 23:23 24:4 25:25 27:3 29:16 30:25 31:15,25 32:3 33:23 34:13 35:15,23 37:24 38:7 45:20 59:23 68:13 75:17 78:24 79:5 81:10,14,17,21 81:24 83:10,16,21 84:12 85:3 87:4 88:3 89:20 91:14 92:23
**thought** 66:8 82:19
**thrashing** 104:22
**three** 52:19 55:21 56:3 57:24 65:6 67:10 69:16 70:4,13 94:16 101:24
**time** 4:16,16 6:17,22 10:10,10 14:4 17:18 17:18 18:14,15 19:7 19:7 20:20,20 27:12 27:13 28:8 33:19,19 40:13,14 43:14,15 45:6,6 48:24 49:15 49:15 55:16 59:9,14 61:15 66:12 70:23 73:6,12,13 85:22 86:5 95:11 96:15,15 96:23 98:5 100:20,21 103:22 105:7
**times** 17:19 94:16
**title** 94:14 95:17 97:17
**titles** 94:16,20 95:20
**today** 61:23 98:12 99:8
**told** 3:21 18:17 81:4 88:21 89:12 91:22 100:10,16,18 101:7

**tom** 88:25
**touch** 91:23 100:13
**trace** 68:2
**traffic** 14:13,13
**transcript** 34:24 106:7,13
**trouble** 21:16
**true** 12:19 26:15 29:12,15 84:2 106:10
**try** 32:23 39:10 44:22 47:9
**trying** 40:19,21 44:23 47:3 50:20 60:15 79:22 104:22
**turn** 29:17 40:20 41:9
**two** 8:7,7 37:3 52:19 68:13 70:5,13 84:6 96:20 97:5 101:23 103:23,24
**tyco** 70:23
**type** 16:5 43:4 48:16
**types** 8:7

**u**

**ultimate** 24:17
**ultimately** 49:16 98:14
**um** 97:13
**unaware** 49:24
**unbeknown** 29:3 42:25
**understand** 3:18 6:19 16:14 27:8,11 40:19,21 47:3 64:10 71:15,16 75:13 82:11 82:18 88:24 103:16
**understanding** 20:8 36:24 42:2 103:10,19
**understood** 72:24 80:11
**undisclosed** 43:2
**unfortunately** 82:16
**united** 1:2
**unquote** 29:20
**unsolicited** 15:19,25 16:4 28:21,22 29:6 31:11 41:6 78:5
**use** 15:12 22:10 62:2 78:24 81:13,14 82:10
**usually** 5:25 6:6 13:10 44:12 94:20

**v**

**valuation** 59:11
**value** 59:13,18,18,21 60:2,19,25 70:25 71:17
**varied** 4:16
**vendor** 10:12 15:13 17:25 20:4,8,13,16 21:13,15 25:25 27:10 28:11 30:25 32:3 36:23 37:11 39:25 40:23 43:9 47:20 48:15,17 78:17 81:17 81:24 84:12 91:15 98:3
**vendor's** 33:24
**vendors** 10:25 12:17 12:18 13:2 14:6,8 15:24 17:3 22:11,22 23:23 24:4,8 25:6 27:3 29:16 31:3,25 34:13 35:16,23 36:16 37:24 38:7,11,14 39:7,22,22 40:5,6 45:20 47:15,18 66:24 78:5,18,25 79:5,12 80:7,17,20 81:10,14 81:21 83:16,21 85:3 87:4 88:3 89:21 92:23,25 94:8 97:22
**veritext** 1:16
**vet** 65:19
**vetted** 32:4
**vice** 97:18 98:7
**view** 102:12,16
**violations** 94:4,9
**vishva** 1:4
**visit** 45:11,14
**visited** 45:13
**visor** 46:15,18
**voice** 8:13 64:13 73:14 74:22 76:23 77:5 103:6,7
**voiced** 77:19

**w**

**walk** 53:6
**want** 7:12 29:9 41:22 43:3 58:18 62:2 64:13 67:3,19,21 70:17 73:10 74:16 76:12 78:2 79:18 80:3 82:10 88:24 92:9,17 104:19
**wanted** 12:7 27:11 41:21 42:7 60:4 64:25 65:3 68:5 75:25 79:25
**wants** 29:2 33:5
**water** 26:24
**way** 20:15 29:6 30:16 38:13,25 66:19 69:25 70:4 92:6
**web** 41:17
**website** 9:9,10,15 11:21 37:6,7,12 38:21 40:12
**websites** 9:6 27:14 36:11,15,17 37:2,2 37:17 81:22
**week** 86:3,12
**went** 22:19 27:10 45:7 62:21 65:5,11 71:9
**west** 2:10
**whatsoever** 101:10
**willing** 68:7,9
**wish** 82:14
**witness** 106:6,12
**woman** 25:20
**word** 16:19 22:3 24:13,13 60:9,13 82:9
**wording** 9:16,18 27:15 38:22
**wordings** 37:13
**words** 29:23 30:7 31:9
**work** 5:12,22 7:25 9:11 10:15 18:16 20:23 51:7 53:21 54:3,9,16,19,21 68:7 88:24 89:14 91:25 92:10,18 96:17 101:4
**worked** 3:25 4:13 5:2 22:22 24:8 32:7 33:17 36:16 46:11,12 52:21 54:4 65:22
**workers** 89:3
**working** 5:6 14:6,8 50:13,19 65:20
**works** 20:24
**worth** 59:9,16,16
**write** 23:2
**writing** 80:10,10
**writings** 91:3
**written** 12:24 14:9 14:10 15:14 22:11,25 25:4 89:18,25 90:2,9 90:17 91:10
**wrong** 16:21 23:24 44:13,21 60:13
**wrongdoing** 44:18

**x**

**x** 1:3,9

**y**

**yamato** 2:16
**yeah** 44:8 72:13
**year** 52:2 62:4 65:16 94:25 96:11
**years** 70:12
**yesterday** 18:23 49:2 81:10 85:17