# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| VISHVA DESAI and PHILIP J. CHARVAT, ) <br> on behalf of themselves and others similarly situated, ) <br> ) <br>     Plaintiffs, ) <br> ) <br>     v. ) <br> ) <br> ADT SECURITY SYSTEMS, INC., ) <br> ) <br>     Defendant. ) <br> ------------------------------------------------------------- ) <br> ADT SECURITY SYSTEMS, INC., ) <br> ) <br>     Third-Party Plaintiff, ) <br> ) <br>     v. ) <br> ) <br> MR. PETE TOLMAN; LEADS DIRECT ) <br> MARKETING; VOICE TEL CORP.; MR. ) <br> CHRISTOPHER LONG; EMI, INC.; CITY VIP, LLC; ) <br> JMB ENTERPRISES; DIRECT SAVINGS USA, INC.; ) <br> MR. OSCAR MONTENEGRO; EVERSAFE ) <br> SECURITY SYSTEMS, INC.; SAFE STREETS USA, ) <br> LLC; PARAMOUNT MEDIA GROUP; THE ) <br> ELEPHANT GROUP, INC.; and UNKNOWN JOHN ) <br> DOE DEFENDANTS I THROUGH XX, ) <br> ) <br>     Third-Party Defendants. ) <br> ------------------------------------------------------------- ) <br> SAFE STREETS USA, LLC, as successor to ) <br> EVERSAFE SECURITY SYSTEMS, INC., ) <br> ) <br>     Cross-Claimant and    Third-Party Plaintiff ) <br> ) <br>     v. ) <br> ) <br> DIRECT SAVINGS USA, INC.; MR. OSCAR ) <br> MONTENEGRO; DIRECT SAVINGS USA, ) <br> ) <br>     Cross-Defendants and ) <br>     Third-Party Defendants. ) <br> _____ ) | Case No. 11 C 1925 <br><br> Judge Bucklo |

**ELEPHANT GROUP INC.'S RESPONSE IN OPPOSITION TO
ADT'S MOTION FOR SUMMARY JUDGMENT**

NOW COMES Third Party Defendant, Elephant Group, Inc. (EG), responds to ADT Security Services, Inc.'s ("ADT") motion for summary judgment as follows:

**I.     INTRODUCTION**

Plaintiffs sued ADT claiming that calls were being placed on behalf of ADT through a marketing program that encouraged the participating dealers to generate sales leads through the placement of telemarketing calls in violation of the Telephone Consumer Protection Act (TCPA). ADT responded to that suit by filing a third party complaint against 13 entities, alleging that each contributed to create the potential liability faced by ADT in the original case. ADT received contribution from one of the named third party defendants, and also settled with 2 unnamed third party defendants while abandoning the claims against all other third party defendants except for EG. ADT claims that EG breached a contract and owes indemnity to ADT because it (1) made unlawful outbound telemarketing calls in violation of the TCPA, and (2) retained "affiliates" to make additional allegedly unlawful calls advertising ADT"s products.

ADT has now filed a motion for summary judgment, arguing that there are no disputed material facts and that EG is liable for contractual indemnity in contributing to create a situation where ADT faced potentially bankrupting damages in the underlying class action lawsuit. ADT is wrong, and the summary judgment motion should be denied for four reasons.

First, in its motion for summary judgment, EG has demonstrated that ADT's claim fails as a matter of law because ADT's own fault in creating the exposure destroyed any contractual indemnity obligation owed by EG. For the reasons detailed in that motion, EG is entitled to summary judgment and a finding that ADT's claim is without merit. Moreover, EG's motion showed that ADT, and by extension, EG, could not be held vicariously liable under the TCPA

1

for the calls that precipitated this case and were made by unrelated third parties. Second, ADT has simply misrepresented the facts of this case – there is no evidence that EG ever made any outbound telemarketing calls on behalf of ADT. Third, any of the potentially unlawful conduct was committed by entities that had no contractual relationship with EG, and were not affiliates of EG. EG is not vicariously liable for the conduct of independent and unrelated entities that were unknown to EG. Fourth, to the extent the Court concludes that EG could be liable for the calls made by one of the parties that actually made the calls (EMI), there is a disputed question of material fact as to whether ADT had approved EG's use of Paramount, which in turn purchased the leads from EMI. If ADT knew about, and approved the use of Paramount, as claimed by EG, such a factual dispute is material and precludes summary judgment in favor of ADT.

