# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| VISHVA DESAI and PHILIP J. CHARVAT, on behalf of themselves and others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> ADT SECURITY SYSTEMS, INC., <br><br> Defendant. <br> ------------------------------------------------------------- <br> ADT SECURITY SYSTEMS, INC., <br><br> Third-Party Plaintiff, <br><br> v. <br><br> MR. PETE TOLMAN; LEADS DIRECT MARKETING; VOICE TEL CORP.; MR. CHRISTOPHER LONG; EMI, INC.; CITY VIP, LLC; JMB ENTERPRISES; DIRECT SAVINGS USA, INC.; MR. OSCAR MONTENEGRO; EVERSAFE SECURITY SYSTEMS, INC.; SAFE STREETS USA, LLC; PARAMOUNT MEDIA GROUP; THE ELEPHANT GROUP, INC.; and UNKNOWN JOHN DOE DEFENDANTS I THROUGH XX, <br><br> Third-Party Defendants. <br> ------------------------------------------------------------- <br> SAFE STREETS USA, LLC, as successor to EVERSAFE SECURITY SYSTEMS, INC., <br><br> Cross-Claimant and  Third-Party Plaintiff <br><br> v. <br><br> DIRECT SAVINGS USA, INC.; MR. OSCAR MONTENEGRO; DIRECT SAVINGS USA, <br><br> Cross-Defendants and <br> Third-Party Defendants. | Case No. 11 C 1925 <br><br> Judge Bucklo |

**ELEPHANT GROUP INC.'S RESPONSE TO ADT'S LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS AND ELEPHANT GROUP, INC.'S STATEMENT OF ADDITIONAL MATERIAL FACTS**

NOW COMES defendant Elephant Group, Inc. ("EG"), by and through undersigned counsel, and pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1(b)(3), submits this Response to ADT's Statement of Material Facts and Statement of Additional Material Facts in connection with EG's opposition to ADT's Motion for Summary Judgment and in support of its Cross-Motion for Summary Judgment. Elephant Group respectfully requests the Court consider the following:

**EG'S RESPONSE TO ADT'S STATEMENT OF MATERIAL FACTS**

1. Each and every factual allegation in ADT's Corrected First Amended Third Party Complaint is "conclusively established" because defendant chose not to answer the complaint. *Modrowski v. Pigatto*, 712 F.3d 1166, 1170 (7th Cir. 2013); *see* FED. R. CIV. P. 8(b)(6).

    **Response:** **Denied. EG has answered the complaint. See doc. 274. See also doc. 283.**

2. This Court has supplemental jurisdiction of the claims in ADT's third-party complaint pursuant to 28 U.S.C. §1367(a) because the claims are part of the same case or controversy as the claims in the plaintiffs' amended complaint. (Exhibit 1 at ¶ 19.)

    **Response:** **EG admits that this Court has jurisdiction.**

3. Venue is proper before this Court pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claims at issue occurred in this district. (Exhibit 1 at ¶ 22.)

    **Response:** **EG admits that venue is proper.**

4. On May 28, 2008, Elephant Group, Inc. and its subsidiary (collectively "Elephant Group") entered into a written Agreement with ADT whereby Elephant Group would generate sales leads through online advertisements for ADT Authorized Dealers (the "Agreement"). (Exhibit 2; Exhibit 1 at ¶ 50.)

    **Response:** **Admitted.**

5. The Agreement was amended in December 2008 when Elephant Group's subsidiary changed its name to Saveology. (Exhibit 3.) The amendment expressly made Saveology a party to the Agreement and bound by all of the Agreement's terms and conditions. (Exhibit 3.)

**Response:** Admitted.

6. Elephant Group did not distinguish between itself and Saveology. (Exhibit 4 at 28.)

**Response:** Denied. Saveology is a wholly-owned limited liability company of Elephant Group Inc. *ADT's Exhibit 3.*

7. Pursuant to the terms of the Agreement, Elephant Group agreed to comply with all federal, state, and local laws concerning telemarketing, including the TCPA, as well as ADT's telemarketing guidelines. (Exhibit 2 at ¶ 23A.1; Exhibit 1 at ¶¶ 51, 52.)

**Response:** Admitted.

8. In particular, Elephant Group agreed: "Under no circumstances will Elephant Group make any unsolicited outbound telephone calls as part of a plan, program or campaign directly or indirectly through telemarketing agents or others on behalf of ADT to any person." (Exhibit 2 at ¶ 23.A.)

**Response:** Admitted.

9. The Agreement also prohibited Elephant Group from using "prerecorded messages in connection with Telemarketing Services on ADT's behalf without prior written approval from ADT." (Exhibit 2 at ¶ 23A.1.)

