IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| VISHVA DESAI and PHILIP J. CHARVAT on behalf of themselves and others similarly situated, | |
| Plaintiffs, | |
| v. | |
| ADT Security Services, Inc., | |
| Defendant/Third-Party Plaintiff, | |
| v. | Case No. 1:11-cv-1925 |
| PETE TOLMAN, LEADS DIRECT MARKETING, VOICE TEL CORPORATION, CHRISTOPHER LONG, EMI, INC., JMB ENTERPRISES, CITY VIP, LLC, DIRECT SAVINGS, USA, INC., OSCAR MONTENEGRO, EVERSAFE SECURITY SYSTEMS, INC., SAFE STREETS USA, LLC, PARAMOUNT MEDIA GROUP, THE ELEPHANT GROUP, INC., AND UNKNOWN JOHN DOE DEFENDANTS I THROUGH XX, | Judge Bucklo<br>Magistrate Judge Keys |
| Third-Party Defendants. | |
| SAFE STREETS USA, LLC, SUCCESSOR BY MERGER TO EVERSAFE SECURITY SYSTEMS, INC., | |
| Fourth-Party Plaintiff, | |
| v. | |
| DIRECT SAVINGS USA, LLC, | |
| Fourth-Party Defendant. | |

**ADT'S MEMORANDUM OF LAW IN OPPOSITION TO
ELEPHANT GROUP'S MOTION FOR SUMMARY JUDGMENT**

Elephant Group moves for summary judgment with arguments that ignore the clear terms of the parties' contract; that ignore the indisputable facts (elsewhere conceded) that Elephant Group, through its agents Paramount and EMI, made millions of prerecorded telemarketing calls in violation of the TCPA; and that ignore the governing laws that foreclose its arguments. Elephant Group tries to deflect its own undeniable liability by asserting ADT's contributory negligence. But Elephant Group never pleaded contributory negligence, in violation of Rule 8(c); ADT was never provided with notice of Elephant Group's intention to assert ADT's negligence in this action; and Elephant Group offers no record evidence now to support such an argument. Its motion must fail.

**ARGUMENT**

Elephant Group offers a litany of arguments, each mistaken. *First:* Elephant Group argues [DE 278 at 4-5] that it is not responsible for the acts of its affiliate Paramount Media Group under the indemnity provisions because Paramount was not, in fact, its "affiliate." *Second:* Elephant Group argues that ADT's contributory negligence bars its indemnity claim. [DE 278 at 5-9.] *Third:* Elephant Group argues [DE 278 at 10] that the indemnity provisions govern only Elephant Group's conduct, and not its agents' conduct. *Fourth:* Elephant Group argues [DE 278 at 10-15] that it did not cause ADT's loss. *Fifth:* Elephant Group argues [DE 278 at 16] that it should not be held liable for a settlement that released claims that Elephant Group did not cause. As shown below, not one of these arguments is supported by the record before the Court, or by the governing law.

1

I.  **The Overwhelming Evidence Demonstrates That Paramount Was Elephant Group's Affiliate, And That Elephant Group Therefore Must Indemnify ADT For Paramount's Unlawful Acts Under Paragraph 6(b) Of The Parties' Agreement.**

As this Court has elsewhere recognized, a party opposing entry of summary judgment need only "identify specific facts showing that there is a genuine issue for trial." *Hackman v. Dickerson Realtors, Inc*., 746 F. Supp. 2d 962, 966 (N.D. Ill. 2010) (Bucklo, J.), *citing Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986). "The non-movant 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Hackman*, 746 F. Supp. 2d at 966, *quoting Matsushita*, 475 U.S. at 586. ADT more than meets these thresholds.

Here, nearly everything in the record before this Court contradicts Elephant Group's new claim [DE 278 at 3] that Paramount was not, in fact, its "affiliate" for the purposes of Paragraph 6(b) of the parties' indemnity agreement. *First:* Elephant Group itself conceded in its Rule 12 motion that Paramount was its affiliate. [DE 170 at 6.] This Court thus noted in its order denying the motion: "Elephant Group does not deny that Paramount is an 'affiliate' under the terms of the contract." [DE 217 at 7.] Nor did Elephant Group contest Paramount's affiliate status by answering the complaint's allegation that Paramount was Elephant Group's affiliate [DE 121, ¶ 55] within the time permitted by Rule 12(a)(4), thus conclusively establishing the fact by operation of Rule 8(b)(6). *See Modrowski v. Pigatto*, 712 F.3d 1166, 1170 (7th Cir. 2013) (the allegations of a plaintiff's complaint are "conclusively established" where the defendant fails "to file a timely answer," because "failure to deny an allegation constitutes an admission."). ADT relied in discovery to its prejudice on Elephant Group's concessions.

