IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| VISHVA DESAI and PHILIP J. CHARVAT on behalf of themselves and others similarly situated, | |
| Plaintiffs, | |
| v. | |
| ADT Security Services, Inc., | |
| Defendant/Third-Party Plaintiff, | |
| v. | Case No. 1:11-cv-1925 |
| PETE TOLMAN, LEADS DIRECT MARKETING, VOICE TEL CORPORATION, CHRISTOPHER LONG, EMI, INC., JMB ENTERPRISES, CITY VIP, LLC, DIRECT SAVINGS, USA, INC., OSCAR MONTENEGRO, EVERSAFE SECURITY SYSTEMS, INC., SAFE STREETS USA, LLC, PARAMOUNT MEDIA GROUP, THE ELEPHANT GROUP, INC., AND UNKNOWN JOHN DOE DEFENDANTS I THROUGH XX, | Judge Bucklo<br>Magistrate Judge Keys |
| Third-Party Defendants. | |
| SAFE STREETS USA, LLC, SUCCESSOR BY MERGER TO EVERSAFE SECURITY SYSTEMS, INC., | |
| Fourth-Party Plaintiff, | |
| v. | |
| DIRECT SAVINGS USA, LLC, | |
| Fourth-Party Defendant. | |

## ADT'S RESPONSE TO ELEPHANT GROUP'S STATEMENT OF FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule 56.1, the third-party plaintiff hereby responds to Elephant Group's Statement of Uncontested Material Facts. [DE 279].

1. Disputed. There are a number of entities that share the name, "ADT," and not all of them are Delaware corporations.

2. Disputed. There are a number of entities that share the name, "ADT," and many of them do not provide electronic security services to residences in the U.S.

3. Admitted.

4. Disputed. There are a number of entities that share the name, "ADT." Elephant Group was never an authorized marketer for nearly all of them, and today is not an authorized marketer for any of them.

5. Admitted.

6. Admitted.

7. Disputed. There are a number of entities that share the name, "ADT." Admitted, that ADT Security Services, Inc., entered into such an agreement.

8. Disputed. The Agreement contains two independent indemnity provisions which are triggered by specific conduct beyond breach of the Agreement. [DE 282-2 at ¶ 6(b) and ¶ 23F.)]

9. Admitted.

10. Admitted.

11. Disputed. There are a number of entities that share the name, "ADT." ADT Security Services, Inc., undertook extensive vetting of Elephant Group, including checking references and investigating Elephant Group's compliance department and operations before

signing the Agreement with Elephant Group. [DE 279-2 (Lim Dep. at 131-32.)] During the course of the relationship, ADT's dedicated "contact compliance" team monitored calls made by Elephant Group as well as calls by other third party marketers, and investigated all consumer complaints reported to ADT. [DE 282-4 (Bergman Dep. at 20-21, 37-42.)] ADT shut down all marketing by other entities immediately upon learning of the existence of unapproved affiliates. [DE 279-3 (Shapiro Dep. at 55)]

The quoted portion of testimony is taken out of context. The witness was *not* asked about ADT's supervision to ensure Elephant Group's compliance with the telemarketing rules. Instead the witness was asked the following:

> Q: The contract formation, when ADT was actually working with Elephant Group, was there any sort of followup in terms of auditing, site inspections, **anything like that, where ADT checked to ensure that Elephant Group was not hiring lead generators without express written permission?**

[DE 279-2 (Lim Dep. at 132.)] (emphasis added)

12. Disputed. Elephant Group, through its affiliate, Paramount, and subaffiliate, EMI, made millions of prerecorded telemarketing calls advertising ADT Security Services, Inc.'s products and services without consumer consent. [DE 282-21; 282-22 at 9, 14; 282-24 at ¶¶ 8-9, 28-32.]

