# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| VISHVA DESAI and PHILIP J. CHARVAT, on behalf of themselves and others similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 11 C 1925 |
| ADT SECURITY SYSTEMS, INC., | ) ) | Judge Bucklo |
| Defendant. | ) ) | |
| ------------------------------------------------------------ | ) | |
| ADT SECURITY SYSTEMS, INC., | ) ) | |
| Third-Party Plaintiff, | ) ) | |
| v. | ) ) | |
| MR. PETE TOLMAN; LEADS DIRECT MARKETING; VOICE TEL CORP.; MR. CHRISTOPHER LONG; EMI, INC.; CITY VIP, LLC; JMB ENTERPRISES; DIRECT SAVINGS USA, INC.; MR. OSCAR MONTENEGRO; EVERSAFE SECURITY SYSTEMS, INC.; SAFE STREETS USA, LLC; PARAMOUNT MEDIA GROUP; THE ELEPHANT GROUP, INC.; and UNKNOWN JOHN DOE DEFENDANTS I THROUGH XX, | ) ) ) ) ) ) ) ) ) ) ) | |
| Third-Party Defendants. | ) ) | |
| ------------------------------------------------------------ | ) | |
| SAFE STREETS USA, LLC, as successor to EVERSAFE SECURITY SYSTEMS, INC., | ) ) ) | |
| Cross-Claimant and   Third-Party Plaintiff | ) ) | |
| v. | ) ) | |
| DIRECT SAVINGS USA, INC.; MR. OSCAR MONTENEGRO; DIRECT SAVINGS USA, | ) ) ) | |
| Cross-Defendants and Third-Party Defendants. | ) ) ) | |
| _____ | ) | |

**REPLY BRIEF IN SUPPORT OF ELEPHANT GROUP, INC.'S**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

NOW COMES defendant Elephant Group, Inc. (EG), and hereby submits this reply brief in support of its motion for summary judgment.

**I.     INTRODUCTION**

EG has filed a motion for summary judgment demonstrating that ADT's contractual indemnity claim fails for a variety of reasons.   In response, ADT raises five arguments attempting to show that the motion should be denied. Each of these arguments fail, as ADT continues to distort the underlying facts and demonstrates a misunderstanding of law. Specifically, this Court should reject ADT's arguments and enter summary judgment for EG because:

<u>First</u>, ADT has not, and cannot show that Paramount was an affiliate of EG as that term is defined in the contract between ADT and EG.

<u>Second</u>, and related to the first, ADT has likewise failed to show that any agents of EG made any calls that exposed ADT to the potential liability in the underlying case.

<u>Third</u>, EG does not argue that ADT's indemnity claim is barred due to ADT's contributory negligence.   This is a breach of contract action, and considerations of contributory negligence do not apply.  Instead, EG has shown that ADT's own negligent conduct, as a matter of contract, vitiates any contractual indemnity obligations potentially owed by EG to ADT.

<u>Fourth</u>, ADT cannot point to any acts or omissions committed by EG that exposed ADT to liability under the Telephone Consumer Protection Act (TCPA).

<u>Fifth</u>, EG's allegedly wrongful act in this case, which consists solely of using Paramount to assist in the generation of additional sales leads, could not have caused any potential TCPA liability for ADT as a matter of law.

## II.    PARAMOUNT IS NOT AN AFFILIATE OF EG

Reduced to its core, ADT's claim is predicated on the assertion that Paramount and EMI were affiliates of EG.  In fact, ADT's entire contractual indemnity claim hinges on whether EG had an affiliate or agency relationship with Paramount.  Conspicuous by its absence though, especially for such a critical and fundamental piece of their case, ADT has failed to introduce any probative evidence that EG had an affiliate relationship with Paramount.  In lieu of facts, ADT has elected instead to repeatedly state in a conclusory fashion that Paramount was an affiliate of EG.  Simply making a "rote repetition of an unsupported legal assertion does not magically make it become law" however.  *Lawson v. Life of the South Insurance Co.*, 2010 WL 1416551, *3 ((M.D. Ga. 2010).

ADT argues that Paramount was an affiliate of EG for four reasons, none of which are persuasive. First, EG did not admit that Paramount was an affiliate in briefing the motion to dismiss; assuming facts to be true for purposes of a Rule 12(b)(6) is not an admission by EG of an affiliate relationship.  *Wood v. Moss,* 134 S.Ct. 2056, (2014) (court must accept all factual allegations as true on a motion to dismiss, but not legal conclusions.)  ADT's attempt to elevate arguments made on a motion to dismiss into evidence must be rejected.

