## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| VISHVA DESAI and PHILIP J. CHARVAT, ) <br> on behalf of themselves and others similarly situated, ) <br> ) <br>     Plaintiffs, ) <br> ) <br>     v. ) <br> ) <br> ADT SECURITY SYSTEMS, INC., ) <br> ) <br>     Defendant. ) <br> ------------------------------------------------------------------ ) <br> ADT SECURITY SYSTEMS, INC., ) <br> ) <br>     Third-Party Plaintiff, ) <br> ) <br>     v. ) <br> ) <br> MR. PETE TOLMAN; LEADS DIRECT ) <br> MARKETING; VOICE TEL CORP.; MR. ) <br> CHRISTOPHER LONG; EMI, INC.; CITY VIP, LLC; ) <br> JMB ENTERPRISES; DIRECT SAVINGS USA, INC.; ) <br> MR. OSCAR MONTENEGRO; EVERSAFE ) <br> SECURITY SYSTEMS, INC.; SAFE STREETS USA, ) <br> LLC; PARAMOUNT MEDIA GROUP; THE ) <br> ELEPHANT GROUP, INC.; and UNKNOWN JOHN ) <br> DOE DEFENDANTS I THROUGH XX, ) <br> ) <br>     Third-Party Defendants. ) <br> ------------------------------------------------------------------ ) <br> SAFE STREETS USA, LLC, as successor to ) <br> EVERSAFE SECURITY SYSTEMS, INC., ) <br> ) <br>     Cross-Claimant and    Third-Party Plaintiff ) <br> ) <br>     v. ) <br> ) <br> DIRECT SAVINGS USA, INC.; MR. OSCAR ) <br> MONTENEGRO; DIRECT SAVINGS USA, ) <br> ) <br>     Cross-Defendants and ) <br>     Third-Party Defendants. ) <br> _____ ) | Case No. 11 C 1925 <br><br> Judge Bucklo |

**ELEPHANT GROUP INC.'S REPLY TO ADT'S LOCAL RULE 56.1
STATEMENT OF ADDITIONAL MATERIAL FACTS**

NOW COMES defendant Elephant Group, Inc. ("EG"), by and through undersigned counsel, and pursuant to Rule 56.1, submits this Reply to ADT's Statement of Additional Material Facts in connection with EG's Motion for Summary Judgment. Elephant Group respectfully requests the Court consider the following:

1. On October 12, 2010, Elephant Group entered into an agreement entitled "Affiliate Agreement" with Paramount in which Elephant Group authorized Paramount to conduct certain marketing of ADT products and services for Elephant Group. [DE 282-7]

**Response:** EG admits that it entered into an Agreement with Paramount on October 12, 2010, but denies that the October 12, 2010 document pertained specifically to ADT. The Addendum dated November 12, 2010, pertained to ADT. *EG's SMF ¶ 22*; see also Doc. 179-1.

2. In November 2010, Elephant Group and Paramount executed an Addendum to the Affiliate Agreement, which refers to Paramount as an "affiliate," a "Saveology ADT Affiliate" and a "Saveology.com affiliate." [DE 282-7; DE 282-6 (Fernandes Dep. at 28.)]

**Response:** EG admits that Addendum uses those terms. Regardless, an affiliate is defined in the contract between EG and ADT as "any corporation or other person or entity that directly or indirectly controls, is controlled by, a successor-in interest to, or alter ego of, or is under the common control with, ADT or Elephant Group, respectively" and denies that Paramount was an affiliate under the contract definition. *Exhibit 1 to EG's SMF, ¶ 4.1.*

3. Elephant Group's Director of Operations testified that the Addendum to the Affiliate Agreement is "a standard addendum for an ADT affiliate." [DE 282-6 (Fernandes Dep. at 34.)]

**Response:** Admitted.

4. The Addendum includes strict requirements as to the types of marketing Paramount was permitted to do and restricted specific telemarketing activities. [DE 282-7 at Exhibit B]

**Response:** EG admits that the addendum included requirements on the types of marketing Paramount was permitted to do and restricted specific telemarketing activities, but to the extent ADT is implying that the requirements were "strict" in an effort to show that Paramount was an affiliate of EG, that is denied. *Exhibit 1 to EG's SMF, ¶ 4.1.*

5. The Addendum also states in detail how and when Elephant Group will pay commissions to Paramount and what deductions Elephant Group may take from commissions. [DE 282-7]

**Response: EG admits that the Addendum detailed the commissions, but to the extent ADT is implying that the details show that Paramount was an affiliate of EG, that is denied.** *Exhibit 1 to EG's SMF, ¶ 4.1.*

6. Daphne Fernandes, Elephant Group's Director of Operations, would visit Paramount's offices for quality assurance purposes. [DE 282-6 (Fernandes Dep. at 47-48.)]

