**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

VISHVA DESAI and PHILIP J. CHARVAT
on behalf of themselves and others similarly
situated,

                  Plaintiffs,

v.

ADT Security Services, Inc.,

                  Defendant/Third-Party
Plaintiff,

v.

PETE TOLMAN, LEADS DIRECT
MARKETING, VOICE TEL
CORPORATION, CHRISTOPHER LONG,
EMI, INC., JMB ENTERPRISES, CITY VIP,
LLC, DIRECT SAVINGS, USA, INC.,
OSCAR MONTENEGRO, EVERSAFE
SECURITY SYSTEMS, INC., SAFE
STREETS USA, LLC, PARAMOUNT
MEDIA GROUP, THE ELEPHANT GROUP,
INC., AND UNKNOWN JOHN DOE
DEFENDANTS I THROUGH XX,

                  Third-Party Defendants.

SAFE STREETS USA, LLC, SUCCESSOR
BY MERGER TO EVERSAFE SECURITY
SYSTEMS, INC.,

                  Fourth-Party Plaintiff,

v.

DIRECT SAVINGS USA, LLC,

                  Fourth-Party Defendant.

No.  1:11-cv-1925

Judge Bucklo
Magistrate Judge Keys

**ADT'S REPLY IN SUPPORT OF ITS**
**MOTION FOR SUMMARY JUDGMENT**

Through fifteen pages of scattershot argument largely unsupported by legal authorities,

Elephant Group's response to ADT's summary judgment motion boils down to whether the acts

of Paramount and its agent EMI may be imputed to Elephant Group under the law of agency and

the parties' contract. Elephant Group points the Court to no evidence that creates a disputed

issue of fact. Given the agreed underlying facts, the Court may enter summary judgment as a

matter of law. In reply, ADT states:

**I.      The Uncontradicted Record Supports The Conclusion**
**That Paramount Acted As Elephant Group's Agent.**

Elephant Group's brief nowhere addresses (much less rebuts) the central and irrefutable

facts that support an award of summary judgment:

- Elephant Group, in violation of its Agreement with ADT, contracted with
  Paramount to generate leads for ADT products and services;

- Elephant Group exercised substantial control over Paramount such that
  Paramount was an agent of Elephant Group;

- Paramount contracted with EMI to generate sales leads for ADT products,
  thereby making EMI a subagent of Elephant Group;

- EMI made prerecorded telemarketing calls in violation of the TCPA on
  behalf of Paramount, including the call to Vishva Desai that prompted the
  underlying lawsuit;

- Elephant Group knew that Paramount used unknown subagents to
  make outbound calls to consumers, but failed to take precautionary
  measures to safeguard against illegal calls by the subagents.

Rather than dispute any of these facts, Elephant Group argues by unsupported non

sequiturs that Paramount was not its affiliate, that Elephant Group itself made no unsolicited

outbound telemarketing calls, and that ADT was negligent. As already shown in ADT's

opposition to Elephant Group's own motion for summary judgment,[1] [DE 288] and below, these arguments do not answer the dispositive and unchallenged facts that establish Elephant Group's agency relationship with Paramount. As ADT showed in its opposition, each of these arguments fails to create a genuine issue of fact with respect to the facts on which ADT's motion rests.

Elephant Group disputes Paramount's status as its "affiliate," [DE 286 at 3-7] yet *all* of the evidence before the Court points to the opposite conclusion. Elephant Group's record citations that purportedly show a lack of affiliation, in fact, demonstrate just the opposite. [DE 279 ¶¶ 22, 26.] ADT has elsewhere [DE 288 at 5-6] provided a lengthy list of the record facts that establish Elephant Group's control over Paramount sufficient to create an agency relationship generally – which by itself is enough to establish liability under both contractual indemnity provisions – and, moreover, to establish Paramount as an Elephant Group "affiliate" under the contract. ADT also there noted [DE 288 at 4] that Elephant Group had itself argued, in its own motion for summary judgment, that Elephant Group could not have acted negligently with respect to Paramount, *precisely because of the extensive control Elephant Group exercised over Paramount's work:*

> EG worked to ensure that Paramount was living up to the contractual standards by auditing Paramount during the term of the agreement, including performing on-site reviews, correcting any process errors, listening to recordings and approving scripts. … EG put in strict rules and undertook supervision to ensure that Paramount was not making outbound telemarketing calls.

