IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| VISHVA DESAI and PHILIP J. CHARVAT on behalf of themselves and others similarly situated, | |
| Plaintiffs, | |
| v. | |
| ADT Security Services, Inc., | |
| Defendant/Third-Party Plaintiff, | No. 1:11-cv-1925 |
| v. | Judge Bucklo |
| PETE TOLMAN, LEADS DIRECT MARKETING, VOICE TEL CORPORATION, CHRISTOPHER LONG, EMI, INC., JMB ENTERPRISES, CITY VIP, LLC, DIRECT SAVINGS, USA, INC., OSCAR MONTENEGRO, EVERSAFE SECURITY SYSTEMS, INC., SAFE STREETS USA, LLC, PARAMOUNT MEDIA GROUP, THE ELEPHANT GROUP, INC., AND UNKNOWN JOHN DOE DEFENDANTS I THROUGH XX, | Magistrate Judge Keys |
| Third-Party Defendants. | |
| SAFE STREETS USA, LLC, SUCCESSOR BY MERGER TO EVERSAFE SECURITY SYSTEMS, INC., | |
| Fourth-Party Plaintiff, | |
| v. | |
| DIRECT SAVINGS USA, LLC, | |
| Fourth-Party Defendant. | |

## ADT'S REPLY TO ELEPHANT GROUP'S
## STATEMENT OF ADDITIONAL MATERIAL FACTS

Third-Party Plaintiff ADT Security Services, Inc. ("ADT"), by and through undersigned counsel, and pursuant to Rule 56.1, submits this Reply to Elephant Group's ("EG") Statement of Additional Material Facts in connection with ADT's Motion for Summary Judgment.

1. An affiliate is defined in the contract between EG and ADT as "any corporation or other person or entity that directly or indirectly controls, is controlled by, a successor-in-interest to, or alter ego of, or is under the common control with, ADT or Elephant Group, respectively." *Exhibit 1 to EG's SMF, ¶ 4.1.*

**Response:** Admitted.

2. Paramount was not the agent of EG, but an independent contractor. *Exhibit 6 to EG's SMF, p. 33.*

**Response:** Disputed. Paramount was Elephant Group's affiliate and agent. [DE 288 at 5-6]. As a matter of law, an independent contractor may also be an agent. *See Grease Monkey Int'l, Inc. v. Montoya*, 904 P.2d 468, 472-73 (Colo. 1995).

3. Subject to telemarketing restrictions incorporated into the Agreement by EG, Paramount was responsible for determining how best to market ADT's products. *Exhibit 6 to EG's SMF, p. 33.*

**Response:** Disputed. Elephant Group provided frequent and consistent direction and supervision to Paramount. [DE 288 at 5-6]. Among other indicia of control and direction, Elephant Group provided strict requirements as to the types of marketing Paramount was permitted to do. [DE 282-7 at Exhibit B.] Elephant Group provided live training as well as written training materials to Paramount. [DE 282-6 at 46-47.] Elephant Group randomly monitored Paramount's calls [DE 282-6 at 48, 52; DE 282-13 at 45] and required Paramount to correct any deficiencies. [DE 282-6 at 53.] Elephant Group's Director of Operations, Daphne Fernandes, would visit and inspect Paramount's offices for quality assurance purposes. [DE 282-6 at 47-48.] Elephant Group specified the procedures by which Paramount would qualify a customer, and provided the script for Paramount to follow. [DE 282-6 at 40.] Elephant Group controlled Paramount's marketing tactics and methods by requiring that Paramount submit them to Elephant Group for review and approval. [DE 282-6 at 105, 116.]

4. EG exercised no control and did not tell Paramount how to generate leads; that process was left up to Paramount. *Exhibit 6 to EG's SMF, p. 34.*

**Response:** Disputed. The record evidence demonstrates Elephant Group's control and supervision of Paramount [DE 288 at 5-6]. Further, Elephant Group has admitted that it exercised control over Paramount:

> EG worked to ensure that Paramount was living up to the contractual standards by auditing Paramount during the term of the agreement, including performing on-site reviews,

> correcting any process errors, listening to recordings and approving scripts. … EG put in strict rules and undertook supervision to ensure that Paramount was not making outbound telemarketing calls.

[DE 278 at 8.]

5. EMI advised Paramount that the leads it was selling were generated from live (non-automated) calls placed by EMI's representatives, and that calls would be transferred to Paramount if the customer expressed an interest in purchasing a home security system. *Exhibit 6 to EG's SMF, p. 15*.

**Response:** Disputed. EMI's Transfer Service Orders contained no warranties or representations that EMI complied with all federal, state, and local telemarketing laws; Paramount did no due diligence on EMI prior to purchasing leads; and EMI did not inform Paramount how it obtained its leads. [DE 282-8 (Neill Dep. at 48-50, 94); DE 282-19 at 2] Paramount should have known, with the exercise of reasonable care, that EMI was robocalling or sending prerecorded messages to consumers.

