VISHVA DESAI and PHILIP J.        )
CHARVAT, on behalf of             )
themselves and others             )
similarly situated                )
                                  )
              Plaintiffs,         )
      v.                          )   No. 11 C 1925
                                  )
ADT SECURITY SYSTEMS, INC.,       )
                                  )
              Defendant/          )
     Third Party Plaintiff,       )
                                  )
        v.                        )
                                  )
TOLMAN, *et al*.                  )
                                  )
     Third Party Defendants.      )
                                  )
--------------------------        )
                                  )
SAFE STREETS USA, LLC, as         )
successor to EVERSAFE             )
SECRUITY SYSTEMS, INC.            )
                                  )
     Third Party Defendant/       )
          Cross-Claimant,         )
                                  )
        v.                        )
                                  )
DIRECT SAVINGS USA, INC.,         )
*et al*.                          )
                                  )
     Third Party Defendants/      )
          Cross-Defendants.       )

<u>MEMORANDUM OPINION AND ORDER</u>

After receiving unsolicited, pre-recorded telemarketing calls promoting ADT Security Services, Inc.'s ("ADT") products and services, Vishva Desai filed a class action lawsuit against ADT in March 2011 alleging violations of the Telephone Consumer Protection Act of 1991 ("TCPA"), 105 Stat. 2394, 47 U.S.C. § 227. ADT, in turn, sued various individuals and entities that allegedly made prohibited telemarketing calls to the putative class.

In June 2013, I granted final approval to a $15 million settlement between ADT and a class comprised of all persons or entities that received a "covered call" at any time between January 1, 2007 and the date of the settlement. *See* Dkt. No. 243 at ¶ 6 (defining "covered call").

ADT has recovered $7 million in contribution or indemnification from third parties. ADT seeks to recover the remaining $8 million paid to the class and over $2 million in attorney's fees and costs from The Elephant Group, Inc. ("EG") under either of two indemnification provisions in the ADT-EG contract.

ADT and EG have filed cross motions for summary judgment on ADT's contractual indemnification claim. I grant ADT's motion in part and deny EG's cross motion for the reasons stated below.

I.

The following facts are undisputed unless stated otherwise. As reflected in their Local Rule 56.1 statements, the parties agree on the facts, but disagree about the legal conclusions that should be drawn from those facts.

A.

ADT sells home security services, both directly to consumers and through a network of ADT Authorized Dealers. In May 2008, EG signed a contract with ADT to generate sales leads for ADT Authorized Dealers. *See* Dkt. No. 282-2 ("Agreement"). The Agreement called for EG to "acquire referrals through a variety of marketing channels that include: partnerships, direct marketing and internet marketing as approved in writing by ADT." *Id.* at Ex. B. Although the contract expressly contemplated marketing partnerships between EG and third parties, EG was prohibited from transferring or assigning any of its contractual duties without ADT's express written consent. *Id.* at ¶ 17.

The Agreement also imposed restrictions on EG's ability to engage in "Telemarketing Services" of ADT's products and services. *Id.* at ¶ 23.A.[1] As relevant here, EG could not "make any unsolicited outbound telephone calls as part of a plan,

---

[1] The Agreement defined "Telemarketing Services" to include "any internet chat, internet phone calls, cable or cellular phone calls, direct mailing, or other communications with customers, consumers, and prospective customers." *Id.* at ¶ 23.A.

program, or campaign directly or indirectly through telemarketing agents or others on behalf of ADT to any person, including but not limited to ADT Customers or Leads." *Id*. at ¶ 23.A.

The only telemarketing EG could engage in consisted of "responding by telephone to consumer inquiries regarding ADT or ADT Dealer goods or services received via internet, telephone, e-mail, or other electronic means" subject to several additional restrictions. *Id*. For example, when making outbound telemarketing calls, EG agreed to (1) comply with the TCPA and similar laws; (2) refrain from using pre-recorded messages without ADT's consent; and (3) "scrub" all phone numbers against ADT's do-not-call list. *Id*. at ¶ 23.A.1. Upon request, EG also agreed to provide ADT with its outbound calling records; remove numbers from its calling lists; and present "documentary proof of its and its telemarketing agents' compliance" with the TCPA and similar laws. *Id*. at ¶¶ 23.A.1.e-g. EG was also required to use an ADT-approved script for all of its outbound telemarketing calls. *Id*. at ¶ 23.A.3.