## II. ADT'S CONTRACTUAL INDEMNITY CLAIM FAILS AS A MATTER OF LAW

ADT's sole claim is one arising out of EG's alleged breach of the contract between EG and ADT. That contract contains two different indemnity provisions, each of which ADT claims was violated, triggering EG's duty to indemnify ADT. The undisputed facts in this case establish that EG made no telemarketing calls and engaged in no direct conduct that created any possible liability for ADT under the TCPA. The only basis upon which EG can be in breach of the contract then, is if an affiliate or agent of EG acted in some impermissible way. In fact, that was the conclusion this Court reached in denying EG's motion to dismiss the contractual indemnity claim. *See doc. 217, p. 7.*[1] However, now that discovery has been completed, and the Rule 12(b)(6) deferential standard of review can be discarded, the evidence shows that ADT has not, and cannot, establish that either Paramount or EMI was an agent or affiliate of EG. Without

---

[1] The Court concluded that the "complaint can reasonably be read to allege that EMI has committed negligence or an intentional tort by placing phone calls in violation of the TCPA and that Paramount was negligent in its use of EMI's services. Elephant Group does not deny that Paramount in an 'affiliate' under the terms of the contract. Elephant Group also fails to offer a substantive response to ADT's contention that the complaint alleges facts to support a claim that Paramount itself was negligent."

2

that threshold showing, the indemnity claim fails as a matter of law.

## A. PARAMOUNT IS NOT AN AFFILIATE OR AGENT OF EG

The entire predicate of ADT's motion is legally and factually flawed. ADT seeks to hold EG liable for telephone calls that were made by EMI, an entity with no relationship to EG and which made calls without the knowledge or involvement of EG.[2] ADT attempts to fill the void between EG and EMI through Paramount, an entity that EG did contract with to assist in generating sales leads. ADT's efforts fail because other than the use of unsupported conclusory labels, ADT has no evidence that Paramount (or EMI) was an affiliate or agent of EG.

An affiliate is defined in the contract between EG and ADT as "any corporation or other person or entity that directly or indirectly controls, is controlled by, a successor-in-interest to, or alter ego of, or is under the common control with, ADT or Elephant Group, respectively." *See* EG's Statement of Additional Material Facts ("*SAMF*") ¶ *1*. ADT tries to fit Paramount within this definition in two ways – first, because the contract between Paramount and EG was entitled "Affiliate Agreement", and, second, because EG allegedly conceded that Paramount was an affiliate.[3] *Doc 281, p. 9.* Neither of these arguments have merit.

First, the label in the contract used to describe Paramount is of no consequence. The fact that the agreement between EG and Paramount was titled "Affiliate Agreement" does not answer the question of whether Paramount meets the definition of an "affiliate" in the contract between EG and ADT. *Engineered Data Products, Inc. v. Nova Office Furniture, Inc.*, 849 F.Supp. 1412,

---

[2] To be clear though, the underlying lawsuit involved more calls than those that were made by EMI. ADT's settlement was much broader and included calls that were made by other vendors and authorized dealers of ADT. ADT attempts now to characterize the potential liability in this case in a linear fashion, from EMI to Paramount, from Paramount to EG and finally, from EG to ADT. ADT's characterization is wrong though; a correct metaphor is more akin to a web, with ADT in the center, and EMI being one of several "callers" at the edge of the web, and then sold any leads generated from those calls to a variety of vendors, including authorized ADT dealers, and with all calls eventually leading back to ADT.

[3] ADT does not even attempt to argue that EMI was an affiliate of EG.

3

1417 (D. Colo. 1994) (titles are not a part of the contract).[4] To answer that question, reference must be made to the express definition in the ADT-EG contract, which requires EG to either exercise some control over, to be a successor in interest to, or alter ego of, Paramount. Here, ADT has offered no evidence that EG had any control over, was a successor to, or alter ego of Paramount. This failure to produce any competent evidence, standing alone, is enough to warrant denial of ADT's motion.

Second, the "concession" made by EG is equally unavailing – the source of the concession arises from EG's motion to dismiss pursuant to Rule 12(b)(6), where the allegations of the complaint must be assumed true. At no time has EG admitted that Paramount is an affiliate. As ADT has the burden of proof on this issue, ADT is required now to come forward with proof that Paramount was an affiliate. *Fed.R.Civ.P. 56(e)*. ADT's failure to produce any evidence that Paramount was an affiliate of EG is fatal to the indemnity claim. *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir 2013) (summary judgment appropriate when there is a lack of admissible evidence on an essential element of plaintiff's case). Not only has ADT failed to produce evidence to support an essential element of the claim, the undisputed facts actually contradict ADT's contention and demonstrates that Paramount was not an affiliate of EG.