**Response:** Admitted.

10. Elephant Group never received written approval from ADT to use prerecorded messages. (Exhibit 6 at 27; Exhibit 5 at ¶ 7; Exhibit 1 at ¶ 52.)

**Response:** Admitted.

11. The Agreement also expressly prohibited Elephant Group from assigning any duties under the Agreement to any third party without ADT's "express written consent." (Exhibit 2 at ¶ 17.)

**Response:** Denied. ADT had approved a more informal process of review and vendor approval, which involved telephone conversations or e-mail exchanges between ADT and Elephant Group. *EG's Statement of Material Facts ("SMF"), ¶ 13 (doc. 279).*

3

12. The Agreement provided that for any provision requiring the consent of ADT, such consent shall be given in writing by ADT's Vice President Chief Marketing Officer or Vice President of Residential Sales. (Exhibit 2 at ¶ 21.)

**Response: Denied. The referenced provision of the agreement is not accurately quoted and does not limit consent to come only from ADT's Vice President Chief Marketing Officer or Vice President of Residential Sales. *ADT's Exhibit 2 at ¶ 21.* Moreover, over the course of the contract life, ADT and EG had developed a more informal process for seeking and securing consent, which involved telephone conversations or e-mail exchanges between ADT and Elephant Group. *EG's SMF, ¶ 13.***

13. Prior to plaintiffs' filing of the underlying action, ADT did not grant express written consent to Elephant Group for an assignment to any third party. (Exhibit 5 at ¶ 7; Exhibit 6 at 121-22.)

**Response: Denied. ADT had approved a more informal process of review and vendor approval, which involved telephone conversations or e-mail exchanges between ADT and Elephant Group. *EG's SMF, ¶ 13.* Specifically, prior to the filing of this lawsuit, ADT was aware that EG was using Paramount to assist in generating leads. *See Exhibit 7 to EG's SMF, p. 97 and Exhibit 2 to EG's SMF, p. 136.***

14. Nevertheless, Saveology assigned duties under the Agreement to between five and ten unauthorized affiliates prior to 2012. (Exhibit 6 at 56, 118.)

**Response: Denied. The referenced testimony is not accurately cited. While the testimony reflects that Daphne Fernandes supervised five to ten vendors that marketed ADT products and services, there is no evidence that Saveology "assigned duties under the agreement" to those companies. *ADT's Exhibit 6 at 56, 118.* Further, these vendors were not "unauthorized" as alleged because ADT had approved a more informal process of review and vendor approval, which involved telephone conversations or e-mail exchanges between ADT and Elephant Group. *EG's SMF ¶ 13.***

15. The Agreement contains two separate indemnification provisions requiring Elephant Group to indemnify ADT. (Exhibit 2 at ¶ 23.F and ¶ 6(b).)

**Response: EG admits that the Agreement contains two separate indemnification provisions but denies that that Elephant Group is "required" to indemnify ADT under those provisions given the facts here. *See EG's motion for summary judgment (doc. 277).***

16. Specifically, Elephant Group agreed "to indemnify, defend and hold ADT harmless from and against any claims, actions, proceedings and damages, including reasonable attorney's fees and costs, and all monetary penalties and costs imposed upon ADT arising out of Elephant Group's breach of the provisions set forth in Sections A and B, hereinabove." (Exhibit 2 at ¶ 23.F.) Section A of paragraph 23 expressly prohibits Elephant Group from using prerecorded messages and making unsolicited outbound calls. (Exhibit 2 at ¶ 23.A.)

4

**Response:** EG admits the Agreement contains the referenced provision, but denies breaching this provision or using prerecorded messages or making unsolicited outbound calls. *See EG's SMF, ¶ 12; ¶ ¶17-18.*

17. In addition to the indemnification provision in Paragraph 23.F, Paragraph 6(b) of the Agreement states that Elephant Group shall indemnify, defend and hold ADT, its Affiliates, officers, directors, employees and agents (collectively the "ADT Group") harmless from and against any and all damages, costs, (including court costs and attorney's fees), losses, fees, and expenses suffered by the ADT Group resulting from or relating to, any negligence or intentional torts by Elephant Group, its Affiliates, officers, directors, employees, and agents, in connection with or related to this Agreement, except to the extent that any such claim or action is due to any negligent acts, omissions, wrongful acts, fault or willful misconduct of ADT, its employees, agents, or invitees. (Exhibit 2 at ¶ 6(b).)

**Response:** EG admits the Agreement contains the referenced provision.

18. On October 12, 2010, Saveology entered into an Affiliate Agreement with Paramount Media Group ("Paramount"), in which Saveology authorized Paramount to conduct certain marketing of ADT products and services for Saveology. (Exhibit 7.)