*Second:* Elephant Group concedes, as it must, that the parties' agreement defines an "affiliate" to include any entity that Elephant Group "directly or indirectly controls," but then

2

claims as an "undisputed fact" that "Paramount was an independent vendor" beyond Elephant Group's control. [DE 278 at 5.] *Yet in the very next section of Elephant Group's own brief, Elephant Group itself states the ways in which it controlled Paramount's work:*

> EG worked to ensure that Paramount was living up to the contractual standards by auditing Paramount during the term of the agreement, including performing on-site reviews, correcting any process errors, listening to recordings and approving scripts. … EG put in strict rules and undertook supervision to ensure that Paramount was not making outbound telemarketing calls.

[DE 278 at 8.] Well: Which is it?

*Third:* Elephant Group's new denial of its affiliation with Paramount ignores Elephant Group's own contracts with Paramount. Elephant Group and Paramount signed an "Affiliate Agreement" by which, it appears, Paramount would provide services to help Elephant Group perform the ADT contract. Despite ADT's numerous requests that the Affiliate Agreement be produced, (Exhibit 1 at Request no. 17; DE 279-3 at 46; Exhibit 2) and despite Elephant Group's testimony that the Agreement exists, [DE 282-6 at 30-36] Elephant Group never produced the Affiliate Agreement in discovery. Given the document's existence, and Elephant Group's failure to produce it, the Court may draw the reasonable inference that the document supports the conclusion that the Affiliate Agreement in fact created an affiliation as between Elephant Group and Paramount. *See Russell v. Nat'l R.R. Passenger Corp.*, 189 F.3d 590, 595 (7th Cir. 1999). Corroborating with such an inference, Elephant Group *did* produce an "Addendum" to its Paramount "Affiliate Agreement" that refers repeatedly to Paramount as Elephant Group's "affiliate." [DE 282-7.]

*Fourth:* Ample record evidence contradicts Elephant Group's new denial of its affiliation with Paramount. Here is an incomplete list of the facts from which the Court may find that

3

Elephant Group asserted sufficient control over Paramount to create an affiliation under the parties' indemnity agreement:

- Elephant Group's Director of Operations testified that the Addendum to the unproduced Affiliate Agreement is a "standard addendum" for an "affiliate." [DE 282-6 at 34.]

- The Addendum includes strict requirements as to the types of marketing Paramount was permitted to do and restricted specific telemarketing activities. [DE 282-7 at Exhibit B.]

- The Addendum also states in detail how and when Elephant Group will pay commissions to Paramount and what deductions Elephant Group may take from commissions. [DE 282-7.]

- Elephant Group provided live training as well as written training materials to Paramount regarding calling practices. [DE 282-6 at 46-47.]

- Elephant Group's Director of Operations, Daphne Fernandes, randomly monitored Paramount's calls. [DE 282-6 at 48, 52; DE 282-13 at 45.]

- In the event Ms. Fernandes discovered something incorrect about Paramount's calling procedures, she would require Paramount to correct it. [DE 282-6 at 53.]

- Ms. Fernandes would visit and inspect Paramount's offices for quality assurance purposes. [DE 282-6 at 47-48.]

- Elephant Group specified the procedures by which Paramount would qualify a customer, and provided the script for Paramount to follow. [DE 282-6 at 40.]

- Paramount was required to upload its customer information into Elephant Group's computer system. [DE 282-8 at 31.]

- Elephant Group controlled Paramount's marketing tactics and methods by requiring that Paramount submit them to Elephant Group for review and approval. [DE 282-6 at 105, 116.]

- Elephant Group's Chairman as well as its Director of Operations referred to Paramount as an "affiliate" of Elephant Group in their respective testimony. [DE 282-6 at 28, 93, 116, 120, 134, 138; DE 282-13 at 83.]