13. Disputed. The documents cited by Elephant Group that purportedly support this "fact" do not actually support it. Nothing in the cited material demonstrates that "ADT approved a more informal process of review and vendor approval." In fact, the Agreement provided that it "may be amended only by writing duly executed by ADT and Elephant Group." [DE 282-2 at ¶ 15] Further, the Agreement included a no-waiver provision which stated that "[n]o failure by either party to exercise . . . its rights, and no course of dealing with respect to any right . . .shall operate as a waiver thereof, unless and only to the extent agreed to in writing by both parties."

[DE 282-2 at ¶16.] No such writing executed by both parties exists, and Elephant Group points to none. ADT Security Services, Inc., never granted express written consent to Elephant Group for an assignment to Paramount or any third party prior to the filing of the underlying lawsuit. [DE 282-5 at ¶7; 282-6 (Fernandes Dep. at 121-22.)]

14. Disputed. ADT bases its indemnity claims on the terms of the contract. The two indemnification provisions oblige Elephant Group to indemnify ADT for damages (1) arising out of Elephant Group's breach of the telemarketing provisions of the Agreement, (2) resulting from or relating to Elephant Group's own negligence, or (3) resulting from or relating to the negligent and intentional torts of Elephant Group's affiliate, Paramount. [DE 282-2 at ¶23F and ¶6(b).]

15. Disputed. For those calls that ADT Security Services *could identify* as originating from a telemarketing call involving Elephant Group, Elephant Group was able to provide ADT with substantiation that the consumer had consented to the call.

16. Disputed. ADT Security Services received 19 complaints *that it could identify* as originating from a telemarketing call involving Elephant Group.

17. Disputed. Elephant Group's affiliate, Paramount, and subaffiliate, EMI, used prerecorded messages in telemarketing for ADT products and services, and those calls are chargeable to Elephant Group itself under basic principles of agency, as corporations may act only through their agents. [DE 282-22 at 9, 14; DE 282- 24 at ¶¶8-9, 28-32]

18. Disputed. Elephant Group's affiliate, Paramount, and subaffiliate, EMI, made unsolicited outbound telemarketing calls for ADT products and services, and those calls are chargeable to Elephant Group itself under basic principles of agency, as corporations may act only through their agents. [DE 282-22 at 9, 14; DE 282-24 at ¶¶8-9, 28-32]

4

19.     Disputed.  Paramount also made outbound calls [DE 282-16 and 282-17; DE 282-6 (Fernandes Dep. at 15)] and contracted with EMI who made millions of prerecorded calls on Paramount's behalf.  [DE 282-22 at 9, 14; DE 282-24 at ¶¶8-9, 28-32]

20.     Admitted.

21.     Disputed.  Paramount also made outbound calls [DE 282-16 and 282-17] and contracted with EMI who made millions of prerecorded calls on Paramount's behalf. [DE 282-22 at 9, 14; DE 282-24 at ¶¶8-9, 28-32]

22.     Disputed.  Paramount was an affiliate of Elephant Group, and executed an "Affiliate Agreement" with Elephant Group.  [DE 282-7; DE 282-6 (Fernandes Dep. at 28, 34); DE 282-13 (Bamira Dep.at 83.)]

23.     Disputed.  Paramount sold a different security product prior to selling ADT.  [DE 282-8 (Neill Dep. at 18.)]  Once it contracted with Elephant Group, Paramount sold only leads for ADT products and services.  [*Id*.; DE 282-7]  Paramount sold ADT leads exclusively to Elephant Group; it did not work with any ADT authorized dealers, authorized marketers or authorized telemarketers aside from Elephant Group. [DE 282-9 at Response no. 4]

24.     Disputed.  Elephant Group gave Paramount the authority to subcontract with unknown and unidentified entities. [DE 282-7]  Elephant Group knew that Paramount used subaffiliates and/or third party lead generators to make telephone calls.  [DE 282-6 (Fernandes Dep. at 102-05; DE 282-10, DE 282-11, DE 282-12; DE 282-8 (Neill Dep. at 76-77, 84.)]  EG did nothing to learn the identities of these subaffiliates or investigate their compliance practices. [DE 282-6 (Fernandes Dep. at 105-08); DE 282-13 (Bamira Dep. at 31.)]