Moreover, ADT never actually alleged that Paramount was an affiliate of EG.   The closest ADT comes to making that allegation in the third party complaint occurs in Paragraph 55, when ADT alleges: "Upon information and belief, Elephant Group and Paramount are parties to an Affiliate Agreement whereby Paramount may conduct certain marketing of ADT products for Elephant Group. ADT is not a party to the contract between Elephant Group and Paramount, was not involved in the negotiation or course of performance of the contract, and had no involvement in Elephant Group's selection of Paramount to perform any work, nor did it approve Elephant

Group's appointment of Paramount." *See doc. 121, ¶ 55.* EG could not have "admitted" to allegations that ADT did not actually make.

Second, ADT makes a facile attempt at showing that Paramount's relationship with EG fits within the ADT-EG agreement's definition of affiliate because EG is alleged to have exercised control over Paramount. ADT is conflating concepts – to be sure, EG undertook due diligence to ensure that Paramount was living up to the contractual duties it undertook, including to refrain from making outbound telemarketing calls or using pre-recorded messages. *See EG's statement of material facts (doc. 279) (SMF) ¶ ¶ 24, 26-29.* However, the evidence is undisputed that Paramount was an independent contractor that made its own determination on how best to generate leads and market the products. *SMF ¶ ¶ 20, 22, 23, 26.* EG did not "control" Paramount; EG simply ensured that Paramount operated consistent with ADT's marketing guidelines. *Id.* And if not controlled by EG, Paramount cannot be an affiliate of EG as that term is defined in the agreement.

Third, ADT argues that Paramount was an affiliate of EG because that was the term used to describe Paramount internally by EG and the contract between EG and Paramount was entitled "Affiliate Agreement." The label used to describe Paramount does not transform the relationship into an affiliate relationship as contemplated by the ADT-EG agreement. *Engineered Data Products, Inc. v. Nova Office Furniture, Inc.*, 849 F.Supp. 1412, 1417 (D. Colo. 1994) (titles are not a part of the contract). To determine if Paramount was an affiliate as defined by the ADT-EG agreement, reference must be made to that contract. *Norfolk Southern Railway Co. v. Kirby*, 543 U.S. 14, 31 (2004) ("[W]here the words of a…contract, have a plain and obvious meaning, all construction, in hostility with such meaning, is excluded.") It is of no importance or relevance that EG described Paramount as an affiliate in a different contract.

The agreement between ADT and EG defines an affiliate as "any corporation or other person or entity that directly or indirectly controls, is controlled by, a successor-in-interest to, or alter ego of, or is under the common control with, ADT or Elephant Group, respectively." To determine if ADT has met its burden of showing that Paramount was an affiliate as defined by the ADT-EG agreement, the critical question is not what did EG call Paramount, but instead is this: was Paramount controlled by EG?[1] The answer is no, and ADT has failed to create a question of fact attempting to show that EG controlled Paramount's activities. *SMF, ¶¶ 22, 26.*

Finally, the litany of "facts" advanced by ADT attempting to demonstrate that EG controlled Paramount is not sufficient to create a question of fact on whether Paramount was an affiliate. *See doc. 288, pp. 4-5.* The 17 "facts" listed by ADT can be grouped into two general categories alleged to demonstrate control. First, EG called Paramount an affiliate in the contract (unnumbered bullet point 1 and 11); the remaining 15 "facts" are simply specific and redundant examples of actions that EG undertook to ensure that Paramount was generally operating consistent with the agreement when marketing ADT's products. Critically, none of these activities involved the direction or control over the manner or timing of how Paramount performed under the contract. It cannot be denied that Paramount was free to determine how best to market the ADT product, and EG did not tell Paramount how to generate the sales leads. *See EG's Statement of Additional Material Facts (doc. 287) (SAMF) ¶¶3-4.*

In this case, Paramount was an independent contractor entrusted to operate within the boundaries of ADT's telemarketing guidelines to develop its own strategy for generating sales leads, and selling those leads to EG. Though ADT attempts to characterize the relationship in other ways (alternatively as an affiliate or agent), ADT has offered no evidence to overcome the

---

[1] ADT has not attempted to argue that EG was a successor in interest to, alter ego of, or under common control with Paramount, so that the only way Paramount can be shown to meet the contractual definition of an affiliate is through direct or indirect control.