**Response: Admitted.**

7. Elephant Group provided a script to Paramount and the procedure to qualify a customer. [DE 282-6 (Fernandes Dep. at 40.)]

**Response: Admitted.**

8. Paramount entered customer information into Elephant Group's system. [DE 282-8 (Neill Dep. at 31.)]

**Response: EG admits only that Paramount entered "qualified leads" or "qualified referrals" into EG's system.** *Neill Dep. at 31; Fernandes Dep., pp. 40-41.*

9. Elephant Group controlled Paramount's marketing tactics and methods by requiring that Paramount submit its marketing tactics to Elephant Group for approval. [DE 282-6 (Fernandes Dep. at 105, 116.)]

**Response: Denied. The marketing tactics were not "controlled" but they were approved by EG.** *Fernandes Dep., p. 105.* **The tactics were also approved by ADT.** *Fernandes Dep., p. 60.*

10. Both Elephant Group's Director of Operations and its Chairman referred to Paramount as an affiliate of Elephant Group in their respective testimony. [DE 282-6 (Fernandes Dep. at 28, 93, 116, 120, 134, 138); DE 282-13 (Bamira Dep. at 83.)]

**Response: Denied. Simply referring to Paramount as an affiliate in deposition testimony does not make them an "affiliate" pursuant to the terms of the contract between EG and ADT, which defines affiliate as "any corporation or other person or entity that directly or indirectly controls, is controlled by, a successor-in interest to, or alter ego of, or is under the common control with, ADT or Elephant Group, respectively."** *Exhibit 1 to EG's SMF, ¶ 4.1.*

11. Elephant Group and Paramount had regular and frequent contact concerning the marketing of ADT products and services. [DE 282-6 (Fernandes Dep. at 53); DE 282-10, DE 282-11, DE 282-12, DE 282-14, DE 282-16]

**Response: EG admits that it was in contact with Paramount, but denies the remainder of this assertion because the terms regular and frequent are not defined.**

12. Elephant Group gave guidance and direction to Paramount concerning its marketing of ADT products and services. [DE 282-6 (Fernandes Dep. at 52-53); DE 282-10, DE 282-17]

**Response: Denied as to the phrase "guidance and direction," which is not supported by the citations provided by ADT. Regardless, EG admits that it took affirmative steps to verify that Paramount was complying with ADT's telemarketing policies.** *Fernandes Dep., p. 52.* **Paramount received and was trained on ADT's telemarketing guidelines.** *Neil Dep., p. 42.* **Subject to telemarketing restrictions incorporated into the Agreement by EG, Paramount was responsible for determining how best to market ADT's products.** *Neil Dep., p. 42.* **EG exercised no control and did not tell Paramount how to generate leads; that process was left up to Paramount.** *Neil Dep., p. 34.*

13. Elephant Group directed Paramount to scrub phone numbers prior to making outbound calls, and forwarded scrubbing instructions to Paramount with additional guidance. [DE 282-17].

**Response: EG admits that it required Paramount to scrub any phone number against ADT's internal Do Not Call list before making any call.** *Neil Dep., p. 34.* **This was an ADT requirement.** *DE 282-17.*

14. Paramount was required to answer compliance inquiries sent by Elephant Group. Daphne Fernandes, who had responsibility for compliance at Elephant Group, regularly forwarded ADT inquiries to Paramount with instructions to provide specific information (such as opt-in data) concerning particular calls. [DE 282-10; DE 282-11; DE 282-12; DE 282-14; DE 282-16]

**Response: Admitted. These inquiries were initiated by ADT and ADT required that EG respond. Moreover, every time that ADT received a complaint from a consumer about a telemarketing call from Elephant Group, Elephant Group was able to provide ADT with substantiation that the consumer had consented to receiving the return telephone call from EG.** *EG's SMF ¶ 15.*

15. Paramount was required to supply Elephant Group with all of its Caller IDs. [DE 282-11]

**Response: Admitted.**

4

16. Paramount marketed ADT products and services solely on behalf of Elephant Group. It did not work for any other ADT Authorized Dealer, Authorized Marketer, or Authorized Telemarketer. [DE 282-9 at Response no. 4]

**Response:** Denied. Paramount's relationship with Elephant Group was not exclusive. Paramount could and did sell security leads to other companies. *EG's SMF ¶ 23.*

17. Elephant Group's agreement with Paramount did not prohibit subcontracting. [DE 282-7]

**Response:** Denied. Paramount was not permitted to subcontract with another entity without receiving prior written approval from EG. *See Exhibit 7 to EG's SMF, p. 114.*