[DE 278 at 8.]

---

[1]  Because Elephant Group's opposition to ADT's summary judgment motion [DE 286] largely replicates Elephant Group's own summary judgment motion [DE 278], ADT asks the Court to consider here the facts and arguments that ADT has already offered [DE 288] in opposition to Elephant Group's motion.

Elephant Group thus itself concedes that it exercised "strict" control over Paramount's generation of sales leads for the ADT contract. A principal's right to give "interim instructions" in the execution of a contract is the "hallmark of an agency relationship." *Smith v. State Farm Mutual Auto Ins. Co.*, No. 13cv2018, 2014 WL 3906923 at *6 (N.D. Ill. Aug. 11, 2014), *quoting* RESTATEMENT (THIRD) AGENCY § 1.01 cmt. f(1) ("the power to give interim instructions distinguishes principals in agency relationships from those who contract to receive services provided by persons who are not agents"). Here, as already noted, [DE 288 at 5-6] Elephant Group not only provided "interim instructions" to Paramount, but indeed exercised *daily control* over Paramount's work: training Paramount employees [DE 282-6 at 46-47], randomly monitoring Paramount's calls [DE 282-6 at 48, 52; DE 282-13 at 45], requiring corrections by Paramount as it performed [DE 282-6 at 53], conducting on-site inspections of Paramount's offices for quality assurance [DE 282-6 at 47-48], specifying the scripts for Paramount's operators to follow [DE 282-8 at 31], requiring advance approval of all Paramount marketing practices [DE 282-6 at 105, 116], and so forth. There is no basis in this record to find a genuine dispute as to any material fact with respect to Paramount's status as Elephant Group's agent.

Finally, Elephant Group now argues [DE 286 at 4-5] that Paramount was not its affiliate because Paramount was an independent contractor. This argument, too, is a *non sequitur*: An independent contractor may also be an agent. "Independent contractor" states an employment relationship that has nothing to do with whether an agency exists. As the Colorado Supreme Court has stated, "there are two kinds of independent contractors – those who are agents and those who are not." *See Grease Monkey Int'l, Inc. v. Montoya*, 904 P.2d 468, 472-73 (Colo. 1995); *accord Bradbury v. Phillips Petroleum Co.*, 815 F.2d 1356, 1360 (10th Cir. 1987). An agency arises where one is entrusted with the business of another, subject to the other's direction

and control. *See Citywide Banks v. Armijo*, 313 P.3d 647, 651 (Colo. App. 2011). An agent's

employment status is irrelevant to the agency. Paramount's agency is clear from the record

before the Court, regardless of its independent contractor status.

## II. The Uncontradicted Record Also Compels The Conclusion That Elephant Group Is Liable For EMI's Wrongs Under The Law Of Agency.

Furthermore, the uncontradicted record here requires a finding that EMI was Paramount's

agent – Elephant Group's subagent – and that Elephant Group is responsible under basic rules of

agency for EMI's robocalling activities. Elephant Group's contrary (and largely unsupported)

statement of agency law presumes facts not found in the record before the Court.