6. EG required that, before Paramount made any phone call, it scrubbed the phone number against it ADT's internal Do Not Call list, *Exhibit 6 to EG's SMF, p. 43*.

**Response:** Disputed. The record evidence shows that more than five months after execution of the Affiliate Agreement by Elephant Group and Paramount, Elephant Group sent the following e-mail to Paramount: "Are your call centers making outbound calls? If so, we must scrub those number [sic] prior to calling the consumers even if they opted in. I was under the impression that all of your calls were inbound calls. If you are dialing we have to start the scrub today." [DE 282-16]. Five days later, on April 13, 2011, Fernandes sent instructions on the ADT Do Not Call scrubbing process to Paramount. [DE 282-17].

7. At the time Paramount entered into the agreement with EG, Paramount knew that it was required to comply with the marketing guidelines of ADT. *Exhibit 6 to EG's SMF, p. 19-20; p. 35*.

**Response:** Disputed. Paramount did not receive the actual ADT telemarketing guidelines, but instead received guidelines written by Elephant Group and included in the Addendum to the Affiliate Agreement between Elephant Group and Paramount. [DE 282-7 at Exhibit B; DE 282-6 (Fernandes Dep. at 36)] Despite the contents of the guidelines, Paramount contracted with EMI which made millions of prerecorded calls advertising ADT products and services. [DE 282-22 at 9, 14; DE 282-24 at ¶¶8-9, 28-32]

8. Pursuant to the agreement with EG, Paramount knew that it was prohibited from making unsolicited outbound telemarketing calls. *Exhibit 6 to EG's SMF, p. 36.*

**Response:** Disputed. Paramount did so anyway. Paramount used subaffiliates to make telephone calls. [DE 282-6 (Fernandes Dep. at 102-05; DE 282-10, DE 282-11, DE 282-12; DE

3

282-8 (Neill Dep. at 76-77, 84.)] One such subaffiliate was EMI, which made millions of prerecorded calls advertising ADT products and services on behalf of Paramount. [DE 282-22 at 9, 14; DE 282-24 at ¶¶8-9, 28-32]

      9.    Paramount received and was trained on ADT's telemarketing guidelines. *Exhibit 6 to EG's SMF,* p. 42.

      **Response:** Disputed. Paramount did not receive the actual ADT telemarketing guidelines, but instead received guidelines written by Elephant Group and included in the Addendum to the Affiliate Agreement between Elephant Group and Paramount. [DE 282-7 at Exhibit B; DE 282-6 (Fernandes Dep. at 36).] Elephant Group provided training to Paramount. [DE 282-6 at 46-47.]

      10.    Paramount operated only as an inbound call center, taking calls from potential customers and attempting to convert those leads into sales. *Exhibit 6 to EG's SMF, p. 12*.

      **Response:** Disputed. Paramount also made outbound calls [DE 282-16 and 282-17] and contracted with EMI who made millions of prerecorded calls on Paramount's behalf. [DE 282-22 at 9, 14; DE 282-24 at ¶¶8-9, 28-32]

      11.    EG required Paramount to get prior approval before purchasing leads from third parties. *Exhibit 7 to EG's SMF, p. 105.*

      **Response:** Disputed. Elephant Group's record citation does not support its factual assertion. The document cited demonstrates that Elephant Group required Paramount to get approval for its marketing tactics, but Paramount was *not* required to submit the name of the vendor from whom it was purchasing leads, as Elephant Group considered this to be Paramount's proprietary information.

      12.    Paramount was not permitted to subcontract lead generation services without receiving prior written approval from EG. *Exhibit 7 to EG's SMF, p. 114.*

      **Response:** Disputed. By its own terms, the Addendum did not bar Paramount from subcontracting nor did it require Paramount to obtain prior written approval from Elephant Group. [DE 282-7] Elephant Group did not produce the Affiliate Agreement during discovery and thus may not rely on it for the summary judgment motions.

Dated: August 28, 2014                          McNEW P.A.

                                                      /s/ C. Sanders McNew
                                                      C. Sanders McNew (*pro hac vice*)
                                                      2385 NW Executive Center Drive
                                                      Suite 100
                                                      Boca Raton, Florida 33431

                    Telephone: (561) 299-0257
                    mcnew@mcnew.net

                    John A. Leja
                    Polsinelli PC
                    161 N. Clark St.
                    Suite 4200
                    Chicago, Illinois 60601
                    Telephone: (312) 873-3670
                    jleja@polsinelli.com

                    *Counsel for ADT*

## CERTIFICATE OF SERVICE

The undersigned certifies that on August 28, 2014, he caused the foregoing **ADT'S REPLY TO ELEPHANT GROUP'S STATEMENT OF ADDITIONAL MATERIAL FACTS** to be filed electronically with Court's CM/ECF system. Notice of this filing will be sent to all parties and counsel of record by operation of the Court's CM/ECF system.

                                              /s/ John A. Leja