B.

About five months after ADT and EG signed the contract described above, EG received a referral from one of its marketing partners about a lead provider called Paramount Media Group, LLC ("PMG"). *See* Dkt. No. 282-6 ("Fernandes Dep.") at

4

27-29.  PMG's managing member, Ryan Neill, explained to EG that his company obtained home security sales leads in two ways: (1) through websites where customers could "opt in" to receiving telemarketing calls and (2) from companies that upsold their customers on home security services and transferred live callers to PMG.  *Id.* at 43-44.

Daphne Fernandes, EG's Director of Operations for the Home Security Division, instructed PMG to fill out the "Affiliate Agreement" on EG's website.  *Id.* at 30-31.  PMG signed an "Affiliate Agreement" with EG on or around October 12, 2010.[2] PMG was one of five to ten companies from which EG purchased sales leads for ADT's products and services.  *Id.* at 56, 118. PMG, in turn, did not work with any ADT dealers, marketers, or telemarketers other than EG.  *See* Dkt. No. 282-9 at ¶ 4.  ADT did not learn that EG was buying leads from PMG until February 2011 when a consumer complained to ADT about receiving a call from a PMG agent.  *See* Dkt. No. 282-15.

On November 12, 2010, PMG signed an "Addendum" to its contract with EG whereby PMG agreed to generate sales leads for ADT's home security services in exchange for commission payments.  *See* Dkt. No. 282-7 ("Addendum").  PMG agreed to abide by marketing guidelines "set out by ADT" in Exhibit B of the

---

[2] The "Affiliate Agreement" between EG and PMG is not relevant to the pending motions, so ADT's motion to strike Dkt. No. 290-2 is denied as moot.

Addendum. *Id*. EG lifted some, but not all, of the telemarketing restrictions from its Agreement with ADT and inserted them into its contract with PMG. With regard to telemarketing, PMG could not "make any unsolicited outbound telephone calls as part of a plan, program or campaign directly or including but not limited to ADT Customers or Leads" or "use prerecorded messages in connection with Telemarketing Services on ADT's behalf." *Id*. at Ex. B. The only form of telemarketing PMG could engage in consisted of "responding by telephone to consumer inquiries regarding ADT goods or services received via Internet, telephone, e-mail or other electronic means." *Id*. EG also reserved the right to request PMG's outbound calling records and "[a]ny other information required by ADT." *Id*.

Once PMG obtained a home security sales lead, EG required PMG agents to qualify potential customers using a call script. *Id*. at 40. Daphne Fernandes also provided hands on training to PMG's agents before they started promoting ADT's home security services. *Id*. at 47. She returned to PMG's office on five and ten occasions to perform quality assurance on outbound calls. *Id*. at 47-48. Her goal during these visits was to make sure PMG's agents were "following the script." *Id*. at 51. She could also monitor in real-time whether the phone numbers PMG was calling had been scrubbed against ADT's do-not-call list. *Id*. at 55. If Fernandes noticed any errors in PMG's calls, she

would bring the issue to Ryan Neill's attention and/or verbally correct the mistake. *Id*. at 52-53. Fernandes communicated with PMG on a daily or weekly basis at the beginning of the EG-PMG relationship. *Id*. at 53.

EG also required PMG to submit its "marketing tactics" for EG's approval. *Id*. at 105-8. For instance, PMG submitted to EG the language PMG used to obtain opt-in leads through websites. *Id*. at 69-70. EG, in turn, obtained ADT's approval of PMG's opt-in in language. *Id*. As for which marketing partners PMG used to obtain opt-in in leads, EG considered that information proprietary to PMG. *Id*. at 105. EG never asked PMG to supply a list of all companies from which PMG purchased sales leads. *Id*. at 44. According to EG, it was "industry standard" for PMG not to disclose the names of its lead providers, which EG compared to a "secret sauce." *Id*. at 106.