In particular, Paramount was an independent vendor of EG. *SMF ¶¶ 20, 22 and 23* (doc. 279) EG did not control, nor was it controlled by Paramount. *SMF ¶¶ 22, 26*. EG was not a successor-in-interest to, an alter ego of or under common control with Paramount. *SMF ¶¶ 22, 23 and 26*. In fact, Paramount was a separate LLC formed independent of EG. *SMF ¶ 20*.

Similarly, ADT is unable to show that Paramount was an agent of EG. It is well-established under Colorado law that "agency is a fiduciary relation which results from the

---

[4] The underlying agreement provides that the contract "shall be construed and enforced in accordance with the laws of the state of Colorado."

manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Stortroen v. Beneficial Financial Co.*, 736 P.2d 391, 395 (Colo. 1987). "The essential characteristics of an agency relationship are that (1) the agent holds a power to alter legal relations between the principal and third persons and between the principal and the agent, (2) the agent is a fiduciary with respect to matters within the scope of agency; and, (3) the principal has the right to control the conduct of the agent with respect to matters entrusted to the agent." *City and County of Denver v. Fey Concert Co.*, 960 P. 2d 657, 669-70 (Colo. 1998).

Here, ADT had produced no evidence that EG's relationship with Paramount satisfied any of these essential elements. There is no evidence that EG manifested any right to control the conduct of Paramount. In fact, ADT concedes this point, and argues that EG was itself negligent for not controlling Paramount. *See doc. 281, p. 12.*

Not only does ADT lack a factual basis for a claim that Paramount was an agent of EG, the evidence here proves the opposite. Paramount knew that it was not the agent of EG, but an independent contractor. *SAMF ¶2*. Moreover, subject to telemarketing restrictions incorporated into the agreement by EG, Paramount was responsible for determining how best to market ADT's products. *SAMF ¶ 3*. EG exercised no control and did not tell Paramount how to generate leads; that process was left up to Paramount. *SAMF ¶ 4.*

Judge St. Eve recently considered the same issue in the context of a motion to dismiss in *Smith v. State Farm Mutual Automobile Insurance Co.*, ---F.Supp.2d---, 2014 WL 3906923 (N.D. Ill. August 11, 2014). There, plaintiffs alleged that three insurance companies violated the TCPA by marketing their services through the use of a lead generator, Variable. Defendants moved to dismiss, arguing that plaintiffs had not alleged a basis to hold them liable for the calls.

5

The Court granted the motion of two of the insurance companies, but denied State Farm's motion because plaintiffs had alleged sufficient facts to plausibly establish that Variable was a sub-agent of State Farm. In reaching this conclusion, the Court detailed the three hurdles plaintiff was required to overcome: (1) that the local insurance agent was the agent of State Farm; (2) that the lead generator was the agent of the local insurance agent; and (3) that the lead generator was the sub-agent of State Farm.

The Court concluded that plaintiffs had met the burden, first because it was plausible that the local insurance agents were the agents of State Farm. Plaintiffs were also able to allege that the Variable was the agent of the local insurance agents because plaintiffs alleged the insurance agents "directed the quality, timing, and volume of Variable's telemarketing calls," that the agents provided Variable with information "regarding the nature and pricing of State Farm's products to allow Variable to route customers to the proper insurance agents", and the insurance agents "entered into contracts with Variable that specified the days of the week and times in which Variable should make its calls, the geographic location of the customers whom it should call, and the number of calls Variable should transfer to the insurance agency each day." *Id*., 2014 WL 3906923, * 9.

Here, on a motion for summary judgment, ADT has failed to produce any similar degree of evidence that EG had an agency relationship with Paramount, that Paramount had an agency relationship with EMI, or that EMI could be a sub-agent of EG. In fact, ADT has utterly failed to provide any evidence to connect the two relationships which is necessary to establish an agency relationship between EG and EMI.