**Response:** **EG admits the November 12, 2010 Addendum attached as ADT's Exhibit 7 references an "Affiliate Agreement" dated October 12, 2010, but denies that the October 12, 2010 document pertained to ADT.** *EG's SMF ¶ 22.*

19. The Addendum to the Affiliate Agreement required Paramount to follow ADT's telemarketing guidelines and precluded Paramount from using prerecorded messages. (Exhibit 7.)

**Response:** Admitted.

20. ADT was not a party to the agreement between Saveology and Paramount. (Exhibit 7.)

**Response:** Admitted.

21. ADT had no involvement in Saveology's selection of Paramount. (Exhibit 1 at ¶ 55.)

**Response:** **EG admits that ADT was not a party to the agreement, but denies that there was a "selection" of Paramount as stated in this paragraph.** *EG's SMF ¶ 22.* **Also, ADT was aware that EG was using Paramount prior to the filing of this lawsuit.** *See Exhibit 7 to EG's SMF, p. 97 and Exhibit 2 to EG's SMF, p. 136.*

22. Saveology did not request ADT's express written consent to assign its duties to Paramount. (Exhibit 5 at ¶ 6.)

5

**Response:** Denied. ADT had approved a more informal process of review and vendor approval, which involved telephone conversations or e-mail exchanges between ADT and Elephant Group. *EG's SMF ¶ 13.* Further, Daphne Fernandes informed ADT in email exchanges that EG was working with Paramount. *See Exhibit 7 to EG's SMF, p. 97.*

23. ADT never consented in writing for Saveology to assign its duties under the Agreement to Paramount or any other entity. (Exhibit 5 at ¶ 7; Exhibit 6 at 121.)

**Response:** Denied. ADT had approved a more informal process of review and vendor approval, which involved telephone conversations or e-mail exchanges between ADT and Elephant Group. *EG's SMF ¶ 13.* Moreover, ADT was aware that EG was using Paramount prior to this lawsuit being filed, but did not instruct EG to terminate Paramount for 7 months. *See Exhibit 7 to EG's SMF, p. 126 and Exhibit 2 to EG's SMF, p. 138.*

24. Paramount never had any communications with ADT, did not have a contract with ADT, and was not paid by ADT. (Exhibit 8 at 30, 31, 68.)

**Response:** Admitted.

25. Other than its relationship with Saveology, Paramount did not work with any ADT Authorized Dealers, Authorized Marketers or Authorized Telemarketers. (Exhibit 9 at Response no. 4.)

**Response:** Denied. Paramount's relationship with Elephant Group was not exclusive. Paramount could and did sell security leads to other companies. *EG's SMF ¶ 23.*

26. The Addendum to the Affiliate Agreement did not prohibit Paramount from subcontracting with another entity. (Exhibit 7.)

**Response:** Denied. Paramount was not permitted to subcontract with another entity without receiving prior written approval from EG. *See Exhibit 7 to EG's SMF, p. 114.*

27. Saveology knew that Paramount and its other affiliates who marketed ADT products and services used sub-affiliates and/or third party lead generators to make telephone calls. (Exhibit 6 at 102-05; Exhibits 10-12; Exhibit 8 at 76-77, 84.)

**Response:** Denied. This statement is unlimited in time and overly broad as to what Savelogy "knew" and when. Responding further, EG placed contractual limitations on Paramount's ability to engage in marketing activities and Paramount was specifically prohibited from placing unsolicited outbound telemarketing calls. *EG's SMF ¶ 43.* Paramount was also prohibited from purchasing leads that involved prerecorded messages. *EG's SMF ¶ 44.*

6

28. Saveology maintained that it is a common practice in the lead generation industry for companies like Paramount to use anonymous subagents to assist them in generating sales leads. (Exhibit 6 at 106-08.)

**Response: Denied. The cited testimony does not refer to "anonymous sub-agents" and the statement is inaccurate.** *ADT's Exhibit 6, p. 106-08.* **Responding further, EG required Paramount to get approval in order to purchase leads from third parties.** *ADT's Exhibit 6, p. 105.*

29. Saveology did not know the names or identities of the sub-affiliates used by Paramount and its other affiliates. (Exhibit 6 at 105-08; Exhibit 13 at 31-32.)