- Elephant Group and Paramount had regular and frequent contact concerning the marketing of ADT products and services. [DE 282-6 at 53; DE 282-10; DE 282-11; DE 282-12; DE 282-14; DE 282-16; DE 282-18.]

- Elephant Group guided and directed Paramount's marketing of ADT products and services. [DE 282-6 at 52-53, DE 282-10; DE 282-17.]

- Elephant Group required Paramount to "scrub" phone number lists before making outbound calls to remove numbers listed in "do not call" registries, and forwarded scrubbing instructions to Paramount with additional guidance. [DE 282-17.]

- Paramount was required to answer compliance inquiries sent by Elephant Group. Ms. Fernandes regularly forwarded ADT inquiries to Paramount with instructions to provide specific information (such as opt-in data) concerning particular calls. [DE 282-10; DE 282-11; DE 282-12; DE 282-14 & DE 282-16.]

- Paramount was required to supply Elephant Group with all of its Caller IDs. [DE 282-11.]

- Paramount marketed ADT products and services solely on behalf of Elephant Group. It did not work for any other ADT Authorized Dealer, Authorized Marketer, or Authorized Telemarketer. [DE 282-9, Response 4.]

All of the above facts demonstrate that Elephant Group exercised near-complete control over Paramount's performance of work for Elephant Group such that Paramount was its "affiliate," as that term is used in Paragraph 6(b) of the parties' Agreement. Elephant Group's claim that Paramount was not its affiliate is thus disputed (and refuted) by these material facts, each supported by the record before the Court. Indemnity thus lies under Paragraph 6(b).

## II. Elephant Group's Contributory Negligence Defense Fails As A Matter of Law.

Elephant Group wrongly argues at length that ADT is barred by its own negligence from seeking indemnity here. [DE 278 at 5-10.] The argument fails for several reasons, each fatal. *First:* The argument is barred by Elephant Group's failure to plead contributory negligence. *Second:* Elephant Group offers no facts to support its allegations that ADT was negligent in its engagement of marketers. *Third:* Elephant Group misreads the indemnity provisions as barring

5

indemnity in the presence of contributory negligence, when in fact the contract provisions contain no such bar. The Court should reject the defense out of hand.

### A. Elephant Group's Failure To Plead Contributory Negligence As An Affirmative Defense Bars Its Reliance On ADT's Conduct.

As the Court is aware, Elephant Group did not answer the complaint until after the close of discovery. [DE 274.] ADT moved to strike the answer. [DE 275.] Elephant Group's late-filed answer, such as it is, asserts no affirmative defenses. [DE 274 at 40.]

Nothing in the record of this case suggested, before this motion, that Elephant Group was intending to defend this action by asserting that ADT's own negligence in its relations with Elephant Group or ADT's other marketing partners barred ADT's recovery against Elephant Group in this case. ADT objected to Elephant Group's discovery requests aimed at ADT's relationships with other marketers on grounds that they were irrelevant. (Exhibit 3 at Requests 8-11, 24-25, 29-33; Interrogatory no.22.) Elephant Group conceded the point – it never disputed ADT's relevance objections, and it never moved to compel responses. Now, for the first time, Elephant Group defends by alleging ADT's contributory negligence based, *inter alia*, on the unproven supposition of ADT's "failure to supervise its other authorized vendors, such as Eversafe, Absolute Security, Defendant, Alarms Pro and Home Alert." [DE 278 at 7.]

Rule 8(c) provides that defenses based on contributory negligence must be affirmatively pled in the answer. *See* FED. R. CIV. P. 8(c). This Court has itself recognized that an unpled affirmative defense is waived when it is raised, as here, for the first time in a summary judgment motion. *See Phipps v. Sheriff of Cook County*, 681 F. Supp. 2d 899, 906 (N.D. Ill. 2009) (Bucklo, J.). The Seventh Circuit concurs. *See Venters v. City of Delphi*, 123 F.3d 956, 969 (7th Cir. 1997) (refusing to permit the late assertion of an unpled affirmative defense in violation to Rule 8(c) during the briefing of summary judgment motions). As the Seventh Circuit there reasoned:

> We cannot overlook the failure to comply with Rule 8(c) in this context. Intentionally or not, Venters was bushwacked. We recognize that the limitations defense may have been meritorious; and Venters' counsel should have had some inkling that the defense *might* be raised given the date that her own allegations placed on the events central to her free speech claim. But it was not Venters' obligation to raise the defense, and if Rule 8(c) is not to become a nullity, we must not countenance attempts to invoke such defenses at the eleventh hour, without excuse and without adequate notice to the plaintiff.