25. Disputed. Paramount, through its agent, EMI, made millions of prerecorded calls without consumer consent advertising ADT products and services. [DE 282-22 at 9, 14; DE 282-24 at ¶¶8-9, 28-32]

26. Disputed. Paramount did not receive the actual ADT telemarketing guidelines, but instead received guidelines written by Elephant Group and included in the Addendum to the Affiliate Agreement between Elephant Group and Paramount. [DE 282-7 at Exhibit B; DE 282-6 (Fernandes Dep. at 36)]

27. Admitted.

28. Disputed. Although the Addendum prohibited Paramount from using prerecorded messages, it did so nonetheless. [DE 282-22 at 9, 14; DE 282-24 at ¶¶8-9, 28-32] Elephant Group knew that Paramount used subaffiliates and/or third party lead generators to make telephone calls. [DE 282-6 (Fernandes Dep. at 102-05); DE 282-10, DE 282-11, DE 282-12; DE 282-8 (Neill Dep. at 76-77, 84.)] Elephant Group did nothing to learn the identities of these subaffiliates or investigate their compliance practices. [DE 282-6 (Fernandes Dep. at 105-08); DE 282-13 (Bamira Dep.at 31.)]

29. Although the Addendum prohibited Paramount from using prerecorded messages, it did so nonetheless. [DE 282-22 at 9, 14; DE 282-24 at ¶¶8-9, 28-32]

30. Disputed. Paramount sold leads for ADT products and services exclusively to Elephant Group; Paramount did not work with any ADT authorized dealers, authorized marketers or authorized telemarketers aside from Elephant Group. [DE 282-9 at Response no. 4]

31. Disputed. The Transfer Service Orders between EMI and Paramount are written contracts. [DE 282-18 and 282-19]

32. Admitted.

6

33. Admitted.

34. Admitted.

35. Disputed. The Transfer Service Orders between EMI and Paramount are written contracts. [DE 282-18 and 282-19]

36. Disputed. The Transfer Service Orders executed by Paramount expressly state that it "has read and approved all scripts associated with this Service Order." [DE 282-19 at 2] The scripts used by EMI included the ADT name. [DE 282-24 at Exhibit B] EMI did not inform Paramount how it obtained its leads, and Paramount did no due diligence on EMI prior to purchasing leads. [DE 282-8 (Neill Dep. at 48, 49, 50, 94)] Paramount should have known, with the exercise of reasonable care, that EMI was using ADT's name even though EMI was not authorized to do so.

37. Disputed. EMI did not inform Paramount how it obtained its leads; EMI's Transfer Service Orders contained no warranties or representations that EMI complied with all federal, state , and local telemarketing laws; and Paramount did no due diligence on EMI prior to purchasing leads. [DE 282-8 (Neill Dep. at 48, 49, 50, 94); DE 282-19 at 2] Paramount should have known, with the exercise of reasonable care, that EMI was robocalling or sending prerecorded messages to consumers.

38. Admitted only that during their initial conversation EMI told Paramount that it complied with all telemarketing rules, and that Paramount did not inquire further. However, EMI did not inform Paramount how it obtained its leads; EMI's Transfer Service Orders contained no warranties or representations that EMI complied with all federal, state , and local telemarketing laws; and Paramount did no due diligence on EMI prior to purchasing leads. [DE 282-8 (Neill Dep. at 48, 49, 50, 94); DE 282-19 at 2] Paramount should have known, with the

exercise of reasonable care, that EMI was robocalling or sending prerecorded messages to consumers.

39. Disputed. EMI did not inform Paramount how it obtained its leads; EMI's Transfer Service Orders contained no warranties or representations that EMI complied with all federal, state , and local telemarketing laws; and Paramount did no due diligence on EMI prior to purchasing leads. [DE 282-8 (Neill Dep. at 48, 49, 50, 94); DE 282-19 at 2] Paramount should have known, with the exercise of reasonable care, that EMI was robocalling or sending prerecorded messages to consumers.