understanding between EG and Paramount that the relationship was one of an independent contractor.[2] *SMF ¶¶ 20, 22, 23.  City and County of Denver v. Fey Concert Co.*, 960 P.2d 657, 661 (Colo. 1998) (independent contractor relationship recognized when the agreement defined the relationship as one of an independent contractor); and *Norton v. Murphy*, 661 F.2d 882, 884 (Colo. App. 1981) (intent of the parties, as manifested in the contract, must be considered in determining whether there is an independent contractor relationship).  Here, ADT attempts to elevate EG's training and auditing functions into control.  That is contrary to how both EG and Paramount understood the relationship, and contrary to how the relationship actually operated. *SMF ¶ 22.*  EG's exercise of due diligence to ensure contractual compliance cannot result in a *de facto* affiliate relationship contrary to the intent and understanding of both EG and Paramount. *City and County of Denver*, 960 P.2d at 661.

### A. EG Does Not Owe Indemnity Under Paragraph 23.F Because No Agents Of EG Made Any Calls

ADT makes the related argument that EG's summary judgment motion should be denied because EG's agents allegedly made outbound telemarketing calls.  *See doc. 288, p. 11.*  The agents that ADT argues made the outbound calls are Paramount and EMI.  *Id.*  This argument collapses under the weight of evidence.

---

[2] ADT also argues that EG has failed to produce a copy of the contract between EG and Paramount, and that this Court is free to make an inference that the agreement between EG and Paramount would support ADT's claim of an affiliate relationship. *Doc. 288, p. 3.*  ADT's argument is misplaced, as EG objected to the production of the affiliate agreement. *See EG's answer to request for production number 17, attached as Exhibit A.*  ADT never moved to compel the production of the agreement, and instead now argues that the failure to produce the agreement allows for an adverse inference.    In light of ADT's statements, EG has elected to waive the previous objections, and produced a copy of the agreement to ADT on August 25, 2014.  A copy is attached as Exhibit B.  In that agreement, Paramount and EG define the nature of the relationship consistent with the deposition testimony – as one of an independent contractor.  *See Exhibit B, p. 2* (Paramount is a "non-exclusive, independent sales agent); and p. 12 ("The parties agree and shall be, with respect to the subject matter of this Agreement, independent contractors of one another and nothing herein shall be deemed to create an agency, partnership, employment, or joint venture relationship between the parties.")

First, Paramount is not an agent of EG because EG did not control the marketing activities of Paramount. *SMF ¶¶ 22, 23, 26. See Smith v. State Farm Mutual Automobile Insurance Co.*, --F.Supp.2d--, 2014 WL 3906923, * 6 (N.D. Ill. 2014) (without a degree of control that includes an ability to provide interim instructions controlling another's conduct, the existence of a contract between two entities – "even one that imposes certain constraints" – does not demonstrate an agency relationship.)

Second, even assuming that Paramount is EG's agent, despite the mutual intent and understanding of the parties, *see SMF ¶ 22*, Paramount made no outbound telemarketing calls. *SAMF ¶ 10.* If Paramount, as the putative agent of EG, did not make any outbound telemarketing calls, there was no breach of Paragraph 23.F, and no indemnity is owed by EG to ADT.

Third, EG cannot be held liable under Paragraph 23.F for the calls made by EMI. To meet its burden, ADT must show that Paramount was an agent EG, and that EMI was the agent of Paramount. EG's indemnity obligation under Paragraph 23.F is triggered only if EG made "any unsolicited outbound telephone calls as part of a plan, program or campaign directly to indirectly through telemarketing agents or others." Here, EMI was not an agent of Paramount, but was merely a retailer of sales leads. *SMF ¶¶ 31, 34, 35.* Paramount exercised no control over EMI, and had no contractual relationship with EMI. *SMF ¶¶ 31, 34, 35. American Express Financial Advisors, Inc. v. Topel*, 38 F.Supp.2d 1233, 1241 (D. Colo. 1999) (existence of agency relationship determined by intent of the parties); *City and County of Denver*, 960 P. at 669-70 (agency relationship requires circumstance where "the principal has the right to control the conduct of the agent with respect to matters entrusted to the agent.")

More importantly, EG was not aware that Paramount was purchasing leads from EMI.