18. Elephant Group knew that Paramount and its other affiliates used subaffiliates and/or third party lead generators to make outbound calls marketing ADT products and services. [DE 282-6 (Fernandes Dep. at 102-05); DE 282-10, DE 282-11, DE 282-12; DE 282-8 (Neill Dep. at 76-77, 84)]

**Response:** Denied. This statement is unlimited in time and overly broad as to what Elephant Group "knew" and when. Responding further, EG placed contractual limitations on Paramount's ability to engage in marketing activities and Paramount was specifically prohibited from placing unsolicited outbound telemarketing calls. *EG's SMF ¶ 43.* Paramount was also prohibited from purchasing leads that involved prerecorded messages. *EG's SMF ¶ 44.* EG did not allow any vendor to make outbound telemarketing calls.

19. Saveology did not know the names or identities of the subaffiliates used by Paramount and its other affiliates. [DE 282-6 (Fernandes Dep. at 105-08); DE 282-13 (Bamira Dep. at 31-32.)]

**Response:** Denied. This statement is unlimited in time and overly broad as to what Elephant Group "knew" and when. Additionally, the cited testimony does not refer to a "sub-affiliate" as alleged and there is no evidence that Paramount was using any "subaffiliates." *Fernandes Dep., p. 105-08 and Bamira Dep., p. 31-32.* Responding further, Paramount was not an affiliate of EG and, therefore, could not have used a subaffiliate as alleged. Paramount was an independent vendor of EG. *SMF ¶¶ 20, 22 and 23.* EG did not control, nor was it controlled by Paramount. *SMF ¶¶ 22, 26.* EG was not a successor-in-interest to, an alter ego of or under common control with Paramount. *SMF ¶¶ 22, 23 and 26.* Paramount was a separate LLC formed independent of EG by an individual unrelated to EG, Ryan Neill. *SMF ¶ 20.*

20. Saveology did not require Paramount to disclose the names of its subaffiliates or lead vendors, as Saveology considered such information to be a proprietary "secret sauce." [DE 282-6 (Fernandes Dep. at 105-08); DE 282-13 (Bamira Dep. at 31.)]

5

**Response:** Denied. Saveology required Paramount to get approval in order to purchase leads from third parties. *Fernandes Dep. at 105.* Responding further, EG asked Paramount if they were working with various lead providers. *Fernandes Dep. at 108.*

21. Daphne Fernandes, Elephant Group's Director of Operations, had heard the name EMI "somewhere along the way" and was told it was a voice broadcaster, "so it was somebody that I would never have touched" and a "no for us." [DE 282-6 (Fernandes Dep. at 139, 141)]

**Response:** Admitted.

22. Paramount did not do any due diligence on EMI prior to purchasing EMI leads. [DE 282-8 (Neill Dep. at 48, 94.)]

**Response:** Denied. EMI told Paramount that EMI was fully compliant with all federal regulations regarding telemarketing. *EG's SMF ¶ 38.* As part of that compliance, Paramount understood that EMI was manually dialing outbound calls through live agents. *EG's SMF ¶ 39.* If EMI was using ADT's name and making calls using prerecorded messages, that would be contrary to what EMI told Paramount. *EG's SMF ¶ 40, 42.*

23. EMI did not inform Paramount how it obtained its leads. [DE 282-8 (Neill Dep. at 50.)]

**Response:** Denied. EMI told Paramount the leads were from EMI's own opt-in database. *ADT's Exhibit 8 at 50.* Additionally, EMI told Paramount that EMI was fully compliant with all federal regulations regarding telemarketing. *EG's SMF ¶ 38.*

24. EMI's Transfer Service Orders did not contain any warranties or representations that EMI complied with federal, state, and local telemarketing laws. [DE 282-19]

**Response:** EG admits that EMI's transfer service orders did not contain any warranties or representations that EMI complied with federal, state, and local telemarketing laws. However, EMI told Paramount that EMI was fully compliant with all federal regulations regarding telemarketing. *EG's SMF ¶ 38.*

25. EMI retained a dialing company, Dynamic Interactive Corp., to provide the Voice Broadcasting technology platform for EMI's prerecorded telemarketing campaigns. These campaigns used Dynamic's platforms to rapidly deliver prerecorded messages about ADT home security systems to several million recipients through the phone. [DE 282-24 at ¶¶8-9, 28-32.]

**Response:** EG is not aware of any evidence that contradicts this statement.

26. EMI called class plaintiff Vishva Desai's cellular telephone using a prerecorded message placed by Dynamic's automated dialing system. ("Desai Call") The Desai Call was part of a larger EMI telemarketing campaign for Paramount. [DE 282-24 at ¶¶28-29; DE 282-1 at 40, 41.]