### A. Elephant Group Granted Paramount Actual Authority to Use Subagents.

The scope of any agency relationship turns on the principal's grant of authority to

conduct the principal's affairs. Absent Elephant Group's original Affiliate Agreement with

Paramount,[2] it is not possible to state whether Elephant Group gave Paramount *express* authority

---

[2] In opposing Elephant Group's summary judgment motion, ADT asked the Court to draw adverse inferences from Elephant Group's failure to produce the Affiliate Agreement despite ADT's several requests for the document. [DE 288 at 4.] Three days ago, months after the close of discovery, Elephant Group produced an "Affiliate Agreement." Whatever this document is, it plainly is not *Paramount's* agreement – it is unexecuted and does not mention Paramount. The "Addendum" to the Paramount Affiliate Agreement that Elephant Group *did* timely produce states that it "amends the Affiliate Agreement ('Agreement') dated 10/12/10." [DE 282-7 at 1.] The unexecuted form produced this week, by contrast, is undated; in addition, it shows a creation date of October 18, 2010, so it cannot possibly be regarded as even a specimen of Paramount's October 12 agreement with Elephant Group. Moreover, because the document was never produced during discovery, Elephant Group may not offer it now "to supply evidence on a motion." FED. R. CIV. P. 37(c)(1); *accord Saunders v. City of Chicago*, 320 F. Supp. 2d 735, 739 (N.D. Ill. 2004) (Bucklo, J.). *See, e.g., System Dev. Integration, LLC v. Computer Sciences Corp.*, 2012 WL 2953063, at *2 (N.D. Ill. July 19, 2012) (excluding untimely-disclosed witnesses and documents even where defendant claimed they came into existence after the discovery cut-off); *Aon Risk Services, Inc. v. Shetzer*, 2002 WL 1989466 at *6 (N.D. Ill. August 27, 2002) (applying Rule 37(c) to bar a party from using twenty documents that were produced after the close of discovery).

to engage subagents such as EMI. Elephant Group, however, clearly vested Paramount with *implied* authority to hire subagents for the ADT contract. "Implied authority of an agent is actual authority evidenced by conduct," and may be "proved by evidence of [the principal's] acquiescence with knowledge of the agent's acts." *Citywide Banks*, 313 P.3d at 652-53. A principal is thus responsible for the torts of its agent's agents where, *inter alia*, "the appointment of subagents for the performance of such transactions is usual, or the principal has reason to know that the agent employs subagents," *Stat Tech Liquidating Trust v. Fenster*, 981 F. Supp. 1325, 1345 (D. Colo. 1997), *quoting* RESTATEMENT (SECOND) AGENCY § 80. *Accord Norton v. Jim Phillips Horse Transp., Inc.*, 901 F.2d 821, 825 (10th Cir. 1989); *Rohauer v. Little*, 736 P.2d 403, 407 (Colo. 1987); *Stortroen v. Beneficial Finance Co. of Colorado*, 736 P.2d 391, 395-96 (Colo. 1987) (a "subagent is the agent of both the appointing agent *and the principal*.") (emphasis added).

By these standards, Paramount's implied authority to engage EMI as a subagent to perform the contract is shown throughout this undisputed record:

- The Addendum to the Affiliate Agreement did not bar Paramount from subcontracting with other entities or require any approval for the use of third parties. [DE 282-7].

- Elephant Group's principal as well as its Director of Operations, among others in the company, knew that Paramount and the other affiliates used unidentified and untested third party lead generators in the ordinary course of business to make telephone calls. [DE 282-6 at 102-05; DE 282-10; DE 282-11; DE 282-12; DE 282-13 at 28-32; DE 282-14; DE 282-8 at 76-77, 84]. Elephant Group acquiesced and did nothing to curb the use of these subagents.

- Elephant Group's Director of Operations testified that it is a common practice in the lead generation industry for companies like Paramount to use anonymous subagents to assist in generating sales leads [DE 282-6 at 106-08] and that Elephant Group accepted it.

6

- Elephant Group did not require Paramount to disclose the names or identities of its subagents because Elephant Group considered that information to be "secret sauce" – proprietary information of its agents like Paramount that was off-limits to Elephant Group. [DE 282-6 at 105-08; DE 282-13 at 31-32].