The only circumstances in which EG asked PMG to confirm or deny whether it was working with a particular lead provider was when ADT received a consumer complaint. *See e.g.*, Dkt. No. 282-10 (Apr. 2011 e-mail in which EG asked PMG whether it was "working with a lead provider called American Protection Services"); Dkt. No. 282-11 (May 2011 e-mail in which EG asked PMG whether it or its "lead provider[s]" had called a particular phone number); Dkt. No. 282-12 (May 2011 e-mail in which EG asked PMG whether "you or any of your partners" had called two

phone numbers); Dkt. No. 282-12 (Apr. 2011 e-mail in which EG
asked PMG whether "your lead providers" used three particular
caller identification numbers).  The closest EG came to gaining
a complete understanding of PMG's lead provider network was in
May 2011 when Fernandes told PMG, "Remember, I need all of the
CIDs [caller identification numbers] 'you' PMG use and that
includes your affiliates/lead providers."  Dkt. No. 282-11.

C.

In late 2010, PMG started purchasing home security sales
leads from a company called Europe Media International, Inc.
("EMI").  PMG's managing member, Ryan Neill, saw EMI's
advertisement for home security leads on craigslist.com.  *See*
Dkt. No. 282-8 ("Neill Dep.") at 14.  Neill called the number
listed in EMI's advertisement and spoke with Chris Lopez, who
boasted that "anyone who is big in [home] security [sales] uses
us."  *Id.*  Lopez told Neill that EMI would make legal
telemarketing calls to customers who had opted in to receiving
home security offers, warm up the customer, and then transfer
the caller to a PMG agent.  *Id.* at 15.  Lopez said EMI
maintained its own opt-in data, but never disclosed whether EMI
purchased leads from other companies.  *Id.* at 50.  At the end of
the call, Neill asked Long to send him a purchase order.  *Id.* at
14.  PMG performed no due diligence on EMI other than Neill's
phone call with Lopez.  *Id.* at 94.

8

PMG purchased more than 9,700 home security leads from EMI between February 2011 and May 2011. *See* Dkt. No. 282-18. PMG submitted its orders on a form contract called a "Transfer Service Order" that required PMG to pay in advance for a specified number of sales leads. *See* Dkt. No. 282-19. The contract contained no representations or warranties that EMI obtained its leads in compliance with the TCPA and similar laws. The Transfer Service Order stated that PMG had "read and approved all scripts" EMI would use to generate sales leads. *Id.* PMG could specify which markets it wanted EMI to target; the content of any messages EMI should leave; and any screening criteria EMI should apply before transferring a live call to PMG's agents. *Id.*

Until this lawsuit was filed in March 2011, ADT and EG were unaware that PMG had purchased leads from EMI. PMG, in turn, did not know how EMI obtained its database of consumers who had "opted in" to receiving home security promotions. The record shows that EMI purchased millions of leads from 2freenites.com, a website with a disclosure stating that consumers who participated in the advertised promotions agreed to receive telemarketing calls from EMI. *See* Dkt. No. 282-21 ("Tantalo Declar.") at ¶¶ 1-10. In reality, almost none of the leads that EMI purchased from 2freenites.com came from consumers who "opted in" through that website. *Id.* at ¶¶ 11-13. Instead,

2freenites.com sold EMI leads that it had purchased from a
network on twenty to thirty different lead generation websites,
who obtained their leads from other lead generators. *Id.* at ¶¶
14-16.  In short, the consumer database EMI used to make its
calls came from an expansive network of unknown lead generators.

At or around the time PMG started purchasing sales leads
from EMI, EMI contracted with a company called Dynamic
Interactive Corp. ("Dynamic") that provides "voice broadcasting"
or "robocalling" services.  *See* Dkt. No. 282-24 ("Bernal
Declar.") at Ex. A.  Using Dynamic's platform, EMI created and
launched millions of robocalls on PMG's behalf to promote ADT's
home security services.  *Id*. at ¶ 32.  EMI's robocalls played
the following pre-recorded message:

> Hello, my name is Jennifer with ADT.  Over the next
> few weeks we'll be in your neighborhood installing
> free in-home alarm systems, and we would like to offer
> you one too.  You'll get the system, free
> installation, four panic buttons for police, fire,
> home invasion and medical dispatch.  Don't leave your
> home unprotected against these things, with an alarm
> system from ADT, you'll have total protection, and
> because it's obvious you have an alarm, you
> significantly reduce the possibility of burglary or
> home invasion robbery.  To get this free in-home
> system, press 1 now, and we can schedule your
> installation.  You just pay the monthly monitoring
> fee.  Press 1 now.  Press 1 now.  Press 1 and get
> protected.  Press 1.