As explained in *Smith,* there were "facts to show that State Farm's insurance agents exercised a level of control over Variable's telemarketing activities (including the timing, target

6

location, and volume of Variable's calls) to make the existence of an agency relationship between State Farm's insurance agents and Variable plausible. Without the ability to control the manner and content of the calls, and give interim instructions, there can be no finding that EMI was the sub-agent of EG. *Id.*, 2014 WL 3906923, * 9, citing *Restatement (Third) of Agency,* § 1.01 cmt. f(1) ("[T]he power to give interim instructions distinguishes principals in agency relationships from those who contract to receive services provided by persons who are not agents.") and *Chemtool, Inc. v. Lubrication Techs., Inc.*, 148 F.3d 742, 745 (7th Cir. 1998) ("While an agency relationship can be created by contract or by conduct, not all contracts create agency relationships and not all conduct creates agency relationships.")

No such facts exist here. EG was not aware that Paramount was even using EMI, specifically forbid Paramount from hiring EMI and prohibited the use of pre-recorded calls or unsolicited outbound telemarketing calls. *SMF ¶¶ 25-26; ¶ 41; SAMF ¶¶ 6-11.* EG exercised no power to give interim instructions to Paramount or EMI, and allowed Paramount to use its discretion on how best to generate leads. *SAMF ¶¶2-4.* Without meaningful control over Paramount, or involvement with EMI, there is no sub-agency relationship between EG and EMI. As there can be no dispute that Paramount was neither an affiliate nor agent of EG, ADT's claim arising out of the conduct of EMI as a "sub-agent" of Paramount fails as a matter of law.

### B. EG Did Not Breach Paragraph 23.A of the Contract

ADT argues that EG breached ¶ 23.A of the contract in two ways, thereby triggering an indemnity obligation. ADT first argues that EG breached the agreement by using prerecorded messages while telemarketing ADT's services. *Doc. 281, p. 6.* Second, ADT alleges that EG made unsolicited outbound telemarketing calls. ADT's argument appears to misunderstand the manner in which EG performed under the contract. Paragraph 23.A provides that "[u]nder no

circumstance will Elephant Group make any unsolicited outbound telephone calls as part of a plan, program or campaign directly or indirectly through telemarketing agents or others on behalf of ADT." The undisputed facts show that EG never used a prerecorded message to make any calls and never made any outbound telemarketing calls. *SMF ¶ 12, 18*. Because EG did not make any outbound telemarketing calls, EG could not, as a matter of law, have breached the prohibition of ¶ 23.A.

To the extent that ADT seeks to hold EG liable for the conduct of EMI, the only entity alleged to have made any calls that involved EG in any way (though tangentially), that claim fails as well. To be clear, there were numerous entities that ADT alleges were making unlawful telemarketing calls, including Leads Direct Marketing, Direct Savings USA, City VIP and JMB Enterprises. *SMF ¶¶ 53, 54, 55, 58-60*. Despite the abundance of wrongdoing that was ongoing during the class period, ADT now seeks to hold EG wholly liable. The end result is that EG is targeted to pay for all calls that were released by the settlement agreement, despite the fact that EG only had a contract with Paramount and no relationship or involvement with any of the other third party defendants that actually made the calls, including EMI.

ADT advances this claim despite the fact that EG, Paramount and EMI were not involved in any way in making two of the three calls that were directed to the named plaintiffs in the underlying case. The third call was placed by EMI, but there is no evidence that the call was made attempting to generate a lead to be sold to Paramount, as opposed to an ADT authorized dealer such as Eversafe. As ADT has conceded, EMI engaged in telemarketing campaigns for ADT dealers unrelated to Elephant Group, including Alarms Pro and Home Alert. *SMF ¶ 54*.

ADT's theory requires a finding that Paramount was either ran affiliate or agent of Paramount, and that EMI was a "sub-agent" of EG through Paramount. ADT has failed to

produce the necessary evidence to establish this relationship between the three entities though, or that EG had any control over EMI. Instead, the facts show that Paramount was not an affiliate or agent of EG. *See supra*, § A. EMI was not an agent of Paramount. *SMF ¶ 34, 35*. EMI was not a sub-agent or affiliate of EG, as EG was unaware that EMI was even making telephone calls or working with Paramount. *SMF ¶41*. EMI was simply a vendor that sold sales leads to a variety of entities, including both Paramount and authorized dealers of ADT. *SMF ¶34, 54*. In selling those leads, EMI advised Paramount that the leads were generated from live (non-automated) calls placed by EMI's representatives, and that calls would be transferred to Paramount if the customer expressed an interest in purchasing a home security system. *SAMF ¶5*. Paramount would pay for each lead that was transferred to Paramount, though there was no service contract between Paramount and EMI. *SMF ¶34, 35*.