**Response: Denied. This statement is unlimited in time and overly broad as to what Savelogy "knew" and when. Additionally, the cited testimony does not refer to a "sub-affiliate" as alleged and there is no evidence that Paramount was using any "sub-affiliates."** *See ADT's Exhibit 6, p. 105-08 and ADT's Exhibit 13, p. 31-32.* **Responding further, Paramount was not an affiliate of EG and, therefore, could not have used a sub-affiliate as alleged. Paramount was an independent vendor of EG.** *SMF ¶¶ 20, 22 and 23.* **EG did not control, nor was it controlled by Paramount.** *SMF ¶¶ 22, 26.* **EG was not a successor-in-interest to, an alter ego of or under common control with Paramount.** *SMF ¶¶ 22, 23 and 26.* **Paramount was a separate LLC formed independent of EG by an individual unrelated to EG, Ryan Neill.** *SMF ¶ 20. See ADT's Exhibit 6, p. 108.*

30. For example, on April 20, 2011, Saveology's Director of Operations, Daphne Fernandes, asked Ryan Neill of Paramount: "Are you working with a lead provider called American Protection Services? They have been calling an ADT high level person for several months now, who has repeatedly asked to be put on the DNC list." (Exhibit 10.)

**Response: EG admits that the e-mail attached as ADT's Exhibit 10 contains those sentences but denies that the e-mail supports a claim that Saveology was not aware of the names of lead generators; in fact, this proves the opposite.** *See Exhibit 7 to EG's SMF, p. 108.*

31. On April 21, 2011, Fernandes asked Neill: "Can you check and see if your databases show that you or any of your partners have called either of the numbers below? . . . They are both complaints naming the same company "Home Solutions," but I'm sure it's a subaffiliate of one of my affiliates. I've sent this to all of my lead partners so as of right now, I don't know who is calling these numbers." (Exhibit 12.)

**Response: EG admits that the e-mail attached as ADT's Exhibit 12 contains those sentences but denies that the use of the term "affiliate" satisfies the definition of "Affiliate" in the Agreement between ADT and EG.** *SMF ¶¶ 20, 22, 23 and 26.* **EG also denies that the e-mail supports a claim that Saveology was not aware of the names of lead generators; in fact, this proves the opposite.** *See Exhibit 7 to EG's SMF, p. 108.*

7

32. In another e-mail exchange, Fernandes asked Paramount: "Did you find out if those 3 caller ID's were your lead providers?" (Exhibit 14.)

**Response: EG admits that the e-mail attached as ADT's Exhibit 14 contains that sentence but denies that the e-mail supports a claim that Saveology was not aware of the names of lead generators; in fact, this proves the opposite.** *See Exhibit 7 to EG's SMF, p. 108.*

33. In early May 2011, Fernandes sent Neill the following message: "Can you please review the below complaint from ADT's legal department and provide me with your call logs (Date and times) that you dialed this number? "You" meaning your lead provider as well. . . . Can you please let me know if your affiliates own these CIDs? Remember, I need all of your CIDs "you" PMG use and that includes your affiliates/lead providers." (Exhibit 11.)

**Response: EG admits that the e-mail attached as ADT's Exhibit 11 contains those sentences. Responding further, that email also reflects that Ms. Fernandes called the number referenced in the complaint from ADT and she was sent to someone other than Paramount.** *ADT's Exhibit 11.* **Paramount was not using that number or caller ID.** *Id.* **Further, Paramount did not make any unsolicited outbound telemarketing calls.** *EG's SMF ¶ 25.* **Paramount operated an inbound call center.** *EG's SMF ¶ 21.*

34. Saveology did not require Paramount to disclose the names of its lead vendors, as Saveology considered such information to be a proprietary "secret sauce." (Exhibit 6 at 105-08; Exhibit 13 at 31.)

**Response: Denied. Saveology required Paramount to get approval in order to purchase leads from third parties.** *ADT's Exhibit 6, p. 105.* **Responding further, EG asked Paramount if they were working with various lead providers.** *ADT's Exhibit 6, p. 108.*

35. On February 25, 2011, about three weeks prior to the filing of the Desai action, ADT received a consumer complaint naming Paramount, and alleging that Paramount was a Partner of Saveology. (Exhibit 15.) ADT immediately tendered the complaint to Saveology and inquired whether Saveology did in fact have a relationship with Paramount. (*Id.*)

**Response: EG admits the e-mail attached as ADT's Exhibit 15 is dated February 25, 2011 and references a complaint.**

36. On February 28, 2011, Saveology assured ADT that Paramount was "not an outbound team." (Exhibit 15.)

**Response: In this e-mail, EG confirmed to ADT that it worked with Paramount but that Paramount was not an outbound team.** *ADT's Exhibit 15.*

37. On April 8, 2011, more than five months after execution of the Affiliate Agreement with Paramount, Daphne Fernandes, who had responsibility for Saveology's

8

telemarketing compliance, sent the following e-mail to Paramount: "Are your call centers making outbound calls? If so, we must scrub those number [sic] prior to calling the consumers even if they opted in. I was under the impression that all of your calls were inbound calls. If you are dialing we have to start the scrub today." (Exhibit 16; Exhibit 6 at 15.)