*Venters*, 123 F.3d at 969 (emphasis in original), *citing Maul v. Constan*, 928 F.2d 784, 786 (7th Cir. 1991) (court "will not speculate as to how the case would have proceeded had the correct procedure been followed").

If Elephant Group was planning to stake its defense on ADT's conduct with respect to ADT's other marketing partners, then ADT was entitled to notice and an opportunity to prepare its case in response to the defense. This is the clear requirement of Rule 8(c), and of due process generally. *See Mullane v. Central Hanover Bank & Trust Co.*, 329 U.S. 306, 313-15 (1950). Elephant Group failed this requirement.

### B. Elephant Group's Contributory Negligence Claims Are Based On Nothing More Than Rank Speculation.

Moreover, Elephant Group's contributory negligence argument fails on its merits because it is based entirely on speculation and unsupported inferences. Elephant Group claims that ADT's damages from the underlying action were due to ADT's own negligence and failure "to supervise its other authorized vendors." [DE 278 at 7.] Yet nowhere does Elephant Group specify any acts or omissions by ADT that constitute negligence. This case has been pending for more than three years. Elephant Group, however, makes not even a cursory effort to identify when, how, or by whom such failure to supervise occurred. Nor does Elephant Group show how any allegedly wrongful conduct by ADT proximately caused the damages incurred. *See Woods v. Delgar Ltd.*, 226 P.3d 1178,1180 (Colo. App. 2009) (under Colorado law, a party asserting

7

negligence must show that: (i) defendant owed a legal duty to conform to a certain standard of care; (ii) breach of that duty; (iii) damages; and (iv) the damages were caused by the defendant's breach.)

Instead, Elephant Group argues by grand (and unsupported) pronouncements such as: "EG's putative negligence is dwarfed by the wrongful acts of ADT." [DE 278 at 7.] Because other companies made outbound telemarketing calls on behalf of authorized ADT dealers, Elephant Group presumes, ADT must have been negligent. But that is a presumption without any record evidence to support it. Elephant Group's bullet-pointed "evidence" [DE 278 at 6] offers *not one fact* by which the Court might find negligence *of any sort* on ADT's part:

- Elephant Group invokes a 2007 consent decree that ADT voluntarily entered into with the FTC in 2007. The decree does not demonstrate any negligence by ADT that caused the underlying lawsuit. In fact, the consent decree had no relation to the underlying action, or to the plaintiffs' robocalling allegations. [DE 282-4 at 55-56.] ADT completed its reporting requirements in 2012, and the FTC has not since requested any additional information. [DE 282-4 at 58, 61.]

- Elephant Group argues that "calls were being made by entities that had no contractual relationship with Elephant Group." [DE 278 at 6.] This statement does not demonstrate negligence by ADT. At best, it might show that there were multiple tortfeasors. It does not, however, evidence any breach of a duty of care by ADT.

- Similarly, the mere fact that EMI also engaged in telemarketing campaigns for ADT dealers unrelated to Elephant Group does not establish negligence by ADT. Elephant Group offers no proof that ADT failed to exercise due care in its supervision of its dealers. Nothing, in fact, in this statement evidences any failure by ADT to exercise reasonable care.

- Elephant Group refers to ADT's own call center, but again does not show any connection between ADT's call center and the allegations in the underlying action. In fact, the evidence shows that ADT's call center primarily handles inbound calls and *never* makes unsolicited outbound calls. [DE 279-2 at 114-15; DE 282-4 at 14-15] As Elephant Group concedes, ADT itself did not make any of the calls at issue in the underlying action. [DE 279-2 at 96-97; DE 278 at n.4]

- Likewise, the mere fact that authorized dealers unrelated to Elephant Group also hired lead generators does not evidence any elements of negligence by ADT, nor does it relieve Elephant Group of liability for its own misconduct.

- Elephant Group asserts: "ADT admits that most of the covered calls included in the class action settlement were not called by EMI." The assertion, again, is irrelevant to any claim of negligence by ADT.

- Elephant Group cites allegations from a new TCPA class action lawsuit against ADT. But a complaint, by itself, carries no evidentiary weight.