40. Disputed. The Transfer Service Orders executed by Paramount expressly state that it "has read and approved all scripts associated with this Service Order." [DE 282-19 at 2] The scripts used by EMI included the ADT name. [DE 282-24 at Exhibit B] EMI did not inform Paramount how it obtained its leads, and Paramount did no due diligence on EMI prior to purchasing leads. [DE 282-8 (Neill Dep. at 48, 49, 50, 94)] Paramount should have known, with the exercise of reasonable care, that EMI was using ADT's name even though EMI was not authorized to do so.

41. Disputed. Elephant Group knew that Paramount was purchasing leads from unknown and unidentified third parties, and that Paramount's subaffiliates and/or third party lead generators were making outbound calls. [DE 282-6 (Fernandes Dep. at 102-05); DE 282-10, DE 282-11, DE 282-12; DE 282-8 (Neill Dep. at 76-77, 84.)] Elephant Group knew that EMI was a voice broadcaster operating in the industry [DE 282-6 (Fernandes Dep. at 139, 141)] but did nothing to learn the identities of Paramount's subaffiliates or investigate their compliance practices. [DE 282-6 (Fernandes Dep. at 105-08); DE 282-13 (Bamira Dep. at 31.)]

8

42. Disputed. EMI did not inform Paramount how it obtained its leads; EMI's Transfer Service Orders contained no warranties or representations that EMI complied with all federal, state , and local telemarketing laws; and Paramount did no due diligence on EMI prior to purchasing leads. [DE 282-8 (Neill Dep. at 48, 49, 50, 94); DE 282-19 at 2] Paramount should have known, with the exercise of reasonable care, that EMI was robocalling or sending prerecorded messages to consumers.

43. Disputed. Although the Addendum prohibited Paramount from making unsolicited outbound telemarketing calls, it did so nonetheless. [DE 282-22 at 9, 14; DE 282-24 at ¶¶8-9, 28-32] Elephant Group knew that Paramount used unknown and unidentified subaffiliates and/or third party lead generators to make outbound calls. [DE 282-6 (Fernandes Dep. at 102-05; DE 282-10, DE 282-11, DE 282-12, DE 282-8 (Neill Dep. at 76-77, 84.)] Elephant Group also knew that EMI was a voice broadcaster operating in the industry [DE 282-6 (Fernandes Dep. at 139, 141)] Yet Elephant Group did nothing to learn the identities of Paramount's subaffiliates or investigate their compliance practices. [DE 282-6 (Fernandes Dep. at 105-08; DE 282-13 (Bamira Dep. at 31.)]

44. Disputed. Although the Addendum prohibited Paramount from using prerecorded messages, it did so nonetheless. [DE 282-22 at 9, 14; DE 282-24 at ¶¶8-9, 28-32] Elephant Group knew that Paramount used unknown and unidentified subaffiliates and/or third party lead generators to make outbound calls. [DE 282-6 (Fernandes Dep. at 102-05); DE 282-10, DE 282-11, DE 282-12; DE 282-8 (Neill Dep. at 76-77, 84.)] Elephant Group also knew that EMI was a voice broadcaster operating in the industry [DE 282-6 (Fernandes Dep. at 139, 141)] Yet Elephant Group did nothing to learn the identities of Paramount's subaffiliates or investigate

their compliance practices. [DE 282-6 (Fernandes Dep. at 105-08); DE 282-13 (Bamira Dep. at 31.)]

45. Although the Addendum prohibited Paramount from using prerecorded messages, it did so nonetheless. [DE 282-22 at 9, 14; DE 282-24 at ¶¶8-9, 28-32]

46. Disputed. Paramount did not receive the actual ADT telemarketing guidelines, but instead received guidelines written by Elephant Group and included in the Addendum to the Affiliate Agreement between Elephant Group and Paramount. [DE 282-7 at Exhibit B; DE 282-6 (Fernandes Dep. at 36).]