*SMF ¶ 41.* EG did not take part in any "plan, program or campaign" to make outbound calls because EG did not know that Paramount was buying leads from EMI, or that EMI was making outbound calls. In fact, no one knew EMI was making outbound calls because EMI misrepresented the manner in which the leads were being generated. *SMF ¶ 25, 38, 42.* There can be no "plan, program or campaign" amongst EMI, Paramount and EG because only EMI was aware that EMI made the outbound calls. ADT's indemnity claim necessarily fails because there is no evidence of an agency relationship between EG, Paramount and EMI.

## III. EG IS NOT RELYING ON AN AFFIRMATIVE DEFENSE OF CONTRIBUTORY NEGLIGENCE

ADT also argues that EG is not entitled to summary judgment because it is relying on an affirmative defense of contributory negligence that was not raised and without producing any facts to support such a defense. ADT again has misapprehended EG's argument. This is a breach of contract case, where ADT is seeking contractual indemnity from EG; this is not a case arising out of a tort generally or negligence specifically. To determine if there was a breach of the contract, reference must be made to the acts alleged to constitute the breach, and not contributory negligence. *Baruch v. Beech Aircraft Corp.*, 175 F.2d 1, 3 (10th Cir. 1949). In other words, contributory or comparative negligence has no place in a contact action. *McCall v. Meyers*, 94 P.3d 1271, 1273 (Colo. App. 2004) (finding that Colorado's comparative negligence statute applies to negligence cases).

Pursuant to the operative contract, ADT has the burden of demonstrating that the conduct of ADT did not cause or contribute to cause the underlying claim. *SMF ¶ 9.* (Paragraph 6(b) of the agreement provides indemnity rights to ADT only to the "extent any such claim or action is [not] due to any negligent acts, omissions, wrongful acts, fault or willful misconduct of ADT…). ADT therefore has the burden of both proving a breach of the contract by EG, and that ADT did

not contribute to cause the underlying suit through its own wrongful conduct. This is not an affirmative defense; this is ADT's burden. ADT's attempt to shift the burden onto EG turns the indemnity agreement on its head.

Not only has ADT failed to carry this burden, but EG has demonstrated with irrefutable evidence that underlying claim was the result of ADT's own lack of oversight in creating a marketing program that allowed many authorized participants to obtain sales leads through telemarketing calls. This is made clear by the claims of the two class representative plaintiffs - two of the three calls that were made to the named plaintiffs in the original case were in no way connected to EG, Paramount or EMI. In fact, both calls made to plaintiff Charvat were made by or through other, unrelated authorized dealers of ADT's products. *SMF ¶¶ 59, 61.* The third call, made to plaintiff Desai, was made by EMI but is in no way linked in any way to EG. *SMF ¶¶ 30, 41.*

Discovery in this case shows that ADT had, and continues to have, a long and problematic relationship with its marketing program and compliance with the TCPA, beginning no later than 2007 and continuing to the present time. *SMF ¶ 52.* ADT cannot deny that many of its authorized dealers were obtaining leads from EMI, Leads Direct, City VIP and other lead generators, each of which made automated telemarketing calls during the class period that exposed ADT to liability and did not involve EG in any way. *SMF ¶¶ 47-49, 53-55, 68-60, 62.* Yet ADT has done nothing to curb the systemic problem. ADT admits as much in the third party complaint – though ADT has abandoned efforts to hold the various dealers responsible here, that complaint specifically alleges that numerous entities in the ADT marketing web were acting contrary to ADT's telemarketing rules, yet ADT failed to reign these vendors in or otherwise prevent them from contributing to cause the potential exposure. *See doc. 121, ¶ 67, 68, 119 and*

*127.* ADT's current attempts to bury its head in the sand, feign ignorance of the problem and hide behind a contractual indemnity shield is precluded by the facts in this case that show the scope of the problem and the allegations that ADT itself has made.

## IV. EG TOOK NO ACTIONS THAT EXPOSED ADT TO LIABILITY

As a last gasp to stave off summary judgment, ADT argues that EG is barred by *res judicata* from arguing that the underlying settlement was fair. ADT again contorts EG's argument to suit its needs. EG is not attempting to re-litigate the fundamental fairness or propriety of the settlement reached by ADT with plaintiffs. EG's argument focuses on the contract language, and not the settlement. EG's indemnity obligation arises only if ADT's losses resulted from the negligence or torts of EG (*SMF ¶ 9*) or EG's making of outbound telemarketing calls (*SMF ¶ 10*). In the motion for summary judgment, EG showed that none of EG's conduct had the capability of exposing ADT to liability. In other words, there are no "losses, fees or expenses suffered by the ADT Group resulting from, or relating to" the conduct of EG as a matter of law. *SMF ¶ 9.* And if EG's conduct did not cause any losses, fees or expenses, the indemnity obligation is not triggered.