6

**Response:** Denied to the extent that this statement asserts that EMI was acting on behalf of Paramount. Paramount, like Eversafe and Home Alerts, simply bought leads from EMI and paid EMI for each phone call that EMI transferred to Paramount. *EG's SMF ¶ 34*. There is no evidence the Desai Call was transferred to Paramount or to any other entity. Additionally, there is no evidence that the campaign was related to leads to be sold to EG.

27. Ms. Desai never gave anyone consent to call her on her cell phone via autodialer and prerecorded message on behalf of ADT. [DE 282-25 at Response no. 2.]

**Response:** EG is not aware of any evidence that contradicts this statement.

28. Elephant Group and its counsel participated in at least three mediation sessions with ADT and other third party defendants. [DE 282-13 (Bamira Dep. at 66-67.)]

**Response:** Admitted.

29. Both during the mediations and outside of the mediations (including at the fairness hearing), Elephant Group did not object to the settlement between ADT and the plaintiff class. [DE 282-13 (Bamira Dep. at 73-77.)]

**Response:** Denied. Mr. Bamira objected to ADT's assessment that it had to settle. *Bamira Dep. at 69-70.*

30. Elephant Group considers the terms of ADT's settlement with the plaintiffs to be reasonable. [DE 282-13 (Bamira Dep. at 71-72.)]

**Response:** Denied. Mr. Bamira testified that, from ADT's perspective, he understood in what shoes they were standing considering ADT's corporate separation from Tyco which was occurring at the same time and which made it important for ADT to settle. *Bamira Dep. at 70-72*. Mr. Bamira also objected to ADT's assessment that it had to settle. *Bamira Dep. at 69-70.*

31. Elephant Group's former Chairman of the Board, Joseph Bamira, said that ADT faced a "material risk. . . . Even if the chance [of a class being certified] was small, given the number that they faced, the probabilities, probably from their perspective, it was a good decision." [DE 282-13 (Bamira Dep. at 70-71, 72.)] He continued as follows: "If you have to choose between losing 15 and risking 2 billion, if that's the case, the mathematics is probably fair." [DE 282-13 (Bamira Dep. at 72.)]

**Response:** Mr. Bamira testified that, from ADT's perspective, he understood in what shoes they were standing considering ADT's corporate separation from Tyco which was occurring at the same time and which made it important for ADT to settle. *Bamira Dep. at 70-72*. Mr. Bamira also objected to ADT's assessment that it had to settle. *Bamira Dep. at 69-70.*

32. ADT settled the underlying action based on an assessment of the risks and the potential exposure to liability of a billion dollars. [DE 279-2 at 106-08, 111]

**Response: Denied. ADT's willingness to settle was premised on its desire to have "total peace with respect to any claims relating to Robocalls, that relate in any way to ADT prior to the effective date."** *Doc. 229, p. 3.* **ADT did not settle the underlying action because of the likelihood of class certification or an adverse liability finding. ADT has admitted that "without a settlement, the class would likely recover nothing."** *Doc. 229, p. 2.*

33. ADT was aware that the FCC was considering vicarious liability as a basis for TCPA violations, and knew that an FCC ruling on that issue was expected at the time of the settlement negotiations. [DE 279-2 at 106-08, 111]

**Response: Admitted.**

34. The reporting done by ADT pursuant to the 2007 Consent Decree with the FTC did not include the use of Elephant Group. [DE 282-4 (Bergman Dep. at 59.)] ADT completed its reporting requirements in 2012, and the FTC has not requested any additional information. [DE 282-4 (Bergman Dep. at 58, 61.)]

**Response: Admitted.**

Respectfully submitted,

/s/ Daniel W. Pisani
James K. Schultz
Daniel W. Pisani
Sessions Fishman Nathan & Israel, LLC
55 West Monroe Street, Suite 1120
Chicago, Illinois 60603
Telephone: (312) 578-0990
Facsimile: (312) 578-0991
jschultz@sessions-law.biz
dpisani@sessions-law.biz

*Attorneys for Elephant Group, Inc.*

## **CERTIFICATE OF SERVICE**

    I HEREBY CERTIFY that on August 28, 2014, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to the parties of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

        Respectfully submitted,

        /s/ Daniel W. Pisani
        James K. Schultz
        Daniel W. Pisani
        Sessions Fishman Nathan & Israel, LLC
        55 West Monroe Street, Suite 1120
        Chicago, Illinois 60603
        Telephone: (312) 578-0990
        Facsimile: (312) 578-0991
        jschultz@sessions-law.biz
        dpisani@sessions-law.biz

        *Attorneys for Elephant Group, Inc.*