These undisputed facts establish that Elephant Group gave Paramount implied authority under the Colorado law of agency to use subagents like EMI on the ADT contract. "The authority to appoint subagents is inferred where the principal knows or has reason to know the agent employs subagents." *Bloom v. Wolfe*, 547 P.2d 934, 936 (Colo. App. 1976); *accord Stat Tech*, 981 F. Supp. at 1344-45 (D. Colo. 1997). The court in *Stat Tech* concluded, consistent with these rules, that a party may be a subagent of a principal even where the principal had no communications with the subagent. *Id. See also Norton v. Jim Phillips Horse Transp., Inc*., 901 F.2d 821, 825 (10th Cir. 1989); *Stortroen v. Beneficial Finance Co. of Colorado*, 736 P.2d 391, 395-96 (Colo. 1987) (a "subagent is the agent of both the appointing agent and the principal").

Remarkably, Elephant Group rests it contrary argument entirely on *Smith v. State Farm Mutual Auto Ins. Co*., No. 13cv2018, 2014 WL 3906923 at *6 (N.D. Ill. Aug. 11, 2014) – *a decision that in fact supports a finding of agency in this case*. State Farm observed that an agency is established based on the indicia of control exercised over the agent's marketing efforts – all present in the record before this Court. As already noted above, *State Farm* held (at *6) that the principal's right to give "interim instructions" is the "hallmark of an agency relationship" – a conclusion that firmly fixes Paramount's status as Elephant Group's agent. It *also* supports a finding of agency between Paramount and EMI for which Elephant Group is liable. Paramount hired EMI to perform functions that Paramount had consented to perform for Elephant Group, in particular, generating leads for ADT products and services. According to the written contracts between Paramount and EMI [DE 282-19 at 2-4], Paramount specified the target markets that it

directed EMI to call; provided the volume of transfers to be made from EMI; had the right to control the days of the week and times of EMI's calls; and had the power to mandate any message details or special instructions.  [DE 282-19 at 2-4.]  Paramount's right to control EMI's telemarketing activities, including the target locales, timing, and volume of calls, establishes an agency relationship between Paramount and EMI under the criteria discussed in *State Farm*.  *See* 2014 WL 3906923 at *6.

*State Farm*, while persuasive, does not purport to state the Colorado agency rules that govern this case.  The Colorado authorities, discussed above, clearly make Elephant Group responsible for EMI's torts.  *State Farm's* general statement of agency law supports findings that Paramount was Elephant Group's agent, and that EMI was Paramount's.  Elephant Group's complete reliance on *State Farm* only underscores the total lack of authority that supports its contention that it should not be responsible for EMI's robodialing here.

### B.     Elephant Group Must Indemnify ADT For the Unlawful Acts of Paramount and EMI.

Given the agency relationships established above, Elephant Group must indemnify ADT under the parties' agreement for the intentional torts committed by Paramount's subagents, including EMI.  Paragraph 6(b) requires Elephant Group to indemnify ADT for losses resulting from any negligence or intentional torts of Elephant Group's affiliates and agents, such as Paramount and EMI.  The facts above trigger Elephant Group's indemnity obligation under paragraph 6(b).

In addition, Elephant Group is liable for the damages caused by EMI's unlawful calls pursuant to paragraph 23.F.  Elephant Group argues that it bears no indemnity obligation under paragraph 23.F because Elephant Group itself did not make unsolicited outbound telemarketing calls. [DE 286 at 7-9].  The argument, again, is a *non sequitur* that does not relieve Elephant

8

Group from liability. Elephant Group ignores the operative language of Paragraph 23.A, which holds Elephant Group accountable for unsolicited outbound calls made "directly *or indirectly through telemarketing agents or others.*" (Emphasis added.) Elephant Group completely fails to address the agency language of the provision, or the Colorado agency rules generally, and therefore does not refute this basis for indemnity.

### C. Elephant Group Is Liable For the Unlawful Acts of "Others" it Entrusted to Perform the ADT Contract.

The above argument shows why Elephant Group necessarily is liable to ADT for the actions of Paramount and EMI under agency theories. In addition, Elephant Group is also liable under Paragraph 23.A for calls made indirectly by "others," a term which necessarily is broader than "agents," which the paragraph also specifies. The plain meaning of the paragraph is to make Elephant Group responsible for any loss incurred as a result of its performance under the contract, even if delegated to another such as Paramount or EMI, beyond the rules of agency or vicarious liability. Elephant Group's complete failure to offer any substantive response to this language is fatal.