*Id*. at Ex. B.  EMI initiated almost 3.8 million robocalls on
PMG's behalf using this script in February and March 2011.

D.

On March 1, 2011, Plaintiff Vishva Desai received an unsolicited robocall from EMI using the script quoted above (henceforth referred to as "the Desai call"). *See* Dkt. No. 287 at ¶¶ 58-59; Dkt. No. 289 at ¶ 62. Three weeks later, Desai filed a class action against ADT alleging widespread violations of the TCPA. She joined Philip Charvat--who received robocalls that did not involve EG, PMG, or EMI--as a co-plaintiff in April 2011. Desai and Charvat settled their class lawsuit against ADT in June 2013 for $15 million.

ADT asserted claims against EG for contractual indemnification, common law indemnification, and common law contribution. *See* Dkt. No. 121 at Counts X-XII. In September 2012, I dismissed ADT's claims against EG except for the contractual indemnification claim. *See* Dkt. No. 217.

II.

ADT and EG have filed cross motions for summary judgment on ADT's contractual indemnification claim.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "As with any summary judgment motion, [I] review cross-motions for summary judgment 'construing all facts, and drawing all reasonable inferences from those facts, in favor of

the non-moving party.'"  *Laskin v. Siegel*, 728 F.3d 731, 734
(7th Cir. 2013) (quoting *Wis. Central, Ltd. v. Shannon*, 539 F.3d
751, 756 (7th Cir. 2008)).

ADT's claim against EG is based on two indemnification
provisions in the Agreement.  "Contract cases such as this one
are often prime candidates for summary judgment because contract
interpretation is a question of law."  *Hanover Ins. Co. v.
Northern Bldg. Co.*, 751 F.3d 788, 791 (7th Cir. 2014).  The
parties agree that ADT's contractual indemnification claim is
governed by Colorado law.  *See* Agreement at ¶ 19 (providing that
the Agreement "shall be construed and enforced in accordance
with" Colorado law).

The Agreement's first indemnification provision, Paragraph
6(b), requires EG to indemnify ADT for losses "resulting from or
relating to, any negligence or intentional torts by [EG], its
Affiliates...or agents, in connection with or related to this
Agreement, except to the extent that any such claim or action is
due to any negligent acts, omissions, wrongful acts, fault or
willful misconduct of ADT, its employees, agents, or invitees."
The parties disagree over whether ADT was more negligent in
supervising EG and its lead providers than EG was in supervising
PMG and its lead providers.  As explained *infra*, I need not take
sides in that debate because ADT is entitled to recover its

losses arising from the Desai call under the Agreement's other indemnification provision.

Paragraph 23.F of the Agreement requires EG to "indemnify, defend and hold ADT harmless from and against any claims, actions, proceedings and damages, including reasonable attorney's fees and costs, and all monetary penalties or costs imposed upon ADT arising out of [EG's] breach of the provisions set forth in Section A and B, hereinabove." The cross referenced provisions, Paragraphs 23.A and 23.B, concern "Telemarketing and Emailing" and "Email Marketing Services," respectively.

Among other restrictions, Paragraph 23.A prohibits EG from "mak[ing] unsolicited outbound telephone calls as part of a plan, program, or campaign directly or indirectly through telemarketing agents or others on behalf of ADT to any person." There is no evidence that EG directly made any unsolicited outbound calls on ADT's behalf, so ADT's indemnification claim under Paragraph 23.F turns on whether PMG and EMI, respectively, were "telemarketing agents" through which EG made the Desai call "as part of a plan, program, or campaign" of similar calls.

A.

Under Colorado law, "[a]n 'agent' is generally one who acts for, or in place of, another [i.e., the principal], or is

13

entrusted with the business of another." *Moses v. Diocese of Colo.*, 863 P.2d 310, 324 (Colo. 1993).