ADT needs more than labels to prevail on summary judgment – ADT must prove that EMI and Paramount were operating with the knowledge of and pursuant to the control of EG. ADT has made no effort to show that there was an agency relationship between EMI and Paramount, or an affiliate relationship between Paramount and EG. To the extent that EMI made any outbound telemarketing calls, or used any prerecorded messages while telemarketing, that conduct was done without the involvement or knowledge of EG, and EG cannot be charged with breach of a contract under ¶ 23.A for the actions of a wholly unrelated and independent entity.

    C.    **EG Does Not Have A Duty To Indemnify Under Paragraph 6(b)**

Paragraph 6(b) of the Agreement requires EG to indemnify ADT for all damages "resulting from or relating to, any negligence or intentional torts by Elephant Group, its Affiliates, officers, directors, employees and agents in connection with or related to this Agreement, except to the extent that any such claim or action is due to any negligent acts,

9

omissions, wrongful acts, fault or willful misconduct of ADT, its employees, agents or invitees." *SMF ¶ 9*. ADT's indemnity claim premised on ¶ 6(b) fails for five reasons. First, the indemnity obligation only arises "to the extent that" ADT did not engage in any negligent or wrongful acts to contribute to cause the damages or loss. Here, as more fully detailed in EG's motion for summary judgment, ADT's own actions in building and maintaining a telemarketing model predicated on making outbound telephone calls contributed to the potential liability, and extinguishes any indemnity rights ADT had against EG. *See doc. 278, pp. 4-8*.

Second, EG itself made no outbound telemarketing calls or used any prerecorded voice messages to advertise ADT's services. Though at various times ADT suggests that EG itself made telephone calls or used a pre-recorded voice messages to engage in telemarketing in violation of the TCPA, (s*ee., e.g, doc. 281, p. 6* ["Elephant Group conceded that it never obtained written approval from ADT to use prerecorded messages (UF-10) – a concession that in itself is dispositive."]), any claim arising out of direct calls from EG is factually unsupported, as the record is clear that EG itself made no outbound telemarketing calls. *SMF ¶12*. Of course EG never sought consent from ADT to use prerecorded messages, because EG never made any outbound calls with a prerecorded message.

Third, none of the alleged wrongdoing highlighted by ADT, which focuses on only those calls made by EMI, is conduct that was performed by EG or any affiliate of EG. Paragraph 6(b) can be invoked only to the extent the alleged wrongdoing was committed by EG or its affiliates. As shown above, no entity that made any telemarketing calls (e.g., EMI), or that bought leads obtained from telemarketing calls, (e.g., Paramount), were affiliates of EG. *See supra, § A*.

Fourth, EG is not legally responsible for any negligence attributable to Paramount in using EMI. Again, ADT's argument relies on the unfounded assumption that EMI was somehow

10

an agent of Paramount. This assumption is false. Like others in the ADT network, Paramount simply bought leads from EMI after being advised that EMI was complying with all federal telemarketing rules and was generating leads by placing non-automated calls to consumers. *SMF ¶34, 38, 39.* More importantly, EG cannot be liable for the putative negligence of Paramount in buying leads from EMI because EG did not authorize the purchase and at no time was EG even made aware that Paramount was buying leads from EMI. *SMF ¶ 41.*

Finally, ADT argues that EG was negligent in hiring and failing to supervise Paramount. Specifically, ADT argues that EG was directly negligent in three ways: (1) by hiring Paramount without obtaining ADT's written consent; (2) by failing to ensure that ADT's telemarketing rules applied to Paramount; (3) and by failing to monitor Paramount to ensure that the calls made by Paramount were consistent with ADT's telemarketing polices. *Doc. 281, pp. 12-15*. ADT is wrong on all three fronts.

First, even before the underlying lawsuit was filed, ADT was aware that EG hired Paramount to assist in generating sales leads, but took no action to end the relationship until after ADT was sued in this case. In fact, during the course of the contractual relationship, the practice developed between ADT and EG that allowed for permission to use vendors to assist EG in generating leads to be routinely given during telephone calls. *SMF ¶ 13*. EG could not be negligent for simply hiring Paramount because ADT knew about it, condoned the hiring and took no steps to end the relationship.