**Response:** **EG admits the e-mail attached as ADT's Exhibit 16 contains those sentences. Responding further, Paramount did not make any unsolicited outbound telemarketing calls.** *EG's SMF ¶ 25.* **Paramount was specifically prohibited from making any unsolicited outbound telemarketing calls.** *EG's SMF ¶ 24.* **Paramount operated an inbound call center.** *EG's SMF ¶ 21.*

38. Five days later, on April 13, 2011, Fernandes sent instructions on the ADT DNC scrubbing process to Paramount. (Exhibit 17.)

**Response:** **EG admits the e-mail attached as ADT's Exhibit 17 references sending instructions on the ADT DNC scrubbing process. However, there is no evidence that this was the first time that Paramount received the scrubbing instructions. In fact, Paramount was provided the instructions at the time of entering the contract with EG, which were referenced in the EG addendum to the Paramount agreement.** *See Exhibit 6 to EG's SMF, p. 20.*

39. In late 2010, Neill discovered a lead vendor called EMI through an ad on Craig's List advertising home security leads. (Exhibit 8.)

**Response:** **Admitted.**

40. From late 2010 through May 2011, Neill signed various purchase orders (also known as Transfer Service Orders) with EMI. (Exhibit 18; Exhibit 19.)

**Response:** **Admitted.**

41. In total, Paramount purchased more than 9,700 home security leads from EMI. (Exhibit 8 at 52; Exhibit 18.)

**Response:** **Admitted.**

42. Paramount converted many of the leads into sales for Saveology. (Exhibit 8 at 31; Exhibit 20.)

**Response:** **Denied. Paramount passed leads along to Saveology and entered information into their order entry system.** *ADT's Exhibit 8 at 31-2.* **This would be a considered a qualified lead. EG then did their due diligence, set up an installation date and soled the qualified customer to an ADT authorized dealer.** *See Exhibit 7 to EG's SMF, pp. 41-2.* **Responding further, Paramount would create its own leads, or purchase leads from EMI and sell those leads to other ADT dealers, and was not exclusively providing leads to Elephant Group.** *EG's SMF ¶ 30.*

9

43. To do so, Paramount entered customers' information into Saveology's order entry system, and Saveology paid Paramount per installation. (Exhibit 8 at 31.)

**Response: EG admits Paramount passed leads along to Saveology and entered information into their order entry system and that Paramount was paid per installation.** *ADT's Exhibit 8 at 31-2.*

44. Saveology paid Paramount $1,367,977 during the course of the approximately ten month relationship between them. (Exhibit 20.)

**Response: Admitted.**

45. ADT had no knowledge of Paramount's relationship with EMI, or Paramount's purchase of EMI leads. (Exhibit 1 at ¶ 59; Exhibit 6 at 141; Exhibit 13 at 100-01.)

**Response: Admitted. Responding further, EG was also not aware that Paramount was buying leads from EMI.** *EG's SMF ¶ 41.*

46. EMI did not inform Paramount how it obtained its leads. (Exhibit 8 at 50.)

**Response: Denied. EMI told Paramount the leads were from EMI's own opt-in database.** *ADT's Exhibit 8 at 50.* **Additionally, EMI told Paramount that EMI was fully compliant with all federal regulations regarding telemarketing.** *EG's SMF ¶ 38.*

47. EMI purchased millions of leads from 2freenites.com, a lead generator. (Exhibit 21 at ¶¶ 4-9.)

**Response: EG denies this statement in part, as the affidavit states that the leads were sold to EMI and Nationwide.** *ADT's Exhibit 21, ¶ 9.*

48. The Terms and Conditions and Privacy pages of the 2freenites.com website included a disclosure that consumers participating in promotions on 2freenites.com were providing consent to receive telemarketing calls from EMI. (Exhibit 21 at ¶ 10.) The disclosure on 2freenites.com did not mention ADT or Saveology. (Exhibit 21 at ¶¶ 26-27.)

**Response: EG is not aware of any evidence that contradicts this statement.**

49. Most of the leads that 2freenites.com sold to EMI, however, did not come from the 2freenites.com website, but rather came from a network of twenty to thirty lead generation websites. (Exhibit 21 at ¶¶ 13-14.)

**Response: EG is not aware of any evidence that contradicts this statement.**

10

50. These websites contained a hyperlink to 2freenites.com, but did not contain any disclosure related to EMI or consent to receive telemarketing calls from EMI. (Exhibit 21 at ¶¶ 17-23.)