Not one of these points proves anything. Elephant Group has offered the Court no fact to prove ADT's negligence – no fact to show that ADT owed a duty of care, and failed to meet it. Elephant Group's unfounded contributory negligence argument cannot be credited; rank speculation cannot justify summary judgment. Lacking evidentiary support, the argument fails.

It is not ADT's burden, in opposing summary judgment, to make affirmative proof of its due care taken in the conduct of its marketing operations, but the Court should note the many facts in the record before it on which a jury could conclude that ADT in fact exercised due care in its relations with its marketing partners. ADT subjects potential marketing partners to extensive due diligence before hiring them. [DE 279-2 at 131-32] ADT maintains a dedicated contact compliance team that monitors the activities of its marketing partners, and that investigates all consumer complaints reported to ADT. [DE 282-4 at 20-21, 37.] ADT shuts down all marketing activities by any partner, like Elephant Group, that is found to have violated the terms of the parties' agreements, or who has engaged in conduct that violates the law. [DE 279-3 at 55] ADT promptly investigates details of any customer complaint that might come to its attention. [DE 282-4 at 37-42.] Unlike Elephant Group [DE 282-7], ADT expressly prohibits the delegation of work under its contracts to subcontractors, precisely to assure itself that work performed in ADT's name under the contract is performed by the company ADT hired to perform it, subject to the controls ADT specified in the contract. [DE 279-2 at 102, 128-29]

ADT's relations with its marketers should have no bearing on the disposition of this case, but in any event the record supports the conclusion that ADT did in fact exercise due care in the conduct of its marketing activities.

      **C.    Elephant Group Misreads The Indemnity Provisions.**

Finally, Elephant Group misconstrues Paragraph 6(b)'s indemnity provision. Contrary to Elephant Group's suggestion, a finding of contributory negligence by ADT would not "abrogate" Elephant Group's indemnity obligation. Paragraph 6(b) requires Elephant Group to indemnify ADT "*except to the extent that* any such claim or action is due to any negligent acts, omissions, wrongful acts, fault or willful misconduct of ADT" (emphasis added). At most, ADT's fault (had any been shown) might reduce the amount Elephant Group owed under Paragraph 6(b), but would not "abrogate" it. And it would have no effect whatsoever on Elephant Group's indemnity obligations under Paragraph 23.F, which contains no similar condition.

Thus, even if Elephant Group had pled contributory negligence (which it did not), and even if Elephant Group had offered facts sufficient to establish ADT's contributory negligence (which it did not), Elephant Group would nonetheless remain liable for indemnity in some measure under the parties' agreement. Elephant Group readily acknowledges that its actions contributed to the harm suffered by ADT. As Elephant Group writes: "On balance," ADT's conduct "contributed to a *greater degree* to the underlying action than any acts or omissions of EG." [DE 278 at 9 (emphasis added).] By its own admission, Elephant Group has contributed to at least some of ADT's damages, and at least to that extent must indemnify ADT.

**III.    Paragraph 23.F Expressly Requires Elephant Group To Indemnify ADT For Losses Caused By Paramount.**

Elephant Group makes the meritless claim [DE 278 at 9-10] that it is not liable to indemnify ADT under Paragraph 23.F of the Agreement because Elephant Group itself did not

10

make unsolicited outbound telemarketing calls. In making this argument, Elephant Group completely ignores the unambiguous language of Paragraph 23.A, which holds Elephant Group accountable for *any* unsolicited outbound telemarketing calls whether made "directly or indirectly through telemarketing agents or others on behalf of ADT." [DE 282-2 at ¶23.A.] The plain language of the provision forecloses this argument.

It is immaterial that Elephant Group itself did not make unsolicited outbound calls. The language of Paragraph 23.F makes Elephant Group liable for calls made "indirectly through telemarketing agents or others," a term which necessarily includes Paramount and EMI. As explained in ADT's motion for summary judgment, [DE 281 at 10-12] Elephant Group is liable for the acts of its affiliate, Paramount, and its sub-affiliate, EMI, under common-law agency principles. The law affords Elephant Group no basis to avoid the plain language of Paragraph 23.F. *See Constable v. Northglenn, LLC*, 248 P.3d 714 (Colo. 2011) (affirming summary judgment where lease contained clear expression of intent to indemnify).