47. Disputed. Elephant Group knew that EMI was a voice broadcaster operating in the industry. [DE 282-6 (Fernandes Dep. at 139, 141.)] Yet Elephant Group did nothing to learn the identities of Paramount's subaffiliates or investigate their compliance practices. [DE 282-6 (Fernandes Dep. at 105-08); DE 282-13 (Bamira Dep. at 31.)]

48. Admitted that EMI sold leads to Paramount, Alarm Pros, Home Alert and Eversafe, but not with the knowledge, consent or permission of ADT Security Services, Inc. [DE 282-1 at ¶¶36-37, 59]

49. Admitted that there were vendors other than EMI, including Leads Direct marketing and City VIP, that were making outbound telemarketing calls for ADT Security Services, Inc.'s products, but disputed that such fact has any relevance.

50. Disputed. There are a number of entities that share the name, "ADT." Further, "directly" and "indirectly" are vague.

51. Admitted that ADT Security Services, Inc., engaged in direct marketing, with an inbound center that employed approximately 450 people to take inbound calls. [DE 282-4 (Bergman Dep. at 15.)] Further, the fact is irrelevant. As Elephant Group admits, the underlying

10

action did *not* allege that ADT Security Services, Inc., itself made any of the calls at issue. [DE 278 n.4].

54. Disputed. The document itself is the best evidence of the terms of the Consent Decree. Nor does the Consent Decree have any relevance to this action.

53. Disputed. Elephant Group had a relationship with Eversafe, an authorized ADT Security Services dealer, and Elephant Group sold qualified customers to Eversafe. [DE 282-6 (Fernandes Dep. at 42.)]

54. Admitted only that EMI engaged in telemarketing campaigns for entities unrelated to Elephant Group, including Alarm Pros and Home Alert, but disputed that such fact has any relevance.

55. Disputed. The documents cited by Elephant Group show that these three authorized dealers hired lead-generation partners, including Saveology, who hired affiliates that made unauthorized telemarketing calls. [DE 279-2 at 12, 14] The evidence does not show that these sales leads were independent of EMI. (Id.)

56. Admitted that ADT engages in its own telemarketing, but its call center is primarily an inbound center employing approximately 450 people to take inbound calls. [DE 282-4 (Bergman Dep. at 15.)] Further ADT disputes the relevance of this fact. As Elephant Group admits, the underlying action did *not* allege that ADT itself made any of the calls at issue. [DE 278 n.4].

57. Disputed because it mischaracterizes the *Fitzhenry* lawsuit. The pleadings themselves are the best evidence of the nature of the suit. This Court refused to designate *Fitzhenry* as a related case. [DE 265]

58. Admitted.

11

59. Admitted.

60. Admitted

61. Admitted.

62. Admitted.

63. Admitted.

64. Admitted.

65. Admitted.

66. Disputed. ADT Security Services, Inc. received the benefit of the EMI calls because it obtained customers under the Elephant Group contract in part as a result of the calls, albeit without knowledge of EMI's role in generating them.

67. Admitted only that this paragraph quotes a portion of the Final Approval Order [DE 243] that defined the settlement class. The fact that the "Covered Calls" may have included calls unrelated to Elephant Group is irrelevant.

## ADDITIONAL FACTS THAT REQUIRE DENIAL OF ELEPHANT GROUP'S MOTION FOR SUMMARY JUDGMENT

1. On October 12, 2010, Elephant Group entered into an agreement entitled "Affiliate Agreement" with Paramount in which Elephant Group authorized Paramount to conduct certain marketing of ADT products and services for Elephant Group. [DE 282-7]

2. In November 2010, Elephant Group and Paramount executed an Addendum to the Affiliate Agreement, which refers to Paramount as an "affiliate," a "Saveology ADT Affiliate" and a "Saveology.com affiliate." [DE 282-7; DE 282-6 (Fernandes Dep. at 28.)]