ADT's supposition, unsupported by record evidence, that EG contributed to cause the original claim from plaintiffs simply ignores the entirety of the situation. ADT's contractual claim fails because ADT continues to improperly frame this case. Here, ADT has attempted to argue that EG's hiring of Paramount put in place a chain of events that led to the $15 million settlement. That narrow construct ignores the entirety of the case – ADT may have faced billions of dollars of exposure, but that exposure was not created by EG in any way. EG's hiring of a vendor to assist in generating sales leads, without more, is incapable as a mater of law of exposing ADT to vicarious liability under the TCPA. No indemnity is owed from EG to ADT

therefore, because ADT cannot establish that it would be directly or vicariously liable, or would have suffered any loss, because of EG.

This same conclusion was reached recently by Judge St. Eve in *Smith v. State Farm Mutual Automobile Insurance Co.*, ---F.Supp.2d.---, 2014 WL 3906923 (N.D. Ill. August 11, 2014). In *Smith*, plaintiffs filed a putative class action lawsuit alleging that three insurance companies violated the TCPA by using a lead generator to make telemarketing calls on their behalf. The lead generating company, Variable Marketing, had been retained by local insurance agents of the three insurance companies to place the telemarketing calls. Defendants moved to dismiss, arguing that they could not be held either directly liable or vicariously liable for calls made by Variable.

The court quickly rejected plaintiffs' argument that the insurance company defendants were directly liable under the TCPA, because no calls were actually made by the defendants. Like EG in this case, the defendants in *Smith* could not be directly liable under the TCPA because only the entity that initiates the call is directly liable. *Id.*, 2014 WL 3906923 * 3. As EG made no outbound telemarketing calls, EG's conduct is incapable of exposing ADT to any direct liability under the TCPA. *SMF ¶ 12.*

*Smith* then explored whether the insurance company defendants could be held vicariously liable for the telemarketing calls. Plaintiffs argued that defendants could be held vicariously liable under the TCPA based on the alternative theories of agency, apparent authority or ratification. Plaintiffs alleged that the insurance company defendants had an agency relationship with the local insurance agents, and that there was a subagency relationship between the local agents and Variable The court rejected that argument in total as it related to two of the defendants, though the subagency relationship was sufficiently supported to a third, State Farm

10

to require denial of the motion to dismiss. Specifically, the court performed a three step analysis to determine if the calls made by Variable could be linked to State Farm.

In finding the claim was plausible, the court first found that there was a sufficiently supported basis to conclude that there was an agency relationship between State Farm and the local agents with respect to telemarketing activities because State Farm was alleged to have entered formal agency agreements with those local agents.

Second, plaintiffs were able to allege that there was an agency relationship between State Farm's local agents and Variable, because the local agents "directed the quality, timing, and volume of Variable's telemarketing calls," and "specified the days of the week and times in which Variable should make its calls, the geographic location of the customers to whom it should call, and the number of calls Variable should transfer to the insurance agency each day." *Id.*, 2014 WL 3906923 * 6.

Last, plaintiffs in *Smith* were able to show the plausible existence of a subagency relationship between State Farm and Variable, because State Farm was alleged to have suggested to their agents that "telemarketing through Variable was a good way to obtain new customers" *Id.*, 2014 WL 3906923 * 7.

Conversely, the vicarious liability claims against the other two insurance companies failed as matter of law because there was no basis to conclude that there was agency relationship between the insurers and Variable. Specifically, the agreements between those insurance companies and their local agents prohibited them from creating an agency relationship with any subagent, there could be no apparent authority because the insurer (as opposed to the local insurance agent) took no action and made no statement representing that Variable had authority to make the telemarketing calls, and there could be no ratification because neither insurer

11

knowingly accepted the benefits of any leads created by Variable. *Id.*, 2014 WL 3906923 * 8-9.

*Smith* is instructive here because it details how a subagent (in this case, alleged to be EMI), could potentially create vicarious liability for the principal (EG, and ultimately ADT). To satisfy the causation standard of the contract between ADT and EG, ADT must show that ADT's exposure was "resulting form or relating to" EG's hiring of Paramount. Applying the three step process of *Smith*, neither ADT nor EG could be vicariously liable for the calls that were made by EMI.