### III. The Uncontradicted Record Also Compels The Conclusion That Elephant Group Is Liable Under Paragraph 6(b) For Its Own Negligence In Hiring And Failing To Supervise Paramount.

Elephant Group erroneously argues [DE 286 at 10-11] that it is not liable under Paragraph 6(b) for its own negligence because ADT's supposed negligence "extinguishes" any indemnity rights ADT might have. ADT has already refuted this argument on a number of grounds, each dispositive, [DE 288 at 5-10] and so refers the Court to that discussion in lieu of repeating it here.

In addition, Elephant Group argues [DE 286 at 15] that its own negligence cannot be a basis for indemnity because it was not, in fact, negligent in supervising Paramount – that

Elephant Group had "no reason to know" that Paramount was likely to harm others. But Elephant Group had ample reason to know that Paramount was likely to harm ADT. First, Elephant Group knew that Paramount was a brand new entity, with no telemarketing track record, when it contracted with Elephant Group. [DE 282-8 at 11.] Moreover, Elephant Group knew that Paramount was not well-versed in the requirements of the TCPA. For example, unbeknownst to ADT, *five months after* Paramount signed its contract with Elephant Group, Daphne Fernandes, Elephant Group's Director of Operations, instructed Paramount that it must scrub all phone numbers prior to making any outbound calls, [DE 282-16] then sent scrubbing instructions to Paramount. [DE 282-17.] Paramount's failure to scrub phone numbers against Do-Not-Call lists for five months was a red flag that Paramount was not a competent telemarketer.

Nonetheless, Elephant Group knew and acquiesced in Paramount's use of unknown and unsupervised subagents to make telemarketing calls on its behalf. The law imposes a duty upon Elephant Group to supervise the activities of its agents, *see Gilmore v. Constitution Life Ins. Co*., 502 F.2d 1344, 1348-49 (10th Cir. 1974), *following Witcher v. Gibson*, 15 Colo. App. 163, 170-71, 61 P. 192, 194 (1900), yet Elephant Group completely disregarded it. Instead of investigating the Paramount subaffiliates' identities and compliance practices, Elephant Group knowingly let them operate anonymously, free of constraints or scrutiny, because Elephant Group considered their identities and activities "secret sauce" – Paramount's proprietary information. Elephant Group's knowing and willful blindness to the telemarketing practices of Paramount's subaffiliates, and the likely harm they would cause, epitomizes negligent supervision.

Elephant Group also argues [DE 286 at 12] that it could not be negligent for hiring Paramount "because ADT knew about it," based on communications with an ADT salesman, "and took no steps to end the relationship." Once again, Elephant Group's statement is

10

contradicted by the evidence: There is nothing in this record that suggests that ADT, through any person qualified to give permission, ever permitted Elephant Group to use vendors to assist in generating leads. The Agreement specifically required *"express written consent" from one of the two ADT Senior Vice Presidents identified in the Agreement as responsible for managing the parties' relationship* for any assignment of duties under the Agreement. [DE 282-2 at ¶¶ 17, 21.] It is undisputed that neither ADT vice president ever granted express written consent (or, indeed, *any consent*) to Elephant Group for an assignment to Paramount or any third party prior to the filing of the underlying lawsuit. [DE 282-5 at ¶7; 282-6 (Fernandes Dep. at 121-22.)]

Furthermore, the Agreement provided that it "may be amended only by writing duly executed by ADT and Elephant Group." [DE 282-2 at ¶ 15.] The Agreement also included a no-waiver provision which stated: "No failure by either party to exercise . . . its rights, and no course of dealing with respect to any right . . . shall operate as a waiver thereof, unless and only to the extent agreed to in writing by both parties." [DE 282-2 at ¶16.] No such writing executed by both parties exists, and Elephant Group points to none.