> The control a principal exercises over the manner of work performed by an agent is evidence that an agency relation exists. No one factor, including control, is determinative. The most important factor in determining whether a person is an agent is the right to control, not the fact of control.

*Id.* (internal citations and quotation omitted). "Agency is ultimately a question of the intention of the parties and is evidenced by their acts and not on what the relationship is called." *Id.*

EG contracted with PMG to promote a specific list of ADT's home security services subject to detailed restrictions on telemarketing (i.e., no unsolicited outbound calls, no pre-recorded messages, no calls before scrubbing numbers against ADT's do-not-call list). EG also reserved the right to inspect PMG's call records and request any information ADT wanted. In short, EG controlled what products and services PMG promoted; what telemarketing techniques PMG could use; and what information PMG was required to provide to ensure compliance with the contract.

EG routinely exercised its contractual rights to control PMG's telemarketing activities. EG trained PMG employees on how they were supposed to market ADT's products and services. In connection with this training, EG provided PMG employees with

ADT's call scrubbing instructions and a call script to follow. On about five occasions, EG performed quality assurance on PMG's calls and brought any problems to PMG's attention. These "interim instructions" from EG to PMG are the hallmark of a principal-agent relationship. *See* Restatement (Third) of Agency § 1.01 cmt. f(1) ("The power to give interim instructions distinguishes principals in agency relationships from those who contract to receive services provided by persons who are not agents."). EG also reviewed PMG's marketing tactics; asked PMG to confirm or deny whether it was working with particular lead providers; and requested a full list of call identification numbers that PMG and its lead providers used.

In its own motion for summary judgment, EG actually boasts about the control it exercised over PMG and accuses ADT of being comparatively negligent in its supervision of EG and its lead providers. *See* Dkt. No. 278 at 8 ("[U]nlike ADT, EG worked to ensure that Paramount was living up to the contractual standards by auditing Paramount during the term of the agreement, including performing on-site reviews, correcting any process errors, listening to recordings and approving scripts.").

In sum, the only reasonable conclusion a judge or jury could draw from these facts is that EG's control over PMG was sufficient to form a principal-agent relationship. *See Stortroen v. Beneficial Finance Co. of Colo.*, 736 P.2d 391, 395

(Colo. 1987) (noting that court may decide whether agency relationship exists as a matter of law "when the facts are not in dispute"). In other words, PMG was a "telemarketing agent" for EG within the meaning of Paragraph 23.A of the Agreement.

B.

The next question is whether PMG appointed EMI as a subagent, which would make EMI a "telemarketing agent" for EG. *See Stortroen*, 736 P.2d at 395-96 ("A subagent is the agent of both the appointing agent and the principal." (citing Restatement (Second) of Agency § 5(1) cmt. d)).

"A subagent is 'a person appointed by an agent empowered to do so, to perform functions undertaken by the agent for the principal, but for whose conduct the agent agrees with the principal to be primarily responsible.'" *Id*. at 395 (quoting Restatement (Second) of Agency § 3(1)).

> Unless otherwise agreed, authority to appoint a subagent is inferred from authority to conduct a transaction for the principal for the performance of which the agent is to be responsible to the principal if...the appointment of subagents for the performance of such transactions is usual, or the principal has reason to know that the agent employs subagents.

Restatement (Second) of Agency § 80(d); *see also* Restatement (Third) of Agency § 3.15 cmt. c ("An agent has actual authority to create a relationship of subagency when the agent reasonably believes, based on a manifestation from the principal, that the

principal [expressly or impliedly] consents to the appointment of a subagent.").

Nothing in the Addendum prohibited PMG from subcontracting with lead generators. Indeed, EG knew that PMG was working with lead generators, but did not require PMG to submit a list of all companies from which it was purchasing leads. EG says it was "industry standard" for companies like PMG not to disclose the names of third party lead generators with whom they had subcontracted. Fernandes Dep. at 106-7. In short, PMG had inferred authority to appoint subagents because (1) the Addendum did not prohibit PMG from doing so and (2) EG "ha[d] reason to know that [Paramount] employ[ed] subagents." Restatement (Second) of Agency § 80(d).