Second, EG undeniably incorporated the ADT telemarketing rules and policies into their agreement with Paramount. *SMF ¶26*. Any claim from ADT stating otherwise is factually incorrect, (*see Doc. 281, p. 14* ("Fernandez for the first time sent instructions to Paramount on the ADT Do Not Call scrubbing process.") and is contradicted by the testimony. *SAMF ¶6*. At

11

the time Paramount entered into the agreement with EG, Paramount knew that it was required to comply with the marketing guidelines of ADT. *SAMF ¶ 7*. As part of those guidelines from EG, Paramount knew that it was prohibited from making unsolicited outbound telemarketing calls. *SAMF ¶8*. Paramount received and was trained on ADT's telemarketing guidelines. *SAMF ¶ 9*. Paramount was also required to scrub any telephone number against ADT's Do Not Call list to ensure that no return telephone calls were made to any number that had requested not to be called. *SAMF ¶ 6*. EG could not be negligent for failing to apply ADT's telemarketing rules into the agreement with Paramount, because the rules were incorporated into and part of the EG-Paramount agreement.

Third, the undisputed facts show that EG did monitor and supervise Paramount, and that the level of supervision far exceeded any oversight provided by ADT over the marketing program. Unlike ADT, which simply relied on the contractual prohibitions, *SMF ¶ 11*, EG took affirmative steps to train, monitor and ensure compliance by Paramount of the telemarketing rules, including on-site visits, training sessions and listening to call recordings. *SMF ¶ 27.*

ADT attempts to color EG as having negligently supervised because EG was unaware that Paramount made outbound calls. *Doc. 281, p. 14*. This argument is both irrelevant and incorrect. It is irrelevant because there are no claims that Paramount's calls violated the TCPA – ADT's position is that it was "EMI, Paramount's agent, [that] placed millions of outbound, unsolicited, prerecorded telemarketing calls." *Doc. 281, p. 9*. More importantly, ADT's factual complaint is wrong: Paramount operated only as an inbound call center, taking calls from potential customers and attempting to convert those leads into sales. *SAMF ¶10.* Paramount did not make any unsolicited, outbound telephone calls or use a prerecorded message trying to sell ADT's products at any time while working with EG. *SMF ¶ 25.*

Finally, ADT attempts to highlight the alleged lack of oversight by mischaracterizing e-mails exchanged with Paramount investigating possible complaints. ADT ignores the critical fact that every time ADT presented EG with one of those complaints, EG was able to document that the call was made in response to a valid opt-in and with consent. *SMF ¶ 15*.

Critically, EG's duty to indemnify under ¶ 6(b) arises only to the extent that "any such claim is due to any negligent acts, omissions, wrongful acts, fault or willful misconduct of ADT." As detailed in EG's own motion for summary judgment, ADT was the ultimate cause of any putative liability it faced in the underlying case. ADT's attempt to ignore its own culpability, and hide behind the alleged negligence of EG, should be rejected by this Court.

### D. EG Was Not Negligent Even If Paramount Was An Agent Of EG

Assuming, *arguendo*, that Paramount is an agent or affiliate of EG, ADT's negligence claim arising out of EG's hiring of Paramount still fails for alternate reasons. To the extent that ADT claims that "EMI has committed negligence or an intentional tort by placing phone calls in violation of the TCPA, and Paramount was negligent in the use of EMI's services", (*see Court's Order, doc. 217, p. 7)* a claim against EG would now fail because Paramount was acting outside the scope of its authority in hiring EMI without the approval of EG, and EMI was acting outside the scope of its authority because it made calls contrary to the instructions from Paramount and in direct contradiction of the methods EMI claimed to be using. *SMF ¶ 36, 38, 40, 42*. *Smith v. Multi-Financial Securities Corp.*, 171 P.3d 1267, 1271 (Colo. App. 2007) (a principal is liable for the acts of an agent only committed within the scope of the agency). Here, Paramount was not permitted by EG's agreement to use vendors like EMI, and EMI specifically told Paramount that it was not making automated telemarketing calls or using prerecorded voice messages. *SMF ¶42.* The acts or omissions of both Paramount and EMI were undeniably outside of any

possible agency agreement with EG, which specifically forbade this conduct, and therefore, EG cannot be held liable for the misconduct of Paramount or EMI.