**Response: EG is not aware of any evidence that contradicts this statement.**

51. Rather, the consent language on those lead generation websites typically informed consumers that by participating in a promotion, a consumer was consenting to receive telemarketing calls from "affiliates" of that site. (Exhibit 21 at ¶ 20.)

**Response: EG is not aware of any evidence that contradicts this statement.**

52. EMI's Transfer Service Orders did not contain any warranties or representations that EMI complied with federal, state, and local telemarketing laws. (Exhibit 19.)

**Response: EG admits that EMI's transfer service orders did not contain any warranties or representations that EMI complied with federal, state, and local telemarketing laws. However, EMI told Paramount that EMI was fully compliant with all federal regulations regarding telemarketing.** *EG's SMF ¶ 38.*

53. Paramount did not do any due diligence on EMI prior to purchasing EMI leads. (Exhibit 8 at 48, 94.)

**Response: Denied. EMI told Paramount that EMI was fully compliant with all federal regulations regarding telemarketing.** *EG's SMF ¶ 38.* **As part of that compliance, Paramount understood that EMI was manually dialing outbound calls through live agents.** *EG's SMF ¶ 39.* **If EMI was using ADT's name and making calls using prerecorded messages, that would be contrary to what EMI told Paramount.** *EG's SMF ¶ 40, 42.*

54. In particular, Paramount did not obtain any written representations or warranties from EMI regarding EMI's compliance. (Exhibit 8 at 49.) According to Neill's testimony, EMI's representative told Neill during their initial conversation that EMI complied with all telemarketing rules, and Neill did not inquire further. (Exhibit 8 at 48, 103, 123-24.)

**Response: EG admits that Paramount did not have any written agreement with EMI regarding compliance. Paramount simply bought leads from EMI through purchases orders; there was no contract between EMI and Paramount.** *EG's SMF ¶ 31, 35.* **Responding further, EMI told Paramount that EMI was fully compliant with all federal regulations regarding telemarketing.** *EG's SMF ¶ 38.* **As part of that compliance, Paramount understood that EMI was manually dialing outbound calls through live agents.** *EG's SMF ¶ 39.* **If EMI was using ADT's name and placing calls with prerecorded messages, that would be contrary to what EMI told Paramount.** *EG's SMF ¶ 40, 42.*

55. In fact, EMI utilized pre-recorded messages to telemarket ADT products and services on behalf of Paramount. (Exhibit 22 at 9, 14.)

11

**Response:** Denied. There is no evidence that EMI was acting "on behalf of" Paramount. Paramount, like Eversafe and Home Alerts, simply bought leads from EMI and paid EMI for each phone call that EMI transferred to Paramount. *EG's SMF ¶ 34.* Paramount did not have a written agreement with EMI. *EG's SMF ¶ 35.* Paramount did not authorize EMI to use ADT's name in pre-recorded messages that were sent out to consumers. *EG's SMF ¶ 36.* Paramount did not know that EMI was robocalling or sending prerecorded messages to consumers. *EG's SMF ¶ 37.* Paramount understood that EMI was manually dialing outbound calls through live agents. *EG's SMF ¶ 39.* If EMI was using ADT's name, EMI was acting contrary to what they told Paramount. *EG's SMF ¶ 40.*

56. Through a contract with EngageTel, Inc., EMI was assigned a block of telephone numbers for its use, including the number (574) 970-0866. (Exhibit 23 at CHARVAT 000931-940.)

**Response:** EG is not aware of any evidence that contradicts this statement.

57. EMI retained a dialing company, Dynamic Interactive Corp., to provide the Voice Broadcasting technology platform for EMI's pre-recorded telemarketing campaigns. These campaigns used Dynamic's platform to rapidly deliver pre-recorded messages about ADT home security systems to several million recipients through the phone. (Exhibit 24 at ¶¶ 8-9, 31-32.)

**Response:** EG is not aware of any evidence that contradicts this statement.

58. On March 1, 2011, EMI, using the ANI (574) 970-0866, called class plaintiff Vishva Desai's cellular telephone using a pre-recorded message placed by Dynamic's automated dialing system. ("Desai Call"). The Desai Call was part of a larger EMI telemarketing campaign for Paramount. (Exhibit 24 at ¶¶ 28-29; Exhibit 1 at ¶¶ 40, 41.)

**Response:** Denied to the extent that this statement asserts that EMI was acting on behalf of Paramount. Paramount, like Eversafe and Home Alerts, simply bought leads from EMI and paid EMI for each phone call that EMI transferred to Paramount. *EG's SMF ¶ 34.* There is no evidence the Desai Call was transferred to Paramount or any other entity. Additionally, there is no evidence that the March 1, 2011 campaign was related to leads to be sold to EG.