## IV. Elephant Group Cannot Avoid Its Indemnity Obligations By Attacking ADT's Settlement Of The Underlying Action.

In a classic case of hindsight, Elephant Group now argues [DE 278 at 10-15] that ADT should not have settled the underlying action for $15 million because "plaintiffs' theory would fail as a matter of law." [DE 278 at 3.] Neither the law nor circumstance justifies Elephant Group's invitation to re-open the underlying lawsuit and relitigate the merits of the class plaintiffs' claims.

*First:* The argument fails because the settlement's reasonableness is *res judicata*. This Court has already approved ADT's settlement of the class action for $15 million as "fair, adequate, [and] reasonable" in light of the "complex legal and factual posture of the Action, and the fact that the Settlement Agreement is the result of arms' length negotiations presided over by

11

a neutral mediator." [DE 243 at 2.] Elephant Group did not object to the settlement, [DE 282-13 at 73-75, 77] or to the Court's order approving it. Indeed, the Court entered DE 243 on the plaintiffs' *unopposed* motion. [DE 243 at 1.]

    *Second:* Estoppel bars the argument because Elephant Group never objected *anywhere* to the settlement (indeed, welcomed it) and ADT relied on Elephant Group's acquiescence in going forward with the settlement. Elephant Group participated in at least three mediations with ADT before the settlement. [DE 282-13 at 67-68.] Elephant Group had ample opportunity to object at mediation to the proposed settlement, yet sat silent. [DE 282-13 at 73-5, 77.] Nor, as already noted, did Elephant Group object when the Court heard arguments on the settlement. At all times, Elephant Group was represented by local and national counsel. Elephant Group had been served with ADT's third-party complaint demanding indemnity. Elephant Group had clear notice not only of the settlement, but also of its legal consequences in light of ADT's indemnity claim. [DE 282-13 at 77.] Yet Elephant Group did not object. If anything, Elephant Group cheered the settlement because the class settlement *benefitted Elephant Group* by capping its own potential liability under the indemnity agreement to a manageable sum. ADT relied on Elephant Group's acquiescence when at last it decided to settle with the class for $15 million. (Exhibit 4 at 74-76.) Elephant Group, having stood silent as ADT compromised the class claims, and having failed to object when this Court approved it, should not now be heard to argue that the settlement was improvident, or that it should be permitted to duck its indemnity obligations on that premise. "One may not assume a position inconsistent with a former position to the prejudice of his adversary." *Lebold v. Inland Steel Co*., 125 F.2d 369, 375 (7th Cir. 1941), *cert. denied*, 316 U.S. 675 (1942) *citing* Pomeroy, EQUITY JURIS. § 804. "It is the injury accruing from inducement or silent acquiescence which creates the estoppel." *Id*.

*Third:* The argument fails on the facts. Elephant Group's own Chairman, Joseph Bamira, agreed at deposition with ADT's logic in settling the class claim for $15 million. Mr. Bamira testified that the class action, in his opinion, presented a "material risk" to ADT, adding: "Even if the chance [of a class being certified] was small, given the number that [ADT] faced, the probabilities, probably from their perspective, it was a good decision" to settle. [DE 282-13 at 70-71, 72.] Mr. Bamira concluded: "If you have to choose between losing 15 and risking 2 billion, if that's the case, the mathematics is probably fair." [DE 282-13 at 72.] ADT settled to avoid the real risk of being held vicariously liable for the acts of the third party defendants, including Elephant Group, in advance of an anticipated FCC ruling on that very subject.[1] [DE 279-2 at 106-08] Had a class been certified in the underlying action, ADT would have risked liability in the billions of dollars. [DE 279-2 at 106-08, 111] Given that existential exposure, ADT's decision to settle the action for $15 million was eminently reasonable. *See Burlington Northern RR Co. v. Stone Container Corp,* 934 P.2d 902, 906-07 (Colo. App. 1997).