3. Elephant Group's Director of Operations testified that the Addendum to the Affiliate Agreement is "a standard addendum for an ADT affiliate." [DE 282-6 (Fernandes Dep. at 34.)]

4. The Addendum includes strict requirements as to the types of marketing Paramount was permitted to do and restricted specific telemarketing activities. [DE 282-7 at Exhibit B]

5. The Addendum also states in detail how and when Elephant Group will pay commissions to Paramount and what deductions Elephant Group may take from commissions. [DE 282-7]

6. Daphne Fernandes, Elephant Group's Director of Operations, would visit Paramount's offices for quality assurance purposes. [DE 282-6 (Fernandes Dep. at47-48.)]

7. Elephant Group provided a script to Paramount and the procedure to qualify a customer. [DE 282-6 (Fernandes Dep. at 40.)]

8. Paramount entered customer information into Elephant Group's system. [DE 282-8 (Neill Dep. at 31.)]

9. Elephant Group controlled Paramount's marketing tactics and methods by requiring that Paramount submit its marketing tactics to Elephant Group for approval. [DE 282-6 (Fernandes Dep. at 105, 116.)]

10. Both Elephant Group's Director of Operations and its Chairman referred to Paramount as an affiliate of Elephant Group in their respective testimony. [DE 282-6 (Fernandes Dep. at 28, 93, 116, 120, 134, 138); DE 282-13 (Bamira Dep.at 83.)]

11. Elephant Group and Paramount had regular and frequent contact concerning the marketing of ADT products and services. [DE 282-6 (Fernandes Dep. at 53); DE 282-10, DE 282-11, DE 282-12, DE 282-14, DE 282-16]

12. Elephant Group gave guidance and direction to Paramount concerning its marketing of ADT products and services. [DE 282-6 (Fernandes Dep. at 52-53); DE 282-10, DE 282-17]

13. Elephant Group directed Paramount to scrub phone numbers prior to making outbound calls, and forwarded scrubbing instructions to Paramount with additional guidance. [DE 282-17]

14. Paramount was required to answer compliance inquiries sent by Elephant Group. Daphne Fernandes, who had responsibility for compliance at Elephant Group, regularly forwarded ADT inquiries to Paramount with instructions to provide specific information (such as opt-in data) concerning particular calls. [DE 282-10; DE 282-11; DE 282-12; DE 282-14; DE 282-16]

15. Paramount was required to supply Elephant Group with all of its Caller IDs. [DE 282-11]

16. Paramount marketed ADT products and services solely on behalf of Elephant Group. It did not work for any other ADT Authorized Dealer, Authorized Marketer, or Authorized Telemarketer. [DE 282-9 at Response no. 4]

17. Elephant Group's agreement with Paramount did not prohibit subcontracting. [DE 282-7]

18. Elephant Group knew that Paramount and its other affiliates used subaffiliates and/or third party lead generators to make outbound calls marketing ADT products and services.

[DE 282-6 (Fernandes Dep. at 102-05); DE 282-10, DE 282-11, DE 282-12; DE 282-8 (Neill Dep. at 76-77, 84)]

19. Saveology did not know the names or identities of the subaffiliates used by Paramount and its other affiliates. [DE 282-6 (Fernandes Dep. at 105-08); DE 282-13 (Bamira Dep. at 31-32.)]

20. Saveology did not require Paramount to disclose the names of its subaffiliates or lead vendors, as Saveology considered such information to be a proprietary "secret sauce." [DE 282-6 (Fernandes Dep. at 105-08); DE 282-13 (Bamira Dep. at 31.)]