The issue in the two cases is the same: is the entity on whose behalf a call is made subject to a claim of vicarious liability because of the conduct of a lead generator? *Smith* makes abundantly clear that any exposure ADT had in this case was not "resulting form or relating to " EG's decision to contract with Paramount and compels the conclusion that ADT's exposure in this case did not result from any conduct of EG.

For example, in step one, unlike State Farm in *Smith,* there is no formal agency agreement between EG and Paramount. In fact, ADT has failed to establish that there is any type of agency relationship between EG and Paramount. *See supra, Section 2(A), p. 5.*

Second, there is no evidence that there is a subagency relationship between Paramount and EMI. *SMF ¶ 31, 34, 35.* To show such a relationship existed, ADT is required to show that Paramount "directed the quality, timing, and volume of [EMI]'s telemarketing calls," or "specified the days of the week and times in which [EMI] should make its calls, the geographic location of the customers to whom it should call, and the number of calls [EMI] should transfer to [Paramount] each day." *Id.*, 2014 WL 3906923 * 6. ADT has submitted no evidence that Paramount had any such relationship with, or control over EMI. The evidence supports the opposite conclusion, as Paramount simply bought leads from EMI and played no role in how

EMI obtained those leads. *SMF ¶ 31, 34, 35*. Critically, unlike the local insurance agents in *Smith*, Paramount controlled neither the manner, timing or content of EMI's calls.

Third, ADT is unable to show that there was a subagency relationship between EG and EMI. Unlike State Farm in *Smith,* here EG did not recommend or suggest that Paramount use EMI. Just the opposite was happening – EG was not aware that Paramount was using EMI to make any calls. *SAMF ¶ 41*. There can be no subagency between EG and EMI because ADT has failed to show that EG exercised any control over EMI's telemarketing activities. *Id.*, 2014 WL 3906923 * 6.

The case against EG is more akin to the claims raised against the non-State Farm insurance companies in *Smith*, and there can be no vicarious liability as a matter of law flowing from EMI through Paramount to either EG or ADT under theories of agency, apparent authority or ratification. Like those companies, EG's agreement with Paramount prohibited the use of subagents to make outbound telemarketing calls. *SMF ¶ 24*. There is no evidence that EG performed any act or made any statement representing that EMI had apparent authority to make telemarketing calls; EG did not know EMI was making the calls. *SAMF ¶ 41*. And there is no evidence that EG knowingly accepted the benefit of EMI's calls – again because EG did not know the calls were being made. *Id.*

EG did not breach the agreement with ADT by hiring Paramount and did not expose ADT to any potential liability under the TCPA. EG could not be held vicariously liable under the TCPA simply because it hired Paramount. There is no evidence of an agency relationship with a requisite degree of control sufficient to expose EG to vicarious liability under the TCPA for the acts of EMI. ADT similarly could not be held liable for calls that were made by EMI, without the knowledge, direction or involvement of either Paramount or EG. As such, EG's

13

relationship with Paramount, and by extension, EMI, was insufficient to have created vicarious liability for ADT. Simply put, ADT faced no viable vicarious liability claim that "resulted from or related to" the acts of EG. ADT's indemnity claim therefore fails, and summary judgment should be entered in favor EG.

## V.    CONCLUSION

WHEREFORE, Elephant Group requests that the Court enter an Order granting summary judgment in its favor and against ADT, for the attorney fees and costs incurred in defending this lawsuit and for all other just and equitable relief.

Respectfully submitted,

/s/ Daniel W. Pisani
James K. Schultz
Daniel W. Pisani
Sessions Fishman Nathan & Israel, LLC
55 West Monroe Street, Suite 1120
Chicago, Illinois 60603
Telephone:  (312) 578-0990
Facsimile: (312) 578-0991
jschultz@sessions-law.biz
dpisani@sessions-law.biz

*Attorneys for Elephant Group, Inc.*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on August 28, 2014, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to the parties of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Respectfully submitted,


/s/ Daniel W. Pisani
James K. Schultz
Daniel W. Pisani
Sessions Fishman Nathan & Israel, LLC
55 West Monroe Street, Suite 1120
Chicago, Illinois 60603
Telephone: (312) 578-0990
Facsimile: (312) 578-0991
jschultz@sessions-law.biz
dpisani@sessions-law.biz

*Attorneys for Elephant Group, Inc.*