Finally, Elephant Group argues [DE 286 at 14-15] that even if Paramount were its agent, Elephant Group would not be liable because Paramount acted outside the scope of its authority. Once again, the evidence in this record fails to support Elephant Group's assertion. An agent acts within the scope of his authority when he does the work assigned to him or what is necessarily incidental to that work, or what is customary in the employer's business. *See Moses v. Diocese of Colorado*, 863 P.2d 310, 329-30 (Colo. 1993). The "scope of employment" requirement restricts vicarious liability for tortious conduct of an agent to actions that "should be considered one of the normal risks to be borne by the business in which the servant is employed." *Moses,* 863 P.2d at 329-30 n.27, *citing* the RESTATEMENT (SECOND) AGENCY §229

11

cmt.a (1958). An act falls within the scope of the agent's authority where the agent acts with the intention "to further the employer's business." *Id*.

The uncontradicted record here establishes that Paramount was acting within the scope of its authority. Elephant Group authorized Paramount to generate leads promoting ADT products. [DE 282-7.] Elephant Group permitted Paramount to use unidentified third-party lead generators. Paramount was acting within its authority to engage EMI to generate leads for Elephant Group's ADT account – it was performing the work assigned to it and acting to further Elephant Group's business. Given Elephant Group's knowledge of and acquiescence in Paramount's use of anonymous subagents, the risk that Paramount could purchase leads that were not compliant with the TCPA was foreseeable and a "normal risk" of a lead generator in the telemarketing business. *Compare Moses*, 863 P.2d at 330 (priest was not acting within scope of his employment when engaging in sex with a parishioner).

## IV. The Law Of The Case Requires Entry Of Summary Judgment.

Finally, Elephant Group tries to rebut ADT's law-of-the-case argument [DE 281 at 4-6] by arguing that ADT has not offered facts to show that Paramount was its agent, and that the law has changed since the Court's ruling. [DE 286 at 16.] Both arguments are demonstrably false. As shown at length above and in ADT's previous submissions, ADT has in fact offered a conclusive record on summary judgment regarding Paramount's status as Elephant Group's agent. The "substantial change in the law" that Elephant Group invokes – the FCC ruling on the Dish Network petition regarding vicarious liability of a seller for its telemarketer's TCPA violation – did not in fact make a change in the law, substantial or otherwise. In fact, the FCC's ruling expressly found that, as in all other areas in which Congress codifies a common-law tort, Congress intends to incorporate in the statutory right of action all common-law tort rules that

12

relate to agency and vicarious liability – a finding that conforms to existing law, not one that changes it. *See State Farm*, 2014 WL 3906923 at *6. Moreover, the FCC ruling with respect to the application of common-law agency rules to TCPA cases was mere "guidance" to courts, not binding precedent. *See Dish Network L.L.C. v. FCC*, 552 Fed. Appx. 1 (D.C. Cir. 2014). Because courts are free to follow or reject the FCC opinion, the ruling lacks the precedential weight required to find *any* change in the law, "substantial" or otherwise. The Court should grant ADT's summary judgment motion for this reason as well.

## CONCLUSION

The motion should be granted.


Dated: August 28, 2014                    McNEW P.A.


                                          s/ C. Sanders McNew
                                          C. Sanders McNew (*pro hac vice*)
                                          2385 NW Executive Center Drive
                                          Suite 100
                                          Boca Raton, Florida 33431
                                          Telephone: (561) 299-0257
                                          mcnew@mcnew.net

                                          John A. Leja
                                          Polsinelli PC
                                          161 N. Clark St.
                                          Suite 4200
                                          Chicago, Illinois 60601
                                          Telephone: (312) 873-3670
                                          jleja@polsinelli.com

                                          *Counsel for ADT*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on August 28, 2014, he caused the foregoing **ADT'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** to be filed electronically with Court's CM/ECF system. Notice of this filing will be sent to all parties and counsel of record by operation of the Court's CM/ECF system.

<u>              /s/ John A. Leja             </u>