Whether PMG appointed EMI as a subagent pursuant to its inferred authority to make such appointments is a separate question. EG contracted with PMG for the same reason that Paramount contracted with EMI: to obtain sales leads for ADT's home security services. Thus, EMI meets the threshold condition for subagency because it "perform[ed] functions undertaken by the agent [PMG] for the principal [EG]." *Id.* at § 5(1). In order to be a subagent, EMI must have "act[ed] subject to the control of the appointing agent." Restatement (Third) of Agency § 3.15 cmt. b. As the contracts between PMG and EMI show, PMG paid in advance for a specific numbers of leads and approved the

17

script for EMI's calls.  PMG could also specify the target

markets from which it wanted to receive leads, the content of

any messages EMI was supposed to leave, and how EMI should

screen callers before transferring them to PMG.

PMG's control over which markets EMI targeted, what EMI

should say to potential customers, and how many calls EMI should

transfer to PMG in a given time period shows that PMG and EMI

were in an appointing agent-subagent relationship.  As a

subagent, EMI was "[an] agent of both the appointing agent

[Paramount] and the principal [EG]." *Stortroen*, 736 P.2d at 396

(citing Restatement (Second) of Agency § 5(1) cmt. d).  That is,

EMI was a "telemarketing agent" for EG as that term is used in

Paragraph 23.A of the Agreement.

C.

Returning full circle, ADT's indemnification claim under

Paragraph 23.F of the Agreement turns on whether PMG and EMI

were "telemarketing agents" through which EG made the Desai call

as part of a "plan, program, or campaign" of similar calls.

Agreement at ¶ 23.A.

I have already concluded that PMG and EMI were

telemarketing agents for EG.  EMI made over one million

robocalls on PMG's behalf on the same day as it made an

unsolicited outbound call to Desai.  *See* Bernal Declar. at ¶ 32.

Thus, the Desai call was indisputably part of a "plan, program

or campaign" of similar calls.  Agreement at ¶ 23.A.  It follows
that ADT is contractually entitled to indemnification from EG
under Paragraph 23.F of their Agreement.

III.

Under Paragraph 23.F, EG must "indemnify, defend and hold
ADT harmless from and against any claims, actions, proceedings
and damages, including reasonable attorney's fees and costs, and
all monetary penalties or costs imposed upon ADT arising out of"
the Desai call.

Desai's class action lawsuit against ADT arose from the
contractually prohibited call she received in March 2011.  In
other words, EG's breach of Paragraph 23.A of the Agreement
triggered a lawsuit that eventually settled for $15 million.  EG
is contractually obligated to "indemnify, defend, and hold ADT
harmless from and against" Desai's class action suit.

ADT seeks to recover $8 million of its settlement costs and
over $2 million in attorney's fees and costs.  ADT's settlement
cost plainly falls within EG's indemnification obligation.  EG's
argument that ADT cannot recover its settlement costs unless
Desai's class claim was meritorious lacks any textual support in
the contractual indemnification provision.  As for EG's argument
that the class settlement was unreasonable, I have already
rejected that argument.  *See* Dkt. No. 243 at ¶ 5 (finding that

the settlement was "fair, adequate, reasonable, and in the best interests of the Settlement Class.").

Although ADT is clearly entitled to recover $8 million of its settlement costs from EG, I cannot determine on the present record whether ADT's requests for attorney's fees and costs in the amounts of $2,083,790.30 and $189,514.41, respectively, are reasonable. *See* Dkt. No. 287 at ¶ 70 (averring that "ADT has not produced the underlying bills to support the attorney fee and costs claim").

The parties are directed to comply with the procedures in Local Rule 54.3(d) to resolve the dispute over reasonable attorney's fees and costs. If any matters remain in dispute after following the required procedures, the parties shall prepare the joint statement required under Local Rule 54.3(e) no later than 4/18/2015. If necessary, ADT's renewed motion for attorney's fees and costs is due on 5/1/2015.

IV.

ADT's motion for summary judgment is granted in part for the reasons stated above. EG's cross motion is denied. In light of these rulings, ADT's motion to strike EG's late filed answer (Dkt. No. 275) is denied as moot.

**ENTER ORDER:**

_____

**Elaine E. Bucklo**
United States District Judge

Dated: January 30, 2015