Conversely, if ADT's claim instead is that EG negligently failed to supervise Paramount, that claim likewise fails. To succeed on a negligent supervision claim, ADT must prove that EG had a duty to prevent an unreasonable risk of harm to third persons. *Engeman Enterprises, LLC v. Tolin Mechanical Systems Co.*, 320 P.3d 364 (Colo. App. 2013). The duty to supervise arises if EG "had reason to know that" Paramount "is likely to harm others." *Settle v. Basinger*, 2013 WL 781110, *3 (Colo. App. 2013). When "a plaintiff asserts a claim for negligent supervision, the question of whether the employer owes a duty of care to the injured third party boils down to issues of knowledge and causation—whether the employee's acts are so connected with the employment in time and place such that the employer knows that harm may result from the employee's conduct and that the employer is given the opportunity to control such conduct." *Keller v. Koca*, 111 P.3d 445, 448-49 (Colo. 2005).

ADT has failed to produce any evidence giving rise to such a duty, and no such duty existed because EG could not have known Paramount was "likely to harm others". EG secured Paramount's agreement to not hire third parties without the permission of EG in the service agreement. *SAMF ¶ 11, 12*. Paramount also agreed to and did in fact comply with the direct prohibitions from ADT against making outbound telemarketing calls or using prerecorded voice messages. *SMF ¶25*. Moreover, in buying leads from EMI, Paramount attempted to confirm that the leads were generated in a compliant manner. *SMF ¶ 36-40, 42*. The only harm that Paramount may have ultimately caused resulted because EMI lied to Paramount. *Id. See also Loveland v. St. Vrain Valley School*, 328 P.3d 228, 233 (Colo. App. 2012) (negligent supervision claims impose a duty on a principal to prevent a foreseeable harm to third parties).

14

**III.  LAW OF THE CASE DOES NOT APPLY**

ADT argues that it is entitled to summary judgment under the law of the case doctrine, as it is "conclusively established" that EG's "affiliates" breached the Agreement. However, in evaluating a motion, Rule 56 permits judgment only if ADT demonstrates that there is no genuine issue of material fact. Even when facts may be undisputed, "the court must still ascertain that judgment is proper as a matter of governing law." *Johnson v. Gudmundsson*, 35 F.3d 1104, 1112 (7th Cir. 1994). Here, the Court is required to apply the facts to determine if Paramount was an affiliate of EG. As shown above, ADT has failed to come forward with any facts showing that Paramount was an affiliate of EG. As such, as part of the gate keeping function required before entering judgment, there is no factual basis to allow this Court conclude that judgment for ADT is proper. *Id.*

Moreover, there has been a substantial change in the law. Plaintiffs' theory in this case was that ADT was liable for calls made "on behalf of" ADT by others. Since the case was filed, and since the Court entered an order denying EG's motion to dismiss, the FCC has specifically rejected "on behalf of" liability in this context. *See In the Matter of the Joint Petition Filed by Dish Network, LLC, et al.*, 28 F.C.C.R. 6574, 6582 (FCC May 9, 2013). In that order, the FCC concluded that "on behalf of" liability does not apply to TCPA claims under § 227(b), and that an entity like ADT can only be vicariously liable for improper calls when the beneficiary of the call has an agency relationship with the wrongdoer, "when the third party has apparent (if not actual) authority" or through ratification. *2013 FCC Ruling*, 28 F.C.C.R. at 6586-87. The change in the law as announced by the FCC in 2013 demonstrates that plaintiff's claims were without merit, and preclude the application of the law of the case doctrine.

15

IV. CONCLUSION

WHEREFORE, Elephant Group requests that this Honorable Court deny ADT's motion for summary judgment, enter an Order granting summary judgment in favor of Elephant Group and for all other just and equitable relief.

                                                  Respectfully submitted,

                                                  /s/ Daniel W. Pisani
                                                  James K. Schultz
                                                  Daniel W. Pisani
                                                  Sessions Fishman Nathan & Israel, LLC
                                                  55 West Monroe Street, Suite 1120
                                                  Chicago, Illinois 60603
                                                  Telephone: (312) 578-0990
                                                  Facsimile: (312) 578-0991
                                                  jschultz@sessions-law.biz
                                                  dpisani@sessions-law.biz

                                                  *Attorneys for Elephant Group, Inc.*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on August 14, 2014, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to the parties of record by operation of the Court's electronic filing system.

                                                 /s/ Daniel W. Pisani