59. Ms. Desai never gave anyone consent to contact her on her cell phone via autodialer and pre-recorded message on behalf of ADT. (Exhibit 25 at Response no. 2.)

**Response:** EG is not aware of any evidence that contradicts this statement.

60. ADT did not place the Desai Call, or any other call that led to the filing and prosecution of this lawsuit. (Exhibit 1 at ¶¶ 28, 34; Exhibit 24 at ¶ 32.)

**Response:** Denied. ADT entered into a settlement agreement in this lawsuit that specifically included calls placed by ADT. *EG's SMF ¶ 67; see also Doc. 243, pp. 2-3 (Final*

12

*Approval Order).* There would be no reason for ADT to include the calls placed by ADT in the agreement it negotiated unless ADT believed the calls it placed were related to this lawsuit.

61. ADT did not authorize the Desai Call, nor did ADT authorize Paramount or EMI to conduct any telemarketing services relating to ADT's products or services. (Exhibit 1 at ¶¶ 34-39, ¶ 59.)

**Response:** Admitted.

62. Daphne Fernandes had heard the name EMI "somewhere along the way" and was told it was a voice broadcaster, "so it was somebody that I would never have touched" and a "no for us." (Exhibit 6 at 139, 141.)

**Response:** Admitted.

63. As a result of the Desai call and other robocalls made by EMI and Paramount, ADT was sued by class plaintiffs in March 2011 for alleged violations of the TCPA. [DE 1.]

**Response:** Denied. ADT was not sued as a result of calls made by EMI and Paramount as alleged in this statement. Paramount operated an inbound call center only and did not make any outbound calls. *EG's SMF ¶ 19, 25.* Responding further, per plaintiffs' complaint, ADT was sued because ADT engaged in an annoying and impermissible advertising campaign for its security products including the making of automatic telephone dialing system and prerecorded/artificial message telephone calls to cellular telephones. *DE 1, ¶ 2.*

64. On August 25, 2011, ADT filed a third party complaint against various entities and individuals whom ADT believed were responsible for the calls at issue in the Desai complaint. [DE 75.]

**Response:** Admitted. Responding further, ADT asserted claims against eleven other entities alleging each of those entities were in some way responsible for calls placed to both Charvat and Desai. *DE 75.*

65. In October 2011, ADT amended its third party complaint to name Elephant Group as a third-party defendant, and to assert claims for indemnification and contribution. [DE 121.]

**Response:** Admitted.

66. In January 2013, the class plaintiffs and ADT reached a settlement. [DE 240.]

**Response:** Admitted.

67. ADT paid $15 million to settle the class claims. [DE 240-1 at ¶ 4.1.]

**Response:** Denied. The settlement between plaintiff and ADT was much broader and included calls beyond those alleged in the class action complaint. The settlement class consisted of:

> All persons or entities who, at any time from January 1, 2007 through the date of the Settlement Agreement, received one or more Covered Calls. "Covered Calls" means either (1) a telemarketing call utilizing a pre-recorded message or (2) a telemarketing call to a cell phone that was made through the use of automated dialing equipment, where the call described in (1) and/or (2) relates in any way to ADT Security Services, Inc. Covered Calls include calls initiated or made by ADT or by someone acting or purporting to act on behalf of ADT, or calls initiated or made by someone seeking to sell products or services relating in any way to ADT, including calls made by ADT's Authorized Dealers, ADT's Authorized Telemarketers, ADT's Marketing Partners, or calls initiated or made by anyone seeking to sell leads relating to ADT, or any calls initiated or made by anyone seeking to sell leads relating to ADT to anyone else, where the lead sought to be generated from the call ultimately could have been sold to ADT, ADT's Authorized Dealers, ADT's Authorized Telemarketers, or ADT's Marketing Partners, including but not limited to any calls made or caused to be made by Christopher Long (or any entity associated with Christopher Long), Oscar Montenegro (or any entity associated with Oscar Montenegro), EMI, Inc. (also known as European Marketing International and European Media International and Nationwide Media, Inc.) (collectively "EMI") (or anyone acting by, through, or with EMI), Direct Savings USA, LLC (or anyone acting by, through, or with Direct Savings USA, LLC), Direct Savings USA, Inc. (or anyone acting by, through, or with Direct Savings USA, Inc.), Paramount Media Group (or anyone acting by, through or with Paramount Media Group), Dynamic Interactive Corp. (or anyone acting by, through or with Dynamic Interactive Corp.), Pete Tolman, Leads Direct Marketing (or anyone acting by, through, or with Leads Direct Marketing), Voice Tel Corp. (or anyone acting by, through, or with Voice Tel Corp.), TM Caller ID (or anyone acting by, through, or with TM Caller ID), City VIP (or anyone acting by, through, or with City VIP), and JMB Enterprises (or anyone acting by, through, or with JMB Enterprises). Covered Calls included any such calls whether or not authorized by, approved by, or known by ADT.