*Fourth:* The law does not support Elephant Group's efforts to relitigate the wisdom of ADT's settlement. *See, e.g., Minch v. City of Chicago*, 486 F.3d 294, 301 (7th Cir. 2007) (applying a presumption against reopening matters already decided). One need not prove "absolute legal liability" to recover indemnity following a settlement, but, rather, only that one was "potentially liable to the claimant and that the settlement amount was reasonably related to the liability exposure." *Burlington Northern RR Co.*, 934 P.2d at 906-07. Thus, for example, the Tenth Circuit has found that indemnity lies for any amount of a total settlement for which the plaintiff has a "reasonable anticipation of liability." *Vitkus v. Beatrice Co.*, 127 F.3d 936, 945

---

[1] Only two months after the settlement, on May 9, 2013, the FCC released its declaratory ruling upholding an expansive reading of vicarious liability in TCPA actions, thereby increasing the likelihood that ADT would have been held liable had it continued to litigate. *See In re Joint Petition Filed by Dish Network, LLC*, 28 F.C.C.R. 6574 (FCC May 9, 2013).

13

(10th Cir. 1997). Were an indemnitee required to prove that it was actually liable to receive indemnification, it would have little reason ever to settle an action against it. *See id*. Instead, the indemnitee need show only that the settlement fairly reflected the indemnitee's potential exposure in the underlying lawsuit. *See id*. Thus, in *Vitkus*, the Tenth Circuit found a ten million dollar payment reasonable in light of the "far greater" judgment the indemnitee might have faced at trial. *Id*., 127 F.3d at 946.

ADT satisfied that standard. ADT's decision to settle, made after many months of intense negotiations through the offices of one of the nation's top mediators, under this Court's supervision, and with this Court's approval, was reasonable in light of the astronomical risks presented – risks caused in large part by Elephant Group's own recklessness.

## V. The Breadth Of The Settlement Offers Elephant Group No Basis For Shirking Its Indemnity Obligations.

Finally, Elephant Group argues that indemnity should not lie because the "settlement was extremely broad and most of the covered calls are not alleged to be connected to EG." [DE 278 at 16.] Again, Elephant Group offers no data to prove that allegation. Moreover, the allegation is irrelevant. Nothing in the parties' contract provides for such a result. Not surprisingly, Elephant Group cites to no authority for this proposition, nor is ADT aware of any case or theory that diminishes an indemnity obligation by reason of the scope of the release obtained. If Elephant Group believes the indemnity to be paid is disproportionate to its share of ADT's loss, its remedy is a contribution action against the other tortfeasors, who together have already paid ADT $7 million (UF 68-69). *See, e.g., Prisbey v. Noble*, 505 F.2d 170, 176 (10th Cir. 1974) (contribution lies as among several co-indemnitors "upon payment by one co-obligor of more than his share"). Of course, Elephant Group has not yet even attempted its threshold showing, with record evidence, that it is being asked to pay a disproportionate share of ADT's

14

loss.  Indeed, since it was an EMI call to Vishva Desai, made in the performance of Elephant Group's ADT contract, that triggered this entire lawsuit, a jury could reasonably conclude that Elephant Group is responsible for the entire loss.

As shown in ADT's motion for summary judgment, Elephant Group, through its affiliate Paramount, and its sub-affiliate EMI, unleashed millions of unauthorized and unlawful robocalls upon the public in ADT's name, including the call to Ms. Desai that prompted this lawsuit.  The fact that other entities may have also made illegal calls does not release Elephant Group from liability to indemnify losses caused by its own misconduct, and that of its affiliates.  ADT has pursued each and every third-party who bears responsibility for its losses in this case, and has collected $7 million from them.  It is time for Elephant Group to honor its contract, and to indemnify ADT for the remainder.

## CONCLUSION

The motion should be denied.

Dated: August 14, 2014

By:  __/s/ John A. Leja__
John Leja (ARDC 6256269)
POLSINELLI PC
161 N. Clark Street, Suite 4200
Chicago, Illinois 60601
Telephone:  (312) 819-1900
Facsimile:  (312) 819-1910
*jleja@polsinelli.com*

C. Sanders McNew
McNEW P.A.
2385 NW Executive Center Drive
Suite 100
Boca Raton, Florida  33431
Telephone:  (561) 299-0257
*mcnew@mcnew.net*

*Attorneys for Defendant/Third-Party Plaintiff ADT Security Services, Inc. (n/k/a The ADT Corporation or ADT, LLC)*

## CERTIFICATE OF SERVICE

Please take notice that on August 14, 2014, I caused the foregoing to be filed with the Clerk of the United States District Court for the Northern District of Illinois, utilizing the Court's ECF system which will send a copy of the said documents to all attorneys of record by electronic mail.

By: /s/ John A. Leja