21. Daphne Fernandes, Elephant Group's Director of Operations, had heard the name EMI "somewhere along the way" and was told it was a voice broadcaster, "so it was somebody that I would never have touched" and a "no for us." [DE 282-6 (Fernandes Dep. at 139, 141)]

22. Paramount did not do any due diligence on EMI prior to purchasing EMI leads. [DE 282-8 (Neill Dep. at 48, 94.)]

23. EMI did not inform Paramount how it obtained its leads. [DE 282-8 (Neill Dep. at 50.)]

24. EMI's Transfer Service Orders did not contain any warranties or representations that EMI complied with federal, state, and local telemarketing laws. [DE 282-19]

25. EMI retained a dialing company, Dynamic Interactive Corp., to provide the Voice Broadcasting technology platform for EMI's prerecorded telemarketing campaigns. These campaigns used Dynamic's platforms to rapidly deliver prerecorded messages about ADT home security systems to several million recipients through the phone. [DE 282-24 at ¶¶8-9, 28-32.]

26. EMI called class plaintiff Vishva Desai's cellular telephone using a prerecorded message placed by Dynamic's automated dialing system. ("Desai Call") The Desai Call was part

15

of a larger EMI telemarketing campaign for Paramount. [DE 282-24 at ¶¶28-29; DE 282-1 at 40, 41.]

27. Ms. Desai never gave anyone consent to call her on her cell phone via autodialer and prerecorded message on behalf of ADT. [DE 282-25 at Response no. 2.]

28. Elephant Group and its counsel participated in at least three mediation sessions with ADT and other third party defendants. [DE 282-13 (Bamira Dep. at 66-67.)]

29. Both during the mediations and outside of the mediations (including at the fairness hearing), Elephant Group did not object to the settlement between ADT and the plaintiff class. [DE 282-13 (Bamira Dep. at 73-77.)]

30. Elephant Group considers the terms of ADT's settlement with the plaintiffs to be reasonable. [DE 282-13 (Bamira Dep. at 71-72.)]

31. Elephant Group's former Chairman of the Board, Joseph Bamira, said that ADT faced a "material risk. . . . Even if the chance [of a class being certified] was small, given the number that they faced, the probabilities, probably from their perspective, it was a good decision." [DE 282-13 (Bamira Dep. at 70-71, 72.)] He continued as follows: "If you have to choose between losing 15 and risking 2 billion, if that's the case, the mathematics is probably fair." [DE 282-13 (Bamira Dep. at 72.)]

32. ADT settled the underlying action based on an assessment of the risks and the potential exposure to liability of a billion dollars. [DE 279-2 at 106-08, 111]

33. ADT was aware that the FCC was considering vicarious liability as a basis for TCPA violations, and knew that an FCC ruling on that issue was expected at the time of the settlement negotiations. [DE 279-2 at 106-08, 111]

34. The reporting done by ADT pursuant to the 2007 Consent Decree with the FTC did not include the use of Elephant Group. [DE 282-4 (Bergman Dep. at 59.)] ADT completed its reporting requirements in 2012, and the FTC has not requested any additional information. [DE 282-4 (Bergman Dep. at 58, 61.)]

Dated: August 14, 2014

By:   /s/ John A. Leja
John Leja (ARDC 6256269)
POLSINELLI PC
161 N. Clark Street, Suite 4200
Chicago, Illinois 60601
Telephone: (312) 819-1900
Facsimile: (312) 819-1910
*jleja@polsinelli.com*

C. Sanders McNew
McNEW P.A.
2385 NW Executive Center Drive
Suite 100
Boca Raton, Florida 33431
Telephone: (561) 299-0257
*mcnew@mcnew.net*

*Attorneys for Defendant/Third-Party Plaintiff ADT Security Services, Inc. (n/k/a The ADT Corporation or ADT, LLC)*

**CERTIFICATE OF SERVICE**

Please take notice that on August 14, 2014, I caused the foregoing to be filed with the Clerk of the United States District Court for the Northern District of Illinois, utilizing the Court's ECF system which will send a copy of the said documents to all attorneys of record by electronic mail.

By: /s/ John A. Leja