*EG's SMF ¶ 67; see also Doc. 243, pp. 2-3 (Final Approval Order)*

68. ADT has received contribution or indemnification from certain other third-party indemnitors in the aggregate amount of $7 million. (Exhibit 26 at Interrogatory Response no.2; Exhibit 27 at ¶ 7.)

**Response:** Admitted.

14

69. ADT is entitled to indemnification for the remaining $8 million not already paid by other indemnitors. (*Id.*)

**Response: Denied. See generally EG's Motion for Summary Judgment and EG's Response in Opposition to ADT's Motion for Summary Judgment.**

70. ADT incurred attorney's fees and costs in the amount of $2,083,790.30 to defend the class action, for which it now seeks indemnification as well. (Exhibit 27 at ¶ 5.)

**Response: Denied. ADT has not produced the underlying bills to support the attorney fee and costs claim.**

71. As of July 14, 2014, ADT has incurred attorney's fees and costs in the amount of $189,514.41 to prosecute this third-party indemnity action. (Exhibit 27 at ¶ 6.) ADT continues to incur fees and costs in the prosecution of this action as it continues in this Court. (*Id.*)

**Response: Denied. ADT has not produced the underlying bills to support the attorney fee and costs claim.**

### EG'S STATEMENT OF ADDITIONAL MATERIAL FACTS

1. An affiliate is defined in the contract between EG and ADT as "any corporation or other person or entity that directly or indirectly controls, is controlled by, a successor-in-interest to, or alter ego of, or is under the common control with, ADT or Elephant Group, respectively." *Exhibit 1 to EG's SMF, ¶ 4.1.*

2. Paramount was not the agent of EG, but an independent contractor. *Exhibit 6 to EG's SMF, p. 33.*

3. Subject to telemarketing restrictions incorporated into the Agreement by EG, Paramount was responsible for determining how best to market ADT's products. *Exhibit 6 to EG's SMF, p. 33.*

4. EG exercised no control and did not tell Paramount how to generate leads; that process was left up to Paramount. *Exhibit 6 to EG's SMF, p. 34.*

5. EMI advised Paramount that the leads it was selling were generated from live (non-automated) calls placed by EMI's representatives, and that calls would be transferred to Paramount if the customer expressed an interest in purchasing a home security system. *Exhibit 6 to EG's SMF, p. 15.*

6. EG required that, before Paramount made any phone call, it scrubbed the phone number against it ADT's internal Do Not Call list, *Exhibit 6 to EG's SMF, p. 43.*

15

7. At the time Paramount entered into the agreement with EG, Paramount knew that it was required to comply with the marketing guidelines of ADT. *Exhibit 6 to EG's SMF, p. 19-20; p. 35.*

8. Pursuant to the agreement with EG, Paramount knew that it was prohibited from making unsolicited outbound telemarketing calls. *Exhibit 6 to EG's SMF, p. 36.*

9. Paramount received and was trained on ADT's telemarketing guidelines. *Exhibit 6 to EG's SMF, p. 42.*

10. Paramount operated only as an inbound call center, taking calls from potential customers and attempting to convert those leads into sales. *Exhibit 6 to EG's SMF, p. 12.*

11. EG required Paramount to get prior approval before purchasing leads from third parties. *Exhibit 7 to EG's SMF, p. 105.*

12. Paramount was not permitted to subcontract lead generation services without receiving prior written approval from EG. *Exhibit 7 to EG's SMF, p. 114.*

Respectfully submitted,

/s/ Daniel W. Pisani
James K. Schultz
Daniel W. Pisani
Sessions Fishman Nathan & Israel, LLC
55 West Monroe Street, Suite 1120
Chicago, Illinois 60603
Telephone: (312) 578-0990
Facsimile: (312) 578-0991
jschultz@sessions-law.biz
dpisani@sessions-law.biz

*Attorneys for Elephant Group, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 14, 2014, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to the parties of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Respectfully submitted,

/s/ Daniel W. Pisani
James K. Schultz
Daniel W. Pisani
Sessions Fishman Nathan & Israel, LLC
55 West Monroe Street, Suite 1120
Chicago, Illinois 60603
Telephone: (312) 578-0990
Facsimile: (312) 578-0991
jschultz@sessions-law.biz
dpisani@sessions-law.biz

*Attorneys for Elephant Group, Inc.*